WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors In Possession
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Perez, Esq.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| **WORLDCOM, INC., et al.,** | : | **02-13533 (AJG)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |

------------------------------------------------------------x

**NOTICE OF EXPEDITED HEARING REGARDING MOTION OF
THE DEBTORS PURSUANT TO SECTIONS 363(b) AND 105(a)
OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO
<u>ESTABLISH A KEY EMPLOYEE RETENTION PLAN</u>**

PLEASE TAKE NOTICE that a hearing will be held before the Honorable

Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States

Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York,

New York, on **October 29, 2002, at 10:00 a.m.** (the "Hearing"), or as soon thereafter as

counsel may be heard to consider the Motion of the Debtors Pursuant to Sections 363(b)

and 105(a) of the Bankruptcy Code for Authorization to Establish a Key Employee

Retention Plan (the "Motion").

PLEASE TAKE FURTHER NOTICE that responses or objections to the

Motion, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy

Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard-copy delivered directly to Chambers), and shall be served in accordance with General Order M-242 upon (i) the Debtors, 1133 19th Street, Washington, D.C. 20036, Attention: Michael Salsbury, Esq., General Counsel, (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Marcia L. Goldstein, Esq. and Lori R. Fife, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st floor, New York, New York 10004, Attention: Mary Elizabeth Tom, Esq.; (iv) Akin Gump Strauss Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022, Attention: Daniel Golden, Esq., attorneys for the statutory committee of creditors; (v) Kirkpatrick & Lockhart LLP, 1800 Massachusetts Avenue, Washington, DC 20036, Attention: Richard Thornburgh, Esq. attorneys for the examiner; and (vi) Shearman & Sterling, 599 Lexington Avenue, New York, New York 10022, Attention: Douglas Bartner, Esq. and Marc B. Hankin, Esq., attorneys for the Debtors' postpetition lenders, and shall be filed with the

Clerk of the United States Bankruptcy Court for the Southern District of New York, in each case so as to be received no later than October 24, 2002, at 4:00 p.m. (Eastern Time).

Dated: New York, New York
October 18, 2002

/s/Marcia L. Goldstein
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

and

Alfredo R. Perez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors and
 Debtors In Possession

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors In Possession
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Perez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
**In re** :
: **Chapter 11 Case No.**
**WORLDCOM, INC., et al.,** : **02-13533 (AJG)**
:
: **(Jointly Administered)**
**Debtors.** :
---------------------------------------------------------------x

**MOTION OF THE DEBTORS PURSUANT TO SECTIONS**
**363(b) AND 105(a) OF THE BANKRUPTCY CODE**
**FOR AUTHORIZATION TO ESTABLISH A**
**KEY EMPLOYEE RETENTION PLAN**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and

debtors in possession (collectively, "WorldCom" or the "Debtors"), respectfully represent:

**Background**

1. On July 21, 2002 (the "Commencement Date"), WorldCom, Inc. and

substantially all of its direct and indirect domestic subsidiaries commenced cases under chapter

11 of title 11 of the United States Code (the "Bankruptcy Code"). By Order, dated July 22,

2002, WorldCom's chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

2. WorldCom continues to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 29, 2002, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Committee").

3. Under the Orders and rulings of the United States District Court for the Southern District of New York (the "District Court"), dated June 28, 2002, July 3, 2002, July 15, 2002, July 17, 2002, August 1, 2002 and August 27, 2002 (collectively, the "Orders"), Mr. Richard C. Breeden, former Chairman of the United States Securities and Exchange Commission, was appointed Corporate Monitor (the "Corporate Monitor") for WorldCom and its worldwide subsidiaries. Under the Orders, the Corporate Monitor must, *inter alia*, approve any and all forms of compensation to be paid by WorldCom to any employee, officer, or director or outside advisor retained by WorldCom except as otherwise provided in the Orders or as determined by the Corporate Monitor to be outside the scope of his review. The Corporate Monitor has authority under the Orders to "exercise complete oversight responsibility with respect to all compensation paid by WorldCom." August 1, 2002 Order. The District Court has exercised jurisdiction over the Debtors with regard to the role of the Corporate Monitor pursuant to 28 U.S.C. § 157(d).

4. In its August 1, 2002 Order, the District Court ruled that the filing of the petition in Bankruptcy Court by WorldCom following the Corporate Monitor's appointment did not change the nature, scope or extent of the Corporate Monitor's authority. The Debtors may not file a motion with the Bankruptcy Court with respect to any compensation paid by

WorldCom unless the Corporate Monitor has first approved such action and motion. However, approval by the Corporate Monitor of any proposed action by the Debtors does not limit the scope of review by the Bankruptcy Court or the right of any party in interest to object such proposed action. On October 11, 2002, the Corporate Monitor approved the filing of this Motion by the Debtors and the proposed payments under the Severance Program as set forth herein, provided that any such amounts are not increased beyond what is set forth in this motion.

5. WorldCom, Inc., together with approximately 200 direct and indirect domestic subsidiaries and 200 non-debtor foreign affiliates (collectively, the "Company"), is one of the world's preeminent global communications companies that provides a broad range of communication services in over 200 countries on six continents. Through its core communications services business, which includes voice, data, Internet, and international services, the Company carries more data over its networks than any other entity.

6. The Company operates one of the most expansive, wholly-owned communications networks comprising approximately 70,000 route miles of network connections linking metropolitan centers and various regions across North America, Europe, the Middle East, Africa, Latin America, Australia, and Asia. Providing integrated data, Internet, and commercial voice communications services over its seamless networks, the Company is the leading global data, Internet, and network services provider measured by revenues and traffic carried.

7. As part of this line of business, the Company is a provider of network services for critical applications for the United States Government. These applications include the provision of communications services in support of customer service to 80 million Social Security beneficiaries, air traffic control applications for the Federal Aviation Administration, network management for the Department of Defense, and critical data network services for the

United States Postal Service. The Company also provides long distance voice and data communications services for the House of Representatives, the Senate, the General Accounting Office, and virtually every other government agency.

8. The Company is also the second largest carrier of consumer and small business long distance telecommunications services in the United States, provides a broad range of retail and wholesale communications services, including long distance voice and data communications, consumer local voice communications, wireless messaging and voice services, private line services, and dial-up Internet access services. The Company's retail businesses, provided to consumers and small businesses in the United States, include basic long distance service, dial around, collect calling, operator assistance, local telephone services and calling card services (including prepaid calling cards), and toll-free or 800 services to approximately 20 million residential and small business customers and more than 470 carriers and other resellers. The Company's wholesale businesses include wholesale voice and data services provided to carrier customers and other resellers, and dial-up Internet access services.

9. For the year ended December 31, 2001, WorldCom recorded revenue of more than $30 billion.[1] As of March 31, 2002, WorldCom's books and records reflected liabilities totaling more than approximately $40 billion. As of June 30, 2002, WorldCom employed more than 63,900 individuals, of which approximately 57,700 were full-time employees and approximately 6,200 were part-time employees.

---

[1] The amounts in this paragraph are stated on a consolidated basis, including Debtors and non-debtor domestic subsidiaries only. WorldCom, Inc. has announced its intention to restate the financial statements for 2000, 2001, and the first quarter of 2002.

## Jurisdiction

10. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Retention Plan

11. The Debtors seek authority under sections 363(b) and 105(a) of the Bankruptcy Code to adopt a retention bonus plan (the "Retention Plan") that establishes bonuses to encourage the retention of specific employees whose responsibilities are directly and significantly impacted by the chapter 11 cases (the "Key Employees"). In developing the Retention Plan, the Debtors reviewed their existing compensation and employee benefit plans and the retention or "stay" bonus programs of large companies that have adopted similar compensation programs while operating under chapter 11. In addition, the Debtors considered the size and difficulty of the chapter 11 cases, as well as the underlying business strategy to continue their business operations with the least amount of disruption to their major customers and vendors and suppliers who continue to provide goods and services on terms similar to those that applied prior to commencement of the chapter 11 cases.

12. Prior to the finalizing of the proposed Retention Plan, the Debtors presented various proposals to the Corporate Monitor for his review and comment. Following a thorough analysis, the Corporate Monitor has approved the Retention Plan in its proposed form.

13. The Retention Plan provides bonuses designed to encourage Key Employees to both remain employed by the Debtors throughout the reorganization process and to work productively to ensure that the Debtors complete their reorganization in a timely and efficient manner. The Retention Plan provides for a stay bonus (the "Stay Bonus") if the Key Employee remains employed by the Debtors on specific target dates. The Stay Bonus for any

Key Employee is equal to a percentage of the individual's annual base compensation according to the classification of the Key Employee set forth below. The Debtors propose to pay the Stay Bonuses pursuant to the following schedule:

- 25% of the Stay Bonus paid on December 1, 2002,
- 25% of the Stay Bonus paid on March 31, 2003, and
- 50% of the Stay Bonus paid 60 days after confirmation of a plan of reorganization.

Notwithstanding the requirement that the Key Employee remains employed by the Debtors on specific target dates, a Key Employee whose employment is terminated (other than for cause) in a reduction in force will be entitled to receive the portion of the Stay Bonus allocated to next target date, provided, however, a Key Employee terminated prior to the Plan Confirmation Date (defined below) shall not be entitled to any additional bonus amount set forth in paragraph 14 hereof.

14. In addition, the Retention Plan provides that each Key Employee who remains employed by the Debtors on the date that a plan of reorganization is confirmed (the "Plan Confirmation Date") will receive an additional bonus amount equal to 10% of the Key Employee's Stay Bonus (the "Plan Progress Bonus"). The Plan Progress Bonus would be earned if the Plan Confirmation Date occurs by December 2003. Should the Plan Confirmation Date occur earlier, the Plan Progress would increase as set forth on the schedule below:

- 100% of the Plan Progress Bonus if the Plan Confirmation Date occurs in December 2003;
- 150% of the Plan Progress Bonus if the Plan Confirmation Date occurs in November 2003;
- 200% of the Plan Progress Bonus if the Plan Confirmation Date occurs in October 2003; and

- 250% of the Plan Progress Bonus if the Plan Confirmation Date occurs on or before September 30, 2003.

The proposed enhancements to the Stay Bonus provide additional incentive for working intensely to facilitate a swift conclusion of these chapter 11 cases.

15. The Debtors have to date identified approximately 329 Key Employees who will participate in the Retention Plan. In developing the Retention Plan, the Debtors classified those Key Employees into four groups (each a "Group") based on each employee's role in the Company and expected contribution to the reorganization efforts of the Debtors:

- Group 1 includes 4 Key Employees (the "Group 1 Employees") who hold the most senior positions at WorldCom. None of these employees will participate in the Retention Plan.

- Group 2 includes 25 Key Employees (the "Group 2 Employees"). The Stay Bonus for each Group 2 Employee is equal to 65 % of the individual's annual base compensation, subject to a cap of $125,000 The range of Stay Bonuses for Group 2 Employees is expected to be from $90,000 to $125,000.

- Group 3 includes 90 Key Employees (the "Group 3 Employees"). The Stay Bonus for each Group 3 Employee is equal to 50 % of the individual's annual base compensation, subject to a cap of $125,000 The range of Stay Bonuses for Group 3 Employees is expected to be from $47,000 to $125,000.

- Group 4 includes approximately 210 Key Employees (the "Group 4 Employees"). The Stay Bonus for each Group 4 Employee is equal to 35 % of the individual's annual base compensation, subject to a cap of $125,000 The range of Stay Bonuses for Group 4 Employees is expected to be from $20,000 to $90,000.

In addition, the enhancements described above will be paid to Key Employees in Group 2, Group 3, and Group 4 if the conditions thereto are met.

16. The Retention Plan includes a provision that permits management of the Debtors to vary an individual Key Employee's Stay Bonus by as much as 20%; provided,

however, under no circumstances will the total Stay Bonus for any particular Key Employee exceed the percentages or dollar caps set forth above.

17. As part of the Retention Plan, the Debtors will set aside a discretionary pool of up to $2.5 million (the "Discretionary Pool") to address unforeseen events and to send a positive message to employees other than Key Employees. Payments from the Discretionary Pool will not be made without the approval of the Corporate Monitor. The total cost of the Retention Plan, including the Discretionary Pool, is approximately $25 million.

### The Retention Plan is Required to Preserve the Value of the Debtors

18. The successful rehabilitation of the Debtors' business operations is dependent upon the continued employment, active participation, and dedication of Key Employees who possess knowledge, experience, and skills necessary to support the Debtors' business operations. The Debtors' ability to stabilize and preserve their business operations and assets will be substantially hindered if the Debtors are unable to retain the services of these Key Employees.

19. As in any large chapter 11 case, the Debtors' Key Employees, particularly those in management positions, are concerned about the uncertainty regarding the Debtors' future operations and each individual's job security. The Debtors believe that this uncertainty could lead to resignations of Key Employees, particularly those Key Employees who have skills that are transferable to businesses whose prospects generally are less uncertain. Employee morale has been deteriorating due to the Debtors' well-publicized financial difficulties, the numerous criminal investigations into the conduct of certain former employees of the Debtors, and the increased scrutiny that has been focused on the Debtors in recent months. Moreover, the chapter 11 filings have increased employee responsibilities and workload. The Debtors believe

that unless the Retention Plan is approved, there will be a further erosion in employee morale and additional resignations of Key Employees.

20. The loss of the Key Employees would be extremely costly. The following reasons, among others, justify the proposed retention incentives:

- The Debtors have expended significant time and resources in recruiting and retaining their Key Employees, which has been difficult given the pressures and scrutiny facing the Debtors;

- A company in chapter 11 is not a particularly appealing employment option for experienced job candidates, thus making it difficult to replace departing Key Employees;

- To find suitable replacements for these departures, the Debtors will have to pay (and indeed have paid) executive search firm fees, typically in the range of 25 to 35 percent of base salaries, signing bonuses, moving expenses and above-market salaries so as to induce qualified candidates to accept employment with a chapter 11 debtor;

- The loss of a particular Key Employee could lead to additional employee departures;

- The loss of Key Employees may result in the loss of institutional knowledge and key contacts with vendors and customers; and

- The loss of Key Employees will hinder, delay and disrupt the Debtors in their pursuit of a timely and successful reorganization.

21. The Debtors believe that the Retention Plan is the most cost-effective manner in which to protect against attrition and to improve employee morale. The Retention Plan will offer financial incentives designed to be paid only if the Key Employee remains actively employed by the Debtors during the pendency of the chapter 11 cases. By adopting the Retention Plan, the Debtors will be sending a positive message to its Key Employees that they are a valuable resource and that their continued employment with the Company is essential to the future of the enterprise.

**Approval of the Retention Plan is Authorized Under**
**Sections 363(b) and 105(a) of the Bankruptcy Code**

22. The Retention Plan should be approved by the Court pursuant to section 363 of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when there is a "sound business purpose" that justifies such action. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (D. Del. 1991).

23. In the context of operating under chapter 11, the establishment of an employee retention program for key employees pursuant to section 363(b)(1) of the Bankruptcy Code has been authorized by numerous courts in this and other districts and has become an essential part of a bankruptcy case. See, e.g., In re Enron Corp., (Case No 01-16034) (Bankr S.D.N.Y. 2002); In re Adelphia Business Solutions, Inc., et al., (Case No. 02-11389) (Bankr. S.D.N.Y. 2002); In re AI Realty Marketing of New York, Inc., Laser Acquisition Corp., DDG I, Inc., Sunbeam Americas Holdings, Ltd., et. al. (Case. Nos. 01-40252 through 01-40290) (Bankr. S.D.N.Y. 2001); In re R.H. Macy & Co., Case No. 92 B 40477 (BRL) (Bankr. S.D.N.Y. 1992); In re Best Products Co., Inc. et al., Case Nos. 91 B 10048 through 91 B 10053 (TLB) (Bankr. S.D.N.Y. 1991); In re Armstrong World Indus., Inc., et al., Case No. 00-4471 (JJF) (D. Del. 2000); In re Carmike Cinemas, Inc. et al., Case Nos. 00-3302 through 00-3305 (SLR) (D. Del. 2000); In re Genesis Health Ventures, Inc., Case No. 00-2692 (PJW) (Bankr. D. Del. 2000); In re Hedstrom Holdings, Inc., et al., Case No. 00-01665 (PJW) (Bankr. D. Del. 2000).

24. Under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting

the value of the Debtors' assets.  See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); Bird v. Crown Convenience (In re NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern"); In re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("the Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

25. The Debtors have determined that the costs associated with adoption of the Retention Plan are more than justified by the numerous benefits described above that are expected to be realized by retaining Key Employees. The Retention Plan will discourage resignations among Key Employees, dispel the perceived risk of working for the Debtors notwithstanding their chapter 11 cases, and reduce or eliminate the direct and indirect costs attendant to replacing Key Employees. The payments under the Retention Plan will serve as an incentive for Key Employees to remain with the Debtors during the course of these chapter 11 cases and to work diligently toward their successful conclusion.

26. Inasmuch as the Retention Plan is required to retain Key Employees, who, in turn are necessary for the preservation of the Debtors' estates, the payment rights of Key Employees under the Retention Plan is "actual, necessary costs and expenses of preserving the [Debtors'] estate[s]," and, therefore, should be accorded administrative expense priority under section 503(b)(1)(a) of the Bankruptcy Code.

### The Debtors Will Continue to Honor Obligations
### Under Their Existing Severance Program

27.     The Debtors also plan to continue to honor their obligations under their existing severance program (the "Severance Program") with respect to employees terminated postpetition. The Severance Program provides for severance pay benefits and extended medical and dental benefits to eligible employees for a period of time based generally upon an employee's job position and years of service with the Company, subject to signing a general employment release. Generally, an employee is eligible for severance benefits under the Severance Program if the employee's employment is permanently terminated by the Debtors as a result of a reduction in the Debtors' workforce or an elimination of the employee's present job position. The Severance Program is designed to alleviate concerns employees have expressed regarding job security. By minimizing the risks associated with a potential downsizing of the Company's workforce, continuation of the Severance Program will support the Company's efforts to retain not only employees covered by the Retention Plan, but employees generally. Accordingly, the continuation of the Severance Program is critical to the overall retention of employees and is consistent with the objectives of the retention incentives proposed herein.

28.     Accordingly, the Debtors submit that the relief requested is necessary, appropriate, and in the best interests of its estate and creditors, and, therefore, the Retention Plan should be approved in all respects.

### Waiver of Memorandum of Law

29.     This Motion includes citations to the applicable authorities and does not raise any novel issues of law. Accordingly, the Debtors respectfully request that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted.

## Notice

30. Notice of this Motion has been provided pursuant to this Court's Order, dated July 29, 2002, establishing notice procedures in these chapter 11 cases. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice need be provided.

31. No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other or further relief as is just.

Dated: New York, New York
October 18, 2002

/s/Marcia L. Goldstein
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

and

Alfredo R. Perez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors and
 Debtors In Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                :

**In re**                                    :

                                                :          **Chapter 11 Case No.**

**WORLDCOM, INC., et al.,**                  :          **02-13533 (AJG)**

                                                :          **(Jointly Administered)**

                      **Debtors.**             :
-----------------------------------------------------------------x

## ORDER PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE AUTHORIZING ESTABLISHING A OF KEY EMPLOYEE RETENTION PLAN

Upon the motion, dated October 18, 2002 (the "Motion"), of WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, "WorldCom" or the "Debtors"), for an order pursuant to sections 105(a) and 363 (b) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors to establish a retention plan for key employees (the "Retention Plan"), as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of the Debtor, and its estates and creditors; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for

the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Retention Plan is hereby approved and ratified in all respects; and it is further

ORDERED that the Debtors are hereby authorized to execute, deliver implement and fully perform any and all instruments and documents and to take any and all actions necessary or appropriate to implement and effectuate the Retention Plan, including, without limitation, making the payments thereunder; and it is further

ORDERED that the Debtors are hereby authorized to continue to honor their obligations under their current severance program; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that the requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York for the filing of a memorandum of law is waived.

Dated: New York, New York
       October __, 2002

                             THE HONORABLE ARTHUR J. GONZALEZ
                             UNITED STATES BANKRUPTCY JUDGE