**Hearing Date: September 8, 2003**

Daniel H. Golden (DG-5624)
Ira S. Dizengoff (ID-9980)
James R. Savin (JS-9920)
Kenneth A. Davis (KD-9070)
Shuba Satyaprasad (SS-5875)

AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, NY 10022
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Counsel to the Official Committee of Unsecured
Creditors of WorldCom, Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                           :
In re:                                     :        Chapter 11
                                           :
WORLDCOM, INC., et al.,                    :        Case No. 02-13533 (AJG)
                                           :
                          Debtors.         :        (Jointly Administered)
------------------------------------------------------------x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MEMORANDUM OF LAW**
**IN SUPPORT OF CONFIRMATION OF DEBTORS' AMENDED JOINT PLAN OF**
**REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... v

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 9

MERGERS AND ACQUISITIONS ........................................................................... 9

RESTRUCTURINGS ............................................................................................... 10

PREPETITION EVENTS .......................................................................................... 12

POST-PETITION EVENTS ....................................................................................... 13

THE PLAN AND DISCLOSURE STATEMENT ...................................................... 19

ARGUMENT ............................................................................................................ 22

I.      THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY
        MEANS FORBIDDEN BY LAW ................................................................... 22

        Honest Intentions ........................................................................................ 23

        Substantive Consolidation ........................................................................... 24

        Settlements .................................................................................................. 26

        A.      The Only Equitable Plan that Could Be Filed by the Debtors is the Two-
                Entity Substantive Consolidation Plan ............................................. 28

                1.      Substantive Consolidation is Appropriate Where the Debtors
                        Operated as an Integrated Enterprise ..................................... 30

                2.      The Irreparable Entanglement and Inability to Reconcile and Value
                        Intercompany Accounts of the WorldCom Debtors Forced the
                        Debtors to Propose Their Substantive Consolidation .............. 31

                3.      The Plan Benefits All Creditors and Does Not Unfairly Prejudice
                        Any Creditor Group ................................................................ 37

                4.      Challenges to the Debtors' Transfer Pricing Plan Foreshadow the
                        Endless Intercompany Litigation Avoided by the Plan ............ 39

        B.      The Intermedia Settlement, the MCIC Senior Note Settlement, and the
                Bank Settlement were Each Proposed in Good Faith ......................... 42

II.     THE SETTLEMENTS EMBODIED IN THE PLAN SHOULD BE APPROVED .......... 44

A.  The MCIC Senior Notes Settlement Should be Approved ...................................48

  1.  The Debtors' Probability of Success in Litigating  the Applicability
      of Substantive Consolidation  to the MCIC Senior Debt Claimants
      Is Unclear ...................................................................................................50

  2.  Absent the MCIC Senior Notes Settlement, Litigation of
      Substantive Consolidation and the Intercompanies Would be
      Complex and Costly, Delay the Debtors' Emergence from Chapter
      11 and Result in an Attendant Erosion of Significant Value ....................52

  3.  The MCIC Senior Notes Settlement  Is in the Best Interest of
      Creditors ....................................................................................................54

B.  The Intermedia Settlement Should be Approved....................................................56

  1.  The Intermedia Recharacterization Dispute .............................................58

  2.  The Intermedia Fraudulent Transfer Dispute ...........................................60

  3.  The Intermedia Preference Dispute ..........................................................64

  4.  Remedies Available if the Intercompany Note and Prepayments are
      Avoidable Preferences ..............................................................................66

  5.  Intermedia Valuation Dispute ...................................................................67

  6.  The Intermedia Settlement Meets the Standards  of Bankruptcy
      Rule 9019 and Should be Approved ..........................................................68

      (a)  The Debtors' Probability of Success in  Litigating the
           Intermedia Settlement Issues is Unclear .......................................68

      (b)  Absent the Intermedia Settlement, Litigation of the
           Intermedia Settlement Issues Would be Complex and
           Costly, Delay the Debtors' Emergence from Chapter 11
           and Result in an Attendant Erosion of Significant Value ..............69

      (c)  The Intermedia Settlement Is in the Best Interest of
           Creditors .......................................................................................69

C.  The Bank Settlement Should be Approved .........................................................70

  1.  The Debtors' Probability of Success  in Litigating the Constructive
      Trust  Action and Maryland Action Is Unclear ........................................71

  2.  Absent the Bank Settlement, Litigation of the Constructive Trust
      Action and Maryland Action Would be Complex and Costly,

Delay the Debtors' Emergence from Chapter 11 and Result in An
Attendant Erosion of Significant Value ....................................................75

3.    The Bank Settlement  Is in the Best Interest of Creditors .........................75

CONCLUSION.................................................................................................................76

4403486 v11

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

Aetna Life Ins. Co. v. Weekes, 241 Ga. 169, 244 S.E.2d 46 (1978) .......................................73

Alfred v. Fairchild, 785 So. 2d 1064 (Miss. Sup. Ct. 2001) ....................................................73

Ali Inc. v. Cold Harbor Assocs. (In re Cold Harbor Assocs.),
    204 B.R. 904 (Bankr. E.D. Va. 1997) ..............................................................................59

Barry v. Smith (In re New York, N.H. & H.R. Co.), 632 F.2d 955 (2d Cir. 1980)................45

Belisle v. Plunkett, 877 F.2d 512 (7th Cir. 1989) ...................................................................74

Boberschmidt v. Society Nat'l Bank (In re Jones), 226 F.3d 917 (7th Cir. 2000)..................65

Branch v. Federal Deposit Ins. Corp., 825 F. Supp. 384 (D. Mass. 1993).............................62

Breeden v. Thomas (In re Bennett Funding Group, Inc.), Adv. Pro. No. 98-40892A,
    1999 Bankr. LEXIS 1843 (Bankr. N.D.N.Y. Apr. 29, 1999) ...........................................61

Breeden v. Erie Islands Resort & Marina (In re Bennett Funding Group, Inc.),
    No. 96-61376, 2003 Bankr. LEXIS 41 (Bankr. N.D.N.Y Jan. 2, 2003)...........................48

Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 60 S. Ct. 1 (1939) ..........................45

Central Claims Svcs. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.),
    192 B.R. 903 (Bankr. S.D. Oh. 1996)...............................................................................32

Chbat v. Tleel (In re Tleel), 876 F.2d 769 (9th Cir. 1989) ......................................................74

Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.),
    369 F.2d 845 (2d Cir. 1966) .......................................................................................30, 32

Coan v. Fleet Credit Card Servs. (In re Guerrera),
    225 B.R. 32 (Bankr. D. Conn. 1998) ................................................................................62

Cunningham v. Brown, 265 U.S. 1, 44 S. Ct. 424 (1924)........................................................73

Duff v. United States Trustee (In re California Fidelity, Inc.),
    198 B.R. 567 (9th Cir. BAP 1996) ...................................................................................27

EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.),
    243 B.R. 231 (Bankr. D. Del. 2000).................................................................................71

F.D.I.C. v. Colonial Realty Co., 966 F.2d 57 (2d Cir. 1992) ..................................................28

Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.),
    432 F.2d 1060 (2d Cir. 1970) .....................................................................................50, 51

G.G. Survivor Creditor Corp. v. Harari (In re G. Survivor Corp.),
    217 B.R. 433 (Bankr. S.D.N.Y. 1998).....................................................................48

Gallo v. Prudential Residential Serv., L.P., 22 F.3d 1219 (2d Cir. 1994)...........................48

Gillenardo v. Connor Broadcasting Delaware Co.,
    98C-06-015, 2002 WL 991110 (Del. Super. Ct. Apr. 30, 2002) .......................................40

Goldberg v. Cablevision Sys. Corp., 261 F.3d 318 (2d Cir. 2001) ........................................48

Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,
    527 U.S. 308, 119 S. Ct. 1961 (1999).....................................................................28

Haber Oil Co. v. Swinehart (In re Haber Oil Co.), 12 F.3d 426 (5th Cir. 1994)...................72

Hazlett v. Fusco, 177 A.D.2d 813, 576 N.Y.S.2d 427 (1991) ..................................................74

Hill v. Kinzler (In re Foster), 275 F.3d 924 (10th Cir. 2001) ..................................................72

Hogg v. Walker, 622 A.2d 648 (Del. Sup. Ct. 1993) ................................................................72

In re 599 Consumer Elecs., Inc., 195 B.R. 244 (S.D.N.Y. 1996) ...............................29, 32, 51

In re Allegheny Int'l, Inc., 118 B.R. 282 (Bankr. W.D. Pa. 1990) ....................................47, 55

In re Bennett Funding Group, Inc., 292 B.R. 476 (N.D.N.Y. 2003) .......................................48

In re Bennett Funding Group, Inc., No. 96-613-76,
    1999 Bankr. LEXIS 1860 (Bankr. N.D.N.Y. Apr. 9, 1999) .............................................55

In re Best Prods. Co., 168 B.R. 35 (Bankr. S.D.N.Y. 1994),
    aff'd, 68 F.3d 26 (2d Cir. 1980) ..........................................................................45, 46

In re Centennial Textiles, Inc., 220 B.R. 165 (Bankr. S.D.N.Y. 1998) ..................................66

In re Century Glove Inc., No. Civ. A. 90-400-SLR, Civ. A. 90-401-SLR,
    1993 WL 239489 (D. Del. Feb. 10, 1993) ...........................................................................27

In re Churchill Mortg. Inv. Corp., 256 B.R. 664 (Bankr. S.D.N.Y. 2000), aff'd, 264
    B.R. 303 (S.D.N.Y. 1001) ..................................................................................................62

In re Clamp-All Corp., 233 B.R. 198 (Bankr. D. Mass. 1999)................................................27

In re Colonial Realty Co., 226 B.R. 513 (Bankr. D. Conn. 1998)...........................................66

In re Commercial Envelope Mfg. Co., No. 76B2354,
    1977 WL 182366 (Bankr. S.D.N.Y. Aug. 22, 1977) ....................................30, 33

In re Crystal Apparel, Inc., 220 B.R. 816 (Bankr. S.D.N.Y. 1998) ........................48

In re Dow Corning Corp., 227 B.R. 111 (Bankr. E.D. Mich. 1998) ........................27

In re Drexel Burnham Lambert Group Inc.,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ......................................................Passim

In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir. 1992) ............................46

In re Grant Broadcasting of Phil., Inc., 71 B.R. 390 (Bankr. E.D. PA. 1987) ..................53, 55

In re Gucci, 174 B.R. 401 (Bankr. S.D.N.Y. 1994) ....................................29

In re Hibbard Brown & Co., 217 B.R. 41 (Bankr. S.D.N.Y. 1998) ........................45

In re I.R.C.C., Inc., 105 B.R. at 243 ....................................29, 32

In re Interstate Cigar Co., 182 B.R. 675 (Bankr. E.D.N.Y. 1995),
    aff'd, 16 F.3d 1200 (2d Cir. 1998) ....................................59

In re Interstate Stores, Inc., No. 70B 614-802, 1978 Bankr. LEXIS 11
    (Bankr. S.D.N.Y. Jan. 27, 1978) ....................................32

In re KDI Holdings, Inc., 277 B.R. 493 (Bankr. S.D.N.Y. 1999) ..........................41

In re Kellog Square Ptrshp., 160 B.R. 336 (Bankr. D. Minn. 1993) ......................28

In re Lan Yik Foods Corp., 185 B.R. 103 (Bankr. E.D.N.Y. 1995) ......................66

In re Leslie Fay Cos., Inc., 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..................26, 29

In re Mobile Steel Co., 563 F.2d 692 (5th Cir. 1977) ................................40

In re Northway Agencies, Inc., 106 B.R. 29 (N.D.N.Y. 1989) ..............................39

In re Purofied Down Prods. Corp., 150 B.R. 519 (S.D.N.Y. 1993) ......................46

In re Sanford, 979 F.2d 1511 (11th Cir. 1992) ....................................39

In re Schick, 234 B.R. 337 (Bankr. S.D.N.Y. 1999) ................................66

In re Shared Techs. Cellular, Inc., 293 B.R. 89 (D. Conn. 2003) ..........................67

In re Signal Hill-Liberia Ave. L.P., 189 B.R. 648 (Bankr. E.D. Va. 1995) ..........................72

In re Snyder, 51 B.R. 432 (Bankr. D. Utah 1985) ................................27

In re Standard Brands Paint Co., 154 B.R. 563 (Bankr. C.D. Cal. 1993)................................32

In re Stone & Webster, Inc., 286 B.R. 532 (Bankr. D. Del. 2002) ..........................................28

In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y.), appeal dismissed, 92 B.R. 38
    (S.D.N.Y. 1988) ..............................................................................................................26, 47

In re W.T. Grant Co., 699 F.2d 599 (2d Cir. 1983) ................................................................46

In re Walnut Equip. Leasing Co., . 97-19699, Bankr. LEXIS 496 (Bankr. E.D. Pa.
    May 4, 1999).....................................................................................................................47, 49

In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999) ...............................................26

Jaffke v. Dunham, 352 U.S. 280, 77 S. Ct. 307 (1957) ..........................................................72

James Talcott, Inc. v. Wharton (In re Continental Vending Mach. Corp.),
    517 F.2d 997 (2d Cir. 1975) ............................................................................................37, 55

Kane v. Johns- Manville Corp., 843 F.2d 636 (2d Cir. 1988) .................................................26

Kmart v. Cartier, Inc., 486 U.S. 281, 108 S. Ct. 1811 (1988) ................................................32

Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc. (In re Koreag, Controle
    et Revision S.A.), 961 F.2d 341 (2d. Cir. 1992) .............................................................72, 73

LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279 (D. Del. 2000) .....................................73

Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30 (2d Cir. 1996) ...........63, 65

Lids Corp. v. Marathon Inv. Ptrs., L.P. (In re Lids Corp.), 281 B.R. 535
    (Bankr. D. Del. 2002) ...........................................................................................................63

Matushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574, 106 S. Ct. 1348 (1986)...................................................................................48

McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.),
    210 B.R. 27 (N.D.N.Y. 1997), aff'd, 142 F.3d 571 (2d Cir. 1998).......................................66

Mid-Atlantic Supply, Inc. v. Three Rivers Aluminum Co.
    (In re Mid-Atlantic Supply Co.), 790 F.2d 1121 (4th Cir. 1986) .........................................72

Moody v. Security Pac. Bus. Credit Inc., 127 B.R. 958 (W.D. Pa. 1991),
    aff'd, 971 F.2d 1056 (3d Cir. 1992) ......................................................................................64

Mullins v. Burtch (In re Paradise & Assoc., Inc.), 249 B.R. 360 (D. Del. 2000)...................75

Murphy v. General Elec. Credit (In re Duque Rodriguez),
    77 B.R. 939 (Bankr. S.D. Fla. 1987), aff'd, 895 F.2d 725 (11th Cir. 1990) ......................62

viii

N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 104 S. Ct. 1188 (1984) ...............................27

Nellis v. Shugrue, 165 B.R. 115 (S.D.N.Y. 1994)............................................................45, 46

Newman v. Stein, 464 F.2d 689 (2d Cir. 1972)........................................................................46

Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),
    68 B.R. 530 (Bankr. S.D. Fla. 1986), aff'd, 848 F.2d 1196 (11th Cir. 1988) ...................62

O'Cheskey v. United States, No. 3-00-CV-0142-P,
    2001 U.S. Dist. LEXIS 21370 (N.D. Tex. Dec. 21, 2001) ................................................46

Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corp.
    (In re W.R. Grace & Co.), 281 B.R. 852 (Bankr. D. Del. 2002) .......................................63

Official Committee of Unsecured Creditors v. Columbia Gas Sys. Inc.
    (In re Columbia Gas Sys. Inc.), 997 F.2d 1039 (3d Cir. 1993) .........................................74

Palmer v. Palmer, 654 So. 2d 1 (Miss. Sup. Ct. 1995)............................................................74

Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.
    Anderson, 390 U.S. 414, 88 S. Ct. 1157 (1968) ...............................................................45

Resolution Trust Corp. v. Best Prods. Co., Inc. (In re Best Prods. Co., Inc.),
    177 B.R. 791 (S.D.N.Y. 1995) ........................................................................................49

S.E.C. v. Antar, 120 F. Supp. 2d 431 (D.N.J. 2000), aff'd, Nos. 00-1820,
    2002 WL 1774063 (3d Cir. Aug. 2, 2002) .......................................................................63

Saccurato v. Mars Leasing Co. (In re Masters, Inc.),
    149 B.R. 289 (E.D.N.Y. 1992) ........................................................................................47

Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.),
    874 F.2d 88 (2d Cir. 1989) ..............................................................................................72

Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),
    281 B.R. 506 (Bankr. E.D.N.Y. 2002) .............................................................................62

Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111 (5th Cir. 1995) ...............72

Soviero v. Franklin Nat'l Bank, 328 F.2d 446 (2d Cir. 1964) .................................................32

The Air Line Pilots Assoc., Int'l v. American National Bank & Trust Co.
    (In re Ionosphere Clubs, Inc.), 156 B.R. 414 (S.D.N.Y. 1993),
    aff'd, 17 F.3d 600 (2d Cir. 1994) ..............................................................................45, 46

Trans World Airlines, Inc. v. Texaco Inc. (In re Texaco Inc.),
    81 B.R. 813 (S.D.N.Y. 1988) ..........................................................................................27

<u>Union Sav. Bank v. Augie/Restivo Banking Co., Ltd.</u>
   <u>(In re Augie/Restivo Baking Co., Ltd.)</u>, 860 F.2d 515 (2d Cir. 1988) ......................*passim*

<u>United States v. Tabor Court Realty</u>, 803 F.2d 1288 (3d Cir. 1986) ......................................64

<u>WRT Creditors Liquidation Trust v. WRT Bankruptcy Litigation Master File</u>
   <u>Defendants (In re WRT Energy Corp.)</u>, 282 B.R. 343 (Bankr. W.D. La. 2001) ...............63

<u>Wieboldt Stores v. Schottenstein</u>, 94 B.R. 488 (N.D. Ill. 1988).............................................64

<u>XL/Data Comp., Inc. v. Wilson (In re Omegas Group, Inc.)</u>, 16 F.3d 1443 (6th Cir.
   1994) ............................................................................................................................................75

<u>Zentek GBV Fund IV, LLC v. Vesper</u>, Nos. 00-5385, 2001 WL 1042217
   (6th Cir. Aug. 29, 2001) ...........................................................................................................27

## STATUTES & OTHER AUTHORITIES

11 U.S.C. § 105.................................................................................................................28, 59

11 U.S.C. § 362........................................................................................................................67

11 U.S.C. § 502...................................................................................................................*passim*

11 U.S.C. § 502(d).................................................................................................................41

11 U.S.C. § 541........................................................................................................................71

11 U.S.C. § 544........................................................................................................................61

11 U.S.C. § 547...................................................................................................................*passim*

11 U.S.C. § 548...........................................................................................................61, 63, 66

11 U.S.C. § 550........................................................................................................................66

11 U.S.C. § 553........................................................................................................................67

11 U.S.C. § 1129......................................................................................................................22

26 U.S.C. § 482........................................................................................................................39

Fed. R. Bankr. P. 9014............................................................................................................48

Fed. R. Bankr. P. 9019............................................................................................................71

Fed. R. Civ. P. 56......................................................................................................................

4403486 v11

I.R.C. § 368(a) .................................................................................................................10

O.C.G.A. § 53-12-93(a) ...................................................................................................73

7A U.L.A. 2 .....................................................................................................................61

7A U.L.A. 266 .................................................................................................................61

U.F.C.A. § 2 .....................................................................................................................63

U.F.C.A. § 3 .....................................................................................................................62

U.F.T.A. § 4 .....................................................................................................................63

4403486 v11

The Official Committee of Unsecured Creditors (the "Official Creditors Committee") of

WorldCom, Inc., et al. (the "Debtors"), by and through its counsel, Akin Gump Strauss Hauer &

Feld LLP, submits this memorandum of law (the "Memorandum") [1, 2] in support of the Debtors'

Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").

In support of its Memorandum, the Official Creditors Committee respectfully represents as

follows:

## PRELIMINARY STATEMENT

1.      The fundamental premise of chapter 11 is the reorganization of a debtor enterprise

with the attendant preservation of jobs and deployment of estate resources to maximize asset

values for the benefit of creditors.  The Debtors' chapter 11 cases are on the cusp of

accomplishing precisely what Congress envisioned and legions of courts laud.  Approximately

one year ago, the Debtors filed the largest chapter 11 cases in history, mired by fraud, accounting

irregularities, scandal, low employee morale and high employee turnover, business uncertainty

and highly concerted competitor campaigns designed to take advantage of these uncertainties.

2.      In nine month's time since the Petition Date, as defined below, through focused

and tireless efforts, the Debtors completed scores of achievements all aimed toward the goal of

proposing a confirmable, and preferably consensual, plan of reorganization.

3.      The Debtors' accomplishments include, among others:

---

[1] This Memorandum also constitutes the Official Creditors Committee's objection to the Motion for Partial
Summary Judgment Rejecting the MCIC Senior Settlement filed by the Dissenting Trade Claims Purchaser
Committee.

[2] By this Memorandum, the Official Creditors Committee joins and incorporates, as if fully set forth herein, the
legal and factual assertions set forth in: (a) the Debtors' Memorandum of Law in Support of Substantive
Consolidation and in Opposition to Objections Thereto; (b) the Debtors' Memorandum of Law (i) in Support of the
Intermedia Settlement, the Bank Settlement and the MCIC Settlement and (ii) in Opposition to Motion for Partial
Summary Judgment; and (c) Debtors' Memorandum of Law in Support of Confirmation of Debtors' Amended Joint
Plan of Reorganization under Chapter 11 of the Bankruptcy Code, Dated July 9, 2003 and in Response to Objections
Thereto.

- in the wake of accounting scandals, the replacement of senior management by the addition of (a) Michael Capellas, a 25-year information technology professional with an impeccable reputation for integrity and honesty as Chief Executive Officer, (b) Robert Blakely, a 30-year financial veteran as Chief Financial Officer, (c) Anastasia Kelly, an attorney with 23 years of experience as General Counsel, and (d) the replacement of every individual associated with the accounting irregularities;

- the replacement of the entire Board of Directors with new independent directors;

- the initiation and implementation of the "100-Day Initiative," which included the development of one and three year business plans and culminated in the filing of the Plan;

- the analysis and corresponding rejections or assumptions of thousands of executory contracts;

- the resolution of the SEC Action, defined below, resulting in a settlement and compromise of the claim of the Securities and Exchange Commission (the "SEC") and its treatment under the Plan;

- the resolution of hundreds of motions seeking relief from the automatic stay, motions to compel payment of administrative expenses, motions to enforce the automatic stay, motions to settle many claims, and numerous similar matters;

- the restructuring of the Debtors' European, Middle Eastern and African operations; and

- the divestiture of non-core assets such as various data centers and the Pentagon City property.

4.    All of these projects culminated in the Plan.  The Plan, approved by every class of creditors entitled to vote to accept or reject the Plan, separately substantively consolidates the WorldCom Debtors and the Intermedia Debtors (each defined below) and incorporates three major settlements and compromises.  The Plan is the product of intense, complex and, at times, arduous negotiations among the Debtors and their major creditor constituencies.

5.    The premise of the Plan is the substantive consolidation of the WorldCom Debtors.  The Debtors concluded that based upon the inherent unreliability of their books and records, the necessity of nearly $12 billion of accounting restatements which are still ongoing,

2

4403486 v11

the material weaknesses in internal controls over books and records and financial statements, the

fact that the Debtors operated their business on a product line (not legal entity) basis, the

intercompany payables and receivables ("Intercompanies") among the various Debtor entities

could not accurately be determined.  In addition to the unreliable Intercompanies, the Debtors did

not maintain accurate separate legal entity balance sheet, income or profit and loss financial

statements in the ordinary course of business, thereby precluding any accurate allocation of

enterprise value on a subsidiary by subsidiary level.  This confluence of facts prevented the

Debtors from determining whether, and how much, any one subsidiary would recover on account

of an Intercompany from another.  As a result, the Debtors cannot determine the value of any

individual legal entity.

6.       For example, based on the six months of intense forensic accounting

investigations of the Debtors' books and records by the Official Creditors Committee's forensic

accountant, FTI Consulting, Inc. ("FTI"), WorldCom, Inc. ("WorldCom") is owed substantial

amounts of money by (and owes substantial amounts of money to) numerous subsidiaries on

account of Intercompanies.  In fact, WorldCom's books and records reflect that each of the

following Debtors owe WorldCom in excess of $100 million:

| Company Legal Entity | Receivable Balance[3] |
|---|---|
| MCI WorldCom Network Services, Inc. | 20,672,057,260 |
| Telecom*USA, Inc. | 2,866,473,836 |
| MFS Globenet, Inc. | 1,723,980,961 |
| W100 | 488,085,343 |
| Tru Vision-Flippin, Inc. | 405,035,947 |
| WorldCom Wireless, Inc. | 366,818,300 |

---

[3] This is restated information received from the Debtors in May 2003.  This information only includes G/L intercompany balances from the Debtors' two primary intercompany accounts (A21999999 and A27000000).  These balances exclude intercompany transfer pricing amounts totaling approximately $3.9 billion from MCIC and its subsidiaries to the remaining WorldCom Debtors that were recorded in the Lawson general ledger.

3

| | |
|---|---|
| MCI WorldCom International, Inc. | 173,132,302 |
| Mtel International, Inc. | 158,467,775 |
| WorldCom International Data Services, Inc. | 157,466,674 |
| SkyTel Communications, Inc. | 133,797,541 |
| Sum of 22 other legal entity balances less than $100 million | 303,212,207 |
| | |
| **Total** | **27,448,528,147** |

7.      In order to determine how much WorldCom could recover on account of
Intercompanies, the Debtors require at least two data benchmarks: (a) accurate intercompany
balances; and (b) specific value allocations for each subsidiary that owes WorldCom. Based on
the Intercompanies above, and breaking down the analysis further, WorldCom and its creditors
would need to know (a) that the amount owed to it by Telecom*USA, Inc. ("Telecom"), for
example, was accurate and (b) what its percentage recovery would be on account of the
approximately $2.866 billion that it is owed by Telecom. If Telecom was solvent, WorldCom
would recover $2.866 billion and then, in turn, distribute that $2.866 billion to its creditors
(including certain holders of WorldCom Senior Debt Claims[4] and subsidiaries that have direct
claims against WorldCom).

8.      This analysis is further complicated because it is not possible to determine the
percentage recovery on account of Intercompanies until each and every subsidiary has an
allocable value (based on standard valuation methodologies). The Debtors cannot determine an
initial allocable value of Telecom, for example, because the Debtors did not run their businesses
by legal entities but rather by product line. Thus, Telecom has no accurate separate financial
statements, no accurate separate earnings or any other metric that can be used to determine initial

---

[4] All capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the
Plan or the Disclosure Statement.

4

allocable value.[5]  Further, Telecom's own assets consist of Intercompanies owed by sister

companies (i.e., based on FTI's intercompany matrix, Telecom is owed approximately $5.4

billion by MCI WorldCom Communications, Inc. ("MCIWC"), which is in turn owed

approximately $17.4 billion by MCI WorldCom Network Services, Inc. ("Network Services"),

which in turn is owed $14.6 billion by MCI Communications Corporation ("MCIC"), and on and

on).  Accordingly, Telecom's creditors (like WorldCom) would need to ascertain the percentage

payments of those sister companies to Telecom on account of its Intercompanies.  This spiral

would continue down the 222 legal entity corporate structure.  In these cases, once the Debtors

concluded that they could not determine the initial value of each subsidiary and believed the

Intercompanies recorded in their books and records were unreliable, the Debtors had no choice

but to substantively consolidate all of the WorldCom Debtors.

9.      Further, the facts outlined above compelled the two-entity (WorldCom Debtors

and Intermedia Debtors) form of consolidation chosen by the Debtors.  Utilizing the example of

Telecom, assuming Telecom was solvent, WorldCom as a direct creditor, would recover $2.866

billion for distribution to WorldCom's creditors and the residual equity value, if any existed after

direct creditors were paid in full, would flow to MCIC, the parent company of Telecom.  In the

event of a consolidation other than the one compelled by the facts of these cases, (i.e., a three-

entity consolidation – of the WorldCom Debtors, the MCI Debtors, as defined below, and the

Intermedia Debtors), the creditors of WorldCom would be materially harmed because value that

would have been available to satisfy WorldCom creditors would be improperly diverted to

creditors of MCI Debtors.  Although this example assumes the solvency of Telecom, the

---

[5] While the expert testimony of the Debtors' financial advisor, Lazard Frères & Co. LLC, will prove that the consolidated Debtors' enterprise value is $11.4 billion, the Debtors cannot determine separate legal entity value.

fundamental premise of the Plan is that the Debtors cannot determine which constituency is

benefited or harmed by the proposed two-entity consolidation.  Thus, the only fair, just and

equitable solution is the consolidation proposed in the Plan.

        10.     The Dissenting Trade Claims Purchaser Committee and the Subordinated MCIC

Bondholders Committee, each described below, spend an extraordinarily large portion of their

respective objections to the Plan discussing the intercompany royalty charges, even though it is

just one category of over a trillion dollars in intercompany claims, in an attempt to manufacture

support for a fictional (and fundamentally flawed) three-entity substantive consolidation plan of

reorganization.  Despite the entanglement of the assets and liabilities of the Debtors, other than

the Intermedia Debtors, the dissenters' desire a three-entity substantive consolidation because it

would allow creditors of MCI Debtors to abscond with the recoveries that would otherwise be

distributed to creditors of the WorldCom Debtors.  Without basis or justification, the dissenters

propose to offset consolidated WorldCom Debtors' Intercompanies against consolidated MCI

Debtors' Intercompanies to achieve for themselves the benefit of a dollar-for-dollar-setoff with

respect to the billions of dollars of cash transactions recorded in the Debtors' books and records

even though the requirement of mutuality set forth in chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code") is not satisfied.  The fictional three-entity consolidation would

allow the focus of the dissenters' case to be royalty charges.  The Dissenting Trade Claims

Purchaser Committee and the Subordinated MCIC Bondholders Committee, however, ignore the

uncontroverted fact that the royalty claims suffer from the same unreliable books and records of

the separate legal entities as all other intercompany transactions and the inability to calculate the

recovery on <u>any</u> Intercompany.

6

11.     The royalty charges were not some evil sham designed to cheat one group of Debtors as posited by the dissenters.  To the contrary, the royalty charges are part of a tax minimization strategy for the combined enterprise conceived, documented, and implemented with the assistance of outside tax professionals and validated by a study performed by the outside tax professionals contemporaneously with its implementation.  Instead of supporting their own goals of sabotaging the Plan, the dissenters' objections, including numerous contradicting expert reports, actually support the Plan by demonstrating that adjudication of the appropriate royalty charge would be so complex, and take so long to accomplish, that, by the time it was done, the Debtors' business would be destroyed and the vast majority of value available for distribution to creditors would have evaporated.  Even if the Debtors' estates and creditors were forced to endure years of litigation regarding the proper amount of royalty charges, that would not solve any of the other fundamental problems, such as the unreliability of the Debtors' books and records, including an inability to allocate assets, liabilities and revenue among legal entities, which forced the Debtors to propose the Plan.

12.     In addition, the Plan embodies three compromises and settlements of major litigable issues which will expedite the Debtors' emergence from chapter 11.  These settlements, negotiated at arm's length, in good faith, were the culmination of intense negotiation over complex legal and factual disputes.  The Debtors and every major constituency believed that because of the intense competitive environment within which the Debtors operate, the marketplace perception of the Debtors' viability as a going concern, the empirical data suggesting that a prolonged stay in chapter 11 would cause business and residential customers to flee (and the corresponding decline in revenue, operating profit and enterprise value), every creditor would benefit from a consensual resolution of as many issues as possible.

7

13.    Toward that end, the settlements:

- resolve the treatment of MCIC Senior Debt Claims which in turn resolves,

  o a litigation hazard regarding the applicability of the equitable remedy of substantive consolidation to pre-merger funded debt claimants,

  o litigation regarding the allowance or disallowance of the Intercompanies and attendant fraudulent conveyance, equitable subordination, recharacterization and preference causes of action and available remedies, and

  o factual disputes concerning the MCIC Senior Debt Claims' entitlement to the residual equity value in each of MCIC's subsidiaries;

- resolve the treatment of Intermedia claimants which in turn resolves,

  o litigation regarding the voidability of the Intermedia Intercompany Note,

  o litigation regarding the allegedly preferential payments made by WorldCom on account of the Intermedia Intercompany Note,

  o litigation regarding the remedies available in the event WorldCom could prove a preference, and

  o litigation regarding the transfer of assets from Intermedia to WorldCom;

- resolve the treatment of the Bank Claims which in turn resolves,

  o litigation concerning whether the Banks could impose a constructive trust on proceeds of the 364-Day Facility including,

    (i)    the priority of a constructive trust claimant vis-à-vis the Debtors' strong arm powers,

    (ii)    the traceability of the 364-Day Facility proceeds, and

    (iii)    the lowest intermediate balance of commingled funds.

14.    Accordingly, the Debtors believe, and the Official Creditors Committee agrees, that the expedited resolution of these complex legal and factual disputes benefits the estates by avoiding the time, delay and expense of litigation whose outcome is uncertain and which would have severe negative consequences for the Debtors and the value of their estates.

8

4403486 v11

## BACKGROUND

15.     On July 21, 2002 (the "Initial Petition Date"), WorldCom and certain of its

subsidiaries and affiliates filed with this Court their voluntary petitions for relief under the

Bankruptcy Code.  In addition, on November 8, 2002 (the "Subsequent Petition Date" and,

together with the Initial Petition Date, the "Petition Date"), additional subsidiaries and affiliates

of WorldCom filed with this Court their voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.  The Debtors continue to operate their respective businesses and properties as

debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

## Mergers and Acquisitions

16.     In 1983, WorldCom was organized under its original name Long Distance

Discount Services, Inc. ("LDDS") as a licensed long distance provider in Mississippi.  In August

1989, LDDS became a public company.  According to the examiner appointed in these cases,

WorldCom has grown exponentially since 1983 through a high number of mergers, acquisitions

and outsourcing transactions, establishing it as a leading provider of local and long distance

telecommunications services in the United States and abroad.

17.     In December 1996, WorldCom acquired MFS Communications Company, Inc.

("MFS"), which owned and operated local network access facilities installed in and around major

United States cities and several major European cities.  UUNet Technologies, Inc. ("UUNet"), a

subsidiary of MFS, was a significant component of the transaction.  As a leading provider of

many Internet access modalities, applications, and consulting services, UUNet provided a

foundation for meeting projected high demand for Internet applications.

18.     In January 1998, WorldCom acquired Brooks Fiber Properties, Inc., a leading

U.S. facilities-based provider of competitive local telecommunication services.

9

19.    In September 1998, WorldCom completed the $40 billion acquisition of MCIC and its affiliates pursuant to the merger of MCIC with and into a wholly-owned subsidiary of WorldCom.  At the time, MCIC was the second largest long distance provider in the United States.

20.    Following the MCIC acquisition, WorldCom began acquiring wireless and web services companies.  Toward that end, in 1999, WorldCom acquired SkyTel Communications, Inc., a leading provider of nationwide messaging services in the United States, and CAI Wireless Systems, Inc. and Wireless One, providers of wireless communications services.

21.    In September 2000, WorldCom purchased Intermedia Communications, Inc. ("Intermedia"), a provider of integrated data and voice communications services.  On July 1, 2001, WorldCom consummated the acquisition of Intermedia for approximately $5.8 billion, including the assumption of long-term debt, pursuant to the merger of a wholly-owned subsidiary with and into Intermedia.  One of the principal attractions to the Debtors was the acquisition of Intermedia's controlling interest in Digex, Inc., a provider of managed Web and application hosting services designed exclusively for businesses that have Internet requirements tied to critical business objectives.

**Restructurings**

22.    Subsequent to WorldCom's acquisition of MCIC and its affiliates in September 1998, WorldCom scheduled five restructurings of its businesses (the "Restructurings")[6] in order to: (a) align legal entities along operational lines by matching legal entities with the product and operations as they are managed and reported within WorldCom; (b) streamline WorldCom's

---

[6] Pursuant to section 368(a) of the Internal Revenue Code, in order to maintain the tax-free nature of the merger between MCIC and WorldCom, no assets of MCIC could be transferred from the legacy MCIC entities to the legacy WorldCom entities, but assets could be transferred from the legacy WorldCom entities to the legacy MCIC entities.

4403486 v11

organizational structure to ease administrative burdens and improve operations efficiencies; (c)

minimize state taxes and achieve maximum cost saving synergies resulting from the potential

synergies in the merger between MCIC and WorldCom and future acquisitions of WorldCom;

and (d) reduce WorldCom's regulatory burden by decreasing the number of regulated entities

and simplifying billing and revenue reporting within WorldCom.  The Restructurings occurred,

respectively, in December 1998, June 1999, September 1999, December 1999 and December

2001.  The first four Restructuring were completed as of the Petition Date (the "Completed

Restructurings")[7].  Among other things, pursuant to the Completed Restructurings:

- the management assets of the legacy WorldCom entities and the legacy MCIC entities were consolidated pursuant to the transfer of management assets from (a) WorldCom to MCIC, (b) MCI Telecommunications Corporation to MCIC, and (c) MCIC to MCI WorldCom Management Company;

- UUNet transferred a variety of assets to merge the Internet operations that were historically located in three different entity families into one consolidated holding company structure;

- WorldCom segregated certain valuable intangibles into a separate legal entity, MCI WorldCom Brands, L.L.C.;

- WorldCom created a synergies company to identify and maximize savings that could be attained by both identifying synergies that would result in substantial cost savings and focusing attention on certain economic liabilities to minimize or substantially reduce costs associated with those items;

- through the transfer of assets and ownership of certain entities from WorldCom to MCIC, WorldCom centralized its (a) domestic network correspondence related assets and operations within Network Services, (b) voice correspondence related assets and operations within MCI International Telecommunications, Inc., and (c)

---

[7] The fifth Restructuring, which was scheduled to occur in December 2001, was designed to consolidate WorldCom's wireless businesses.  The restructuring was still in the process of being finalized on the Petition Date. The stated goals of the December 2001 Restructuring were to align legal entities along operational lines, streamline WorldCom's organizational structure to ease administrative burdens and improve operational efficiencies, provide for a more efficient conversion of the use of assets from the provision of video programming and data services including wireless Internet access, and eliminate over 100 subsidiaries, centering operations and reducing administrative operations and compliance burdens on subsidiaries.

data correspondence related assets and operations within Western Union
International, Inc.;

- WorldCom's end-user sales force was consolidated within MCIWC and its long
distance network operations were consolidated within Network Services;

- WorldCom's organizational structure was streamlined by the merger of MFS, a
holding company for the legacy MFS group, into MCIC, allowing MCIC to
become the holding company for the majority of WorldCom's long-distance, local
and Internet business; and

- MCI WorldCom International, Inc., a wholly-owned subsidiary of MCIC, was
merged with and into MCI Global Resources, Inc., a wholly-owned subsidiary of
MCI International, Inc.

**Prepetition Events**

23.     On April 29, 2002, Bernard Ebbers resigned as the Debtors' chairman and chief

executive officer and was replaced by John Sidgmore, the Debtors' then-vice chairman.

24.     On June 25, 2002, the Debtors announced that following an internal audit, certain

accounts related to line cost expenses in the amount of $3.055 billion during fiscal year 2001 and

$797 million during the first quarter of 2002 were not made in accordance with generally

accepted accounting principles ("GAAP").  Upon discovery of the accounting improprieties, the

Debtors promptly reported these matters to the SEC.  The Debtors also promptly notified their

external auditors, KPMG LLP ("KPMG"), to undertake a comprehensive audit of the Debtors'

financial statements for 2000, 2001 and 2002.

25.     In response to the Debtors' disclosures on June 25, 2002, the SEC commenced an

enforcement action (the "SEC Action") on June 26, 2002 in the United States District Court for

the Southern District of New York (the "District Court") against the Debtors for violations of,

among other securities laws, sections 10(b) and 13(a) of the Securities and Exchange Act of

1934, alleging that from at least the first quarter of 2001 through the first quarter of 2002,

12

WorldCom defrauded investors by disguising its true operating performance via improper

accounting methods that materially overstated its income by approximately $3.8 billion.

26.      On June 28, 2002, the District Court, with the consent of the Debtors and the

SEC, appointed Richard C. Breeden, the former chairman of the SEC, as the corporate monitor

(the "Corporate Monitor") who (a) is charged with overseeing the document retention policies of

the Debtors and (b) has responsibility (i) to prevent unjust enrichment as a result of the Debtors'

prepetition conduct and (ii) to ensure that the Debtors' assets are not dissipated by payments that

are not necessary to the operation of the Debtors' business.

27.      Promptly after the accounting announcement, the Debtors' board of directors

formed a special committee (the "Special Committee") to conduct an independent investigation.

The Special Committee, chaired by Nicholas deB Katzenbach, former Attorney General of the

United States and Under Secretary of State and General Counsel of IBM Corporation, retained

William McLucas, former head of enforcement at the SEC, to head the investigation.  In

addition, the Debtors terminated or accepted the resignation of various financial and accounting

personnel, including the Debtors' chief financial officer and corporate controller.  The Special

Committee issued its report on March 31, 2003, which was made public on June 10, 2003.

**Post-Petition Events**

28.      On July 22, 2002, upon the request of the Office of the United States Trustee (the

"United States Trustee") and with the consent of the Debtors, this Court directed the appointment

of an examiner to investigate "any allegations of fraud, dishonesty, incompetence, misconduct,

mismanagement or irregularity in the arrangement of the affairs of any of the Debtors by current

or former management, including but not limited to issues of accounting irregularities."  See

Order Granting the Motion of the United States Trustee for the Appointment of an Examiner,

dated July 22, 2003 (the "Examiner Order").  On August 6, 2002, this Court approved the

13

selection of Richard Thornburgh, former Attorney General of the United States and Governor of

Pennsylvania, as the examiner (the "Examiner"). The Examiner issued his first interim report on

November 4, 2002 and his second interim report on June 9, 2003. In the second report, the

Examiner identified significant wrongdoing or problems with respect to virtually every area

reviewed including acquisitions, strategic planning, debt management, credit facilities, loans to

executive officers, employee compensation and internal controls. The Examiner identified 22

separate areas of concern and found specific weaknesses with respect to WorldCom's system of

oversight and internal controls relating to accounting policies.

29.      On July 29, 2002, the United States Trustee formed the Official Creditors

Committee. The Official Creditors Committee currently is comprised of fourteen members

consisting of representatives from substantially all of the Debtors' unsecured creditor

constituencies – holders of WorldCom funded debt obligations, holders of MCIC funded debt

obligations, holders of Intermedia funded debt obligations and trade creditors. [8]

30.      On August 8, 2002, as a result of the Debtors' ongoing internal review of its

financial statements and the discovery of additional accounting improprieties in reported pre-tax

earnings, the Debtors announced an additional $3.8 billion in required earnings restatements. On

November 5, 2002, the Debtors announced that the restatement of earnings could be in excess of

$9 billion. This figure has reached $11 billion with the restatements going back to 1999.

31.      On September 10, 2002, the Debtors announced that they were actively seeking a

permanent chief executive officer to replace John Sidgmore, the Debtors' interim chief executive

---

[8]      The Official Creditors Committee is comprised of the following entities: ABN Amro Bank N.V.; AOL Time Warner, Inc.; Blue River, LLC; Cerberus Capital Management, L.P.; Deutsche Bank AG; Electronic Data Systems Corporation; Elliott Management Corp.; ESL Investments; Law Debenture Corporate Services, Inc., as indenture trustee; Metropolitan Life Insurance Co.; Metropolitan West Asset Management LLC; New York Life Investment Management LLC; Sun Trust Bank; and Wilmington Trust Company, as indenture trustee.

14

officer.  The Debtors' determination to commence a search for a permanent CEO was, in large

part, at the behest of the Official Creditors Committee.  The Official Creditors Committee

determined that there was a pressing need for permanent leadership distinct from the Debtors'

current and prior management to quell public perception about the Debtors' financial

irregularities, stability and ongoing businesses.  The Official Creditors Committee also believed

that independent and new leadership was necessary to help ensure the successful restructuring

efforts of the Debtors.  After an exhaustive search process, which included extensive

participation by members of the Official Creditors Committee, on November 15, 2002, the

Debtors announced the selection of Michael D. Capellas as their new President, CEO and

Chairman of the Board of Directors.  On December 16, 2002, the District Court and this Court

jointly approved the terms of Mr. Capellas' employment as chief executive, president and

chairman of the board of directors of the Debtors.  Mr. Capellas' employment agreement

contains a unique ethics pledge, which requires Mr. Capellas to implement the reforms necessary

to make the Debtors a "model" of healthy governance practices and to establish institutional

mechanisms to further the goals of transparency, integrity and the highest standards of legal and

ethical compliance.

        32.    On October 15, 2002, this Court entered an order authorizing the Official

Creditors Committee to retain FTI as its forensic accountant to, among other things, (a) analyze

and determine the appropriateness of the Debtors' accounting journal entries and other record

keeping methods relating to inter/intra company transactions between their various legal entities,

(b) obtain and review the Debtors' intercompany account balances and any reconciliations that

may be required, (c) analyze the Debtors' historical financings and acquisitions and determine

the appropriateness of those transactions on a legal-entity-by-legal-entity basis and (d) review

with the Debtors' management, and gain an understanding of, the Debtors' operating practices and policies including the Debtors' cash management system and inter/intra company transactions.  In addition, on January 14, 2003, this Court entered a final order authorizing the Official Creditors Committee to retain Houlihan Lokey Howard & Zukin Capital ("Houlihan") as its financial advisor to, among other things, assist it in the critical tasks associated with analyzing and implementing restructuring alternatives.

33.     On November 26, 2002, the Debtors consented to the entry of a permanent injunction that partially resolved the SEC litigation.  Pursuant to the partial settlement, the Debtors agreed (a) not to violate securities laws in the future, (b) to provide reasonable training and education to its senior operational officers and financial reporting personnel to minimize the possibility of future violations, (c) to conduct a review of the effectiveness of its material internal accounting control structure and policies and, (d) that following consideration of the Special Committee's report, the Corporate Monitor would submit recommendations concerning the Debtors' on-going corporate governance and ethics policies.

34.     On December 17, 2002, all of the remaining members of the Debtors' prepetition board of directors resigned.  The Debtors' current board of directors, appointed subsequent to the announcement of the Debtors' accounting irregularities, consists entirely of independent members (save Capellas) and includes Michael Capellas, Nicholas deB Katzenbach, Dennis Beresford, Professor of Accounting at the University of Georgia's Terry College of Business and former Chairman of the Financial Accounting Standards Board, and C.B. Rodgers, Jr., former Chairman and Chief Executive Officer of Equifax.

35.     On January 14, 2003, the Debtors, via web broadcast, announced a 100-day initiative which outlined their major reorganization projects (the "100-Day Initiative").  Pursuant

16

to the 100-Day Initiative, the Debtors proposed to: (a) launch new consumer and business

products and services; (b) aggressively address the small-to-medium-sized business market; (c)

implement cost reduction plans; (d) implement additional corporate integrity initiatives,

including establishing a new corporate leadership structure whereby the Debtors' business

market and mass market sales, international operations, strategy and marketing operations and

technology, human resources, finance, accounting and legal functions all report directly to the

chief executive officer; (e) prepare one-year and three-year business plans; and (f) file a plan of

reorganization by April 14, 2003.  Due to the tireless efforts of the Debtors' new management

team, the Debtors successfully completed the 100-Day Initiative on April 14, 2003 with the filing

of a plan of reorganization and the appointment of Robert Blakely, former finance chief of

Lyondell Chemical Co., as their new chief financial officer.  On August 4, 2003, the Debtors

named Anastasia Kelly, former general counsel for Sears, Roebuck & Co., as executive vice

president, general counsel and corporate secretary.

36.    On April 17, 2003, an ad hoc committee comprised of entities which purchased

trade claims after the Petition Date (the "Dissenting Trade Claims Purchaser Committee") filed

its Motion for the Appointment of a Chapter 11 Trustee for MCI Communications Corporation

and its Subsidiaries (the "Trade Claims Purchaser Trustee Motion").  The Dissenting Trade

Claims Purchaser Committee consists of secondary purchasers of various trade claims (the

"Trade Claims Purchasers") of two Debtor entities, Network Services and MCIWC with

aggregate claims of approximately $250 million (less than .6% of the aggregate claims asserted

against the Debtors).  On April 21, 2003, an ad hoc committee of holders of MCIC subordinated

securities (the "Subordinated MCIC Bondholders Committee") filed their Motion to Appoint a

Limited Purpose Chapter 11 Trustee for MCI Communications Corporation and its Subsidiaries

17

(the "Subordinated Bondholder Trustee Motion," and together with the Trade Claims Purchaser

Trustee Motion, the "Trustee Motions").  The Subordinated MCIC Bondholders Committee

primarily consists of holders (the "MCIC Subordinated Debt Claimants") of the preferred stock

instruments issued by MCI Capital I, a non-Debtor affiliate of MCIC.  MCI Capital I has an

interest in subordinated debt instruments of MCIC.  On May 16, 2003, the Court entered an

Order denying the Trustee Motions.

37.    On June 3, 2003, KPMG issued a letter (the "KPMG Report") to the audit

committee (the "Audit Committee") of the Debtors' Board of Directors regarding the Debtors'

internal controls and operations, which reported ten "material weaknesses" involving the design

or operation of various internal accounting controls of the Debtors which present a significant

risk that errors or fraud could occur without being timely detected by the Debtors' employees.

The KPMG Report was annexed to the Debtors' Form 8K, filed on June 3, 2003.  On July 31,

2003, in reliance on the KPMG Report and other purported evidence of less than adequate

internal accounting controls, the United States General Services Administration (the "GSA")

issued a proposed debarment, temporarily barring the Debtors from competing for any new

government contracts and prohibiting the GSA or any other federal agency from awarding a new

contract to the Debtors (the "Debarment").

38.    On July 7, 2003, the District Court approved a final compromise and settlement of

the SEC Action, pursuant to which the Debtors are liable for a civil penalty of $2.25 billion to be

satisfied by a $500 million cash payment and $250 million in New Common Stock of the

reorganized Debtors to be distributed to shareholders and bondholders upon the Debtors'

emergence.  On August 6, 2003, the Court entered its Order Granting Debtors' Motion for

Approval of Compromise and Settlement with Securities and Exchange Commission.

18

**The Plan and Disclosure Statement**

39.    Less than nine months after filing the largest chapter 11 case in history, on April

14, 2003, the Debtors filed their disclosure statement (the "Disclosure Statement") and their Joint

Plan of Reorganization under Chapter 11 of the Bankruptcy Code, which has since been

amended.  The Disclosure Statement described the Plan, which provides for the substantive

consolidation of the Intermedia Debtors[9] and all of the Debtors other than the Intermedia Debtors

(the "WorldCom Debtors"), respectively.  Under the Plan, among other things, holders of (a)

WorldCom Senior Debt Claims, including claims arising under the WorldCom Notes Indentures,

will receive a combination of either New Notes or New Common Stock equaling 35.9% of their

allowed claims and (b) WorldCom General Unsecured Claims will receive a combination of

Cash and New Common Stock equaling 35.9% of their allowed claims.  Additionally, pursuant

to the compromise and settlement of various issues with the Debtors, (a) MCIC Senior Debt

Claims will receive New Notes equaling 80% of their allowed claim for principal amounts due

under the MCIC Senior Notes Indentures, (b) Intermedia Senior Debt Claims will receive New

Notes or New Common Stock equaling 93.5% of their allowed claims, (c) Intermedia General

Unsecured Claims will receive 83.2% of their allowed claims, and (d) Intermedia Subordinated

Debt Claims will receive 46.4% of their allowed claims.

40.    Among the numerous parties objecting to the Debtors' Disclosure Statement, the

Subordinated MCIC Bondholders Committee and the Dissenting Trade Claims Purchaser

---

[9]    "Intermedia Debtors" means, collectively, Access Network Services, Inc.,  Access Virginia, Inc., Business
Internet, Inc., Express Communications, Inc., ICI Capital LLC, Intermedia, Intermedia Capital, Inc., Intermedia
Communications of Virginia, Inc., Intermedia Investment, Inc., Intermedia Licensing Company, Intermedia Services
LLC, National Telecommunications of Florida, Inc., Netwave Systems, Inc., NTC, Inc., WorldCom Intermedia
Communications Corporation f/k/a Shared Technologies Fairchild Communications Corporation, WorldCom
Intermedia Telecom, Inc. f/k/a Shared Technologies Fairchild Telecom, Inc., or WorldCom Intermedia, Inc. f/k/a
Shared Technologies Fairchild, Inc.

4403486 v11

Committee objected to the Disclosure Statement on the grounds, among many others, that the

Plan (a) effected a massive shift in value away from the estates of MCIC and its subsidiaries (the

"MCI Debtors," a subset of the WorldCom Debtors, which are referred to separately from time

to time herein) to benefit creditors of WorldCom, and (b) includes a proposed settlement with

holders of MCIC Senior Debt Claims (the "MCIC Senior Debt Claimants") that confers no

benefit to the Debtors' estates as a result of its failure to avoid opposition to substantive

consolidation. Objections to the Disclosure Statement were either resolved by language

additions to the Disclosure Statement or overruled by the Court in its May 28, 2003 order

approving the Disclosure Statement.

41.    On July 3, 2003, the Debtors filed their Motion for Order Approving Proposed

Supplement to Disclosure Statement describing, among other things (a) the Debtors' agreement

to a compromise and settlement of certain bank actions, including an agreement to pay

$75,000,000 to certain banks that were party to a constructive trust action against the Debtors

and (b) revisions to the Debtors' proposed settlement with the SEC. On July 11, 2003, the Court

entered an order approving the proposed supplement to the Disclosure Statement.

42.    Among other objections to the Plan, on July 31, 2003, the Subordinated MCIC

Bondholders Committee filed its Objection to the Debtors' Joint Plan of Reorganization (the

"Subordinated MCIC Bondholders Plan Objection"). On August 4, 2003, the Dissenting Trade

Claims Purchaser Committee filed its Objection to the Debtors' Joint Plan of Reorganization

under Chapter 11 of the Bankruptcy Code (the "Trade Claims Purchaser Plan Objection"). Both

objections are similar to those made by the same parties in opposition to the Disclosure

Statement. The focus of these objections is the substantive consolidation of the WorldCom

Debtors' estates:

(a)    the Subordinated MCIC Bondholders Plan Objection asserts that their reliance on the separate credit of MCIC defeats the substantive consolidation proposed under the Plan and that the Debtors cannot establish that the assets of the WorldCom Debtors are so hopelessly entangled that substantive consolidation would benefit all creditors of their estates; and

(b)    the Trade Claims Purchaser Plan Objection asserts, among other things, that substantive consolidation is inappropriate on similar grounds, that the treatment of MCIC Senior Debt Claims under the Plan cannot be approved and that the Plan fails to satisfy the requirements for confirmation set forth in the Bankruptcy Code.

43.    On July 31, 2003, following the Debarment, the allegations contained in at least one objection to the Plan regarding the Debtors' call routing practices, and investigations concerning the Debtors initiated by the Department of Justice (the "DOJ") and the Federal Communications Commission (the "FCC"), the Court, on its own motion, entered its Order (1) Directing Debtors to File a Second Supplement to Debtors' Disclosure Statement, (2) Setting Objection Deadline Related Thereto, and (3) Extending Voting Deadlines and Adjourning Date for Commencement of Confirmation Hearing.  Accordingly, on August 4, 2003, the Debtors filed their Motion for Order Approving Proposed Second Supplement to Disclosure Statement, addressing the effect of the Debarment, the investigation of the DOJ into allegations of the Debtors' improper routing of network traffic and the similar investigation by the FCC.  On August 6, 2003, the Court entered its order approving the second supplement to the Disclosure Statement.

44.    Every class of creditors entitled to vote on the Plan accepted.  In fact, six of the eight classes of creditors entitled to vote, voted to accept the Plan by over 93% in dollar amount and number.  The overwhelming acceptance of the Plan by the Debtors' creditors reflects the Plan's fundamental fairness.

21

## ARGUMENT

**I.    THE PLAN HAS BEEN PROPOSED IN GOOD FAITH
AND NOT BY ANY MEANS FORBIDDEN BY LAW**

45.    The Plan is the product of good faith, arm's length and arduous negotiations among (a) the Debtors, (b) the Official Creditors Committee, (c) certain holders of WorldCom Senior Debt Claims (the "Ad Hoc Committee of WorldCom Senior Notes Holders"), (d) certain holders of Bank Claims (the "Bank Group"), (e) certain holders of significant Claims against the Debtors referred to collectively as the MatlinPatterson Investors, (f) certain holders of MCIC Senior Debt Claims (the "Ad Hoc Committee of MCIC Senior Notes Holders"), and (g) certain holders of Intermedia Senior Debt Claims and Intermedia Subordinated Debt Claims (the "Ad Hoc Committee of Intermedia Notes Holders" and, collectively with the MatlinPatterson Investors, the Ad Hoc Committee of WorldCom Senior Notes Holders, the Bank Group, and the Ad Hoc Committee of MCIC Senior Notes Holders, the "Ad Hoc Committees"), satisfies each element of section 1129 of the Bankruptcy Code and should be confirmed.  In fact, creditors voting on the Plan overwhelmingly approved of the Plan and support its confirmation.

46.    Among other reasons, the Dissenting Trade Claims Purchaser Committee objects to the Plan on the grounds that:

- substantive consolidation is unfair, does substantial harm to creditors, and does not meet the applicable standard for substantive consolidation;

- settlement with the Ad Hoc Committee of MCIC Senior Notes Holders provides no value to the estates; and

- the Plan does not satisfy the good faith and other confirmation requirements of the Bankruptcy Code.

47.    Similarly, the Subordinated MCIC Bondholders Committee objects to the Plan on the grounds, among others, that:

22

- the Plan improperly reallocates MCIC's assets to creditors of WorldCom, while depriving the MCIC Subordinated Debt Claimants of the 100% recovery to which they would otherwise be entitled, and transfers $3 billion in value to WorldCom and its creditors in violation of the absolute priority rule; and

- the Plan fails to show that MCIC Subordinated Debt Claimants would receive no greater recovery in a non-consolidated liquidation, notwithstanding the fact that MCIC encompasses at least 90% of the Debtors' assets and is liable for less than 20% of the Debtors' debts.

48.    Although the objectors raise a panoply of concerns, stripped to its core, the principal issue presented by these dissenters is whether the Plan, including the settlements contained therein and the proposed substantive consolidation (which will avoid fraudulent conveyance, setoff, preference and recharacterization litigation over the transfer of assets and the allowance or disallowance of $1 trillion in intercompany claims) satisfies the good faith requirement of Bankruptcy Code section 1129(a)(3).

49.    As discussed further below, the Official Creditors Committee believes that the Plan meets the good faith requirements:

### Honest Intentions

- The Debtors proposed the Plan with a legitimate and honest purpose to reorganize.  The Plan maintains the value of the Debtors as a going concern, expedites emergence from chapter 11, has a reasonable prospect of success and has been accepted by all eight classes of creditors entitled to vote to accept or reject the Plan (six of the classes voted to accept the Plan by over 93% in dollar amount and number).  See Certification of Jane Sullivan with Respect to the Tabulation of Votes on the Plan of Reorganization, August 29, 2003; Deposition of David Lee (representative of Electronic Data Systems Corp. on the Official Creditors Committee), July 31, 2003 at 120:9-15 ("I thought that there was significant value to all of the creditors to getting the [C]ompany out of bankruptcy as soon as possible and preventing further decline in the value of the company that, in my opinion, would hurt all of the creditors."); Deposition of Mark Neporent (representative of Cerberus Capital Management, L.P. on the Official Creditors Committee and Co-Chairman of the Official Creditors Committee), August 7, 2003 at 240:3-9 (similar).

**Substantive Consolidation**

- Compelled by the facts of these cases, the WorldCom Debtors' determined to substantively consolidate in the Plan because:

    o The Debtors' businesses (other than Intermedia) run as an integrated whole, along product lines, not by legal entities. See Deposition of John S. Dubel (former Interim Chief Financial Officer for the Debtors), July 30, 2003 at 34:5-12; Deposition of Victoria D. Harker (Senior Vice President of Financial Planning and Analysis for the Debtors), July 22, 2003 at 68:24 - 69:7; Deposition of Robert A. Peterson (Chief Counsel of Technology and Network Law for the Debtors), July 22, 2003 at 74:2-8.

    o As a result of the inherently unreliable information regarding intercompany activities (e.g., the almost $12 billion in accounting irregularities and the required restatements dating back to 1999), the lack of internal controls (see KPMG Report at 1) and the inability to determine with any degree of accuracy the assets and liabilities of 222 legal entities, the Debtors were compelled to seek substantive consolidation of the WorldCom Debtors. Deposition of Robert L. Pierson (Interim Controller for the Debtors), July 28, 2003 at 26:11-23, 27:9-16; Deposition of David Yarbrough (Managing Director of FTI), July 10, 2003 at 153:14 - 155:14, 27:9-16, 240:14-19, 59:7-18; Deposition of John S. Dubel (former Interim Chief Financial Officer for the Debtors), August 13, 2003 at 235:8-16, 236:3-13, 309:17-22, 342:9-16; Deposition of Susan Mayer (former Senior Vice President and Treasurer for the Debtors), August 20, 2003 at 76:2-5, 83:17; Deposition of Terry Savage (Managing Director of Lazard, Frères & Co. LLC, financial advisor to the Debtors), August 4, 2003 at 37:16–18 ("[T]his company cannot produce separate legal entity [balance sheet, income and profit and loss] statements.").

    o No other form of substantive consolidation, as suggested by the dissenters (three-entity), is possible:

        ➢ Claims that the "MCI Companies have approximately 90% of the assets, compared to approximately 20% of the debt,"[10] are, for most intents and purposes, baseless. The objecting parties could as easily claim a 75/25, 95/5, 60/40 or virtually any other split of the Debtors' physical assets. Given the entanglement of the WorldCom Debtors' affairs and the well documented unreliability of its consolidating books and records, the appearance of certain amounts of assets or liabilities on the MCI Debtors' balance sheets, or anywhere else, are in significant measure, the product of happenstance. Quite simply, the

---

[10]    See, e.g., Trade Claims Purchaser Plan Objection at 44.

Debtors were run as a consolidated enterprise, along business lines, not on a legal entity basis.

➢ Depending on the assets of a particular intercompany obligor, an intercompany claim held by a Debtor could be worth anywhere from zero to one-hundred cents on the dollar. Since the Intercompanies (and the initial allocable value of each Debtor) cannot be properly valued, the Debtors cannot determine the value of the estate of each WorldCom Debtor holding such a claim. Accordingly, the Debtors cannot determine the amount of value (i.e., how much of the alleged "90% of assets" at the group of MCI Debtors should properly be used to pay Intercompanies and thereby be used to satisfy the claims of creditors) available for distribution to each WorldCom Debtor's creditors.

➢ It also would be improper to offset or net one group of WorldCom Debtors' Intercompanies against another's because (a) a prerequisite of a proper setoff under the Bankruptcy Code is that the debts must be mutual – i.e., between the same exact legal entities – and, therefore, it is improper to setoff obligations on a group basis, (b) only a valid claim can offset another valid claim and the inherent unreliability of the Debtors' consolidating books and records makes it impossible to determine the validity of the Intercompanies, and (c) doing so would be inequitable since each Intercompany subject to netting would have a different value depending upon the solvency, or, in some cases, massive insolvency of the Debtor obligated to pay it.

➢ The value of WorldCom's stock in its subsidiaries, or any other WorldCom Debtor which holds stock in another WorldCom Debtor, cannot be determined without determining the value of each subsidiary WorldCom Debtor. A three-entity substantive consolidation would be inequitable because it would render the value of WorldCom's stock in its subsidiaries worthless without justification. It would also effect a shift in value away from the entity entitled to the residual equity value for the benefit of a massively insolvent sister subsidiary. For example, in such a three-entity consolidation circumstance, the value of UUNet (net of UUNet creditors), which is a subsidiary of MCIC, would be taken away from MCIC creditors and the residual value from WorldCom creditors and given to the creditors of Network Services, a massively insolvent entity with no entitlement to any assets other than its own and the equity value of its subsidiaries.

o Substantive consolidation benefits all creditors and does not unfairly prejudice any creditor group because, absent such consolidation, (a) the Debtors would languish in chapter 11 while mired in massive litigation over, among many other things, asset transfers pursuant to the Restructurings and Intercompanies (regarding, e.g., transfer pricing,

25

setoffs, recharacterization, preference and fraudulent conveyance issues)
and (b) the enterprise value of the estates, as established by empirical data,
would erode significantly, causing creditors to lose a major portion of their
recovery.

**Settlements**

- The Debtors' decision to settle and compromise three highly litigious issues
  whose outcome is uncertain manifests the Debtors' good faith in proposing the
  Plan.

50.    In summary, the only equitable result is the proposed two entity substantive

consolidation because there is no way to establish the assets and liabilities of any one subset of

WorldCom Debtors without figuring out each WorldCom Debtors' assets and liabilities,

including the value of each Intercompany (not improperly subject to offset or lumped together

with other WorldCom Debtors' Intercompanies) and the value of each WorldCom Debtors' stock

in other WorldCom Debtors (not dissipated by massively insolvent Debtors with no legal

entitlement to such value).  As a result, the WorldCom Debtors are compelled to a two-entity

substantive consolidation: the only equitable way to deal with all indeterminate Intercompanies,

rather than the objectors' proposal which allegedly only deals with a majority of such

indeterminate claims.

51.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in

good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  The Second Circuit

defines the good faith standard as requiring a showing that "the plan was proposed with 'honesty

and good intentions.'" Kane v. Johns- Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988).  In the

context of a chapter 11 plan, "a plan is proposed in good faith 'if there is a likelihood that the

plan will achieve a result consistent with the standards prescribed under the Code.'" In re Leslie

Fay Cos., Inc., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting In re Texaco Inc., 84 B.R.

893, 907 (Bankr. S.D.N.Y.), appeal dismissed, 92 B.R. 38 (S.D.N.Y. 1988)); see also In re

26

Zenith Elecs. Corp., 241 B.R. 92, 107 (Bankr. D. Del. 1999).  "[W]here the plan is proposed with

the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good

faith requirement of section 1129(a)(3) is satisfied."  In re Century Glove Inc., No. Civ. A. 90-

400-SLR, Civ. A. 90-401-SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993).  The

requirement of good faith must be viewed in light of the totality of the circumstances

surrounding the establishment of a chapter 11 plan.  See id.

52.    The primary goal of chapter 11 is to promote the restructuring of the debt

obligations of a debtor.  Congress recognized that the continuation of the operation of a debtor's

business as a viable entity benefits the national economy through the preservation of jobs and

continued production of goods and services.  The Supreme Court echoed these sentiments in

recognizing that "[t]he fundamental purpose of reorganization is to prevent a debtor from going

into liquidation, with an attendant loss of jobs and possible misuse of economic resources."  In re

Drexel Burnham Lambert Group Inc., 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992) (quoting

N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 528 , 104 S. Ct. 1188, 1198 (1984)).

53.    The Plan accomplishes these goals by providing the only means through which

the Debtors may continue to operate as a viable entity.  Moreover, the support of the Plan by the

Official Creditors Committee and the Ad Hoc Committees[11] reflects the collective

---

[11] Despite the dissenters' assertions, the Debtors' negotiation of the treatment of the MCIC Senior Debt Claims
with the Ad Hoc Committee of MCIC Senior Notes Holders prior to the time the Debtors filed their Plan did not
violate section 1125(b) of the Bankruptcy Code, which prohibits the solicitation of acceptance or rejection of a plan
without the simultaneous transmission of a plan or plan summary and an approved disclosure statement.  See Trans
World Airlines, Inc. v. Texaco Inc. (In re Texaco Inc.), 81 B.R. 813, 814 (S.D.N.Y. 1988) (settlement providing that
party not "vote for, consent to, support or participate in the formulation of any [plan other than the debtor's" did not
violate section 1125(b)]); In re Clamp-All Corp., 233 B.R. 198, 205-206 (Bankr. D. Mass. 1999) (similar); Duff v.
United States Trustee (In re California Fidelity, Inc.), 198 B.R. 567, 571-72 (9th Cir. BAP 1996) (recognizing that
solicitation has been interpreted as a "specific request for an official vote" and that "[m]ost courts have reasoned that
a broader construction of the term would curtail free and honest negotiations among creditors and, therefore, inhibit
creditor participation in the debtor's reorganization"); In re Dow Corning Corp., 227 B.R. 111, 118 (Bankr. E.D.
Mich. 1998) (similar); In re Snyder, 51 B.R. 432, 437 (Bankr. D. Utah 1985) (similar); Zentek GBV Fund IV, LLC

27

acknowledgment by the Debtors' major creditor constituencies that the Plan provides

fundamental fairness and the greatest possible recovery to creditors. Inasmuch as the Plan

promotes the rehabilitative objectives and purposes of the Bankruptcy Code, including the

reorganization of the Debtors, the preservation of the Debtors' going concern value, the

preservation of 55,000 jobs, and the maximal use of estate resources, the Plan meets the good

faith requirements of section 1129(a)(3).

### A. The Only Equitable Plan that Could Be Filed by the Debtors is the Two-Entity Substantive Consolidation Plan

54. The only plan of reorganization that could be proposed by the Debtors is the two

entity substantive consolidation set forth in the Plan. The substantive consolidation proposed by

the Debtors in these cases is appropriate where, as here, "(i) . . . creditors dealt with the [debtor]

entities as a single economic unit and 'did not rely on their separate identity in extending credit,'

or (ii) . . . the affairs of the debtors are so entangled that consolidation will benefit all creditors."

Union Sav. Bank v. Augie/Restivo Banking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.),

860 F.2d 515, 518 (2d Cir. 1988) (citations omitted; emphasis added);[12] see also F.D.I.C. v.

---

v. Vesper, Nos. 00-5385, Nos. 00-5386, 2001 WL 1042217 (6th Cir. Aug. 29, 2001) (same); In re Kellog Square Ptrshp., 160 B.R. 336, 340 (Bankr. D. Minn. 1993) ("[l]imiting the bar of § 1125(b) . . . avoids a chill on debtors' post-petition negotiations with their creditors, one which otherwise might prove devastating to the reorganization process.").

[12] Despite the objectors' assertions to the contrary, substantive consolidation remains an available remedy in chapter 11 cases after the Supreme Court's decision in Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 119 S. Ct. 1961 (1999). See In re Stone & Webster, Inc., 286 B.R. 532, 540 (Bankr. D. Del. 2002) (after considering thoroughly the Grupo Mexicano decision, the court found "clear statutory authority in the Bankruptcy Code for substantive consolidation in Chapter 11 cases."). In Grupo Mexicano, the Supreme Court held that federal courts do not have authority to grant provisional remedies pursuant to Rule 65 of the Federal Rules of Civil Procedure (preliminary injunction) to potential creditors who have not received judgments against a defendant because such a remedy was neither specifically authorized by statute nor an equitable remedy administered by courts of equity at the time of the enactment of the Judiciary Act of 1789. Id. at 333. The Grupo Mexicano "holding has nothing to do with substantive consolidation or the authority of a bankruptcy court to grant the remedy of substantive consolidation." In re Stone & Webster, 286 B.R. 532, 538 (Bankr. D. Del. 2002). Authority to substantively consolidate (a) is derived from the general equitable powers vested in courts pursuant to section 105 of the Bankruptcy Code, (b) has been recognized by the Supreme Court since 1941 and (c) has been acknowledged by the Advisory Committee for the Federal Rules of Bankruptcy Procedure. See id. at 538-539. As stated by the court

28

Colonial Realty Co., 966 F.2d 57, 59 (2d Cir. 1992) (citing two-part Augie/Restivo test); In re

599 Consumer Elecs., Inc., 195 B.R. 244 (S.D.N.Y. 1996) (same); In re Leslie Fay Cos., Inc.,

207 B.R. 764 (Bankr. S.D.N.Y. 1997) (same); In re Gucci, 174 B.R. 401 (Bankr. S.D.N.Y. 1994)

(same); In re I.R.C.C., Inc., 105 B.R. 237, 243 (Bankr. S.D.N.Y. 1989) (same).

      55.     Based on the facts and circumstances of these cases, the Debtors believe, and the

Official Creditors Committee agrees, that by substantively consolidating and pooling the

WorldCom Debtors' assets and liabilities for distribution purposes, the Plan benefits all

creditors.[13]  Substantive consolidation of the WorldCom Debtors, which is the only fair way to

divide value among disparate entities, is compelled by, among other things, (a) the irreparable

entanglement of the WorldCom Debtors, who managed their business along product lines, not

legal entities, (b) the inability to allocate the Debtors' physical assets and receivables among

legal entities, (c) the inability to reconcile Intercompanies, and (d) the corresponding inability to

determine, with any accuracy, the distributable value of any Intercompanies.  Accordingly, and

because the Debtors' proposal of such substantive consolidation accords with applicable law, the

Plan's good faith is apparent.

---

in the In re Stone & Webster decision, "I seriously doubt that the above discussed longstanding judicial precedent
has been overruled by Grupo Mexicano." Id. at 540.

    [13] Since the Intermedia Debtors were acquired by WorldCom in the year prior to the Petition Date, had not been
fully integrated into the Debtors' operations and continued to prepare, to a certain extent, separate consolidated
financial statements, annual reports and other financial information, their affairs are not irreparably entangled with
the WorldCom Debtors.  See Deposition of John S. Dubel (former Interim Chief Financial Officer for the Debtors),
July 30, 2003 at 186:14 – 187:2.  Accordingly, it would be inappropriate to consolidate the Intermedia Debtors
with the WorldCom Debtors.  By way of contrast, the financial affairs of the remaining WorldCom Debtors are
hopelessly intertwined and must be consolidated.  In light of the foregoing, and because the Plan avoids the
unnecessary substantive consolidation of the Intermedia Debtors, criticism of the Debtors' good faith is
unwarranted.

4403486 v11

1.    **Substantive Consolidation is Appropriate Where
the Debtors Operated as an Integrated Enterprise**

56.    Augie/Restivo established a two prong analysis for determining the propriety of

substantive consolidation.  Courts within this circuit approve substantive consolidation under the

first prong[14] where debtors operate as an integrated business without regard to legal entities.  See

Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.), 369 F.2d 845 (2d Cir.

1966) (approving substantive consolidation of the debtor corporations, upon a finding, among

other things, that they operated as a single unit with little or no attention paid to the formalities

usually observed in independent corporations); In re Drexel Burnham Lambert Group, Inc., 138

B.R. at 743-44 (consolidating the Debtors into two separate groups upon a finding that doing so

"accord[ed] with the reality of Drexel's operation, the public perception of Drexel and the

available financial information about Drexel"); In re Commercial Envelope Mfg. Co., No.

76B2354, 1977 WL 182366, at *5 (Bankr. S.D.N.Y. Aug. 22, 1977) (granting substantive

consolidation, finding, among other things, that "[m]any of the day to day operations have

occurred as though the debtors were one consolidated and integrated entity.").

57.    In these cases, the Debtors operated their business as one integrated whole:

> As is typical with many large entities, whether in the telecom field or
> others, this particular business, because it is a telecommunications
> business, with multiple product lines, was managed more on a product line
> basis versus a legal entity by legal entity basis.

Deposition of John S. Dubel (former Interim Chief Financial Officer of the Debtors), July 30,

2003 at 34:5-12.

> [T]he day-to-day affairs of the business are organized around product and
> business lines; not specific legal entities.  The business lines have been
> created on a customer facing need in terms of which products are sold,

---

[14] See Debtors' Memorandum of Law in Support of Substantive Consolidation and in Opposition to Objections
Thereto at 73-84 (discussing Debtors' satisfaction of the "single unit" inquiry of Augie/Restivo).

how the sales force is aligned, how products are rolled out to meet the
needs of specific customer groups across the spectrum from mass market
to small business and on up to the commercial retail space.

Deposition of Victoria D. Harker (Senior Vice President of Financial Planning and Analysis for

the Debtors), July 22, 2003 at 68:24 - 69:7; see also id. at 69:19 - 70:18, 108:17-24, 116:3-13;

Deposition of John S. Dubel (former Interim Chief Financial Officer for the Debtors), July 30,

2003 at 89:17 - 90:10; Deposition of Robert A. Peterson (Chief Counsel of Technology and

Network Law for the Debtors), July 22, 2003 at 72:2-8; Deposition of Arthur D. Currie (former

Tax Services Partner with KPMG), August 14, 2003 at 117:1-4; Deposition of Susan Mayer

(former Senior Vice President and Treasurer for the Debtors), August 20, 2003 at 85:3-4;

Deposition of Terry Savage (Managing Director of Lazard, Frères & Co. LLC, financial advisor

to the Debtors), August 4, 2003, 37:22–23.  Accordingly, the Debtors, in good faith, proposed a

substantive consolidation plan that comports with the facts of these cases and the law.

> ### 2.    The Irreparable Entanglement and Inability to Reconcile and Value Intercompany Accounts of the WorldCom Debtors Forced the Debtors to Propose a Plan Based Upon Substantive Consolidation

58.    In addition, the Debtors had no choice but to propose the substantive

consolidation of the WorldCom Debtors because of the irreparable entanglement and inability to

reconcile and value Intercompanies or allocate the Debtors' physical assets and revenue among

legal entities.  Under the second prong of Augie/Restivo, substantive consolidation is warranted

where the affairs of debtors are irreparably entangled, regardless of a debtor's separate securities

and tax filings, structural subordination provisions appearing in public filings[15], individual

---

[15]    One such provision, quoted by the Dissenting Trade Claims Purchaser Committee provides that "debt securities will be 'structurally subordinated' to all obligations . . . of our subsidiaries, which means that, in case of insolvency or bankruptcy, the claims of the direct creditors of our subsidiaries would have to be satisfied before any funds would be available to the holders of the debt securities as creditors of WorldCom only."  Trade Claims Purchaser Plan Objection at 9-10 (quoting Prospectus dated May 9, 2001 for WorldCom, Inc. (emphasis added)).

31

ownership of intellectual property and other acts that might support a creditor's reliance on a

debtor's separate credit. [16]  See Augie/Restivo, 860 F.2d at 518-19 (describing creditor reliance

and entanglement tests in the alternative); In re 599 Consumer Elecs., Inc., 195 B.R. at 248

(reasoning that the two factors are "alternatively sufficient criteria."); Chemical Bank, 369 F.2d

845 (finding that despite failure to show that objecting creditor had relied upon all of the Debtors

as a group, substantive consolidation was appropriate because of the excessive entanglement of

the Debtors' affairs).

59.    As the court recognized in In re Drexel Burnham Lambert:

> The myriad of issues that exist between and among the several Debtors
> that are resolved by the substantive consolidation and other Plan
> provisions would delay reorganization and distributions to Creditors for an
> indefinite period absent such consolidations . . . .  Establishing to whom
> actual liability, if any, should be allocated would be a herculean task
> consuming years of costly professional services, thereby draining
> significant amounts of value from the Debtors' estates.  The
> reorganization effort will be obstructed irreparably and certainly to the
> detriment of most if not all creditors of the Debtors by an effort to tease
> apart pieces of an integrated whole . . . .  Among other things, failing
> consolidation, years of intercorporate litigation can be anticipated merely
> to recover intercompany accounts, some of which may be subject to
> contractual or equitable subordination.

138 B.R. at 744, 766-67; see also In re I.R.C.C. Inc., 105 B.R. at 243 (finding, among other

things, that "management left the books and records of all the debtors in disarray and . . . the

trustee in bankruptcy cannot begin to unscramble the chaotic financial picture"); In re Interstate

Stores, Inc., No. 70B 614-802, 1978 Bankr. LEXIS 11, at *5, *18 (Bankr. S.D.N.Y. Jan. 27,

---

[16] See, e.g., Soviero v. Franklin Nat'l Bank, 328 F.2d 446, 448 (2d Cir. 1964) (the filing of separate state tax returns to secure a tax benefit does not affect substantive consolidation); Central Claims Svcs. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 192 B.R. 903 (Bankr. S.D. Oh. 1996) (same); In re Standard Brands Paint Co., 154 B.R. 563, 572 (Bankr. C.D. Cal. 1993) (finding that, notwithstanding references to their separateness in public filings, "the debtors function[ed] as a consolidated entity, and there [were] multiple interdebtor guarantees, and interdebtor debts . . . .  Thus, in a functional sense the affairs of all five debtors [were] so entangled that consolidation will benefit all creditors . . . ."); see also Kmart v. Cartier, Inc., 486 U.S. 281, 299, 108 S. Ct. 1811, 1821 (1988) ("[T]he parent corporation – and not the subsidiary whose every decision it controls -- better fits the bill as the true owner of any [trademark] property that the subsidiary nominally possesses.").

32

1978) (finding with respect to one group of consolidated debtors that the "debtors had common

management and centralized purchasing and payment procedures . . . and, most importantly, it

would be impossible to ascertain which debtor is the obligor with respect to the debt owed to any

particular trade creditor since the accounting for such transactions was, in effect, done on a

consolidated basis . . . .  [T]he relationship of the[] debtors [was] 'hopelessly obscured.'"); In re

Commercial Envelope Mfg. Co., 1977 WL 182366, at *5 (granting substantive consolidation and

finding "the inter-relationships are complex and in many instances obscured . . . .  [E]ven if the

expense of an audit were undertaken, there could be no assurance that it would be successful in

unscrambling the relationships.").

60.    Here, the threat to ultimate creditor recoveries presented by the prospect of the

Debtors remaining in chapter 11 while making futile efforts to create accurate consolidating

financials, is far greater than in past cases, such as Drexel, in which substantive consolidation

was approved.

61.    A comprehensive study of the Debtor's financial affairs by FTI, for instance,

establishes that because the Debtors managed their business along product lines (which

encompass or cross legal entities, and not by legal entity), the intercompany balances have not

been reconciled by the Debtors and cannot be accurately determined on a consolidating basis.

Among other things, FTI's findings establish that:

- the Debtors' general ledger employs in excess of 1,000 general ledger company codes despite the fact that there are only 222 domestic Debtors in these cases and 500 legal entities incorporated within the Debtors' worldwide business enterprise;

- an accurate and complete map which shows which general ledger company codes are associated with which legal entities does not exist;

- no audit or review of separate legal entity financial statements has been completed during the past three years, except for the Intermedia Debtors (only consolidated results have been audited);

33

- the Debtors have completed multiple corporate legal restructurings involving the transfer of legal entities and assets (e.g., UUNet, Network Services and MFS) to MCIC and was still in the process of completing a restructuring of its wireless units on the Petition Date;

- internal controls for properly recording activity by separate legal entity have not been in place and were not a focus of management review or control and, as a result, in numerous instances Intercompanies were not recorded to the proper legal entity;

- previous management is not available to explain their rationale for recording certain transactions and documentation is often unavailable;

- intercompany accounts, cash, PP&E, accounts receivable, and similar items were not reconciled on a legal entity by legal entity basis;

- there appear to be known errors on a separate legal entity basis, including intercompany transactions; and

- the ongoing restatements due to fraudulent activity of the past have given rise to questions concerning the accuracy of any prepetition recording of information by legal entity.

See Expert Opinion of Joseph L. D'Amico, August 19, 2003 at 4-8, 9-18; FTI Letter to Official Creditors Committee, dated March 24, 2003 at 3-4; Deposition of David Yarbrough (Managing Director of FTI), July 10, 2003 at 153:21 – 155:13.

62.    Professionals with Alix Partners, the turnaround managers hired by the Debtors at the outset of these cases, agree with FTI's opinion that it would be next to impossible for the Debtors' to ever prepare accurate separate legal entity financial statements as of July 21, 2002. Summarizing the WorldCom Debtors' accounting chaos, John S. Dubel of Alix Partners stated:

> In order to create accurate . . . legal entity financial statements . . . you need to look at all of the different categories of assets, liabilities and equity. The intercompany accounts [include] specific receivables and payables, and so you need to look at . . . receivables, non-intercompany receivables, property, plant, equipment, real estate, cash accounts, the liabilities, et cetera, and determine whether or not they are properly stated and accurately stated on a legal entity by legal entity basis.
>
> There has been in many of these other categories a lack of control, internal controls, as it relates to the reconciliation of subledgers to ledgers. There

34

> is a lack of documentation that would support the entries on a legal entity
> by legal entity basis as to which was the appropriate legal entity for the
> transactions to occur within.
>
> There was effectively no management focus on a contemporaneous basis
> of managing the financial accounts on an entity, legal entity by legal entity
> basis as the company's focus was more on a product line basis.
>
> There was a general lack of quality accounting personnel that would again
> cause concern, and those are just some of the other reasons.

Deposition of John S. Dubel (former Interim Chief Financial Officer for the Debtors), July 30,

2003 at 89:3 – 90:10.  In light of these and myriad other issues, the Debtors and their

professionals concluded that it would be impossible to generate accurate separate legal entity

financial statements for the Debtors.  See id. at 73:8-14.

63.    The unreliability of the Debtors' intercompany records within this milieu is

manifest.  For example, FTI discovered, among other things, that: (a) MCIWC had reflected a

*negative* $4.3 billion cash balance as of June 30, 2002; (b) that billions of dollars in royalties

were recorded as liabilities of certain general company codes rather than as liabilities associated

with other general ledger company codes as required by the agreements for such royalties; (c) the

Debtors completely failed to record $1 billion in intercompany royalty charges that were

calculated for the year ended December 31, 2001; (d) interest was charged on certain

intercompany account balances, but not on all intercompany accounts; (e) interest was not

charged in accordance with the terms of the intercompany notes, thereby misstating the

intercompany balances for the affected WorldCom Debtors; (f) tax allocations were not made for

federal income tax purposes; and (g) the Debtors did not reconcile their intercompany accounts.

See, e.g., Expert Opinion of Joseph L. D'Amico, August 19, 2003 at 4-8, 9-18

64.    FTI's conclusions have, in turn, been corroborated by the KPMG Report, the

GSA and the Examiner.  KPMG identified numerous "material weaknesses" in the Debtors'

internal accounting controls presenting a significant risk of errors or fraud. The GSA's

Debarment of the Debtors also is predicated, among other things, on the Debtors' lack of internal

accounting controls. Similarly, the Examiner independently concluded that an insufficient

budget and a focus on maximizing revenue, reducing costs and improving efficiencies, may have

contributed to the Debtors' ineffective internal auditing processes. Thus, the Debtors, the

Examiner, the Debtors' independent auditors, the Official Creditors Committee and its

professionals, the Ad Hoc Committees, and agencies of the United States government all

concluded that the Debtors' intercompany financial records are irreconcilable or, at least, utterly

undependable.

65.    Coupling the unreliability of the Intercompanies with the inability to determine

the value of each Debtor separately precludes any other form of consolidation. For example, in

order to separate out WorldCom from the remaining Debtors, WorldCom's assets would need to

be determined. The assets of WorldCom, or any WorldCom Debtor, can only be determined if,

among other things, the value of each Intercompany (i.e., the recovery that WorldCom will

receive on account of the Intercompany) due to WorldCom is determined. In order to determine

the value of the Intercompany assets of WorldCom, the assets and liabilities of every single one

of the WorldCom Debtors that is an obligor on an Intercompany due to WorldCom needs to be

determined, along with assets and liabilities of every WorldCom Debtor that is an obligor on an

Intercompany due to a WorldCom Debtor that is an obligor on an Intercompany due to

WorldCom and so on and so on. Thus, it is only possible to separate WorldCom (or any other

Debtor) from the WorldCom Debtors if the assets and liabilities of each WorldCom Debtor can

be accurately determined, in which case substantive consolidation in any form is not appropriate.

66.     For these reasons, the Debtors' substantive consolidation proposal is both

mandated by, and entirely consistent with, applicable precedent.

### 3.     The Plan Benefits All Creditors and Does Not Unfairly Prejudice Any Creditor Group

67.     Claiming that the Plan is inequitable to certain creditors and overly generous to

others, those that object to the Plan fail to recognize that by foreclosing the indefinite delay and

enormous expense of further efforts to construct reliable consolidating financial information,

which almost certainly is not possible, and lengthy litigation over Intercompanies, the Plan

benefits all creditors.  In substance, they ignore the admonition of the Augie/Restivo Court that

"where 'the time and expense necessary even to attempt to unscramble [the commingled affairs

of affiliated debtors] is so substantial as to threaten the realization of any net assets for all of the

creditors,' . . . or where no accurate identification and allocation of assets is possible, . . . all

creditors are better off with substantive consolidation." 860 F.2d at 519 (emphasis added); see

also James Talcott, Inc. v. Wharton (In re Continental Vending Mach. Corp.), 517 F.2d 997,

1001 (2d Cir. 1975) (noting that the inequities of substantive consolidation may be "heavily

outweighed by practical considerations such as the accounting difficulties (and expense) which

may occur where the interrelationships of the corporate group are highly complex, or perhaps

untraceable" and overruling the objection of a secured creditor).  Here, the Official Creditors

Committee, the Debtors, the Ad Hoc Committees, with the assistance of their various

professionals, and a litany of other parties with diverse interests all concluded that, as required

by Augie/Restivo, "no accurate identification and allocation of the [WorldCom Debtors'] assets

is possible." 860 F.2d at 519.  Accordingly, substantive consolidation benefits all creditors in

these cases because there is no other choice.  The alternative, years of forensic accounting and

37

intercompany litigation – foreshadowed by several objections to the Plan – would destroy the Debtors' business to the detriment of all parties in interest.

68.    Those arguing that the WorldCom Debtors and MCI Debtors should be separately consolidated ignore the fact that to propose such a substantive consolidation, the Debtors need some method of valuing the assets and liabilities of the MCI Debtors separate and apart from the other WorldCom Debtors.  The Plan negotiators correctly concluded, upon advice from FTI and the Debtors, that the Intercompanies consist of claims which are impossible to value without accurate information regarding the separate assets and liabilities of each WorldCom Debtor.

69.    Finally, given the impossibility of reconciling the Debtors' affairs, the Dissenting Trade Claims Purchaser Committee's and others' assertions that WorldCom's creditors absconded with $3 billion of value at the expense of consolidated MCIC creditors is plainly misguided.  Since the value of any one Debtor's estate depends upon the ability to reconcile the Intercompanies that affect it and the value of its subsidiaries, the value of any one estate is impossible to determine.  Thus, whether the Plan favors the creditors of one estate over another and by how much is similarly not possible to ascertain.  In sum, as (a) WorldCom is a direct creditor of many of its subsidiaries, (b) many of WorldCom's subsidiaries are direct creditors of one another and (c) it is impossible to (i) reconcile WorldCom's claims against its subsidiaries or its subsidiaries' claims against one another or (ii) determine the actual recoverable value of any one of those claims (i.e., is a claim against MCI International worth zero, five or one hundred cents?), it is not possible to identify the value existing in any one of the WorldCom Debtors' estates.  Thus, substantive consolidation as proposed in the Plan is a necessity and evidences the Debtors' good faith.

38

### 4. Challenges to the Debtors' Transfer Pricing Program Foreshadow the Endless Intercompany Litigation Avoided by the Plan

70.    By challenging the substantive consolidation proposed by the Debtors on the grounds that their intercompany agreements, such as the Intangible Assets License Agreement, are unenforceable, the objectors ignore applicable state and federal law[17] and provide but a sample of the endless litigation that will ensue in the absence of the substantive consolidation proposed in the Plan.

71.    The Debtors executed the Intangible Assets License Agreement (the "Brands Agreement") and commissioned a detailed transfer pricing analysis (prepared by KPMG) to ensure that the royalties charged pursuant to the Brands Agreement satisfied the arm's length standard of the Internal Revenue Code as forth in 26 U.S.C. § 482 ("section 482").[18] The transfer pricing study concludes that, as a result of the merger and integration of the MCI Debtors with and into the other Debtors, the Debtors' integrated business enterprise had the potential to earn higher than normal returns because of its unique ability to provide bundled telecommunications services. KPMG, Intercompany Pricing Analysis: MCIWorldCom, June 11, 1999 at 20-24. Thus, this transfer pricing analysis supports the royalties reported in the Debtors' federal income tax returns as well as their state and local tax returns. Specifically, the analysis indicates that the amounts accrued under the Brands Agreement are royalties and are properly treated as such for tax purposes (i.e., deductible by the licensees and treated as royalty income by the licensor).

---

[17] The validity and legality of claims is generally determined under section 502 of the Bankruptcy Code with reference to applicable non-bankruptcy law. In re Northway Agencies, Inc., 106 B.R. 29 (N.D.N.Y. 1989). Federal law may also determine if a claim would be enforceable outside of bankruptcy. In re Sanford, 979 F.2d 1511 (11th Cir. 1992).

[18] Such an analysis is required for federal income tax purposes.

72.     The objectors argue that aspects of the transfer pricing analysis are not in accordance with the standards of section 482.  While not accurate, even if such a position was accepted, it would not eliminate the obligation of the licensees to pay amounts accrued under the agreements.  Rather, noncompliance with section 482 could bar deduction of such amounts by the licensees for tax purposes, effectively allocating income of the licensees to the licensor.  To conform the licensees' and licensor's accounts to reflect this adjustment, the licensees would be deemed to have accrued the payment to the licensor in the licensees' capacity as subsidiaries of the licensor.  In other words, the royalty would be effectively recharacterized as a dividend by the licensees to the licensor.  But regardless of the proper tax treatment of the royalties, the Debtors' intercompany royalty claims cannot be summarily dismissed, as argued by some objectors, because they are based on the Brands Agreement, which was duly executed, supported by consideration, and is thus enforceable between the Debtors.[19]  See generally Gillenardo v. Connor Broadcasting Delaware Co., 98C-06-015, 2002 WL 991110, at *6 (Super. Ct. Del. April 30, 2002) (a valid contract under Delaware law requires an offer, acceptance, consideration, and sufficiently specific terms that determine the obligations of the parties).

73.     Equitable subordination of the Debtors' intercompany royalty claims, which would subordinate such claims to the Debtors' other creditors, would be appropriate only if (a) the Debtors engaged in some type of inequitable conduct in order to create the claim and (b) such conduct caused injury to the Debtors' creditors or conferred an unfair advantage on the Debtors as intercompany claimants, which is not the case here.  See In re Mobile Steel Co., 563 F.2d 692

---

[19] Moreover, the Brands Agreement was an integral part of the Restructurings, under which substantial assets were distributed amongst the Debtors.  To invalidate or unwind the transfer pricing arrangement would, by necessity, raise intractable issues concerning (a) whether the Restructurings (including the asset transfers) must be invalidated and/or unwound and (b) the avoidability of the transfer of assets pursuant to the Restructurings and the billions of intercompany transactions that occurred thereafter.

40

(5th Cir. 1977); see also In re KDI Holdings, Inc., 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999).

The objectors have not alleged, nor can they establish, any inequitable conduct or "bad act" by

the Debtors because their transfer pricing arrangement is part of a synergy maximization and

valid tax minimization plan that was designed to satisfy the 'arm's length' transfer pricing

provisions of section 482.  See Expert Report of Richard Pomp, August 19, 2003 at 10 (The

Debtors' "use of royalties is legitimate and legal.  The transactions that generated the royalties

were not shams.  [The Debtors] had valid and legitimate business purposes supporting the

payment of royalties.").

74.    The Plan, if confirmed and consummated, will prevent years of complex and

uncertain litigation asserted by interested parties, including:

- the validity of approximately $1 trillion of intercompany claims, including the royalty claims;

- whether any of the Restructurings and corresponding transfers of legacy WorldCom assets to legacy MCIC entities (which formed the basis for the royalties) constitute a fraudulent conveyance;

- the validity of the Debtors' six transfer pricing agreements (Shared Network Costs, Sales Services, Purchasing Services, Correspondence Costs, Management Services and Trademark License and Royalties) under state contract law and section 482;

- the interpretation of each of the transfer pricing agreements;

- the recharacterization of transfer pricing payments;

- whether at any point in time the incurrence of the obligations under the transfer pricing agreements rendered the applicable Debtor insolvent;

- equitable subordination of the claims arising under the transfer pricing agreements;

- whether any of the various intercompany claim reconciliations occurring in the year prior to the Petition Date resulted in an insider preference under section 547 of the Bankruptcy Code, whether any section 547(c) defenses apply and the mandated level of recovery necessary to satisfy section 502(d) of the Bankruptcy Code;

41

- the validity of the Debtors' prepetition cash management system;

- whether the cash management system complies with the Statute of Frauds;

- whether any of the transfers pursuant to the cash management system was a fraudulent conveyance;

- whether any of the transfers pursuant to the cash management system should be recharacterized; and

- whether any of the transfers pursuant to the cash management system should be equitably subordinated.

75.    In short, in the absence of the two entity substantive consolidation proposed by the Plan "[t]he reorganization effort will be obstructed irreparably . . . by an effort to tease apart pieces of an integrated whole . . . . [Y]ears of intercorporate litigation can be anticipated merely to recover intercompany accounts . . . ." In re Drexel Burnham Lambert Group Inc., 138 B.R. at 766-67.  Thus, the Plan's substantive consolidation should be approved.

### B.    The Intermedia Settlement, the MCIC Senior Notes Settlement, and the Bank Settlement were Each Proposed in Good Faith

76.    The Intermedia Settlement, the MCIC Senior Notes Settlement and the Bank Settlement (collectively, the "Settlements"), each of which is described and discussed at length below, are the product of (a) good faith arm's length negotiations and (b) the settling parties' desire to preserve the long term viability of the Debtors' business and maximize the value of the Debtors' estates for the benefit of all creditors.  The Settlements strike a reasonable balance between (a) each party's probability of success on the merits of the relevant litigation, (b) the complexity of the litigation, and the attendant expense, inconvenience, and delay associated with a failure to reach a settlement and (c) the best interests of competing creditor constituencies.

77.    While the issues surrounding the Settlements were known to the Debtors and their various creditor constituencies and generally discussed both in the prepetition and postpetition periods, the "100-Day Initiative" triggered the intense, complex and lengthy negotiations by and

42

among various creditor constituencies and the Debtors, which resulted in the Settlements.

Spurred by growing concern about the Debtors' ability to maintain employee loyalty, generate

new business, and maintain existing business during the few months prior to the filing of the

Plan, various creditors and the Debtors met regularly and worked tirelessly in an attempt to reach

a consensual plan of reorganization.

78.    The concern of the Official Creditors Committee, the Debtors and other major

constituencies was the proverbial "melting ice cube" until the Plan is effected.  As explained by

Brian Dengler, the representative of AOL Time Warner on the Official Creditors Committee, the

"melting ice cube" problem is:

> [The] concern was that by allowing the case to languish and given the
> public perception, the public discomfort and the corporate discomfort of
> dealing with such a large entity in bankruptcy for future business would
> ultimately degrade WorldCom's ability to generate new business and
> could lead to a continuing bleed of existing . . . businesses as customers of
> WorldCom would diversify their network services to other entities.

Deposition of Brian Dengler, July 31, 2003 at 112:2-12; see Deposition of Mark Neporent

(representative of Cerberus Capital Management, L.P. on the Official Creditors Committee and

Co-Chairman of the Official Creditors Committee), August 7, 2003 at 240:3-9 ("We were also

very concerned about the melting ice cube.  We were experiencing, we think, a real risk of heavy

diminution in value because of the business continuing to deteriorate, so the more concern[ed]

we got about that, the more willing some people were to try to reach a settlement."); Deposition

of David Lee (representative of Electronic Data Systems Corp. on the Official Creditors

Committee), July 31, 2003 at 120:9-15 ("I thought that there was significant value to all of the

creditors to getting the [C]ompany out of bankruptcy as soon as possible and preventing further

decline in the value of the company that, in my opinion, would hurt all of the creditors.").

43

79.    Given the parties' concern that the Debtors' business would lose value if the Plan

was not effected on an expedited basis, all concerned parties dedicated their best efforts and

negotiated at arm's length to achieve the Settlements.  They did this with the understanding that

(a) the data they relied upon was uncertain due to the Debtors' restatements and inability to value

and validate the Intercompanies and (b) any attempt to create an empirically precise basis for the

Settlements would take years to complete, would ultimately be futile and such delay would harm

the enterprise value of the estates.  Thus, the Settlements evidence the good faith of the Plan.

## II.    THE SETTLEMENTS EMBODIED IN THE PLAN SHOULD BE APPROVED

80.    Incorporated in the Plan are the compromise and settlement of various complex

issues, which settlements were extensively negotiated among the Debtors and the Ad Hoc

Committees, approved by the Official Creditors Committee and representatives of approximately

90% of the Debtors' creditors, and which benefit the Debtors' estates and creditors.  The three

major Settlements in the Plan are:

(a)    the MCIC Senior Notes Settlement, which resolves unique legal issues regarding substantive consolidation and avoidance litigation as it relates to the holders of the MCIC Senior Debt Claims who are members of the Ad Hoc Committee of MCIC Senior Notes Holders;

(b)    the Intermedia Settlement, which resolves issues related to (the "Intermedia Settlement Issues"): (i) recharacterization of the Intermedia Intercompany Note; (ii) the Intermedia Avoidance Actions, which include fraudulent conveyance and preference claims; and (iii) the accounting and treatment of assets and liabilities of Intermedia and issues relating to WorldCom's acquisition of Intermedia (the "Intermedia Valuation Claims"); and

(c)    the Bank Settlement, which resolves issues relating to claims of certain Bank Group members regarding (i) allegations that funding under the 364-Day Facility was fraudulently obtained by the Debtors and that any amounts received by the Debtors are subject to a constructive trust for the benefit of the Banks that are plaintiffs (the "CTA Banks") in an action asserting constructive trust against the Debtors (the "Constructive Trust Action"); and (ii) an action commenced by certain Bank Group members

44

(the "Maryland Banks," and together with the CTA Banks, the "9019 Banks") seeking damages resulting from alleged negligence and negligent misrepresentation committed in connection with the funding under the 364-Day Facility (the "Maryland Action," and together with the Constructive Trust Action, the "Bank Actions").

81.     Courts, as a general rule, favor compromise, as compromises are "a normal part of the process of reorganization."  Barry v. Smith (In re New York, N.H. & H.R. Co.), 632 F.2d 955, 959 (2d Cir. 1980) (citing Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130, 60 S. Ct. 1, 14 (1939)); see In re Best Prods. Co., 168 B.R. 35, 44 (Bankr. S.D.N.Y. 1994), aff'd, 68 F.3d 26 (2d Cir. 1995).  A debtor entering into compromises and settlements with respect to complicated factual and legal disputes comports with the general public policy favoring settlements.  Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163 (1968) (citing Case, 308 U.S. at 130, 60 S. Ct. at 14); In re Hibbard Brown & Co., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

82.     Pursuant to Bankruptcy Rule 9019 "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019.  The bankruptcy court may exercise its discretion and make an independent determination of whether to approve a settlement under Bankruptcy Rule 9019.  See Nellis v. Shugrue, 165 B.R. 115, 123-124 (S.D.N.Y. 1994); see Hibbard Brown, 217 B.R. at 46.

83.     A settlement may be approved by a bankruptcy court where it is "supported by adequate consideration, is 'fair and equitable,' and is in the best interest of the estate."  The Air Line Pilots Assoc., Int'l v. American National Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994); see TMT Trailer Ferry, 390 U.S. at 424, 88 S. Ct. at 1163.  The bankruptcy court is not required to determine the questions of law and fact raised by the issues to be settled but, rather, to determine whether the settlement "fall[s] below the lowest point in the range of reasonableness."  In re W.T. Grant Co.,

45

699 F.2d 599, 608 (2d Cir. 1983) (citing Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)).

To determine whether the proposed settlement satisfies the "lowest range of reasonableness" test,

courts consider the following factors:

> (a)    the probability of success in the litigation;
>
> (b)    the difficulties associated with collection;
>
> (c)    the complexity of the litigation, and the attendant expense, inconvenience,
>        and delay; and
>
> (d)    the paramount interests of the creditors.

See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir. 1992); In re

Ionosphere Clubs, 156 B.R. at 428; In re Best Prods. Co., 168 B.R. at 44-45.  These standards

"reflect the considered judgment that little would be saved by the settlement process if

bankruptcy courts could approve settlements only after an exhaustive investigation and

determination of the underlying claims."  See In re Best Prods. Co., Inc., 168 B.R. at 51 (citing

In re Purofied Down Prods. Corp., 150 B.R. 519, 522-23 (S.D.N.Y. 1993)).  Among other

factors, when exercising this discretion, the bankruptcy court may consider the experience and

competency of counsel supporting the settlement.  Nellis, 165 B.R. at 124; In re Ionosphere

Clubs, Inc., 156 B.R. at 426; In re Purofied Down Prods. Corp., 150 B.R. at 521.

84.    Courts have found that settlements benefit creditors and should be approved

when, among other things: (a) claimants settle for less than the value of their claims, (b) the

settlement allows a debtor to proceed to confirmation without the obstacle of litigation in its

path, and (c) litigation would be detrimental to the debtor and its creditors due to the expense and

time such litigation would require.  See O'Cheskey v. United States, No. 3-00-CV-0142-P, 2001

U.S. Dist. LEXIS 21370, at *10 (N.D. Tex. Dec. 21, 2001) ("[T]he bankruptcy court found that

the settling parties conferred value on the estates by settling for amounts that likely were less

46

than the value of their claims."); <u>Saccurato v. Mars Leasing Co. (In re Masters, Inc.)</u>, 149 B.R.

289, 293 (E.D.N.Y. 1992) (stating that creditors' withdrawal of (a) motion to dismiss claims, (b)

claim as an unsecured creditor, and (c) objection to substantive consolidation benefited debtor by

allowing it to proceed to confirmation without such obstacles); <u>In re Walnut Equip. Leasing Co.</u>,

No. 97-19699 DWS, 1999 WL 288651, at *5 (Bankr. E.D. Pa. May 4, 1999) (finding settlement

of substantive consolidation to be in creditors' interests after taking into account various

scenarios of recovery to creditors and deleterious impact of litigation); <u>In re Allegheny Int'l, Inc.</u>,

118 B.R. 282, 309 (Bankr. W.D. Pa. 1990) (finding that benefits of settlement included, among

other things, (a) the elimination of substantial expenses to the estate that otherwise would be

incurred if the litigation continued through trial and subsequent appeal; (b) the elimination of the

risk of a verdict unfavorable to plaintiffs if the litigation should proceed to trial; (c) the ability to

proceed with the reorganization without the risk of delay arising from the litigation; (d) the

significant monetary concessions by banks on their claims, and (e) certain banks' acquiescence

to forego claims for postpetition interest and defense costs); <u>In re Texaco Inc.</u>, 84 B.R. at 902-03

(noting that shareholders would receive no recovery if Pennzoil was paid its claim in full and,

therefore, settlement was fair and equitable, benefiting creditors, because Pennzoil received less

than its full claim, allowing shareholders some recovery).

     85.     The premise of the Settlements is the resolution of complex legal and factual

issues.  By effecting the Settlements, the Debtors and their creditors removed specific obstacles

to confirmation of the Plan, thereby allowing an expedited exit from chapter 11, which benefits

all creditors.  Due to the complexity of the issues settled, as discussed below: (a) it is not possible

to determine the likelihood of success in litigating these issues; and (b) litigating the issues

would (i) delay the Debtors' emergence from chapter 11 thereby resulting in an attendant erosion

of significant value of the Debtors' estates, (ii) delay distributions to creditors, and (iii) add

innumerable costs to the Debtors' estates to the detriment of all creditors.  (See Deposition of

Mark Neporent) (representative of Cerberus Capital Management, L.P. on the Official Creditors

Committee and Co-Chairman of the Official Creditors Committee), August 7, 2003 at 240:3-9

(discussing concerns about the Debtors' business continuing to be a "melting ice cube" if their

chapter 11 cases were to be prolonged).  The Settlements were thoroughly negotiated and

reviewed by the Debtors, the Ad Hoc Committees, and the Official Creditors Committee, and

have the support of representatives of at least 90% of the Debtors' creditors.  Accordingly, the

Settlements fall within the range of reasonableness and should be approved.

### A.    The MCIC Senior Notes Settlement Should be Approved[20]

86.    The Plan includes a compromise and settlement of the treatment afforded to

holders of the MCIC Senior Debt Claims.  The Debtors, the Official Creditors Committee, and

the Ad Hoc Committees agreed that under the MCIC Senior Notes Settlement, MCIC Senior

---

[20]    This section of the Memorandum constitutes the Official Creditors Committee's objection to the Motion for Partial Summary Judgment Rejecting the MCIC Senior Settlement filed by the Dissenting Trade Claims Purchaser Committee.  Rule 56 of the Federal Rules of Civil Procedure, which is made applicable to contested matters pursuant to Bankruptcy Rule 9014, provides that summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law . . . ."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); Goldberg v. Cablevision Sys. Corp., 261 F.3d 318, 324 (2d Cir. 2001); Breeden v. Erie Islands Resort & Marina (In re Bennett Funding Group, Inc.), No. 96-613-76, 2003 Bankr. LEXIS 41, at *15 (Bankr. N.D.N.Y Jan. 2, 2003), adopted by In re Bennett Funding Group, Inc., 292 B.R. 476 (N.D.N.Y. 2003).  The moving party bears the burden of demonstrating that no genuine issue respecting any material fact exists.  Gallo v. Prudential Residential Serv., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  A fact is only material "if it affects the result of a proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences."  In re Crystal Apparel, Inc., 220 B.R. 816, 828 (Bankr. S.D.N.Y. 1998).  Further, "[i]n ruling on a motion for summary judgment, the court is required to draw all factual inferences in favor of, and take all factual assertion in the light most favorable to, the party opposing summary judgment."  Id.; see G.G. Survivor Creditor Corp. v. Harari (In re G. Survivor Corp.), 217 B.R. 433, 439 (Bankr. S.D.N.Y. 1998).

In this matter, the issue of whether the MCIC Senior Notes Settlement confers any benefit on the Debtors' estates and creditors is a "genuine issue as to a material fact."  The Dissenting Trade Claims Purchaser Committee erroneously asserts that the MCIC Senior Notes Settlement does not provide the Debtors' estates with any benefit.  It is clear, however, as discussed in detail herein and as will be proved at trial, that the MCIC Senior Notes Settlement confers a number of significant tangible benefits to the Debtors' estates and creditors.

Debt Claimants will receive a recovery on the principal amount of their outstanding debt equal to 80 cents on the dollar.  The settlement represents an amount equal to a distribution to all MCIC bondholders (including the MCIC Subordinated Debt Claimants) of approximately 62 cents on the dollar on account of the principal amount of their claims.  Upon giving effect to the contractual subordination provision contained in the indenture governing the MCIC Subordinated Debt Claims (the "MCIC Subordinated Debt Indenture") and resulting "give-up" of the MCIC Subordinated Debt Claimants' recovery to the MCIC Senior Debt Claimants, the recovery to the MCIC Senior Debt Claimants increases to 80 cents on the principal dollar amount. [21]  In turn, the recovery to MCIC Subordinated Debt Claimants is reduced to zero.

87.    Embodied in this settlement is a resolution with the members of the Ad Hoc Committee of MCIC Senior Notes Holders of numerous litigable complex legal and factual issues, including:

- the availability of the equitable remedy of substantive consolidation to pre-merger funded debt claims;

- the allowance or disallowance of intercompany pre- and post-petition claims (including royalties, management fees, purchasing fees, etc.) and the corresponding setoff, equitable subordination, fraudulent conveyance, preference (and available remedies) litigation; and

- the avoidability of asset transfers from legacy WorldCom companies to MCIC and available remedies.

---

[21]    It is reasonable to reflect the benefits of enforcement of subordination provisions in the context of settlement.  See Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co., Inc.), 177 B.R. 791, 795 (S.D.N.Y. 1995), aff'd, 68 F.3d 26 (2d Cir. 1995); In re Walnut Equip. Leasing Co., 1999 Bankr. LEXIS 496.

4403486 v11

1.    **The Debtors' Probability of Success in Litigating
the Applicability of Substantive Consolidation
to the MCIC Senior Debt Claimants Is Unclear**

88.    The litigated outcome of the applicability of substantive consolidation as to the

MCIC Senior Debt Claims is uncertain.  Thus, the Debtors sought to resolve this issue by

compromising the treatment afforded to certain creditors.

89.    The Debtors and certain creditors, including the Ad Hoc Committee of

WorldCom Senior Notes Holders and the MatlinPatterson Investors, contend that the WorldCom

Debtors should be substantively consolidated.  Relying principally on the WorldCom Debtors'

entanglement and inability to parse the complex web of Intercompanies and attendant issues,

these parties believe substantive consolidation is appropriate and fair for all creditors.

90.    The Ad Hoc Committee of MCIC Senior Notes Holders alleges, however, that

substantive consolidation is not an available remedy over the objection of funded-debt creditors

of a pre-merger entity.  Specifically, the Ad Hoc Committee of MCIC Senior Notes Holders

alleges that: (a) MCIC Senior Debt Claimants relied on the credit of a specific Debtor-entity,

MCIC, in extending credit to MCIC prior to its merger with WorldCom; and (b) such holders did

not deal with the Debtors as a single economic unit.

91.    As a result, the Ad Hoc Committee of MCIC Senior Notes Holders believes that

the equitable remedy of substantive consolidation is <u>not</u> available against a creditor who

purchased public securities issued by a debtor-entity prior to its merger with the remaining

debtors.[22]  <u>See</u> <u>Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.)</u>, 432

F.2d 1060 (2d Cir. 1970) ("<u>Flora Mir</u>").  The Ad Hoc Committee of MCIC Senior Notes Holders

---

[22]    While the MCIC Subordinated Debt Claimants would like to use this argument to assert that substantive
consolidation should not apply to them, due to the subordination provision of the MCIC Subordinated Debt
Indenture, even if the MCIC Subordinated Debt Claimants were correct, they would still receive no recovery under
the Plan.

4403486 v11

relies primarily on Flora Mir, a Second Circuit decision which predates Augie/Restivo. In Flora Mir, Meadors, Inc. issued convertible subordinate debentures many years prior to being acquired by Flora Mir Candy Corp. One year after the merger, Flora Mir Candy Corp. and its subsidiaries filed voluntary petitions for relief under Chapter XI of the Bankruptcy Act and sought consolidation. See id. The holders of the convertible subordinate debentures of Meadors, Inc. (the "Meadors Funded Debt Creditors") objected to the proposed consolidation. The court found that the Meadors Funded Debt Creditors stood differently from trade creditors of companies in the Flora Mir group and that consolidation would be inequitable as to the Meadors Funded Debt Creditors because the debentures were issued by Meadors, Inc. prior to its merger with Flora Mir Candy Corp. Thus, the court upheld the lower court's determination that consolidation could not include funded debt of Meadors, Inc.

92.     The Debtors, Ad Hoc Committee of WorldCom Senior Notes Holders and the MatlinPatterson Investors, however, assert that even if a creditor relied on one debtor entity separate and apart from other debtors, a court should order substantive consolidation where, as here, there is hopeless entanglement. In effect, the Debtors, the Ad Hoc Committee of WorldCom Senior Notes Holders and the MatlinPatterson Investors believe that the holders of MCIC Senior Debt Claims read Flora Mir too broadly and Augie/Restivo refined that analysis such that hopeless entanglement overrides single entity reliance. See, e.g., In re 599 Consumer Elecs., Inc., 195 B.R. 244. In re 599 Consumer Elecs., Inc., a Southern District of New York case post-dating Augie/Restivo and Flora Mir, suggests that even if creditors rely on debtor entities separately, substantive consolidation may still be warranted based on entanglement. See id. at 250-51. Here, the Debtors believe that entanglement is evident because, among other things:

- The Debtors' businesses were run as an integrated whole, along product lines, not by legal entities.

- Given the entanglement of the WorldCom Debtors' affairs and the well documented unreliability of its books and records, the appearance of certain amounts of assets or liabilities on the MCI Debtors' balance sheets, or anywhere else, are in significant measure, the product of happenstance, because the Debtors were run as a consolidated enterprise, along business lines, not on a legal entity basis.

- The Debtors were run on a consolidated basis with little attention to legal entities and had few, if any, internal controls.

- Since the Intercompanies and the value of any such Intercompany flowing to and from each WorldCom Debtor cannot be identified, the value of each WorldCom Debtor also cannot be identified.

93.     As a result of these competing legal theories and the significant litigation hazards as to the applicability of substantive consolidation to funded debt claimants, the Debtors determined to compromise the treatment of the holders of MCIC Senior Debt Claims.[23]

**2.     Absent the MCIC Senior Notes Settlement, Litigation of Substantive Consolidation and the Intercompanies Would be Complex and Costly, Delay the Debtors' Emergence from Chapter 11 and Result in an Attendant Erosion of Significant Value**

94.     The Subordinated MCIC Bondholders Committee and the Dissenting Trade Claims Purchaser Committee allege that the Debtors will, regardless of the MCIC Senior Notes Settlement, be forced to litigate the issue of substantive consolidation and, therefore, the MCIC Senior Notes Settlement does not benefit the estates. This understates and obscures the utility of the MCIC Senior Notes Settlement. By settling the treatment of MCIC Senior Debt Claims, the Debtors resolved the applicability of substantive consolidation as an available remedy to be utilized against MCIC Senior Debt Claims. If, however, the Debtors did not settle this issue and

---

[23]   The Dissenting Trade Claims Purchaser Committee does not have the same reliance argument (i.e., that substantive consolidation is not an available remedy) as the MCIC Senior Debt Claimants, because said claims are not funded debt claims and virtually all trade claims are current post-merger obligations.

litigated the issue of the applicability of substantive consolidation to the MCIC Senior Debt

Claimants, the litigation would be more complex and uncertain than the litigation that currently

exists, resulting in a greater likelihood that the Debtors' emergence from chapter 11 and

distributions to creditors would be materially delayed.[24]  Any delay in the Debtors' emergence

from chapter 11 will be detrimental to the Debtors' creditors because (a) the Debtors' business

will continue to erode due to customers' unwillingness to do business with a chapter 11 debtor

and (b) the Debtors' competitors' will continue with their unprecedented efforts to force a

liquidation of the Debtors by undermining customer confidence by publicizing allegations of

misconduct.  Further, without the settlement, the Debtors would engage in expensive and lengthy

litigation.

95.    In addition to the litigation hazards, the Ad Hoc Committee of MCIC Senior

Notes Holders alleges that, by virtue of the MCI Debtors' organizational structure, MCIC Senior

Debt Claimants are entitled to the equity value of the subsidiaries of MCIC and, as a result,

MCIC is solvent.  For example, the Ad Hoc Committee of MCIC Senior Notes Holders asserts

that UUNet, which is a subsidiary of MCIC, is a solvent entity and that the equity value in

UUNet should flow to MCIC to satisfy claims of MCIC creditors.  Thus, the Ad Hoc Committee

of MCIC Senior Notes Holders believes its members should receive a distribution of 113 cents

per one dollar of MCIC Senior Debt Claim (which includes pre- and post-petition interest).

96.    The Debtors and other major creditors, on the other hand, assert that: (a) UUNet

and several other companies which became subsidiaries of MCIC as a result of the

Restructurings are only MCIC subsidiaries by virtue of fraudulent transfers which occurred

---

[24]    Also, the value of a settlement to an estate is not undermined if a debtor settles litigation with one group of creditors, despite another party having the same litigable issues.  See, e.g., In re Grant Broadcasting of Phil., Inc., 71 B.R. 390, 398-99 (Bankr. E.D. Pa. 1987) (overruling objection to debtors' settlement by group of programmers with similar litigable issues as settling programmer ("Viacom") and finding settlement benefited debtors' estates).

4403486 v11

between 1998 and 2000 and rightfully, these entities should be direct WorldCom subsidiaries; (b)

even if there were not fraudulent transfers, the Debtors cannot with any degree of accuracy

determine the assets (and liabilities) of UUNet or any other subsidiary such that is it is not

possible to determine if UUNet or any other subsidiary has any residual equity value flowing to

MCIC; and (c) even if there were not fraudulent transfers, UUNet and the other subsidiaries are

required to pay their direct creditor claims, which includes claims of WorldCom as a creditor

(ahead of any residual equity value flowing to MCIC), which would inure to the benefit of

WorldCom's own creditors.  Thus, as a result of those direct intercompany claims and the

entanglement, MCIC creditors should not receive more than approximately thirty-five cents

($.35) (the proposed payment in the event all estates were substantively consolidated).  As a

result of these factual and legal disputes, the Debtors settled between the 35¢ and 113¢ recovery

outliers at 62¢ (which nets 80¢ by virtue of the subordination provision roll-up).

### 3.    The MCIC Senior Notes Settlement Is in the Best Interest of Creditors

97.    The MCIC Senior Notes Settlement is the result of multi-party arm's length

negotiations among the Debtors and the Ad Hoc Committees as major creditors.  Those

negotiations were protracted and difficult due to the complex issues and significant effect on all

creditor recoveries.  The arm's length nature of these multi-party negotiations and the resulting

support by representatives of the overwhelming majority of creditors reflects the ultimate

fairness of the MCIC Senior Notes Settlement.  Due to the numerous complex and unsettled

factual and litigable issues, each constituency compromised.  For example, the MCIC Senior

Debt Claimants initially sought payment in full, which equals 113 cents on the principal dollar

(including accrued but unpaid interest of 13 cents for each principal amount dollar).  After

negotiations among all parties, the MCIC Senior Debt Claimants agreed to receive 62% of their

54

principal amount with the roll-up of the MCIC Subordinated Debt Claimants' recovery, which
would bring the total recovery to 80 cents on the principal amount dollar.

98.    As discussed above, the recovery under the Plan to the MCIC Senior Debt
Claimants takes into account the unique legal (whether substantive consolidation applies to pre-
merger funded debt) and factual (whether the MCIC Senior Debt Claims are entitled to residual
equity value) arguments of such claimants and the attendant risk to all creditors' recoveries.

99.    Based on the foregoing, because the MCIC Senior Debt Claimants stand in a
unique position as compared with other claimants, it is reasonable and logical that their recovery
under the Plan is greater than that of other creditor constituencies, though it is arguably less than
what they could otherwise receive without the settlement.[25]

100.    After taking into account the strength of the MCIC Senior Debt Claimants'
position based on their reliance on MCIC prior to its merger with WorldCom, the effect of the
subordination clause in the MCIC Subordinated Debt Indenture, the time and expense required to
litigate the allowance or disallowance of the Intercompanies, and that the MCIC Senior Debt
Claimants may look to the entire equity value of all MCIC subsidiaries (an argument not
available to the MCIC Subordinated Debt Claimants until MCIC creditors are paid in full or to

---

[25]  See In re Continental Vending Mach. Corp., 517 F.2d 997 (holding that though estates were substantively
consolidated, it was fair and equitable to consolidate estates for purposes of dealing with unsecured claims, but not
as to secured claims); In re Bennett Funding Group, Inc., No. 96-613-76, 1999 Bankr. LEXIS 1860, at *36-42
(Bankr. N.D.N.Y. Apr. 9, 1999) (finding that in substantively consolidated cases, creditors with differently situated
claims and different litigation risks did not have to be treated similarly in 9019 settlement); In re Drexel Burnham
Lambert Group Inc., 138 B.R. at 748 (noting that in settling intercompany claims within substantively consolidated
estates, guaranty claims settled and were provided differing treatment in plan due to character of claims and varying
litigable issues); In re Allegheny Int'l, Inc., 118 B.R. at 309 (finding that trade creditors who sought same right
under settlement in plan of reorganization to seek post-petition interest as certain class of creditors (the "Allegheny
Creditors") were distinct from Allegheny Creditors because the Allegheny Creditors had contractual loan agreement
specifying their ability to recover interest); In re Grant Broadcasting of Phil., Inc., 71 B.R. at 398-99 (overruling
objection of group of programmers to debtors' settlement with another programmer ("Viacom") due to, among other
things, (i) settlement with Viacom benefited debtors' interests in effecting reorganization, (ii) Viacom received less
than full amount that debtors would otherwise have to pay, and (iii) Viacom took actions to distinguish itself as a
creditor and, therefore, could be treated differently).

55

the creditors at Network Services), it is in the best interest of all creditors and the estates that the

MCIC Senior Debt Claimants receive a recovery of 80 cents on the principal dollar amount.

101.    In sum, the MCIC Senior Notes Settlement is fair and equitable and benefits the

Debtors' creditors because:

(a)    the MCIC Senior Debt Claimants will receive less than the potential
amount of their claim (80 cents on the principal amount dollar vs. 113
cents on the principal amount dollar);

(b)    other creditors, as a result, will receive a greater recovery than they would
receive if the MCIC Senior Debt Claims were paid in full;

(c)    the issue of applicability of substantive consolidation to the MCIC Senior
Debt Claimants will not have to be litigated;

(d)    the Debtors may proceed to confirmation of the Plan without the obstacle
of litigation with the Ad Hoc Committee of MCIC Senior Notes Holders
regarding the allowance or disallowance of Intercompanies and the alleged
fraudulent transfers giving rise to such claims which would obstruct their
path and the attendant loss of significant value due to the erosion of the
Debtors' business operations while in chapter 11; and

(e)    the Debtors' estates will not have to bear the time, expense and delay of
litigating these issues with the Ad Hoc Committee of MCIC Senior Notes
Holders.

Accordingly, the MCIC Senior Notes Settlement should be approved.

### B.    The Intermedia Settlement Should be Approved

102.    The Intermedia Settlement provides for the resolution of complex legal and

factual issues by settling the recovery of the Intermedia estate on account of the Intermedia

Intercompany Note at $1 billion.  This, in turn, fixes the treatment of holders of claims against

Intermedia.  Specifically, the Plan estimates recoveries of 93.5%, 83.2%, and 46.4%,

respectively, to holders of Intermedia Senior Debt Claims, Intermedia General Unsecured

Claims, and Intermedia Subordinated Debt Claims.  The Intermedia Settlement resolves: (a)

various claims arising under and related to the Intermedia Intercompany Note among the

56

WorldCom Debtors, the MatlinPatterson Investors, the Ad Hoc Committee of Intermedia Notes

Holders, and the Intermedia Debtors; and (b) various intercreditor issues relating to, among other

things, the assets and liabilities of Intermedia raised by the Ad Hoc Committee of WorldCom

Senior Notes Holders, the MatlinPatterson Investors, the Ad Hoc Committee of Intermedia Notes

Holders and the Debtors. The Intermedia Settlement is the result of an assessment by the

Debtors, the Official Creditors Committee, and the Ad Hoc Committees of their ability to prevail

on a number of complex issues relating to recharacterization, the Intermedia Avoidance Actions

and Intermedia Valuation Claims.

103. The dispute leading to the Intermedia Settlement Issues began in September 2000,

when WorldCom purchased Intermedia and subsequently consummated the acquisition for

approximately $5.8 billion, including the assumption of long-term debt, pursuant to the merger

of Wildcat Acquisition Corp. ("Wildcat"), a wholly-owned subsidiary of WorldCom, with and

into Intermedia on July 1, 2001. In consummating the acquisition of Intermedia, WorldCom

issued the Intermedia Intercompany Note, a note in the aggregate principal amount of

$7,074,929,250, to Wildcat and paid $70,750 in cash in exchange for shares of Wildcat Junior

Preferred Stock, par value $1.00 per share, which shares had an aggregate liquidation value of

$7,075,000,000. Upon the merger of Wildcat with and into Intermedia, the shares of Wildcat

Junior Preferred Stock became shares of Intermedia Junior Preferred Stock, and the cash and

Intermedia Intercompany Note were transferred to Intermedia. By issuing the Intermedia

Intercompany Note, WorldCom (a) complied with warranties in the merger agreement, and (b)

allowed Intermedia to remain in compliance with the indenture covenants contained in its

outstanding bond debt, including certain capitalization requirements. The Debtors' records

reflect that in the one year period prior to the Petition Date, WorldCom made prepayments on the

Intermedia Intercompany Note in the approximate amount of $1,390,000,000 and Intermedia

recorded approximately $434,592,000 in aggregate interest payments.  The Intermedia

Settlement Issues all relate to the Intermedia Intercompany Note and the payments made by

WorldCom on the note.

104.    Due to the factual and legal complexity of these issues, the probability of success

of the parties if the Intermedia Settlement Issues were to be litigated is uncertain.  Further, based

on the inherently complicated nature of the Intermedia Settlement Issues and the overall

importance of these issues to any plan of reorganization, litigation would likely delay the

Debtors' emergence from chapter 11, resulting in an erosion of value of the Debtors' estates, and

delay distributions to creditors.  Thus, by allowing the Debtors to continue towards confirmation

of the Plan and emergence from chapter 11 without the uncertainty of litigating the Intermedia

Settlement Issues or adding the burden of expense and delay that such litigation would

necessarily entail, the Intermedia Settlement is in the interest of creditors and falls above the

lowest point in the range of reasonableness.

**1.      The Intermedia Recharacterization Dispute**

105.    The Debtors assert that the Intermedia Intercompany Note should be

recharacterized as an equity contribution because, among other things, the purpose of the note

was to enable Intermedia to meet the net worth covenants contained in its indentures.  The Ad

Hoc Committee of Intermedia Notes Holders and MatlinPatterson Investors, however, disagree.

The issue of recharacterization is complicated and, based on the law, the Debtors' probability of

success in litigating the issue is unclear.

106.    While there is no specific provision of the Bankruptcy Code that expressly

authorizes courts to recharacterize debt claims as equity, courts rely on section 105(a) of the

Bankruptcy Code, which provides bankruptcy courts with general equitable powers to "issue any

order, process or judgment that is necessary or appropriate to carry out the provisions of this title" for authority to recharacterize claims.  11 U.S.C. §105(a); see Ali Inc. v. Cold Harbor Assocs. (In re Cold Harbor Assocs.), 204 B.R. 904, 915 (Bankr. E.D. Va. 1997). The Second Circuit recognizes recharacterization as a remedy.  In re Interstate Cigar Co., 182 B.R. 675, 678 (Bankr. E.D.N.Y. 1995), aff'd, 166 F.3d 1200 (2d Cir. 1998).

107.    In determining whether to recharacterize a claim, bankruptcy courts are required to "weigh[] the substance over the form of the advance."  In re Interstate Cigar Co., 182 B.R. at 678 (citations omitted).  While no one factor is decisive, generally, the factors courts will consider in assessing whether to recharacterize a claim include:

- names given to documents evidencing indebtedness;

- presence or absence of a fixed maturity date and schedule of payments;

- presence or absence of a fixed rate of interest and interest payments;

- source of repayments;

- adequacy or inadequacy of capitalization;

- identity of interest between the creditor and the stockholder;

- security for the advances;

- corporation's ability to obtain financing from outside lending institutions;

- extent to which the advances were subordinated to the claims of outside creditors;

- extent to which the advances were used to acquire capital assets;

- the presence or absence of a sinking fund to provide repayments;

- failure of an advance recipient to repay amounts on the due date or to seek a postponement; and

- intent of the parties.

59

108.    Upon reviewing the facts and legal issues surrounding recharacterization of the Intermedia Intercompany Note, strong arguments both in favor and against recharacterization exist.  For example, the identity of interest between the creditor and stockholder, the absence of a sinking fund to provide repayments, and the lack of security for advances support recharacterization of the Intermedia Intercompany Note.  The name provided to the documents and the existence of an interest rate and maturity date, however, weigh against recharacterization of the Intermedia Intercompany Note.  Thus, recharacterization as to the Intermedia Intercompany Note is a highly litigable issue, and the outcome of such litigation is uncertain.

### 2.    The Intermedia Fraudulent Transfer Dispute

109.    The Debtors and the Ad Hoc Committee of WorldCom Senior Notes Holders also assert that the Intermedia Intercompany Note may be voidable as a fraudulent transfer, arguing that WorldCom and Intermedia were insolvent at the time of the issuance of the Intermedia Intercompany Note and, as a result, WorldCom did not receive reasonably equivalent value in return for its obligations thereunder.

110.    The Ad Hoc Committee of Intermedia Notes Holders and the MatlinPatterson Investors disagree with these assertions, arguing that: (a) WorldCom was solvent at the time of the Intermedia acquisition; and (b) WorldCom received reasonably equivalent value in return for the Intermedia Intercompany Note because the assets acquired were the subject of competitive bidding, and Intermedia was solvent at the time of the acquisition.

111.    The legal and evidentiary analysis of the fraudulent conveyance issue is complex. In litigating the alleged fraudulent conveyance, parties would be required to conduct lengthy, timely and costly discovery, especially with respect to issues of valuation and solvency.  The outcome, however, of such litigation is unclear.  Due to the complexity of the issues, the

60

uncertainty and cost of litigation, and the likely delay of the Debtors' emergence from chapter

11, settlement of the fraudulent conveyance issue is in the best interest of all creditors.

112.    Under the Bankruptcy Code, a debtor-in-possession or estate representative is

provided two mechanisms for attacking fraudulent conveyances, sections 544 and 548 of the

Bankruptcy Code.  Section 544(b)[26] of the Bankruptcy Code provides that a party may utilize

state fraudulent conveyance law, either the Uniform Fraudulent Transfer Act ("UFTA")[27] or the

Uniform Fraudulent Conveyance Act ("UFCA")[28] (collectively, the "Uniform Acts"), to attack

conveyances as fraudulent.  The UFTA provides that conveyances lacking "reasonably

equivalent value" may be avoidable.  See U.F.T.A. § 4(a), (b).  The UFCA, which is similar,

states that, among other things, the creditor must prove that the debtor did not receive "fair

consideration" (as opposed to "reasonably equivalent value") in exchange for the transfer or

obligation.  See Breeden v. Thomas (In re Bennett Funding Group, Inc.), Adv. Pro. No. 98-

40892A, 1999 Bankr. LEXIS 1843, at *22 (Bankr. N.D.N.Y. Apr. 29, 1999).  The terms "fair

consideration" and "reasonably equivalent value" have the same fundamental meaning.  See In re

Churchill Mortg. Inv. Corp., 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000), aff'd, 264 B.R. 303

---

[26] Section 544(b) of the Bankruptcy Code provides:

> the trustee may avoid any transfer of an interest of the debtor in property or any
> obligation incurred by the debtor that is voidable under applicable law by a creditor
> holding an unsecured claim that is allowable under section 502 of this title or that is
> not allowable under section 502(e) of this title.

11 U.S.C. §544(b).

[27] The following states have enacted the UFTA or a modified form of the UFTA: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Texas, Utah, Vermont, Washington, West Virginia, and Wisconsin.  Unif. Fraud. Trans. Act, 7A U.L.A. 266 (1999 & Supp. 2000).

[28] The following states have enacted the UFCA or a modified form of the UFCA: Maryland, New York, Tennessee, Virgin Islands, and Wyoming.  Unif. Fraud. Conv. Act, 7A U.L.A. 2.

4403486 v11

(S.D.N.Y. 2001). It is unclear which state's law would apply to the Intermedia Intercompany Note.[29]

113.    The standard for determining "reasonably equivalent value" has been described as a "measurement test" by which a court, on a case by case basis, compares what was given with what was received at the time the transfer was made, taking into account the totality of the circumstances surrounding the transaction. See In re Churchill Mortg. Inv. Corp., 256 B.R. at 678; Coan v. Fleet Credit Card Servs. (In re Guerrera), 225 B.R. 32, 36 (Bankr. D. Conn. 1998). In contrast, under section 3 of the UFCA, a conveyance is not considered made with fair consideration unless the exchange is made in good faith and is a fair equivalent. Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.), 281 B.R. 506, 518-19 (Bankr. E.D.N.Y. 2002).[30]

114.    Even if the transferor did not receive reasonably equivalent value or fair consideration, any one of the following factors must also exist for constructive fraud: (a) the transferor was insolvent either before or as a result of the conveyance; (b) as a result of the conveyance, the transferor retained unreasonably small capital to conduct its business; or (c) the

---

[29] The possible states include New York, Georgia, Virginia and Delaware. The choice of law issue is particularly relevant because Virginia requires actual, rather than constructive, fraud to avoid a transfer as a fraudulent conveyance.

[30] Generally, courts are willing to find reasonably equivalent value for a transfer from a parent to a subsidiary on the basis that, because the parent is the sole shareholder of the subsidiary, any benefit the subsidiary receives inures to the benefit of the parent in the form of increased stock value. See Branch v. Federal Deposit Ins. Corp., 825 F. Supp. 384, 399-400 (D. Mass. 1993). Under certain circumstances, however, the "presumption" in favor of fair or equivalent consideration may be overcome. See id. The presumption in favor of a transfer to a subsidiary being for fair consideration is rebuttable when the subsidiary is insolvent, because the parent will not receive a benefit from the transfer, as the value of the stock remains negative after the transfer. Thus, a parent's transfer of assets to a subsidiary is for less than reasonably equivalent value when the subsidiary was insolvent at the time of the transfer. See Murphy v. General Elec. Credit (In re Duque Rodriguez), 77 B.R. 939, 941-42 (Bankr. S.D. Fla. 1987), aff'd, 895 F.2d 725 (11th Cir. 1990); Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 68 B.R. 530 (Bankr. S.D. Fla. 1986), aff'd, 848 F.2d 1196 (11th Cir. 1988). Based on the foregoing, another issue that would be litigated without the Intermedia Settlement is Intermedia's solvency at the time of the transfer of the Intermedia Intercompany Note.

transferor intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts mature.  See 11 U.S.C. § 548; U.F.T.A. § 4(a)(2), U.F.C.A. § 2.  The fraudulent transfer arguments related to Intermedia center around the issue of WorldCom's and Intermedia's solvency at the time of the issuance of the Intermedia Intercompany Note.[31]  As detailed above, the combination of the prepetition accounting irregularities, lack of accurate financial records and absence of people familiar with the Debtors' finances prior to the Petition Date create additional uncertainty and complexity to any fraudulent conveyance litigation.

115.    The Debtors and the Ad Hoc Committee of WorldCom Senior Notes Holders argue that, taking into account the accounting fraud, its impact on revenue and earnings, and securities fraud claims, WorldCom and Intermedia were insolvent at the time the Intermedia Intercompany Note was transferred.[32]  On the other hand, the Ad Hoc Committee of Intermedia

---

[31] The debtor's financial condition is measured at the time of the transfer.  See WRT Creditors Liquidation Trust v. WRT Bankruptcy Litigation Master File Defendants (In re WRT Energy Corp.), 282 B.R. 343, 368 (Bankr. W.D. La. 2001) ("The relevant solvency valuation date for avoidance purposes is the date of the challenged transfer."). Additionally, claims arising from securities fraud are considered in determining a debtor's solvency.  See Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.), 281 B.R. 852, 863 (Bankr. D. Del. 2002); S.E.C. v. Antar, 120 F. Supp. 2d 431 (D.N.J. 2000), aff'd, Nos. 00-1820, 2002 WL 1774063 (3d Cir. Aug. 2, 2002).  Two basic standards are generally used to determine a debtor's solvency: (a) the "reconstituted balance-sheet test" that examines whether a debtor's entire property and assets are sufficient to pay its debts; and (b) the "cash flow" test that analyzes a debtor's ability to pay debts as they become due.  However, determination of fair valuation is an inexact science and may at times be impossible.  Courts are generally in agreement, however, that "book value" does not necessarily establish "fair saleable value."  See Lids Corp. v. Marathon Inv. Ptrs., L.P. (In re Lids Corp.), 281 B.R. 535, 541 (Bankr. D. Del. 2002) (noting that "balance sheet test" is a misnomer because the test is based on fair valuation, not on GAAP); see also Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 36 (2d Cir. 1996) ("[W]hile book values alone may be inappropriate as a direct measure of the fair value of property . . . such figures are, in some circumstances, competent evidence from which inferences about a debtor's insolvency may be drawn.").  Specifically, the market value of assets may be more or less than their book value.

[32] If the transfer of the Intermedia Intercompany Note is deemed to be a two-part transaction (i.e. a transfer from WorldCom to Wildcat, and from Wildcat to Intermedia, pursuant to the merger), as alleged by the Ad Hoc Committee of Intermedia Notes Holders and the MatlinPatterson Investors, it is feasible that a court would find that WorldCom does not have a fraudulent transfer claim against Intermedia, assuming Wildcat was solvent at the time of the transfer.  However, it is likely that a court would look beyond the formal structure of the transaction and collapse the transfer of the Intermedia Intercompany Note into one transaction, as Wildcat was merely a conduit and the Intermedia Intercompany Note was meant to benefit Intermedia.  See, e.g., United States v. Tabor Court Realty, 803 F.2d 1288, 1302-03 (3d Cir. 1986); Moody v. Security Pac. Bus. Credit Inc., 127 B.R. 958, 992 (W.D. Pa. 1991), aff'd, 971 F.2d 1056 (3d Cir. 1992); Wieboldt Stores v. Schottenstein, 94 B.R. 488, 502-04 (N.D. Ill. 1988). Under such circumstances, WorldCom would have a potential fraudulent transfer claim against Intermedia.

63

Notes Holder and the MatlinPatterson Investors assert that neither WorldCom nor Intermedia

was insolvent at the time the note was transferred.  Further, based on the solvency analyses and

experts the parties to the dispute would rely upon, both sides of the argument would likely

provide substantial evidence substantiating their respective positions.  Thus, based on the

foregoing, the need to settle the complexities of the fraudulent transfer dispute is apparent.

### 3.    The Intermedia Preference Dispute

116.    The Debtors also assert that the $1.39 billion in principal prepayments and $434.6

million in interest payments made during the one year period prior to the Petition Date on

account of the Intermedia Intercompany Note satisfy the requirements of section 547 of the

Bankruptcy Code, are not subject to any statutory defenses, and thus, should be avoided as

preferential transfers.  In contrast, the Ad Hoc Committee of Intermedia Notes Holders and the

MatlinPatterson Investors disagree, asserting:

- WorldCom did not make actual transfers on account of the Intermedia
  Intercompany Note, but made book-keeping entries to track unrelated
  intercompany accounts;

- recorded interest payments were not actually paid, but rather were added to the
  outstanding balance of the Intermedia Intercompany Note;

- WorldCom was solvent when each allegedly preferential payment was made;

- the alleged prepayments were not made on account of the Intermedia
  Intercompany Note, but were on account of unrelated WorldCom liabilities; and

- even if preferential transfers were made, they were made in the ordinary course of
  the Debtors' businesses, properly benefit from affirmative statutory defenses and
  are therefore not avoidable.

117.    Section 547(b) of the Bankruptcy Code provides that a trustee or debtor-in-

possession may avoid a "preferential" transfer of the debtor's property made prior to the debtor's

filing for bankruptcy which was: (a) a transfer of the debtor's interest in property; (b) to or for

the benefit of a creditor; (c) for or on account of an antecedent debt; (d) made while the debtor

64

was insolvent; (e) made within ninety (90) days of the bankruptcy filing, or between ninety (90)

days and one year of the filing if the transferee was an "insider"; and (f) a transfer enabling such

creditor to receive more than such creditor would receive under a chapter 7 liquidation if the

transfer had not been made.  11 U.S.C. § 547(b).[33]

118.    The complex legal and factual issues surrounding the issue of solvency for

purposes of the Intermedia Settlement are the same as those discussed above with regard to the

fraudulent transfer issues.

119.    Further, the Ad Hoc Committee of Intermedia Notes Holders and the

MatlinPatterson Investors assert that even if preferential transfers were made, such transfers are

not subject to avoidance because they were made in the ordinary course of the Debtors'

businesses.[34]  Without lengthy discovery to determine the course of dealings between WorldCom

---

[33]    In order to satisfy the requirements of section 547(b), *all* of the elements of a preference must be present.
See Boberschmidt v. Society Nat'l Bank (In re Jones), 226 F.3d 917, 921 (7th Cir. 2000).  The trustee has the burden
of establishing the elements of section 547(b) and proving the avoidability of a transfer as preferential.  See 11
U.S.C. § 547(g).  Section 547(c) of the Bankruptcy Code, as discussed in detail herein, provides that certain
transfers may be exempt from a preference attack, even if all of the elements of a preference are present.  For
preference purposes, the debtor is presumed to have been insolvent during the ninety (90) days immediately
preceding the date of the debtor's filing for bankruptcy protection.  See 11 U.S.C. § 547(f).  The presumption,
however, is rebuttable, and may be overcome if a creditor introduces some evidence that the debtor was not
insolvent at the time of the transfer.  See In re Roblin Indus., Inc., 78 F.3d at 34.

[34] Section 547(c)(2) of the Bankruptcy Code provides, in pertinent part, that a preferential transfer is not
avoidable, to the extent that such transfer was:

(A)    in payment of a debt that was incurred by the debtor in the ordinary course of business or
financial affairs of the debtor and the transferee;

(B)    made in the ordinary course of business or financial affairs of the debtor and the
transferee; and

(C)    made according to ordinary business terms.

With respect to whether the transfer was in payment of a debt incurred by the debtor in the ordinary course
of business or financial affairs of the debtor and the transferee pursuant to section 547(c)(2)(A) of the Bankruptcy
Code, courts will make a subjective inquiry into the prior dealings between the parties, considering the following
factors:

(1)    the length of time the parties were engaged in the transaction at issue;

and Intermedia, which will be difficult due to the Debtors' lack of accurate records regarding

intercompany transactions or employees with knowledge of the Debtors' prepetition financial

affairs, the availability of the "ordinary course" defense cannot be determined.

**4.    Remedies Available if the Intercompany Note
and Prepayments are Avoidable Preferences**

120.    Even if the transfer of the Intermedia Intercompany Note and/or the prepayments

made on the note were determined to be avoidable under the Bankruptcy Code, it is unclear what

remedy, if any, would be available to WorldCom.  Section 550 of the Bankruptcy Code provides

that the trustee or debtor-in-possession may recover property transferred preferentially or

pursuant to fraudulent conveyance, serving essentially to "restore the estate to the financial

condition it would have enjoyed if the transfer had not occurred."  In re Centennial Textiles, Inc.,

220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998); see In re Colonial Realty Co., 226 B.R. 513, 525

(Bankr. D. Conn. 1998).  Section 502(d) of the Bankruptcy Code, which functions in tandem

with section 550 of the Bankruptcy Code, provides that the court shall, among other things,

disallow any claim of any transferee of a transfer avoidable under sections 547 and 548 of the

Bankruptcy Code, unless the entity or transferee has paid the amount or turned over such

property for which the entity is liable under sections 550 or 553 of the Bankruptcy Code.

121.    Application of section 502(d) of the Bankruptcy Code becomes more complicated

when, as in this matter, two bankruptcy estates are involved.  Though one debtor received an

---

(2)    whether the amount or form of tender differed from past practices;

(3)    whether the debtor or creditor engaged in any unusual collection or payment activity; and

(4)    whether the creditor took advantage of the debtor's deteriorating financial position.

See McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.), 210 B.R. 27, 34 (N.D.N.Y. 1997), aff'd, 142
F.3d 571 (2d Cir. 1998); In re Lan Yik Foods Corp., 185 B.R. 103, 110 (Bankr. E.D.N.Y. 1995); In re Schick, 234
B.R. 337, 348 (Bankr. S.D.N.Y. 1999).

4403486 v11

avoidable transfer and has a claim against the estate of the other debtor entity, it is unclear

whether section 502(d) of the Bankruptcy Code mandates (a) repayment of the entire avoidable

transfer received prior to the allowance of any claim, or (b) whether treatment of the avoided

transfer as a general unsecured claim satisfies section 502(d) of the Bankruptcy Code.  See In re

Shared Techs. Cellular, Inc., 293 B.R. 89, 97-98 (D. Conn. 2003) (finding, in case of first

impression, in a decision regarding section 362 of the Bankruptcy Code, that it would be

appropriate to treat a claim resulting from an avoidable preference as a general unsecured

claim).[35]  Here, in the event WorldCom proved a preference claim against Intermedia, and

section 502(d) of the Bankruptcy Code required Intermedia to pay back $1.4 billion prior to

receiving an allowed claim against WorldCom for the Intermedia Intercompany Note, Intermedia

could likely not come up with the required funds, and Intermedia creditors would receive zero

recovery.  On the other hand, if Intermedia could satisfy WorldCom's preference claim with an

unsecured claim in Intermedia's case, then Intermedia creditors would likely be paid in full.

Based on the foregoing, not only would litigation of the remedy due to WorldCom upon

avoidance of the transfer of the Intermedia Intercompany Note and/or prepayments made on the

note be complex without any clear result, it is unclear whether and what amount WorldCom

could recover from Intermedia.

### 5.    Intermedia Valuation Dispute

122.    The Ad Hoc Committee of Intermedia Notes Holders and the MatlinPatterson

Investors also allege that WorldCom: (a) improperly transferred assets and revenue of Intermedia

to WorldCom before and after the Petition Date; (b) before and after the Petition Date,

---

[35] Upon information and belief, In re Shared Techs. Cellular, Inc. is the only published case to discuss the
application of section 502(d) of the Bankruptcy Code between two debtors.

improperly charged the Intermedia estate for expenses Intermedia did not incur; and (c)

appropriated cash generated from the sale of Intermedia business segments.  The Debtors deny

and contest all these allegations.

### 6.    The Intermedia Settlement Meets the Standards of Bankruptcy Rule 9019 and Should be Approved

123.    As discussed above, the bankruptcy court need only determine whether a

proposed settlement falls below the lowest point in the range of reasonableness in approving

such settlement.  The Intermedia Settlement falls within the applicable range of reasonableness

and should be approved because: (a) the Debtors' probability of successfully litigating the

Intermedia Settlement Issues is unclear; (b) litigation of the Intermedia Settlement Issues would

be complex, and add tremendous expense and inconvenience to these cases, delaying the

Debtors' emergence from chapter 11 and distributions to creditors; and (c) the Intermedia

Settlement is in the best interest of creditors.

### (a)    The Debtors' Probability of Success in Litigating the Intermedia Settlement Issues is Unclear

124.    Each of the Intermedia Settlement Issues requires an intense factual and legal

analysis, the result of which remains unclear.  For example, as discussed above, certain factors

weigh in favor of, and certain factors weigh against, recharacterization of the Intermedia

Intercompany Note.  Thus, whether the Debtors will succeed in pursuing their recharacterization

claim is uncertain.  Additionally, among other things, in determining whether the transfer of the

Intermedia Intercompany Note and the prepayments by the Debtors on the note are preferential

transfers or fraudulent conveyances, the parties will all have to provide evidence as to the

solvency of Intermedia and WorldCom at the time of the relevant transfers.  The parties will

undoubtedly all provide conflicting expert testimony.  Finally, assuming that the Intermedia

Intercompany Note and/or the prepayments on the note can be avoided as preferential transfers

68

or fraudulent conveyances, the issue of how to treat a claim of one chapter 11 debtor against

another chapter 11 debtor - WorldCom's resulting claim against Intermedia - pursuant to section

502(d) of the Bankruptcy Code is unclear.

125.    Determination of solvency, recharacterization, and valuation issues require

complicated and fact intensive inquires and, in the context of these chapter 11 cases, the outcome

of any such determination is unclear.  Based on the foregoing, there are significant litigation

hazards which are avoided by the Intermedia Settlement.

> **(b)    Absent the Intermedia Settlement, Litigation
> of the Intermedia Settlement Issues Would
> be Complex and Costly, Delay the Debtors'
> Emergence from Chapter 11 and
> Result in an Attendant Erosion of Significant Value**

126.    Litigation of the Intermedia Settlement Issues would also delay the Debtors'

emergence from chapter 11 as well as distributions to creditors, to the detriment of all creditors.

Litigation of the Intermedia Settlement Issues would be particularly complicated by the absence

of accurate financial records or employees knowledgeable about the Debtors' prepetition

financial affairs.  Additionally, because of the magnitude and overall importance of these issues

to the entire restructuring, it would be impossible to determine creditors' recoveries absent either

a settlement or determination on the Intermedia Settlement Issues.

> **(c)    The Intermedia Settlement Is in the Best Interest of Creditors**

127.    The Official Creditors Committee, after conducting its own diligence and review

of the Intermedia Settlement Issues, determined that the Intermedia Settlement is in the best

interest of creditors because:

> (a)    fraudulent conveyance will not have to be litigated;
>
> (b)    avoidance of the Intermedia Intercompany Note, pursuant to section 547
>        of the Bankruptcy Code, will not have to be litigated;

(c)    recharacterization of the Intermedia Intercompany Note will not have to be litigated;

(d)    valuation will not have to be litigated;

(e)    the Debtors' estates and creditors will not suffer the time, expense and delay that would otherwise result from litigating the Intermedia Settlement Issues;

(f)    the Debtors may proceed to confirmation of the Plan without the obstacle of litigation of the Intermedia Settlement Issues obstructing their path;

(g)    the Debtors and creditors will not have to risk the possibility of an unfavorable outcome of litigation of the Intermedia Settlement Issues;

(h)    there will be less likelihood of delay of distributions to creditors as a result of the Intermedia Settlement; and

(i)    there will be no erosion of value of the Debtors' estates that would otherwise result from litigating the Intermedia Settlement Issues during the pendency of these cases.

128.    These factors are all clear benefits to the Debtors' estates and creditors and accordingly, the Intermedia Settlement should be approved.

### C.    <u>The Bank Settlement Should be Approved</u>

129.    The Bank Settlement resolves issues relating to: (a) allegations by the CTA Banks that the Debtors fraudulently obtained funding under the 364-Day Facility and that such funds are subject to a constructive trust for the benefit of the CTA Banks; and (b) allegations of negligence and negligent misrepresentation committed by the Debtors in connection with the 364-Day Facility asserted by the Maryland Banks.  The Bank Settlement provides that the CTA Banks will receive a *pro rata* share of New Notes in the aggregate amount of $75 million under Class 3 of the Plan.  Distribution of the New Notes is contingent upon the CTA Banks dismissing the Constructive Trust Action and obtaining a dismissal with prejudice of the Maryland Action from the Maryland Banks.  Finally, upon the effective date of the Plan, the CTA Banks will file a notice dismissing the Constructive Trust Action with prejudice.  The dismissal of the Maryland

70

Action is particularly beneficial to the Debtors, because a defendant in the Maryland Action is a former treasurer of WorldCom who continues to provide information to the Debtors on critical financial information and is valuable to the Debtors' estates.

130.    The factual and legal issues surrounding the litigation of constructive trust are complex and, if litigated, would lead to an uncertain outcome.  Further, litigation of constructive trust, as well as the attendant costs of litigating the Bank Actions and resulting delay in the Debtors' emergence from chapter 11, would be detrimental to the Debtors' creditors.  Therefore, the Bank Settlement, which is in the best interest of creditors, should be approved pursuant to Bankruptcy Rule 9019.

**1.    The Debtors' Probability of Success
        in Litigating the Constructive Trust
        <u>Action and Maryland Action Is Unclear</u>**

131.    The law of constructive trust is complicated and, if litigated, it is unclear which party, the CTA Banks or the Debtors, would prevail.  Bankruptcy Code section 541(d) provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11. U.S.C. § 541(d).  Relying on this definition, "courts have concluded that property which a debtor holds in trust (express or constructive) for another does not become property of the estate when the debtor files for bankruptcy." <u>EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.)</u>, 243 B.R. 231, 235 (Bankr. D. Del. 2000); <u>see</u> <u>also</u> <u>Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)</u>, 874 F.2d 88, 93 (2d Cir. 1989) (similar).  Accordingly, if it is determined that a debtor in bankruptcy holds property in "constructive" trust, "'the sole permissible administrative act of the [debtor] is to pay over or endorse over the property to the beneficiary or beneficiaries.'" <u>In re</u>

71

Signal Hill-Liberia Ave. L.P., 189 B.R. 648, 651 (Bankr. E.D. Va. 1995) (quoting Mid-Atlantic

Supply, Inc. v. Three Rivers Aluminum Co. (In re Mid-Atlantic Supply Co.), 790 F.2d 1121,

1126 (4th Cir. 1986)).

132.    Generally speaking:

> A constructive trust is one that arises by operation of law against one who,
> by fraud, actual or constructive, by duress or abuse of confidence, by
> commission of wrong, or by any form of unconscionable conduct, artifice,
> concealment, or questionable means, or who in any way against equity and
> good conscience, either has obtained or holds the legal right to property
> which he ought not, in equity and good conscience, to hold and enjoy.

Alfred v. Fairchild, 785 So. 2d 1064, 1067 (Miss. Sup. Ct. 2001); see also Koreag, Controle et

Revision S.A. v. Refco F/X Assoc., Inc. (In re Koreag, Controle et Revision S.A.), 961 F.2d 341,

352 (2d. Cir. 1992); Hogg v. Walker, 622 A.2d 648, 652 (Del. Sup. Ct. 1993).  The party seeking

the imposition of a constructive trust bears the burden of establishing the trust requirements. See

Haber Oil Co. v. Swinehart (In re Haber Oil Co.), 12 F.3d 426, 436 (5th Cir. 1994); Hill v.

Kinzler (In re Foster), 275 F.3d 924, 926 (10th Cir. 2001).

133.    The requirements for establishing a constructive trust on account of wrongful

activity are dictated by state law.  See, e.g., Jaffke v. Dunham, 352 U.S. 280, 281, 77 S. Ct. 307,

308 (1957) (holding that the issue is governed by the law of the state in which the bankruptcy

court is situated); Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1118 (5th

Cir. 1995) (holding that the issue is governed by the law of the state in which the relevant

property is located); LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 289 (D. Del. 2000)

(holding in a non-bankruptcy civil suit that the law of the state of incorporation governs the

imposition of a constructive trust where the issue is predicated on the conduct of officers and

directors).  In this matter, it is likely that the laws of: (a) Georgia, the state of WorldCom's

incorporation, (b) New York, the state whose law may govern the applicable credit facility and

72

the location of the chapter 11 cases, or (c) Mississippi, the state of WorldCom's principle place

of business, may apply, but the states all include similar requirements for the establishment of a

constructive trust on account of fraud or other wrongdoing.

134.    The essential requirement of New York, Georgia and Mississippi law is that in

order to establish a constructive trust, a claimant must demonstrate that the debtor received legal

title to property by fraud or other wrongdoing and that the debtor will be unjustly enriched if it is

allowed to retain legal title to such property.  See In re Koreag, Controle et Revision S.A., 961

F.2d at 353-54 (applying New York constructive trust law); Alfred v. Fairchild, 785 So. 2d at

1067 (applying Mississippi constructive trust law); see also O.C.G.A. § 53-12-93(a) ("[a]

constructive trust is a trust implied whenever the circumstances are such that the person holding

legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the

property without violating some established principle of equity" under Georgia statutory law).

Other formal requirements, such as the requirement that a claimant show a fiduciary or other

confidential relationship with the debtor, are regularly excused in order to remedy wrongdoing

and unjust enrichment.  See, e.g., In re Koreag, Controle et Revision S.A., 961 F.2d at 354 ("[A]

person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the

lack of a fiduciary relationship."); Aetna Life Ins. Co., 241 Ga. 169, 244 S.E.2d 46 ("A

constructive trust arises not from the intent of the parties, but by equity . . . .").

135.    Finally, assuming the requirements for imposition of a constructive trust are met,

the claimant must also be able to trace the property that is allegedly held by the debtor in

constructive trust for the claimant.  See Cunningham v. Brown, 265 U.S. 1, 44 S. Ct. 424 (1924);

Hazlett v. Fusco, 177 A.D.2d 813, 576 N.Y.S.2d 427 (1991) (applying New York law); Palmer

v. Palmer, 654 So. 2d 1, 6 (Miss. Sup. Ct. 1995) (applying Mississippi law).  If the property at

73

issue is cash, the claim is not necessarily lost if the debtor commingles cash with other moneys in

a single account.  See Official Committee of Unsecured Creditors v. Columbia Gas Sys. Inc. (In

re Columbia Gas Sys. Inc.), 997 F.2d 1039, 1063 (3d Cir. 1993).  Under such circumstances,

courts may apply the "lowest intermediate balance" test, which "allows trust beneficiaries to

assume that trust funds are withdrawn last from a commingled account.  Once trust money is

removed, however, it is not replenished by subsequent deposits.  Therefore, the lowest

intermediate balance in a commingled account represents trust funds that have never been

dissipated and which are reasonably identifiable."  Id.

136.    The CTA Banks assert that they extended credit to WorldCom because

WorldCom certified that its financial statements were in accordance with GAAP, that there were

no defaults under the 364-Day Facility, and that the funds would be held in WorldCom's bank

account at Bank of America, which representations the CTA Banks assert are false.  The CTA

Banks also assert that the elements required for a constructive trust have been established and

seek a secured claim in the amount of the lowest intermediate balance, which they assert is

between $150 million and $250 million.

137.    The Debtors, however, argue that the CTA Banks cannot meet the requirements

necessary to impose a constructive trust because:

> (a)    a court sitting in equity may refuse to impose a constructive trust even if
> the CTA Banks met the requisite elements;
>
> (b)    WorldCom, as a debtor-in-possession, could avoid or defeat the
> constructive trust under its strong-arm powers, as the Sixth, Seventh and
> Ninth Circuit Courts of Appeals and the District of Delaware[36] have held
> that property of a debtor's estate includes property subject to a
> constructive trust; and

---

[36] See XL/Data Comp., Inc. v. Wilson (In re Omegas Group, Inc.), 16 F.3d 1443 (6th Cir. 1994); Belisle v. Plunkett, 877 F.2d 512 (7th Cir. 1989); Chbat v. Tleel (In re Tleel), 876 F.2d 769 (9th Cir. 1989); Mullins v. Burtch (In re Paradise & Assoc., Inc.), 249 B.R. 360 (D. Del. 2000).

74

     (c)     the CTA Banks will be unable to adequately trace the funds subject to a constructive trust.

138.    Based on the foregoing, the Debtors and the CTA Banks, respectively, have arguments in support of and against the imposition of constructive trust that could be successful. However, it remains unclear, based on the complexity of the applicable law and facts, which party would be successful.

> **2.     Absent the Bank Settlement, Litigation of the Constructive Trust Action and Maryland Action Would be Complex and Costly, Delay the Debtors' Emergence from Chapter 11 and Result in An Attendant Erosion of Significant Value**

139.    Litigating the Constructive Trust Action would: (a) add great expense to the Debtors' estates, (b) subject the creditors to a possible determination that the CTA Banks are entitled to $150-250 million in cash from the estates, (c) delay the Debtors' emergence from chapter 11 as these important issues are being determined, and (d) deprive the Debtors' estates of the advice of their former treasurer, the defendant in the Maryland Action.  Thus, the Bank Settlement is necessary to the Debtors' reorganization and should be approved.

> **3.     The Bank Settlement Is in the Best Interest of Creditors**

140.    The Bank Settlement would:

     (a)     prevent the Debtors from continuing to expend time and funds in litigating the Constructive Trust and Maryland Actions;

     (b)     allow the Debtors to proceed to confirming the Plan without the obstacle and uncertainty of the Constructive Trust and Maryland Actions and the attendant loss in value to the Debtors' estates; and

     (c)     the Maryland Action, which will be dismissed, will allow the former treasurer of WorldCom to continue to aid in the Debtors' reorganization efforts.

141.    For these reasons, the Bank Settlement falls above the lowest point in the range of

reasonableness and is in the best interest of creditors and should be approved.

## CONCLUSION

For all of the foregoing reasons, the Official Creditors Committee respectfully requests

that the Court (a) confirm the Plan and (b) grant such other relief as the Court deems just,

equitable and proper.

Dated: New York, New York
          September 3, 2003

**AKIN GUMP STRAUSS HAUER & FELD LLP**


/s/ Daniel H. Golden

Daniel H. Golden (DG-5624)
Ira S. Dizengoff (ID-9980)
James R. Savin (JS-9920)
Kenneth A. Davis (KD-9070)
Shuba Satyaprasad (SS-5875)
590 Madison Avenue
New York, New York 10022
(212) 872-1000

Counsel to the Official Committee of Unsecured Creditors
of WorldCom, Inc., et al.

76