UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------x
                                        :
In re                                   :
                                        :        Chapter 11 Case No.
WORLDCOM, INC., et al.,                 :        02-13533 (AJG)
                                        :
                                        :        (Jointly Administered)
          Debtors.                      :
---------------------------------------------------------------x
```

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED SEPTEMBER 12, 2003 AND IN RESPONSE TO CERTAIN OBJECTIONS THERETO

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
  Debtors in Possession
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Perez, Esq.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................iii

PRELIMINARY STATEMENT .....................................................................2

FACTS .........................................................................................................4

ARGUMENT................................................................................................11

I.    THE SECOND AMENDED PLAN COMPLIES WITH  SECTION 1129(a)(1) OF THE BANKRUPTCY CODE .....................................11

    A.    The Second Amended Plan Complies With Section 1122(a)....................12

    B.    The Second Amended Plan Complies With Section 1123(a)(4).............16

        i.    The Contributions By The Holders of MCIC Senior Debt Claims And The Holders of MCIC Subordinated Debt Claims To The Trade Claims Committee Are Permissible And Do Not Violate Section 1123(a)(4) Of The Bankruptcy Code..................................................................................16

        ii.    The Treatment Of MCI Pre-merger Claims  In Class 6 Is Permissible And Does Not Violate  Section 1123(a)(4) Of The Bankruptcy Code..................................................................25

II.    THE SECOND AMENDED PLAN COMPLIES WITH SECTION 1129(a)(2) OF THE BANKRUPTCY CODE .....................................26

    A.    The Second Amended Plan Complies With Section 1125 ......................27

    B.    The Second Amended Plan Complies With Section 1126 ......................29

III.    THE SECOND AMENDED PLAN WAS PROPOSED IN GOOD FAITH .......30

IV.    THE SECOND AMENDED PLAN DOES NOT DISCRIMINATE UNFAIRLY WITH RESPECT TO CLASS 6 AND IS FAIR AND EQUITABLE WITH RESPECT TO CLASS 7....................................................33

    A.    The Second Amended Plan Does Not Discriminate Unfairly .................33

    B.    The Second Amended Plan Is Fair And Equitable ..................................35

        i.    Section 510(b) of the Bankruptcy Code Provides for Subordination of Securities Litigation Claims to All General Unsecured Claims ...........................................................................35

        ii.    Holders of Securities Litigation Claims Are Not Entitled To the Benefits of Section 510(a) of the Bankruptcy Code ..................37

V.    THE EXCULPATION PROVISIONS CONTAINED IN THE SECOND AMENDED PLAN ARE STANDARD AND APPROPRIATE..........................39

i

## TABLE OF CONTENTS
### (continued)

Page

VI.    THE SECOND AMENDED PLAN SATISFIES THE REQUIREMENTS
OF SECTION 1127 OF THE BANKRUPTCY CODE ......................................44

CONCLUSION...........................................................................................................44

# TABLE OF AUTHORITIES

## CASES

*ABF Capital Management v. Kidder Peabody & Co. (In re Granite Partners L.P.)*, 210 B.R. 508 (Bankr. S.D.N.Y. 1997)......................................................40

*Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173 (10th Cir. 2002) ...........36, 38

*American Broadcasting Systems, Inc. v. Nugent*, 240 F.3d 823 (9th Cir. 2001)...........................37

*In re CGE Shattuck, LLC*, 254 B.R. 5 (Bankr. D.N.H. 2000) ........................................................22

*In re Cajun Electric Power Cooperative*, 150 F.3d 503 (5th Cir. 1998) .......................................23

*In re Cajun Electric Power Cooperative*, 230 B.R. 715 (Bankr. M.D. La. 1999).........................23

*In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000) .........................................................41

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717 (Bankr. S.D.N.Y. 1992), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992).........................................................14, 40, 41

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001) .......................17, 19, 34

*In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr. S.D.N.Y. 1997) ............................................37

*In re Holywell Corp.*, 913 F.2d 873 (11th Cir. 1990) ..............................................................15, 25

*In re JLM, Inc.*, 210 B.R. 19 (2d Cir. BAP 1997) ........................................................................40

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir. 1988) ...................................11, 12, 26, 31

*Koelbl v. Glessins (In re Koelbl)*, 751 F.2d 137 (2d Cir. 1984) ....................................................31

*In re Leslie Fay Cos.*, 207 B.R. 764 (Bankr. S.D.N.Y. 1997)........................................................31

*Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385 (S.D.N.Y. 1993) ...................................................41

*In re MCorp Finance, Inc.*, 160 B.R. 941 (S.D. Tex. 1993)........................................16, 19, 20, 21

*Manati Sugar Co. v. Mock*, 75 F.2d 284 (2d Cir. 1935)................................................................31

*In re Mid-American Waste Systems, Inc.*, 228 B.R. 816 (Bankr. D. Del. 1999) ...........................37

*Moran v. Hong Kong & Shanghai Banking Corp. (In re Deltacorp, Inc.)*, 179
    B.R. 773 (Bankr. S.D.N.Y. 1995) ................................................................. 15

*In re Nuclear Imaging*, 270 B.R. 365 (Bankr. E.D. Pa. 2001) ...................... 17

*Official Committee of Unsecured Creditors v. Stern (In re SPM Manufacturing
    Corp.)*, 984 F.2d 1305 (1st Cir. 1993) ................................................. 16, 17, 18

*In re One Times Square Associates Ltd. Partnership*, 159 B.R. 695 (Bankr.
    S.D.N.Y. 1993) ............................................................................................ 14

*Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438 (S.D.N.Y. 1994) ........................ 40

*In re Parke Imperial Canton, Ltd.*, 1994 WL. 842777 (Bankr. N.D. Ohio 1994) ....... 17, 20, 21, 34

*In re Permian Producers Drilling, Inc.*, 263 B.R. 510 (W.D. Tex. 2000) .................... 37

*Philip v. L.F. Rothschild Holdings (In re L.F. Rothschild Holdings)*, 163 B.R. 45
    (S.D.N.Y. 1994) .......................................................................................... 40

*In re Prudential Energy Corp.*, 58 B.R. 857 (Bankr. S.D.N.Y. 1986) .................... 27, 28

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)        41, 42, 43

*In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002) .................... 16, 20

*In re Texaco Inc.*, 84 B.R. 893 *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988) .......................... 31

*In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141 (Bankr. S.D.N.Y. 1984) .................... 12, 27

*In re Union Meeting Partners*, 165 B.R. 553 (Bankr. E.D. Pa. 1994), *aff'd* 52 F.3d
    317 (3d Cir. 1995) ....................................................................................... 23

*Vasconi & Associate, Inc. v. Credit Manager Association of California*, 1997
    WL. 383170 (N.D. Cal. 1997) ..................................................................... 41

*In re Walnut Equipment Leasing Co., Inc.*, 1999 WL. 1068448 (Bankr. E.D. Pa.
    1999) ............................................................................................................ 13

*In re White Glove, Inc.*, 1998 WL. 731611 (Bankr. E.D. Pa. 1998) .................... 17, 20, 21, 22

## FEDERAL STATUTES

11 U.S.C. § 1122 ................................................................................................... 12

11 U.S.C. § 1126(c) ............................................................................................. 30

11 U.S.C. § 1127(a) ...................................................................................................44

11 U.S.C. § 1129(a)(1) ..............................................................................................11

11 U.S.C. § 1129(a)(2) ..............................................................................................26

11 U.S.C. § 1129(a)(3) ..............................................................................................31

11 U.S.C. § 1129(b) ..................................................................................................34

11 U.S.C. § 510(b) ....................................................................................................36

## MISCELLANEOUS

4 COLLIER ON BANKRUPTCY 510.04[1], at 510-11 (15th rev. ed. 2002) ...........................36

7 COLLIER ON BANKRUPTCY 1103.05[4], at 1103-32 to 33 (15th rev. ed.
    2002) ....................................................................................................................42

H.R. Rep. No. 95-595 (1977) ...........................................................................11, 13

*Robert J. Stark, Reexamining the Subordination of Investor Fraud Claims in
    Bankruptcy: A Critical Study of In Re Granite Partners, L.P.*, 72 Am.
    Bankr. L.J. 497 (1998) ...........................................................................................37

S. Rep. No. 95-989 (1978) ...............................................................................11, 13

HEARING DATE AND TIME: October 15, 2003 at 10:00 a.m.

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors in Possession
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Perez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | |
| | : | **Chapter 11 Case No.** |
| **WORLDCOM, INC.,** *et al.*, | : | **02-13533 (AJG)** |
| | : | |
| | : | **(Jointly Administered)** |
| Debtors. | : | |

-----------------------------------------------------------------x

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED SEPTEMBER
12, 2003 AND IN RESPONSE TO CERTAIN OBJECTIONS THERETO**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

WorldCom, Inc. and certain of its direct and indirect subsidiaries, as

debtors and debtors in possession (collectively, the "Debtors"[1]), submit this

Memorandum of Law (the "Memorandum") in support of confirmation, pursuant to

section 1129 of title 11 of the United States Code (the "Bankruptcy Code"), of the

Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the

Bankruptcy Code, dated September 12, 2003 (the "Second Amended Plan") and in

response to certain objections thereto.

---

[1] Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Second
Amended Plan.

<u>**PRELIMINARY STATEMENT**</u>

The goal of a chapter 11 case is to reach a consensual plan of reorganization.  That goal has been met in this case.  After extensive negotiations and at times Herculean efforts by many parties over the course of the past approximately eight months, the Debtors have now proposed the Second Amended Plan that is supported by every major creditor constituency and was overwhelmingly accepted by every class of creditors entitled to vote.

The Second Amended Plan incorporates an integrated settlement which, together with the Intermedia Settlement, the MCIC Settlement, and the Bank Settlement, form the foundation of an almost universally consensual plan of reorganization, the benefits of which cannot be overstated.  The integrated settlement eliminates significant litigation surrounding confirmation of the Second Amended Plan, eliminates appeals from the Debtors' settlements with the Securities and Exchange Commission and Electronic Data Systems Corporation and EDS Information Services LLC, and will enable the Debtors to emerge expeditiously from chapter 11.  The Second Amended Plan also provides all creditors with the benefits of substantive consolidation while at the same time eliminating virtually any asserted prejudice associated therewith -- a fact confirmed by the overwhelming acceptance of the Second Amended Plan.

As of the date hereof, the Debtors have received only nine objections to the Second Amended Plan (the "Objections"), none of which stands as an impediment to confirmation.  Specifically, the United States Trustee for the Southern District of New York (the "U.S. Trustee") and Bank of America, N.A. seek certain modifications to the Second Amended Plan but do not object to confirmation.  Wells Fargo Bank, N.A. ("Wells Fargo") asserts an absolute priority argument with respect to the holders of

Intermedia Preferred Stock, notwithstanding the overwhelming acceptance of all classes

of Intermedia creditors.  It also reargues that it is not bound by the Bank Settlement, an

argument Wells Fargo has agreed will be adjudicated subsequent to the Confirmation

Hearing, in connection with the Debtors' pending objection to the Wells Fargo proof of

claim.  Another Objection filed by Alan G. Hevesi, Comptroller of the State of New

York, as Administrative Head of the New York State and Local Retirement Systems and

as Trustee of the New York State Common Retirement Fund (the "Comptroller")

incorrectly interprets section 510(b) of the Bankruptcy Code and the bankruptcy policy

relative to the status of fraud claims arising out of the purchase and sale of securities.

      The remaining five objectors, who collectively hold approximately $7

million out of approximately $35 billion of prepetition claims, are (i) America West

Airlines, Inc. ("America West"), (ii) CIT Lending Services Corporation ("CIT"), (iii)

Courthouse Place, Inc. ("Courthouse"), (iv) Ikon Office Solutions, Inc. and IOS Capital,

Inc. (together, "Ikon"), and (v) Next Factors, Inc. ("Next").  Although these Objections

purport to raise confirmation issues, each Objector essentially requests that the Court

recharacterize its Claim so that it will be afforded more favorable treatment under the

Second Amended Plan.  In fact, the Second Amended Plan provides a mechanism for the

Court's resolution of such Claims outside of the confirmation process.

      For ease of presentation, in addition to this Memorandum, which provides

a more fulsome response to some of the assertions set forth in the Objections, the Debtors

have filed contemporaneously herewith the Debtors' Response to Objections to

Confirmation of the Debtors' Second Amended Joint Plan of Reorganization Under

Chapter 11 of the Bankruptcy Code, dated September 12, 2003 (the "Response").  As

demonstrated herein, in the Response, and in the Confirmation Brief (as defined below), and as will be demonstrated by the record of the Confirmation Hearing (including the evidentiary record established at the hearing held on September 8, 9, 15, 16 and 17), the Second Amended Plan satisfies all applicable requirements of the Bankruptcy Code, including sections 1122, 1123, 1125, 1127, and 1129. The Objections should be overruled, and the Second Amended Plan confirmed.

## FACTS

1.      The pertinent and salient facts are set forth below, in the Disclosure Statement, and in (i) the Debtors' Memorandum of Law in Support of Confirmation of Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, (ii) the Debtors' Memorandum of Law in Support of Substantive Consolidation and in Opposition to Objections Thereto, (iii) the Debtors' Memorandum of Law (I) in Support of the Intermedia Settlement, the Bank Settlement and the MCIC Settlement and (II) in Opposition to Motion for Partial Summary Judgment, and (iv) the Debtors' Response to Objections to Confirmation of Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated July 9, 2003 (collectively, the "Confirmation Brief"). All such facts are incorporated herein as if fully set forth.

2.      On July 9, 2003, the Debtors filed their Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Amended Plan"). By order, dated July 31, 2003, the Court, *inter alia*, established (i) August 26, 2003 as the deadline for creditors to vote to accept or reject the Amended Plan and (ii) September 8, 2003 as the commencement date for the Confirmation Hearing.

3.      On July 31, 2003, the Ad Hoc Committee of Dissenting

Bondholders filed an objection to the Amended Plan and a memorandum of law in

support thereof (together, the "Dissenting Bondholder Objection").[2]  In its objection, the

Ad Hoc Committee of Dissenting Bondholders asserted, *inter alia*, that

- the Amended Plan violates several provisions of section 1129(a) of the Bankruptcy Code;

- the substantive consolidation proposed in the Amended Plan is inappropriate because holders of MCIC Subordinated Debt Claims relied only on MCIC and its direct and indirect subsidiaries (collectively, "MCI") when extending credit and the affairs of MCI are not hopelessly entangled with those of WorldCom, Inc. and its subsidiaries (collectively, "WorldCom"); and

- holders of MCIC Subordinated Debt Claims are entitled to payment in full because they are structurally senior to the holders of WorldCom Senior Debt Claims and the assets of MCI are sufficient to pay all MCI creditors in full after elimination of allegedly improper intercompany claims.

4.      On August 4, 2003, the Ad Hoc MCI Trade Claims Committee

filed an objection to the Amended Plan (the "Trade Claims Committee Objection").[3]  In

its objection, the Ad Hoc MCI Trade Claims Committee asserted, *inter alia*, that

- the Amended Plan fails to satisfy the requirements of section 1129(a) of the Bankruptcy Code;

- the settlement reached among the Debtors, the Committee, and the Ad Hoc Committee of MCIC Senior Notes Holders should not be approved;

- the substantive consolidation proposed in the Amended Plan is inappropriate because members of the Ad Hoc MCI Trade Claims Committee relied on the separateness of MCI and the affairs of MCI are not hopelessly entangled with those of WorldCom or WorldCom, Inc.; and

---

[2] HSBC Bank USA filed a joinder in the Dissenting Bondholder Objection.

[3] Platinum Partners Value Arbitrage Fund, L.P. filed a joinder in the Trade Claims Committee Objection.

- because the holders of trade claims against MCI are structurally senior to holders of WorldCom Senior Debt Claims, MCIC Senior Debt Claims, and MCIC Subordinated Debt Claims, the members of the Ad Hoc MCI Trade Claims Committee are entitled to payment in full.

5.      The Debtors disputed each of these assertions and, on September 3, 2003, the Debtors filed their Confirmation Brief.

6.      In addition to the Dissenting Bondholder Objection and the Trade Claims Committee Objection, the Debtors received approximately 58 formal objections to the Amended Plan, substantially all of which have been consensually resolved.  On August 29, 2003, the Debtors' Court-appointed voting and tabulation agent filed the certification of the voting results with respect to the Amended Plan (the "Vote Certification").  As set forth in the Vote Certification, each class of creditors entitled to vote, voted to accept the Amended Plan.

7.      The Confirmation Hearing commenced on September 8, 2003.  At the urging of the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee, the Debtors informed the Court that the Debtors, the Committee, the Ad Hoc Committee of Dissenting Bondholders, and the Ad Hoc MCI Trade Claims Committee had been engaged in negotiations and that an opportunity for further discussions could enable the parties to resolve the issues raised in the Dissenting Bondholder Objection and the Trade Claims Committee Objection.  Based upon these representations, the Court adjourned the remainder of the day's hearing to allow the parties to continue negotiations.

8.      On September 9, 2003, the Debtors informed the Court that following extensive arm's-length, good faith negotiations, agreements had been reached with the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade

Claims Committee.  Pursuant to such agreements, (i) the Debtors would further amend

the Amended Plan, (ii) stipulations with the Ad Hoc Committee of Dissenting

Bondholders and Ad Hoc MCI Trade Claims Committee would be entered into by the

Debtors, the Committee, and other creditor representatives, and (iii) the Ad Hoc

Committee of Dissenting Bondholders and Ad Hoc MCI Trade Claims Committee would

withdraw their objections.  In addition, (i) the Ad Hoc Committee of Dissenting

Bondholders, the Ad Hoc MCI Trade Claims Committee, and HSBC would abate their

respective appeals from the Court's Order, dated August 6, 2003, and the Order of the

United States District Court for the Southern District of New York, dated July 7, 2003

Approving the Settlement with the Securities and Exchange Commission and (ii) the Ad

Hoc MCI Trade Claims Committee would abate its appeal from the Order, dated June 4,

2003, Authorizing the Debtors to Assume as Amended Certain Executory Contracts with

Electronic Data Systems Corporation and EDS Information Services LLC.  Such appeals

would be withdrawn with prejudice on the Effective Date of the Plan.

        9.     Thereafter, the Debtors filed the Third Supplement and the Second

Amended Plan.  The Second Amended Plan embodies an integrated, tripartite settlement

that enables the Debtors to effectuate the proposed substantive consolidation of their

estates while recognizing the equities of the various reliance or prejudice arguments that

may be asserted by certain of the Debtors' creditors.  The integrated settlement consists

of (i) a settlement regarding the treatment of MCIC Subordinated Debt Claims reached

with the Ad Hoc Committee of Dissenting Bondholders (the "MCIC Subordinated Debt

Settlement"), (ii) a settlement of the Trade Claims Committee Objection based upon

contributions of consideration by the holders of MCIC Senior Debt Claims and MCIC

Subordinated Debt Claims (the "Trade Claims Committee Settlement"), and (iii) an

amendment to provide for additional recoveries to certain Class 6 creditors whose claims

arise from transactions completed prior to September 13, 1998 with MCIC or any of its

subsidiaries, as of that date (the "Pre-merger MCI Creditors Settlement," and together

with the MCIC Subordinated Debt Settlement and the Trade Claims Committee

Settlement, the "Integrated Settlement").

        10.     The MCIC Subordinated Debt Settlement provides, *inter alia*, that

each holder of an MCIC Subordinated Debt Claim will receive, at the election of such

holder, either (i) New Notes in a principal amount equal to 44% of the principal amount

of such holder's Allowed MCIC Subordinated Debt Claim (subject to a pro-rata reduction

in the event of an oversubscription for New Notes) or (ii) Cash in an amount equal to

42% of the principal amount of such holder's Allowed MCIC Subordinated Debt Claim.

In addition, each holder of an MCIC Subordinated Debt Claim will receive its *pro rata*

share of $31,000,000 in Cash; *provided*, *however*, that, to the extent Class 10 votes to

accept the Plan, the Class 10 distribution will be reduced by, and each holder of an MCIC

Subordinated Debt Claim agrees to contribute its *pro rata* share of, $19 million of Cash

consideration which will be contributed to the members of the Ad Hoc MCI Trade

Claims Committee (the "MCIC Subordinated Debt Contribution").[4]  The MCIC

Subordinated Debt Settlement is detailed in the Stipulation And Agreement Between The

Debtors, The Committee, The Ad Hoc Committee Of Dissenting MCI Bondholders, And

---

[4] Each member of the Steering Group (as defined in the Bankruptcy Rule 2019 Statement of Kramer Levin Naftalis & Frankel LLP filed on August 27, 2003) of Dissenting Bondholders has agreed to pay over its *pro rata* share of the remaining $12,000,000 in Cash distributed to the holders of MCIC Subordinated Debt Claims to Staro Asset Management, LLC.  The Debtors are not party to, and have no information regarding the specific terms of, this intercreditor agreement.

HSBC Bank USA With Respect To Confirmation Of The Debtors' Amended Plan Of

Reorganization, a copy of which was filed with the Court on September 30, 2003.

11.    The Trade Claims Committee Settlement provides that each

member of the Ad Hoc MCI Trade Claims Committee will receive its *pro rata* share of

the MCIC Subordinated Debt Contribution and its *pro rata* share of $21.2 million of New

Notes, which will be contributed by the holders of MCIC Senior Debt Claims (the

"MCIC Senior Debt Contribution," and together with the MCIC Subordinated Debt

Contribution, the "Contributions").  The Trade Claims Committee Settlement is detailed

in the Stipulation And Agreement Between The Debtors, The Committee, The Ad Hoc

MCI Trade Claims Committee, and Platinum Partners Value Arbitrage Fund L.P. With

Respect To Confirmation Of The Debtors' Amended Plan Of Reorganization, a copy of

which was filed on September 30, 2003.

12.    The third component of the Integrated Settlement is the Pre-merger

MCI Creditors Settlement.  The Pre-merger MCI Creditors Settlement provides that any

holder of an Allowed WorldCom General Unsecured Claim that can establish in writing,

with supporting documentation, to the Debtors' satisfaction (and, until the Effective Date,

on reasonable notice to the Committee) that (i) its Claim arises solely from an individual

transaction or series of transactions that was fully completed on or before September 13,

1998 (the date the merger between MCIC and WorldCom was consummated) and (ii) it

relied on the separate credit of MCIC or any subsidiary of MCIC, as of or prior to

September 13, 1998 (the "Pre-merger MCI Creditors"), will receive an additional

distribution of Cash in the amount of .243 multiplied by the Allowed amount of their

Claims in Cash, resulting in an estimated recovery of 60%.  Notwithstanding that the

Debtors' books and records are inextricably entangled, the Pre-merger MCI Creditors

Settlement takes into account the equities of the reliance argument that could be

advanced by the holders of MCI Pre-merger Claims who could not have anticipated the

integrated post-merger enterprise.

13.    In addition to the Integrated Settlement, since the filing of the

Second Amended Plan, the Debtors and the Committee have reached agreement with an

Ad Hoc Committee of Holders of Intermedia Preferred Stock interests (the "Intermedia

Preferred Stock Committee") pursuant to which (i) the value provided to the Intermedia

Debtors' estates under the Intermedia Settlement will be increased by $29 million, (ii)

each holder of an Intermedia Preferred Stock interest will receive its *pro rata* share of

$29 million of Cash, and (iii) the Intermedia Preferred Stock Committee will withdraw its

objection to the Amended Plan (the "Intermedia Preferred Stock Committee Settlement").

The Debtors have modified Section 4.15 of the Second Amended Plan to incorporate the

Intermedia Preferred Stock Committee Settlement.

14.    By order, dated September 12, 2003 (the "Third Supplemental

Disclosure Statement Order"), the Court, *inter alia*, (i) approved the Third Supplement

under section 1125 of the Bankruptcy Code, (ii) established September 30, 2003 as the

deadline by which parties in interest may object to the Second Amended Plan, but only to

the extent such objections relate to the Integrated Settlement or the Intermedia Preferred

Stock Committee Settlement, and (iii) established October 8, 2003 as the deadline by

which holders of Claims in Class 10 may vote to accept or reject the Second Amended

Plan and holders of Claims in Classes 5, 6, 9, 11, 12, and 13 may change their votes (or if

a vote was not previously cast, to vote at this time).  As set forth in the September 23,

2003 Affidavit of Service of Innisfree M&A Incorporated (the "Innisfree Afficavit"), the

Debtors complied with the notice and solicitation requirements set forth in the Third

Supplemental Disclosure Statement Order.

15.    On October 10, 2003, a supplemental certification of the voting

results with respect to the Second Amended Plan was filed with the Court on behalf of

the Debtors' Court-appointed voting and tabulation agent (the "Second Vote

Certification").  As set forth in the Second Vote Certification, each class of creditors

entitled to vote to accept or reject the Second Amended Plan overwhelmingly voted to

accept the Second Amended Plan.

16.    As set forth above, notwithstanding the overwhelming support for

the Second Amended Plan and the resolution of substantially all of the objections to the

Amended Plan, the Debtors have received nine Objections to the Second Amended Plan.

For the reasons set forth herein and in the Response, the Objections should be overruled

and the Second Amended Plan confirmed.

## ARGUMENT

## I.

## THE SECOND AMENDED PLAN COMPLIES WITH
## SECTION 1129(a)(1) OF THE BANKRUPTCY CODE

Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan must

"compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. §

1129(a)(1).  The legislative history of section 1129(a)(1) explains that this provision

encompasses the requirements of sections 1122 and 1123 governing classification of

claims and contents of a plan, respectively.  H.R. Rep. No. 95-595, at 412 (1977); S. Rep.

No. 95-989, at 126 (1978); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr.

S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y.

1987), *aff'd, Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir. 1988); *In re Toy &*

*Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).  The Second

Amended Plan complies fully with the requirements of sections 1122 and 1123 of the

Bankruptcy Code.

### A.    The Second Amended Plan Complies With Section 1122(a)

Section 1122(a) of the Bankruptcy Code provides as follows:

> (a)    Except as provided in subsection (b) of this section, a plan may
> place a claim or interest in a particular class only if such claim or
> interest is substantially similar to the other claims or interests of
> such class.

11 U.S.C. § 1122.  Consistent with the requirements of section 1122, the Second

Amended Plan provides for the separate classification of MCIC Senior Debt Claims,

MCIC Subordinated Debt Claims, and WorldCom General Unsecured Claims.  Such

classification is patently proper.

Nonetheless, America West argues that, by virtue of the cancellation of

the contractual subordination provisions in the MCIC Subordinated Notes Indenture

pursuant to the Second Amended Plan, MCIC Senior Debt Claims and MCIC

Subordinated Debt Claims are no different from the WorldCom General Unsecured

Claims.  Therefore, America West argues that the separate classification of such Claims

violates section 1122(a) of the Bankruptcy Code.[5]  This argument misstates the

requirements of section 1122(a) of the Bankruptcy Code and ignores the applicable facts.

---

[5] Although Ikon and Courthouse Place assert that the "classification scheme" in the Second Amended Plan
violates section 1122 of the Bankruptcy Code, their argument is actually an assertion of disparate treatment
of pre-merger and non pre-merger creditors under section 1123(a)(4) of the Bankruptcy Code.  This
1123(a)(4) argument is addressed in Section I.B below.

First, MCIC Senior Debt Claims, MCIC Subordinated Debt Claims, and all other general unsecured claims are not substantially similar within the context of section 1122. While all of such Claims are unsecured claims, there are intercreditor, contractual subordination provisions that distinguish these Claims and that are recognized under section 510(a) of the Bankruptcy Code. Pursuant to the subordination provisions of the MCIC Subordinated Notes Indenture (which, contrary to America West's assertion, are not eliminated or cancelled until the Effective Date) and section 510(a) of the Bankruptcy Code, the MCIC Senior Debt Claims and MCIC Subordinated Debt Claims are dissimilar in legal nature from any other Claims against the WorldCom Debtors.[6] *In re Walnut Equipment Leasing Co., Inc.*, 1999 WL 1068448, *1 (Bankr. E.D. Pa. 1999) ("As I find it rather obvious that the holders of subordinated debt do not have claims substantially similar to the holders of senior debt, I do not view this to be a § 1122 issue and I will focus on treatment, not classification, of claims.") Separate classification is, therefore, appropriate.

Second, even if this Court were to determine that the MCIC Senior Debt Claims, MCIC Subordinated Debt Claims, and all other unsecured claims are "substantially similar," contrary to America West's assertion, section 1122(a) would not require that all such substantially similar claims be classified together. Rather, section

---

[6] America West incorrectly interprets the cancellation of the subordination provisions of the MCIC Subordinated Notes Indenture. Cancellation of such subordination provisions is effectuated upon the occurrence of the Effective Date. Until such time as the Second Amended Plan becomes effective, the subordination provisions of the MCIC Subordinated Notes Indenture are in effect and may not be ignored. The cancellation of such provisions at the Effective Date protects the holders of the MCIC Subordinated Notes from the risk that holders of MCIC Senior Notes would still have the right to enforce subordination with respect to their plan recoveries. As such, America West's argument is antithetical to the legislative history of 1129 which contemplates that senior creditors may vote to give up value to junior creditors in an effort to achieve a consensual plan. Such agreements by senior creditors and accompanying waivers of subordination do not eliminate the distinction between senior and subordinated classes. H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 413-420 (1977).

1122(a) requires that, if claims are classified together, they must be substantially similar. *See In re One Times Square Associates Ltd. Partnership*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993) ("A broad reading of section 1122(a) does not, however, require all similarly situated claims to be classified together. The statute on its face merely requires that claims classified together be 'substantially similar.' Thus, a debtor is allowed some discretion when classifying unsecured claims."); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes.").

A debtor need not place all substantially similar claims in the same class as long as the debtor has a reasonable basis for the separate classification. *See Times Square Associates*, 159 B.R. at 703 ("The separate classification of substantially similar unsecured claims, therefore, will be allowed only when there is a reasonable basis for doing so or, in other words, when the decision to separately classify does not offend one's sensibility of due process and fair play."). The Debtors have a reasonable basis for the separate classification of MCIC Senior Debt Claims, MCIC Subordinated Debt Claims, and WorldCom General Unsecured Claims. First, the intercreditor contractual subordination provisions discussed above alone provide a reasonable basis to classify these Claims separately. Second, while the Debtors submit that they have established that substantive consolidation as proposed in the Second Amended Plan is appropriate based upon the inextricable entanglement of the Debtors' books and records, it is appropriate, although not required, for the Debtors to consider the relative prejudice to

the creditors that may have relied upon MCIC or its subsidiaries prior to the 1998 merger.

*See*, *e.g.*, *Moran v. Hong Kong & Shanghai Banking Corp.* (*In re Deltacorp, Inc.*), 179

B.R. 773, 777 & n.5 (Bankr. S.D.N.Y. 1995) ("Because substantive consolidation is an

equitable doctrine, the relief granted can come in different forms to square with the facts

of each case. Thus, for example, a secured creditor with a floating lien on receivables and

inventory of one debtor might not be permitted to extend its lien to the assets from all of

the consolidated debtors. So too if the debt-to-asset ratio of one of the consolidated

estates is far different from that of the other estates, it may be most equitable to give a

different distribution to the unsecured creditors of that estate. It is therefore impossible to

define for all cases the results of substantive consolidation.").  In fact, taking into account

the reliance arguments of pre-merger creditors contributes to the fundamental fairness of

the Second Amended Plan.  Moreover, such classification does not manipulate class

voting, violate priorities, or otherwise prejudice the rights of holders of such interests,

and thus, is appropriate.  *See In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)

(plan proponent allowed considerable discretion to classify claims and interests according

to facts and circumstances of case so long as classification scheme does not violate basic

priority rights or manipulate voting).

Accordingly, the classification provisions of the Second Amended Plan

comply with section 1122 of the Bankruptcy Code.

**B.**     **The Second Amended Plan Complies With Section 1123(a)(4)**

    **i.**     **The Contributions By The Holders of MCIC Senior Debt
Claims And The Holders of MCIC Subordinated Debt
Claims To The Trade Claims Committee Are Permissible
And Do Not Violate Section 1123(a)(4) Of The Bankruptcy Code**

America West and CIT argue that the Second Amended Plan violates

section 1123(a)(4) of the Bankruptcy Code because the members of the Ad Hoc MCI

Trade Claims Committee will receive more value than other Class 6 creditors pursuant to

the Trade Claims Committee Settlement.  Section 1123(a)(4) provides that a plan shall

"provide the same treatment for each claim or interest of a particular class, unless the

holder of a particular claim or interest agrees to less favorable treatment of such

particular claim or interest."  However, the additional consideration to be received by the

members of the Ad Hoc MCI Trade Claims Committee is a result of the Contributions –

not a treatment of Claims under the Second Amended Plan – and thus, does not diminish

estate assets.  Accordingly, section 1123(a)(4) is not violated.

It is well established that sharing of proceeds received under a plan by one

creditor with another does not violate the Bankruptcy Code.  The seminal case on this

principle is *Official Comm. of Unsecured Creditors v. Stern* (*In re SPM Mfg. Corp.*), 984

F.2d 1305, 1313 (1st Cir. 1993), which stands for the proposition that creditors are

generally free to do whatever they wish with the bankruptcy dividends they receive,

including to share them with other creditors.  The cases that have followed *In re SPM*

have likewise consistently held that creditors of a debtor are free to enter into agreements

to contribute their share of a distribution in the bankruptcy case to other creditors or

classes of creditors.  *See, e.g., In re MCorp Fin., Inc.*, 160 B.R. 941 (S.D. Tex. 1993); *In*

*re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002); *In re Nuclear Imaging*, 270 B.R.

365 (Bankr. E.D. Pa. 2001); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D.

Del. 2001); *In re White Glove, Inc.*, 1998 WL 731611 (Bankr. E.D. Pa. 1998); *In re*

*Parke Imperial Canton, Ltd.*, 1994 WL 842777 (Bankr. N.D. Ohio 1994).

        In *In re SPM*, the debtor owed $5.5 million to general unsecured creditors

and $9 million to Citizen Savings Bank ("Citizen"), which held perfected first liens on

nearly all the debtor's property.  The Internal Revenue Service held an unsecured priority

claim for $750,000, which was personally guaranteed by the debtor's president and

members of his family.  984 F.2d at 1307.  Citizen and the official committee of

unsecured creditors entered into an agreement by which Citizen agreed to share its

distributions from the debtor's estate with general unsecured creditors.  The case was

later converted to a case under chapter 7 and the debtor's property was liquidated for $5

million.  But for the sharing agreement, as a result of the debtor's insolvency, Citizen

would have been entitled to the entirety of the proceeds, and the IRS and the general

unsecured creditors would have received no distribution.  The debtor and its president

objected to the sharing agreement and the bankruptcy court declined to approve it;

instead, the court ordered the sums that would otherwise go to the unsecured creditors be

paid to the estate for the benefit of priority creditors.  *Id.* at 1309.  On appeal, the district

court affirmed.  *Id.* at 1310.

        On appeal to the First Circuit Court of Appeals, the debtor and its

president argued that the sharing agreement "improperly syphoned proceeds to the

general unsecured creditors 'at the expense of priority creditors'" and in violation of the

Bankruptcy Code.  *Id*. at 1312.  The First Circuit disagreed and reversed the district court,

noting that:

> [I]t is hard to see how the priority creditors lost anything
> owed them given the fact the re would have been nothing
> left for the priority creditors after the $5 million was
> distributed to Citizens.  The "syphoning" of the money to
> general, unsecured creditors came entirely from the $5
> million belonging to Citizens, to which no one else had any
> claim of right under the Bankruptcy Code.

*Id.*  The court specifically held that "[t]he Agreement did not affect estate property, i.e.,

the sale proceeds, but only concerned the contracting parties' claims against the estate,

i.e., their rights to be paid by the estate.  We find no support in the Code for banning this

type of contractual relationship . . . .  [A]bsent some effect on the administration of the

estate or diminution of estate property, <u>neither the Code nor the Rules prohibit or</u>

<u>discourage creditors from receiving cash from nondebtors in exchange for their claims</u>."

*Id.* at 1313-14 (emphasis added).  Accordingly, Citizen's decision to share its distribution

with the unsecured creditors was held to be permissible.  *Id.*

      In upholding the agreement, the First Circuit analogized the sharing

transaction to a hypothetical purchase by Citizen of unsecured claims, and concluded that

a similar or identical result would have ensued.  That is, the unsecured creditors would

have received proceeds from the sale of their claims to Citizen and the priority tax

claimants would have received nothing.  The court also noted that, pursuant to

Bankruptcy Rule 3001(e), a court would not have had authority to interfere with such a

purchase of claims.  *Id.* at 1314-15.  Thus, under *In re SPM*, the Bankruptcy Code does

not govern the right of creditors to transfer or receive non-estate property.  *See id.* at

1313.

      Similarly, in *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D.

Del. 2001), the senior lenders agreed to give a portion of the value they would otherwise

receive to "certain" general unsecured creditors.  Several parties who held unsecured

punitive damage claims against the debtors that were not entitled to receive any

distribution objected to the separate treatment of their claims and the debtors' failure to

provide a distribution to them under the proposed plan.  *Id.* at 600.  The debtors argued

that the classification and treatment of such claims was not improper because the

distribution to other general unsecured creditors was attributable to an agreement of the

senior lenders to give up a portion of the value they would otherwise receive.  *Id.*  The

court, citing *In re SPM*, agreed with the debtors and held that agreement was enforceable

and that the distribution of a portion of the senior lenders' value to certain general

unsecured creditors did not violate the Bankruptcy Code.  *Id.* at 602.

    In *In re MCorp Fin., Inc.*, 160 B.R. 941 (S.D. Tex. 1993), a case closely

analogous to the case at bar, an ad hoc group of senior unsecured creditors agreed to

distribute $33 million to the Federal Deposit Insurance Corporation ("FDIC") to settle

pending litigation between the FDIC and the debtors on the basis that the senior creditors

would lose more in foregone interest if the litigation continued.  The $33 million

distribution to the FDIC was offset by the senior creditors' agreement to limit their

recovery on their undisputed claim.  The *MCorp* court upheld this arrangement despite

the fact that certain junior creditors whose claims were higher in priority than the claims

of the FDIC received no property under the plan.  The court reasoned that "[t]he seniors

may share their proceeds with creditors junior to the juniors, as long as the juniors

continue to receive as least as much as what they would without the sharing."  *Id.*  The

court further noted that the fact that the senior creditor in *SPM* was secured was not

relevant – the *SPM* principles applied to unsecured creditors as well.  *Id.* at 960.

In *In re Parke Imperial Canton, Ltd.*, 1994 WL 842777, at *11 (Bankr.

N.D. Ohio 1994), two of the debtor's secured creditors proposed a plan that guaranteed a

10% dividend to unsecured deficiency creditors, while trade creditors would receive only

a *pro rata* distribution under the plan.  The court held that, based on the reasoning set

forth in *In re SPM*, the senior creditors' allocation of their own proceeds to one class of

unsecured creditors but not to another class of unsecured creditors was permissible.  *See*

*also In re White Glove, Inc.*, 1998 WL 731611, at *6-7 (Bankr. E.D. Pa. 1998) (holding

that secured creditor's agreement to use proceeds from its collateral to distribute to

unsecured creditors was permissible); *In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y.

2002) (permitting same treatment).

As all of these cases make clear, it is permissible for a creditor to receive

from another creditor a contribution of consideration for its claim as long as that

contribution does not diminish other creditors' recoveries from the estate.  Thus, creditors

are free to share their bankruptcy dividends with other creditors.  In the Debtors' case, the

members of the Ad Hoc MCI Trade Claims Committee are receiving an increase in value

as a result of the Contributions from holders of Class 9 and Class 10 Claims as part of an

integrated intercreditor settlement, not as a distribution from the Debtors under the Plan.

Moreover, whether or not the Contributions are made to the Ad Hoc MCI Trade Claims

Committee, Class 6 creditor recoveries are unaffected.  If the Contributions were not

made, the amounts represented thereby would not inure to the benefit of America West,

CIT, or any other Class 6 creditor, but rather would remain available to the classes

contributing those amounts.  Simply put, the Contributions do not in any way implicate or

diminish the recoveries of Class 6 creditors.

The applicable cases also demonstrate that a sharing agreement may be with specified creditors; it need not benefit an entire class. *See, e.g., In re White Glove, Inc.*, 1998 WL 1611 (undersecured creditor agreed to share proceeds from its collateral with the IRS and counterparties to assumed leases); *In re Parke Imperial Center*, 1994 WL 842777 (secured creditor guaranteed a dividend to unsecured deficiency claim creditors); *In re MCorp*, 160 B.R. 941 (unsecured creditors contribute to the distribution of only one unsecured creditor).

Both *MCorp* and *Parke Imperial* as well as *SPM* and its progeny are directly applicable here. The holders of MCIC Senior Debt Claims and the MCIC Subordinated Debt Claims have agreed – in order to protect their recoveries – to contribute a portion of their recoveries to the members of the Ad Hoc MCI Trade Claims Committee. The Contributions clearly come from the recoveries which the contributing holders would otherwise receive under the Plan – the recoveries of the holders MCIC Senior Debt Claims are reduced from approximately 80% to 79.2% as a result of the MCIC Senior Debt Contribution. Likewise, as to the holders of MCIC Subordinated Debt Claims, only to the extent that their class (Class 10) votes to accept the Second Amended Plan (which it overwhelmingly did), do such holders make the MCIC Subordinated Debt Contribution to the Ad Hoc MCI Trade Claims Committee. In fact, while the Contributions to the Ad Hoc MCI Trade Claims Committee are an integral part of the Integrated Settlement, the Debtors cannot compel the holders of MCIC Subordinated Debt Claims or MCIC Senior Debt Claims (who had the right to change their votes) to contribute any of their recovery to the Ad Hoc MCI Trade Claims Committee.

CIT's attempt to distinguish these cases is unpersuasive.  For example, CIT claims that *Parke Imperial* "simply has no application to the largest chapter 11 reorganization in the history of the United States."  CIT Objection at 13.  CIT, however, provides no support or justification as to why *Parke Imperial* has no application to the largest chapter 11 reorganization in history.  CIT further claims that *In re White Glove* is distinguishable because the distribution from the senior creditor complied with the Bankruptcy Code's priority scheme.  In fact, the court in *White Glove*, after discussing that there is no prohibition in the Bankruptcy Code on contractual assignments between creditors, noted that "[t]he permissibility of this arrangement is even more apparent here where the contemplated distribution is consistent with the statutory priority scheme of the Code."  *In re White Glove*, 1998 WL 731611, at *7.  *White Glove* in no way modifies the holdings of *In re SPM* or its progeny that sharing of plan recoveries among creditors is not subject to and is outside the scope of the Bankruptcy Code priority scheme.

The cases cited by America West and CIT purportedly to the contrary are inapposite.  For example, in *In re CGE Shattuck, LLC*, 254 B.R. 5 (Bankr. D.N.H. 2000), a creditor circulated a commitment to share proceeds of its collateral if the debtor's plan was rejected and the creditor was permitted to liquidate its collateral.  The court held that this commitment constituted a *de facto* plan and distinguished *In re SPM* on the basis that in *SPM* there was a bilateral agreement between creditors that called for the parties to work together, as opposed to a unilateral offer by a creditor, with no formally executed agreement, where the parties are not working together to formulate a plan.  Clearly, the facts here are much more closely analogous to *SPM* than to *CGE*.  There are formal agreements between the holders of the MCIC Senior Debt Claims, the MCIC

Subordinated Debt Claims and the Ad Hoc MCI Trade Claims Committee, and the

agreements were reached in furtherance of achieving a consensual plan of

reorganization.[7]

America West also cites *In re Cajun Elec. Power Cooperative*, 230 B.R.

715 (Bankr. M.D. La. 1999) to support its contention that the Contributions violate

section 1123. However, the court in *Cajun* specifically found, without discussing *SPM* or

any of its progeny, that the payments to certain creditors were coming from, and therefore

diminishing, the assets of the bankruptcy estate. *Id.* Moreover, the Court of Appeals for

the Fifth Circuit has specifically held in *Cajun*, in relation to a different intercreditor

payment, that creditor contributions that do not diminish the debtor's estate are

permissible. *In re Cajun Elec. Power Cooperative*, 150 F.3d 503, 518 (5th Cir. 1998)

(upholding payments by creditor-plan proponent to certain other creditors to assist in

payment of their legal fees in supporting the proposed plan because the payments were

not derived from assets of the estate). Here, unlike the lower court decision in *Cajun

Electric*, the holders of the MCIC Senior Debt Claims and the MCIC Subordinated Debt

Claims are making the Contributions to the Ad Hoc MCI Trade Claims Committee from

distributions which they would otherwise receive pursuant to the Second Amended Plan.

The Contributions are not coming from estate assets.

Generally, CIT and America West assert that the Debtors engineered the

Contributions to the Ad Hoc MCI Trade Claims Committee in order to remove their

---

[7] The only other case cited by CIT, *In re Union Meeting Partners*, 165 B.R. 553 (Bankr. E.D. Pa. 1994), *aff'd* 52 F.3d 317 (3d Cir. 1995), did not discuss *SPM* or its progeny or the ramifications of those cases. The payments in *Union Meeting* were from insiders of the debtors, the debtor's general partners, in return for voting on a plan and for providing general releases to the partners, *id.*, which the court found may have been an attempt to isolate a single creditor and gerrymander the votes in favor of the plan that the debtor's general partners supported, *id.* at 567.

objection as an obstacle to confirmation, thereby making *SPM* and its progeny inapplicable. This assertion is incorrect. The Debtors could not force the holders of the MCIC Subordinated Debt Claims to make a contribution to the Ad Hoc MCI Trade Claims Committee – they overwhelmingly voted to do so as part of their vote to accept or reject the Second Amended Plan. The holders of the MCIC Senior Debt Claims likewise could not be forced to make the MCIC Senior Debt Contribution. Such holders had the right to revoke or change their votes in favor of the Second Amended Plan if they did not support the contribution of the $21 million of their Second Amended Plan consideration to the Ad Hoc MCI Trade Claims Committee. As set forth in the Second Vote Certification, 98.4% in amount, and 94.9% in number of holders, of MCIC Senior Debt Claims voted, were voted to accept the Second Amended Plan; and 99.4% in amount, and 96.7% in number of holders, of MCIC Subordinated Debt Claims voted, were voted to accept the Second Amended Plan, and thus, to make the Contributions. Simply because the Integrated Settlement has resolved objections to confirmation of the Debtors' chapter 11 plan does not mean it is a sham. *SPM*, *In re MCorp*, and the other cases discussed above are directly on point -- the Contributions to the Ad Hoc MCI Trade Claims Committee do not violate section 1123(a)(4).

The Integrated Settlement complies with applicable provisions of the Bankruptcy Code and benefits all parties in interest in these cases. In fact, it is almost axiomatic that the benefit is universal among the creditors as, out of the hundreds of thousands of creditors in the Debtors' cases representing approximately $35 billion in Claims, only four creditors representing approximately $7 million have objected to the Second Amended Plan asserting that the Contributions are not proper. The Integrated

Settlement eliminates significant litigation surrounding the confirmation of the Second

Amended Plan and eliminates appeals from orders approving two significant settlements

(i.e., the SEC Settlement and the EDS Settlement), paving the way for the Debtors'

prompt emergence from chapter 11, which as all parties have recognized, is absolutely

crucial to the continuing viability of the Debtors' businesses.[8]

>    **ii.      The Treatment Of MCI Pre-merger Claims
>             In Class 6 Is Permissible And Does Not Violate
>             Section 1123(a)(4) Of The Bankruptcy Code**

CIT, Courthouse Place, Ikon, and Next also argue that the Second

Amended Plan violates section 1123(a)(4) of the Bankruptcy Code because pre-merger

and non pre-merger creditors are classified together but are receiving disparate treatment.

Because the Second Amended Plan contemplates the substantive consolidation of the

WorldCom Debtors, the Debtors have classified together all trade claims against any of

the WorldCom Debtors.  Such classification does not manipulate class voting, violate

priorities, or otherwise prejudice the rights of holders of such interests and is entirely

appropriate.  *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990).

In connection with the Integrated Settlement, the Debtors determined that

Class 6 creditors who satisfied the criteria of MCI Pre-merger claims would receive

additional consideration.  The Second Amended Plan provides a fair mechanism for

---

[8]   America West asserts that the settlements do not satisfy the requirements under Bankruptcy Rule 9019, and therefore, cannot be approved.  While the Debtors believe that, to the extent necessary, the Debtors could demonstrate that the Integrated Settlement satisfies the requirements under Bankruptcy Rule 9019, the Debtors do not believe that approval of the Integrated Settlement implicates Rule 9019.  The Debtors have resolved dozens of confirmation objections by, for example, modifying language of the Second Amended Plan or entering into other stipulations.  Demonstrating that the resolution of each objection to the Second Amended Plan satisfies the requirements of Bankruptcy Rule 9019 is unnecessary.  The nomenclature of the Integrated Settlement notwithstanding, the Integrated Settlement is effectuated by modifications to the Second Amended Plan, which has been overwhelmingly accepted by creditors and the Debtors' only obligation is to demonstrate that the Second Amended Plan is confirmable.  Further, the Contributions to the Ad Hoc MCI Trade Claims Committee are outside the scope of the administration of the estates, and thus, Bankruptcy Rule 9019 is not implicated.

determining which Class 6 Claims are MCI Pre-merger Claims and establishes the

criteria that claimants must meet in order for their Class 6 WorldCom General Unsecured

Claim to qualify.  However, until such time as a holder of a Class 6 WorldCom General

Unsecured Claim establishes that it holds an MCI Pre-merger Claim, it is entitled to

treatment as a nonqualifying Class 6 creditor.  Only when the Debtors have agreed (or the

Court has determined) that the criteria are satisfied does the Class 6 creditor receive

additional consideration.  Therefore, separate classification of such Claims would not be

practical.  In any event, Class 6 voted in favor of the Second Amended Plan, including

the mechanism for determining qualification as an MCI pre-merger claim.

Based upon the foregoing, the Second Amended Plan complies fully with

the requirements of sections 1122 and 1123 of the Bankruptcy Code.

## II.

### THE SECOND AMENDED PLAN COMPLIES
### WITH SECTION 1129(a)(2) OF THE BANKRUPTCY CODE

Section 1129(a)(2) of the Bankruptcy Code requires that the plan

proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11

U.S.C. § 1129(a)(2).  The legislative history to section 1129(a)(2) reflects that this

provision is intended to encompass the disclosure and solicitation requirements under

sections 1125 and 1126 of the Bankruptcy Code.  *See In re Johns-Manville Corp.*, 68

B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78

B.R. 407 (S.D.N.Y. 1987), *aff'd*, *Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir.

1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984);

H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2)

[of section 1129(a)] requires that the proponent of the plan comply with the applicable

provisions of chapter 11, such as section 1125 regarding disclosure."). The Debtors have

complied with the applicable provisions of title 11, including, specifically, sections 1125

and 1126 of the Bankruptcy Code.

### A.    The Second Amended Plan Complies With Section 1125

America West argues that the Third Supplement does not contain

"adequate information" as set forth in section 1125 of the Bankruptcy Code because the

Debtors failed to disclose certain information therein. First, America West's objection is

essentially a disclosure statement objection that America West failed to make with

respect to the Third Supplement at the appropriate time. In addition, substantially all of

the information America West asserts that the Debtors failed to disclose is either (i)

information that is essentially America West's confirmation objections and (ii)

information that is incorrect as a factual matter.

As set forth above, by order dated September 12, 2003, the Court

approved the Third Supplement as containing adequate information as set forth in section

1125 of the Bankruptcy Code. America West did not object to the approval of the Third

Supplement. Nevertheless, based upon an overly broad reading of *In re Prudential

Energy Corp.*, 58 B.R. 857 (Bankr. S.D.N.Y. 1986), America West asserts that the Court

should now conduct what is essentially another disclosure statement hearing regarding

the Third Supplement.

In *Prudential*, the bankruptcy court considered whether to confirm a

proposed plan of reorganization in light of, *inter alia*, "revisions" to prior disclosure and

"redoing of the numbers" that called into question the feasibility of the proposed plan.

*Id.* at 867. The bankruptcy court held that the revisions "bear directly on the voting

process" and "[i]n view of these shortcomings, it is now apparent the Disclosure

Statement should not have been approved under § 1125 as containing adequate

information." *Id.* at 867.

       While it is appropriate for a bankruptcy court to consider, pursuant to

section 1129(a)(2) of the Bankruptcy Code, whether the plan proponent complied with

section 1125 of the Bankruptcy Code, the holding in *Prudential* does not support

America West's efforts to have this Court conduct a second hearing on the adequacy of

the information contained in the Third Supplement, especially because America West did

not object to the approval of the Third Supplement.  Here, the Debtors have not "redone"

the numbers or altered their projections such that creditors are now presented with

information that they did not have when considering whether to accept or reject the

Second Amended Plan, and therefore, there is no basis for America West to assert that

the information contained in the Third Supplement is not adequate.

       With respect to the information that is essentially America West's

confirmation objections (e.g., "[the Third Supplement] [f]ails to adequately disclose to

creditors in Class 6 that the proposed unequal treatment of certain creditors within Class

6 violates § 1123(a)(4)," *see* America West Objection at 17), inclusion of such

information in the Third Supplement is patently inappropriate.  America West's assertion

that a debtor should be required to disclose allegations (not even raised at the Disclosure

Hearing) that its plan is not confirmable demonstrates America West's utter

misunderstanding of the requirements of section 1125 and 1129(a)(2) of the Bankruptcy

Code.

Finally, with respect to the alleged incorrect information that America West asserts must be disclosed (e.g., [the Third Supplement] [f]ails to explicitly advise creditors that the prior justification for the separate classification of Class 10 has been eliminated under the Second Amended Plan," *see* America West Objection at 17), its inclusion is not appropriate as it is contradictory to the purpose of the disclosure statement (i.e., provide creditors and interest holders with accurate and adequate information in order to facilitate an informed vote). As set forth above, the cancellation of the subordination provision in the MCIC Subordinated Notes Indenture is not effective until the Effective Date. Such cancellation is necessary so that holders of MCIC Senior Debt Claims cannot seek to recover distributions received by holders of MCIC Subordinated Debt Claims after the Effective Date. It does not mean that Claims in Class 10 no longer have distinct legal and contractual attributes. The basis for the separate classification of Class 10 Claims, therefore, has not been eliminated. America West's assertion misrepresents the facts and the mechanics of the Second Amended Plan, and therefore, its Objection that the Debtors have not complied with section 1125 of the Bankruptcy Code should be overruled.

## B.    The Second Amended Plan Complies With Section 1126

Section 1126(c) specifies the requirements for acceptance of a plan by a class of claims entitled to vote as follows:

> (c)    A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected the plan.

11 U.S.C. § 1126(c).

As set forth in the Innisfree Affidavit and the Second Vote Certification, in accordance with section 1126 of the Bankruptcy Code and the Third Supplemental Disclosure Statement Order, the Debtors solicited acceptances or rejections of the Second Amended Plan from the holders of all Allowed MCIC Subordinated Debt Claims in Class 10 and provided notice to holders of Allowed Claims in Classes 4, 5, 6, 9, 11, 12, and 13 that such holders could revoke or change their votes.

The Second Amended Plan has been accepted by creditors holding in excess of two-thirds in amount and one-half in number of the Allowed Claims voted in Class 10, which was the only Class solicited in connection with the Third Supplement and the Second Amended Plan.  In total, 96.74% in number and 99.39% in dollar amount of all Claims voted in Class 10 were voted to accepted the Second Amended Plan.  In addition, the Second Amended Plan has been accepted by creditors holding in excess of two-thirds in amount and one-half in number of the Allowed Claims voted in each of Classes 4, 5, 6, 9, 11, 12, and 13 of the Second Amended Plan, which, pursuant to the Third Supplemental Disclosure Statement Order, were the Classes of Claims entitled to revoke or change their votes.[9]

Based upon the foregoing, the requirements of section 1129(a)(2) have been satisfied.

III.

## THE SECOND AMENDED PLAN WAS PROPOSED IN GOOD FAITH

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. §

---

[9]  Pursuant to section 1127(d) of the Bankruptcy Code, each holder that accepted the Amended Plan is deemed to have accepted the Second Amended Plan unless such holder validly and timely changed its vote.

1129(a)(3).  The Second Circuit has defined the good faith standard as "requiring a showing that the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'"  *Koelbl v. Glessins* (*In re Koelbl*), 751 F.2d 137, 139 (2d Cir. 1984) (quoting *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935)); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 631-32 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir. 1988).  In the context of a chapter 11 plan, courts have held that "a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."  *In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting *In re Texaco Inc.*, 84 B.R. 893, 907 (Bankr. S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988)).  "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan."  *Leslie Fay*, 207 B.R. at 781 (citations omitted).  The Debtors submit that as previously set forth in the Confirmation Brief and herein, and based upon the record of the Confirmation Hearing, the requirement of good faith has been established.

Nonetheless, the U.S. Trustee argues that the Second Amended Plan was not proposed in good faith because the Debtors have inserted an "Obligation to Defend" provision in the Second Amended Plan, which requires that the Debtors pay defense costs, costs of settlement (which must be consented to by the Debtors), and any judgment against the current and former members, partners, officers, directors and employees of the Creditors' Committee and its members and the members, partners, officers, directors and employees of the Ad Hoc Committee of Intermedia Noteholders, the Ad Hoc

Committee of MCIC Senior Noteholders, the Ad Hoc Committee of WorldCom

Noteholders, the MatlinPatterson Investors, and Silver Lake and each of their members

(the "Covered Parties") relating to or arising out of the conduct of such party with respect

to the Plan, except in the case of gross negligence, willful misconduct, or breach of

fiduciary duty, in which case, such Covered Parties shall reimburse the Debtors for all

payments made pursuant to this provision. Actually, this is not an objection to the

Debtors' good faith[10] – the U.S. Trustee simply believes that the provision is an

"inappropriate burden on these Debtors" but has no other basis upon which to object to

the provision. The U.S. Trustee seeks the elimination of the "Obligation to Defend"

provision because it "potentially impacts the Debtors' fresh start," "was added after the

settlements had been reached with the Covered Parties," "[t]here was no consideration

provided to the Debtors for this benefit," and the provision is similar to, but more onerous

than, an insurance policy. Each of the U.S. Trustee's assertions is incorrect.

First, the "Obligation to Defend" provision does no more to impact the

Debtors' fresh start than any other postpetition contract that the Debtors have entered into

or the tens of thousands of executory contracts that the Debtors will assume pursuant to

the Second Amended Plan. The Debtors have exercised their business judgment in

negotiating and analyzing the "Obligation to Defend" provision and believe that the

inclusion of the provision in the Second Amended Plan, and the resulting support for the

---

[10]  America West asserts that the Second Amended Plan is not fundamentally fair, and therefore, is not
proposed in good faith in violation of section 1129(a)(3) of the Bankruptcy Code because the Second
Amended Plan violates section 1122 and 1123 of the Bankruptcy Code. Obviously, this is not an objection
under section 1129(a)(3), but rather, a reiteration of America West's 1122 and 1123 objections. As set
forth above, the Second Amended Plan complies fully with section 1122 and 1123 of the Bankruptcy Code,
and therefore, America West's 1129(a)(3) objection is without merit. Nevertheless, the Debtors submit
that, by providing for the substantive consolidation of the WorldCom Debtors while recognizing the
equities of the various reliance arguments that may be asserted by certain creditors, the Second Amended
Plan represents the fairest and most equitable allocation of value possible.

Second Amended Plan by the Covered Parties, is in the best interests of the estates and all creditors.

Second, the "Obligation to Defend" provision was not added after the Integrated Settlement had been reached. The addition of the "Obligation to Defend" provision was incorporated into the Second Amended Plan as an integral component of the Integrated Settlement, a component to which all parties that support the Second Amended Plan have agreed. Accordingly, consideration was provided <u>to the Debtors</u> in the form of a consensus in support of the Integrated Settlement that eliminated significant litigation and furthered the Debtors' efforts to emerge from chapter 11 as promptly as possible.

Finally, the U.S. Trustee's concern that the provision is more onerous than an insurance policy is pure speculation. The Debtors agreed to this provision in the context of the exculpation provision that will protect the Covered Parties in the first instance. The U.S. Trustee does not have a basis to compare the provision to the potential expense or availability of insurance.

**IV.**

**THE SECOND AMENDED PLAN DOES NOT
DISCRIMINATE UNFAIRLY WITH RESPECT TO CLASS 6
<u>AND IS FAIR AND EQUITABLE WITH RESPECT TO CLASS 7</u>**

**A.**     **<u>The Second Amended Plan Does Not Discriminate Unfairly</u>**

IKON and Courthouse Place argue that the Second Amended Plan unfairly discriminates against general unsecured creditors of MCI because, *inter alia*, the members of the MCI Trade Claims Committee will receive the Contributions. Because

Class 6 – which includes the Claims of IKON and Courthouse Place – has voted to accept the Plan, IKON and Courthouse Place may not argue that the Plan unfairly discriminates.

Moreover, a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar claims are treated differently by the debtors without a reasonable basis for the disparate treatment. *See* 11 U.S.C. § 1129(b). The prohibition on unfair discrimination applies to debtors, not to creditors. The Bankruptcy Code does not impose any requirements as to unfair discrimination when one class of creditors determines to allocate part of its recovery to certain classes or categories of creditors but not others. Thus, because the Contributions, which provide enhanced value to the members of the Ad Hoc MCI Trade Claims Committee are from other creditors, section 1129(b) is not implicated. *In re Parke Imperial Canton, Ltd.*, 1994 WL 842777, at *11 (Bankr. N.D. Ohio 1994) (holding that plan which provided for payment to certain unsecured creditors and not others did not discriminate unfairly because the payments were not paid from estate assets); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001) (stating that "the recovery by Classes G4 and M4 of a dividend in the form of New Common Stock and Warrants is based on the agreement of the Senior Lenders to allocate a portion of the value they would have otherwise received to Classes G4 and G5. The disparate treatment between Classes G4 and G7 and Classes M4 and M7 is a permissible allocation by the secured creditors of a portion of the distribution to which they would otherwise be entitled, rather than unfair discrimination against Classes G7 and M7 by the proponents of the plan").

**B.**     **The Second Amended Plan Is Fair And Equitable**

The Comptroller argues that the Second Amended Plan is not "fair and equitable" with respect to Class 7.  The Comptroller concedes that, pursuant to section 510(b) of the Bankruptcy Code, Class 7 Securities Litigation Claims based upon MCIC Senior Debt Claims are subordinated to Class 9 MCIC Senior Debt Claims.  The Comptroller asserts, however, that Class 7 Securities Litigation Claims based upon MCIC Senior Debt Claims are senior to Class 10 MCIC Subordinated Debt Claims.  Therefore, because the holders of MCIC Subordinated Debt Claims are receiving a recovery under the Second Amended Plan and Class 7 Securities Litigation Claims are not paid in full, the Second Amended Plan is not fair and equitable with respect to Class 7 Securities Litigation Claims.

The Comptroller's argument relies upon an erroneous interpretation of section 510(b) of the Bankruptcy Code and is inconsistent with section 510(a) of the Bankruptcy Code.  In fact, the Comptroller fails to cite a single authority to support his Objection.

   **i.**     **Section 510(b) of the Bankruptcy Code**
          **Provides for Subordination of Securities**
          **Litigation Claims to All General Unsecured Claims**

Section 510(b) of the Bankruptcy Code provides for the automatic subordination of Securities Litigation Claims "to all claims or interests that are senior to or equal the claim or interest represented by such security."  11 U.S.C. § 510(b).  Importantly, the statute does not provide that Securities Litigation Claims are subordinated to senior or equal *classes*; rather, the statute provides for the subordination of such Securities Litigation Claims to *claims* that are equal to or senior to the claim represented by the security.  As set forth in COLLIER ON BANKRUPTCY, "[i]f the security is

a debt instrument, the claim that is represented by that security is a general, unsecured

claim.  Since the claim represented by the instrument is a general, unsecured claim, any

claim for rescission will be subordinated until the claims of the general creditors have

been satisfied."  4 COLLIER ON BANKRUPTCY ¶ 510.04[1], at 510-11 (15th rev. ed. 2002);

*see also Allen v. Geneva Steel Co.* (*In re Geneva Steel Co.*), 281 F.3d 1173 (10th Cir.

2002) (upholding bankruptcy court finding that claim for fraud in connection with the

claimant's retention of bond securities is subordinated under section 510(b) to claims of

all other bondholders and other general unsecured creditors).  Because the relevant

security (i.e., the MCIC Senior Notes) is a debt instrument that is a general unsecured

claim, the claim for damages (i.e., the Securities Litigation Claim) is properly

subordinated to all general unsecured claims.  *Geneva Steel*, 281 F.3d at 1177 ("a fraud

claim arising from the purchase or sale of a security is treated *not as a general unsecured*

*claim* but rather as a claim below or equivalent to the rights afforded by the underlying

security") (emphasis added) (internal quotations and citations omitted).

        The Comptroller's interpretation of section 510(b) also contradicts

Congress' intent that holders of securities fraud claims should not receive any

distributions until all general unsecured claims are paid in full.  *See Geneva Steel,* 281

F.3d at 1179 (noting with respect to section 510(b) that "its language, its legislative

history, and most important, its embodied legislative policy choices, reflect strong

congressional disapproval of investor fraud claims in bankruptcy"); *In re Mid-American*

*Waste Systems, Inc.*, 228 B.R. 816 (Bankr. D. Del. 1999) ("Congress made a legislative

judgment that claims emanating from tainted securities law transactions should not have

the same priorities as the claims of general creditors of the estate."); *see also* Robert J.

Stark, *Reexamining the Subordination of Investor Fraud Claims in Bankruptcy:  A Critical Study of In Re Granite Partners, L.P.*, 72 AM. BANKR. L.J. 497 (1998) ("The Bankruptcy Code does not think much of defrauded investors.  It shunts their claims aside with cruel particularity while, at the same time, protecting every other creditor's right to payment."); *see generally In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr. S.D.N.Y. 1997) (invoking broad reading of section 510(b) in line with intent of Congress); *American Broadcasting Systems, Inc. v. Nugent*, 240 F.3d 823 (9th Cir. 2001) (same); *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 520 (W.D. Tex. 2000) ("As a remedial statute, the Court reads section 510(b) broadly in order to effectuate the intent of Congress.").

> **ii.    Holders of Securities Litigation Claims Are Not Entitled
> To the Benefits of Section 510(a) of the Bankruptcy Code**

The holders of Class 7 Securities Litigation Claims arising from MCIC Senior Notes, if any, are not, and cannot be, current holders of MCIC Senior Debt Claims.[11]  Rather, the hypothetical holders of Securities Litigation Claims arising from MCIC Senior Notes that the Comptroller has posited,[12] could only be former holders of such notes who are no longer party to, or beneficiaries of, the subordination provisions in the MCIC Subordinated Notes Indenture.  Such former holders are, therefore, not entitled to the benefits of section 510(a).

---

[11]  The Second Amended Plan provides that the distributions received by holders of Class 9 MCIC Senior Debt Claims are in full and complete satisfaction of any and all Claims arising under the MCIC Senior Notes Indenture.  Thus, holders of MCIC Senior Debt Claims cannot also hold Securities Litigation Claims with respect to their current holdings of MCIC Senior Debt Claims.

[12]  According to the Comptroller, he is the lead plaintiff in the consolidated securities class action captioned *In re WorldCom, Inc. Securities Litigation*, Master File No. 02 Civ. 3288 (DLC) (S.D.N.Y.).  Notably, no class has not been certified.  Additionally, the size of the class, the precise components of the class, and the potential liability of the Debtors to the class are unclear.

In addition, the subordination provisions of the MCIC Subordinated Notes Indenture provide that MCIC Subordinated Claims are subordinated only to "Senior Debt," which includes bonds, but excludes litigation claims against the Debtors. Providing holders of Securities Litigation Claims a recovery ahead of holders of MCIC Subordinated Debt Claims would be unjust and contrary to the expectations of the holders of MCIC Subordinated Debt Claims, which bargained only for subordination to senior bonds, of which $2.65 billion exist. These creditors did not agree to the subordination of their claims to securities fraud claims, the potential liability of which could reach into the hundreds of billions of dollars, as such claims may be brought by anyone who purchased, sold, or retained securities during the relevant time period. *See generally Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180 (10th Cir. 2002) (referencing creditors' expectations to be paid ahead of investors as reason for a broad interpretation of section 510(b)).

Furthermore, the MCIC Subordinated Notes Indenture provides that, upon payment in full to the holders of MCIC Senior Debt Claims, the holders of MCIC Subordinated Debt Claims are subrogated to the rights of holders of MCIC Senior Debt Claims.[13] The very subordination provisions upon which the Comptroller relies belies

---

[13] See Section 1306 "Subrogation to Rights of Holders of Senior Debt" of the MCIC Subordinated Notes Indenture, which provides, in relevant part:

> Subject to the payment in full of all Senior Debt, or the provision for such payment in cash or cash equivalents or otherwise in a manner satisfactory to the holders of Senior Debt, the Holders of the Securities shall be subrogated to the extent of the payment or distributions made to the holders of such Senior Debt pursuant to the provisions of this Article (equally and ratably with the holders of all indebtedness of the Company which by its express terms is subordinated to the Senior Debt of the Company to substantially the same extent as the Securities are subordinated to the Senior Debt and is entitled to like rights of subrogation by reason of any payments or distributions made to holders of such Senior Debt) to the rights of holders of such Senior Debt to receive payments and distributions of cash, property and securities applicable to the Senior Debt until the principal of (and premium, if any) and interest on the Securities shall be paid in full.

the Comptroller's interpretation of section 510(a), which would necessarily emasculate

the subrogation rights of holders of MCIC Subordinated Debt Claims.

Therefore, notwithstanding the contractual subordination extant between

the MCIC Senior Debt Claims and the MCIC Subordinated Debt Claims, any Claim

subject to subordination under section 510(b) of the Bankruptcy Code arising from any of

the debt instruments issued by the Debtors is subordinated to all general unsecured

claims, including the MCIC Subordinated Debt Claims.  Accordingly, the requirements

of section 1129(b)(2)(B) of the Bankruptcy Code are satisfied with respect to Class 7.

## V.

### THE EXCULPATION PROVISIONS CONTAINED IN THE SECOND AMENDED PLAN ARE STANDARD AND APPROPRIATE

The U.S. Trustee objects to the Second Amended Plan on the grounds that

the exculpation provision of the Second Amended Plan is overbroad with respect to the

Debtors and the Committee.  The U.S. Trustee is mistaken -- the exculpation provision is

carefully tailored to the facts of this case and forms an essential component of the

agreement among the major economic parties in interest.  The exculpation provision,

which specifically exempts any party's willful misconduct, gross negligence, or criminal

misconduct, is customary, appropriate, and consistent with applicable law.  For the

reasons set forth below, the exculpation provision in the Second Amended Plan should be

approved.[14]

Debtors in possession are fiduciaries of the entire estate.  *See, e.g.*, *In re*

*JLM, Inc.,* 210 B.R. 19 (2d Cir. BAP 1997).  Similarly, members of creditors' committees

---

[14] To the extent the Court deems appropriate, the Debtors are agreeable to excluding from the exculpation provision, misuse of confidential information and *ultra vires* acts.

are fiduciaries of unsecured creditors.  The fiduciary duty "extends to the class as a

whole, not to its individual members."  *In re Drexel Burnham Lambert Group, Inc.*, 138

B.R. 717, 722 (Bankr. S.D.N.Y. 1992), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992).  The

fiduciary duties themselves give rise to "an implicit grant of limited immunity."  *Id.* at

722.  The qualified immunity "corresponds to, and is intended to further, the [fiduciary's]

statutory duties and powers."  *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514

(S.D.N.Y. 1994).  Based upon the qualified immunity, fiduciaries, including the members

of creditors' committees, are immune from suit alleging breach of fiduciary duty, unless

such fiduciary engaged in "willful misconduct" or an "*ultra vires*" act.  *See, e.g., Philip v.*

*L.F. Rothschild Holdings* (*In re L.F. Rothschild Holdings*), 163 B.R. 45, 49 (S.D.N.Y.

1994); *ABF Capital Mgmt. v. Kidder Peabody & Co.* (*In re Granite Partners L.P.*), 210

B.R. 508, 516 (Bankr. S.D.N.Y. 1997) ("Further, committee members enjoy qualified

immunity for the actions they take within the scope of the authority conferred upon them

by statute or the court, and to overcome this qualified immunity, the party challenging the

member's actions must plead and prove willful misconduct or *ultra vires* activities."); *In*

*re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000) (fiduciary duty owed by

committee representatives to the committee's constituents gives rise to an implicit grant

of limited immunity; party alleging breach of fiduciary duty must prove that the

committee engaged in willful misconduct or *ultra vires* activity); *Luedke v. Delta Air*

*Lines, Inc.*, 159 B.R. 385 (S.D.N.Y. 1993) (creditors' committee's qualified immunity

does not extend to willful misconduct).

   As such, plans that exculpate fiduciaries from all claims arising out of a

chapter 11 case and the negotiation of a chapter 11 plan are permissible, so long as claims

based upon "willful misconduct" and "*ultra vires*" are preserved.  *See, e.g., Drexel Burnham*, 138 B.R. at 722 (holding that plan provision exculpating equity committee was "consistent with the role that committees play in the bankruptcy system, because it preserve[d] liability . . . for 'willful misconduct.'"); *Vasconi & Assoc., Inc. v. Credit Manager Ass'n of California*, 1997 WL 383170, *4 (N.D. Cal. 1997) ("Here, the confirmed Plan contains a release provision insulating the Committee from liability unless the Committee's actions amount to gross negligence or willful misconduct.  By preserving liability for willful misconduct, this provision maintains the proper balance between the fiduciary obligations and implicit immunity of § 1103(c)").

The Third Circuit's decision in *In re PWS Holding Corp.*, 228 F.3d 224, 235 (3d Cir. 2000) is directly on point.  In *PWS*, the debtors proposed an exculpation that is broader than the exculpation contained in the Second Amended Plan.  Specifically, the exculpation provision provided:

> [n]one of the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee or any of their respective members, officers, directors, employees, advisors, professionals or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee and each of their respective members, officers, directors, employees, advisors, professionals and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the plan.

*PWS*, 228 F.3d at 246.  The Third Circuit approved the exculpation, holding that "[u]nder [the exculpation provisions], members of the Committee and professionals who provided services to the Debtors remain liable for willful misconduct or gross negligence.  Because

we conclude that this standard of liability is the standard that already applies in this

situation, we believe that Paragraph 58 affects no change in liability."  *Id.*

      In other words, the exculpation clause simply tracks applicable law; it

does not create an independent release in favor of the exculpated party.[15]  As such, by

seeking to restrict the applicability of a traditional exculpation clause, the U.S. Trustee is

actually seeking to deprive the exculpated parties of the qualified immunity that they

already enjoy under applicable law based upon their roles as fiduciaries.  This should not

be permitted.

      Failure to provide a customary exculpation to members of a creditors'

committee will have a chilling effect on parties willing to serve on such committees.  *See*,

*e.g.*, 7 COLLIER ON BANKRUPTCY ¶ 1103.05[4], at 1103-32 to 33 (15th rev. ed. 2002)

("[A]ctions against committee members in their capacity as such should be discouraged.

If members of the committee can be sued by persons unhappy with the committee's

performance during the case or unhappy with the outcome of the case, it will be

extremely difficult to find members to serve on an official committee.").  It is truly rare to

have a 100% consensual plan of reorganization, with all creditors voting affirmatively in

favor of a plan.  In the absence of such unanimity, a "clean" exculpation is the only

protection that a committee member has to protect itself against a disgruntled creditor

seeking to collaterally attack the plan by commencing suit against the committee and/or

its professionals.  Once a court approves a plan under section 1129 of the Bankruptcy

---

[15]  In addition, the exculpation provisions are consistent with section 1125(e) of the Bankruptcy Code,
which provides that a person that solicits acceptance or rejection of a plan, in good faith and in compliance
with the applicable provisions of chapter 11 is not liable on account of such solicitation or participation for
violation of any applicable law, rule or regulation governing solicitation or the offer, issuance, sale, or
purchase of securities.

Code, fiduciaries of the estate, including the members of the creditors' committee, should

be exculpated from claims arising from the negotiation and formulation of such plan,

absent allegations of willful misconduct or gross negligence.  Finally, as noted by the

Third Circuit in *PWS*, exculpations such as the exculpation set forth in the Second

Amended Plan have become "commonplace" in chapter 11 cases.  *PWS*, 228 F.3d at

236.[16]

The U.S. Trustee also objects to the inclusion in the exculpation provision

all of the parties other than the Debtors and the Committee because the Debtors did not

receive adequate consideration in exchange for providing such exculpation.  This

assertion is also incorrect.  The U.S. Trustee ignores the fact that each of the parties

included in the exculpation provision participated in significant negotiations regarding

the Second Amended Plan.

---

[16] Examples in this jurisdiction include *In re Viasystems Group, Inc.,* 02-14867 (ALG) (Bankr. S.D.N.Y. 2002) (court approved confirmation order which provided for the release of any and all causes of action against the Debtors, directors, officers, professionals relating to or arising from the chapter 11 case, except for any cause of action arising out of (i) any express contractual obligation owing by any such director, officer, or employee of the Debtors or (ii) the willful conduct or gross negligence of such director, officer or employee); *In re Pinnacle Towers III Inc.,* Case Nos. 02-12477 and 02-12482 through 02-12484 (BRL) (Bankr. S.D.N.Y. 2002) (court approved Debtor's plan containing Article XVI, Section J which provided that neither the reorganized Debtor, their investors, lenders, any statutory creditors committee, or any of their respective advisors, attorneys, or agents shall have any liability for any act or omission arising out of the chapter 11 proceedings, except for their willful misconduct); *In re Lodgian Inc*., 01-16345 (BRL) (Bankr. S.D.N.Y. 2001) (court approved Debtor's plan containing section 11.7 which provided that none of the Debtors or any releasee shall be liable for any act or omission as it relates to the chapter 11 proceedings except for willful misconduct or gross negligence); *In re Rhythms NetConnections Inc*., 01-14283 through 01-4287 (BRL) (Bankr. S.D.N.Y. 2001) (court approved Debtor's plan containing section 12.5 which provided exculpation for the Debtors, the Disbursing Agent, the Committee, members, officers, directors, professionals, for any action or omission in connection with, or arising out of these Chapter 11 cases, except for willful misconduct or gross negligence); *In re Sunbeam Corporation*, 01-40291 (AJG) (Bankr. S.D.N.Y. 2001) (court approved section 11.6 of Debtor's plan which provided exculpation for the Debtors, the banks, the committees, professionals, officers and directors, for any act or omission in connection with, related to, or arising out of the Chapter 11 case, except for willful misconduct or gross negligence); *In re Al Realty Marketing of New York*, 01-40252 through 01-40290 (AJG) (Bankr. S.D.N.Y. 2001) (court approved section 10.6 of the Debtor's plan which provided exculpation for the Debtors, the banks, the committees, professionals, officers and directors, for any or omission in connection with, related to, or arising out of the Chapter 11 case, except for willful misconduct or gross negligence).

Accordingly, the U.S. Trustee's Objection to the exculpation provision should be overruled and the provision approved.

## VI.

### THE SECOND AMENDED PLAN SATISFIES THE REQUIREMENTS OF SECTION 1127 OF THE BANKRUPTCY CODE

Section 1127 of the Bankruptcy Code requires that:

(a)    The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.

\*                         \*                         \*

(c)    The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

11 U.S.C. § 1127(a), (c).  As set forth above, the Second Amended Plan complies fully with section 1122 and 1123 of the Bankruptcy Code.  In addition, the Debtors have complied with section 1125 with respect to the Third Supplement and the Second Amended Plan.  Accordingly, the requirements of section 1127 of the Bankruptcy Code have been satisfied.

### CONCLUSION

The Second Amended Plan complies with and satisfies all of the requirements of sections 1127 and 1129 of the Bankruptcy Code.  The Objections should,

therefore, be overruled and the Second Amended Plan confirmed.

Dated: New York, New York
      October 13, 2003

                        /s/ Marcia L. Goldstein
                        Marcia L. Goldstein, Esq. (MG 2606)
                        Lori R. Fife, Esq. (LF 2839)

                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, NY  10153-0119
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007

                        and

                        Alfredo R. Perez, Esq.

                        WEIL, GOTSHAL & MANGES LLP
                        700 Louisiana, Suite 1600
                        Houston, TX  77002
                        Telephone: (713) 546-5000
                        Facsimile: (713) 224-9511

                        Attorneys for Debtors and
                         Debtors in Possession