Hearing Date: October 15, 2003

Daniel H. Golden (DG-5624)
Ira S. Dizengoff (ID-9980)
James R. Savin (JS-9920)
Shuba Satyaprasad (SS-5875)

AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, NY 10022
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Counsel to the Official Committee of Unsecured
Creditors of WorldCom, Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                              :
In re:                                        :        Chapter 11
                                              :
WORLDCOM, INC., et al.,                       :        Case No. 02-13533 (AJG)
                                              :
                              Debtors.        :        (Jointly Administered)
------------------------------------------------------------x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION**
**OF THE DEBTORS' SECOND AMENDED JOINT**
**PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Official Creditors Committee") of

WorldCom, Inc., et al. (the "Debtors"), by and through its counsel, Akin Gump Strauss Hauer &

Feld LLP, submits this supplemental memorandum of law (the "Memorandum")[1] in support of

Confirmation of the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11

---

[1] By this Memorandum, the Official Creditors Committee joins and incorporates, as if fully set forth herein, the legal and factual assertions set forth in Debtors' Memorandum of Law in Support of Confirmation of Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, Dated September 12, 2003 and in Response to Certain Objections Thereto, and the Debtors' Response to Objections to Confirmation of Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, Dated September 12, 2003, as filed with this Court on October 13, 2003. Further, this Memorandum supplements the Official Committee of Unsecured Creditors' Memorandum of Law in Support of Confirmation of Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, filed on September 3, 2003.

of the Bankruptcy Code (the "Second Amended Plan"). In support of its Memorandum, the

Official Creditors Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

The Second Amended Plan, which has been accepted by every class of creditors entitled

to vote, is the culmination of intense, arduous negotiations and achieves a nearly consensual

restructuring of the largest and arguably most complex chapter 11 in history. Each of the

Debtors, the Official Creditors Committee and the Debtors' material creditor constituencies

worked tirelessly to forge a consensual plan of reorganization that maximizes recoveries for all

creditors. By resolving the objections to confirmation raised by Ad Hoc Committee of

Dissenting Bondholders[2], the Intermedia Preferred Stock holders and the Ad Hoc MCI Trade

Claims Committee, the Second Amended Plan removes all material impediments to confirmation

and will expedite the Debtors' emergence from chapter 11.

As the Court is aware, the Ad Hoc Committee of Dissenting Bondholders, the Intermedia

Preferred Stock holders and the Ad Hoc MCI Trade Claims Committee each vigorously opposed

the Plan (as defined below), raising, among others, complex legal and factual issues including

the ability to consolidate pre-merger funded debt, the entanglement of the WorldCom Debtors,

the reconciliation of the Debtors' intercompany claims (the "Intercompanies"), and the rationale

for the settlements included in the Plan. The Official Creditors Committee and the Debtors

believed these objections to be without merit and that the Plan satisfied the elements of section

1129 of the Bankruptcy Code and thus should be confirmed over their objection.

At the outset of the Confirmation Hearing, the parties believed a settlement could be

achieved and worked tirelessly during the next few days to achieve a resolution of this hotly

---

[2] All terms not otherwise defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

2

contested confirmation. The Debtors and their creditors were able to resolve all of the issues raised by Ad Hoc Committee of Dissenting Bondholders, the Intermedia Preferred Stock holders and the Ad Hoc MCI Trade Claims Committee by amending the Plan to provide that: (i) the MCIC Subordinated Debt Claimants (Class 10) will receive a 44.5% recovery and contribute $19 million in cash to the members of the Ad Hoc MCI Trade Claims Committee; (ii) the MCIC Subordinated Notes Indenture Trustee will receive the same treatment with respect to its fees and expenses as other Indenture Trustees receive under the Plan; (iii) the MCIC Senior Debt Claimants (Class 9) will contribute $21.2 million in New Notes to the members of the Ad Hoc MCI Trade Claims Committee; (iv) holders of MCI Pre-merger Claims will receive an additional recovery of 24.3% exclusive of the recovery provided to such claims as WorldCom General Unsecured Claims; and (v) each holder of Intermedia Preferred Stock will receive its *pro rata* share of $29 million in satisfaction of its allowed claim.

Since the amendments contained in the Second Amended Plan benefit the Debtors' estates and creditors by allowing the Debtors to proceed to confirmation with minimal litigation risk and comply with applicable law, the Official Creditors Committee believes the Second Amended Plan should be confirmed and supports such confirmation.

## BACKGROUND

1.      On July 21, 2002 (the "Initial Petition Date"), WorldCom and certain of its subsidiaries and affiliates filed with this Court their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). In addition, on November 8, 2002 (the "Subsequent Petition Date" and, together with the Initial Petition Date, the "Petition Date"), additional subsidiaries and affiliates of WorldCom filed with this Court their voluntary petitions for relief under the Bankruptcy Code. The Debtors continue to operate their respective

7045869 v5

businesses and properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a)

and 1108.

2.       On July 29, 2002, the United States Trustee formed the Official Creditors

Committee.  The Official Creditors Committee currently is comprised of fourteen members

consisting of representatives from substantially all of the Debtors' unsecured creditor

constituencies, including holders of WorldCom funded debt obligations, holders of MCIC funded

debt obligations, holders of Intermedia funded debt obligations and trade creditors.[3]

**The Plan and Disclosure Statement**

3.       Less than nine months after filing the largest chapter 11 case in history, on April

14, 2003, the Debtors filed their disclosure statement (the "Original Disclosure Statement"),

which was amended pursuant to supplements dated, respectively, July 9, 2003 (the "First

Supplement"), August 6, 2003 (the "Second Supplement") and September 12, 2003 (the "Third

Supplement," and, with the Original Disclosure Statement, the First Supplement and the Second

Supplement, the "Disclosure Statement").  The Original Disclosure Statement, First Supplement,

Second Supplement, and Third Supplement were approved by this Court pursuant to orders

entered on May 28, 2003, July 10, 2003, August 6, 2003 and September 12, 2003, respectively.

On April 14, 2003, the Debtors also filed their Joint Plan of Reorganization under Chapter 11 of

the Bankruptcy Code (the "Original Plan").  On July 9, 2003, the Debtors filed the Debtors'

Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the

"Amended Plan") and, subsequently, on September 12, 2003, the Debtors filed the Second

---

[3] The Official Creditors Committee is comprised of: ABN Amro Bank N.V.; AOL Time Warner, Inc.; Blue River, LLC; Cerberus Capital Management, L.P.; Deutsche Bank AG; Electronic Data Systems Corporation; Elliott Management Corp.; ESL Investments; Law Debenture Corporate Services, Inc., as indenture trustee; Metropolitan Life Insurance Co.; Metropolitan West Asset Management LLC; New York Life Investment Management LLC; Sun Trust Bank; and Wilmington Trust Company, as indenture trustee.

7045869 v5

Amended Plan, which was modified pursuant to the Modifications to Debtors' Second Amended

Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code on September 19, 2003

(collectively, with the Original Plan, the Amended Plan and the Second Amended Plan, the

"Plan").

      4.     The Plan provides for the substantive consolidation of the Intermedia Debtors[4]

and all of the Debtors other than the Intermedia Debtors (the "WorldCom Debtors"),

respectively.  Under the Plan, among other things, holders of (a) WorldCom Senior Debt Claims,

including claims arising under the WorldCom Notes Indentures, will receive a combination of

either New Notes or New Common Stock equaling approximately 36% of their allowed claims,

(b) WorldCom General Unsecured Claims will receive a combination of Cash and New Common

Stock equaling approximately 36%, or 60% if such a claim is a MCI Pre-merger Claim, of their

allowed claims, and (c) each holder of Intermedia Preferred Stock will receive a *pro rata* share of

$29 million in full and complete satisfaction of its Allowed claim.[5]  Additionally, pursuant to the

compromise and settlement of various issues with the Debtors, (a) MCIC Senior Debt Claims

will receive New Notes equaling 80% of their allowed claim for principal amounts due under the

MCIC Senior Notes Indentures[6], (b) Intermedia Senior Debt Claims will receive New Notes or

---

[4] "Intermedia Debtors" means, collectively, Access Network Services, Inc.,  Access Virginia, Inc., Business Internet, Inc., Express Communications, Inc., ICI Capital LLC, Intermedia, Intermedia Capital, Inc., Intermedia Communications of Virginia, Inc., Intermedia Investment, Inc., Intermedia Licensing Company, Intermedia Services LLC, National Telecommunications of Florida, Inc., Netwave Systems, Inc., NTC, Inc., WorldCom Intermedia Communications Corporation f/k/a Shared Technologies Fairchild Communications Corporation, WorldCom Intermedia Telecom, Inc. f/k/a Shared Technologies Fairchild Telecom, Inc., or WorldCom Intermedia, Inc. f/k/a Shared Technologies Fairchild, Inc.

[5] The recovery to the holders of Intermedia Preferred Stock was added to the Plan pursuant to the Modifications to Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, filed on September 19, 2003.

[6] As discussed below, incorporated in the Second Amended Plan is an amendment providing that holders of the MCIC Senior Debt Claims (the "MCIC Senior Debt Claimants") will contribute $21.2 million of their consideration paid in New Notes to the members of the Ad Hoc Committee of MCI Trade Claims (as defined below).

New Common Stock equaling 93.5% of their allowed claims, (c) Intermedia General Unsecured

Claims will receive 83.2% of their allowed claims, and (d) Intermedia Subordinated Debt Claims

will receive 46.4% of their allowed claims.

**Objections to the Amended Plan and Related Litigation**

5.      Every class of creditors entitled to vote on the Amended Plan accepted.  In fact,

six of the eight classes of creditors entitled to vote, voted to accept the Amended Plan by over

93% in dollar amount and number.  Certain parties, however, objected to confirmation of the

Amended Plan.

6.      On July 31, 2003, the Ad Hoc Committee of Dissenting Bondholders filed its

Objection to the Debtors' Joint Plan of Reorganization (the "Subordinated MCIC Bondholders

Plan Objection").  On August 4, 2003, the Ad Hoc MCI Trade Claims Committee filed its

Objection to the Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code

(the "Trade Claims Purchaser Plan Objection").

7.      Among other reasons, the Ad Hoc MCI Trade Claims Committee objected to the

Amended Plan on the grounds that:

- substantive consolidation, as outlined in the Amended Plan and Disclosure Statement, is unfair and does substantial harm to creditors;

- the Debtors do not meet the applicable standard for substantive consolidation;

- substantive consolidation, as outlined in the Amended Plan and Disclosure Statement, effected a massive shift in value away from the estates of MCIC and its subsidiaries (the "MCI Debtors," a subset of the WorldCom Debtors, which are referred to separately from time to time herein) to benefit creditors of WorldCom;

- settlement with the MCIC Senior Debt Holders provides no value to the estates; and

- the Amended Plan does not satisfy the good faith and other confirmation requirements of the Bankruptcy Code.

6

8.     In addition to the arguments asserted by the Ad Hoc MCI Trade Claims

Committee, the Ad Hoc Committee of Dissenting Bondholders objected to the Amended Plan on

the grounds, among others, that:

- the Amended Plan (i) improperly reallocates MCIC's assets to creditors of WorldCom, (ii) deprives the MCIC Subordinated Debt Claimants of the 100% recovery to which they would otherwise be entitled, and (iii) transfers $3 billion in value to WorldCom and its creditors in violation of the absolute priority rule;

- the Amended Plan fails to show that MCIC Subordinated Debt Claimants would receive no greater recovery in a non-consolidated liquidation, notwithstanding the fact that MCIC encompasses at least 90% of the Debtors' assets and is liable for less than 20% of the Debtors' debts;

- substantive consolidation is not an available remedy against a prepetition lender that relied upon the separate credit of MCIC; and

- as creditors of MCIC, the MCIC Subordinated Debt Claimants may look to all the MCIC subsidiaries for value.

9.     The primary issue raised in opposition to the Amended Plan by the Ad Hoc MCI

Trade Claims Committee and the Ad Hoc Committee of Dissenting Bondholders was whether the

Amended Plan, including the settlements contained therein and the proposed substantive

consolidation (which will avoid fraudulent conveyance, setoff, preference and recharacterization

litigation over the transfer of assets and the allowance or disallowance of over $1 trillion in

intercompany claims), satisfies the good faith requirement of Bankruptcy Code section

1129(a)(3).

10.     The Debtors and the Official Creditors Committee disputed the allegations set

forth in the Trade Claims Purchaser Objection and Subordinated MCIC Bondholders Plan

Objection.[7]

---

[7] The Debtors' response is set forth in the following pleadings dated September 3, 2003: (a) the Debtors' Memorandum of Law in Support of Substantive Consolidation and in Opposition to Objections Thereto; (b) the Debtors' Memorandum of Law (i) in Support of the Intermedia Settlement, the Bank Settlement and the MCIC

11.    In addition to the Plan objections: (i) the Ad Hoc MCI Trade Claims Committee filed a Notice of Appeal from the Order Granting Motion of WorldCom, Inc. for Authority to Assume As Amended Certain Executory Contracts with Electronic Data Systems Corporation and EDS Information Services LLC (the "EDS Appeal") on June 13, 2003; and (ii) on August 18, 2003, the Ad Hoc MCI Trade Claims Committee, the Ad Hoc Committee of Dissenting Bondholders, and HSBC Bank USA, the MCIC Subordinated Notes Indenture Trustee, each filed a Notice of Appeal (the "SEC Settlement Appeal") of the Order Granting Debtors' Motion for Approval of Compromise and Settlement with the Securities and Exchange Commission, dated August 6, 2003.[8]

12.    In litigating the objections of the Ad Hoc Committee of MCI Trade Claims and the Ad Hoc Committee of Dissenting Bondholders, over fifty (50) depositions were scheduled, hundreds of hours of depositions have been completed, and expert reports from the various constituencies were exchanged.  Additionally, numerous witnesses were expected to testify during the trial relating to confirmation of the Amended Plan, during which time depositions were expected to continue.  Finally, designations and counterdesignations of record were filed

---

Settlement and (ii) in Opposition to Motion for Partial Summary Judgment; and (c) Debtors' Memorandum of Law in Support of Confirmation of Debtors' Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, Dated July 9, 2003 and in Response to Objections Thereto.  The Official Creditors Committee's response is set forth in the Memorandum of Law  in Support of the Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, filed on September 3, 2003.

[8] On June 25, 2002, the Debtors announced that following an internal audit, certain accounts related to line cost expenses in the amount of $3.055 billion during fiscal year 2001 and $797 million during the first quarter of 2002 were not made in accordance with generally accepted accounting principles.  In response to the Debtors' disclosures on June 25, 2002, the Securities and Exchange Commission commenced an enforcement action (the "SEC Action") on June 26, 2002 in the United States District Court for the Southern District of New York (the "District Court") against the Debtors for violations of, among other securities law, sections 10(b) and 13(a) of the Securities and Exchange Act of 1934.  On July 7, 2003, the District Court approved a final compromise and settlement of the SEC Action, pursuant to which the Debtors are liable for a civil penalty of $2.25 billion to be satisfied by a $500 million cash payment and $250 million in New Common Stock of the reorganized Debtors to be distributed to shareholders and bondholders upon the Debtors' emergence (the "SEC Settlement").  On August 6, 2003, this Court also approved the SEC Settlement.

7045869 v5

with respect to the SEC Settlement Appeal and EDS Appeal, and the Debtors and the Official

Creditors Committee filed briefs in the EDS Appeal.

**The Settlements in the Second Amended Plan**

    13.    The Confirmation Hearing commenced on September 8, 2003.  On September 8,

2003, the Court, upon the request of the interested parties, adjourned the Confirmation Hearing

to allow the parties to continue efforts to settle the confirmation objections filed by the Ad Hoc

MCI Trade Claims Committee and the Ad Hoc Committee of Dissenting Bondholders.

    14.    After lengthy and difficult negotiations, the parties reached agreements early on

September 9, 2003, which resolved the Trade Claims Purchaser Plan Objection and the

Subordinated MCIC Bondholders Plan Objection.  The multi-party settlement, described in detail

in the Third Supplement and included in the Second Amended Plan, provides for the following:

- a resolution regarding the treatment in the Plan of MCIC Subordinated Debt Claims (the "MCIC Subordinated Debt Settlement") reached with the Ad Hoc Committee of Dissenting Bondholders;

- a reduction of the recovery provided to MCIC Senior Debt Claimants (the "MCIC Senior Debt Amendment") due to the contribution by MCIC Senior Debt Claimants of a portion of their distributions to the members of the Ad Hoc MCI Trade Claims Committee;

- a resolution of the Trade Claims Purchaser Plan Objection (the "Ad Hoc Committee of MCI Trade Claims Settlement") based upon a contribution by the MCIC Senior Debt Claimants and MCIC Subordinated Debt Claimants of certain of their distributions to the members of the Ad Hoc MCI Trade Claims Committee; and

- an amendment to provide for additional recoveries to holders of MCI Pre-merger Claims, which are Class 6 creditors whose claims arise from transactions completed prior to September 13, 1998 with MCIC or any of its subsidiaries, as of that date.

    15.    Pursuant to the order approving the Third Supplement, this Court established

October 8, 2003 at 4:00 p.m. as the deadline for votes to be cast on the Second Amended Plan by

holders of claims classified under the Second Amended Plan in Class 5 (WorldCom Senior Debt

Claims), Class 6 (WorldCom General Unsecured Claims), Class 9 (MCIC Senior Debt Claims),

Class 10 (MCIC Subordinated Debt Claims), Class 11 (Intermedia Senior Debt Claims), Class 12

(Intermedia General Unsecured Claims) and Class 13 (Intermedia Subordinated Debt Claims),

and (ii) October 3, 2003 at 4:00 p.m. as the deadline for parties to file objections, if any, to

confirmation of the Second Amended Plan.

### The MCIC Subordinated Debt Settlement

16.     Described in the Third Supplement is the proposed resolution of issues relating to

the treatment under the Plan of the MCIC Subordinated Debt Claims.  In sum, the Plan provides

as follows:

- the MCIC Subordinated Debt Claimants will receive a *pro rata* share of $353 million, distributed in the form of up to $165 million in New Notes and not less than $188 million in cash;

- the MCIC Subordinated Debt Claimants will contribute $19 million of their aggregate cash distributions to the members of the Ad Hoc MCI Trade Claims Committee; and

- the MCIC Subordinated Notes Indenture Trustee will receive the same treatment with respect to its fees and expenses as other Indenture Trustees receive under the Second Amended Plan; i.e., reasonable fees and expenses of the MCIC Subordinated Notes Indenture Trustee, as agreed by the Debtors, the Official Creditors Committee, the United States Trustee and the MCIC Subordinated Notes Indenture Trustee, will be paid by the Debtors.  Absent agreement, such fees will be determined by this Court.

17.     Based on the foregoing, the net estimated consideration the MCIC Subordinated

Debt Claimants will receive pursuant to the Plan will be $334 million, resulting in an estimated

recovery of 44.5%.  In consideration for this recovery, the Ad Hoc Committee of Dissenting

Bondholders agreed to withdraw its objection to confirmation of the Plan and withdraw its

appeal of the SEC Settlement.  The MCIC Subordinated Notes Indenture Trustee also agreed to

withdraw its objection to confirmation of the Plan and its appeal of the SEC Settlement.

10

**The MCI Senior Debt Amendment, and
the Ad Hoc Committee of MCI Trade Claims Settlement**

18.     Pursuant to the MCIC Senior Debt Amendment, the MCIC Senior Debt Claimants will contribute $21.2 million of their consideration paid in New Notes to the members of the Ad Hoc MCI Trade Claims Committee, reducing the net recovery of the MCIC Senior Debt Claimants to 79.2% of the principal amount of their claims.  The Ad Hoc Committee of MCIC Senior Noteholders supports the MCIC Senior Debt Amendment.

19.     Based on (i) the $21.2 million in New Notes contributed by the MCIC Senior Debt Claimants pursuant to the MCIC Senior Debt Amendment, and (ii) the $19 million cash contribution by the MCIC Subordinated Debt Claimants pursuant to the MCI Subordinated Debt Settlement, the members of the Ad Hoc MCI Trade Claims Committee will receive additional consideration of $40.2 million.  In exchange for the additional recovery received by members of the Ad Hoc MCI Trade Claims Committee from other creditor groups, the Ad Hoc MCI Trade Claims Committee agreed to withdraw its objection to confirmation of the Plan, the EDS Appeal and its appeal of the SEC Settlement.

**Premerger MCI Creditors Settlement**

20.     Finally, certain creditors who can establish to the Debtors' satisfaction that (i) their claim arises solely from an individual transaction or series of transactions that was fully completed on or before September 13, 1998, the date the merger between MCI and WorldCom was consummated, and (ii) they relied on the separate credit of MCIC or a subsidiary of MCIC, as of or prior to September 13, 1998 (i.e. creditors holding MCI Pre-merger Claims), will receive an additional .243 multiplied by the Allowed amount of their Claims in cash, resulting in an estimated recovery of 60%.  This is consistent with the greater recovery being received under the Plan by the MCIC Senior Debt Claimants and the MCIC Subordinated Debt Claimants.  Any

dispute as to whether a claim qualifies as a MCI Pre-merger Claim will be determined by this Court.

## ARGUMENT

**I.      THE MCIC SUBORDINATED DEBT
SETTLEMENT SET FORTH IN THE
PLAN SHOULD BE APPROVED**

21.      As a result of the treatment provided to MCI Subordinated Debt Claimants pursuant to the Plan, the Ad Hoc Committee of Dissenting Bondholders and the MCIC Subordinated Debt Indenture Trustee agreed to withdraw their objections to confirmation of the Plan and their appeals of the SEC Settlement.

22.      Such compromises, as a general rule, are favored by courts, as compromises are "a normal part of the process of reorganization." Barry v. Smith (In re New York, N.H. & H.R. Co.), 632 F.2d 955, 959 (2d Cir. 1980) (citing Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130, 60 S. Ct. 1, 14 (1939)); see In re Best Prods. Co., 168 B.R. 35, 44 (Bankr. S.D.N.Y. 1994), aff'd, 68 F.3d 26 (2d Cir. 1995). A debtor entering into compromises and settlements with respect to complicated factual and legal disputes comports with the general public policy favoring settlements. Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163 (1968) (citing Case, 308 U.S. at 130, 60 S. Ct. at 14); In re Hibbard Brown & Co., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

23.      Courts have found that settlements benefit creditors and should be approved when, among other things: (a) claimants settle for less than the value of their claims, (b) the settlement allows a debtor to proceed to confirmation without the obstacle of litigation in its path, and (c) litigation would be detrimental to the debtor and its creditors due to the expense and time such litigation would require. See O'Cheskey v. United States, No. 3-00-CV-0142-P, 2001 U.S. Dist. LEXIS 21370, at *10 (N.D. Tex. Dec. 21, 2001); Saccurato v. Mars Leasing Co. (In re

12

Masters, Inc.), 149 B.R. 289, 293 (E.D.N.Y. 1992); In re Walnut Equip. Leasing Co., No. 97-

19699 DWS, 1999 WL 288651, at *5 (Bankr. E.D. Pa. May 4, 1999); In re Allegheny Int'l, Inc.,

118 B.R. 282, 309 (Bankr. W.D. Pa. 1990); In re Texaco Inc., 84 B.R. 893, 902-03 (Bankr.

S.D.N.Y. 1988).

> A.    **The Debtors' Probability of Success in Litigating
> the Applicability of Substantive Consolidation
> to the MCIC Subordinated Debt Claimants Is Unclear**

24.    The litigated outcome of the applicability of substantive consolidation as to the

MCIC Subordinated Debt Claims is as uncertain as it would be if litigating with the Ad Hoc

Committee of MCIC Senior Notes Holders.  The Debtors and certain creditors, including the Ad

Hoc Committee of WorldCom Senior Notes Holders and the MatlinPatterson Investors, contend

that the WorldCom Debtors should be substantively consolidated.  Relying principally on the

WorldCom Debtors' entanglement and inability to parse the complex web of intercompany

claims (the "Intercompanies") and attendant issues, these parties believe substantive

consolidation is appropriate and fair for all creditors.

25.    The Ad Hoc Committee of Dissenting Bondholders alleges, as did the Ad Hoc

Committee of MCIC Senior Notes Holders, however, that substantive consolidation is not an

available remedy over the objection of funded-debt creditors of a pre-merger entity.  Specifically,

the Ad Hoc Committee of Dissenting Bondholders alleges that: (a) MCIC Subordinated Debt

Claimants relied on the credit of a specific Debtor-entity, MCIC, in extending credit to MCIC

prior to its merger with WorldCom; and (b) such holders did not deal with the Debtors as a single

economic unit.

26.    As a result of these competing legal theories and the significant litigation hazards

as to the applicability of substantive consolidation to pre-merger funded debt claimants, the

7045869 v5

Debtors determined to compromise the treatment under the Plan of MCIC Subordinated Debt

Claimants.

> **B.** **Absent the MCIC Subordinated Debt Settlement, Litigation of
> Substantive Consolidation and the Intercompanies Would be Complex and
> Costly, Delay the Debtors' Emergence from Chapter
> 11 and Result in an Attendant Erosion of Significant Value**

27.    By amending the treatment of MCIC Subordinated Debt Claims under the Plan,

the Debtors resolved the applicability of substantive consolidation as an available remedy to be

utilized against MCIC Subordinated Debt Claims.  If, however, the Debtors did not settle this

issue and litigated the issue of the applicability of substantive consolidation to the MCIC

Subordinated Debt Claimants, the litigation would be complex and uncertain, resulting in a

greater likelihood that the Debtors' emergence from chapter 11 and distributions to creditors

would be materially delayed.  Any delay in the Debtors' emergence from chapter 11 will be

detrimental to all of the Debtors' creditors because (a) the Debtors' business will continue to

erode due to customers' unwillingness to do business with a chapter 11 debtor and (b) the

Debtors' competitors' will continue with their unprecedented efforts to force a liquidation of the

Debtors by undermining customer confidence by publicizing allegations of misconduct.  Further,

without the settlement, the Debtors would engage in expensive and lengthy litigation.

28.    In addition to the litigation hazards, the Ad Hoc Committee of Dissenting

Bondholders alleges, as did the Ad Hoc Committee of MCIC Senior Notes Holders, that, by

virtue of the MCI Debtors' organizational structure, the MCIC Subordinated Debt Claimants are

entitled to the equity value of the subsidiaries of MCIC and, as a result, MCIC is solvent.  For

example, the Ad Hoc Committee of Dissenting Bondholders asserts that UUNet, which is a

subsidiary of MCIC, is a solvent entity and that the equity value in UUNet should flow to MCIC

to satisfy claims of MCIC creditors.  Thus, the Ad Hoc Committee of Dissenting Bondholders

14

believes its members should receive a distribution of 100 cents per one dollar of MCIC Subordinated Debt Claim.

29.     The Debtors and other major creditors, on the other hand, assert that: (a) UUNet and several other companies which became subsidiaries of MCIC as a result of the restructurings that occurred upon the merger of WorldCom and MCIC are only MCIC subsidiaries by virtue of fraudulent transfers which occurred between 1998 and 2000 and rightfully, these entities should be direct WorldCom subsidiaries; (b) even if there were not fraudulent transfers, the Debtors cannot with any degree of accuracy determine the assets (and liabilities) of UUNet or any other subsidiary such that is it is not possible to determine if UUNet or any other subsidiary has any residual equity value flowing to MCIC; and (c) even if there were not fraudulent transfers, UUNet and the other subsidiaries are required to pay their direct creditor claims, which includes claims of WorldCom as a creditor (ahead of any residual equity value flowing to MCIC), which would inure to the benefit of WorldCom's own creditors.  Thus, as a result of those direct Intercompanies and the entanglement, MCIC creditors should not receive more than approximately thirty-six cents ($.36) (the proposed payment in the event all estates were substantively consolidated).  Further, the Debtors and other major creditors believe that, based on the foregoing, the MCIC Senior Debt Claimants cannot be paid in full and, therefore, due to the subordination of the MCIC Subordinated Debt Claims, the MCIC Subordinated Debt Claimants should not receive any recovery on account of their claims.  As a result of these factual and legal disputes, the Debtors settled between the 0¢ and 100¢ recovery outliers at 44.5¢.

**C.     The MCIC Subordinated Debt Settlement
         Is in the Best Interest of Creditors**

30.     The MCIC Subordinated Debt Settlement is the result of multi-party arm's length negotiations among the Debtors and their major creditors.  Those negotiations were protracted

15

and difficult due to the complex issues and significant effect on all creditor recoveries. The arm's length nature of these multi-party negotiations and the resulting support by representatives of the overwhelming majority of creditors reflects the ultimate fairness of the MCIC Subordinated Debt Settlement.

31.     The recovery under the Plan to the MCIC Subordinated Debt Claimants takes into account: (i) the legal (whether substantive consolidation applies to pre-merger funded debt) and factual (whether the MCIC Subordinated Debt Claims are entitled to residual equity value) arguments of such claimants and the attendant risk to all creditors' recoveries; and (ii) the time and expense required to litigate the allowance or disallowance of over a $1 trillion of Intercompanies.

32.     In sum, the MCIC Subordinated Debt Settlement is fair and equitable and benefits all of the Debtors' creditors because:

(a)     the MCIC Subordinated Debt Claimants will receive less than the potential amount of their claim (100 cents on the principal amount dollar vs. a pre-contribution recovery of 44.5 cents on the principal amount dollar);

(b)     the issue of applicability of substantive consolidation to the MCIC Subordinated Debt Claimants will not have to be litigated;

(c)     the propriety of the MCIC Senior Notes Settlement will not have to be litigated;

(d)     the validity of the Intercompanies will not have to be litigated; and

(e)     the Debtors' estates will not have to bear the time, expense and delay of a protracted Confirmation Hearing and any subsequent appeal.

33.     Accordingly, the MCIC Subordinated Debt Settlement should be approved.

16

II.     **THE MCIC SENIOR DEBT AMENDMENT AND THE**
        **AD HOC COMMITTEE OF MCI TRADE CLAIMS**
        **SETTLEMENT ARE REASONABLE AND SHOULD BE APPROVED**

34.     The MCIC Senior Debt Amendment provides that MCIC Senior Debt Claimants

will gift part of their recovery to the members of the Ad Hoc MCI Trade Claims Committee in

consideration for the Ad Hoc MCI Trade Claims Committee's agreement to withdraw the Trade

Claims Purchaser Plan Objection, the EDS Appeal, and its appeal of the SEC Settlement.  The

MCIC Subordinated Debt Claimants have also agreed to gift a portion of their recovery under the

Plan to the members of the Ad Hoc MCI Trade Claims Committee.

35.     Such agreements among classes of creditors to contribute portions of recovery to

other creditors under a plan of reorganization are consistent with applicable law and are proper.

See Official Unsecured Creditors Committee v. Stern (In re SPM Manufacturing Corp.), 984 F.2d

1305 (1st Cir. 1993) (holding that senior lender could share a portion of its recovery with

unsecured creditors when priority creditors did not receive a distribution under the debtor's

plan); In re MCorp Financial, Inc., 160 B.R. 941 (S.D. Tex. 1993); In re Nuclear Imaging

Systems, Inc., 270 B.R. 365, 376 (Bankr. E.D. Pa. 2001); In re Genesis Health Ventures, Inc.,

266 B.R. 591, 601 (Bankr. D. Del. 2001) (finding that agreement by senior lenders to give up a

portion of the value they would receive under the plan to unsecured and subordinated creditors in

certain classes was proper); In re White Glove, Inc., No. 98-12493, 1998 Bankr. LEXIS 1303

(Bankr. E.D. Pa. Oct. 14, 1998); In re Parke Imperial Canton, Ltd., No. 93-61004, 1994 Bankr.

LEXIS 2274 (Bankr. N.D. Ohio Nov. 14, 1994).  As noted by the court in In re SPM

Manufacturing Corp., "creditors are generally free to do whatever they wish with the bankruptcy

dividends they receive, including to share them with other creditors."  984 F.2d at 1313.

7045869 v5

36.     Additional consideration provided by a class of creditors to certain other creditors in Class 6, the members of the Ad Hoc MCI Trade Claims Committee, does not violate section 1123(a)(4) because the additional consideration is not being provided from the Debtors' estates. See, e.g., In re SPM Manufacturing Corp., 984 F.2d at 1313 (finding that the parties' agreement to share proceeds could be seen as a partial assignment of their right to receive bankruptcy dividends, and that such property was not property of the debtor's estate). Creditors in classes 9 and 10 agreed, by voting as classes to accept the Plan in overwhelming numbers, to gift a portion of their recovery to members of the Ad Hoc MCI Trade Claims Committee in order to remove the litigation risk posed by the Trade Claims Purchaser Plan Objection. Although all parties in interest benefit from the actions of creditors in classes 9 and 10, no other creditors' treatment under the Plan is adversely modified as a result. Under the Plan, the Debtors' estates are providing the same recovery, approximately 36% or 60%, depending on whether the claim is a MCI Pre-merger Claim, to all Class 6 creditors. See Plan at 19-20, § 4.07. As a result, the Plan complies with section 1123(a)(4) of the Bankruptcy Code.

37.     Further, pursuant to section 1126(c) of the Bankruptcy Code, if creditors of a class holding at least two-thirds in amount and more than one-half in number vote to accept a plan of reorganization, it is a fundamental tenet of bankruptcy that the non-consenting members of the class are bound by the vote. See 11 U.S.C. § 1126(c). Even if a plan of reorganization provides that a particular class will contribute a portion of its recovery to certain other creditors, the class, including the non-consenting members of the class, are bound by the class's vote pursuant to section 1126(c) of the Bankruptcy Code. See High River L.P. v. TransTexas Gas Corp. (In re TransTexas Gas Corp.), No. 00-40221, slip op. (5th Cir. Mar. 8, 2000), aff'g In re TransTexas Gas Corp., No. 00-024, slip op. (S.D. Tex. Mar. 1, 2000) (denying motion for stay pending

18

appeal and finding that plan provision providing that members of class would gift a portion of their recovery to lower classes in exchange for lower classes agreement to abandon right to proceed in litigation of fraudulent conveyance was proper under <u>SPM</u> and section 1126(c) of the Bankruptcy Code); <u>see also</u> <u>In re American Solar King Corp.</u>, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988).

38.     In one case directly on point, <u>In re TransTexas Gas Corp.</u>, the debtor's plan of reorganization provided that the members of class 3 reallocate a portion of their recovery to lower classes.  Class 3 voted to accept the plan.  A member of class 3 (the "Objector"), however, objected to the reallocation of recovery included in the plan and sought a stay pending appeal of the order confirming the debtor's plan.  In ruling on the motion for a stay, the United States District Court for the Southern District of Texas (the "Texas District Court") stated that even though the Objector did not like the treatment of class 3 in the plan, class 3 voted to accept the plan and, therefore, the Objector was bound by the class's acceptance of the plan.  The opinion of the Texas District Court, which is attached hereto as <u>Exhibit A</u>, was affirmed by the United States Court of Appeals for the Fifth Circuit.

39.     Similarly, in this matter, Classes 9 and 10 have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.[9]  Therefore, all members of Classes 9 and 10, including the non-consenting members, are bound by each respective class's vote, and a portion of the recovery of each of the members of Classes 9 and 10, respectively, may be contributed to the members of the Ad Hoc Committee of MCI Trade Claims, as described in the Plan.

---

[9] More specifically, Class 9 voted 98.36% in amount and 94.89% in number, and Class 10 voted 99.39% in amount and 96.74% in number, in favor of the Plan.

### III.    RESPONSE TO OBJECTION OF THE UNITED STATES
### TRUSTEE TO CONFIRMATION OF THE SECOND AMENDED PLAN

40.    On August 1, 2003, the United States Trustee filed an objection to confirmation of the Amended Plan (the "Initial Objection"), asserting, among other issues, that certain aspects of the exculpation provision set forth in Section 10.06 of the Amended Plan was inappropriate.

41.    On September 5, 2003, the Official Creditors Committee filed a response to the Initial Objection.

42.    On October 9, 2003, the United States Trustee filed an objection to confirmation of the Second Amended Plan, asserting, in addition to the issues raised in the Initial Objection, that Section 10.10 of the Second Amended Plan (the "Reimbursement Provision") is inappropriate.   For the reasons set forth below, the Official Creditors Committee believes that the Reimbursement Provision is appropriate and properly included in the Second Amended Plan.

43.    The Reimbursement Provision provides that, with respect to actions threatened or commenced by third parties against any Covered Party relating to or arising out of the conduct of such Covered Party during the Debtors' bankruptcy cases with respect to the Plan, and subject to certain limitations, the Debtors shall pay defense costs, settlement costs and judgments.   The Reimbursement Provision specifically provides that the obligations of the Debtors terminate with respect to any Covered Party to the extent such Covered Party is determined by a final judgment to be guilty of gross negligence, willful misconduct or breach of fiduciary duty.

44.    First, contrary to the United States Trustee's assertion, the Reimbursement Provision was bargained for consideration provided to the Covered Parties by the Debtors in connection with the formulation of the Second Amended Plan and the negotiations with respect to the settlements contained therein.   The Official Creditors Committee further believes that the inclusion in the Second Amended Plan of the Reimbursement Provision was vital to the

20

successful negotiation of the terms of the Second Amended Plan in that without such a provision,

the Covered Parties would have been less likely to negotiate the terms of the settlements and the

Second Amended Plan.  As a party to the negotiations with respect to the Second Amended Plan,

the Official Creditors Committee is aware that each of the Covered Parties bargained for their

respective inclusion in the Reimbursement Provision as part of the various compromises that

form the basis of the Second Amended Plan.  Finally, the Covered Parties supported the Second

Amended Plan in reliance on the benefits proposed to be provided in the Reimbursement

Provision, and it would be fundamentally unfair for this provision to be stricken, especially

considering that not a single creditor has objected to its inclusion.

45.    Second, contrary to the Untied States Trustee's objection, the Debtors' estates do

retain significant control in connection with the Reimbursement Provision.  The Reimbursement

Provision provides that (i) the choice of counsel has to be reasonably acceptable to both the

Covered Party and the Debtors and (ii) any settlement must be reasonably acceptable to the

Debtors.  The effect of the foregoing is that the Debtors will have some control over defense

costs and will not have to pay for settlements that they do not believe are reasonable or that the

Debtors believe result from the gross negligence, willful misconduct or breach of fiduciary duty

on the part of the Covered Party.

46.    Third, the Reimbursement Provision will not effect the Debtors' "fresh start".  As

Reorganized Debtors, there are many obligations such as pension plans, assumed contracts and

indemnification obligations for officers and directors that survive confirmation of the Plan.  The

Reimbursement Provision does not effect the Debtors' fresh start in a manner different than any

other continuing obligation.

7045869 v5

## CONCLUSION

For all of the foregoing reasons, the Official Creditors Committee respectfully requests

that the Court (a) confirm the Second Amended Plan and (b) grant such other relief as the Court

deems just, equitable and proper.

Dated: New York, New York
      October 13, 2003

          **AKIN GUMP STRAUSS HAUER & FELD LLP**

          /s/ Daniel H. Golden
          Daniel H. Golden (DG-5624)
          Ira S. Dizengoff (ID-9980)
          James R. Savin (JS-9920)
          Shuba Satyaprasad (SS-5875)
          590 Madison Avenue
          New York, New York 10022
          (212) 872-1000

          Counsel to the Official Committee of Unsecured
          Creditors of WorldCom, Inc., et al.

22

## **EXHIBIT A**

United States District Court
Southern District of Texas
ENTERED

MAR 0 1 2000

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| TRANSTEXAS GAS CORPORATION, et.al. | §<br>§<br>§ | CASE NO. 99-215 50-C- 11<br>(Jointly Administered) |
| Debtors | § | |
| HIGH RIVER LIMITED PARTNERSHIP | §<br>§ | 17. |
| Appellant | §<br>§ | Misc. No. C-00-024 |
| vs. | §<br>§ | |
| TRANSTEXAS GAS CORPORATION | §<br>§ | |
| Appellee | § | |

## ORDER DENYING MOTION OF HIGH RIVER
## LIMITED PARTNERSHIP FOR STAY PENDING APPEAL

On this day came on for consideration the Motion of High River Limited Partnership ("High River") for Stay Pending Appeal of Order Confirming Debtor's Second Amended, Modified and Restated Plan of Reorganization. (The "Motion for Stay"). The Court, having heard the arguments of counsel and having reviewed the record below, finds that the Motion for Stay should be denied.

### Background

The Bankruptcy Court confirmed TransTexas' Plan of Reorganization by Order entered February 7, 2000. High River filed its Motion for Stay Pending Appeal of Order Confirming the Plan with the Bankruptcy Court on February 9, 2000. High River filed its Notice of Appeal on February 14, 2000. The Bankruptcy court held a hearing on the Motion for Stay Pending Appeal on February 15, 2000, and orally denied the Motion for Stay. Findings of Fact and Conclusions of law were entered by the Bankruptcy Court on February 16, 2000. High River then filed its Emergency Motion

for Stay Pending Appeal with this Court on February 18, 2000. A hearing was held on February 24,
2000. High River seeks either a limited stay or a full stay of the confirmation order.

High River's primary objections to confirmation revolve around two Plan provisions. First is
the "reallocation" or "gifting" provisions, which provide that High River and all other members of
Class 3 give up a portion of money to be given to lower classes. In exchange for that "gift", the lower
classes abandoned their rights to proceed against certain parties for fraudulent transfers. The second
is the exculpation provisions in the Plan, which provide that Firststar, the Indenture Trustee of the
bonds which High River holds, is absolved of liability for its actions in the context of the
reorganization process. The Plan of Reorganization is the product of months of extensive, arms'
length negotiations among the Debtor, the Bondholder Committee, the Creditors' Committee, the
SubDebt Committee, GMAC, the Post Confirmation Credit Facility Lenders, and hundreds of
mineral interest owners and lien creditors and their respective counsel and financial advisors. The
original version and each subsequent version of the TransTexas Plan of Reorganization contained a
provision for re-allocation of a portion of the Class 3 Distributions to other classes, which is the
primary provision to which High River objects. The same provision was contained in the Debtors'
Joint Disclosure Statement dated September 29, 1999. High River, a member of Class 3, obtained all
of its interest post-petition and over 85% of the dollar amount of that interest after the Disclosure
Statement was filed.

The Bankruptcy Court deadline for filing objections to the Plan of Reorganization was
November 5, 1999. High River filed an objection to confirmation on November 4, 1999. That
objection did not include any reference to the exculpation or reallocation provisions of the Plan.
High River filed a supplemental objection to the confirmation of the TransTexas Plan on December

2

3, 1999. This objection likewise did not include any reference to the exculpation or reallocation provisions of the Plan. Without leave of the Bankruptcy Court, High River filed a Second Supplemental Objection to Confirmation of the TransTexas Plan on January 24, 2000, in which it objected to the reallocation provisions of the Plan for the first time. High River raised objections to the exculpation provisions of the TransTexas Plan for the first time on the record of the confirmation hearing around January 25, 2000. The Bankruptcy Court overruled as time-barred High River's objections to the re-allocation and exculpation provisions of the TransTexas Plan, other than those directly related to the fact that a plan of reorganization for TEC (a companion case) was not simultaneously confirmed.

The evidence at confirmation indicated that the members of Class 3 voted in favor of the Plan by the requisite dollar amount and numbers provided for in 11 U.S.C. §1126(c). Thus, although High River voted against confirmation, its class as a whole voted in favor. High River argued that Firstar was the proper party to vote its bonds, but the Bankruptcy Court held that the individual bondholders were the proper parties to vote.

Throughout the Chapter 11 case, the Debtor reached settlements with various creditor constituencies, including the Creditors' Committee, the TEC Bondholders and the SubDebt Committee. Each of these settlements was announced in open court and was not objected to by counsel for High River. Each of the settlements is being implemented through the TransTexas Plan.

3

### Discussion

#### 1. Standard of Review

Denials of declaratory or injunctive relief are reviewed for abuse of discretion. *Matter of Schimmelpenninck*, 183 F.3d 347, 353 (5ª Cir. 1999). A District Court reviews the bankruptcy court's findings of fact for clear error and issues of law *de novo. Id.* at 354.

The four criteria for granting a stay pending appeal are set forth by the Fifth Circuit Court of Appeals in *In re First South Savings Assoc.*, 820 F.2d 700, 709 (5ª Cir. 1987). "The four criteria are: (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest." *id.* The Bankruptcy Court's Findings of Fact and Conclusions of Law address all four criteria. This Court, having reviewed the tapes of the Bankruptcy Court's hearing on the Motion for Stay Pending Appeal and the record below, finds that the Bankruptcy Court did not make any clear error in its findings of fact. Applying the Bankruptcy Court's Findings of Fact to the controlling law, the Court finds, for the reasons following, that a stay pending appeal is not appropriate in this case.

#### 2. Waiver

First, it is apparent from the record below that High River waived its reallocation or gifting objections by failing to file timely its objection thereto. A creditor may waive its right to object to a plan by failing timely to raise issues before confirmation. *See, e.g., In re Pavlovich*, 952 F.2d 114 (5ª Cir. 1992); *In re Richard Buick, Inc.*, 126 B.R. 840 (Bankr. E.D.Pa. 1991). Though the Bankruptcy Court established November 5, 1999, as the deadline for objection to confirmation of the Plan, High

4

River waited until January 24, 2000, to raise its objection to the reallocation provisions of the Plan. High River failed to seek leave of the Bankruptcy Court to file this objection, and failed to establish or even allege that this delay was due to excusable neglect. High River has yet to offer any explanation for its tardy objection other than the fact that there was a change in counsel for High River sometime in December. Moreover, High River is estopped from objecting to the Plan, because it stood silent, well past the objection deadline, while settlements were being made that benefitted them. Indeed, High River came to this bankruptcy after it was filed and chose to buy the bonds, most of which were purchased after the Disclosure Statement was filed.

Although High River clearly does not like the treatment of Class 3 in that the Class is giving away value to junior classes, Class 3 voted to accept the Plan. The Bankruptcy Code provides that a class of claims has accepted a plan if it is accepted by creditors holding at least two-thirds in amount and more that one-half in number of the allowed claims of the class. 11 U.S.C. §1126(c). The ability of a consenting class to bind non-consenting members is a fundamental tenet of bankruptcy and is not a serious or novel issue. Voluntarily or otherwise, High River is receiving the same treatment as every other TEC Bondholder and is bound by the same compromises as the rest of Class 3.

### 3. Standards for Obtaining a Stay Were Not Met

#### a. Likelihood of Success on the Merits

High River is unable to meet is burden of proof on this prong of the test. First, as noted above, its objection to the reallocation or gift provisions of the plan was waived. Even if not time-barred, High River is not likely to succeed on the merits on this issue. Creditors are generally free to do whatever they wish with the bankruptcy dividends they receive. See, e.g. SPM Mfg. Corp., 984 F.2d 1305 (1st Cir. 1993). In this case, senior creditors chose to share value with junior classes under

5

the Plan, as part of an overall negotiated reorganization. Bankruptcy reorganizations frequently involve compromises and arrangements whereby a higher class gives something up to a lower class. High River complains that the gift is not voluntary on their part, an argument holding little water considering Class 3 as a whole voted in favor of the Plan.

### b. No Irreparable Harm to High River[1]

High River argues that it will be irreparably harmed if the Plan is not stayed, because if it is successful on appeal, it will be unable to collect the its share of the "gift" once the "gift" is distributed to the junior classes, and because its appeal will be rendered moot. The rendering of an appeal as moot is not sufficient to constitute irreparable harm. *In re 203 North LaSalle Street Partnership*, 190 B.R. 595, 597-98 (Bankr. N.D.Ill. 1995); *In re Charter Co.*, 72 B.R. 70 (M.D. Fla. 1987); *In re Baldwin United Corp.*, 45 B.R. 385 (Bankr. S.D. Ohio 1984); *In re Moreau*, 135 B.R. 209 (N.D.N.Y. 1992); *In re Public Service Co. of New Hampshire*, 116 B.R. 347 (Bankr. D.N.H. 1990).

High River calculates that its potential damage is its share of the "gift" which, once distributed, will be uncollectible. High River provided no other evidence of its potential harm or damage. In fact, High River is in a win-win situation. Success on a request for stay pending appeal will likely crater the reorganization and High River's owner, who owns interests in competitors of TransTexas, can raid or shut down its competitor. If High River is unsuccessful in obtaining a stay pending appeal, the case will move forward and High River will recognized a significant return on its investment. The Court is mindful that High River is a sophisticated investor who purchased bonds post-petition for cents on the dollar. High River is not a trade creditor or other lender who was dragged into Bankruptcy Court. The evidence shows that High River stands to make a 40% profit on

---

[1] High River offered no evidence in support of its Motion for Stay at either the Bankruptcy Court hearing or before this Court.

6

its investment, unlike the unsecured creditors, who will receive at most 20¢ on the dollar. Although High River's profit from its investment may not be relevant to the merits of its appeal, it is highly relevant to High River's right to an equitable remedy such as a stay pending appeal. High River failed to demonstrate any potential for irreparable injury. The only harm to High River is that it will receive the same treatment that the rest of Class 3 will receive, a result that the class as a whole agreed to. Additionally, this case presents no novel issues of law that merit a stay pending appeal.

### c. A Stay Would Substantially Harm Other Parties

The uncontroverted evidence presented to the Bankruptcy Court demonstrates that granting a stay, whether of the entire case or only on the limited issue of the gifting, will result in the Debtors' loss of its exit financing from GMAC, loss of production payment financing, loss of any extension of the Bondholder DIP Facility which is due and payable now in the amount of $30 million, and potential loss of Debtor's assets, including several oil and gas leases. The net result of granting a stay is the collapse of a multi-million dollar, negotiated plan of reorganization and liquidation rather than reorganization of the Debtor. The harm to creditors in that event is the loss to creditors of not less than $299 million.

### d. A Stay Serves No Public Interest

No public interest is served by granting a stay pending appeal and allowing High River to effectively end this reorganization. High River should not be rewarded for waiting until the end of the case to try to get a better deal than everyone else. Moreover, there is strong public policy in favor of successful reorganizations and providing continued employment to TransTexas' many employees. Public policy also favors settlement among parties and the equal distribution within a class of claims.

7

### 4. A Partial Stay Should not be Granted

High River alternatively requests a limited stay, in which the Court would carve out 13.2% of the "gift" otherwise payable to the junior classes and place it in escrow. This form of relief is not a solution which would allow High River to meet the criteria for a stay pending appeal. First, section 10.02 of the Plan provides that a condition precedent to the Effective Date which may not be waived is the provision regarding the deposit of the Maximum GUC Cash Amount in a segregated account for the sole benefit of Class 8 Claimants (unsecured creditors). If a limited stay is granted, the Effective Date will never occur because the deposit cannot be made. Second, a limited stay harms the creditors just as much as an entire stay. Even with a limited stay, GMAC will not provide exit financing, the Bondholder Lenders will not extend the Bondholder DIP Facility, the Debtor will not have access to production payment financing, the Debtor's drilling operations will not continue and the Debtor might lose various oil and gas leases due to lease provisions requiring continuous drilling. The potential harm to creditors, even for a limited stay, outweighs the potential harm to High River. Finally, the idea of altering the Plan by carving out a part of it is not allowed in the Bankruptcy Code. A Plan of Reorganization cannot be sliced apart. To do so runs afoul of the rights of all parties who voted in favor of the Plan and the financing entities who relied on the Plan provisions to commit to financing. Equal distribution within a class and disclosure to all interested parties are fundamental principles of the Bankruptcy Code.

### 5. High River's Offer to Finance

High River's offer to provide the exit financing also does not overcome its failure to meet the standards for a stay pending appeal. Changing the financing entity entirely modifies the Plan. To do so requires re-noticing of a new Disclosure Statement and re-solicitation of votes. Creditors cannot

8

be required to accept a new financing entity without their consent. Moreover, the evidence suggests that High River and its owner, a well known corporate raider, own interest in competitors of TransTexas. To allow a creditor to perform the required due diligence and to have the degree of control over the Debtor which a lender possesses is an untenable position for the Debtor to be placed. Certainly such a situation cannot occur without further disclosure and opportunity for the creditors to object.

## CONCLUSION

The Bankruptcy Court did not abuse its discretion when it denied High River's Motion for Stay. To the extent that the Motion for Stay Pending Appeal filed with this Court should be treated as a new Motion for Stay, as opposed to an appeal of the Bankruptcy Court's denial of a stay, this Memorandum Opinion and Order constitutes the Court's Findings of Fact and Conclusions of Law and the Court finds that High River is not entitled to a stay pending appeal.

It is therefore ORDERED that the Motion of High River Limited Partnership for Stay Pending Appeal of Order Confirming Debtor's Second Amended, Modified and Restated Plan of Reorganization is hereby DENIED.

At Corpus Christi, Texas, this 29th day of February, 2000.

JANIS GRAHAM JACK
United States District Judge