UNITED STATES BANKRUPTCY COURT          FOR PUBLICATION

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| WORLDCOM, INC., *et al.*, | : | Case No. 02 B 13533 (AJG) |
| Reorganized Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**A P P E A R A N C E S :**

**WEIL, GOTSHAL & MANGES LLP**
**Attorneys for Reorganized Debtors**
By:   Adam P. Strochak, Esq
**767 Fifth Avenue**
**New York, New York 10153-0119**

**BUCHANAN INGERSOLL, P.C.**
**Attorneys for Merck Finck & Co.**
By:   Selinda A. Melnik, Esq.
**140 Broadway, 35th Floor**
**New York, NY 10005-1101**
**1201 North Market Street, Suite 1501**
**Wilmington, DE 19801**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**MEMORANDUM OPINION RESOLVING OBJECTION**
**TO CLAIM OF MERCK FINCK & CO.**

      Before the Court is reorganized debtors' motion for summary judgment on debtors'

Fourteenth Omnibus Objection to certain claims.  This opinion grants the motion and sustains the debtors'

objection to the claim of Merck Finck & Co. ("Merck").

**Jurisdiction**

      This Court has jurisdiction over this proceeding under 28 U.S.C. §§ 1334(a) and 157(a)

and the standing order of referral to Bankruptcy Judges signed by Acting Chief Judge Robert J. Ward on

July 10, 1984.  This is a core proceeding under 28 U.S.C. § 157(b).

**Background**

On July 21, 2002 and November 8, 2002, WorldCom, Inc. and certain of its direct and indirect subsidiaries (collectively, the "debtors" or "WorldCom") filed petitions under Chapter 11 of the Bankruptcy Code. The debtors' Chapter 11 cases were consolidated for procedural purposes and jointly administered. On October 31, 2003 the Court confirmed the debtors' Modified Second Amended Plan (the "Plan").

Most of the objections contained in the Fourteenth Omnibus Objection have been resolved. The objection dealt with in this Opinion was argued at a hearing on May 11, 2005.

**Discussion**

As stated in Merck's July 14, 2003 Objection to the debtors' Fourteenth Omnibus Objection:

> 5. Merck holds in excess of 130,000 shares of WorldCom stock purchased prior to the disclosures of WorldCom's fraudulent acts, accounting manipulations and financial reporting irregularities. Through the financial reporting, accounting manipulations, misrepresentations and malfeasance of WorldCom and its agents, Merck was fraudulently induced to purchase and retain holdings in WorldCom, causing Merck damages of at least $850,000 and potentially in excess of $6 million, for which claim Merck timely filed a Proof of Claim which is the subject of the Debtors' [Fourteenth Omnibus Objection].[1]

The Fourteenth Omnibus Objection, as to Merck, is based on Section 510(b) of the Bankruptcy Code, 11 U.S.C. § 510(b), which provides as follows:

> (b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

---

[1] The damages of "potentially in excess of $6 million" is unexplained in the record before the Court.

The debtors assert that the Merck claim falls squarely within Section 510(b) and must be subordinated to the priority of common stock, which receives nothing under the Plan.

Merck argues that "Merck's Claim for damages occasioned by the Debtors' massive fraud should not be subordinated pursuant to Bankruptcy Code section 510(b)" and that "section 510(b) simply should not be applicable" because "WorldCom engaged in a measure of fraudulent and tortious conduct through which Merck was harmed that is wholly disproportionate to any conceivably contemplated by the risk-allocation/risk-purchase theories and analyses articulated by Professors John J. Slain and Homer Kripke and others upon which Congress predicated the Bankruptcy Code's 'absolute priority' rule and the subordination of securities-related claims through Bankruptcy Code section 510(b)." (Merck's July 14, 2003 Objection ¶¶ 6, 7 at pp. 3-4, footnotes omitted)   Amplifying on this argument, Merck continues:

> 19.  This is not a situation where the purchaser of stock in a company undertook "normal" expected investor risk and "lost" and now yells foul in an attempt to slip past the absolute priority rule and gain equanimity [sic] of treatment with general unsecured creditors.  Merck undertook "normal" risk — it did **not** undertake risk of fraud of the "colossal" magnitude that WorldCom perpetrated, nor did it take the risk that **neither** "big four" independent auditors nor the United States Government watchdogs would uncover such fraud or prevent communication to the public of the resultant massive and destructive misinformation.  . . .

(*Id.* at 7-8)

The statute, however, does not discriminate between great frauds like WorldCom, which caused major damages to large and sophisticated investors like Merck, and petty swindles involving little companies which cause small investors to lose small amounts (or, perhaps, their pensions or life savings). The statute applies evenhandedly to swindles both great and small leading to claims for rescission or damages by investors both great and small.  In the unlikely event that "colossal" frauds ought to be treated in a manner different from ordinary frauds, it will be for Congress to so provide, not the courts.

- 3 -

Merck also relies on the Sarbanes-Oxley Act, asserting that "[a]s part of Sarbanes-Oxley, section 523(a)(19) was added to the Bankruptcy Code specifically to '[a]mend the Bankruptcy Code to make judgments and settlements based upon securities law violation **nondischargeable, protecting victims' ability to recover their losses**'"(*id.* at ¶ 10 at 4, quoting from legislative history, emphasis added by counsel for Merck).

The simple answer to this contention is that Section 523(a)(19) is applicable only to individual debtors. It has no application to corporate debtors such as WorldCom.

Recognizing this, Merck suggests that "it is arguable that Congress intended that nondischargeability of securities fraud claims in bankruptcy apply to both individual and corporate debtors and that the Sarbanes-Oxley drafters did not recognize that the dischargeability provisions of section 523(a) apply only in bankruptcy proceedings respecting individual persons." (*Id.* ¶ 12 at 5) This appears to pay undue disrespect to the Sarbanes-Oxley drafters. But if the drafters were indeed as confused as Merck suggests, it will be for Congress to change the statute, not this Court.

In its Objection dated July 23, 2004 to the debtors' motion for summary judgment, Merck posits that there are "issues of fact" precluding summary judgment, which Merck identifies as follows at page 6 of the 2004 Objection:

> (a) The nature, scope and extent of reasonable risk to which purchasers of stock subscribe when they purchase equity securities in a public company predicated upon public disclosures prepared by prominent accountancy firms and submitted to and disseminated through the United States Securities and Exchange Commission;
>
> (b) The nature, scope and extent of actual harm to which Merck Finck was subjected after purchasing the equity securities of WorldCom;
>
> (c) Whether the nature, scope and extent of actual harm to which Merck Finck was subjected after purchasing the equity securities of WorldCom was beyond the nature, scope and extent of reasonable risk described in paragraph 3(a) hereinabove; and
>
> (d) The nature and extent of damage suffered by Merck Finck through the acts and omissions, defalcations and intent of WorldCom.

The "nature, scope and extent of reasonable risk to which purchasers of stock subscribe" (paragraphs (a) and (c)) does not give rise to any triable issue of fact for two reasons. First, it is tautological to say that the purchaser of stock in a corporate enterprise "subscribes" to whatever good fortune or fatal vicissitudes may bring to the venture to produce success or utter failure. Obviously, the sophisticated and intelligent persons and firms who invested in WorldCom, Enron, Global Crossing and the whole litany of corporate fiascos of recent years never imagined that their investments would be subjected to the kinds of risks that brought these and many other companies into bankruptcy in recent years. But the plain fact is that all of these debacles happened, and when Merck and other investors purchased their stock, that is exactly what they "subscribed" to, just like all the other disappointed investors in this or any other era of capitalism. The second reason that the question of investor risk does not give rise to a triable issue of fact is that nothing in the statute calls for such an inquiry. The statute applies on its face and by its plain language to claims that may be said to arise from a purchase or sale of securities. Congress did not provide in Section 510(b) that subordination of claims should depend upon any factual findings or legal analysis based upon the "nature, scope and extent of reasonable risk" to which any particular purchasers of stock subscribed, or thought they subscribed, when they purchased their stock. It is not for the courts to discriminate among investors based on factual criteria such as risk which Congress did not prescribe.

The same may be said with respect to the purported issues of fact relating to the "actual harm" or the "damage" suffered by Merck (paragraphs (b) and (d)). So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold shares of stock or other securities of the debtor, the claimant falls within the scope of Section 510(b), and it is not up to the courts to decide that certain types of damage or harm were not contemplated by

Congress or should otherwise not be included within the scope of the statute.[2] In this case the harm or damage sustained by Merck is the total loss in value of its WorldCom stock and, as such, arises from its purchase of that stock. The damage and harm sustained by Merck, whether proximately caused by fraud in the inducement of its purchase, or the retention of its ownership, or misappropriation or other malfeasance of management, arises from and is based upon Merck's purchase and ownership of WorldCom stock and as such is squarely within the scope of Section 510(b).

        At the oral hearing on May 11, 2005, counsel for Merck argued for the first time that Merck's claim for damages against WorldCom was not based on either a purchase or a sale of WorldCom stock but, rather, was based upon Merck's having *retained* its WorldCom stock because of WorldCom's failure to disclose the colossal fraud. Counsel argued that Merck's claim for damages arises not "from the purchase or sale" of the stock but from Merck's having been fraudulently induced to *retain* the stock instead of selling it before disclosure of the fraud, after which the stock price plummeted,

---

[2] Obviously, owners of securities of a debtor may also hold a variety of claims against the debtor not derived from their purchase or sale of the debtor's securities. For example: (i) a stockholder who is injured by a vehicle owned and operated by the debtor may have a tort claim which is quite unrelated to his ownership of stock; (ii) a debenture holder may have a claim against the debtor for breach of contract to supply widgets which is entirely independent of his status as a debenture holder; (iii) a stockholder may have a claim against the debtor for money loaned to the corporation which is independent of his ownership of stock. But no claim unrelated to Merck's ownership of WorldCom stock is alleged.

eventually to zero.[3]  Since no purchase or sale was involved, Merck argues, Section 510(b) does not apply.

The purported distinction between a stockholder damage claim in respect of the purchase or sale of a security, on the one hand, and a damage claim in respect of retention of the security, on the other, is entirely illusory and must be rejected as a matter of law.  Assuming, *arguendo* (and contrary to Merck's July 14, 2003 Objection at ¶ 5, quoted above), that Merck was not "fraudulently induced to purchase" its WorldCom stock, that the colossal fraud post-dated Merck's purchase of WorldCom stock, and that Merck did not sell and still retains its WorldCom stock, the nature of the damages suffered by Merck is functionally indistinguishable from the nature of the damages sustained by the shareholder who sold his stock or who was induced by fraud to purchase his stock.  Stated differently, Merck's claim (if any) against the corporation arises from the fact of it having purchased stock, whether before or after the colossal fraud, and whether Merck ultimately sold its stock and thereby realized a loss or retained the stock until it became valueless, in which case it suffered exactly the same loss as that of the stockholder who sold his stock, differing only in the quantum of the loss actually sustained.  From the perspective of Section 510(b), it makes no difference whether the stockholder's loss in the value of his stock was caused by a pre-purchase fraud which induced his purchase, or a post-purchase fraud, embezzlement, looting, or

---

[3]  It is difficult to imagine what kind of a claim, if any, a WorldCom stockholder such as Merck might have *against WorldCom itself* if the stockholder was *not* induced to purchase his stock by fraud of the corporate entity.  Once a security holder has purchased his security, his investment is at risk of whatever may befall the corporation thereafter, including economic recession or depression, business reverses due to competition, technological obsolescence, acts of God or terrorism, gross financial or operational mismanagement, and misappropriation or other wrongdoing by management.  If a corporation experiences problems after an investor buys stock in the corporation, the fact that management may cause the corporation to publish statements and reports that hide its problems (resulting in a fraud-inflated stock price) does not in and of itself harm the existing investor — indeed, the investor will benefit by the fraud if he innocently sells his stock before public disclosure of the fraud.  The harm to the existing stockholder lies in the problems themselves, for which the stockholder has no claim against the corporation itself (although the corporation may have claims against officers, directors or others who caused the problems, which the stockholder may be able to assert derivatively on behalf of the corporation).  Public disclosure of the problems cannot help the existing stockholder to avoid loss due to existing problems, since the "efficient market" will promptly cause the market price of the security in question to reflect the negative information disclosed.  Disclosure to the stockholder could enable him to avoid loss on his stock only if he received inside information of the undisclosed problems and could thereby sell out at the fraud-inflated price before public disclosure, in violation of securities laws.  But the issue of whether Merck has any claim against WorldCom at all is academic in the context of this contested matter, since the outcome is the same whatever may be the nature and validity of Merck's claim.

other corporate misconduct which undermined the value of his stock. In either case, the stockholder's loss represented by diminution in or destruction of the value of his stock ultimately constitutes a claim for damages derived from his ownership of stock and therefore "arising" from his purchase of the stock, whether the stockholder retained his stock or sold it.

Upon the foregoing analysis, Section 510(b) does not appear ambiguous to this Court in the context of this dispute. Nevertheless, some courts "have viewed this language as ambiguous* and have tended to adopt a broad meaning of the term 'arising from.'**" **COLLIER ON BANKRUPTCY** ¶ 510.04[1][3] at 510-13-510-14 (15th Ed. Rev. Rel. 87 — 9/03) (citing * *Allen v. Geneva Steel Co.* (*In re Geneva Steel Co.*), 281 F.3d 1173 (10th Cir. 2002); *In re Granite Partners, L.P.*, 208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997) and ** *Allen v. Geneva Steel Co.* (*In re Geneva Steel Co.*), 281 F.3d 1173 (10th Cir. 2002); *Baroda Hill Inv., Inc. v. Telegroup, Inc.* (*In re Telegroup, Inc.*), 281 F.3d 133 (3d Cir. 2001); *Frankum v. Int'l Wireless Communications Holdings, Inc.* (*In re Int'l Wireless Communications Holdings, Inc.* ), 279 B.R. 463 (D. Del. 2002), *aff'g In re Int'l Wireless Communications Holdings, Inc., 257 B.R. 739 (Bankr. D. Del. 2002)*; *In re NAL Fin. Group, Inc.*, 237 B.R. 225 (Bankr. S.D. Fla. 1999)). In this Court's view, the better reasoned decisions have found that "retention" claims fall within the ambit of Section 510(b). *See, e.g.*, *In re Granite Partners,* 208 B.R. at 338, which addressed "whether a claim that post-investment fraud induced an investor to hold on to and not sell his investment is a claim 'arising from the purchase or sale' of a security of the debtor." Although the court concluded that the phrase "arising from the purchase or sale" is ambiguous, it held that both components of the retention claim, *i.e.*, (1) the continuing concealment element and (2) the "charges that the debtors misrepresented their performance through the use of managers' marks, and issued false operating reports which induced the [claimants] to hold on to their investments," arose from a purchase or sale of the debtors' securities within the meaning of Section 510(b). *Id.* at 342. The *Granite Partners* court reasoned in part that:

> The charge of continuing concealment cannot exist independent of the initial fraudulent sale, *i.e.*, without fraud in the inducement, there cannot be a wrongful concealment. . . . Since the rescission claims indisputably come within section 510(b), interference with the rescission claims should not create a new and different claim, of greater priority, that shares *pari passu* with the other unsecured creditors.
>
> *   *   *
>
> [The claimant] charges that the debtors misrepresented their performance through the use of managers' marks, and issued false operating reports which induced the [claimant] to hold on to their investments. Unlike the continuing concealment claim, the investor need not assert that he is a defrauded purchaser. Nevertheless, section 510(b) also subordinates this claim. First, from the creditors' point of view, it does not matter whether the investors initially buy or subsequently hold on to their investments as a result of fraud. In either case, the enterprise's balance sheet looks the same, and the creditors continue to rely on the equity cushion of the investment.
>
> Second, a fraudulent retention claim involves a risk that only the investors should shoulder. In essence, the claim involves the wrongful manipulation of the information needed to make an investment decision. The [claimant's] charge that the debtors' [sic] wrongfully deprived them of the opportunity to profit from their investment (or minimize their losses) by supplying misinformation which affected their decision to sell. Just as the opportunity to sell or hold belongs exclusively to the investors, the risk of illegal deprivation of that opportunity should too. In this regard, there is no good reason to distinguish between allocating the risks of fraud in the purchase of a security and post-investment fraud that adversely affects the ability to sell (or hold) the investment; both are investment risks that the investors have assumed. *Id.* at 342.

To the same effect, *see In re Geneva Steel Co.*, 281 F.3d 1173 in which a claimant alleged that "company fraud caused him to retain his debt securities" *(id.* at 1175) and in an accompanying letter stated "that he had retained his notes, much to his detriment, because company officials remained silent in the face of growing financial difficulties." *Id.* Essentially following the reasoning in *Granite Partners,* the court held that post-investment fraud that causes an investor to hold rather than sell his securities 'arises' from the 'purchase or sale' of those securities." *Id.* at 1179-1183.[4]

---

[4] Neither *Limited Partners Committee of Amarex, Inc. v. Official Trade Creditors' Committee of Amarex, Inc. (In re Amarex, Inc.)*, 78 B.R. 605 (W.D. Okla. 1987) nor *In re Angeles Corp.,* 177 B.R. 920 (Bankr. C.D. Cal. 1995) involved mere retention claims (*i.e.*, alleged fraud of management that induced the security holder to refrain from selling his security) by holders of securities in the respective debtors. *Amarex* involved claims by limited partners not against the limited partnerships in which they held securities, but against Amarex,

(continued...)

- 9 -

To summarize, the debtors' objection in the Fourteenth Omnibus Objection to Merck's claim for damages based upon the allegation that it "was fraudulently induced to purchase and retain holdings in WorldCom, causing Merck damages of at least $850,000 . . ." is unarguably within the scope of Section 510(b) of the Bankruptcy Code. In accordance with that provision, Merck's damage claim must be subordinated.

Debtors' counsel will submit an appropriate order.

Dated: White Plains, NY
May 26, 2005

/s/ Adlai S. Hardin, Jr.
U.S.B.J.

---

[4](...continued)
Inc., the general partner and manager of the limited partnerships, for damages for alleged mismanagement of the partnerships, breach of contract, breach of fiduciary duty, negligence and common law fraud. Similarly, *Angeles* involved tort claims by limited partners against the debtor Angeles Corp. for harm to the limited partnerships in which the claimants held securities. Neither of these cases addresses the type of claims here involved by a stockholder of the debtor against the debtor.