1       EIGHTEENTH JUDICIAL DISTRICT COURT

2        PARISH OF WEST BATON ROUGE

3          STATE OF LOUISIANA

4                      *

5 THE STATE OF LOUISIANA,    *
  WILLIAM KIMBALL, H. M. KIMBALL,*

6 JR. AND ELIZABETH KIMBALL   *
  LEWIS, INDIVIDUALLY AND AS  *

7 REPRESENTATIVES OF A CLASS OF *
  THOSE SIMILARLY SITUATED    *

8                      *
  VERSUS                *  NO.  26,334 "C"

9                      *
  SPRINT COMMUNICATIONS,     *

10 COMPANY, L.P., ET AL      *
  SOUTHWEST LOUISIANA       *

11 * * * * * * * * * * * * * * * * * * * * * * * *

12          CONSOLIDATED WITH

13                      *
  THE STATE OF LOUISIANA AND  *

14 XCL LTD., ET AL, INDIVIDUALLY *
  AND AS REPRESENTATIVES OF A  *

15 CLASS OF THOSE SIMILARLY    *
  SITUATED               *  NO.  26,304 "C"

16                      *
  VERSUS                *

17                      *
  WILTEL, INC., ET AL       *

18 * * * * * * * * * * * * * * * * * * * * * * * *

19       The deposition of LOWELL SIBILLE was

20  taken in connection with the captioned cause,

21  pursuant to the following stipulation, before

22  Cheryl Venable, Certified Court Reporter, at the

23  offices of Mr. Michael R. Mangham, 406 Audubon

24  Blvd., Lafayette, Louisiana, on Tuesday, the 17th

25  day of September, 2002, beginning at 10:00 a.m.

ORIGINAL

ERIN MACKEY
Certified Shorthand Reporter
Post Office Box 2494
Lafayette, Louisiana  70502
(337) 237-4124

EXHIBIT
3

A P P E A R A N C E S

MR. VICTOR MARCELLO
Talbot, Carmouche & Marcello
Attorneys at Law
P.O. Box 759
Gonzales, LA  70707

MR. CHRISTOPHER L. WHITTINGTON
Attorney at Law
P.O. Box 3035
Baton Rouge, LA  70821-3035

MR. SCOTT A. POWELL
AND MR. DON McKENNA
Hare, Wynn, Newell & Newton
Attorneys at Law
The Massey Building
Suite 800
2025 Third Avenue North
Birmingham, AL  35203-3331

MR. MICHAEL R. MANGHAM
Mangham & Fuqua
Attorney at Law
406 Audubon Boulevard
Suite A
Lafayette, LA  70503-2613

MR. JOHN F. OLINDE
Chaffe, McCall, Phillips,
Toler & Sarpy
Attorneys at Law
2300 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-2300

1        S T I P U L A T I O N

2

3            It is hereby stipulated by and between

4    counsel for plaintiff and counsel for defense that

5    the deposition of

6                    LOWELL SIBILLE

7    is being taken before Cheryl Venable, Certified

8    Court Reporter, by counsel for the defense for

9    discovery purposes, pursuant to notice and to the

10   provisions of the appropriate statutes of the

11   Louisiana Code of Civil Procedure.

12           The parties hereto waive all formalities

13   in connection with the taking of said deposition,

14   including the reading and signing thereof, except

15   the swearing of the witness, and the reduction of

16   the questions and answers to typewriting.

17           Counsel for all parties reserve all

18   objections, including the form of the question and

19   the responsiveness of the answer, at the time of

20   taking said deposition, but they also reserve

21   the right to make objections at the time said

22   deposition or any part thereof may be offered in

23   evidence, with the same rights as if the testimony

24   had been taken and given in Open Court.

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

EXAMINATION BY MR. POWELL . . . . . . . . . . 5

### EXHIBITS

Exhibit No. 1  (Agreement). . . . . . . . . .

### OBJECTIONS

BY MR. MARCELLO. . . . . . . 6, 45

BY MR. OLINDE. . . . . . . 43, 44, 45

```
1                      LOWELL SIBILLE
2    after having been duly sworn, was examined and did
3    testify as follows:
4                        EXAMINATION
5    BY MR. POWELL:
6    Q      Give us your name, please, sir.
7    A      Lowell A. Sibille, Jr.
8    Q      Mr. Sibille, what is your profession?
9    A      Funeral director.
10   Q      You have been deposed already in this case;
11          have you not, sir?
12   A      Yes, sir.
13   Q      And that was, if I recall correctly, June of
14          1998?
15   A      That's right.
16   Q      In connection with -- or let me back up and
17          ask it this way.  Since June of 1998 when
18          you gave your last deposition in this case,
19          what have you done in terms of your
20          responsibilities as a class representative
21          in connection with furthering the
22          prosecution of this litigation?
23   A      I spoke to Mr. Whittington, my attorney, on
24          several occasions, but as far as for
25          actually doing anything else, I don't think
```

1          I did anything else.  Just called him to

2          find out how the case was going.

3    Q    Am I understanding you correctly, then, that

4          since June of 1998, you would inquire of Mr.

5          Whittington on occasion to determine the

6          status of the litigation?

7    A    The status of the litigation.

8    Q    And what was going on?

9    A    That's correct.

10   Q    Other than that, that would be the extent of

11         the activities?

12   A    As far as I know, yeah, that's it.

13   Q    Now, I was unclear from your last deposition

14         when you actually were named as a class

15         representative in the litigation.  Can you

16         shed some light on that for me?

17              MR. MARCELLO:  Object to the form of

18              the question.  It's a matter of

19              record, but go ahead.  You can

20              answer.

21   A    I would say in 1998 actually.  That was when

22         I was named as a representative in the class

23         action suit.

24   MR. POWELL:  (CONTINUING)

25   Q    When you were named as a class

**ERIN MACKEY**                    6
Certified Shorthand Reporter
Post Office Box 2494
Lafayette, Louisiana  70502
(337) 237-4124

1       representative in 1998, did you read the

2       complaint that had been filed in connection

3       with this case?

4   A   I didn't read it.  I relied on my attorney

5       to tell me what the suit was basically based

6       upon.

7   Q   You did not read the complaint; is that

8       right?

9   A   I don't think I read it, no.

10  Q   Have you ever read it?

11  A   The complaint itself?

12  Q   Yes, sir.

13  A   No.

14  Q   Or any amendments to the complaint?  Have

15      you ever read any of the amendments?

16  A   No.

17  Q   When you came on board as a class

18      representative in 1998, did you understand

19      what your rights and obligations were as a

20      class representative to the absent class

21      members?

22  A   Yes.

23  Q   And describe what you understood those to

24      be.

25  A   I understood I was going to be a lead

1    witness for the class action suit and that I

2    was to be deposed and if necessary go to

3    court if it went that far.

4 Q  Now, in terms of your responsibilities as

5    being, as you described it, a lead witness,

6    what responsibilities did you have in

7    connection with being a lead witness as you

8    understood them to be?

9 A  What responsibilities?

10 Q  Yes, sir.

11 A  As I said before, it was to -- if called

12    upon to be deposed, if I was called upon,

13    which I did, I was deposed.  If I had to be

14    relied upon to go to court, I was told that

15    I would have to go to court.  Other than

16    that, I don't know what else to say about,

17    you know, what my role was.  I mean, I

18    wasn't the only one.  There were other

19    people that were also witnesses.

20 Q  And who were they, please?

21 A  I think one was a Katherine McClellan

22    Sibille and then a Mrs. -- she was from

23    Eunice, but I can't think of her name.  It

24    was the coach's wife and I can't think of

25    who she was.  I think she was also a

```
 1              witness.  Those were the three that were

 2              there when I was in Baton Rouge.  You know,

 3              otherwise, I have no idea who the other

 4              witnesses would be.

 5      Q       Other than witnesses, I'm talking just about

 6              class representatives now.

 7      A       Well, class representative then.

 8      Q       Now, I looked at your last deposition as

 9              well and is there Sprint fiber on your

10              property?

11      A       Yes, sir.

12      Q       Have you identified its location?

13      A       I identified the marker that comes out of

14              the ground that signified there's an

15              underground fiber optic cable in that area.

16      Q       When did you do that?

17      A       I did it after the deposition.

18      Q       As I recall, in June of 1998 when you were

19              deposed, you had not specifically seen any

20              markers or identifying marks about cable on

21              your property; is that right?

22      A       That's correct.

23      Q       And did you identify the marker as being a

24              Sprint marker?

25      A       Yes, sir.
```

1   Q    And you said it was after your deposition.

2        Can you give me some idea timewise as to

3        when that was done?

4   A    Maybe a couple of weeks after.  Or maybe on

5        the way home actually.  That could have been

6        it.  On the way back from Baton Rouge down

7        190 I stopped at the property.

8   Q    When you agreed to come on board as a class

9        rep in this litigation, did you understand

10       that there was certain relief that you were

11       seeking on behalf of yourself and also the

12       absent class members?

13  A    Yes, sir.

14  Q    What relief was that?

15  A    The relief from the people trespassing on

16       our property, on our right-of-way.

17  Q    And what form of relief were you seeking?

18  A    Monetary.

19  Q    Did you have any quantification or basis for

20       determining or seeking any type of monetary

21       relief?

22  A    Did I have -- repeat the question.

23  Q    Yes, sir.  What sort of monetary relief were

24       you looking for?

25  A    At that particular time, I had no idea what

1      the monetary relief would be.  I mean, my

2      statement in the deposition was I would take

3      anything that -- the most I could get.

4   Q  Right.  I remember that.

5   A  Yes, sir.  Whatever the law allowed, that

6      would be what I would take.  I would have no

7      idea what it would be otherwise.

8   Q  Did you also say in your deposition that you

9      were seeking a percentage of the profits

10     that Sprint was receiving on the cable that

11     went through your property?

12  A  Yes, sir.

13  Q  And did you also make a claim that there was

14     some value to the presence of the cable on

15     your property that you were seeking monetary

16     compensation for as well?

17  A  Value meaning they had used my property for

18     their personal gains?

19  Q  Value of the servitude.

20  A  Yes, sir.

21  Q  You were seeking that as well?

22  A  Well, yeah.

23  Q  So at least based on your last deposition in

24     June of 1998, am I correct in understanding

25     that the relief you were seeking was, of

1        course, number one, the most you could get

2        allowed by law and that could have been made

3        up in the form of profits?

4    A   Profits derived from the company using my

5        property without my express permission.

6    Q   And the value of the servitude or the

7        utilization of your property?

8    A   Utilization of said property.

9    Q   Any other relief that you were seeking?

10   A   I don't think so.

11   Q   Now, has that changed in any respect since

12       you gave your deposition; that is, the

13       relief you've been seeking for the absent

14       class members?

15   A   It would probably be the same exact relief.

16   Q   Up through today?

17   A   Yes, sir.

18   Q   In your role as class rep in connection with

19       the relief that you are seeking from Sprint,

20       have you identified or has information been

21       made available to you as to what profits

22       Sprint has made on the cable that has gone

23       through your lines, your property?

24   A   No, sir.

25   Q   Have you asked for that information?

1    A     No.

2    Q     In your discussions -- or have you had any

3          discussions with the other class

4          representatives that you identified for me

5          earlier?

6    A     Katherine Sibille who is married to a cousin

7          of mine.

8    Q     In your discussions with Mrs. Sibille, did

9          you share what ideas the two of you may have

10         had about getting the monetary relief from

11         Sprint?

12   A     I don't think so.

13   Q     You didn't talk about that, what you were

14         each seeking?

15   A     No.

16   Q     You would not be able to tell me, then, that

17         she would concur with you that you're

18         seeking profits that Sprint had made, the

19         value of the servitude and as much as --

20   A     Basically I never spoke to her at all.  I

21         spoke to her husband.  And he indicated that

22         he would like to know how it would work.  If

23         the suit had been settled, what would it be

24         based upon.  And at that time I said that it

25         would probably be based upon the profits

1        made.  You know, with the three lines, we

2        would get a certain amount of money because

3        of the profits that the people made and we

4        didn't give our okay to do it.

5  Q     Did he consent to that approach as far as

6        you know?

7  A     I mean, you're talking about four years ago.

8        I suppose so.

9  Q     Well, in connection, then, with your seeking

10       profits associated with Sprint's utilization

11       of your property and your -- you have not

12       gotten that information as to what those

13       profits are, have you, sir?

14  A    No.

15  Q    Do you not think it important from the

16       standpoint of your job as class

17       representative in evaluating whether or not

18       to settle this claim to get that profit

19       figure from Sprint so you can evaluate

20       whether or not what you were seeking is

21       actually the basis on which this claim had

22       been settled?

23  A    It would probably have been okay to do so,

24       but I left it in the hands of my attorneys

25       to file the suit and go against the company.

1           So I really wasn't that concerned about what

2           the exact profits were.

3    Q      Why?

4    A      If the profits were a hundred billion

5           dollars and the judge allowed you X amount

6           of dollars in settlement, it makes no

7           difference what the ultimate amount of

8           profit the people made.  You know, the

9           settlement would be a fair and just

10          settlement I figured, so why would I have to

11          know exactly what the profits were.

12   Q      Did you make a determination that this was a

13          fair and just settlement?

14   A      After I learned what the settlement was,

15          yes.

16   Q      So the settlement had already been

17          effectuated before you evaluated it and

18          determined it would be fair and just?

19   A      The settlement -- when the settlement --

20          when I talked to Mr. Whittington about what

21          the settlement was, I thought it was a fair

22          settlement.  It wasn't based on how much the

23          actual net profit that the companies made,

24          you know, by running their lines through my

25          property.  It was just that he called and

```
 1            said the settlement was for 55 million
 2            dollars and I thought it was a just
 3            settlement.
 4      Q    So the information you got was the case has
 5            been settled for 55 million dollars?
 6      A    Yes.
 7      Q    And based on that, you said that's fair and
 8            just?
 9      A    As far as I was concerned, it was.
10      Q    Why?
11      A    Why?
12      Q    Why do you think it's fair?
13      A    Because the group of attorneys that handled
14            it said they thought by, you know, comparing
15            it to other settlements, they thought it was
16            a fair and just settlement.  I relied on
17            their judgment.
18      Q    You did not make any independent
19            determination on your own as a class
20            representative to evaluate the fairness or
21            reasonableness of this settlement; is that
22            right?
23      A    That's correct.
24      Q    Now, are you familiar with whether or not
25            there had been other depositions taken in
```

1        this case other than yours?

2    A   The only three depositions I know of are the

3        two that I mentioned prior to this question

4        you just asked me.  Katherine Sibille and

5        Coach Nagata's wife.

6    Q   Those are the only ones you're aware of?

7    A   That's the only ones that I'm aware of.

8    Q   So I take it that because those are the only

9        ones you're aware of, you didn't attend any

10       other than perhaps yourself; is that right?

11   A   That's it.

12   Q   Have you looked at any documents or

13       pleadings in connection with your role as

14       class representative?

15   A   No, sir.

16            MR. MARCELLO:  That settlement paper,

17            the settlement document.

18   A   The settlement documents, yeah.  I didn't

19       know if that's what you meant.

20   MR. POWELL:  (CONTINUING)

21   Q   I'm going to get there.  I wasn't there

22       quite yet.

23            MR. MARCELLO:  I believe he got

24            confused with the word pleading.  He

25            was given the settlement document.

```
 1    MR. POWELL:   (CONTINUING)

 2    Q      But up until the settlement, you have not

 3           looked at any pleadings or documents or

 4           discovery that has been generated in this

 5           litigation; is that right?

 6    A      That's correct.

 7    Q      In your conversations with your counsel, did

 8           they involve any input from you on strategy

 9           of prosecuting this litigation?

10    A      No, sir.

11    Q      And I take it you've not looked or commented

12           or had any input in any of the briefing that

13           has been done in the case; is that right?

14    A      That's correct.

15    Q      Are you aware that there was either one or a

16           series of mediation events that took place

17           in this litigation?

18    A      By that meaning what?

19    Q      Well, where the lawyers sit down with their

20           clients and try to resolve the case.

21    A      The lawyers sitting with their clients, no,

22           I'm not aware of it.

23    Q      You're not aware of that?

24    A      No, sir.

25    Q      So you never attended, I take it, any
```

1          meetings wherein there were efforts made at

2          settlement or resolution of the litigation?

3   A      No, sir.

4   Q      And you were not made aware of the fact that

5          those meetings or sessions were taking

6          place; is that right?

7   A      That's right.

8   Q      And I take it you never were invited to

9          attend any of those sessions?

10  A      No, sir.

11  Q      Do you know if any of the other class

12         representatives that had Sprint cable on

13         their property participated in any mediation

14         sessions?

15  A      Not to my knowledge, but I wouldn't know for

16         sure.

17  Q      When you -- well, let me ask it this way,

18         Mr. Sibille.  When did you get the phone

19         call that informed you of the terms of the

20         settlement?

21  A      When?

22  Q      Yes, sir.

23  A      Oh, God.  It was in 2001.  The latter part

24         of 2001 I suppose.

25  Q      And who called you?

1   A      Mr. Whittington.

2   Q      What did you understand the terms of the

3          settlement to have been?

4   A      I understood the settlement to be 55 million

5          dollars which was from WorldCom.  And what's

6          the other one?  MCI and WorldCom, 55 million

7          dollar settlement which covered, I think, a

8          little over eleven hundred miles of cable.

9   Q      You mean WorldCom and Sprint?

10  A      No.  I said MCI and WorldCom.

11             MR. MARCELLO:  MCI, WorldCom and

12             Sprint.

13             THE WITNESS:  All three?

14             MR. MARCELLO:  Yeah.

15  MR. POWELL:  (CONTINUING)

16  Q      Did you know it was all three?

17  A      I had no idea.  I thought it was the two.

18  Q      Just the two.  Okay.  And did you think it

19         was just the two until your lawyer just

20         mentioned it was Sprint, also?

21  A      I thought it was the two.  I had no idea it

22         was the three, no.

23  Q      So to this day you don't know it's all

24         three, right?

25             MR. MARCELLO:  I think he's getting

**ERIN MACKEY**
Certified Shorthand Reporter
Post Office Box 2494
Lafayette, Louisiana  70502
(337) 237-4124

20

1          confused, Scott.

2          MR. POWELL:  Let's let him answer.

3          MR. MARCELLO:  Okay.

4   A      The reason I thought I was here because you

5          were representing Sprint and I was having to

6          be deposed because of them, but I mean --

7   MR. POWELL:  (CONTINUING)

8   Q      Who do you understand is paying up to 55

9          million dollars?

10  A      Well, now I understand it must be all three.

11  Q      And when did you come to that understanding?

12  A      About five minutes ago.

13  Q      Or a minute ago?

14  A      Well, a minute ago.

15  Q      And up until a minute ago, you thought the

16         up to 55 million was being paid only by MCI

17         and WorldCom; is that correct?

18  A      Yes, sir.

19  Q      Now, up until or throughout this process,

20         Mr. Sibille, did you have any input at all --

21         let me back up and ask it this way.  Other

22         than the payment of 55 million dollars, were

23         you apprised of any other terms of the

24         settlement in that conversation?

25  A      Any other terms of the settlement?

**ERIN MACKEY**
Certified Shorthand Reporter
Post Office Box 2494
Lafayette, Louisiana  70502
(337) 237-4124

21

1    Q    Yes, sir.

2    A    No.  You mean as to what I would get as a

3         plaintiff?

4    Q    We'll start there, yes.  As to what you

5         would get as a plaintiff?

6    A    Basically $5.50 per running foot of the

7         property from each company.

8    Q    $5.50 per foot?

9    A    That would be my portion of the settlement.

10   Q    From each company?

11   A    Yeah.  Which means Sprint, MCI -- MCI and

12        WorldCom.

13   Q    What was your understanding?  That MCI would

14        pay 5.50 and WorldCom would pay 5.50?

15   A    That's what I understood.

16   Q    So that would be $11.00 per foot?

17   A    Yes, sir.

18   Q    And did you know how many feet of cable you

19        had on your property?

20   A    On my particular property, I think about

21        1600 feet.

22   Q    And were you told or did you have any

23        understanding as to what you had to do in

24        terms of a plaintiff in order to qualify or

25        to get that $11.00 a foot for 1600 feet?

1  A    You'd have to get an abstract done on your
2       property to see if, indeed, we had the
3       right-of-way.
4  Q    Okay.
5  A    That anyone had trespassed on our property.
6  Q    And you were told that in the first
7       conversation?
8  A    You're talking about my first conversation
9       with --
10 Q    About the settlement?
11 A    No, sir, not the first conversation.
12 Q    What I want to know is about this first
13      conversation when you were apprised that the
14      case had been settled.
15 A    Oh, the case had been settled?
16 Q    Yes, sir.
17 A    Oh, I'm sorry.  I went back to 1998.
18 Q    No, sir.
19 A    So what's your question again now?
20 Q    My question, we started off that you were
21      apprised that the case had been settled I
22      believe you said in the latter part of 2001?
23 A    Yes, sir.  That's what I thought, yeah.
24 Q    And you got a phone call from Mr.
25      Whittington to that effect?

1    A    Yeah.

2    Q    And you understood that the case had been

3         settled for 55 million dollars?

4    A    Correct.

5    Q    And you thought at that time that that money

6         was going to be paid by MCI and WorldCom,

7         correct?

8    A    Yeah, correct.

9    Q    And that you discovered just several minutes

10        ago that Sprint was participating in that

11        settlement as well, correct?

12   A    Correct.

13   Q    Now, in that first conversation in the

14        latter part of 2001 when you were told that

15        the case had been settled, were you also

16        informed as to what the terms of the

17        settlement were in addition to the 55

18        million dollar, up to 55 million dollar

19        payment?

20   A    In terms of what the settlement was in

21        addition to the 55 million?

22   Q    Yes, sir.

23   A    I didn't know there was anything other than

24        the 55 million.

25   Q    Am I correct, because I want to be clear on

1        this --

2                    MR. MARCELLO:  I think he's confused,

3                    Scott.

4                    MR. POWELL:  That's why I want to be

5                    clear.

6        MR. POWELL:  (CONTINUING)

7    Q    Were you given any of the terms of the

8         settlement in the latter part of 2001 when

9         you first were apprised of it other than the

10        fact that defendants were going to pay up to

11        55 million dollars?

12   A    Repeat the question.  I'm lost.

13   Q    Were you given any additional information in

14        the first conversation you had about the

15        case being settled other than the fact that

16        this class was going to be paid up to 55

17        million dollars?

18   A    No.

19   Q    When was it that you first were told what

20        you were going to get as a class

21        representative out of this settlement?

22   A    That probably would have been 2002.

23   Q    Approximately when?

24   A    Maybe -- I don't know.  Maybe March of 2002.

25        I'm not sure.  I'm just guessing.

1    Q    Let me take you back, if I can, to the first

2         conversation about the 55 million, okay?

3    A    Uh-huh (yes).

4    Q    Are you with me?

5    A    Yes.

6    Q    Were you told how the 55 million was arrived

7         at?

8    A    How it was arrived at?

9    Q    Yes, sir.

10   A    Well, it was a settlement.  In other words,

11        it was arrived at due to a settlement.

12   Q    I understand that.

13   A    Okay.  What's the next question?

14   Q    The question is were you told how the 55

15        million, how that number came about?

16   A    Because of --

17   Q    On what was it based?

18   A    God, I don't know.

19   Q    You don't know?

20   A    What was it based on?

21   Q    Yes, sir.

22   A    I don't think I was told exactly what it was

23        based on.

24   Q    Were you told generally?

25   A    Based on the fact that the company decided

1        to settle rather than go to court.  That's

2        what I was told.

3   Q    Were you told why your lawyers agreed to the

4        55 million dollar figure as opposed to a

5        different figure?

6   A    No.  They just said they thought it was a

7        fair settlement, so it was determined that

8        it should be taken.  It was a fair

9        settlement.

10  Q    Did you ask any questions as to why they

11       thought it was a fair figure at that time?

12  A    Because they said that according to other

13       settlements, you know, that had been settled

14       in the past, that this seemed to be a fair

15       and just settlement.

16  Q    And did they give you any specifics?  And

17       this is the first conversation I'm talking

18       about, okay?  We're still square on that,

19       right?

20  A    (Witness nods head affirmatively.)

21  Q    Correct, sir?

22  A    Yeah.  Sorry.

23  Q    You know you have to answer out loud.

24  A    Yes, sir.

25  Q    So you were told in that first conversation

1         that based on other settlements, it was in

2         their view, that is the lawyers' view, it

3         was fair?

4     A   No, it's not the first conversation.  The

5         second conversation.  I'm sorry.

6     Q   So the first conversation you were told 55

7         million and that --

8     A   That's correct.  That was the end of the

9         story.  The second conversation is when I

10        was told.

11    Q   And when was the second conversation?

12    A   I think it was like in March of 2002.

13    Q   This was when you found out about your

14        portion?

15    A   Yeah.

16    Q   And in that conversation, you were told that

17        in the lawyers' view, it was fair based on

18        other settlements?

19    A   That's correct.

20    Q   Did you ask them what other settlements they

21        were comparing it to?

22    A   Other infringement on trespassing with

23        either pipelines or fiber optic lines or

24        whatever.

25    Q   I understand that, sir.  I'm talking about

1              specifically what other settlements that had

2              been made.

3     A        Oh, they never mentioned a settlement in

4              particular.  They didn't say Exxon settled

5              for such and such, no.

6     Q        Did you ask?

7     A        No.

8     Q        You took their word for it?

9     A        As far as I was concerned, I took their word

10             for it.

11    Q        Have you ever looked at settlement terms in

12             any fiber optic settlements around the

13             country?

14    A        No, sir.

15    Q        Now, in the first conversation back in the

16             latter part of 2001, were you told that the

17             settlement was done and that the lawyers

18             were going through a process of setting up

19             notice provisions to let the class know

20             about the settlement?

21    A        I think so, yeah.

22    Q        In other words, you came away from that

23             conversation in the latter part of 2001

24             understanding that settlement terms were

25             complete and finalized at that time?

1    A    Basically, yeah.

2    Q    Were you asked in that first conversation

3         whether or not you thought it was a fair and

4         reasonable settlement?

5    A    Was I asked personally if I thought it was?

6    Q    Yes, sir.

7    A    I'm not sure if they asked me.  I think I

8         asked them, actually, whether I thought they

9         thought it was a fair and just settlement.

10   Q    So, in other words, then, in 2001 you had

11        not looked at the settlement terms,

12        evaluated the settlement terms and come to

13        an independent conclusion that the

14        settlement was fair, just and reasonable?

15   A    No.  No.

16   Q    In the conversation you had in, I believe,

17        March of 2002, that's when you first were

18        informed as to what your recovery was going

19        to be in this case; is that correct?

20   A    That's correct.

21   Q    Now, between the latter part of 2001 and

22        March of 2002, did you have any conversation

23        with any of the other class representatives

24        as to the settlement terms?

25   A    Woody Sibille, Katherine Sibille's husband.

1    Q    The same gentleman you referred to earlier?

2    A    Yes.

3    Q    And tell me what conversation you had with

4         Mr. Sibille.

5    A    I think he called me and wanted to know if I

6         knew in essence what the monetary payoff

7         would be to us.  And I said that I really

8         didn't know and that I'm sure that we would

9         be finding out within a short period of

10        time.

11   Q    So you didn't really have any information

12        you could share with him between --

13   A    Well, we were given wrong information by I

14        don't know who.  A gentleman by the name of

15        Jimmy Sylvester who works in the clerk of

16        court's office in Opelousas said that he had

17        heard it would be like $200.00 per running

18        foot of the property, which was absolutely

19        incorrect.

20   Q    When did you hear that?

21   A    Around March or April of 2001.

22   Q    Of 2001?

23   A    I mean 2002.  I'm sorry.  Not 2001.

24   Q    And do you know where Mr. Sylvester got his

25        information?

1 A I have no idea.

2 Q But the information you got from your

3   counsel in that first conversation of 55

4   million dollars to be paid by the defendant,

5   you did have that discussion with Mr. Woody

6   Sibille, is that right, before March of

7   2000?

8 A Before March of 2002?

9 Q 2002.  Excuse me.

10 A I had information about the 55 million

11   settlement?

12 Q Right.

13 A Before I talked to Woody Sibille?  Yes.

14 Q Did you talk to anybody other than Mr. Woody

15   Sibille?

16 A I don't know these other people.  I just

17   know Nagata.

18 Q Other than the 55 million, you didn't have

19   any of the other settlement terms that you

20   could discuss with Mr. Sibille?

21 A No.

22 Q Now, tell me how the conversation came up in

23   March of 2002 with respect to your recovery

24   in the case.

25 A My conversation with what gentleman, who?

1    Q    Whoever gave you the information as to what
2         your recovery was going to be.
3    A    Per foot you're talking about?
4    Q    However they quantified it.
5    A    Well, in March of 2002 when I spoke to Jimmy
6         Sylvester, he had the wrong information.
7    Q    Okay.
8    A    But later on, which might have been in -- I
9         don't know.  When everyone received their
10        notification in the mail that, you know, if
11        you were, indeed, a property owner and you
12        wanted to get in on the class action suit,
13        that's when I found out from Mr. Whittington
14        that it would probably be after all expenses
15        maybe 5.50 or 5.65 per foot.  But I mean I'm
16        talking about this was in the summer maybe.
17   Q    So you first found out about what you were
18        going to get in the summer of 2002?
19   A    Probably so, yeah.
20   Q    And so the notice that you got in the mail --
21   A    In the mail.
22   Q    -- is the first time that you were apprised
23        or had the knowledge that the compensation
24        to be paid was going to be, as you said,
25        5.50 to 5.65?

1    A    Well, it was in the notice.

2    Q    I understand that.  But my question is

3         that's the first time you were --

4    A    That's the first time I actually got the

5         correct information.

6    Q    And up until that time, the only incorrect

7         information that you know you got was from

8         Mr. Sylvester?

9    A    Was from Mr. Sylvester.

10   Q    You hadn't talked to your lawyers about that

11        up until you got the actual notice in the

12        mail; is that correct?

13   A    That's correct.

14   Q    Now, had you looked at any papers, any

15        documents, any pleadings from the latter

16        part of 2001 when you were first informed of

17        the settlement until the summer of 2002 when

18        you got this notice in the mail informing

19        you of what the compensation was going to

20        be?

21   A    No.

22   Q    So I take it that the notice again in the

23        summer of 2002, that that's the first time

24        you also saw the complete settlement terms

25        on which this case was attempting to be

1         settled; is that right?

2  A    That's right.

3  Q    And you got those in the mail as well?

4  A    Yeah.  We all got them, yeah, as far as I

5         know.

6  Q    All class members as far as you know?

7  A    That's what it indicated, that all class

8         members would be sent the notice.  So I'm

9         surmising they got them.

10  Q    Let me go through some things with you right

11         now.  In connection with your being informed

12         for the first time in the summer of 2002

13         when you got your notice and the other

14         settlement forms and papers -- and you were

15         not aware of the settlement terms until you

16         got that paperwork, correct, sir?

17  A    That's right.

18  Q    As a class representative, you did not

19         before the settlement was reached consent or

20         agree that class members making claims for

21         fully qualifying benefits were required to

22         submit abstract documentation; is that

23         right?

24  A    Was I informed that I was supposed to submit

25         abstract documentation?

1   Q      No, sir.  Before the settlement was reached,

2          did you agree and consent that class members

3          making claims for fully qualifying benefits

4          were required to submit abstract

5          documentation?

6   A      Oh, sure.

7   Q      You did?

8   A      Well, that was an understanding, that you

9          had to have an abstract to make sure that --

10  Q      Let me back up.  Listen to my question,

11         please.  Listen to my question, please.

12                 MR. MARCELLO:  The man was answering

13                 the question and you interrupted him.

14  MR. POWELL:  (CONTINUING)

15  Q      I don't mean to interrupt you.

16                 MR. MARCELLO:  He was answering the

17                 question as to what his understanding

18                 was.  Were you finished answering the

19                 question?

20                 THE WITNESS:  No.

21                 MR. MARCELLO:  Tell him what your

22                 understanding was.

23  A      My understanding was we had to prove, you

24         know, that we actually owned the land

25         beneath the railroad; and in order to prove

1           it, you had to have an abstract done of the

2           property.

3    MR. POWELL:   (CONTINUING)

4    Q    When did you have that understanding?

5    A    When did I have it?

6    Q    When did you come to that understanding?

7    A    I probably understood it from the very

8           beginning.  I mean, how would you be a

9           plaintiff if you didn't know that you

10          actually owned the property beneath the

11          railroad?

12   Q    Well, let me ask this now.  Did you

13          understand or did you participate -- let me

14          back up.  You've already told us that you

15          were not aware of the settlement terms, that

16          is the term on which this case was settled,

17          until you got your notice form and the

18          settlement documents in the summer of 2002.

19          Is that not correct, sir?

20   A    Well, that was just the amount of money to

21          be received from the settlement.  That had

22          nothing to do with if I understood should my

23          property be -- you know, I had to prove that

24          my property was my own property beneath the

25          railroad.  I'm not following you in that

```
 1              case.

 2    Q         When did you -- you're not following me

 3              where?

 4    A         Well, you will have to repeat the question.

 5              I'm lost.

 6    Q         Well, let's take it back.  We'll take it

 7              back from where we started, okay.  As I

 8              understand what you've previously testified

 9              to, you were informed the latter part of

10              2001 that the case had been settled for

11              payments of up to 55 million dollars,

12              correct, sir?

13    A         In 2002?

14    Q         In the latter part of 2001.

15    A         Oh, 2001, yes.

16    Q         And there were no other settlement terms

17              discussed with you at that time?

18    A         When you mean settlement terms, you're

19              meaning having to prove that the property

20              is, indeed, your property?

21    Q         Anything with regard to the settlement.

22    A         Well, sure.

23    Q         What were --

24    A         Now I understand the question, but I mean we

25              had to -- we were told that we had to have
```

1       an abstract done of the property to make

2       sure that it was our property underneath the

3       railroad.

4   Q   When were you told that?

5   A   I was probably told --

6       MR. MARCELLO:  Asked and answered.

7       He's already answered the question.

8   A   I answered the question already.

9 MR. POWELL:  (CONTINUING)

10   Q   When were you told that?

11   A   I think probably at the very beginning of

12       '98.  When I went to the first deposition, I

13       was told.

14   Q   I'm talking about in connection with the

15       settlement.

16   A   In connection with the settlement?

17   Q   Right.

18   A   And I was told once again that the property

19       had to have an abstract on the property.

20   Q   When?

21   A   Probably March of 2002.

22   Q   By whom?

23   A   Mr. Sylvester.

24   Q   Who is Mr. Sylvester?

25   A   Jimmy Sylvester that works for the clerk of

1    court's office in Opelousas.

2 Q  That's the first time you were told you had

3    to have an abstract in connection with this

4    settlement; is that right?

5 A  Oh, in connection with the settlement?

6 Q  Yes, sir.

7 A  Okay.  Yes.

8 Q  With the settlement.

9 A  With the settlement.  Not in connection with

10    the lawsuit itself?

11 Q  That's right.  In connection with the

12    settlement.

13 A  Okay.

14     MR. MARCELLO:  He's already answered.

15 MR. POWELL:  (CONTINUING)

16 Q  In March of 2002?

17 A  Yeah.

18 Q  So I'll get back to the question.  As of the

19    time you were informed of the settlement

20    terms, you did not --

21 A  In 2001?

22 Q  Yes, sir.  Inquire or agree at that time

23    that providing an abstract was going to be

24    part of the settlement terms?

25 A  No.

1    Q    All right.  Now, up until the summer of 2002

2         when you got your notice form and the other

3         settlement documents, had you agreed before

4         the summer of 2002 that class members that

5         would be affected by the settlement did not

6         have any right to appeal a decision made by

7         the claims administrator in connection with

8         this settlement?

9    A    Was I informed of that fact?

10   Q    Or agree to it?

11   A    No.

12   Q    Up until the summer of 2002, did you agree

13        that the notice provision that was sent to

14        the class members did not contain the

15        information that the class members did not

16        have a right to appeal a decision of the

17        claims administrator?  Did you agree to

18        that?

19   A    Repeat the question.  By the time you get

20        through with your question, I'm already

21        lost.

22   Q    You did not agree that there would be no

23        appeal rights by absent class members of a

24        decision of the claims administrator in

25        connection with the settlement at any time,

```
 1           did you, sir?

 2   A       No.

 3   Q       Did you participate or agree prior to the

 4           summer of 2002 that the attorneys' fees to

 5           be paid in this case were to be no more than

 6           18,333,333.00?

 7   A       Did I participate in that?

 8   Q       Yes.

 9   A       No.

10   Q       And did you agree that that fee was to be

11           paid before you got --

12   A       It was my understanding that the courts had

13           set aside the amount that the attorneys were

14           supposed to receive.

15   Q       But you never agreed or participated in a

16           maximum amount that the attorneys would

17           seek?

18   A       No.

19   Q       Did you participate or agree in the

20           settlement terms that permitted the lawyers,

21           the plaintiffs' lawyers in the case, to

22           apply for and receive up to half of that

23           amount of money, that 18 million dollars,

24           prior to the court approving the terms of

25           the settlement?
```

1    A       No.

2                    MR. OLINDE:   I'm going to object to

3                    that question because that's not

4                    accurate.   It's a misleading

5                    question.

6    MR. POWELL:   (CONTINUING)

7    Q       Did you agree that the plaintiffs' attorneys

8            could receive in fees up to $18,333,333.00

9            regardless of the amount that was ultimately

10           paid to the class members?

11   A       No.

12   Q       If that is a fact, Mr. Sibille, that the

13           plaintiffs' lawyers could receive

14           $18,333,333.00 regardless of the amount that

15           is ultimately paid to the class members, do

16           you think that is fair, just and reasonable?

17   A       I would say no.

18   Q       Did you participate or agree to settlement

19           terms which require class members to make an

20           election to stay in the case or opt out of

21           the case before they knew what compensation

22           they were receiving under the settlement?

23   A       No.

24   Q       Do you think as class representative that

25           requiring an absent class member to make a

1    decision as to whether to elect to remain in

2    the case or opt out of the case before they

3    know what their compensation is to be is

4    fair, just and reasonable?

5         MR. OLINDE:   I'm going to object to

6         the form of the question.

7    MR. POWELL:   (CONTINUING)

8    Q    You can answer.

9    A    Repeat the question.

10   Q    Do you think a settlement term requiring an

11        absent class member to make an election to

12        stay in the suit or opt out of the suit

13        before that absent class member is apprised

14        of the compensation he or she is receiving

15        is fair, just and reasonable?

16   A    Yes.

17   Q    Why?

18   A    Well, they should have a say-so as to what

19        the outcome of the settlement would be, what

20        their compensation would be.

21   Q    I agree with that.  My question is this.  If

22        the settlement term requires you to decide

23        to stay in the settlement or opt out and

24        file your own case before you know what your

25        compensation is going to be, do you think

1          that's fair, just and reasonable?

2                    MR. MARCELLO:  I'm going to object to

3                    the question as vague, not based on

4                    any facts.

5                    MR. POWELL:  We'll see.

6     MR. POWELL:  (CONTINUING)

7     Q     Go ahead.  You may answer.

8     A     Repeat the question.  By the time I get it,

9           I'm lost.

10    Q     Is a settlement term requiring you to make a

11          decision to stay in the suit --

12    A     Me personally?

13    Q     Yes, sir.  To stay in the suit or get out of

14          the suit before you know what your

15          compensation is going to be, is that fair,

16          just and reasonable?

17                   MR. OLINDE:  And I object to the form

18                   of the question.

19                   MR. MARCELLO:  I join in that

20                   objection.  It's not a fair question.

21                   Do you understand the question?

22                   THE WITNESS:  I'm not sure.  By the

23                   time he finishes with the question

24                   and then everybody butts in, I'm

25                   already lost as to what the question

1           is.

2                    MR. POWELL:  I'll tell you what.

3           I'll agree that you all can object to

4           every question I ask on whatever

5           grounds and that way we won't have a

6           confusing interruption of this

7           witness.  Everything I ask you have

8           an objection to under whatever

9           grounds you can come up with later

10          on.

11                   MR. MARCELLO:  We don't agree to

12          that.

13   MR. POWELL:  (CONTINUING)

14   Q      I'll repeat it.  Do you think a settlement

15          term requiring you to decide to stay in the

16          settlement or get out of the settlement

17          before you know what your compensation is

18          going to be is fair, just and reasonable?

19   A      No.

20   Q      And that would be true for not only

21          yourself, but every other class member,

22          correct, sir?

23   A      Correct.

24   Q      Did you agree and participate in the terms

25          of the settlement setting up the categories

1        of fully qualifying landowners and partially

2        qualifying landowners?

3  A    Did I agree to the terms?

4  Q    Yes, sir.

5  A    I would have to say no.

6  Q    In fact, you didn't even know those

7        categories were established, did you, until

8        you got the notice?

9  A    Until I got the notice.  Then I realized

10       that there were two sections, two

11       categories.

12  Q   What do you understand is required of a

13       class member who seeks to qualify or seeks

14       to obtain a fully qualifying landowner

15       benefit under these settlement terms?

16  A   Having land that actually belongs to them

17       underneath the railroad up to the point of

18       the highway.

19  Q   The point of the highway?

20  A   Well, whatever the -- from my standpoint,

21       Highway 90, from that portion of that

22       highway to my property is the railroad's

23       right-of-way.  I would have to own the

24       property beneath it.

25  Q   And what do you understand the settlement to

1        require of you in terms of your proving your

2        ownership of that property?

3  A   Having an abstract done of the property and

4        see whether or not the right-of-way was sold

5        or whether you owned the entire section of

6        property.

7  Q   And do you understand the settlement terms

8        to require only an abstract?

9  A   Either an abstract or a deed.

10  Q   And how far back do you understand the

11       settlement to require you to go with your

12       abstract?

13  A   From the time the railroad actually

14       purchased the right-of-way from our family

15       in my case.

16  Q   Do you understand that the requirements for

17       you are the same for every other class

18       member in terms of proof of ownership?

19  A   If they, indeed, fall in my category.  If

20       they don't fall in the other category where

21       they're whatever it's called, partial

22       participants.  Mine would be the opposite.

23       Mine would be the fact that I owned the

24       property.

25  Q   That's an interesting question.  Have you

1            done your abstract?

2    A       It's already been done.

3    Q       Okay.  Are you here, then, as a class

4            representative for those landowners that do

5            not own the property under the right-of-way?

6    A       Well, they're all in the same suit I'm

7            surmising.

8    Q       Do you understand what is required of the

9            other category of landowners that don't show

10           ownership of the land under the

11           right-of-way?

12   A       My thoughts on that would be they would have

13           to produce a deed.  I'm not sure how that

14           thing works.  I'm not exactly sure.

15   Q       So you're not here to represent their

16           interest?

17   A       Well, I'm sure I am, but I mean have no idea

18           what their specific qualifications are

19           according to their property.

20   Q       You are here to represent their interest,

21           but you don't know what the qualifications

22           are for them?

23   A       Well, it's a deed showing that you have --

24           God.  I'm not sure.

25   Q       You don't know?

1   A   No.

2   Q   When you had your -- did you have an

3       abstract done, you said?

4   A   Yes.

5   Q   Did you have somebody do that for you?

6   A   Yeah.  The lawyers did it.

7   Q   The lawyers did it?

8   A   Yeah.

9   Q   You didn't have it done yourself?

10  A   No.

11  Q   Do you know what the cost was to have that

12      abstract done?

13  A   No, sir.

14  Q   Have you asked?

15  A   No.

16  Q   Do you know how much you're going to be

17      receiving from the settlement based upon the

18      abstract that was done for you?

19  A   If I have 1600 feet and if all three

20      companies are obligated to pay the 5.50,

21      that's 1600 -- I mean 16.50 a foot.   16

22      times 1600, whatever that is.

23  Q   That's what you expect to receive?

24  A   Yes, sir.

25  Q   So that's 1600 feet times $16.50 per foot,

1        correct?

2    A   Correct.

3    Q   And I take it you think that is fair, just

4        and reasonable?

5    A   Yes, sir.

6    Q   If you get less than 16.50 per foot for your

7        1600 feet, do you think that number will be

8        fair, just and reasonable?

9    A   Yes, sir.

10   Q   Why?

11   A   Because that's what I'll have to accept.

12   Q   Why?

13   A   What other recourse could I do?  I'd have to

14       file a suit as an individual.

15   Q   Regardless of what that number is less than

16       16.50 a foot, you think that would be fair,

17       just and reasonable?

18   A   Yes, sir.

19   Q   Now, for those class members -- well, let me

20       back up.  Did you pay your lawyers to have

21       your abstract done?

22   A   No, sir.

23   Q   Do you understand that once the -- let me

24       back up.  Are you aware of any other

25       information other than an abstract that the

1          settlement requires you to provide to the

2          claims administrator?

3    A     Not that I know of.

4    Q     Nothing else that you know of?

5    A     No.

6                    (A BREAK IS TAKEN)

7    MR. POWELL:  (CONTINUING)

8    Q     Mr. Sibille, can you explain to me what the

9          scope of the easement is that is purported

10         to be given to the Telecoms in this

11         settlement?

12   A     The scope of the easement?

13   Q     Yes, sir.

14              MR. OLINDE:  Just so that we still

15              have the agreement that any sort of

16              objections are all reserved, correct?

17              MR. POWELL:  Yes.

18              MR. OLINDE:  Even as to form and as

19              to responsiveness?

20              MR. POWELL:  Yes.

21   MR. POWELL:  (CONTINUING)

22   Q     Go ahead, sir.

23   A     What is the question?

24   Q     I'm asking you if you can you explain the

25         scope of the easement that is being

1        purported under the terms of the settlement

2        agreement?

3    A   My attorney would know.  I have no idea what

4        it would be, sir.

5    Q   You don't know?

6    A   No, sir.

7    Q   So you didn't participate in any

8        negotiations with respect to the scope of

9        the easement?

10   A   No, sir.

11   Q   Mr. Sibille, I'm going to show you what has

12       been marked as Exhibit 1 with the initials

13       LS purporting to be your initials, all

14       right, sir?  And it's styled servitude and

15       right-of-way agreement.  I'll ask you, sir,

16       if you have seen that document before.

17   A   You want to know if I've seen it before?

18   Q   Yes, sir.

19   A   No, sir.

20   Q   You never have?

21   A   No.

22   Q   May I walk around beside you and point out

23       some things and ask you some questions about

24       them?  Is that all right, sir?

25   A   Uh-huh (yes).

1  Q   I want you to look with me.  This is a
2      two-page exhibit.  If you come down about
3      two-thirds of the way down the first page,
4      you see the paragraph that
5      telecommunications facilities have been or
6      shall be installed across the property?  You
7      see that?
8  A   Uh-huh (yes).
9  Q   You do see that, sir?
10 A   I see it, yes.
11 Q   Let me read something to you that is
12     contained on this document.  "The exact
13     location of the servitudes conveyed by this
14     instrument shall be determined the present
15     location of grantee's Telecommunications
16     facilities and the servitudes shall extend
17     for seven and one-half feet on each side of
18     the Telecommunications facilities presently
19     located on the property."  Do you have any
20     understanding of what that term of the
21     settlement agreement means?
22 A   No.
23 Q   The next sentence, "If the existing
24     Telecommunications facilities are located
25     within seven and one-half feet of the edge

1         of the right-of-way, the servitudes shall

2         extend 15 feet inward from the edge of the

3         right-of-way."  Do you have any

4         understanding of what that settlement term

5         means in reference to class members?

6  A    No.

7  Q    And I take it you did not participate in

8         negotiating that term?

9  A    No, sir.

10 Q    Nor did you agree to that term before it was

11        agreed to?

12 A    No.

13 Q    You've never agreed to that, have you?

14 A    No.

15 Q    Okay.  Were you aware that Sprint has the

16        option under the terms of this settlement to

17        back out of the settlement after the claim

18        forms have been sent in by the absent class

19        members?

20 A    They have the option to back out?

21 Q    Yes, sir.

22 A    I think so, yeah.  I think it was mentioned

23        to me.

24 Q    And when was it first mentioned to you?

25 A    Or was it mentioned to me?  I'm not sure.

1        I'll have to answer it truthfully.  I'm not

2        sure.  I don't know if it was or not.

3  Q    Do you know if there are any criteria within

4        the settlement that Sprint must utilize in

5        determining whether or not they're going to

6        back out of the settlement?

7  A    No.

8  Q    If there are no -- I want you to assume with

9        me that the settlement does not provide any

10       quantifiable criteria within which Sprint

11       can elect to opt out or to back away, back

12       off from the settlement, get out of the

13       settlement.  Assume that with me, okay?  You

14       understand what I'm saying?  Do you?

15  A   Vaguely.

16  Q   I want you to understand it.  I don't want

17       it to be vague to you.  I want you to assume

18       there are no quantifiable criteria --

19  A   And that means what?

20  Q   That means that there's not a number of opt

21       outs from the settlement that Sprint can

22       utilize and say the opt outs have reached X

23       number or X percent, so therefore we're

24       backing out of the settlement.  That's not

25       in this settlement.  I want you to assume

1       that for me, okay?

2   A   All right.

3   Q   If the absent class members were to spend

4       monies to put together abstracts in attempt

5       to navigate the claims process and submit

6       their claim forms and after they have spent

7       the monies and their energies and submission

8       of the claim forms and Sprint then elects to

9       back out of the settlement, not having met

10      any quantifiable criteria, do you think that

11      settlement term is fair, just and reasonable

12      to those absent class members?

13  A   I would have to say that their attorney

14      would have to advise them on it.  As far as

15      my opinion on it?

16  Q   Yes, sir.

17  A   I would say yes.

18  Q   Why?

19  A   Well, I don't know.  I can't answer it.  I

20      would have to say no then.

21  Q   Who all do you understand that will be

22      receiving a release under the terms of this

23      settlement?

24  A   Relief or release?

25  Q   Release.

1   A   Release?

2   Q   Yes, sir.

3   A   By release what do you mean?

4   Q   In exchange for certain consideration, they

5   will no longer be liable for trespass or any

6   other conduct associated with utilization of

7   your property.

8   A   So ask the question now that I --

9   Q   Who all do you understand to be receiving a

10   release under the terms of this settlement?

11   A   The three companies, WorldCom, MCI and

12   Sprint.

13   Q   Anybody else?

14   A   Not to my knowledge.

15   Q   If the settlement releases the railroad or

16   railroads and the railroads are not paying

17   consideration or compensation to the absent

18   class members, if that's the case, is that

19   fair, just and reasonable to the absent

20   class members?

21   A   That the railroad is not going to have to

22   pay compensation?

23   Q   Yes, sir.  If they're getting released?

24   A   I don't think so.

25   Q   You had mentioned something earlier to me.

**ERIN MACKEY**                                           58
Certified Shorthand Reporter
Post Office Box 2494
Lafayette, Louisiana   70502
(337) 237-4124

1          Then we got bogged down a little bit and

2          perhaps were miscommunicating some.  That in

3          connection with the litigation back in 1998,

4          it was your understanding that to be

5          successful in the litigation, you thought it

6          would be necessary to prove you owned the

7          property, correct?  You recall that

8          discourse that we had?

9   A     In order for me to qualify as a plaintiff, I

10        would have to prove that I, indeed, owned

11        the property?

12  Q     Yes, sir.

13  A     Yes.

14  Q     And that was the case back in 1998?

15  A     Uh-huh (yes).

16  Q     As far as you know, the settlement terms

17        require that you prove you own the property

18        all the way back to when the railroad got

19        their right-of-way in order for you to

20        qualify for compensation; is that correct?

21  A     I think so, yeah.

22  Q     So was it your understanding that the

23        settlement terms are the same in terms of

24        what's required of you in proof of ownership

25        of the property as what you understood the

1  requirements were to be back in 1998 to be a

2  class representative and for the litigation

3  of the case itself?

4  A  Yes.

5  Q  In other words, you understand there was no

6  compromise in the settlement of the

7  requirements of proof of property ownership

8  than what you understood them to be in 1998?

9  A  Yeah.

10  MR. POWELL:  If you all will give me

11  five minutes, we may be ready to

12  close it up.

13  (A BREAK IS TAKEN)

14  MR. POWELL:  (CONTINUING)

15  Q  Mr. Sibille, do you know William Kimball?

16  A  William Kimball?

17  Q  Yes, sir.

18  A  No.

19  Q  What about H. M. Kimball, Jr.?

20  A  It doesn't ring a bell with me.

21  Q  Elizabeth Kimball Lewis?

22  A  No.

23  Q  You had mentioned to me earlier that you

24  were expecting compensation per linear foot

25  out of this settlement and described what

```
 1              your expectations were and what you

 2              understood your compensation was to be.  Do

 3              you have any agreement or understanding as

 4              to any monies other than compensation on a

 5              linear foot for your services as a class

 6              representative?

 7    A         No, sir.

 8    Q         You don't expect any compensation for that?

 9    A         I wasn't told I would get any.  I wasn't

10              guaranteed any, no.  You mean do I have a

11              written agreement saying I'm supposed to get

12              more?  No.

13    Q         Or a promise that we'll try to get you some

14              extra money over and above what you're

15              expecting per linear foot for your services

16              as a class rep?

17    A         Not really, no.

18    Q         When you say not really, that makes me

19              think --

20    A         Well, I'm saying if I was to be given

21              anything, I would appreciate it, but I

22              wasn't expecting any, no.

23    Q         Are you seeking any?

24    A         No.

25    Q         You had mentioned earlier that in March of
```

1         2002 that you had gotten some information

2         from Jimmy Sylvester?

3    A    Uh-huh (yes).

4    Q    Is that right, sir?

5    A    Yes, sir.

6    Q    And that was some conversation about what

7         the payment would be under the settlement,

8         right?

9    A    Yes, sir.

10    Q    Have you had several conversations with Mr.

11         Sylvester about this settlement?

12    A    Throughout the four years?

13    Q    About the settlement?

14    A    Oh, the settlement itself?

15    Q    Yes, sir.

16    A    The only one I really had was that one.  And

17         then after that I talked to him and he said

18         that -- no.  When I got the notice in the

19         mail is when I called him and I said,

20         "Whatever information you got was not

21         accurate because here's the accurate

22         information," which would have been

23         basically 5.65.

24    Q    You mentioned outside the settlement.  Have

25         you had other conversations with Mr.

```
 1              Sylvester --
 2      A       Well, I --
 3      Q       Let me finish the question so you will be
 4              sure you're answering what I'm asking.
 5              Okay?
 6      A       All right.
 7      Q       Have you had other conversations with him
 8              about this litigation in the four years that
 9              you have been a class representative?
10      A       Definitely, yeah.
11      Q       And who is Mr. Sylvester?
12      A       Mr. Sylvester is a deputy clerk of court in
13              the Parish of St. Landry.
14      Q       Where this settlement is being proposed?
15      A       Yes, sir.
16      Q       Did you know Mr. Sylvester before you became
17              class representative?
18      A       I've known him for 30 years.
19      Q       I'm curious as to why you would have
20              conversations with him throughout the four
21              years you've been class representative about
22              this litigation.
23      A       Because he and Mr. Whittington were friends
24              and he spoke to Mr. Whittington
25              periodically.  So I had to go to the clerk
```

1         of court's office every so often and I speak

2         to Jimmy.

3   Q   Is he a class member in this litigation?

4   A   Not to my knowledge.  He may be, but we

5         never discussed it, whether he is or not.

6   Q   As far as you know, he is not a class

7         representative?

8   A   I didn't say that.  I said I don't know.

9   Q   I'm asking as far as you know.

10   A   As far as I know, yeah.  As far as I know.

11         I don't think he is as far as I know.  I

12         have no idea.

13   Q   Since you were informed of the settlement in

14         the latter part of 2001 and up until the

15         time that you got the notice in the summer

16         of 2002, approximately how many times have

17         you talked to Mr. Whittington?

18   A   I'd say about maybe three times.  Two or

19         three.  You know, it's not a whole lot,

20         whatever it is.

21   Q   What about Mr. Marcello?  Have you talked to

22         him within that same time frame?

23   A   A couple of times probably.

24   Q   About the settlement?

25   A   Yeah.  Well, I wouldn't have any reason to

| | | |
|---|---|---|
| 1 | | call him otherwise. |
| 2 | Q | How about Mr. Mangham? |
| 3 | A | No, sir. |
| 4 | Q | How about Mr. Pendley? |
| 5 | A | No, sir. |
| 6 | Q | Any other lawyers that purportedly were |
| 7 | | attempting to represent the class? |
| 8 | A | No, sir. |
| 9 | Q | Do you have any understanding of -- let me |
| 10 | | back up and ask it this way.  Have you read |
| 11 | | the objection that has been filed by the |
| 12 | | McCormick plaintiffs or the McCormicks in |
| 13 | | this case? |
| 14 | A | No, sir. |
| 15 | Q | Have you read any objection that has been |
| 16 | | filed on this case? |
| 17 | A | No, sir. |
| 18 | Q | Do you know that there have been objections |
| 19 | | that have been lodged as to this settlement? |
| 20 | A | I understand there have been, yeah. |
| 21 | Q | But you have not read them or apprised |
| 22 | | yourself of the content of them? |
| 23 | A | No, sir. |
| 24 | Q | Do you not think it important as a class |
| 25 | | representative and representing the absent |

| | | |
|---|---|---|
| 1 | | class members that you apprise yourself of |
| 2 | | some of their objections to this settlement? |
| 3 | A | I left it up to my attorney.  I figured if |
| 4 | | he had to tell me anything, he would. |
| 5 | Q | You had mentioned somebody named Nagata, I |
| 6 | | believe? |
| 7 | A | Mrs. Nagata. |
| 8 | Q | Tell me who Ms. Nagata is. |
| 9 | A | She's supposed to be a what you call it, a |
| 10 | | member of the class action suit from Eunice, |
| 11 | | Louisiana.  I've never met her, you |
| 12 | | understand, but I know that she was supposed |
| 13 | | to have been deposed.  That's the only |
| 14 | | reason why I know her name. |
| 15 | Q | When you say member, you're talking about a |
| 16 | | class representative? |
| 17 | A | Class representative. |
| 18 | Q | What is her first name? |
| 19 | A | I have no idea. |
| 20 | Q | Do you know if it's Jenora? |
| 21 | A | I said I don't know.  I have no idea.  All I |
| 22 | | know is Mrs. Nagata. |
| 23 | Q | And you've not talked to her? |
| 24 | A | No, sir. |
| 25 | Q | Have you been told anything at all about the |

1       nature or content of the objections that

2       have been filed in this case?

3   A   Not specifically, no.

4   Q   How about generally?

5   A   No.

6                   MR. POWELL:  All right, sir.  Thank

7               you, Mr. Sibille, for coming.  I

8               appreciate your time today.

9

10  REPORTER'S NOTE:   ALL OBJECTIONS ARE BEING RESERVED

11          INCLUDING AS TO FORM AND RESPONSIVENESS OF THE

12          ANSWER

13

14

15                      WITNESS EXCUSED

16                      *  *  *  *  *

17  (WHEREUPON, THE DEPOSITION CONCLUDED AT 11:20 A.M.)

18

19

20

21

22

23

24

25

CERTIFICATE

I, Cheryl Venable, Certified Court Reporter, do certify that the foregoing 67 pages of typewritten matter constitute a true and correct transcription of the evidence adduced on the taking of the testimony of

LOWELL SIBILLE

on the 17th day of September, 2002, at Lafayette, Louisiana after the witness had first been properly sworn, as aforesaid.

Further, I am not related to counsel for the plaintiff or counsel for defense, I am in no manner associated with counsel for or any of the interested parties to this litigation, and I am in no way concerned with the outcome thereof.

This the 19th day of September, 2002, LAFAYETTE, LOUISIANA.

_____
CHERYL VENABLE, CCR
Louisiana Certification No. 89010

OFFICIAL SEAL
CHERYL VENABLE
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 89010
Certificate expires 12-31-02

**ERIN MACKEY**                                    68
Certified Shorthand Reporter
Post Office Box 2494
Lafayette, Louisiana   70502
(337) 237-4124