UNITED STATES BANKRUPTCY COURT                    FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
_____
                                              :
In re:                                        :        Chapter 11
                                              :
WORLDCOM, INC., et al.,                       :        Case No. 02-13533 (AJG)
                                              :
                    Reorganized Debtors.      :        (Confirmed Case)
                                              :
_____:

OPINION GRANTING MOTION FOR CERTIFICATION OF A SETTLEMENT CLASS AND
        FOR APPROVAL OF LOUISIANA RIGHT OF WAY SETTLEMENT


A P P E A R A N C E S:

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Reorganized Debtors
767 Fifth Avenue
New York, NY 10153

            Marcia L. Goldstein, Esq.
            Alfredo R. Pérez, Esq.
            Sylvia Ann Mayer, Esq.
                 Of Counsel

JENNER & BLOCK LLP
Special Counsel for the Reorganized Debtors
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, D.C. 20005

            David A. Handzo, Esq.
            J. Alex Ward, Esq.
                 Of Counsel

TALBOT, CARMOUCHE & MARCELLO
Attorneys for the Claimants
214 W. Cornerview
P.O. Box 759
Gonzales, LA 70707

            Victor L. Marcello, Esq.
            Donald T. Carmouche, Esq.

John H. Carmouche, Esq.
Of Counsel

MANGHAM & ASSOCIATES, LLC
Attorneys for the Claimants
406 Audubon Boulevard, Suite A
Lafayette, LA 70503

Michael R. Mangham, Esq.
Donald J. Ethridge, Esq.
Of Counsel

STEFFES, VINGIELLO, & McKENZIE, LLC
Attorneys for the Claimants
13702 Coursey Blvd., Building 3
Baton Rouge, LA 70817

Willaim E. Steffes, Esq.
Of Counsel

PATRICK W. PENDLEY, APLC
Attorneys for the Claimants
58005 Meriam St.
P.O. Drawer 71
Plaquemine, LA 70765

Patrick W. Pendley, Esq.
Of Counsel

MYLES & MYLES
Attorneys for the Claimants
23445 Railroad Ave.
P.O. Box 877
Plaquemine, LA 70764

Allen J. Myles, Esq.
Of Counsel

CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for the McCormick Objectors
One World Financial Center
New York, NY 10281

Barry J. Dichter, Esq.
Of Counsel

HARE, WYNN, NEWELL AND NEWTON
Attorneys for the McCormick Objectors
The Massey Building
2025 Third Avenue N, Suite 800
Birmingham, AL 35203

> Scott A. Powell, Esq.
> Don McKenna, Esq.
> James R. Moncus, III, Esq.
> Of Counsel

SHIPMAN & GOODWIN LLP
Attorneys for the Alexander Objectors
One Constitution Plaza
Hartford, CT 06103

> Kathleen M. LaManna, Esq.
> Corrine L. Burnick, Esq.
> Of Counsel

MOORE, WALTERS, THOMPSON, THOMAS, PAPILLION & CULLENS
Attorneys for the Alexander Objectors
6513 Perkins Road
Baton Rouge, LA 70808

> Edward J. Walters, Jr., Esq.
> Darrel J. Papillion, Esq.
> Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

Before the Court is the Motion for Certification of a Settlement Class and for Approval of

a Louisiana Right of Way Settlement (the "Settlement Motion"), filed by the Reorganized

Debtors, MCI, Inc. (the "Reorganized Debtors"), and the Claimants XCL, Ltd., LM Holding

Assoc. LP, David Odom, Katherine McClellan Sibille, the Sibille Co., Inc., Sylvia Weil

Marcuse, H.M. Kimball Jr., and Elizabeth Kimball Lewis (the "Claimants"). *See* Settlement

Motion, Docket No. 16422. The Reorganized Debtors and the Claimants (collectively, the

"Movants") request approval of the notice of settlement ("Notice") under Fed.R.Civ.P.

23(c)(2)(B), final class certification under Fed.R.Civ.P. 23(a), (b)(3), and approval of the

settlement reached between the parties (the "Settlement") under Fed.R.Civ.P.23(e) and

Fed.R.Bank.P. 9019.  *See* Settlement, Settlement Motion Exhibits, Ex. 1; Notice, Settlement

Motion Exhibits, Ex. 9, 10.  Two groups of proposed class members, the "McCormick

Objectors" and the "Alexander Objectors" (collectively, the "Objectors"), have, through counsel,

filed briefs and appeared before the Court in opposition to the Settlement.  Having reviewed the

parties' pleadings, the record, and the relevant case law, and a fairness hearing having been held,

the Court concludes that (i) the Notice should be approved, (ii) that the class should be certified

for settlement purposes, and (iii) that the Settlement should be approved.  Accordingly, the Court

concludes that the Settlement Motion should be granted.

*Background*

I. Fiber Optic Litigation and Procedural History

The Settlement arose from two class action suits filed in the 18th Judicial District, West

Baton Rouge Parish, Louisiana on October 5, 1994, *State of Louisiana et al v. WilTel, Inc. and

WilTel Commc'n* (the "MCI Suit") and *State of Louisiana et al v. Sprint Commc'n Co., et al* (the

"Sprint Suit") (collectively with the MCI Suit, the "Louisiana Actions"), which were

subsequently consolidated for pre-trial purposes on July 3, 1996.  The Louisiana Actions alleged

that the defendant telecommunication providers had improperly and illegally installed fiber optic

cable in railroad rights-of-way crossing properties owned by the plaintiff class members.[1]  In

particular, the plaintiffs argued that the easements creating the railroad rights-of-way did not

---

[1] This Opinion will continually refer to the rights-of-way in which the fiber optic cable was installed as "railroad rights-of-way."  However, the rights-of-way at issue here and in the Louisiana Actions include highway and utility rights-of-way, though there are few such rights-of-way in comparison to the number of railroad rights-of-way at issue.  Thus, although the Court refers to "railroad rights-of-way" for clarity purposes, it should be recognized that other types of rights-of-way are implicated.

grant telecommunication providers the right to install fiber optic cables even though the telecommunication providers had obtained the railroad's consent.

Numerous class action suits asserting similar legal theories have been filed in federal and state courts over the last fifteen years against a range of telecommunication providers, such as the Reorganized Debtors, Qwest, and AT&T.  During the 1980's and 1990's, telecommunication companies embarked on a rapid program to install tens of thousands of miles of fiber optic cable throughout the country, an effort reminiscent of the original railroad boom.  *See generally*, Jeffrey M. Heftman, *Railroad Right-of-Way Easements, Utility Apportionments, and Shifting Technological Realities*, 2002 U. Ill. L. Rev. 1401 (2002); Jill K. Pearson, *Balancing Private Property Rights with Public Interests: Compensating Landowners for the Use of Railroad Corridors for Fiber-Optic Technology*, 84 Minn. L. Rev. 1769 (2000).  For technical, economic, and efficiency reasons, much of this new fiber optic cable was laid along existing infrastructure and rights-of-way, primarily railroads, highways, pipelines, and utility lines.  However, although the telecoms purchased the right to lay cable in the easements from owners of the dominant estates, in many cases they did not negotiate with the owners of the servient estates, choosing instead to rely upon the authority of the original easement.

Whatever the merits of this choice at the time, the consequence has been a proliferation of class actions, such as the Louisiana Actions, on behalf of those servient landowners.  In general, plaintiffs have not established a positive record.  Few suits have proceeded to trial and a decision on the merits, and of those that have, the Court is aware of only one where the plaintiffs succeeded.  *See Buhl v. U.S. Sprint Commc'n Co.*, 840 S.W.2d 904, 908-13 (Tenn. 1992).  Nonetheless, due to the sheer size of the potential legal exposure measured nationally, attempts have been made to craft regional and national settlements.  However, relying in large part on the

Supreme Court's decision in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), appellate courts have determined that the "commonality" requirement of Rule 23 cannot be met due to the differences in state property law. *See, e.g.*, *Smith v. Sprint Commc'n Co., L.P.*, 387 F.3d 612 (7th Cir. 2004) (reversing class certification for settlement purposes of national class); *Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir. 2001) (reversing class certification for trial purposes of national class).

As successors-in-interest to WilTel, Inc., which was purchased by the Reorganized Debtors' predecessor-in-interest LDDS Communications in 1995, and as MCI, Inc., which had also installed a fiber optic system in Louisiana, the Reorganized Debtors were one of the two defendants in the Louisiana Actions, along with Sprint Communications ("Sprint") (collectively with the Reorganized Debtors, the "Louisiana Defendants"). Following the filing of the complaint and consolidation, the parties conducted discovery on class certification and the substantive property issues. After two years of discovery, the parties began settlement negotiations, which included the participation at times of a mediator. The Settlement was finally executed in 2001.

However, the Reorganized Debtors' bankruptcy intervened after the Louisiana trial court had conditionally certified the class and the Settlement. The two actions were separated, and while the MCI Suit was automatically stayed, the Claimants and Sprint went forward with regard to the Sprint Suit in the Louisiana courts. The trial court subsequently certified the class and approved the Settlement in an opinion dated December 5, 2002. *State of Louisiana v. Sprint Commc'n Co.*, 94-26334 (La. 18th D. Ct. 12/5/02). However, the Louisiana First Circuit Court of Appeal reversed that decision on appeal, *State of Louisiana v. Sprint Commc'n Co.*, 897 So.2d

85 (La.App. 1 Cir. 2004), and the Louisiana Supreme Court denied a petition for review of the appellate court's decision in December of 2005.[2]

In light of the Reorganized Debtors' bankruptcy, the Claimants filed a proof of claim, claim #25038, with this Court for an unliquidated amount based upon the Settlement.  In addition, individual class members filed approximately fifty-two proofs of claim.  Following a series of discussions between counsel regarding the Settlement and the related proofs of claim, the Claimants and the Reorganized Debtors executed the Settlement Implementation Agreement (the "Implementation Agreement") on May 18, 2005.  *See* Implementation Agreement, Settlement Motion Exhibits, Ex. 6.  The Settlement Motion was thereafter filed on July 13, 2005.

On August 2, 2005, this Court issued an Order Preliminarily Certifying A Settlement Class and Approving a Louisiana Right of Way Settlement ("Preliminary Order").  Docket No. 16663.  The Preliminary Order designated October 31, 2005, as the deadline for objections and scheduled a final fairness hearing for December 6, 2005.  However, the devastation and dislocation wrought by Hurricanes Katrina and Rita clearly necessitated changes in the administration of the Settlement.  Upon motion by the Movants, this Court issued a Supplemental Order Regarding Louisiana Right of Way Settlement on October 20, 2005 ("Supplemental Order").  Docket No. 17424.  The Supplemental Order indefinitely delayed notification in those areas most affected by the hurricanes (the "Hurricane-Affected Parishes"),

---

[2] The First Circuit Court of Appeal reversed the trial court's decision on grounds not relevant to this Court's consideration, namely inadequate notice.  The court noted that though the MCI Suit and Sprint Suit had been separated following the Reorganized Debtors' bankruptcy, the settlement notice did not clearly describe the Reorganized Debtors' non-participation and only described the Settlement as it applied to both parties.  The court held that this constituted inadequate notice.  897 So.2d at 93-97.  The court further held that the trial court improperly modified a class action settlement in approving the Settlement only with regard to Sprint, as the Reorganized Debtors and Sprint were jointly party to the Settlement.  *Id.* at 92.

set December 31, 2005 as the new deadline for objections and opt-outs, and rescheduled the final fairness hearing for February 7, 2006.[3]

Two objections to the Settlement Motion were timely filed with this Court on behalf of the proposed class members. Both the McCormick Objectors and the Alexander Objectors are class representatives in similar class action suits filed against the Reorganized Debtors currently pending in the United States District Court, Western District of Louisiana. *See Don Alexander, et al v. MCI WorldCom, et al*, No. 01-1237 (W.D.LA filed July 2, 2001); *Randolph McCormick, et al v. MCI WorldCom, et al*, No. 01-415 (W.D.LA filed March 8, 2001).

II. The Settlement

As previously noted, approval of the Settlement has proceeded independently with regard to Sprint and the Reorganized Debtors. Therefore, this Court need only analyze the Settlement insofar as it pertains to the Reorganized Debtors. Nonetheless, the Settlement was reached with both Louisiana Defendants, and thus it is necessary to describe the Settlement both as a whole and as it applies specifically to the Reorganized Debtors.

The Settlement creates two classes of settling landowners, "Fully Qualifying Landowners" (or "Full Qualifiers", and "Fully Qualifying Claims") and "Partial Qualifying Landowners" (or "Partial Qualifiers", and "Partially Qualifying Claims"), which are distinguished by the quantity and quality of evidence needed to prove a claim. The Settlement defines the "Covered Property" as the land underneath the cable-side of the right-of-way (the "Servient Estate") and the land adjoining the cable-side of the right-of-way (the "Adjoining Parcel"). Full Qualifiers are those who own the Servient Estate in fee absolute, and must provide

---

[3] This Opinion does not address the fairness of the Settlement with regard to the Hurricane-Affected Parishes, namely Orleans, Jefferson, St. Tammany, and Calcasieu Parishes, and nothing in this Opinion should be read as granting final approval of the Settlement with regard to those parishes. A status conference concerning the Hurricane-Affected Parishes is currently scheduled for August 29, 2006.

a title abstract showing the chain of title from the original grant of the easement to the present, a conveyance instrument showing ownership of the Servient Estate, and documentation of the original grant of the easement on the Servient Estate.[4] Partial Qualifiers are those who only own the Adjoining Parcel, but not the Servient Estate bordering their parcel.[5] A Partial Qualifier need only provide a deed of title showing ownership of the Adjoining Parcel to qualify for benefits. The Settlement also provides that a landowner who has a fee absolute interest in the Servient Estate may claim as a Partial Qualifier if he chooses not to submit a title abstract or the instrument creating the easement.[6]

The claim awards for each class are commensurate with the distinct ownership interests.[7] Under the terms of the Settlement, the Louisiana Defendants have agreed to collectively pay up to $55 million dollars in claims, administrative expenses, and attorneys' fees. Partial Qualifiers are eligible for an award fixed at $.50 per linear foot of cable, with an additional $.25 per linear foot of cable for any additional cable lines owned by the Louisiana Defendants crossing the

---

[4] The Settlement also sets forth alternative evidentiary standards for those class members who obtained their property rights through the laws of succession.

[5] The legal issues implicated here will be discussed in more detail later in the opinion, but for clarity purposes one issue should be mentioned briefly. The distinction between Full Qualifiers, those who own the Servient Estate in fee absolute, and Partial Qualifiers, those who only own the Adjoining Parcel, arises from a vagary of Louisiana property law. Rights-of-way for highways, railroads, or utility lines are frequently used in conveyance instruments to describe the boundaries of the transferred property. In the overwhelming majority of jurisdictions, such descriptions are interpreted to convey the property up to the middle of the designated easement. However, prior to 1957, Louisiana law provided that conveyance instruments using that language did not transfer any interest in the servient estate under the easement. Thus, in some instances the property adjoining the easement and the servient estate under the easement were and continue to be held by different parties. This problem is magnified where the landowner who granted the original right-of-way later subdivided his property before selling the tracts. In such cases, it is entirely possible, depending on the language used in the conveyance instruments, that the original landowner and his descendants own only the servient estate while various other landowners own the adjoining parcels. This factual issue has precluded any attempt to incorporate Louisiana fiber optic claims into multi-state or national settlements.

[6] As will be discussed shortly, the Settlement also provides that incomplete Fully Qualifying Claims will be eligible for awards as Partially Qualifying Claims, though failed Fully Qualifying Claims will be ineligible for any award. It should be noted then that any classification and judgment of ownership interest for the purposes of the Settlement is not an adjudication of the scope of any ownership interest under Louisiana state law; that is, the Settlement only concerns the adjudication of claims and rights-of-action.

[7] As will be discussed shortly, due to the Reorganized Debtors' bankruptcy, the following dollar amounts will not correspond to the actual payments class members receive.

property.  However, the award for Full Qualifiers will vary with administrative expenses and

attorneys' fees.  The Settlement provides that benefits for Fully Qualifiers are to be determined

by subtracting administrative expenses and attorneys' fees from the $55 million pool and

dividing the difference by the total number of linear feet of fiber optic cable the Louisiana

Defendants own in rights-of-way across the state.  The Movants have identified 6,229,101 linear

feet (1180 miles) of such cable.  The Movants also estimate that administrative costs will be

approximately $2,000,000, and counsel for the Louisiana Plaintiffs have requested an attorneys

fee award in the amount of $18,333,333, which is 33% of the Louisiana Defendants' maximum

exposure.  Under the terms of the Settlement, therefore, Full Qualifiers are eligible for an

estimated award of $5.57 per linear foot of cable, regardless of the number of cables.

Finally, the Settlement provides that all awards are to be proportional to the ownership

interest in the Servient Estate.  The Settlement defines the "Compensation Period" as beginning

on the "Construction Date" for each Covered Property and ending upon the entry of a judgment

and order, which generally speaking describes a twenty-year period beginning in 1985.[8]  Each

landowner who owned a Servient Estate or Adjoining Parcel during the Compensation Period is

eligible for an award proportional to that fraction of the Compensation Period during which she

owned the property.  Likewise, the Settlement provides that where a Servient Estate or Adjoining

Parcel is owned jointly, each joint owner is eligible for an award proportional to her interest in

the property.

The Settlement similarly sets forth the Louisiana Defendants' respective liabilities.  As

noted, the Movants have identified 6,229,101 linear feet of fiber optic cable owned by the

Louisiana Defendants and affected by the Settlement.  Of that total, 1,779,360 feet, or 28.5% are

owned by Sprint and the remaining 4,449,741 feet are owned by the Reorganized Debtors.

---

[8] The Construction Date is set forth in Exhibit 1 to the Settlement.

Therefore, Sprint is proportionally liable for $15,710,903 and the Reorganized Debtors are proportionally liable for $39,289,097 of the total claim fund. However, each Louisiana Defendant is liable only for claims related to cable it owns.

In order to file a claim under the Settlement, class members must submit the relevant evidentiary information – i.e., either a deed for Partial Qualifiers or a chain of title for Full Qualifiers – as well as a signed servitude agreement (the "Servitude Agreement") granting the Louisiana Defendants an easement in the railroad rights-of-way. *See* Revised Servitude and Right of Way Agreement, Settlement Motion Exhibits, Ex. 8. In addition, class members must submit a release (the "Release") waiving all claims against the Louisiana Defendants, as well as those railroads, utility companies, and public entities that sold the Louisiana Defendants rights in the subject rights-of-way. *See* Revised Release of Claims, Settlement Motion Exhibits, Ex. 7. All submitted claims will then be reviewed by the claims administrator, Rust Consulting, Inc. (the "Claim Administrator"), and the Claim Administrator will determine the validity of any claim according to the rules of construction agreed to by the Movants. *See Testimony of David Holland*, Reorganized Debtors' Hearing Exhibits, Ex. 1. If the Claim Administrator determines that a claim submitted as a Full Qualifier does not include the documentation necessary to establish such a claim, the class member will be so notified and have the opportunity to submit the documents necessary to complete the claim. If the class member cannot cure the claim as a Full Qualifier, the claim will be considered as a Partial Qualifier. However, if a claim is submitted as a Full Qualifier, and the Claim Administrator determines that the class member does not own the Servient Estate, that claim will not be eligible for any award, either as a Full Qualifier or as Partial Qualifier. There is no right to appeal the Claim Administrator's decisions concerning the eligibility of claims.

11

III. The Implementation Agreement

While the Settlement sets forth all terms necessary in relation to the Sprint Suit, the Reorganized Debtors' intervening bankruptcy required additional negotiation by the Movants to implement the Settlement with regard to the Reorganized Debtors.  As a result, the Movants signed the Implementation Agreement on May 18, 2005.

The Implementation Agreement provides that the Settlement is to be treated as a non-executory prepetition contract between the Reorganized Debtors and the Claimants and sets forth the proportion of the Louisiana Defendants' obligations under the Settlement for which the Reorganized Debtors are liable.  More importantly, the Implementation Agreement specifies how allowed claims will be treated under the Reorganized Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan"), which was confirmed by this Court on October 31, 2003. *See* Order Confirming Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, Docket No. 9686.  Those claims totaling $40,000 or less will be treated as allowed Class 4 convenience claims, which, under the Plan, are paid at $.40 on the dollar.  Those claims totaling more than $40,000 will be treated as Class 6 general unsecured claims.  Class 6 claims are to receive 7.14 shares of "New Common Stock" (as defined in the Plan) for each $1,000 and a cash payment of $.1785 on the dollar.

*Standards*

I. Rule 9019

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure grants the bankruptcy court authority to approve settlement of legitimate disputes in bankruptcy cases.  *Lambert Brussels Assocs. Ltd. Partnership v. Drexel Burnham Lambert Group, Inc.* (*In re Drexel Burnham Lambert Group, Inc.*), 140 B.R. 347, 349 (S.D.N.Y. 1992).  The decision whether to approve a

compromise is within the discretion of the bankruptcy court and can only be reversed for abuse

of such discretion. *Fischer v. Pereira* (*In re 47-49 Charles Street, Inc.*), 209 B.R. 618 (S.D.N.Y.

1997). In considering whether to approve a settlement, a bankruptcy court is required to review

the reasonableness of the proposed settlement. *In re Drexel Burnham Lambert Group, Inc.*, 138

B.R. 723, 758 (Bankr. S.D.N.Y. 1992). The Court must make an informed judgment whether the

settlement is fair and equitable and in the best interests of the estate. *In re Drexel Burnham*

*Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991). The bankruptcy judge is best

situated to consider the reasonableness of the settlement, as well as the equities involved.

*Lambert Brussels*, 140 B.R. at 349 (citing *In re Energy Co-op, Inc.*, 886 F.2d 921, 926 (7th Cir.

1989)).

It is not necessary for the bankruptcy court to conduct a "mini trial" on the issue. *Id.* The

Court need only "canvass the issues" to determine if the "settlement falls below the lowest point

in the range of reasonableness." *In re Teltronics Serv., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985).

The factors to be weighed by the court included (1) the balance between the likelihood of success

in the litigation compared to the present and future benefits offered by the settlement, (2) the

prospect of complex and protracted litigation with its attendant expense, inconvenience, and

delay, and the difficulties associated with collection of any judgment, (3) the paramount interests

of the creditors, which includes the relative benefits to be received by members of any affected

class and the degree to which creditors either do not object to or affirmatively support the

proposed settlement, (4) the degree to which the settlement is supported by other parties in

interest and the competency and experience of counsel who support the settlement, (5) the nature

and breadth of releases to be obtained by officers and directors, and (6) the extent to which the

13

settlement is the product of arm's length bargaining. *Nellis v. Shugrue*, 165 B.R. 115, 122 (S.D.N.Y. 1994); *Drexel*, 138 B.R. at 758.

While the bankruptcy court may consider the objections lodged by parties in interest, such objections are not controlling. Similarly, although weight should be given to the opinions of counsel for the debtors and any creditors' committees on the reasonableness of the proposed settlement, the bankruptcy court must still make informed and independent judgment. The Court must consider whether the proposed compromise is fair and equitable by apprising itself of all the factors relevant to an "assessment of the wisdom of the proposed compromise." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968).

II. Rule 23

Rule 23 of the Federal Rules of Civil Procedure, made applicable in bankruptcy proceedings by Rule 7023 of the Federal Rules of Bankruptcy Procedure, conditions any dismissal or settlement of a class action upon the approval of the court. Before approving a settlement, the court must enquire whether the settlement is fair, adequate, and reasonable. *County of Suffolk v. Long Island Lighting*, 907 F.2d 1295, 1323 (2d Cir. 1990). This inquiry has both a procedural and a substantive component. *See e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85-86 (2d Cir. 2000). Moreover, "[w]hen a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness." *Id.*at 85 (citing *Long Island Lighting*, 907 F.2d at 1323).

In considering procedural fairness, the Court looks to the structure and history of the negotiation process for signs of collusion or inadequate representation. Procedural fairness requires that the "compromise be the result of arm's length negotiations and that plaintiffs'

counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). If the Court determines that the Settlement was reached through a fair process, "a strong initial presumption of fairness attaches to the proposed settlement." *In re PaineWebberLimited Partnerships Litigation*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) (citations omitted).

The Court must also look to the terms of the Settlement to assess the substantive fairness of the Settlement. "The Court's 'primary concern is with the substantive terms of the settlement compared to the likely result of a trial." *In re Austrian and German Bank Holocaust Litigation*, 80 F.Supp.2d 164, 174 (S.D.N.Y 2000) (citing *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983)), *aff'd sub nom, D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2000). The Court need not effectively try the case in assessing the settlement, but it should "apprise [itself] of facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should [the] claim be litigated." *Weinberger*, 698 F.2d at 74. In assessing substantive fairness, the Court will consider the following nine factors identified by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)

> (1) the complexity, expense, and likely duration of the litigation,
> (2) the reaction of the class to the settlement,
> (3) the stage of the proceedings and the amount of discovery completed,
> (4) the risks of establishing liability,
> (5) the risk of establishing damages,
> (6) the risks of maintain the class action through trial,
> (7) the ability of the defendants to withstand a greater judgment,
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Discussion*

I. Jurisdiction

This Court has jurisdiction over the Settlement Motion pursuant to 28 U.S.C. § 1334 and under the July 10, 1984, "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.).  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408, 1409.

Though this Court clearly has jurisdiction over the Settlement Motion, the Objectors have nonetheless objected to this Court's exercise of jurisdiction over the Rule 23 determination.  The Objectors do not argue that the Court does not have jurisdiction over the Rule 23 determination under 28 U.S.C §§ 157(b), 1334.  Rather, the Objectors' arguments concern this Court's capabilities and the practical consequences of this Court's exercise of jurisdiction.  The Objectors suggest first that this Court's exercise of jurisdiction deprives class members of their constitutional rights of due process.  The Objectors note the significant time and expense involved in traveling to this Court from Louisiana and argue that this Court's exercise of jurisdiction therefore effectively deprives class members of the right to appear before the Court and testify regarding the Settlement.

This argument is only briefly discussed in two paragraphs and the Objectors cite no statutory authority or case law in support of their position.  The Court is unsure as to whether the Objectors seek to argue that the jurisdictional provisions of the Bankruptcy Code are unconstitutional as applied here, or whether their primary argument is that this Court should decline to exercise jurisdiction on prudential grounds in order to safeguard the due process rights of class members.  In either case, the argument is without merit.  It is sufficient to resolve this

16

objection to note that the Objectors have not suffered real prejudice or deprivation. Both the Movants and Objectors have submitted numerous depositions in support of their respective positions, and the Objectors have had the opportunity to cross-examine each of the Movants' witnesses in Baton Rouge, Louisiana. The Objectors did not request any additional accommodation, such as telephonic appearances, nor did the Objectors inform this Court at any point that they were unable to present the evidence they wished to present.

The Objectors also suggest that this Court is unable to reconcile what the Objectors characterize as competing obligations under Rule 23 and Rule 9019. Highlighting the Court's responsibility under Rule 23 to safeguard the interests of absent class members and the Court's responsibility under Rule 9019 to safeguard the debtor's estate, the Objectors argue that this Court must "wear two hats and apply competing standards." *See Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 262 (S.D.N.Y. 1998) (the court "has a fiduciary duty to the non-representative class members who were not party to the settlement agreement because '[i]nherent in any class action is the potential for conflicting interests among the class representatives, class counsel, and absent class members.'"). In support of their argument, the Objectors cite to a number of passages from the Newberg treatise on class actions and the Manual for Complex Litigation describing the court's role in approving settlements. Herbert B. Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002); Manual for Complex Litigation (Fourth) (2004).

Again, however, the Objectors do not detail their position or cite to authority in support of it. The Objectors' limited citations discuss the role of the court in evaluating settlements under Rule 23, but none stand in any way for the proposition that courts cannot evaluate settlements under both Rule 23 and Rule 9019. Rather, the Objectors merely describe the two different standards and then argue that they are in conflict, without detailing that conflict beyond

17

the Court's distinct obligations or in any way relating that purported conflict to particulars of the instant action. The Objectors appear to argue, therefore, that bankruptcy courts cannot, or at least should not, under any circumstances consider and adjudicate the fairness of a proposed class settlement under Rule 23. In effect then, the Objectors argue that bankruptcy courts should evaluate the class proof of claim, transfer the case to another court to consider the settlement under Rule 23, and then consider the settlement under Rule 9019 if it is approved under Rule 23.

This argument is similarly without merit. The Objectors cite no case law in support of their position, nor do they suggest upon what legal grounds this Court should decline to exercise jurisdiction. More simply, though, the Objectors assume the settlement process is a zero-sum exercise, and that the Settlement can only be in one party's interest. Such a supposition is clearly unwarranted. The Court recognizes that it faces an unusual situation here in which it must analyze the fairness of the Settlement relative to two opposing parties and from the perspective of each. The Court also recognizes that upon review of the relevant legal standards and the facts present, the Settlement may be found to be fair to one party yet not meet the applicable standard with respect to the other. However, it is also possible that the Settlement will fall within the appropriate range of reasonableness or fairness as is required for each party and therefore warrant approval under both Rule 23 and Rule 9019. Thus, these considerations do not signify that the Court cannot adequately perform its duties.[9] Rather, the Court must only be aware of the possible conflict between the interests it must protect here and take care to perform distinct analyses as to each party. Therefore, the Court concludes that the Objectors have failed to

---

[9] Courts are asked in other situations to similarly stand alternatively in each party's shoes. For example, in considering whether to approve an injunction, courts are required to consider the potential harms that might befall each party and balance those competing harms. Clearly, the Court will not here engage in any balancing of the parties' interests. However, the example demonstrates that the situation presented here is not without precedent, and that it is not unreasonable for courts to alternatively consider the interests of opposing parties.

establish that this Court cannot or should not exercise jurisdiction over the Settlement Motion and the Rule 23 determination.

## II. Class Notice and Certification

The Court's Preliminary Order preliminarily approved the Notice and preliminarily certified the class for settlement purposes. Based upon the considerations and findings set forth below, the Court confirms its prior conclusions.

## A. Notice

Fed.R.Civ.P. 23(e)(1)(B) provides that the Court "must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." In addition, Fed.R.Civ.P. 23(c)(2)(B) requires that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The notice "must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." *Weinberger*, 698 F.2d at 70 (citations omitted). *See also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") There is no requirement that the notice be highly detailed or exact, as "[n]umerous decisions, no doubt recognizing that notices to class members can predictably contain only a limited amount of information, have approved very general description[s] of the proposed settlement." *Id.* Similarly, notice need not be so detailed that "an individual class member [can] calculate the amount of his or her actual recovery under the settlement." *PaineWebber*, 171 F.R.D. at 124.

The Notice meets the applicable standards.[10]  Individual notice was mailed to over seven thousand class members and was published in major newspapers throughout the state.  Of particular importance to the Court are those considerations identified by the Louisiana appellate court on appeal in the Sprint Suit.  *See State of Louisiana v. Sprint Commc'n Co.*, 897 So.2d 85 (La.App. 1 Cir. 2004).  The Notice clearly explains the procedural history of the Louisiana Actions and the subsequent severing of the actions as a result of the Reorganized Debtors' bankruptcy.  Further, it clearly states that the Settlement is applicable only to the MCI Suit. Similarly, the Notice explains the consequences of Hurricane Rita and Katrina on the settlement process and explains that class members from the Hurricane-Affected Parishes are not required to take any action until further notified.  Otherwise, the Notice adequately "apprises class members of the salient terms of the settlement and affords them a reasonable opportunity to present any objections."  *PaineWebber*, 171 F.R.D. at 124.  Class members are directed to a website maintained by the Claim Administrator for further information.

In addition, the Notice satisfies the six factors identified in Rule 23(c)(2)(B).  The nature of the action, the definition of the class, and the class claims are concisely explained.  Opt-out procedures are specified in detail, specifically with regard to any actions class members may have taken in response to previous class notices.  The Notice also provides instructions for objecting to the Settlement or otherwise appearing before the Court.  Finally, the consequences of a class judgment under Rule 23(c)(3) are explained in clear language.

The Objectors argue that the Notice unfairly coerces class members to remain in the class.  The Objectors note that the Notice includes language stating that any class member who

---

[10] The Notice comprises three parts: the Class Action Settlement Implementation Notice, which is specific to the MCI Suit and the proceedings before this Court, the Class Action Settlement Notice, which was part of the settlement package for the Louisiana Actions, and the Class Action Settlement Implementation Publication Notice. The Class Action Settlement Implementation Notice incorporates the Class Action Settlement Notice by reference and the Class Action Settlement Notice was enclosed with the Class Action Settlement Implementation Notice.

opts-out may be subject in the future to an individual expropriation action.  However, this is simply a fair statement of possible consequences, similar to the statement concerning the effects of a class judgment, and the Movants would likely be remiss if they did not include such information.

In light of the foregoing, the Court concludes that the Notice satisfies the applicable standards of Fed.R.Civ.P. 23(e)(1)(B) and Fed.R.Civ.P. 23(c)(2)(B).  Accordingly, the Notice should be approved.

B. Certification

Classes may be certified for settlement purposes only.  *See Amchem*, 521 U.S. at 619-22; *Weinberger*, 698 F.2d at 73.  Like all other proposed classes, settlement classes must satisfy the four criteria enunciated in Fed.R.Civ.P. 23(a) and one of the three alternatives set forth in Fed.R.Civ.P. 23(b).  However, when considering a proposed settlement class, the court "need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable."  That requirement is satisfied here.  As noted, over seven thousand class members have been identified and noticed and joinder of that many parties is clearly impractical.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." "'[T]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436, 451 (S.D.N.Y. 2004) (citing *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001)).  The Claimants' trespass claims against the

Reorganized Debtors present a number of common questions of law, *see infra* Section IV.A, and thus this requirement is satisfied.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality is satisfied where the "claims of the representative plaintiffs arise from the same course of conduct that gives rise to claims of the other class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives." *In re Oxford Health Plans*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000). This requirement is satisfied here. All class members' claims arise from the installation of fiber optic cable in railroad rights-of-way and all assert the same legal theory, namely that the Reorganized Debtors did not have the authority to so install that cable. The class representatives' claims are therefore typical of the class.

Rule 23(a)(4) requires the conclusion that "the representative parties will fairly and adequately protect the interests of the class." "The adequacy of representation requirement focuses on whether the plaintiffs have interests antagonistic to those of other class members and whether plaintiffs and their counsel are capable of competently and vigorously prosecuting the action." *In re Auction Houses Antitrust Litigation*, 193 F.R.D. 162, 165 (S.D.N.Y. 2000). All class members here share the same interest in maximizing recovery. *Global Crossing*, 225 F.R.D. at 453. Similarly, class counsel are experienced class action litigators capable "of competently and vigorously prosecuting the action." Accordingly, this requirement is satisfied.

The Claimants seek certification under Rule 23(b)(3), which requires that "question of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and

efficient adjudication of the controversy." "Class-wide issues predominate if resolution of some

of the legal or factual questions that qualify each class member's case as a genuine controversy

can be achieved through generalized proof, and if these particular issues are more substantial

than the issues subject only to individualized proof." *In re Livent, Inc. Noteholders Sec. Litig.*,

210 F.R.D. 512, 517 (S.D.N.Y. 2002).  In analyzing the "superiority" requirement, courts must

consider (A) the interest of members of the class in individually controlling the prosecution or

defense of separate actions, (B) the extent and nature of any litigation concerning the controversy

already commenced by or against members of the class, (C) the desirability or undesirability of

concentrating the litigation of the claims in the particular forum, and (D) the difficulties likely to

be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3).  As previously

noted, courts considering settlement classes need not consider the fourth factor.

Common issues of law dominate individualized issues of fact here.  As will be discussed,

there are a number of legal issues applicable to all class members that must be resolved.  *See

infra* Section IV.A.  In contrast, the sole individual factual issues concern the interpretation of

conveyance instruments and documents creating easements, and that interpretation will be

dependent in large part on the resolution of common legal issues.  For example, while class

members would have to show at trial that each owns the Servient Estate in fee absolute, class

members' claims of trespass would all fail if the Reorganized Debtors successfully argued that

Louisiana law recognizes the doctrine of evolving uses.  Similarly, the measure of damages

available to class members is an uncertain legal issue common to all class members, and class

members' awards will depend more on the Claimants' success in arguing their interpretation of

Louisiana law than on any individual proof of specific damages.  Stated simply, individual

factual issues are minor in comparison to the many unresolved legal issues that will in large part

determine the viability of class members' claims.  Accordingly, the Court concludes that

common issues predominate issues affecting only individual class members.

The Court also concludes that a class action is superior to other forms of adjudication.

There is a substantial probability that many class members would hold negative-value claims if

forced to litigate their claims individually.  As will be discussed shortly, *see infra* Sections IV.A,

D, any trial on the merits would likely consume significant resources with an uncertain

possibility of success.  This problem would almost certainly overwhelm any attempts to

individually litigate a claim.  Moreover, it is probable, due to the Reorganized Debtors'

bankruptcy, that class members will only receive compensation through a class action.  Thus,

"[m]ultiple lawsuits would be costly and inefficient, and the exclusion of class members who

cannot afford separate representation [or who did not file individual proofs of claim] would be

neither 'fair' nor an 'adjudication' of their claims."  *In re NASDAQ Market-Makers Antitrust

Litig.*, 169 F.R.D. 493, 527 (S.D.N.Y. 1996).  Accordingly, the Court concludes that a class

action is superior to other forms of adjudication here.

In light of the foregoing, the Court concludes that the requirements of Rules 23(a) and

23(b)(3) are satisfied.  Accordingly, the Court's preliminary certification of the class is

confirmed and the class should be certified for settlement purposes.

III. Procedural Fairness

The Court is required under both Rule 23 and Rule 9019 to examine the settlement

process for signs of collusion or inadequate representation.

Counsel for the Claimants are skilled attorneys practicing in a range of fields related to

the Louisiana Suits.  Among others are experienced class action litigators who have successfully

prosecuted class action suits nationally, an attorney with a long history of practice in the

acquisition of utility rights-of-way in Louisiana, and a bankruptcy practitioner retained following the Reorganized Debtors' petition for bankruptcy. Similarly, counsel for the Reorganized Debtors are experienced litigators and reorganization attorneys who have ably guided the Reorganized Debtors through the bankruptcy process. The Court concludes that counsel for the Movants possess the necessary skills to ensure adequate representation.

Although no discovery has been conducted while the instant matter has been pending before this Court, the Movants engaged in a lengthy discovery process in the Louisiana Actions regarding both class certification and the substantive factual and legal issues involved at trial. Counsel for the Movants then commenced negotiations regarding a settlement, a process that included the participation of a third-party mediator. That mediator testified in the proceedings before the Louisiana court that the settlement process was "about as hard fought a case as you can see." *Testimony of John Perry*, Objectors' Hearing Exhibits, Ex. 18, 68:21-23. The mediator further testified that the first mediation session "did not result in any settlement agreement. In fact, the discussions were not even to a point where settlement was imminent. The parties were bogged down in major, major, disagreements regarding the appropriate assessment of the many complex issues involved in the case… ." *Id.* at 67:20-27. While no mediator participated in the negotiations that resulted in the Implementation Agreement, the Movants did negotiate over a period of approximately three years before reaching an agreement regarding the treatment of the Settlement in the Reorganized Debtors' bankruptcy. Furthermore, as previously noted, counsel for the Claimants retained the services of an experienced bankruptcy practitioner to aid in those negotiations. *See Affidavit of William E. Steffes*, Claimants' Hearing Exhibits, Ex. 9. In light of this record, the Court concludes that the Settlement and the Implementation Agreement were the result of arms' length bargaining

between the parties.  Accordingly, the Court concludes that the procedural requirements of Rule

23 and Rule 9019 are satisfied and that the negotiation process was procedurally fair.  Therefore,

the Settlement is entitled to a strong initial presumption of fairness.  *PaineWebber*, 171 F.R.D. at

125.

## IV. Substantive Fairness under Rule 23

As previously noted, the Second Circuit has designated nine factors to be considered in

assessing the substantive fairness of a proposed settlement.  *See Grinell*, 495 F.2d at 463.  The

Court will discuss each in turn.

## A. The Complexity, Expense, and Likely Duration of the Litigation

The Court finds that this factor strongly weighs in favor of the Settlement.  The Court

notes first that there are a number of unresolved procedural issues, such as the certification of a

class for trial, which would need to be addressed prior to a trial on the merits.  The Court is

confident that the Reorganized Debtors would press each of these unresolved issues, requiring an

additional investment of time and expenses on behalf of the Claimants.  More importantly, the

Court recognizes the factual and legal complexity of the substantive issues presented here, and

the effect this complexity would have on any trial on the merits.  The Court is persuaded by the

testimony of Prof. Randy Trahan that this litigation presents a large number of unresolved issues

in Louisiana property law.  *See generally Testimony of John Randall Trahan*, Objectors' Hearing

Exhibits, Ex. 18, 18:17 – 60:25.  Among other issues of Louisiana property law that would have

to be resolved, Prof. Trahan identified (1) the interpretation of title or deed documents vis-à-vis

the scope of the original easements, (2) the evolution of permissible uses of easements relative to

technological progress and landowner acquiescence, (3) the interpretation of statutory

prescriptive powers and the related statute of limitations, (4) factual issues occasioned by

changes in Louisiana property law concerning the conveyance of property, and (5) the type and

scope of damages available in this action.  As Prof. Trahan testified, it would "be an

understatement" to say that there are many unresolved legal issues in this case.  *Id.* at 46:20-24.

Accordingly, the Court concludes that the complexity, expense, and duration of any trial on the

merits strongly militate in favor of the Settlement.

B. The Reaction of the Class to the Settlement

The reaction of the class may be a useful proxy through which courts can measure the

fairness of a proposed settlement.  It is expected that some class members will object to or opt-

out of the proposed settlement.  *See In re Nasdaq Market-Makers Antitrust Lit.*, 187 F.R.D. 465,

478 (S.D.N.Y. 1998) ("In litigation involving a large class, it would be extremely unusual not to

encounter objections.").  Conversely, "the absence of objectants may itself be taken as

evidencing the fairness of a settlement." *Ross v. A.H. Robins*, 700 F.Supp. 682, 684 (S.D.N.Y.

1998). *See also Marisol A. v. Giuliani*, 185 F.R.D. 152, 162 (S.D.N.Y. 1999) ("The Court views

the small number of comments from a plaintiff class of over 100,000 children as evidence of the

Settlement Agreements' fairness, reasonableness, and adequacy.").

Excluding the Hurricane-Affected Parishes, the Movants mailed notices to 7,275

landowners registered on the state tax assessment rolls and published notices in local newspapers

throughout the state.  The Movants estimate that, in total, the class includes potentially tens of

thousands of landowners.  Four landowners opted out of the Settlement in response to the notice.

The Objectors represent an additional seventy-two class members.  Even assuming that the class

is no larger than 7,275 landowners, the objecting and withdrawn class members represent 1% of

the total class.  These facts indicate that the Settlement received a favorable response. *Cf.*

*Stoetzner v. US Steel Corp*, 897 F.2d 115, 118-19 (3d Cir. 1990) (approving settlement where

"only" 10% of class objected); *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 624 (N.D.Cal. 1979) (finding 16% negative response rate persuasive evidence in favor of settlement). Accordingly, the Court concludes that the reaction of the settlement class reflects very favorably on the fairness of the Settlement.

## C. The Stage of the Proceedings and the Amount of Discovery Completed

This factor is attuned to the parties' knowledge and awareness of the relative strength or weakness of each party's respective arguments and positions. The progression of discovery is a useful proxy through which to measure that knowledge and awareness.

It is clear that the Movants have conducted sufficient discovery to have an accurate understanding of the various legal and factual issues affecting the probability of recovery. Formal discovery proceeded in the Louisiana courts following consolidation of the Louisiana Actions for over a year before settlement negotiations commenced. Therefore, the Court concludes that this element weighs in favor of the Settlement.

## D. The Risks of Establishing Liability

This factor requires the Court to "weigh the likelihood of success by the plaintiff class against the relief offered by the settlement." *Marisol*, 185 F.R.D. at 164. Clearly, the more risky a trial on the merits, the more valuable the certainty provided by settlement.

The Claimants would face substantial, and likely fatal, challenges if they proceeded to trial. The Court notes first the difficulty the Claimants would face in securing class certification for purposes of trial. The factual complexity previously alluded to in the discussion concerning the complexity of a trial would present a significant barrier to class certification, as other courts across the country have recognized.[11]

---

[11] *See, e.g., Isaacs*, 261 F.3d at 679; *Kirkman v. North Carolina R. Co.*, 220 F.R.D. 49 (M.D.N.C. 2004); *Johnson v. Kansas City S.*, 224 F.R.D. 382 (S.D.Miss. 2004); *Corley v. Entergy Corp*, 220 F.R.D. 478, 486 (E.D.Tex. 2004);

Second, in a number of related opinions, this Court has concluded that claims arising

from the installation and use of the Reorganized Debtors' fiber optic cable systems are

discharged prepetition claims. *See, e.g., In re WorldCom, Inc.*, No. 02-13533, 2006 WL 898027

(Bankr. S.D.N.Y. March 28, 2006); *In re MCI, Inc.*, No. 02-13533, 2006 WL 544494 (Bankr.

S.D.N.Y. January 27, 2006). If the Court were to similarly conclude that the Claimants' claims

are discharged prepetition claims, those claims could only be pursued in this Court if a proof of

claim was filed. While the Claimants did file a class proof of claim, the overwhelming majority

of individual class members did not file any proof of claim. In light of the Court's previous

comments regarding class certification, it is therefore likely that most class members would be

barred from prosecuting their discharged claims in the absence of a settlement.[12]

Finally, the Claimants would have difficulty establishing the merits of their claims at

trial. As Prof. Trahan discussed, there are numerous unresolved issues of state law regarding the

scope of the rights-of-way, the permissible use of the rights-of-way, and the Reorganized

Debtors' prescriptive powers under Louisiana statutory law. *See generally Testimony of John

Randall Trahan*, Objectors' Hearing Exhibits, Ex. 18, 18:17 – 60:25. Moreover, this Court has

already concluded on three occasions that claimants asserting claims similar to those of the

Claimants could not establish the necessary elements of trespass and unjust enrichment under

state law. *In re WorldCom, Inc.*, 02-13533, 2006 WL 538556 (Bankr. S.D.N.Y. Feb. 1,

2006)(rejecting claims under Mississippi law); *MCI, Inc. v. West* (*In re WorldCom, Inc.*), 328

B.R. 35 (Bankr. S.D.N.Y. 2005) (rejecting claims under Georgia law); *In re WorldCom, Inc.*, 320

---

*Ostler v. Level 3 Commc'n*, No. 00-0718-C, 2002 WL 31040337 (S.D.Ind. Aug. 27, 2002); *Oxford v. Williams Cos., Inc.*, 137 F.Supp.2d 756 (E.D.Tex. 2001); *Nicodemus v. Union Pacific Corp.*, 204 F.R.D. 479 (D.Wyo. 2001); *Hallaba v. WorldCom Network Services, Inc.*, 196 F.R.D. 630 (N.D.Okla. 2000). In all cases the court denied class certification for trial. *Cf. Fisher v. Virginia Electric & Power Co.*, 217 F.R.D. 201 (E.D.Va. 2003) (granting class certification).

[12] The Objectors argue that class members could prosecute their claims via the class claim even if this Court rejected the Settlement. However, in light of the above comments regarding class certification, the class claim would have value only for settlement purposes.

B.R. 772 (Bankr. S.D.N.Y. 2005) (rejecting claims under Alabama and Kansas law).

Accordingly, the Court concludes that the risks of establishing liability weigh heavily in favor of

the Settlement.

E. The Risk of Establishing Damages

As previously noted, the Claimants face significant challenges in establishing liability on

their claims. This clearly affects the risk of establishing damages. In addition to those

difficulties, however, there is a clear risk that the Claimants would be entitled to only minimal

damages even if they successfully established liability. For purposes of establishing damages,

the Claimants' most crucial claim is one for unjust enrichment, which is termed the "civil fruits"

under Louisiana law. The damage suffered by the Claimants as a result of the Reorganized

Debtors' trespass is likely insignificant, as the fiber optic cable was installed below-ground in

rights-of-way to which the landowners had no access. A substantial recovery would therefore be

dependent on the Claimants' ability to establish a right to the profits realized as a result of the

Reorganized Debtors' trespass. However, as discussed by Prof. Trahan, there are significant

questions regarding the measurement of damages that would be applied if the Claimants succeed

in that claim. *Testimony of John Randall Trahan*, Objectors' Hearing Exhibits, Ex. 18, 43:11 –

46:3. Accordingly, the Court concludes that the risk of establishing damages weighs in favor of

the Settlement.

F. The Risks of Maintaining the Class Action Through Trial

As previously discussed, it is doubtful in light of overwhelming precedent that a class

would be certified for trial. Accordingly, the Court concludes that this factor weighs heavily in

favor of the Settlement.

G. The Ability of Defendants to Withstand a Greater Judgment

This factor is more often utilized to demonstrate the fairness of a proposed settlement rather than its unfairness. *See PaineWebber*, 171 F.R.D. at 129 ("However, the converse is not necessarily true; i.e., the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate.")  Moreover, this factor is of uncertain utility in the context of an ongoing bankruptcy proceeding, as the defendant's ability to pay more is clearly constrained.  As the court noted in *PaineWebber*, an inability to pay more is an important consideration "since the 'prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures." *Id.*  However, it is true that a non-bankrupt entity, Verizon Communications, is liable for the Reorganized Debtors' debts as a result of the merger between the two companies, and thus, there is a pool from which additional payments could be drawn.  This consideration does not vitiate concerns regarding the Reorganized Debtors' bankruptcy, as Verizon's willingness to assume the Reorganized Debtors' debts was presumably conditioned on an assessment of the risk and cost of doing so.  The paradox is that while the Reorganized Debtors have additional funds to support an increased settlement, those funds are likely available to an extent only because the Settlement was assessed at the present value.

Nonetheless, the Court has considered this factor and concludes that it neither favors nor disfavors the Settlement.  The Reorganized Debtors' maximum liability here represents only a fraction of the total payments available under the Plan.  However, the Court must also recognize that a bankruptcy reorganization entails the distribution of a limited pool of assets, and that the value of the Settlement must be analyzed relative to both the size of that pool and the total liabilities of the Reorganized Debtors.  For those reasons, the Court concludes that though the Reorganized Debtors have the ability to contribute additional assets to the Settlement, no

negative implication may, under the circumstances, be drawn from that fact.  Accordingly, the

Court concludes that this factor neither favors nor disfavors approval of the Settlement.

H. Range of Reasonableness

The final two factors of the *Grinnell* test are usually considered together since both speak

to the fairness of the settlement's terms relative to the possible outcomes of litigation.  *See*

*PaineWebber*, 171 F.R.D. at 129-30 ("Fundamental to analyzing a settlement's fairness is 'the

need to compare the terms of the compromise with the likely rewards of litigation.'") (citing

*Weinberger*, 698 F.2d at 73).  The adequacy of the settlement is judged "not in comparison with

the best possible recovery in the best of all possible words, but rather in light of the strengths and

weaknesses of the plaintiffs' case."  *In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp.740,

762 (E.D.N.Y. 1984) (citing *Grinnell*, 495 F.2d at 455.  The Court need not analyze this factor

with mathematical precision, nor should the Court try the case.  *Austrian and German Bank*, 80

F.Supp.2d at 178 (citations omitted).  Rather, the Court should only "weigh the likelihood of

success by the plaintiff class against the relief offered by the settlement."  *Marisol*, 185 F.R.D. at

164.

As previously noted, the award for Fully Qualifying Claims is estimated to be

approximately $5.50 per linear foot of cable for each line, and the award for Partial Qualifiers is

fixed at $.50 per linear foot of cable for the first line and $.25 per linear foot for each additional

line.  However, due to the Reorganized Debtors' bankruptcy, actual payments will be calculated

at a discount of approximately 40%.[13]  Fully Qualifiers would then be eligible for awards of

roughly $2.20 per linear foot, while Partial Qualifiers would be eligible for awards of roughly

$.20 per linear foot and $.10 per linear foot respectively.  However, this discount will not affect

---

[13] It is difficult to calculate the total discount for those high-value claims that are to be classified as Class 6 unsecured claims, as Class 6 claims are to be paid with a combination of cash and stock.  Therefore, all calculations will be made as if all claims were Class 4 claims, which are to be paid simply in cash at $.40 on the dollar.

the Court's analysis, as any award, even following a successful trial, would be similarly discounted.

None of the parties have provided an estimate as to the best possible recovery the Claimants could expect if they were able to successfully establish liability and damages on all of their claims. In light of the significant legal and factual uncertainties implicated here, it is conceivable that no such estimation is possible. In particular, as previously discussed, the bulk of any significant recovery would be dependent on establishing the right to "civil fruits" damages, i.e., damages for unjust enrichment, the value of which are difficult to calculate if one considers that these could be measured narrowly, as the marginal profits of each particular segment of cable, or more broadly, as the total profits earned as a result of any communication passing through the lines.

Nonetheless, such an estimate is not necessary given the significant legal and factual challenges that would face the Claimants if this action proceeded to trial. *See Austrian and German Bank*, 80 F.Supp.2d at 178. Given the overwhelming precedent denying class certification for trial in similar class actions, and the discharge of the Reorganized Debtors' prepetition debts by its bankruptcy, it is doubtful that the Claimants could obtain any significant recovery outside the Settlement. Moreover, the Reorganized Debtors would offer a number of defenses and counterarguments at trial and could be expected to vigorously challenge the Claimants' legal theories. This would come at a substantial cost in legal fees and time to the Claimants, necessarily reducing any award they might obtain. Finally, even assuming that the Claimants would prevail at trial on the liability issues, there is a substantial risk that the recovery would be less than that offered in the Settlement. Accordingly, the Court concludes that these factors weigh heavily in favor of the Settlement.

I. Conclusion

In light of the foregoing considerations, the Court concludes that the Settlement is fair and reasonable under Rule 23.  As the Court has discussed, the *Grinnell* factors strongly favor approval of the Settlement.  The Court is persuaded that, under the circumstances, the Settlement is fair to all class members and represents a successful resolution of their claims.

V. Substantive Fairness Under Rule 9019

The Court must also consider whether the Settlement is in the best interests of the estate and its creditors.  *In re Drexel Burnham Lambert Group, Inc.*, 143 B.R. at 496.  The six factors elucidated in *Nellis* require the Court to engage in a similar analysis to that required under Rule 23, save that the Court must now judge the Settlement from the perspective of the estate's creditors.  165 B.R. at 122.

In light of the facts and considerations previously discussed, as well as the specific considerations that follow, the Court concludes that the Settlement is fair and reasonable to the estate's creditors under Rule 9019.  The Court's conclusion rests in large part on its judgment of the basic merits of the Claimants' allegations.  As noted, the Reorganized Debtors have a number of procedural challenges and defenses available, and similarly-situated defendants have successfully used those procedural challenges to prevent other class actions from proceeding to trial.  However, the substantive landscape is not as favorable.  Simply, it is the Court's opinion, having considered the relevant facts and legal issues, that the Reorganized Debtors probably did not possess the right to install fiber optic cable on the class members' property under current Louisiana law.  The Court does not consider this judgment inevitable if the parties proceeded to trial.  Louisiana law may, if the issue was presented squarely, be interpreted to permit the Reorganized Debtors' use of railroad rights of way under the evolving use doctrine, which

recognizes the relationship between property use and technology.  Similarly, the class members'

predecessors-in-interest may be judged to have granted the railroads exclusive easements, at least

aboveground, such that the railroads have full authority over the use of the easement.

Nonetheless, the Reorganized Debtors face a risk of adverse judgment in the absence of judicial

intervention, and even more, the simple uncertainty of their property rights.  The proliferation of

class actions similar to the Louisiana Actions across the country testifies to the magnitude of the

legal uncertainty in this area of law, as does the continuing relevance of this type of action over a

decade after the trend began.  These considerations clearly weigh in favor of the Settlement, and

the terms of the Settlement are reasonable in that regard.

## VI. Objections

The Objectors have raised a number of objections to the terms of the Settlement, arguing

that the Court should reject it under Rule 23.  The Court will discuss each in turn, but concludes

that all are without merit and do not alter this Court's conclusion that the Settlement is fair and

reasonable.  All objections raised and not discussed are likewise found to be without merit.

## A. Competency of Class Representatives

During depositions, some of the class representatives were unable to explain a number of

the Settlement's terms, which the Objectors argue demonstrates the inadequacy of the class

representation, and by extension, the unfairness of the Settlement.  Objectors also point to

examples where the representatives agreed that certain terms of the Settlement were unfair.  The

Movants respond that the class representatives have performed their function to the standards of

Rule 23.

Having reviewed the class representatives' testimony, the Court concludes that the

testimony does not disfavor the Settlement and that the class representatives have fulfilled their

function.  The Court notes first its previous conclusion that the Settlement was reached as a result of arms' length negotiation.  Second, two of the class representatives relied on outside counsel for advice concerning the Settlement, and a third class representative is himself an attorney.  The testimony of these attorneys showed that they all understood the terms of the Settlement and exercised independent judgment concerning the fairness of the Settlement.  Third, examining the testimonies in their entirety, the Court finds the class representatives demonstrated that they were familiar with the general facts of the case and the terms of the Settlement.  The failures and inadequacies identified by the Objectors concern specific details or considerations laypersons cannot be expected to be aware of or explain.  *See Eggleston v. Chicago Journeyman Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981) (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366, 86 S.Ct. 845, 847, 15 L.Ed.2d 807 (1966)).  Finally, nothing in the testimonies demonstrates that the Settlement is unfair or unreasonable.  The Objectors' hints that the class representatives are biased or inadequate representatives of certain classes are unsubstantiated by the record, and the class representatives did not describe the Settlement as a whole as unfair.

In light of these considerations, the Court concludes that the objection is without merit.

B. Timing Issues

The Objectors highlight several of the Settlement's terms concerning the timing of the claim administration process and argue that these features demonstrate the unfairness of the Settlement.  The identified terms establish the conditions for participation in the Settlement and together set forth the schedule for the claim submission process.  At root, the Objectors argue that the interplay between the schedule and the required conditions requires class members to make important decisions concerning their participation in the Settlement before they have

access to the information necessary to inform those decisions.  The Objectors also hint that this

consequence was intended in order to discourage class members from filing a claim, a charge

that will be discussed shortly in connection with other objections.

First, the Objectors note that class members must submit the Release and the Servitude

Agreement with their claim documentation, that is, before the Claim Administrator has

determined the value of the submitted claim.  They argue that this is unreasonable on its face, as

class members are forced to forgo and grant rights without any certainty of compensation, and

particularly as the difference between benefits for Full and Partial Qualifiers is so great.  This

argument is without merit.  The Release and Servitude Agreement both are effective only as to

Full Qualifiers.  Partial Qualifiers, by definition, do not or cannot claim to own the Servient

Estate in whole or in part; thus, Partial Qualifiers do not have or cannot prove the rights

putatively granted or released by those documents, rendering their endorsement of the documents

irrelevant.  Moreover, while it is true that Full Qualifiers must weigh the costs of the Release and

Servitude Agreement against the value of the claim, there is nothing to suggest that their

estimation of the comparative benefits will be necessarily inaccurate.  The Objectors do not

argue, and could not argue, that class members cannot estimate the value of their claim given the

necessary inputs, namely, the length of the fiber optic cable crossing the property, the number of

such cables, and the ownership interest in the right-of-way.  While it is likely true that in some

instances the class member's estimate will deviate from the claim administrator's judgment,

there is no evidence that such uncertainty here would be magnified by the timing and schedule of

the process.  Without such evidence, the Objectors' argument reduces to the contention that it is

*per se* unreasonable under Rule 23 to require class members to provide consideration before

class members are made aware of the exact value of their claim.  That position finds no support in the statute or case law.

Second, though the opt-out deadline has already passed, the Objectors similarly highlight the fact that class members were required to choose whether to remain in the class even though they did not know the exact value of their potential claim.  For many of the same reasons stated above, this argument is also without merit.  Class members clearly have the capacity to estimate the value of their claim and the costs of participation once they have received notice of the Settlement, and the Objectors have not demonstrated that these estimates would be regularly inaccurate due to the timing of the opt-out deadline.  And again, without such evidence, the Objectors merely assert an unsupportable *per se* argument.

Third, the Objectors argue that the two conditions just discussed unfairly force class members to expend a significant sum of money in order to submit a claim without any certainty of recovery.  This argument is simply a variation on the above two arguments, and the interjection of monetary considerations does not alter the Court's analysis.  As will be discussed shortly, the parties have engaged in a factual dispute concerning the exact cost of obtaining the documents necessary to submit a valid claim.  At this point, it is sufficient to note that this argument raises no concerns regarding the timing of the process, but only the magnitude of the expense.  That is, it is clear that class action members may be fairly required to expend their own resources prior to receiving benefits and without any certainty of receiving benefits.  The only question then is whether class members are unfairly required to expend an unreasonable amount of resources.  That question will be discussed shortly.  Nonetheless, regarding the arguments just discussed, the Court concludes that the timing of the claim administration process is neither unfair nor unreasonable.

In light of these considerations, the Court concludes that the objection is without merit.

C. Proof of Claim

The most extensive of the Objectors' objections concerns the documentation necessary to prove a claim, and the cost to class members of obtaining that information.  As previously discussed, the documentary requirements for Full Qualifiers are much more substantial than those for Partial Qualifiers, reflecting the larger award for which Full Qualifiers are eligible. Partial Qualifiers are required only to submit a deed or similar conveyance document showing ownership of an Adjoining Parcel.  Full Qualifiers must likewise submit a conveyance instrument showing an ownership interest in the Servient Estate.  However, Full Qualifiers must also provide a title abstract for the Servient Estate from the original grant of easement to the present owner.  The title abstract must also be accompanied by an index of every such transfer of the Servient Estate and copies of the documents recording every such transfer.  Finally, Full Qualifiers must provide documentation showing the ownership interest the railroads obtained at the time the easement was first granted.  While the Settlement does not limit the form such documentation may take, the Court presumes that in most situations class members will submit copies of the original easement deed if available.

The Objectors argue that these conditions demonstrate the unfairness of the Settlement, as well as intent to effectively bar many class members from recovery.  The Objectors first suggest that the language setting forth the documentary requirements is overly technical and legal, so much so that class members would need to consult outside counsel to understand their obligations.  The Objectors then highlight the quantity of information required to submit a Fully Qualifying Claim and argue that this information is no different, i.e. no less, than the information class members would have to submit at trial to prove their claim.  The Objectors further argue

that the documentation is likely to be expensive to obtain, and may, in many cases, exceed the value of the claim.  Finally, the Objectors suggest that, taken together, these conditions evidence a deceptive purpose and fraudulent intent.  The Objectors argue that the Reorganized Debtors have a significant incentive to reduce the number of filed and approved claims, noting that the Settlement only establishes the Reorganized Debtors' maximum liability, not its total liability.  From that perspective, the Objectors contend, it is clear that the documentary requirements are simply the means through which to accomplish that goal.

In support of their arguments, the Objectors have offered the testimony of a contracted abstractor who prepared the documentation he believed necessary to prove the claim for three class members.  *See Letter from Roy J. Billeaud to Don McKenna*, McCormick Plaintiffs' Objection to Motion For Certification and Approval of Settlement, Exhibit 10; *Testimony of Roy J. Billeaud*, Objectors' Hearing Exhibits, Ex. 21, 34:11 – 59:11; *Miller Claim Form*, McCormick Plaintiffs' Objection to Motion for Certification ("McCormick Objection"), Docket No. 17782, Ex. 12.  *Deviller Claim Form*, McCormick Objection, Docket No. 17782, Ex. 13.  In rebuttal the Movants offered an affidavit from an expert landman who reviewed the prepared documents.  *See Affidavit of Robert C. Broadhurst*, Claimants' Hearing Exhibits, Ex. 2.

The Court does not find the Objectors' arguments persuasive.  The Court notes first that the Objectors couch their argument in absolute terms whereas this Court must analyze the terms of the Settlement relative to a number of factors, most importantly its impression of the strength of the Claimants' case.  Simply, terms that may be onerous in certain situations will not necessarily be onerous in others.  Similarly, the Court does not analyze each term in isolation, but rather relative to the Settlement as a whole.  Clearly, class members may accept certain more

onerous terms in exchange for greater benefits, or may trade certain desirable terms for other terms.

Having reviewed the claim form and accompanying instructions, the Court concludes that it is not needlessly complicated or technical. The majority of information required on the form is basic biographical and descriptive information, such as the location of the property or the dates of ownership, to which the class member has easy access. The only legal and potentially confusing information can be found in the section describing the documents that must be submitted with the claim form. That section refers to a "conveyance instrument", a "title abstract", and other documents with which laypersons may not be familiar. However, these documents are required, and it is doubtful that a less-technical description would be less confusing than the technical term.

The Court next notes that the Objectors attempt to turn a permissive statement into a mandatory rule. The Objectors suggest that the Settlement cannot fairly require class members to prove their ownership of the Servient Estate in the form provided because class members would be required to offer exactly the same proof at trial. This is clearly flawed reasoning; that the Court may accept lower standards of proof in a settlement-context does not require that the settlement do so. The reasonableness of the proof requirement must be analyzed in the context of the Settlement. Moreover, the Objectors mistakenly suggest that the proof demanded by the Settlement is sufficient to prove a claim at trial – while the demanded documents may suffice to prove a fee absolute ownership interest in the Servient Estate, more proof would be required to show the Reorganized Debtors did have sufficient authority and to establish damages. Similarly, the Objectors appear to assume that class members cannot be required to complete extensive tasks as a precondition to qualifying for a settlement award. While the Court certainly

recognizes that there must be a limit to what may be demanded of class members, and that

extensive demands may signify an improper intent, it is likewise true that class members are not

entitled to an effortless claim process. Again, context is the key consideration.

From that perspective, the requirements to prove ownership of the Servient Estate are

reasonable. As class members would be forced to offer this proof at trial, it is not unreasonable

to require it of them in a settlement, as class members who do not own the Servient Estate have

no claim against the Reorganized Debtors. The Objectors appear to suggest that the Reorganized

Debtors cannot demand more than minimal effort on the part of class members, as the

Reorganized Debtors allegedly committed improper acts and must therefore accept the burden of

compensating uninjured landowners. The Court does not agree. Moreover, the Objectors have

not suggested an alternative means through which to distinguish owners of the Servient Estate

from owners merely of the Adjoining Parcel. The Settlement's proof requirements distinguish

between the two categories of claimants but do not demand irrelevant information.

Along similar lines, the Court recognizes that this settlement concerns property rights and

that such issues create demands not present in other, more typical class actions, such as

consumer protection or mass tort actions. Property ownership information is often not as

immediately accessible as proof of purchase for a consumer good for reasons not attributable to

the Reorganized Debtors, and thus the difficulty class members have in accessing and compiling

that information arises from the nature of the issues involved and not the capriciousness of the

Reorganized Debtors. Finally, the Objectors incorrectly suggest that class members would only

need to provide proof of ownership to prevail at trial. The Objectors' argument is more

persuasive if the proof demanded in settlement is identical to the proof required at trial. That is

not the case here.  Accordingly the Court concludes that requirements for proving ownership of the Servient Estate are fair and reasonable.

A large portion of the Objectors' briefs is devoted to the issue of costs and the potential for negative-value claims.  The Objectors argue that the high costs of compiling the information necessary to prove ownership will effectively prevent some class members from submitting claims, as the value of the award would be less than the cost of submitting the claim.  As previously noted, the Objectors tie this argument to the timing of the claim administration process, arguing that the problem is magnified because class members would not know that they have negative value claims before they pay the costs of title research.

The Objectors provide no evidence as to how prevalent the problem of negative value claims is or how many Full Qualifiers will hold negative value claims.  The Objectors have provided witness testimony that the cost of compiling a Fully Qualifying Claim would range from $750 to $1,500 and that the cost of compiling a Partially Qualifying Claim would be approximately $150.  *Testimony of Roy J. Billeaud*, Objectors' Hearing Exhibits, Ex. 21, 40:32. In rebuttal, the Movants' witness testified that the estimate provided by the Objectors includes the cost of obtaining extraneous documents and is thus grossly inflated; the witness did not, though, provide a more accurate estimate.[14]  *Affidavit of Robert C. Broadhurst*, Claimants' Hearing Exhibits, Ex. 2, ¶ 8-9; *See also William S. Strain*, Claimants' Hearing Exhibits, Ex. 15 (stating that the offered documents showed that the purported class members did not own the Servient Estate in fee absolute).  The witness also testified that the cost of compiling a Partially Qualifying Claim would likely be below $20.  While these figures allow the Court to roughly

---

[14] The Movants have also suggested that many if not most class members would already have in their possession or have easy access to the necessary documents.

estimate based on the length of fiber optic capable the level at which claims become negative

value claims, it does not establish the frequency with which this may occur.[15]

The Court need not resolve this factual dispute though to assess the Objectors' argument.

Rather, once again the Court must note that this issue must be analyzed relative to the Settlement

as a whole, and in particular, the value of the benefits.  As previously discussed, it is likely that

the class can be certified for settlement purposes only, placing the Claimants in a significantly

worse negotiating position.  The Objectors wish to place the burden of ownership research on the

Reorganized Debtors, but it is not at all clear that the Claimants have sufficient leverage to shift

that burden.  Moreover, in support of their argument, the Objectors cite the proposed national

settlement approved by the district court in *Smith* but rejected by the Seventh Circuit on appeal.

*Smith v. Sprint Co.*, No. 99-3844 (N.D.Ill. filed 1999); *See* Second Amended and Restated

Settlement Agreement, Objectors' Hearing Exhibits, Ex. 22.[16]  In that settlement, the defendants

agreed to provide title research services for a flat fee of $50, paid by the claimant, which the

Objectors cite as evidence that the Settlement is unreasonable to the extent it forces class

members to allegedly pay up to and above $1,000 to prove their claim.  *See* July 2, 2003

Transcript of Proceedings in *Smith v. Sprint Co.*, Objectors' Hearing Exhibits, Ex. 22, 10:25.

However, the Objectors fail to note that Full Qualifiers were eligible under the proposed

settlement for awards of $2 per linear foot, whereas Full Qualifiers here are eligible for awards

---

[15] If one assumes that on average, Fully Qualifying Claims will cost $770, any claim for more than 350 linear feet of cable will have a positive value.  Similarly, if one assumes that on average, Partially Qualifying Claims will cost $20, any claim for more than 100 linear feet will have a positive value.  As a point of comparison, a square acre lot in which the right of way extends the length of one side will have 208.7 linear feet of cable, assuming only one cable is in the right of way.  These calculations should not be interpreted as endorsing either party's estimations.

[16] *See also* Settlement Agreement Between a Settlement Class of Right of Way Claimants, and Sprint, Qwest, Level 3, and Williams, Objectors' Hearing Exhibits, Ex. 25; Amended and Restated Settlement Agreement, Objectors' Hearing Exhibits, Ex. 26.

of $5.50 per linear foot.[17]  In addition, the same factual issues that distinguish the Louisiana

Actions from other class actions across the country make a direct comparison of the Settlement

and the proposed national settlement inapposite.  Unlike in Louisiana, ownership of the adjoining

parcel and ownership of the servient estate are in almost all cases complementary in those states

covered by the proposed national settlement.  The title research costs for the proposed settlement

would therefore have been significantly less.

Finally, the Court finds that the Objectors' allegations of fraudulent intent are without

merit.  The Objectors suggest that all less-than-ideal terms are indicative of an intent to obtain

property rights without significant compensation.  To the Court, those terms represent only the

*quid pro quo* of negotiation.

In light of these considerations, the Court concludes that the objection is without merit.

D. Lack of Appeal

The Objectors argue that the Settlement unfairly denies class members a right to appeal

the claim administrator's decisions.  However, a right to appeal is not required in every

settlement.  Moreover, the Movants will jointly designate the rules of construction the Claim

Administrator will apply.  The Court sees no reason, in light of those circumstances, to demand

that a right of appeal be included in the Settlement.

Accordingly, the Court concludes that the objection is without merit.

E. The Servitude Agreement

The Objectors argue that the Servitude Agreement is unnecessarily overbroad and grants

the Reorganized Debtors greater rights than they would gain at trial.  The Court disagrees.  The

Servitude Agreement merely creates typical utility easements necessary for the installation, use,

---

[17] The Court uses the negotiated value here as a point of comparison in order to make an apples-to-apples
comparison, as any claims against the Reorganized Debtors would be reduced in the same fashion.

and maintenance of the fiber optic cable.  The Objectors further mistakenly represent the consequences of a trial on the merits.  The Objectors suggest that there would be no change in the status quo if class members did not succeed at trial.  Given that a decision on the merits would concern the scope of the original easement and the assignment of those rights, class members would be adjudged to have fewer rights to control the use of the easement.  Class members would not grant the Reorganized Debtors any rights, but would lose rights nonetheless, without compensation.

The Objectors also argue that the Servitude Agreement is unfair to the extent it permits the Reorganized Debtors to assign its rights to Sprint without diminishing its rights.  However, the Servitude Agreement explicitly denies the Reorganized Debtors the ability to do so.

Accordingly, the Court concludes that the objection is without merit.

F. The Release

The Objectors argue that the Release unfairly and unreasonably requires class members to release any claims they might have against the railroad companies involved without consideration.  This argument is without merit.  The Objectors identify no claims class members may bring against those railroads that sold the Reorganized Debtors rights in the easements. Moreover, any such claims may be released as "the claims against the non-party being released [are] based on the same underlying factual predicate as the claims asserted against the parties to the action settled."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005) (citations omitted).

G. Coercion and Intimidation

The Objectors argue that the claim form unfairly deters class members from making claims by threatening class members with criminal prosecution for making false statements on

the claim form.  *See* Louisiana Fiber Optic Settlement Claim Form, Objectors' Hearing Exhibits, Ex. 1.  However, this is only a fair statement of the possible consequences and the Movants would likely be remiss if they did not include such information.

Accordingly, the Court concludes that the objection is without merit.

*Conclusion*

In light of the foregoing, the Court concludes that (i) the Notice satisfies the requirements of Fed.R.Civ.P. 23(c)(2)(B), (ii) the class satisfies the requirements of Fed.R.Civ.P. 23(a) and 23(b)(3), and (iii) the Settlement is fair and reasonable as to both class members and the estate's creditors under Fed.R.Civ.P. 23 and Fed.R.Bankr.P. 9019.  The Court concludes that class should be certified and the Notice and Settlement should be approved.  Therefore, the Settlement Motion is GRANTED.

The Reorganized Debtors are to settle an order consistent with this Opinion.


Dated: New York, New York
       July 26, 2006

                         s/Arthur J. Gonzalez
                         UNITED STATES BANKRUPTCY JUDGE