UNITED STATES BANKRUPTCY COURT  Not For Publication
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re | Chapter 11 |
| WORLDCOM, INC., *et al.*, | Case No. 02-13533 (AJG) |
| | (Confirmed Case) |
| Reorganized Debtors. | (Jointly Administered) |

---

## OPINION DENYING MOTIONS FOR SUMMARY JUDGMENT

A P P E A R A N C E S

STINSON MORRISON HECKER LLP
Special Counsel for Reorganized Debtors
1201 Walnut Street, Suite 2700
Kansas City, MO 64106

    Lawrence W. Bigus, Esq.
    Teresa Clark, Esq.
    Allison M. Murdock, Esq.
    Mark A. Shaiken, Esq.

DURHAM JONES & PINEGAR
Attorneys for Hansen Corporation Pty Limited
111 East Broadway, Suite 900
Salt Lake City, UT 84111

    Erik A. Olson, Esq.
    Kenneth L. Cannon II, Esq.

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

**BACKGROUND**

The following facts are derived from the parties' Statements of Material Facts and related exhibits submitted with the parties' motions for summary judgment.

Hansen Corporation Pty Ltd. ("Hansen"), an Australian corporation, provides information technology solutions and services, including billing solutions, to customers on a global basis. Debtor MCI WorldCom Network Services, Inc. ("MCI"), provides telecommunications services.

Prior to its relationship with Hansen, MCI used separate order-entry and billing systems to track customer information. MCI desired a new computer system that, among other features, would store all pertinent information regarding a single customer in one centralized computer location and would allow MCI to quickly determine billing information from a single computer source.

On or about November 20, 1998, Hansen and MCI entered into an agreement entitled "Master Software License & Services Agreement" (the "Agreement"), under which Hansen agreed to license the software program "Hansen Universal Billing" ("HUB" or "HUB "Software") to MCI and to develop custom software to meet MCI's needs for an integrated billing system under the Agreement's Development Services provision. MCI paid Hansen $1.5 million for a fully-paid up, non-exclusive, perpetual license to use HUB as allowed by the Agreement's scope and $10 million for the development of custom software for MCI's own Customer Management System ("CMS"). Under the Maintenance Services provision of the Agreement, Hansen agreed to update the HUB Software periodically, by correcting errors and providing MCI with new versions of the standard HUB Software.

As of June 2000, MCI chose not to renew Maintenance Services provided by Hansen under the Agreement. The parties ended Hansen's Development Services on December 31, 2001.

Beginning in January 2002, MCI permitted two entities, Bell Canada and Concert Communications Company ("Concert"), access to use CMS outside the United States.[1] At the time of access by Bell Canada and Concert, it is undisputed that CMS contained certain components of the original HUB software, specifically the security features and reference features. MCI contends that such use by Concert and Bell Canada has been limited to the "thin-client" portion[2] of the HUB Software.

WorldCom, Inc. and certain of its direct and indirect subsidiaries (collectively, the "Debtors") filed petitions under Chapter 11 of Title 11 of the United States Code on or about July 21, 2002. MCI was one of the Debtors that filed a petition for bankruptcy protection.

On January 21, 2003, Hansen filed Proof of Claim No. 15798 (the "Claim") seeking $1,500,000. Hansen specifically alleged that MCI used Hansen's proprietary software outside the scope of uses permitted under the Agreement.

Hansen claims that by permitting third parties to use the HUB Software from outside the United States, MCI has breached the Agreement, particularly the license to use the HUB Software. MCI claims that the use of the HUB Software by Bell Canada and Concert was permissible for two reasons (1) MCI exclusively owned

---

[1] MCI calls its creation of custom software "CMS." Hansen refers to MCI's software as "HUB Software." For clarity's sake only, the Court will use the terms "HUB" or "HUB Software" to refer to the software during the Agreement, and "CMS" after the Agreement ended.

[2] "Thin-client" access is not defined in the Agreement but, according to the parties at oral argument and general definitions, it means that software is installed and runs on a server in one place, here located in the United States, but is accessed from a remote computer over a network. For a definition of "thin client," see Webomedia Computer Dictionary, *available at* www.pcwebomedia.com/TERM/T/thin_client.html (last accessed Jan. 17, 2007).

3

CMS, the custom-made software created pursuant to the Agreement, by the time it was accessed by Bell Canada and Concert; and (2) the Agreement unambiguously grants MCI the right to allow Bell Canada and Concert to access HUB on a "thin-client" basis from outside the United States during the normal course of providing MCI telecommunications products and/or services.  MCI does not contend that it obtained ownership of the original HUB Software as it existed at the start of the Agreement or Hansen's intellectual property that existed prior to their Agreement.

After conducting an agreed-upon[3] amount of discovery, both parties moved for summary judgment on Hansen's breach of contract claim.  Hansen alternatively moved for a Rule 56(f) extension to conduct more discovery (1) if the Court determines that the Agreement is ambiguous and thus both parties' interpretations of the Agreement are reasonable; or (2) before ruling on MCI's cross-motion for summary judgment; or (3) if the Court determines that MCI's interpretation is the only reasonable construction of the Agreement then Hansen should be permitted under Rule 56(f) to conduct discovery with respect to the nature of MCI's agreements with Bell Canada and Concert and their use of the HUB Software.

Because the Court denies both parties' motions for summary judgment, concluding the contract is ambiguous, it does not reach the Rule 56(f) motion.

## LEGAL STANDARDS

A. <u>Summary Judgment</u>

Under Federal Rule of Civil Procedure 56(c), made applicable to this proceeding by Federal Rule of Bankruptcy 7056, summary judgment is only

---

[3] The parties have served and responded to document requests and interrogatories although neither party has taken depositions or submitted expert testimony.

4

appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R. Civ. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553 (1986). A genuine issue of material fact exists, where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). In determining whether such an issue exists, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997). The Court's role is "not to weigh the evidence or make determinations of credibility but to 'determine whether there is a genuine issue for trial.'" *Village of Kiryas Joel Local Dev. Corp. v. Ins. Co. of N. America*, 996 F.2d 1390, 1392 (2d Cir. 1993) (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511). When cross-motions for summary judgment are made, as here, courts use the same the standard as for individual motions for summary judgment – each motion must be considered independently of the other and the court must consider the facts in the light most favorable to the non-moving party for each. *See Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). In such a situation, the court is not required to grant judgment as a matter of law for one side or the other. *See id.*

To defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents under Rule 56, "the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried. *See Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). The opposing party "cannot

defeat the motion by relying on the allegations in his pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Id.*; *see also Anderson*, 477 U.S. at 256, 106 S.Ct. at 2512 (the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient"); *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) ("reliance on conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion").

B. Breach of Contract and Contract Interpretation

Under New York law, to establish a claim for breach of, a party must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000). The party claiming breach of contract must prove the material allegations in the complaint by a fair preponderance of the evidence. *See Command Cinema Corp. v. VCA Labs, Inc.*, No. 05 Civ. 6447(SAS), __ F. Supp. 2d __, 2006 WL 3357257 (S.D.N.Y. Nov. 17, 2006).

Certain legal principles under New York law that apply to the interpretation of contracts can guide the Court in this dispute, namely that (1) "the intent of the parties governs; (2) a contract should be construed so as to give full meaning and effect to all of its provisions; (3) words and phrases in a contract should be given their plain meaning; and (4) ambiguous language should be construed against the interest of the drafting party." *See Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (citation and quotation omitted). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."

6

*Compagnie Financiere De CIC Et De L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (citations and quotations omitted).  However, a contract is not made ambiguous "simply because the parties urge different interpretations."  *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).  Ultimately, whether a contract term is ambiguous is a question of law to be resolved by the courts.  *See, e.g.*, *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (2d Cir. 2004).

Where both parties move for summary judgment and also take the position that the language of the contract is unambiguous, for the district court to grant summary judgment in such a case, "there may not be any genuine issue regarding the inferences to be drawn from the language."  *See Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir. 1990).  Thus, "the inferences to be drawn from the language used may not be reasonably susceptible to having more than one meaning ascribed to them."  *Id.* (citations omitted).  Only where the contract's language and the inferences to be drawn from it are unambiguous, may a district court "construe the contract as a matter of law and grant summary judgment accordingly."  *Id.*  Because "intent is all" in contract disputes, the court must thoroughly examine the language to see if ambiguities exist.  *Id.; see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 598 (2d Cir. 2005) ("In interpreting a written contract, a trial court's primary goal is to effectuate the intent of the parties as manifested by the language used in the contract").  As one court has stated

> [T]o insure that the intent of the parties to the contract controls, the standard for granting summary judgment in contract cases focuses on the review of the contract's language and the clarity with which the parties' intent is conveyed. A court may grant summary judgment in those instances in which the contract's words, in and

7

of themselves, convey a definite and precise meaning absent any
ambiguity.

*Gruppo, Levey & Co. v. ICOM Info. & Commc'ns, Inc.*, No. 01 Civ. 8922(JFK), 2003 WL 21511943, at *5 (S.D.N.Y July 1, 2003).

## DISCUSSION

1. Whether Hansen's Failure to Submit an Affidavit in Response
   to MCI Means that Summary Judgment Should be Entered Against It

In its reply memorandum, MCI argues that because Hansen "failed to submit any affidavit or other evidence" challenging MCI's stated facts that were supported by its affidavits, summary judgment should be entered against Hansen under Rule 56(e). The Court disagrees. The nonmovant is not required to submit an affidavit setting forth facts if the record already contains facts sufficient to defeat the summary judgment motion, so long as the nonmovant in its moving papers directs the Court's attention to such facts. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (1986) (the Court held "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'"); *see also D'Alessandro v. Woodloch Pines, Inc.*, No. 99 Civ. 1472(SAS), 2000 WL 28166, at *1 (S.D.N.Y. Jan. 14, 2000) ("If the non-moving party brings forward 'any evidence . . . from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper'") (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). For example, although MCI asserts that all of the HUB software had been completely rewritten, it is permissible for Hansen to challenge this solely in its memorandum and not in an affidavit because, as Hansen states, MCI has been in

8

control of the HUB software. The Court finds that Hansen has designated facts showing why MCI's summary judgment motion should be denied. In this regard, the Court remains mindful that all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *See, e.g., Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 452 (S.D.N.Y. 2002). Second, for Rule 56(e) to come into effect as MCI urges, MCI must have first satisfied its initial burden under Rule 56(c) by showing that there is no genuine issue as to any material fact and that MCI is thus entitled to a judgment as a matter of law. *See, e.g., Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. For reasons discussed below, the Court finds that MCI has not carried that burden.

> 2. Whether the Agreement Permits MCI to Allow
>    Bell Canada and Concert to Access HUB or CMS

MCI's first argument that the access by allow Bell Canada and Concert was permissible is that these entities were permitted to access the CMS Software from outside the United States on a thin-client basis under the license for HUB granted by the Agreement. Hansen argues that this access was not permitted under the Agreement.

MCI argues that Section 3.1A(8) of the Agreement, which allows access on a thin-client basis from anywhere, should be read in conjunction with other permitted uses under Section 3.1, particularly Section 3.1A(5), that allows the program to be used by third parties from its own premises, and Section 3.1A(3), that allows access to the HUB Program by third parties during the normal course of providing MCI products or services. MCI states that the sections should be read in conjunction

because of the phrase in the opening paragraph of Section 3.1 that uses are granted "without limitation."

Section 3.1 states in part

. . . Licensor hereby grants to Licensee a non-exclusive, fully paid-up . . . non-transferable (except to the extent expressly permitted herein), perpetual license to use each Licensed Program covered by such Order in the form of Object Code and Source on an unlimited number of CPUs and only in country for which its use is licensed as identified in Exhibit A or its sub-Exhibit, including without limitation as follows:

    A.    to use the Program
(1) as set forth in Exhibit A and its sub Exhibits
(3) to provide telecommunications and related services to, and access by Customers and other third parties, as required during the normal course of providing MCI products and/or services, and to process Customer and third party information in connection therewith;
(5) . . . to cause or permit a third party to use or operate the Program for the benefit of the Licensee and its Customers, including without limitation for the purposes set forth in clauses (1), (2) and (3) immediately above, and in such event on the premises of Licensee or on the premises of such third party;
(8) to use the server portion of the HUB Program only within the country for which the Program's use is licensed as identified in Exhibit A or its sub-Exhibits, while being entitled to use the thin-client portion of this Program to access the HUB server portion of the Program from anywhere in the world;

Exhibit A, which defines the scope of HUB's geographic limitation under Section 3.1A(8), states that the license is "for use in the United States."

Hansen argues that even assuming the use by Bell Canada and Concert was only on a thin-client basis (this must be assumed),[4] Section 3.1A(8), which permits

---

[4] MCI correctly points out that it is undisputed that Bell Canada and Concert's use is limited to thin-client access under Local Bankruptcy Rule 7056-1(d). *See* Reply Memorandum of Debtors, at 6. Although MCI first argues that Hansen itself "presented as undisputed fact that MCI permitted Bell Canada and Concert to use the CMS software by using the thin-client portion of the software," *id.*

10

use of the thin-client portion of HUB from anywhere in the world, only permits such use by the Licensee according to the opening paragraph of Section 3.1, not third parties such as Bell Canada or Concert.  Hansen argues that there is no basis under the Agreement for third parties to use the thin-client portion of the HUB Software outside the United States and that MCI's interpretation of Section 3.1 "conflicts with the plain language of the Agreement."  Hansen claims that MCI's position is one of "conflation of independent, distinct provisions of the Agreement."

The Court is persuaded that MCI's interpretation of Section 3.1 is too broad.  Although it is well-established that all provisions of a contract should be read together as a harmonious whole, *see, e.g., Seabury Const. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002), there is no indication in the Agreement's language that the numerous provisions under Section 3.1 were intended to be read in tandem with each other.  In fact, because of each provision's precise language as to whom the specific provision applies, the Court is skeptical of MCI's interpretation.

Section 3.1A(8) makes no express mention of third-party use while other provisions clearly do.  For example, Section 3.1A(5) expressly allows a "third party" to use the Program for MCI's benefit on third-party premises.  Section 3.1A(4) allows the creation of derivative works of HUB by "MCI, Licensee or any MCI Personnel" but makes no mention of third parties.  These sections hardly seem drafted to be read

---

(citing Hansen's Statement of Facts, ¶ 13), that is not accurate.  What Hansen actually stated was "MCI has contended . . . that . . . use has been limited to thin-client."  However, the Court agrees with MCI's next argument that because MCI submitted the same fact in its own Statement of Facts at ¶¶ 45-46, 49-50, and because Hansen did not challenge these submissions, this fact thus should be deemed admitted under Local Bankruptcy Rule 7056-1(d).  *See* Local Bankruptcy Rule 7056-1(d) ("Each numbered paragraph in a statement of material facts required to be served by the moving party shall be deemed admitted for purposes of that motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party"); *see also In re Luppino*, 221 B.R. 693, 696 (Bkrtcy. S.D.N.Y. 1998) (deeming facts in a party's statement of facts admitted due to the opposing party's failure to controvert those facts in accordance with Local Bankruptcy Rule 7056-1)

11

in conjunction. Furthermore, although Section 3.1A(5) refers to the purposes set forth in other sub-sections of Section 3.1A, namely sub-sections (1)-(4), Section 3.1A(8) makes no similar reference to any other sub-sections. *See generally Int'l Fidelity Ins. Co. v. County of Rockland*, 98 F. Supp. 2d 400, 412-413 (S.D.N.Y. 2000) ("Sophisticated lawyers . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning . . .[and] must also be presumed to be familiar with standard maxims of contract construction, including the maxim *expressio unium est exclusio alterius* (the expression of one thing is the exclusion of another)"). Since it is reasonable that Section 3.1A(8) was intended to apply only to Licensees according to the language of Section 3.1's introductory paragraph, an ambiguity exists. *See Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993) (holding that a contract was ambiguous because "the interrelationship of . . . two provisions" was "susceptible to different reasonable interpretations").

The Court does not agree with MCI's interpretation of the "without limitation" language in Section 3.1's opening paragraph to mean that all of that section's provisions should be read in conjunction with the other permitted uses. The phrase used, "including without limitation," is a redundant phrase with "including" and "without limitation" each simply meaning that the list that follows is not exhaustive. *See Bekhor v. Bear, Sterns & Co.*, No. 96 Civ. 4156(LMM), 2004 WL 2389751, at *5 (S.D.N.Y. Oct. 25, 2004). That the list is not exhaustive does not mean that the provisions should be read to correlate in the manner that MCI suggests. Furthermore, Hansen's interpretation does not leave a part of the Agreement

12

unreasonable or of no effect. *See, e.g., Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985). If the Agreement does not permit thin-client access by third parties from outside the United States, this does not nullify the uses allowed under Section 3.1.

MCI's argument that it is entitled to summary judgment because the Agreement permits thin-client access of CMS or HUB Software by third parties from outside the United States fails since the Agreement is ambiguous that such use was permitted.

3. Whether MCI Owned the Software at the
   Time of Access by Bell Canada and Concert

An issue crucial for both parties' motions is whether, pursuant to the Agreement's terms, MCI owns CMS free from any of the Agreement's license provision even though CMS retains portions of the original HUB Software, thus allowing MCI to use the software in any manner it desires, such as by allowing Bell Canada and Concert to access it. The Court finds that this question cannot be answered solely by interpreting the Agreement. MCI admits that certain software code contained in the original HUB Software remained in the CMS software program during the time of access by Bell Canada and Concert, and the Agreement is ambiguous as to whether the creation of custom software for MCI was to include portions of software originally owned by Hansen.

MCI claims that under the Agreement Hansen was to provide modifications of and enhancements to HUB in order to meet MCI's particular needs, in work envisioned by the Agreement's Section 9.2, Development Services.

13

Development Services in the Agreement, Section 1.12, is defined as follows

> "Development Services" shall mean the creation of custom software to meet MCI specifications, including all related services reasonably necessary for the creation of such custom software. Such Development Services are provided by Licensor to MCI pursuant to, and in accordance with Section 9.2 of this Agreement.

Section 9.2 reads, in part

> **Development Services**. Licensor shall provide Development Services in accordance with applicable Orders and any attached or referenced SOWs in accordance with the following:
> A. Licensor shall devote its commercially reasonable efforts, attention, knowledge and skill to the performance of Development Services.

The results of the performance of Development Services were deemed Work Product,[5] whose ownership was vested in MCI according the Agreement's Section 13.2, which states that "[a]ll right, title and interest in and to the Work Product shall be exclusively vested in MCI." However, despite the Agreement clearly envisioning the parties' intent for Hansen to help develop custom software for MCI, it is unclear whether the parties meant for the HUB software to be the starting foundation of that custom software, and, if so, whether MCI was entitled to free use of it without the conditions of the Agreement's license applying to it. Although the Agreement clearly states that MCI takes title to whatever software was "written, created, conceived, made or discovered" by Hansen in creating the custom software for MCI, it does not state that pre-existing HUB software used in the custom software was to become MCI's property. For example, the Agreement did not expressly *transfer* rights to

---

[5] § 1.36 defines Work Product
**"Work Product"** means all items and information whether tangible or intangible and in whatever form or media, including without limitation all related Documentation, inventions, improvements or discoveries, whether or not copyrightable or patentable, which are written, created, conceived, made or discovered by Licensor or any Licensor Personnel as a result of the performance of Development Services under this Agreement, together with all copyrights, patents, trade secret rights or other intellectual property rights in any of the foregoing. Work Product expressly excludes Pre-Existing Licensor IP.

14

HUB's existing reference and security features from Hansen to MCI; it stated that new creations would become MCI's property. *See Shugrue v. Continental Airlines, Inc.*, 977 F. Supp. 280, 285 (S.D.N.Y. 1997) (finding no ambiguity where the agreement stated that all right, title and interest to computer software was being "transferred").

During oral arguments on these motions, counsel for Hansen argued that HUB was a "building block" of MCI's CMS system and that if MCI "wanted to use their CMS software in a way that was inconsistent with the license, they shouldn't have built upon this HUB software." MCI's counsel countered that such a position – having to terminate the license or start from scratch – is "contradictory to the ownership provision for the Development Services" and to the perpetual license granted by the Agreement. Hansen's counsel stated that it would be consistent with the Agreement that MCI could only use a program built upon HUB within the scope of the Agreements' license.

MCI makes multiple assertions that there has been a substantial modifications to HUB. For example, Hansen claims that CMS "bears virtually no resemblance to the standard HUB software," that the CMS software "was for all intents and purposes a newly developed software program," and that "CMS did not remotely resemble the HUB predecessor system." In an attached affidavit, Hansen states that "[a]t the time of the filing of this motion [April 4, 2006], all of the HUB software, with the exception of the security features, has been completely and totally rewritten." (*See* Affidavit of David M. Clark, attached to Memorandum in Support of Debtors' Cross-Motion for Summary Judgment on Claim No. 15798 Filed by Hansen Corporation Pty Limited and In Opposition to Hansen's Motion for Summary Judgment ("MCI's

15

Cross-Motion")). MCI claims that CMS constitutes Work Product, in which MCI has ownership rights, and, thus, MCI was entitled to permit Bell Canada and Concert access to the CMS program.

Hansen disputes that the software has been rewritten, and alternatively asks for further discovery under a Rule 56(f) motion for "further discovery to determine the pervasiveness of HUB in MCI's CMS system." Hansen states that while it "agreed at the outset to assist MCI with the development of MCI's CMS system, Hansen never gave MCI ownership of the core HUB software that has always formed the basis for MCI's developing CMS software."

Despite the amount of modifications to CMS, it is not clear from the Agreement or any other evidence whether extensive modifications to the program that retains original software of Hansen would remove the modified program from the Agreement's reach. Also, even assuming the effect of the modifications does constitute a material fact, there are two areas of factual dispute. First, Hansen has disputed that the software has been extensively rewritten. Second, when the software was rewritten could affect Hansen's claims. Despite the litany of changes that MCI details, MCI states that the software was rewritten by March 2006. But the crucial period may start in January 2002, when Bell Canada and Concert first accessed the program – which is only one month after MCI terminated Hansen's Development Services.

For the reasons stated above, the Court finds that whether or not original code from HUB was to be included in the Work Product created by Hansen and MCI under the Development Services provision cannot be answered at this stage. The Agreement is ambiguous as to whether or not original code from HUB was to be

16

included in the Work Product created by Hansen and MCI under the Development Services provision. With the ownership issue unresolved, Hansen is not entitled to summary judgment for its breach of contract claim. Because the Agreement is ambiguous on this issue, both parties' motions for summary judgment are denied.

It could very well turn out that the parties intended to include the HUB as a building block in the development of software to be *wholly owned* by MCI. Hansen's subsequent conduct after the Agreement shows that this is a possibility. For example, in a letter from a Hansen vice-president to MCI after MCI gave notice of terminating the consulting agreement, the Hansen agent stated that "[p]lease also be mindful that CMS has the same parent as Hansen's core billing solution and therefore much of the functionality already or currently developed may be adaptable for use with CMS with little or minor effort." (*See* Exh. 12, attached to MCI's Cross-Motion.) This suggests that the parties intended from the start to build upon existing HUB Software to create CMS's custom software. What is unknown is whether the parties intended for the HUB license provisions to continue to apply to the custom software.

On the other hand, Section 13.1 of the Agreement states that the parties acknowledge that the work provided to MCI under Development Services may incorporate "Pre-Existing Licensor IP [Intellectual Property]" and that MCI received a fully paid-up license to use such intellectual property to the extent it was incorporated into the provided work. However, that definition of Pre-Existing Licensor IP, at Section 1.23, expressly excludes HUB. Thus, the Agreement is unclear as to MCI's entitlement to use HUB in the custom software arising out of Development Services. Hansen's assertion that the license provisions were to continue to apply to the custom software is plausible.

The record so far is not so complete to allow the Court to make a definitive determination on the issue of whether or not original code from HUB was to be included in the Work Product created by Hansen and MCI under the Development Services provision.

4. Rule 56(f) Motion

Because the Court denies the motions for summary judgment, the Court does not reach the Rule 56(f) motion. Hansen's motion for additional discovery "if the Court determines that the Agreement is ambiguous" was not necessary because the parties had agreed to stay discovery upon Hansen's filing of a motion for summary judgment. Furthermore, the parties agreed that if the Court overrules the summary judgment motions of both parties, which it has, then the parties shall complete discovery and agree upon a new scheduling order.

## CONCLUSION

Based upon the aforementioned, each of the motions for summary judgment is denied. The Court does not reach the Rule 56(f) motion for reasons stated above. The parties should submit an order consistent with this opinion. Further, in accordance with the second Amended Scheduling Order ¶ 9, Docket No. 17867, the parties shall agree upon and submit a new scheduling order. In addition, that scheduling order shall provide a date for a pre-trial conference.

Dated: New York, New York
     January 18, 2007

                                            s/Arthur J. Gonzalez
                                            UNITED STATES BANKRUPTCY JUDGE