UNITED STATES BANKRUPTCY COURT　　　　NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

────────────────────────────────────────

In re　　　　　　　　　　　　　　　　　　　：　　Chapter 11

WORLDCOM, INC., et al.,　　　　　　　　　：　　Case No. 02-13533 (AJG)

　　　　　　　Debtors.　　　　　　　　　　：　　(Confirmed Case)

────────────────────────────────────────

OPINION GRANTING IN PART AND DENYING IN PART THE DEBTORS' MOTION FOR
SUMMARY JUDGMENT WITH RESPECT TO THE 22ND OMNIBUS CLAIM OBJECTION
(WIRELESS TRANSITION BONUS EMPLOYEE CLAIMS)


A P P E A R A N C E S

STINSON MORRISON HECKER LLP
Attorneys for the Debtors
1201 Walnut Street
Kansas City, MO 64106

　　Mark A. Shaiken, Esq.
　　Angela G. Heppner, Esq.

Pat Canada
*Pro Se*

Julia McAndrew
*Pro Se*

James McArdle
*Pro Se*

Rodney Tullie
*Pro Se*

ARTHUR J. GONZALEZ
United States Bankruptcy Judge


　　Before the Court is the Debtors' Motion for Summary Judgment (the "Motion") with

respect to the following proofs of claim asserted by former employees of the Debtors

(collectively, the "Bonus Claimants"): claim number 14718, filed by Mr. Patrick Canada ("Canada"); claim number 9739, filed by Ms. Julia McAndrew ("McAndrew"); claim number 35443, filed by Mr. James McArdle ("McArdle"); and claim number 18853, filed by Mr. Rodney Tullie ("Tullie" and the "Tullie Claim").  The Debtors argue that these claims were previously released, and that they should therefore be disallowed and expunged.  Having reviewed the parties' pleadings, and a hearing having been held on this matter, the Court concludes that the Motion should be granted in part and denied in part.  The Debtors are entitled to summary judgment in their favor on claim numbers 14718, 9739, and 35443; however, the Debtors are not entitled to summary judgment in their favor as to the Tullie Claim.  Rather, the Court concludes that the general release executed by both the Debtors and Tullie should be rescinded for lack of mutual assent, returning the parties to their original positions.

BACKGROUND

On July 21, 2002, and continuing thereafter, WorldCom and certain of its direct and indirect domestic subsidiaries filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code.  The Court approved the Debtors' Modified Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code on October 31, 2003.  The Reorganization Plan became effective April 20, 2004.  The Debtors, renamed MCI, Inc., subsequently merged with Verizon Communications, Inc., on January 6, 2006.  Under the merger agreement, MCI, Inc., merged with and into Eli Acquisition, LLC, as a direct, wholly owned subsidiary of Verizon Communications, Inc.  Eli Acquisition, LLC, as the surviving entity, was immediately renamed MCI, LLC.  MCI, LLC is now doing business as Verizon Business Global, LLC.

2

As part of their prepetition efforts to exit the wireless resale business, the Debtors identified certain employees whose efforts the Debtors believed were necessary to accomplish that goal. In June 2002, the Debtors therefore offered those employees individual letter agreements (the "Letter Agreements"). These agreements generally provided that the employees would be paid bonuses if the employees remained with the company until a designated transition date – either August 31, 2002, or December 31, 2002 – and met certain performance objectives. However, as noted above, due to the continuing decline in the their financial position, the Debtors filed voluntary petitions for relief in this Court on July 21, 2002. As part of their reorganization efforts, the Debtors determined that the Letter Agreements were no longer in the best interests of the estate, and on September 10, 2002, accordingly notified the Bonus Claimants that the Letter Agreements would be rejected. The Debtors did, however, offer to make severance payments on the condition that the Bonus Claimants release any claims that they might have had against the Debtors. Each of the Bonus Claimants subsequently executed a GRA and received a severance payment.[1]

DISCUSSION

In prior proceedings, the Court determined that claims arising from the Letter Agreements were not entitled to administrative expense priority status under 11 U.S.C. § 507. *In re WorldCom, Inc.*, No. 02-13533 (Bankr. S.D.N.Y. July 15, 2003) (the *Transition Bonus Case*).[2]

---

[1] For reasons that are not clear from the record, Canada was offered a severance package, including a GRA, prior to being notified that the Letter Agreements would be rejected; Canada executed the GRA on September 6, 2002. The other Bonus Claimants executed GRAs between October 29, 2002, and January 13, 2003. These GRAs were in all relevant features identical, save for the GRA Tullie executed, as will be discussed.

[2] Though the Court denied the claimants' motion for priority status, the Court also determined that the Debtors' motion to reject the Letter Agreements was moot. Agreeing with the claimants and relying on the *Countryman* analysis, the Court held that the claimants had performed their obligations by the date the motion to reject was filed, and therefore concluded that the Letter Agreements were no longer executory contracts to be assumed or rejected. *See The Penn Traffic Co. v. Cor Route 5 Co., LLC* (*In re The Penn Traffic Co.*), No. 05-3755, 2005 U.S. Dist. LEXIS 20407, at *6 (S.D.N.Y. September 16, 2005) (under *Countryman* analysis, executory contract is contract where material obligations remain on both sides); *In re Riodizio,*, 204 B.R. 417, 421 (Bankr. S.D.N.Y. 1997) (where

3

As an alternative rationale for denying the motion for administrative priority status, the Court held, "[T]he plain and unambiguous language of the release provision bars those employees who executed a [GRA] from pursuing claims under the Letter Agreements." *Transition Bonus Case*, at 18. The Court reiterates that conclusion here. As the plain and unambiguous terms of the GRAs provide, any party who executed a *valid* GRA released "any and all claims, demands, causes of action, damages or liability of any nature whatsoever, known or unknown, which Employee has or may and which arise out of, concern, or relate in any way to his/her employment or the cessation of employment."[3]

McANDREW AND McARDLE CLAIMS

Both McAndrew and McArdle executed a GRA, and neither has identified any issue of fact or law that would alter the Court's general conclusion as applied. In her objection to the Motion, McAndrew details her detrimental reliance upon the Debtors' promises; however, while that reliance would be material to her Letter Agreement claim, it does not speak to the validity or effect of the GRA. Similarly, McArdle's objection merely states his opposition without

---

"postpetition events alter the executoriness of a contract… a court will look to the date the motion to assume or reject is made or heard rather than the petition date."). However, that conclusion had little practical effect, as the Court also concluded that the Letter Agreements were not assumed and that assumption could not be implied. Effectively, then, though the Letter Agreements were not rejected, the claimants nonetheless still possessed only general, unsecured claims. The Court's decision in the *Transition Bonus Case* may be contrasted with the Court's decision in *In re WorldCom, Inc.*, 343 B.R. 486 (Bankr. S.D.N.Y. 2006) (*Dobie*). In *Dobie*, the Court considered both the *Countryman* analysis and the alternative "Functional" approach in determining whether a contract was executory in nature. *See Cohen v. The Drexel Burnham Lambert Group, Inc.* (*In re Drexel Burnham Lambert Group, Inc.*), 138 B.R. 687, 707-709 (Bankr. S.D.N.Y. 1992) (under functional analysis, an executory contract is a contract providing benefit to the debtor's estate, regardless of whether outstanding obligations remain on both sides). The contrasting approach the Court took in these two decisions, however, should not be viewed as endorsing one analysis over the other, as the choice of analytical method was not outcome-determinative. The Court reached the same result in *Dobie* applying both tests, and would have reached the same result in the *Transition Bonus Case* if it had applied the "Functional" analysis; in the *Transition Bonus Case*, the Court effectively signaled the conclusion it would have reached had it applied the "Functional" analysis when it concluded that the claimants had not provided benefits to the Debtors postpetition. Which analysis should be applied remains an open issue in this circuit, and the Court has not issued and does not issue an opinion as to that question.

[3] The Letter Agreements provide that they "shall, in all respects, be interpreted, enforced, and governed under the laws of the State of Georgia, without regard to its conflict-of-law provisions." The parties do not dispute that Georgia state substantive law should apply, and accordingly, the Court will apply Georgia contract law in analyzing the GRAs.

4

explanation. Accordingly, the Court concludes that McAndrew and McArdle released the claims they now assert.

CANADA CLAIM

Canada also executed a GRA, but argues that the release is invalid for lack of consideration, that the release does not apply to his claim, and that the GRA is invalid as a contract of adhesion. Under Georgia law, a contract of adhesion is "a standardized contract offered on a 'take it or leave it' basis and under such conditions that a consumer cannot obtain the desired product or service without acquiescing in the form contract. Such contracts, while permissible, are construed strictly against the drafter." *Hospital Authority of Houston County v. Bohannon*, 611 S.E.2d 663, 664 (Ga. App. 2005) (citations omitted). The Court concludes that the GRA is not a contract of adhesion, as it more resembles a legal settlement than a contract to purchase goods or services. However, even assuming that the GRA is a contract of adhesion, that conclusion would not alone be sufficient to resolve the dispute. As noted, contracts of adhesion are enforceable, and a court's judgment that a contract is a contract of adhesion only requires that the contract be strictly construed.

Notwithstanding the release language previously described, Canada argues that he did not release his Letter Agreement claim because that claim arose after the GRA was executed. In particular, Canada highlights the language that the GRA applies to claims "which arise out of, concern or relate in any way to his/her employment or the cessation of employment with WorldCom or any other person or entity referenced herein *prior to the date of this Agreement*." (emphasis added). As previously noted, Canada executed the GRA prior to being notified that the Letter Agreements were to be rejected. Thus, Canada argues, his claim was not released, as it arose following, not prior to, the date of the GRA.

5

Even assuming that the GRA is a contract of adhesion and should be construed strictly, the Court does not concur in Canada's interpretation. The release language is clearly broad, applying to "any and all claims" "of any nature whatsoever, known or unknown" that the employee "has or may have." Moreover, Canada incorrectly interprets the language "prior to the date of this Agreement." Contrary to Canada's interpretation, that language limits the scope of the release to those claims related to Canada's recently-terminated employment; that is, the GRA does not apply to any claims that might arise if Canada resumed his employment with the Debtors in the future. Thus, the Court concludes that the asserted claim falls within the class of claims released under the GRA.

Though Canada asserts that the GRA is a contract of adhesion, his description implies rather that the GRA is unenforceable as unconscionable. Under Georgia law, a contract is unconscionable if "in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." *NEC Technologies, Inc. v. Nelson*, 478 S.E.2d 769, 771 (Ga. 1996) (citations omitted). *See also Georgia Magnetic Imaging, Inc. v. Greene County Hospital Auth.*, 466 S.E.2d 41, 46 (Ga. App. 1995) ("such an agreement as no sane man not acting under a delusion would make and that no honest man would take advantage of"); *F.N. Roberts Pest Control Co. v. McDonald*, 208 S.E.2d 13, 15 (Ga. App. 1974) (a contract that is "abhorrent to good morals and conscience. It is one where one of the parties takes a fraudulent advantage of another."). Unconscionability is "not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula." *Nelson*, 478 S.E.2d at 772 (citations omitted).

6

Applying this standard, the Court concludes that enforcement of the GRA is not unconscionable. Contrary to Canada's suggestion, conditioning the payment of severance benefits on execution of a GRA is not contrary to public policy or representative of a one-sided bargain. As Canada was not entitled to severance pay, the bargain represented a genuine choice between immediate certain benefits and potentially more valuable, but also more risky, future benefits. Unconscionability requires more than differences in bargaining power or unappealing choices, and this bargain would not give "decent, fair-minded persons … a profound sense of injustice" if it were enforced. *Id.* at 774.

Finally, Canada argues that the GRA is unenforceable for failure of consideration. Canada contends that he was entitled to severance pay prior to his execution of the GRA, and therefore, that the Debtors did not offer consideration in exchange for his release of claims. However, Canada has failed to identify the source of his alleged enforceable right to severance pay. The various communications Canada identifies only state that Canada is eligible for severance benefits, not that he is entitled to such benefits. Moreover, the WorldCom Severance Plan itself conditions the payment of severance benefits on the execution of a general release of claims. Thus, the GRA does not suffer from failure of consideration and is enforceable.

TULLIE CLAIM

Tullie did not execute the GRA as presented to him, but rather amended the release recital to include the following language: "Nothing in this agreement shall affect any claims filed with the bankruptcy court." Tullie initialed this amendment and then returned the amended GRA (the "Tullie GRA") to the Debtors. The Debtors executed the Tullie GRA, though without likewise initialing the amendment, and claim that they were unaware of the amendment. Relying on the Tullie GRA, Tullie asserts that his claim was not released and that the Debtors are

7

therefore not entitled to summary judgment. In response, the Debtors argue that the Tullie GRA is invalid and urge the Court to either revert it to its original form or interpret it in such a way as to release Tullie's Letter Agreement claim.

The Debtors state that they did not notice, nor would they have accepted, the amendment, noting that the amendment effectively eviscerates the release; as the automatic stay bars litigation concerning the Debtors' liabilities outside these proceedings, the amended release applies only to a few, if any, potential claims. The Debtors fail, however, to assert a valid ground upon which to reform the Tullie GRA, much less to its original form; nor may the Tullie GRA be interpreted in such a fashion as to release the asserted claim. Georgia law unambiguously holds that failure to read a contract is not grounds for rescission or reformation unless the party is prevented from reading the contract through fraud or inability. *Chitwood v. Southern General Ins. Co.*, 377 S.E.2d 210, 213 (Ga. App. 1988); *Roberson v. Henderson Chemical Co.*, 320 S.E.2d 835, 838 (Ga. App. 1984). This is particularly true where the party is a sophisticated commercial enterprise. Neither may the Debtors establish mistake, as the error was unilateral, arose from ignorance, and does not operate as a gross injustice to either party. *Jackson v. Wiley*, 388 S.E.2d 395 (Ga. App. 1989); *Thomaston v. Fort Wayne Pools, Inc.*, 352 S.E.2d 794, 795-796 (Ga. App. 1987). Finally, the Tullie GRA represents a counteroffer, precluding reformation to a clearly rejected original offer. It would be difficult to justify a result binding a party to an original, rejected offer solely on the basis of the other party's failure to read the contract.

However, the Court concludes that rescission of the Tullie GRA is the proper remedy here because the parties did not evidence the mutual assent necessary to form a contractual relationship. "A meeting of the minds is the first requirement of law relative to contracts. If

8

there is any essential term upon which agreement is lacking, no meeting of the minds of the parties exists, and a valid and binding contract has not been formed." *Auto-Owners Ins. Co. v. Crawford*, 525 S.E.2d 118, 120 (Ga. App. 1999). *See also West v. Southern States Coop, Inc.*, 622 S.E.2d 12 (Ga. App. 2005). Such is the situation here. The scope of the release is necessarily a material term. The Debtors specifically contemplated that the Bonus Claimants would release the Letter Agreement claims. Equally clearly, Tullie specifically intended to not release his Letter Agreement claim. As a result, there was no meeting of the minds, and no agreement was formed. Therefore, the Court concludes that the Tullie GRA should be rescinded and that, as a result, the Debtors are not entitled to summary judgment regarding the Tullie Claim.[4]

CONCLUSION

In light of the foregoing, the Court concludes that Motion should be granted in part and denied in part. The Debtors are entitled to summary judgment regarding claim numbers 14178, 9739, and 35443, and those claims shall be disallowed and expunged. However, the Debtors are not entitled to summary judgment regarding the Tullie Claim. As the Court's determination that Tullie GRA should be rescinded was not contemplated by either party and raises issues concerning the parties' respective obligations, further proceedings are required to determine the ultimate disposition of the Tullie Claim. The Debtors are to settle an order consistent with this opinion, and attach a copy thereof, on each of the claimants. The Debtors and Tullie should also

---

[4] As was previously discussed, Canada did not possess a right to severance payments, and though the Court does not reach the issue, this conclusion in all likelihood applies equally to the Bonus Claimants as a group, including Tullie. Accordingly, it should be noted that as a result of the rescission of the Tullie GRA, the Debtors are probably entitled to the return of those sums paid to Tullie under the terms of the Tullie GRA. However, the Court issues no opinion as to whether the Debtors possess, *inter alia*, set-off rights, nor does the Court wish to preempt any consensual resolution by the parties. Rather, the Court only notes that its discussion and conclusion here do not address the issues that may arise from the fact that Tullie has received payment under the Tullie GRA.

9

contact the Court to schedule a status conference to address the remaining issues regarding the

Tullie Claim.


Dated:  New York, New York
        January 26, 2007

                                               **s/Arthur J. Gonzalez**
                                               United States Bankruptcy Judge