UNITED STATES BANKRUPTCY COURT       **For Publication**
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| WORLDCOM, INC., *et al.*, | : | Case No. 02-13533 (AJG) |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |
| | : | |

—————————————————————————

OPINION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT
BROUGHT SEPARATELY BY MICHAEL JORDAN AND WORLDCOM, INC.


A P P E A R A N C E S

STINSON MORRISON HECKER LLP
Special Counsel for Reorganized Debtors
1201 Walnut Street, Suite 2700
Kansas City, MO 64106

     Norman E. Beal, Esq.
     Mark A. Shaiken, Esq.

SCHIFF HARDIN LLP
Attorneys for Michael Jordan
6600 Sears Tower
Chicago, IL 60606-6473

     Frederick J. Sperling, Esq.
     Eugene J. Geekie, Jr.
     Jason M. Torf
-and-

623 Fifth Avenue
New York, NY 10022

     A. Peter Lubitz, Esq.

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

## INTRODUCTION

Before the Court are cross-motions for summary judgment separately brought by

Michael Jordan ("Jordan") and WorldCom, Inc. (hereafter referred to as the "Debtors" or

"MCI").

## BACKGROUND

On or about July 10, 1995, Jordan and the Debtors entered into an endorsement

agreement (the "Agreement").  At that time, Jordan was considered to be one of the most

popular athletes in the world.  The Agreement granted MCI a ten-year license to use

Jordan's name, likeness, "other attributes," and personal services to advertise and

promote MCI's telecommunications products and services beginning in September 1995

and ending in August 2005.  The Agreement did not prevent Jordan from endorsing most

other products or services, although he could not endorse the same products or services

that MCI produced.  In addition to a $5 million signing bonus, the Agreement provided

an annual base compensation of $2 million for Jordan.  The Agreement provided that

Jordan would be treated as an independent contractor and that MCI would not withhold

any amount from Jordan's compensation for tax purposes.  The Agreement provided that

Jordan was to make himself available for four days, not to exceed four hours per day,

during each contract year to produce television commercials and print advertising and for

promotional appearances.  The parties agreed that the advertising and promotional

materials would be submitted to Jordan for his approval, which could not be

unreasonably withheld, fourteen days prior to their release to the general public.  From

1995 to 2000, Jordan appeared in several television commercials and a large number of

print ads for MCI.

On July 1, 2002, MCI commenced a case under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the Southern

District of New York.  On January 16, 2003, Jordan filed Claim No. 11414 in the amount

of $2 million plus contingent and unliquidated amounts allegedly due under the

Agreement.  On July 18, 2003, the Debtors rejected the Agreement as of that date,

pursuant to § 365(a) of the Bankruptcy Code.  Following that rejection of the Agreement,

Jordan filed Claim No. 36077 (the "Claim") in the amount of $8 million – seeking $2

million for each of the payments that were due in June of 2002, 2003, 2004, and 2005.

MCI does not object to the Claim to the extent Jordan seeks $4 million for the 2002 and

2003 payments under the Agreement.  As of the rejection in July 2003, two years

remained under the Agreement.

*The Parties' Contentions*[1]

MCI asserts two bases for disallowance of the Claim.  One, MCI contends that the

Agreement is an "employment contract" within the meaning of section 502(b)(7) of the

Bankruptcy Code and that Jordan's claim is "capped" pursuant to that section.  Second,

MCI argues that Jordan had an obligation to mitigate his damages and failed to do so.

MCI argues that these two bases entitle it to summary judgment with respect to its

objection to the Claim, and assert that either under section 502(b)(7) or as a result of

Jordan's failure to mitigate damages following the Debtors' rejection, the Claim should

be reduced to $4 million.  MCI argues that it is under no obligation to pay Jordan for

contract years 2004 and 2005.

---

[1] References to arguments made, or positions asserted, by MCI or Jordan are to arguments made by the attorneys for each.

Jordan argues for summary judgment allowing the Claim in full and overruling and dismissing MCI's objections to the Claim. Jordan argues that because he was not an "employee" of MCI and because the Agreement was not an "employment agreement," section 502(b)(7) does not apply to cap his claim. Regarding MCI's mitigation argument, Jordan argues that the objection should be overruled and dismissed for three independent reasons (1) Jordan was a "lost volume seller" and thus mitigation does not apply, (2) there is no evidence that Jordan could have entered into a "substantially similar" endorsement agreement, and (3) Jordan acted reasonably when he decided not to pursue other endorsements after MCI's rejection of the Agreement.

## DISCUSSION

A. **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), made applicable to this proceeding by Federal Rule of Bankruptcy 7056, summary judgment is only appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R. Civ. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). A genuine issue of material fact exists, where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). In determining whether such an issue exists, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997). The court's role is "not to weigh the evidence or make determinations of credibility but to 'determine whether there is a

4

genuine issue for trial.'"  *Village of Kiryas Joel Local Dev. Corp. v. Ins. Co. of N. America*, 996 F.2d 1390, 1392 (2d Cir. 1993) (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511).  It is well established that a party opposing a motion for summary judgment "may not rest upon mere conclusory allegations or denials."  *See Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 222 (2d Cir. 2006) (*quoting Markowitz v. Republic Nat'l Bank of N.Y.*, 651 F.2d 825, 828 (2d Cir. 1981)).  When cross-motions for summary judgment are made, as here, courts use the same standard as for individual motions for summary judgment – each motion must be considered independently of the other and the court must consider the facts in the light most favorable to the non-moving party for each.  *See Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). In such a situation, the court is not required to grant judgment as a matter of law for one side or the other.  *See id.*

B.  **Application of Section 502(b)(7)**

Jordan argues that section 502(b)(7) does not apply to his claim because he was an independent contractor and not an employee of MCI.  MCI argues that section 502(b)(7) does apply to the Claim because the Agreement was an Employment Contract and Jordan was an "employee" within the meaning of that statute.

Section 502(b)(7) provides

(b) [T]he court, after notice and a hearing, shall determine the amount of . . . [a] claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . .

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds -

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of -

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

11 U.S.C. § 502(b)(7).

This section caps an employee's claim for damages resulting from the termination of an employment agreement when the employer has filed for bankruptcy to (1) one year's compensation provided by such agreement measured from the earlier of the date of the filing of the bankruptcy petition or the date of termination, plus (2) any unpaid compensation due on such date. *See, e.g., In re Protarga, Inc.*, 329 B.R. 451, 465 (Bankr. D. Del. 2005). The statutory language shows Congress's intent to limit the amount of damages that are recoverable from a debtor employer when each of two conditions is present – the claim must be that of an "employee" and the damages sought are for the termination of an "employment contract." *See In re Lavelle Aircraft Co.*, No. 94-17496DWS, 1996 WL 226852, at *3 (Bankr. E.D. Pa. May 2, 1996). Neither "employee" nor "employment contract" is defined in the statute or legislative history. *See id.*, at *4.

When originally enacted, subsection (b)(7) did not contain the phrase "of an employee." That language was added in 1984.[2] *See In re Continental Airlines*, 257 B.R. 658, 665 (Bankr. D. Del. 2000). One commentator has stated that the 1984 addition was made to eliminate the possibility of third parties, such as third party contractors, asserting

---

[2] As affected by the 1984 amendments, the numbering of this provision changed from § 502(b)(8) to § 502(b)(7). *See, e.g., In re Goforth*, 179 F.3d 390, 394 n.2 (5th Cir. 1999).

a claim against the estate.  *See id.* (citing Norton Bankruptcy Code Pamphlet, 1994-95

Edition (Revised) § 502(b), Editor's Comment at 379 (1995)).

The cases that have discussed the issues of whether a person was an "employee"

and whether the parties had an "employment contract" pursuant to section 502(b)(7) have

considered a varied, non-exhaustive list of factors.  The factors evidencing an

employment contract include (a) how the agreement is entitled, (b) if the agreement

identifies job responsibilities, (c) if the agreement provides the terms for compensation

and benefits, (d) if withholding taxes and social security benefits are deducted from pay,

(e) if the agreement constrains the "employee" from certain other activities, (f) if the

agreement is not assignable, (g) if the debtor had the right to control the activities of the

"employee,"[3] and (h) the amount of hours the "employee" needed to devote to the

debtor's business per year.[4]  Another case stated that factors showing that a person was

not an employee included that (i) the "employee" ran his own business, and (j) the

"employee" provided services from a location far from the debtor.[5]

The majority of these factors favor Jordan.  First, the Agreement[6] explicitly stated

that "Jordan shall be treated as an independent contractor under the terms of this

Agreement" and that the Debtors would not withhold taxes.  On the federal tax Form

1099 that MCI provided to Jordan, MCI identified Jordan's compensation as "non-

employee compensation."  *See* Jordan's Statement of Uncontested Material Facts In

Support of Mot. Summ. J., Ex. 11.  The Agreement did not provide that the Debtors

---

[3] Factors (a) – (g) were identified in *In re Bergh*, 141 B.R. 409, 416 (Bankr. D. Minn. 1992) (citations omitted).

[4] Factors (d), (f), and (h) were identified in *In re Aero-Auto Co.*, 33 B.R. 107, 108-09 (Bankr. E.D. Va. 1983).

[5] Factors (i) and (j) were identified in *In re Russell Cave Co.*, 253 B.R. 815, 823 (Bankr. E.D. Ky. 2000).

[6] The title of the Agreement was simply "Agreement" and does not favor either side.  *Cf. Aero-Auto,* 33 B.R. at 108 (agreement's title "employment agreement" supported a finding that it was an employment contract).

would furnish Jordan with health insurance or pension benefits, and MCI has not shown

that it did provide Jordan with those benefits.  The Agreement did not provide the

Debtors with substantial rights to control Jordan's activities; in fact, under the

Agreement, Jordan retained substantial rights over his activities for the Debtors.  For

example, MCI agreed to submit copies of "all packaging, advertising and/or promotional

materials" to Jordan for his approval before releasing them to the general public.  The

Agreement also provided that the timing of Jordan's work for MCI would be subject to

Jordan's schedule.  The hours worked under the Agreement strongly favor Jordan.  In

*Bergh*, the court noted that the agreement limited the party's consulting services to a

maximum of 120 hours per year.  *Bergh*, 141 B.R. at 416 (finding that the limit on the

hours was one of the agreement's "significant differences" from factors "which evidence

an employment contract").  Here, Jordan was required to work a maximum of *sixteen*

*hours per year.*

MCI points out that in *In re Wilson Foods Corp.*, 182 B.R. 278 (Bankr. D. Kan.

1995), the court found the consultant, a party designated as an "independent contractor,"

to be an employee under section 502(b)(7).  The claimant there had been a party to a

three-year "Employment Agreement" with the debtor, with the possibility of renewal for

a like term.  When her term was not renewed, the Employment Agreement provided that

the claimant was to serve as a consultant for seven years.  After the debtor filed for

bankruptcy, the court found that the "terms contained in the written contract, delineated

an 'Employment Agreement,' evidenced an employment relationship between" the debtor

and the claimant.  *Wilson Foods*, 182 B.R. at 283.  Some of the factors in that case

admittedly do not favor Jordan – there the claimant had to pay her own taxes, the

Employment Agreement was assignable only under limited circumstances,[7] and had a

non-compete clause.  The Agreement contains similar provisions.  However, the *Wilson*

*Foods* court considered that because the consulting contract was contained in the same

Employment Agreement under which the claimant served as executive vice president, the

"situation is not so far removed from the general statement that the purpose of §

502(b)(7) was to 'limit the claims of key executive-employees, who for one reason or

another, were able to exact long-term contracts calling for substantial remuneration.'"

*Wilson Foods*, 182 B.R. at 283 (citation omitted).  *See also Russell Cave*, 253 B.R. at 823

("the critical difference . . .[in] *Wilson Foods* . . . is that her consulting contract was part

and parcel of the employment contract").

   As shown by *Russell Cave's* distinction of *Wilson Foods*, the policy

considerations behind section 502(b)(7) favor Jordan.  Section "502(b)(7) serves a . . .

purpose by limiting employee damage claims, especially those of *officers, owner-*

*managers and other key-executives* who had been able to exact favorable long term

contracts calling for substantial remuneration."  *Lavelle Aircraft*, 1996 WL 226852, at *5

(emphasis added); *see also In re Prospect Hills Res., Inc.*, 837 F.2d 453, 455 (11th Cir.

1988) ("One purpose of section 502(b)(7) was to relieve bankrupt employers of the

continuing duty to pay high salaries to officers and owners-managers who had been able

to exact favorable terms of tenure and salaries while the business prospered.").  Here,

Jordan was not an officer, an owner-manager, or a key executive of MCI.  He was a

popular athlete whose image MCI wished to license to sell its services and products.

---

[7] This factor favors neither side.  The Agreement provides that Jordan needed MCI's consent to assign, which is consistent with the general rule regarding the assignability of unique personal services contracts. *See Flack v. Laster*, 417 A.2d 393, 399 (D.C. 1980) ("effectiveness of an assignment does not normally depend upon the consent of the obligor unless the rights to be assigned involve the performance of unique personal services").

9

Section 502(b)(7)'s envisioned harm of high-level corporate insiders negotiating a long-term deal has no application to Jordan, whose main duty to the company was showing up for sixteen hours a year at photo and commercial shoots that were presumably far from MCI's corporate offices.  *See, e.g., In re Cincinnati Cordage & Paper Co.*, 271 B.R. 264, 269 (S.D. Ohio 2005) ("This code section was designed to limit the claims of key executives who had been able to negotiate contracts with very beneficial terms.").

As pointed out in *In re U.S. Truck Co., Inc.*, 89 B.R. 618, 627 (E.D. Mich. 1988), the Report of the Commission on the Bankruptcy Laws of the United States, which originally proposed this exception and whose draft was adopted almost word-for-word, explained the rationale for this section:  "This clause is intended principally to apply to long-term contracts providing substantial compensation to management executives of corporate debtors.  It also applies to the termination of contracts obligating payment for future athletic, entertainment, or other services."  Commission Report, H.R. Doc. 137, 93rd Cong., 1st Sess., Part II at 106 (1973), *reprinted in* Collier on Bankruptcy, Appendix B, Part 4-674 (15th Ed. Rev. 2006).

Based upon a review of aforementioned, most specifically the factors cited in the case law, the Court finds that Jordan was not an "employee" and the Agreement was not an "employment contract" pursuant to section 502(b)(7).  Therefore, there being no genuine issue of material facts as to Jordan's status, the Court grants summary judgment to Jordan on this point and holds that this basis for MCI's objection to the Claim is overruled and denied.

10

C. **Mitigation**

The doctrine of avoidable consequences, which has also been referred to as the duty to mitigate damages, "bars recovery for losses suffered by a non-breaching party that could have been avoided by reasonable effort and without risk of substantial loss or injury."  *Edward M. Crough, Inc. v. Dep't of Gen. Servs. of D.C.*, 572 A.2d 457, 466 (D.C. 1990).  The burden of proving that the damages could have been avoided or mitigated rests with the party that committed the breach.  *See Obelisk Corp. v. Riggs Nat'l Bank of Washington, D.C.*, 668 A.2d 847, 856 (D.C. 1995); *see also Norris v. Green*, 656 A.2d 282, 287 (D.C. 1995) ("The failure to mitigate damages is an affirmative defense and the [breaching party] has the burden of showing the absence of reasonable efforts to mitigate").  The efforts to avoid or mitigate the damages do not have to be successful, as long as they are reasonable.  *See Edward M. Crough*, 572 A.2d at 467.

Jordan argues that as a "lost volume seller" he was under no obligation to mitigate damages.  Alternatively, Jordan argues that MCI failed to establish that Jordan could have entered a "substantially similar" endorsement contract and that Jordan acted reasonably in not entering another endorsement agreement after MCI's breach.  MCI counters that Jordan is not a lost volume seller and that MCI has shown that Jordan failed to take reasonable steps to mitigate damages.

The damages for a contract's rejection are determined in accordance with the law that would govern the value of the claim outside the context of bankruptcy.  *See, e.g., R & O Elevator Co. v. Harmon*, 93 B.R. 667, 669, 672 (D. Minn. 1988) (discussing mitigation theory under applicable state law); *see also In re Dabrowski*, 257 B.R. 394,

11

414 n.40 (Bankr. S.D.N.Y. 2001) (state law determines consequences of breach deemed

rejection under § 365); *In re Mitchell*, 249 B.R. 55, 58 (Bankr. S.D.N.Y. 2000) (to

determine the effect of rejection under § 365, "we look to state law").

The Court will look to the District of Columbia ("D.C.") as the applicable state

law for mitigation and other consequences of MCI's rejection of the Agreement.  The

parties, under Section 16 of the Agreement, "Arbitration; Governing Law," provided that

any controversy would be submitted to arbitration to be governed in accordance with

D.C. law.  This is the only choice of law provision in the Agreement.  MCI has asserted

that the Agreement was negotiated between "WorldCom in Mississippi and Michael

Jordan's agent in Washington, D.C. with input from Michael Jordan, a resident of

Illinois."  New York's choice-of-law rules would require application of D.C. law under a

"center of gravity approach" as D.C. was where one party negotiated from and was the

location specified in the only choice of law provision.  *See Beth Israel Med. Ctr. v.*

*Horizon Blue Cross & Blue Shield of N.Y.*, 448 F.3d 573, 583 (2d Cir. 2006) (stating

factors, including place of negotiation, considered under "center of gravity" analysis); *see*

*also Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("New

York courts generally defer to the choice of law made by the parties to a contract").

The Court was not furnished nor did research reveal D.C. cases precisely on point.

Therefore, the Court will discuss and rely on cases from other jurisdictions where needed.

*1.  Whether Jordan Was a "Lost Volume Seller"*

Jordan argues that MCI's mitigation defense does not apply here because Jordan

is akin to a "lost volume seller."  Jordan points to testimony demonstrating that he could

have entered into additional endorsement contracts even if MCI had not rejected the

Agreement. Thus, he argues, any additional endorsement contracts would not have been substitutes for the Agreement and would not have mitigated the damages for which MCI is liable.

"A lost volume seller is one who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity." *Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 490 (Fed. Cl. 2006). A lost volume seller does not minimize its damages by entering into another contract because it would have had the benefit of both contracts even if the first were not breached. *See Jetz Servs. Co. v. Salina Props.*, 865 P.2d 1051, 1055-56 (Kan. Ct. App. 1993). The lost volume seller has two expectations, the profit from the breached contract and the profit from one or more other contracts that it could have performed at the same time as the breached contract. *See Snyder v. Herbert Greenbaum & Assocs.*, 380 A.2d 618, 624 (Md. Ct. Spec. App. 1977). "The philosophical heart of the lost volume theory is that the seller would have generated a second sale irrespective of the buyer's breach" and that "[i]t follows that the lost volume seller cannot possibly mitigate damages." D. Matthews, *Should the Doctrine of Lost Volume Seller Be Retained? A Response to Professor Breen*, 51 U. MIAMI L. REV. 1195, 1214 (July 1997); *see also Snyder*, 380 A.2d at 625 (under this theory, "the original sale and the second sale are independent events").

The lost volume seller theory is recognized in the Restatement (2d) of Contracts, §§ 347, 350 (1981) (the "Restatement (2d)").[8] The lost volume seller theory applies to

---

[8] Comment f to § 347 states in part
    "Lost volume." Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be

contracts for services as well as goods.  *See* Restatement (2d), § 347, ill. 16; *see also Jetz Servs.*, 865 P.2d at 1055-56 (applying theory to seller of services); *Gianetti v. Norwalk Hosp.*, 779 A.2d 847, 853 (Conn. App. Ct. 2001) (applying theory to provider of medical services), *aff'd in part, rev'd in part*, 833 A.2d 891 (Conn. 2003).[9]

This case offers a twist on the typical lost volume seller situation.  In what the Court regards as the typical situation, the non-breaching seller has a near-inexhaustible supply of inventory.  *See, e.g., Katz Commc'ns, Inc. v. Evening News Ass'n*, 705 F.2d 20, 26 (2d Cir. 1983).  In the typical situation, when a buyer breaches an agreement to buy a good or service from the seller, the item is returned to inventory and the lost volume seller continues in its efforts to sell its goods or services.  However, the transactions that occur following the breach are not necessarily the result of the breach but fundamentally the result of the seller continuing efforts to market its goods and services.  It is this continuous effort coupled with a virtually limitless supply that warrants the lost volume exception to mitigation.  As stated above, the transactions that may occur after the breach would in the context of the lost volume seller have occurred independent of the breach.

---

said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract.

Comment d to § 350 states

"Lost volume." The mere fact that an injured party can make arrangements for the disposition of the goods or services that he was to supply under the contract does not necessarily mean that by doing so he will avoid loss.  If he would have entered into both transactions but for the breach, he has "lost volume" as a result of the breach.  See Comment f to § 347.  In that case the second transaction is not a "substitute" for the first one.  See Illustrations 9 and 10.

[9] The Connecticut Supreme Court agreed with the lower court's determination that the lost volume seller theory applies to personal services contracts but disagreed with that court's factual finding on the evidence before it regarding the plaintiff's status as a lost volume seller.  266 Conn. at 571.  The court remanded the case for further findings as to the plaintiff's capacity and intent to perform additional contracts.  *Id.*

Here, Jordan lacked a nearly limitless supply and had no intention of continuing to market his services as a product endorser.[10]

Although not addressed by a D.C. court, the majority of cases hold that Jordan bears the burden of proving that he is a lost volume seller. *See generally Precision Pine*, 72 Fed. Cl. at 495 ("The case law demonstrates that . . . plaintiff bears the burden of demonstrating that it should be compensated as a lost volume seller"); *Snyder*, 380 A.2d at 624; *Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F. Supp. 1003, 1008-09 (S.D.N.Y. 1991); *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 684 (7th Cir. 1987); *Green Tree Fin. Corp. v. ALLTEL Info. Servs., Inc.*, No. Civ. 02-627 JRTFLN, 2002 WL 31163072, at *9 (D. Minn. Sept. 26, 2002).

To claim lost volume seller status, Jordan must establish that he would have had the benefit of both the original and subsequent contracts if MCI had not rejected the Agreement. *See Ullman-Briggs*, 754 F. Supp. at 1008. Although there is no definitive set of elements that the non-breaching party must show, many cases seem to follow the language from the Restatement (2d), Section 347, that the non-breaching party must show that it "could and would have entered into" a subsequent agreement. *See, e.g., Donald Rubin, Inc. v. Schwartz*, 191 A.D.2d 171, 172, 594 N.Y.S.2d 193, 194-95 (1st Dep't 1993); *Precision Pine*, 72 Fed. Cl. at 496-97; *Gianetti*, 833 A.2d at 897; *Jetz Servs.*, 865 P.2d at 1056; *see also Green Tree Financial*, 2002 WL 3116072, at *9 ("[t]o recover lost profits under this theory, a non-breaching party must prove three things: (1) that the

---

[10] On one hand, the "lost volume seller" exception does not appear to be available to a product endorser because of the understandable concern over dilution through overexposure. However, if an endorser has not approached what would be his or her endorsement limit, prior to dilution, it would seem that the continuous effort then to obtain more endorsements would be akin to the traditional lost volume seller, and the defense then available. As will be discussed herein, Jordan's situation is not indicative of a lost volume seller under any analysis.

15

seller of services had the capability to perform both contracts simultaneously; (2) that the second contract would have been profitable; and (3) that the seller of service would have entered into the second contract if the first contract had not been terminated").

In his arguments, Jordan focuses primarily on his *capacity* to enter subsequent agreements, arguing that the loss of MCI's sixteen-hour annual time commitment hardly affected his ability to perform additional endorsement services.  On this prong alone, Jordan likely would be considered a lost volume seller of endorsement services because he had sufficient time to do multiple endorsements.  Although he does not have the "infinite capacity" that some cases discuss, a services provider does not need unlimited capacity but must have the requisite capacity and intent to perform under multiple contracts at the same time.  *See Gianetti*, 266 Conn. at 561-62 (plastic surgeon could be considered a lost volume seller if it were determined that he had the capacity and intent to simultaneously work out of three or four hospitals profitably).

Contrary to Jordan's analysis, courts do not focus solely on the seller's capacity. The seller claiming lost volume status must also demonstrate that it *would* have entered into subsequent transactions.  *See Diasonics*, 826 F.2d at 684; *Green Tree Financial*, 2002 WL 31163072, at *9; *Gianetti*, 779 A.2d at 853 ("for sellers of personal services to come within the purview of the Restatement's lost volume seller theory . . . , they must establish," in addition to capacity, that additional sales would have been profitable and that they would made the additional sale regardless of the buyer's breach).  Jordan has not shown he could and *would have* entered into a subsequent agreement.  Rather, the evidence shows that Jordan did not have the "subjective intent" to take on additional endorsements.  *See Ullman-Briggs*, 754 F. Supp. at 1008.  The testimony from Jordan's

16

representatives establishes that although Jordan's popularity enabled him to obtain

additional product endorsements in 2003, Jordan desired to scale back his level of

endorsements.  Jordan's financial and business advisor, Curtis Polk ("Polk"), testified

that at the time the Agreement was rejected, Jordan's desire was "not to expand his

spokesperson or pitchman efforts with new relationships."  *See* Debtors' Mot. Summ. J.,

App. 5, at 32.  Polk testified that had Jordan wanted to do additional endorsements after

the 2003 rejection, he could have obtained additional deals.  *See id.* at 64-65.  Jordan's

agent, David Falk ("Falk"), testified that "there might have been twenty more companies

that in theory might have wanted to sign him" but that Jordan and his representatives

wanted to avoid diluting his image.  *See* Debtors' Mot. Summ J., App. 6, at 24.  Jordan's

Memorandum for Summary Judgment stated that at the time the Agreement was rejected,

Jordan had implemented a strategy of not accepting new endorsements because of a

belief that new deals would jeopardize his ability to achieve his primary goal of National

Basketball Association ("NBA") franchise ownership.

　　In a district court case in the Southern District of New York, the court held that

the test of whether a plaintiff has established lost volume seller status has both subjective

and objective components.  *See Ullman-Briggs*, 754 F. Supp. at 1008-09.  That case

involved the breach of a sales distribution agreement; the plaintiff was a sales

representation company that had represented the defendant, a manufacturer of small

electrical appliances.  *Id.* at 1004.  After the defendant terminated the contract, the

plaintiff took on seventeen new lines of products to represent.  *Id.* at 1006.  The plaintiff

argued that its damages award should not be offset by the commissions it earned from

these new lines.  *Id.* at 1008.  The court disagreed, finding that the plaintiff failed to show

17

it had the subjective intent to take on these accounts even if the defendant had not

terminated their agreement. *Id.* at 1009 (plaintiff's "own proof refuted that intent as to

many of the additional lines"). The court stated that the plaintiff's "admission that it

would not have had the subjective intent to take on many of the additional lines if Salton

had not terminated the contract" was "fatal to Ullman-Briggs' claim that it may be

properly be regarded as a lost volume seller." *Id.* Here, although the situation is not

strictly parallel because there were no subsequent deals by Jordan, the testimony by

Jordan's agent and advisor shows he lacked the subjective intent to take on additional

endorsement opportunities regardless of MCI's rejection of the Agreement.

Jordan's situation is akin to that of the plaintiff in *Samaritan Inns, Inc. v. District

of Columbia*, 114 F.3d 1227 (D.C. Cir. 1997). In that case, Samaritan Inns, the plaintiff,

provided below-market rental housing to recovering substance abusers. *Id.* at 1229. It

successfully sued the District of Columbia and District officials for violations of the Fair

Housing Act, such as unlawfully enforcing a stop-work order and initiating proceedings

to revoke the plaintiff's construction permits. At issue on appeal, and of relevance here,

was a portion of the damages award. The defendants appealed the award of more than $2

million in damages for potential contributions the plaintiff claimed it lost because of the

defendants' conduct. *Id.* at 1229, 1232. Once the controversy began, Samaritan Inns had

chosen not to begin a planned fundraising campaign and argued that its damages included

the lost contributions from this campaign. *Id.* The court analogized the plaintiff's

argument to the lost volume seller theory, as the plaintiff claimed that charitable

contributions are given on a regular basis. *Id.* at 1236. "[I]f a charity solicits money on

an annual basis, a donation in one year will not compensate the charity for a donation

'lost' in a prior year." *Id.* If not for the disruption of an annual fundraising drive, "the

charity would have received contributions in both years." *Id.* The problem with the

damages award, according to the district court, was that the fundraising campaign was of

"limited duration" and not an annual program. *Id.* The district court noted that if the

fundraising program had been an annual event, a fact-finder could reasonably conclude

that the plaintiff irretrievably lost the contributions, but it was unexplained under the

circumstances – circumstances that included the "limited" duration of the campaign –

why the plaintiff could not "simply make up the 'lost' contributions in later years and still

achieve the goals of the [fundraising] campaign." *Id.* Here, if Jordan had been seeking

additional endorsement agreements independent of the Agreement's rejection, the Court

could conclude that Jordan was a lost volume seller and irretrievably lost the money from

the MCI Agreement.  However, given Jordan's planned limitation on his endorsement

activity based upon a desire to cultivate an image he perceived more compatible with that

of an owner of an NBA team, rather than to continue to market his celebrity athlete

image, the Court cannot make that conclusion.

One of the classic examples of the lost volume seller is found in *Neri v. Retail

Marine Corp.*, 30 N.Y.2d 393, 399-400, 334 N.Y.S.2d 165, 169-70 (N.Y. 1972)

> [I]f a private party agrees to sell his automobile to a buyer for $2,000, a
> breach by the buyer would cause the seller no loss (except incidental
> damages, i.e., expense of a new sale) if the seller was able to sell the
> automobile to another buyer for $2,000. But the situation is different with
> dealers having an unlimited supply or standard-priced goods. Thus, if an
> automobile dealer agrees to sell a car to a buyer at the standard price of
> $2,000, a breach by the buyer injures the dealer, even though he is able to
> sell the automobile to another for $2,000. If the dealer has an inexhaustible
> supply of cars, the resale to replace the breaching buyer costs the dealer a
> sale, because, had the breaching buyer performed, the dealer would have
> made two sales instead of one. The buyer's breach, in such a case, depletes
> the dealer's sales to the extent of one, and the measure of damages should

19

be the dealer's profit on one sale.

This example would surely have a different result if the car dealership was winding down its business and had agreed to sell one of its last cars to a buyer. If that buyer subsequently breached the contract and did not purchase the car, the dealership could hardly be expected to recover lost profits damages if the dealer put the car back onto a deserted car lot, made no attempts to sell it, and kept the dealership shuttered to new customers. Those modifications are analogous to Jordan's situation, with his stated desire to withdraw his services from the endorsement marketplace, and the lost volume seller theory accordingly does not apply to his circumstances.

Jordan states that it is a "red herring" to speculate under the lost volume analysis on what he *would* have done because that

> ignores the central point of the lost volume principle: if Jordan had . . . accepted a substantially similar endorsement opportunity – exactly what [MCI] argues he was required to do to mitigate damages – the damages for which [MCI] is liable would not have been reduced by one penny because the lost volume principle would allow Jordan to retain the benefits of both the [MCI] Agreement and the hypothetical additional endorsement.

*See* Michael Jordan's Reply Brief, at 14-15.

Jordan overlooks an important point about the lost volume seller theory – that the "original sale and the second sale are independent events," *Snyder*, 380 A.2d at 625, because the lost volume seller's intent to enter into new contracts is the same before and after a purchaser's breach. The lost volume seller's desire to sell more units of goods or services is virtually unaffected by the loss of a single sale or agreement.

Next, even if Jordan had mitigated damages by entering one subsequent endorsement agreement, this, without more, does not mean that Jordan was a lost volume

seller. The lost volume seller has the intent and capacity to sell multiple units despite the breach of a contract for one transaction.

Finally, if Jordan had entered into a subsequent agreement or agreements, and if he had showed both the capacity and the intent to make subsequent sales, that might have had the effect of helping him to establish his status as a lost volume seller, which generally would relieve him of the duty to mitigate. This would not be a novel situation but it ignores the fact that he did not do so. *See, e.g., Storage Tech. Corp. v. Trust Co. of N.J.*, 842 F.2d 54, 57 (3d Cir. 1988) ("The lost volume seller theory is a response to a breaching buyer's right to have a non-breaching seller mitigate damages. In other words, a seller can avoid the effect of its failure to mitigate by proving that it was a lost volume seller."); *Chicago Title Ins. Corp. v. Magnuson*, No. 2:03-CV-368, 2005 WL 2373430, at *23 (S.D. Ohio Sept. 26, 2005) (when there is no evidence in the record that plaintiff "turned away or would have turned away business during the relevant period" and the "only evidence on the issue supports that the [plaintiff] could and would have completed such transactions," the consequent instructions to the jury that the plaintiff was a lost volume seller and therefore had no duty to mitigate its damages were not erroneous).

Because the evidence establishes, among other things, that Jordan would not have entered into subsequent agreements, Jordan has not established that he is a lost volume seller. This theory thus does not relieve Jordan from the duty to mitigate damages.

2. *Whether Jordan Made Reasonable Efforts to Mitigate*

Jordan argues at length that MCI must show that Jordan could have entered a "substantially similar" endorsement contract in order to mitigate damages. However, this is not the law of the mitigation of damages or the avoidable consequences theory. This

21

language stems from federal employment cases concerning back pay and mitigation,
which this case, while similar in many respects, is not. *See, e.g., Ford Motor Co .v*
*E.E.O.C.,* 458 U.S. 219, 231-32, 102 S.Ct. 3057, 3065-66 (1982) (the duty to mitigate
damages, "rooted in an ancient principle of law, requires the claimant to use reasonable
diligence in finding other suitable employment. Although the . . . claimant need not go
into another line of work, accept a demotion, or take a demeaning position, he forfeits his
right to back pay if he refuses a job substantially equivalent to the one he was denied")
(footnotes omitted); *Ingrassia v. Shell Oil Co.*, 394 F. Supp. 875, 886 (S.D.N.Y. 1975)
("The general rule in wrongful discharge actions is that the employee is obliged to
mitigate damages by seeking and accepting other available employment of the same or
substantially similar character but not employment of a substantially different kind").

Several of the justifications for the "substantially similar or equivalent" standard
of employment law, aside from the general remedial policy of making the non-breaching
party whole for losses caused by the breaching party, show why there is less concern here
regarding a "substantially equivalent" opportunity as Jordan was not an employee of
MCI. For one, the standard exists in part to ensure the employee's future advancement
by mandating that the employee's promotional opportunities and status should be
virtually identical to the prior position. *See Sellers v. Delgado Community College*, 839
F.2d 1132, 1138 (5th Cir. 1988). Since Jordan was never an employee of MCI, this is not
relevant. Second, to require acceptance of inferior employment can mean "that one who
has been discriminated against would be obliged, in order to mitigate damages, to submit
to the very discrimination of which he complains. *See Williams v. Albemarle City Bd. of*
*Ed.*, 508 F.2d 1242, 1244 (4th Cir. 1974). This, obviously, has no application here.

Finally, the employee's duty to make reasonable efforts in finding substantially equivalent employment is "based both on the doctrine of mitigation of damages and on the policy of promoting production and employment." *See N.L.R.B. v. Miami Coca-Cola Bottling Co.*, 360 F.2d 569, 575 (5th Cir. 1966).

The main case relied on by Jordan for this argument regarding a "substantially similar" opportunity is a case analyzed under employment law and one that presented a completely different factual and procedural background. *See Parker v. Twentieth Century-Fox Film Corp.*, 474 P.2d 689 (Cal. 1970). In *Parker*, the plaintiff, a leading movie actress, agreed to perform in a musical-type film in California. *Id.* at 690. The employer studio later decided not to make the movie and offered to the plaintiff as a substitute the leading role in a dramatic "western type" movie set in an opal mine and to be filmed in Australia. *Id.* at 694. The plaintiff turned down that offer, sued for damages on the original agreement, and the trial court ruled on a summary judgment motion that the earnings from this substitute employment that the plaintiff refused could not be applied in mitigation because the second offer was "different" and "inferior." *Id.* The California Supreme Court affirmed. *Id.*[11]

_____

[11] Even if the "substantially similar" opportunity element from employment cases was the standard here, Jordan's efforts would still be found wanting by the Court. For one, MCI has submitted evidence that similar opportunities apparently existed. MCI's expert stated that similar endorsement opportunities existed between 2003 and 2005 had Jordan chosen to pursue them, based on a measure of Jordan's popularity and familiarity with the public. *See* Debtors' Mot. Summ. J., App. 11, at 2. Polk testified that had Jordan wanted to do product endorsements during 2003 and after, he could have obtained such deals. *See* Debtors' Mot. Summ. J., App. 5, at 64-65. *See, e.g., Sudul v. Computer Outsourcing Servs., Inc.*, 917 F.Supp. 1033, 1048-49 (S.D.N.Y. 1996) ("COSI presented evidence that there is a demand for a person with plaintiff's experience and knowledge of mainframe computers and that such jobs pay in the comparable range of the plaintiff's former salary"); *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 906 (9th Cir. 1994) ("The record reveals that Farmer Bros. demonstrated that there were comparable jobs available between 1985 and 1990 . . . . Farmer Bros. also submitted reliable data . . . showing that substantially equivalent jobs were widely available"); *Samuels v. Albert Einstein Med. Ctr.*, No. Civ.A. 97-3448, 1998 WL 690107, at *3 (E.D. Pa. Sept. 16, 1998) ("Defendant offered sufficient evidence demonstrating that there were [sic] substantially equivalent employment available . . . Defendant produced dozens of advertisements for nursing jobs . . . Moreover, these employment opportunities appear to be substantially

23

More accurately, MCI must show the absence of reasonable efforts by Jordan to avoid consequences or minimize his damages.  *See Norris v. Green*, 656 A.2d 282, 287 (D.C. 1995); Joseph M. Perillo, *Calamari & Perillo on Contracts*, § 14.15, at 584 (5th Ed. 2003) ("The doctrine of avoidable consequences merely requires reasonable efforts to mitigate damages").  As the D.C. law has not addressed this issue in any depth, the Court again turns to other jurisdictions where necessary.

Since "reasonable efforts in the form of *affirmative steps* are required to mitigate damages," *see Robinson v. United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002) (emphasis added) (citing Restatement (2d) § 350), MCI carries its burden by showing that Jordan has not taken affirmative steps to mitigate damages.  Jordan admits in his brief that at the time of the rejection of the Agreement, "Jordan had already implemented a business strategy of not accepting new endorsements."  *See* Jordan's Memo. in Support of Mot. Summ. J. at 17.  Falk testified that a replacement telecommunications company was not approached.  *See* Debtors' Mot. Summ. J., App. 6, at 25-26.  Polk testified that Jordan did not return to the endorsement marketplace to try and replace the revenue he was to be paid under the Agreement.  *See* Debtors' Mot. Summ. J., App. 5, at 28-29, 55.  Polk explained that Jordan did not wish to expand his "pitchman efforts with new relationships" because of his primary goal of becoming the owner of an NBA team.  *Id.* at 31-32.  Although Jordan points to his discussions with another company, Nextel, as

---

equivalent to her prior employment with the Defendant").  Second, under this standard, if MCI demonstrates that Jordan did not make reasonable efforts to obtain work, which the Court holds that it has, MCI does not have to demonstrate the availability of substantially similar employment.  *See, e.g., Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998) (adopting rule from other circuits that an employer "is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment"); *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990) (in a Title VII employment action, "if an employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment").

showing that he was willing to listen to endorsement agreements after MCI's bankruptcy,

MCI effectively responds that responding to an inquiry by giving them contact

information and indicating a willingness to respond to another call "is not trying to find

an alternative" agreement – it is, in effect, "doing nothing." *See* Transcript of Sept. 12,

2006 Hearing, at 32-33.  Based on the foregoing, and drawing all permissible factual

inferences in favor of Jordan, the Court determines that MCI has established that Jordan

did not take affirmative steps to mitigate damages.

> 3.  *Whether Jordan's Beliefs that Another Endorsement Would Dilute His Impact as an Endorser or Harm His Reputation Were Reasonable <u>Justifications for not Mitigating Damages</u>*

Jordan cites the risk that entering another endorsement contract could dilute his

impact as an endorser or damage his reputation or business interests.

> a.  <u>Dilution</u>

Jordan's dilution argument is not convincing.  Jordan's agent Falk testified that

although there were no "fixed numbers" for the amount of endorsements, Jordan and his

representatives were wary about dilution and sensitive about "protecting the brand" of

Jordan.  *See* Debtors' Mot. Summ. J., App. 6, at 11.  Jordan does not set forth any facts

showing that Jordan's image was at risk of dilution.  MCI convincingly responds that

adding an agreement to replace a lost one is merely maintaining the status quo, not a

dilution of Jordan's impact by addition.  MCI's expert stated that Jordan had previously

had sixteen endorsement agreements in place (*see* Debtors' Memo. in Opp. to Jordan's

Mot. for Summ. J., Ex. A (Carter Depo. at 50, 91)), which further weakens Jordan's

dilution argument and casts doubt on Falk's statement that Jordan and his advisors

"always felt that less is more" in terms of endorsements.  *See* Michael Jordan's Memo. In

Support of Mot. for Summ. J. at 16-17.  While the Court recognizes that Jordan's image

is the true commodity here and its market value could be diluted from overexposure, MCI

has shown that Jordan's image was not at risk of dilution by replacing the MCI

endorsement agreement with another one.  The only statements Jordan offers to support

his argument that he behaved reasonably by not seeking another endorsement in 2003

because of a concern with diluting his image are conclusory in nature and contradicted by

the available evidence.  The contention that pursuing an endorsement opportunity would

dilute the image Jordan wished to cultivate as one befitting an NBA team owner, also

discussed under Point 4 below, may well raise factual issues regarding the impact an

endorsement may have on a team owner's image but that impact is irrelevant to Jordan's

duty to mitigate damages for his "rejected" endorsement contract.  There is no genuine

issue of material fact that dilution did not excuse Jordan's duty to mitigate damages.

> b.  <u>Risk to Reputation</u>

Under the risk to reputation theory Jordan cites, an injured party is not allowed to

recover from a wrongdoer those damages that the injured party "could have avoided

without undue risk, burden or humiliation."  *See* Restatement (2d), § 350(1).  Jordan's

"harm to reputation" argument is flawed because the envisioned harm to Jordan's

reputation does not rise to the level of harm found in the cited case law.

The cases cited by Jordan illustrate the harm to reputation that will excuse a

party's duty to mitigate.  In *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949

F.2d 317 (10th Cir. 1991), Kodak shipped a load of sensitized photographic material on a

truck operated by the defendant.  Most of the material was destroyed in transit because of

the defendant's mishandling.  The Tenth Circuit held that Kodak was not required to sell

the damaged merchandise to mitigate damages, stating that the record revealed that Kodak's reputation, which it spent considerable resources in developing, "could be harmed if it was required to sell damaged merchandise in order to mitigate damages." *Id.* at 320.

Another case cited by Jordan is similar to *Eastman Kodak*. In *Sony Magnetic Products, Inc. of America v. Merivienti O/Y*, 668 F. Supp. 1505 (S.D. Ala. 1987), the plaintiff's merchandise, cassette tapes, had been damaged while it was being loaded onto a ship. The plaintiff refused to allow the cassettes to be marketed as "seconds" with only a non-warranty sticker on them and without removal of the marks identifying the cassettes as plaintiff's products. The court stated it was "convinced that as a matter of public policy a manufacturer which has spent years and millions of dollars developing a reputation in the marketplace should not be required to jeopardize that reputation under [those] circumstances." *Id.* at 1515.

Those cases show the uncontroversial maxim that a plaintiff faced with the choice of (1) selling a sub-standard product to the public to mitigate damages caused by the breach of another and (2) doing nothing – can choose to do nothing, but Jordan was not confronted with those circumstances. While Jordan's reputation is considerable and obviously the result of careful development, there are no factual assertions that support the proposition that Jordan's choosing another endorsement opportunity is akin to being forced to sell damaged goods, as was the case in *Eastman Kodak* and *Sony Magnetic Products*.

Jordan also cites *District Concrete Co. v. Bernstein Concrete Corp.*, 418 A.2d 1030, 1037 (D.C. 1980), for the proposition that it is not unreasonable for a plaintiff "to

take into consideration . . . consequences such as injury to reputation" as a factor in post-breach decisions. Bernstein had sued its concrete supplier, District Concrete, for breach of a requirements contract. Bernstein was the sub-contractor for a construction project building an apartment complex. *Id.* at 1032. After the complex's roof was poured with concrete, defects in the concrete were found. *Id.* at 1033. Bernstein considered two approaches to cure the problem (1) tearing out the slab and replacing it, or (2) building a "composite slab" over the defective area. *Id.* Bernstein estimated the cost of each approach to be about $100,000 but considered that the highly visible "tear-out method" could damage Bernstein's and the general contractor's reputations. *Id.* Although the chosen "composite slab" approach ended up costing more than anticipated, the court held that the choice of this method was reasonable when made, given that the "costs and time involved" for each were comparable *and also* considering the consequences of possible reputation damage. *Id.* at 1037.

That case is of little help to Jordan. For one, any harm to Jordan's reputation arising from MCI's bankruptcy is not comparable to the reputation damage a construction contractor faces from building a defective roof. As MCI's expert testified, consumers do not believe that celebrity endorsers are experts in the products they endorse,[12] while a consumer would expect a builder to build a defective-free roof. If the roof fails, consumers would blame the builder. If a company fails, consumers do not blame the company's celebrity endorsers. Also, Jordan has not shown that he faced two reasonable approaches to mitigate his damages, with one of those approaches carrying a risk to his reputation. Jordan has stated that he was faced with two choices (1) mitigate damages,

---

[12] *See* Debtors' Memo. in Opp. to Michael Jordan's Mot. Summ. J., Ex. A at 50 (Depo. of William A. Carter, Jr.).

which he alleges could harm his reputation, or (2) concentrate on a venture that has no
connection to the mitigation of damages.  This situation is thus not comparable to *District
Concrete.*

The above analysis also applies to Jordan's cited case of *Citizens Fed. Bank v.
United States*, 66 Fed. Cl. 179 (Fed. Cl. 2005).  There, the court held that the breaching
party cannot engage in "Monday-morning quarterbacking" to criticize the wronged
party's choice of mitigation.  *Id.* at 185.  "Where a choice has been required between two
reasonable courses, the person whose wrong forced the choice can not complain that one
rather than the other was chosen."  *Id.*  Here, MCI is not complaining about the choice
between "two reasonable courses" of mitigation.  MCI is arguing that choosing to take no
steps to mitigate is not a reasonable course.

In arguing that Jordan acted reasonably by avoiding further endorsements based
on a belief that those efforts would harm his business interests or reputation, Jordan
argues essentially that he would be harmed by doing precisely what he originally
contracted to do under the Agreement and what he has been doing for other clients for a
number of years – endorsing products and services.  The Court recognizes the possibility
of Jordan's market saturation being a valid concern but Jordan's argument that he wanted
to get out of endorsements to pursue other ventures does not relieve the duty to mitigate.
Furthermore, MCI's expert stated that an additional endorsement agreement would not
have harmed Jordan's reputation by either diminishing Jordan's image in the
endorsement marketplace or harming Jordan's goal of becoming an NBA team owner.
*See* Debtors' Reply Memo, Exh. C. at 91, 58 (pointing out that other NBA franchise
owners have multiple business interests).  Jordan has not asserted any facts to refute those

assertions nor did he undermine the credibility of the expert making such assertions. Based on the foregoing, there is a no genuine issue of material fact as to whether reasonable endorsement efforts done to mitigate damages would have harmed Jordan's reputation.  The Court notes that even if there were a genuine issue of material fact as to whether another endorsement would negatively impact his becoming an NBA team owner, for the reasons set forth below, such would be irrelevant to the issue of mitigation regarding his endorsement contract.

> 4. *Whether Focusing on NBA Ownership Was a Reasonable Decision*

Jordan cites his goal of owning an NBA team as a reasonable justification for his decision not to enter additional endorsement agreements.

In support, Jordan cites cases that hold if a non-breaching plaintiff chooses a reasonable course of action despite the existence of another course of action that, in hindsight, would have been better at lessening harm, the plaintiff's damages are not reduced.  A closer examination at such cases reveals that they are not applicable to Jordan's situation.  Cases that Jordan cites, such as *Novelty Textile Mills, Inc. v. C.T. Eastern, Inc.*, 743 F. Supp. 212 (S.D.N.Y. 1990), and *Fed. Ins. Co. v. Sabine Towing & Transp. Co.*, 783 F.2d 347 (2d Cir. 1986), share a common theme not present in the instant matter:  the non-breaching party faced a choice between two reasonable courses of action right after the breach or tort that inflicted the damage, and made a choice to lessen the damage that appeared reasonable at the time.  *See, e.g., Novelty Textile Mills*, 743 F. Supp. at 219 ("If the course of conduct chosen by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable course of action that would have further lessened the plaintiff's damages").  Jordan's choice to focus on NBA

30

team ownership, in contrast, *was not done to lessen the damage from MCI's rejection*, but was done for other, unrelated business reasons.

In *Novelty Textile Mills*, the plaintiff hired the defendant to ship its fabric, but while the defendant had the fabric in its possession, a liquid contaminant damaged the goods. 743 F. Supp. at 215. The court held that, given the circumstances, the plaintiff's decision to salvage the damaged goods rather than attempting to clean them was reasonable. *Id.* at 219. The court considered factors such as the resale cost, the low value of the goods, and that the goods were no longer fit for their intended use. *Id.* at 220.

In *Tennessee Valley*, the plaintiff's barge sank after the defendant towed it. 598 F.2d at 932. The plaintiff decided to raise the barge from the river bottom, rather than abandoning it and contacting the U.S. Army Corps of Engineers, who would have removed it and sought recovery from the negligent party. *Id.* at 934. The trial court concluded that the sinking resulted entirely from the defendant's lack of due care. *Id.* at 932. But at the time the plaintiff made the decision to raise the barge, the defendant denied liability, so the plaintiff faced the possibility that it could be liable for the costs of removal and for any damage the abandoned vessel caused to third parties if it did not act. *Id.* at 934. The court found the decision to remove the barge to be a reasonable one. *Id.* at 935. "In determining whether the victim's conduct falls within the range of reasonableness, the court must consider that the necessity for decision-making was thrust upon him by the defendant, and judgments made at time of crisis are subject to human error." *Id.* at 933.

Those cases demonstrate that a court will not sharply second-guess the decisions made by a non-breaching party when it attempts to mitigate the damages caused by the

breaching party.  The cases differ from Jordan's situation because his decision to focus

on NBA team ownership was independent of MCI's rejection and was not contemplated

as one that would lessen the harm of that rejection.  Such a decision was unrelated to the

duty to mitigate damages resulting from a rejected agreement as a product endorser.  In

short, the argument that Jordan acted reasonably by focusing solely on his efforts to

become an NBA team owner is a red herring.  It may have been reasonable for Jordan to

focus on becoming an NBA team owner in the scope of Jordan's overall future desires

but that does not mean it can support a determination that he was relieved of his

obligation to mitigate damages in response to MCI's rejection of the Agreement.

Furthermore, Jordan did not have to pursue *any* endorsement, such as one that

would be beneath a celebrity of Jordan's stature, e.g., endorsing a product likely to be

distasteful to Jordan or his fans.  Jordan had the duty to take reasonable efforts to

mitigate, such as by seeking another endorsement for an established, reputable company

for compensation near to what he received from MCI.  MCI has established that there is

no genuine issue as to whether Jordan made reasonable efforts to do so.  The Court finds

that as a matter of law Jordan has failed to mitigate damages.  *See Hutton v. Sally Beauty

Co. Inc.*, No. 4:02-CV-00190-SEB-WG, 2004 WL 2397606, at *4 (S.D. Ind. Oct. 22,

2004) (granting summary judgment to defendant where defendant introduced sufficient

evidence to establish that plaintiff made no reasonable attempts to mitigate her damages

following the termination of her employment).

D.  **The Need for a Further Determination of Damages**

A case cited by MCI shows the correct path for further resolution of this matter.

*Wisconsin Ave. Nursing Home v. D.C. Human Rights Comm'n*, 527 A.2d 282 (D.C.

1987), did not, as MCI asserts,[13] hold that the plaintiff's failure to mitigate damages *barred* any recovery. After finding that the discharged employee had not exercised reasonable diligence in seeking substitute employment, the court remanded the case for the factual determination, with the burden of proof on the defendant, of the wages the plaintiff could have earned had she diligently sought substitute employment. *Id.* at 291-92. *See also Obelisk Corp. v. Riggs Nat'l Bank of Washington, D.C.*, 668 A.2d 847, 856 (D.C. 1995) (affirming this jury instruction "if you find . . . that a party should have taken advantage of a business opportunity which was reasonably available to a party under all of the circumstances shown by the evidence, then you should reduce the amount of that party's damages by the amount that the party would have received if it had taken advantage of such opportunity. However, the burden of proving that the damage could have been avoided or mitigated rests with the party that committed the breach."); *In re Rowland*, 292 B.R. 815, 820 (Bankr. E.D. Pa. 2003) ("To prove a failure to mitigate, a defendant must show: (1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced") (quoting *Koppers Co., Inc. v. Aetna Cas. & Surety Co.*, 98 F.3d 1440 (3rd Cir. 1996)). Thus, even though the Court finds that Jordan has failed as a matter of law to mitigate damages, the Court does not disallow the Claim in full.

In this case, there has been no determination and no evidence presented of what Jordan could have reasonably earned had he fulfilled his obligation to mitigate damages by entering the endorsement marketplace following MCI's rejection of the Agreement. It is not clear that Jordan could have found an endorsement agreement in 2003 that paid

---

[13] *See* Memo. In Support of Debtors' Mot. Summ. J., at 13.

him $2 million a year for the contract years 2004 and 2005. It is also unlikely that Jordan

would have been obligated to accept a large number of endorsements of smaller value to

make up the $2 million, due to the dilution effect such a number would have, because

such efforts would likely be unreasonable. However, the facts may reveal that one or

more endorsements could have been found without "diluting" his image and partially or

completely mitigating the damages. Although MCI's expert stated that he believed that

Jordan could have easily earned $2 million from an additional endorsement in 2003, (*see*

Debtors' Memo. In Opp. to Jordan Mot. for Summ. J., Ex. A (Carter Depo. at 92)), that

opinion was not presented with any objective evidence of the marketplace, such as what

other celebrity endorsers of Jordan's stature earned that year and which companies were

in the market for an endorser of Jordan's stature. Although the Court finds that as a

matter of law Jordan has not mitigated damages, there must be an evidentiary hearing on

how much his claim should be reduced to reflect what portion would have been mitigated

had he used reasonable efforts to do so.

## Conclusion

Jordan's motion for summary judgment is granted in part and denied in part. To

the extent Jordan moved to overrule MCI's objection to the Claim that the "Agreement"

is an employment agreement under section 502(b)(7), Jordan's motion is granted. To the

extent Jordan moved to overrule MCI's objection based on MCI's argument that Jordan

failed to mitigate damages, Jordan's motion is denied. MCI's motion for summary

judgment is granted in part and denied in part. To the extent MCI sought to disallow the

Claim in full, MCI's motion is denied. To the extent MCI moved for a ruling that section

502(b)(7) limits the Claim, MCI's motion is denied. To the extent MCI claimed that

Jordan failed to mitigate damages, MCI's motion is granted in part. The Court finds that

Jordan failed to mitigate damages but a further evidentiary hearing is necessary to

determine what Jordan could have received had he made reasonable efforts to mitigate, a

determination that consequently will affect the Claim.

       The Debtors are to settle an order consistent with this opinion.


Dated:   New York, New York
         February 13, 2007

                                           **s/Arthur J. Gonzalez**
                                         UNITED STATES BANKRUPTCY JUDGE