| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>-------------------------------------------------------<br>                                        :<br>In re                                      :<br>                                          :<br>WORLDCOM, INC., et. al.,          :<br>                                          :<br>        Reorganized Debtors.    :<br>                                          :<br>------------------------------------------------------- | Not For Publication<br><br><br><br>Chapter 11<br><br>Case No. 02-13533 (AJG) |

**OPINION DENYING THE DEBTORS' MOTION TO DISMISS TELNET
COMMUNICATIONS, INC.'S AMENDED PROOF OF CLAIM NO. 8297**

**APPEARANCES**

DLA PIPER RUDNICK GRAY CARY US LLP
Special Counsel for the Reorganized Debtors
1251 Avenue of the Americas
New York, NY  10020

       Timothy W. Walsh, Esq.
       Jules Elese Angelley, Esq.

      -and-

1999 Avenue of the Stars
Suite 400
Los Angeles, CA  90067

       William P. Donovan, Jr., Esq.

LOWENSTEIN SANDLER PC
Attorney for Telnet Communications, Inc.
1251 Avenue of the Americas
18th Floor
New York, NY  10020

       Michael S. Etkin, Esq.

      -and-

JACKSON WALKER L.L.P.
Attorney for Telnet Communications, Inc.
100 Congress Avenue
Suite 1100
Austin, TX  78701

    Ben C. Brocks, Esq.

    -and-

DOYLE, RESTREPO, HARVIN & ROBBINS, L.L.P.
Attorney for Telnet Communications, Inc.
600 Travis
Suite 4700
Houston, TX  77002

    Michael D. Robbins, Esq.


ARTHUR J. GONZALEZ
United States Bankruptcy Judge

    WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, referred to as the "Debtors" herein at all times pre- and post-petition) objected to the amended proof of claim filed by Telnet Communications, Inc. ("Telnet"), Claim No. 8297.  Claim No. 8297 relates to Telnet's allegation that WorldCom tortiously interfered with Telnet's contractual relations with its customers

### I. Jurisdiction and Venue

    The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334(b) and 157(a) of title 28 of the United States Code.  This matter is a core proceeding within the meaning of section 157(b) of title 28 of the United States Code.  Venue is properly before the Court, pursuant to sections 1408 and 1409 of title 28 of the United States Code.

### II. Background

The Debtors provide a broad range of communication services in over 200 countries on six continents. Through its core communications service business, which includes voice, data, internet and international services, the Debtors carry more data over its networks than any other entity. The Debtors were the second largest carrier of consumer and small business long distance telecommunications services in the United States, and provided a wide range of retail and wholesale communications services.

On July 21, 2002 and November 8, 2002, the Debtors commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On October 29, 2002, this Court entered an order establishing January 23, 2003, as the bar date for filing proofs of claim (the "Bar Date"). By entry of the Confirmation Order on October 31, 2003, this Court confirmed a plan of reorganization (the "Plan"). The Plan became effective on April 20, 2004 (the "Effective Date"). Upon the Effective Date, WorldCom changed its name to MCI, Inc. On January 6, 2006, Verizon Communications, Inc. and MCI merged. Under the merger agreement, MCI, Inc. merged with and into Eli Acquisition, LLC, as a direct, wholly owned subsidiary of Verizon Communications Inc. Eli Acquisition LLC, as the surviving entity, was immediately renamed MCI, LLC. MCI, LLC is now doing business as Verizon Business Global LLC.

Telnet was a small start-up company that purchased telecommunications services from the Debtors for resale. On January 29, 1996, Telnet signed a Representation Agreement (the "Representation Agreement") with the Debtors. Pursuant to the Representation Agreement, Telnet would receive a commission from the Debtors based upon a percentage of the billed telephone service usage of each customer that Telnet generated. In late February 1996, the relationship between Telnet and the Debtors expanded to enable Telnet to act as a re-biller of the

Debtors' products and services.

To enable Telnet to re-bill its customers for long distance services provided by the Debtors, the Debtors required Telnet to sign "WorldCom's Commercial Application for Services" whereby Telnet committed to purchase $50,000 a month in long distance service over a three-year period. The idea behind the re-billing arrangement was for the Debtors to bill Telnet one rate for all of Telnet's customers' long distance use and then send Telnet a separate bill for each of Telnet's customers with Telnet's rate marked-up by a specific percentage set by Telnet on a customer-by-customer basis. That would enable Telnet to then send a bill to each of its customers at the marked-up rate. The difference in the two rates was to be Telnet's compensation, in lieu of receiving a commission under the Representation Agreement. In February 1996, Telnet had signed up for a tariffed product known as "WorldOne Option G." The one-year period that Telnet purchased long distance services from the Debtors was governed by WorldCom FCC Tariff No. 2 (the "Tariff"). The Tariff included a clause which stated

> [The Debtors] shall not be liable for any direct, indirect, consequential, special, actual or punitive damages, or for any lost profits of any kind or nature whatsoever arising out of any defects or any other cause. This warranty and these remedies are exclusive
> and in lieu of all other warranties or remedies, whether express, implied or statutory, including without limitation implied warranties of merchantability and fitness for a particular purpose.
> The Tariff, Sec. B.5.6 (Aug. 16, 1995).

The Tariff provided for a software program package known as Call Manager PC, also referred to as PC Manager Rerate Software ("Call Manager Software"), which would enable Telnet to re-rate its customers' bills so that Telnet could send bills to its customers with marked-up re-rates.

4

The Debtors' account executives gave Telnet brochures that explained that the Call Manager Software could facilitate the issuance of the re-rated bills necessary to enable Telnet to re-rate and re-bill its customers. The Call Manager Software was sold under the Tariff for $25. On March 29, 1996, the Debtors amended the Tariff to remove all mention of the Call Manager Software as one of its services. The relationship between the Debtors and Telnet ended in April 1997.

Telnet alleges that it was assured that its customers would receive accurate and detailed bills which would reflect calls made, time of day, originating source, and an accurate rate or charge. Telnet maintains that, from the beginning, it and its customers complained that the monthly long distance telephone bills prepared by the Debtors were incorrect, that the rates charged were incorrect, and that customers were being billed for calls they did not place. Telnet claims that because of these problems it lost its clients, credibility, and reputation and as a result could not further market the Debtors' service. The Debtors allege, and Telnet does not deny, that Telnet engaged in self-help and withheld payments of thousands of dollars in outstanding invoices.

In 1998, Telnet filed suit in Texas state court, which was later removed to federal court, alleging that the Debtors misrepresented the reliability and accuracy of its billing services, failed to accurately bill Telnet and Telnet's clients, and failed to provide bills with the "call detail" allegedly promised by the Debtors' representative. Telnet asserted state law claims for breach of contract, fraud, misrepresentation, negligent misrepresentation, negligence, gross negligence, tortious interference, violations of the Texas Deceptive Trade Practices Act (the "DTPA"), and violations of the Federal Communications Act (the "FCA"). Telnet further alleged that the

5

Debtors tortiously interfered with Telnet's contractual relations with its customers in that the Debtors misrepresented to at least one customer (Inter Recycling) that the Debtors were representing Telnet in addition to themselves in offering services to that customer; however, Telnet was never compensated for such sale.

The Court dismissed all of Telnet's claims in an opinion issued on March 25, 2005. *In re WorldCom, Inc.*, 322 B.R. 530, 540 (Bankr. S.D.N.Y. 2005). Telnet's tortious interference claim was dismissed because of Telnet's failure to respond to the Debtors' legal argument and "in not pleading the existence of any valid contract between themselves and a third party with which the Debtors interfered," thereby failing to state a cause of action for which relief could be granted. *Id*. The Court also denied Telnet's request to replead its complaint with regard to its tortious interference claim. *Id*. at 540-41. On October 5, 2005, the Court issued an order expunging Claim No. 8297 and disallowing it in full with prejudice. However, on November 16, 2005, the Court issued an order finding "it erred in denying Telnet's request for leave to amend based on the erroneous finding that Telnet failed to respond to debtor's argument" and allowing Telnet leave "to amend its complaint solely to conform its allegations to plead a claim for tortious interference with prospective business relationships .... "

Telnet filed its amended proof of claim in the Court on January 16, 2006, attaching as support the Fourth Amended Complaint it filed in the Texas proceeding. The Debtors filed their Supplemental Objection to Amended Proof of Claim of Telnet Communications, Inc. ("Supplemental Objection") and Motion to Dismiss Telnet's Amended Individual Proof of Claim (the "Motion to Dismiss") on March 28, 2006. A hearing was held on April 25, 2006. This opinion arises from the Supplemental Objection and Motion to Dismiss, which proffer the same

arguments in support thereof.

### III. Discussion

The Debtors present two reasons why Telnet's amended claim cannot be allowed. First, the Debtors argue that Telnet's tortious interference claim is based on alleged misrepresentations by MCI, representations not "contained in any duly filed MCI tariff." Therefore, the filed rate doctrine prohibits the enforcement of promises not incorporated within the Tariff. Second, the Debtors assert that Telnet "cannot maintain the essential elements of [a] claim for tortious interference with prospective business relations under Texas law," namely Telnet cannot prove malice on MCI's part or prove that there was a reasonable probability Telnet "would have entered any contracts absent MCI's alleged improper interference."

Dismissal pursuant to Federal Rule of Bankruptcy Procedure 7012 incorporates Rule 12(b)(6) of the Federal Rules of Civil Procedure. Under Rule 12(b)(6), dismissal is only appropriate if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Electronics Communication Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). When ruling on a motion to dismiss, "the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir. 1997) (citing *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 740 (1976)). Telnet's claim is that WorldCom tortiously interfered with Telnet's contractual relations with its customers.

The Court's task "in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in

support thereof.'" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F. 2d 774, 779 (2d Cir. 1984)). As a result, the fundamental issue at the dismissal stage "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Phelps v. Kapnolas*, 308 F. 3d 180, 184-85 (2d Cir. 2002) (quoting *Chance v. Armstrong*, 143 F. 3d 698, 701 (2d Cir. 1998)). The Court now turns to assess the legal feasibility of Telnet's claim.

**A. The Filed Rate Doctrine**

The filed rate doctrine prescribes that the "rights and liabilities defined by the Tariff cannot be varied or enlarged by either contract or tort of the carrier." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 227 (1998) (quoting *Keogh v. Chicago & Northwestern R. Co.*, 260 U.S. 156, 163 (1922)). Further, it has been held that under this rule the tariff binds "both customers and carriers with the force of law." *ICOM Holding, Inc. v. MCI WorldCom, Inc.*, 238 F.3d 219, 221 (2001) (quoting *Central Office* at 222).

The filed rate doctrine is motivated by two principles (1) preventing carriers from engaging in price discrimination between ratepayers and (2) preserving the exclusive role of federal agencies in approving rates for telecommunications services that are "reasonable" by keeping courts out of the rate-making process. *Marcus v. Am. Tel. and Telegraph Co.*, 138 F.3d 46, 58 (2d Cir. 1998).

Telnet has conceded that it purchased a tariffed product. Therefore, the Debtors argue that Telnet's claim fails because it relies on representations not contained in the Tariff. The

8

Debtors cite *Central Office* to demonstrate that Telnet's claim cannot proceed.  In *Central Office* a reseller entered into a contract to sell a provider's services to the reseller's customers.  The provider could not fill the volume of the reseller's customers and the reseller subsequently terminated the contract and filed a claim in state court.  The Supreme Court held that the reseller's state law claims were preempted by the filed rate doctrine.  The Debtors assert that since Telnet's tortious interference claim is predicated on alleged representations not included in any duly filed MCI tariff, then the claim should be preempted by the filed rate doctrine.

   Telnet argues that *Central Office* is inapplicable to the present claim.  Whereas the Supreme Court in that case found the creditor's tortious interference claim to be wholly derivative of the precluded contract claim, Telnet alleges that its claim is not derivative of any contract.  Telnet does not allege that MCI's failure to provide services prevented them from servicing its customers; instead, Telnet alleges that MCI misused confidential information obtained from Telnet during their business interactions to sign Telnet's customers and clients as MCI's own clients.

   Telnet cites to *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694 (5th Cir. 1999), in support of its position that the filed rate doctrine is inapplicable to its tortious interference claim.  In *Access Telecomm.*, ATI, who was an MCI customer, alleged that MCI released confidential information to third parties, which prevented ATI from entering into prospective contracts with such third parties.  197 F.3d at 711.  The Court held that the filed rate doctrine did not prevent ATI's claim for tortious interference because "[t]his claim is not derivative of a contract claim.  It does not concern the provision of services which are covered by the filed tariff, but rather it concerns illegal actions outside the scope of the tariff and not

9

derivative of any phone services." *Id*. Similarly, the Court finds that Telnet's claim of tortious interference based upon MCI's alleged misuse of confidential information is not derivative of a contract claim. Therefore, the filed rate doctrine does not preempt Telnet's amended claim.

**B.  Tortious Interference Under Texas Law**

Under Texas law, a party asserting a claim for tortious interference with prospective business relations must prove four elements

> (1) a reasonable probability that the parties would have entered into a contractual relationship, (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring, (3) the defendant did the act with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially certain to occur as a result of the conduct, and (4) the plaintiff suffered actual harm or damage as a result of the interference.

*Community Initiatives, Inc. v. Chase Bank of Texas, Nat'l Ass'n*, 153 S.W.3d 270, 283-84 (Tex. App.–El Paso [8th Dist.] 2004, no pet.). The Debtors maintain that Telnet cannot prove malice on MCI's part or that there was a reasonable probability Telnet "would have entered any contracts absent MCI's alleged improper interference."

As mentioned previously, however, the Court's task "in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F. 2d 774, 779 (2d Cir. 1984)). Moreover, Rule 8 of the Federal Rules of Civil Procedure only requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Telnet has satisfied this rule. Telnet's Fourth Amended Complaint filed in the Texas proceeding was attached as an exhibit with the amended complaint filed with the Court. In the

Fourth Amended Complaint, Telnet alleged that MCI intentionally misused confidential information obtained from Telnet in order to convert Telnet customers to MCI. Telnet further alleged that had MCI not undertaken these activities, Telnet would have entered into a business relationship with those customers. In short and plain statements in its complaint, Telnet has pled a cause of action for which relief can be granted under Texas law.

## IV.  Conclusion

Based on the foregoing, the Court finds that Telnet's claim for tortious interference with prospective business relations is not derivative of a contract claim. Therefore, the filed rate doctrine does not apply. Moreover, Telnet has sufficiently pled facts to support a cause of action under Texas law. The Supplemental Objection and Motion to Dismiss Telnet's amended proof of claim are denied.

Telnet is to settle an order consistent with this opinion.

Dated:  New York, New York
          February 26, 2007

                                        **s/Arthur J. Gonzalez**
                                        UNITED STATES BANKRUPTCY JUDGE