| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | FOR PUBLICATION |

In re : Chapter 11

WORLDCOM, INC., et al., : Case No. 02-13533 (AJG)
: (Jointly Administered)
Reorganized Debtors. :

**OPINION GRANTING REORGANIZED DEBTORS' OBJECTION
TO PROOF OF CLAIM NO. 3785, FILED BY JUDITH WHITTAKER**

A P P E A R A N C E S

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, NY 10153

    Marcia L. Goldstein, Esq.
    Lori R. Fife, Esq.
    Alfredo R. Pérez, Esq.
    Adam P. Strochak, Esq.

HUGHES HUBBARD & REED LLP
Attorneys for Judith Whittaker
One Battery Park Plaza
New York, NY 10004

    Daniel S. Lubell, Esq.

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

## I. INTRODUCTION

       Before the Court is Proof of Claim No. 3785 (the "Claim"), filed by Ms. Judith Whittaker

("Whittaker"), and the Objection to Proof of Claim No. 3785 (the "Objection"), filed by the

Reorganized Debtor MCI, L.L.C., and certain of its direct and indirect subsidiaries (the

"Debtors"). The parties' dispute concerns the ownership of funds held by the Putnam Fiduciary Trust Company ("Putnam") in a "rabbi" trust established by MCI Communications Corp. ("MCI"). Having reviewed the parties' pleadings, and hearings having been held on this matter, the Court concludes that the Objection should be granted.

## II. JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a "core" proceeding pursuant to 28 U.S.C § 157(b)(2)(B). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408, 1409.

## III. FACTUAL BACKGROUND

From 1985 until September 1998, Whittaker served as a member of MCI's Board of Directors and, for at least a portion of that time, as a member of the Board of Directors Compensation Committee. In 1994, MCI created the MCI Communications Corp. Board of Directors Deferred Compensation Plan (the "Deferred Compensation Plan"), which allowed directors to defer any or all of their compensation until a later date. Whittaker executed a deferral agreement (the "Deferral Agreement") on June 27, 1994. She elected to defer 100% of her compensation and to receive ten annual pro rated distributions beginning in 2003.

Among other relevant provisions, the Deferred Compensation Plan stated, "The arrangement created by this Plan is intended to be unfunded and no trust, security, escrow, or similar account shall be required to be established for the purposes of payment hereunder." *Stipulation of Undisputed Facts* ("*Facts Stipulation*"), Docket No. 18280, Exhibit B, at 12. Nonetheless, MCI established a "rabbi" trust with Putnam in order to meet its obligations to

2

Whittaker under the Deferred Compensation Plan. MCI and Putnam executed the MCI Communications Corp. Deferred Compensation Plan Trust Agreement (the "Trust Agreement") on August 8, 1994, creating a rabbi trust (the "Trust") that would remain the property of MCI. *See Facts Stipulation*, Exhibit C. However, Whittaker was listed as the plan participant and had the authority to choose how the trust funds were invested.[1] Whittaker also thereafter received quarterly account statements detailing the balance and investment performance of the Trust.

MCI and WorldCom, Inc. merged in 1998. The Deferred Compensation Plan was subsequently closed to new participants, though existing participants continued to accrue benefits and retained their rights.

On November 13, 2001, Whittaker contacted Putnam regarding unreceived account statements and the status of the Trust. A Putnam representative, Ms. Deborah Hutchins ("Hutchins"), contacted David Blackman ("Blackman"), a senior manager at WorldCom responsible for management of the Deferred Compensation Plan, regarding the status of the trust. Hutchins conveyed verbatim Blackman's response to Whittaker by email on November 20, 2001 (the "Putnam Email"). *See Facts Stipulation*, Exhibit D. Among other representations, Hutchins stated, "[S]ince there haven't been contributions going into the plan for a number of years, and therefore there is no longer a formal plan in place, this is viewed as simply an account with Putnam. What this means is that the funds in the current account are available to you whenever you choose to take them." *Id.*

Whittaker took no further action until November 2002, at which time she contacted Putnam to request distribution of the Trust funds. However, in the interim, the Debtors had filed for bankruptcy and subsequently instructed Putnam to freeze the Trust. Accordingly, Putnam

---

[1] More specifically, the Deferred Compensation Plan stated that "a deemed rate of return shall be credited to a Participant's Account" and that the company "will deem Deferred Compensation to be invested in investment options [chosen by the Participant]." *Facts Stipulation*, Exhibit B, at 6.

3

informed Whittaker that no distributions were permitted. On November 27, 2002, Whittaker filed a poof of claim with this Court for the assets in the Trust, approximately $345,000 (the "Trust Assets"). *See Facts Stipulation*, Exhibit F.

## IV. PROCEDURAL BACKGROUND

On July 21, 2002 (the "Petition Date"), and continuing thereafter, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code" and "Code"). The Court approved the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Reorganization Plan") on October 31, 2003. The Reorganization Plan became effective April 20, 2004. The Reorganized Debtors, renamed MCI, Inc., subsequently merged with Verizon Communications, Inc., on January 6, 2006. Under the merger agreement, MCI, Inc., merged with and into Eli Acquisition LLC as a direct, wholly owned subsidiary of Verizon Communications, Inc. Eli Acquisition LLC, as the surviving entity, was immediately renamed MCI LLC. MCI LLC is now doing business as Verizon Business Global LLC.

The Debtors filed a Notice of Rejection to reject the Deferred Compensation Plan on September 19, 2003. Whittaker filed an Objection to the Notice of Rejection (the "Notice Objection") on January 23, 2004. The Debtors then filed the Objection on September 2, 2004. Responding to Whittaker's assertions in the Notice Objection that she was entitled to payment in full on the Claim, the Debtors argued, without conceding the validity of the Claim, that the Claim was at most a general unsecured claim under the terms of the Reorganization Plan.

On October 12, 2004, the Debtors filed a Notice of Presentment for a proposed Order Authorizing Withdrawal of the Notice of Rejection (the "Withdrawal Order"). On October 14, 2004, Whittaker filed her responses to the Objection and the Withdrawal Order. In addition,

4

Whittaker filed a Motion to Compel Discovery and Payment of Undisputed Claim Amounts (the "Motion to Compel"). On October 21, 2004, the Court entered the Withdrawal Order.

The Debtors also included an objection to the Claim in their Seventy-Ninth Omnibus Objection to Proofs of Claim (the "Omnibus Claim Objection"). Among other claim objections, the Debtors asserted that no money was due Whittaker as there was no record of a debt owed Whittaker. Whittaker filed her response to the Omnibus Claim Objection on November 1, 2004, as well as a Motion for Reconsideration of the Withdrawal Order. On November 11, 2004, the Court withdrew entry of the Withdrawal Order.

The Court held a hearing on Whittaker's objection to the Withdrawal Order and the Motion to Compel on November 16, 2004. Following that hearing, the parties agreed to a Stipulation and Order Relating to Debtors' Objections to Claim Numbered 3785 (the "Procedural Stipulation") on December 28, 2004. *Procedural Stipulation*, Docket No. 14749. The Procedural Stipulation provided that the Claim would be allowed as a general unsecured claim, without prejudice as to Whittaker's claim that she is entitled to the Trust Assets.

A second hearing was held on the Claim on June 20, 2006.

**V. DISCUSSION**

Whittaker's assertion of an ownership interest in the corpus of the Trust rests, as it must, on the purported or imputed effects of the Putnam Email. As the Trust Agreement specifically recites, "Plan participants and their beneficiaries shall have no preferred claim on, or any beneficial ownership interest in any assets of the Trust. Any rights created under the [Deferred Compensation Plan] and this Trust Agreement shall be mere unsecured contractual rights of Plan participants and their beneficiaries against MCI." *Facts Stipulation*, Exhibit C, at 2.[2] This is an

---

[2] The Deferred Compensation Plan similarly states, "Any assets which the Company may set aside to help cover its financial liabilities hereunder are and must remain general assets of the Company subject to the claim of its

5

inherent and immutable feature of rabbi trusts. Though rabbi trusts allow employees to defer their tax liability for deferred compensation until distribution, "the Internal Revenue Code requires beneficiaries to hold only a limited interest in the trust assets prior to distribution. Specifically, the Code requires that all trust assets be property of the employer, and therefore subject to the claims of creditors of the employer." *McAllister v. Resolution Trust Co.*, 201 F.3d 570, 575. *See also Bank of America, N.A. v. Moglia*, 330 F.3d 942, 944 (7th Cir. 2003) (the employee's rights of withdrawal must be "subject to substantial limitations or restrictions"); Priv.Ltr.Rul. 8113107 (December 31, 1980). As a result, "the recipient receives only the company's unsecured promise to pay benefits and has no rights against any assets other than the rights of a general unsecured creditor of the company." *Mertens Law of Federal Income Taxation* § 25B.212 (2007). *See also Resolution Trust Co. v. MacKenzie*, 60 F.3d 972, 977 (2d Cir. 1995) ("Therefore, we hold that, at all times relevant to this case the Plan assets remained the property of [the debtor], subject to the claims of its creditors. MacKenzie and Timms are merely two such creditors.") (citing *Mertens*); *Goodman v. Resolution Trust Co.*, 7 F.3d 1123, 1127 (4th Cir. 1993). It is only "the act of distribution which conveys the assets held in a grantor trust from the grantor to the grantee." *MacKenzie*, 60 F.3d at 977. Only, then, if the Putnam Email distributed the Trust Assets, or represented that the Trust Assets had been distributed, can Whittaker establish an ownership interest in the Trust Assets.

A. DISTRIBUTION IN FACT

---

creditors. The Participant's relationship to the Company under this Agreement shall be only that of a general unsecured creditor, and this Agreement (including any action taken pursuant hereto) shall not, in and of itself, create or be construed to create a trust or fiduciary relationship of any kind between the Company and the Participant, his or her Beneficiary or other person, or a security interest of any kind in any property of the Company in favor of the Participant or any other person." *Facts Stipulation*, Exhibit B, at 12.

6

Whittaker argues, first, that the Putnam Email distributed the Trust Assets.[3] Specifically, Whittaker contends that the Putnam Email eliminated the "substantial limitations or restrictions" barring distribution and thus distributed the Trust Assets. Whittaker argues that this distribution, though it was prior to the dates specified in the Deferral Agreement, was a valid acceleration of payment under the Deferred Compensation Plan. As Whittaker characterizes the dispute, "This case is about the acceleration of payment of Judith Whittaker's fully funded and 100% vested deferred compensation plan account at least eight months prior to the Debtors' bankruptcy filings." *Whittaker's Pre-Hearing Memorandum*, Docket No. 18331, at 1.

The unilateral acceleration of payment is provided for under the Deferred Compensation Plan. Section 12.07, entitled "Acceleration of Payment," states, "The Company reserves the right to accelerate the payment of any benefits payable under this Plan at any time without the consent of the Participant, the Participant's estate, a Beneficiary or any other person claiming through the Participant." *Facts Stipulation*, Exhibit B, at 14. In a similar vein, section 12.04 provides, "The Company retains the sole and unilateral right to terminate, amend, modify, or supplement this Plan, in whole or in part, at any time, including an amendment that would

---

[3] The Putnam Email states, in full

Judith,
I just wanted to give you an update on your account that we discussed last week.
I have reordered your 2nd and 3rd Quarter statements, and will mail them out today for you. Your next statement will be run at the beginning of January, and will cover 4th Quarter, 2001.
As far as removing the funds from this account. I have followed up on that as well. I spoke with a representative from MCI that had the original documentation from when you began in the plan. Back then, there were stipulations that stated that you would keep the funds in the account until 2003, just as you had remembered.
However, since there haven't been contributions going into the plan for a number of years, and therefore there is no longer a formal plan in place, this is viewed as simply an account with Putnam. What this means is that the funds in the current account are available to you whenever you choose to take them. That waiting period no longer exists.
In order to close out your account, and receive a check, we will need a letter of instruction from you. That letter should be signed, and notarized.
As we also discussed, you are able to keep your account as-is.
Please let me know if you have any additional questions.
Thanks
Deb Hutchins

*Facts Stipulation*, Exhibit D.

7

accelerate the payment of amounts standing credited to Participants' Accounts. However, no Company action under this right shall reduce the Account of any participant or Beneficiary." *Id.* at 13. Whittaker also notes section 5.4(d) of the Trust Agreement: "… Trustee shall have the following powers and rights, and be subject to the following duties with respect to the Trust… (d) to make payments from the Trust to such persons, at such times and in such amounts as MCI shall direct, without inquiring as to whether a payee is entitled to payments or as to whether the payment is proper, to the extent such payment is made in good faith without actual notice or knowledge of the impropriety of such payment."

Nonetheless, Whittaker has failed to establish that the Trust Assets were distributed, whether or not such a distribution would have been valid. Whittaker's flawed argument rests upon the misapplication of a doctrine of tax law – the constructive receipt doctrine – to an issue of property law, namely, the ownership of the Trust Assets. As previously discussed, courts have recognized that "unless an executive's right to receive money from the trust is 'subject to substantial limitations or restrictions,' rather than being his to draw on any time… the executive must include any contribution to the trust and any interest or other earnings of the trust in his gross income in the year in which the contribution was made or the interest obtained." *Moglia*, 330 F.3d at 944. Whittaker argues, conversely, that the elimination of such "substantial limitations" constitutes a distribution of a trust's funds, and suggests that the Putnam Email eliminated such substantial limitations. As Whittaker contends, "It is enough that MCI removed the restrictions to Whittaker's receipt of her own account funds and made them available to her at any time so as to have made a constructive distribution under the tax code and conveyed to Whittaker ownership of the funds." *Whittaker's Pre-Hearing Memorandum*, at 16.

8

However, the "constructive receipt" doctrine is a tax doctrine, which the Internal Revenue Service ("I.R.S.") and courts have enunciated in order to address attempts to defer the receipt of property for tax purposes. 26 U.S.C. § 451 (2007); Treas. Reg. § 1.451-2(a) (2007). It is simply incorrect as a matter of law and as a matter of logic to suggest that constructive receipt for tax purposes necessarily presupposes or results in actual ownership or possession for the purposes of state property law. The case law is clear that a taxpayer may be in constructive receipt of income even if not in actual possession; this is, indeed, the *raison d'être* of the constructive receipt doctrine. *See, e.g., Walter v. United States*, 148 F.3d 1027, 1029 (8th Cir. 1998) ("[T]he strongest reason for holding constructive receipt of income to be within the statute is that for taxation purposes income is received or realized when it is made subject to the will and control of the taxpayer and can be, except for his own action or inaction, reduced to actual possession. So viewed, it makes no difference why the taxpayer did not reduce to actual possession. The matter is in no wise dependent on upon what he does or upon what he fails to do.") (citations omitted); *Rossi v. Commissioner*, 1950 WL 8052 (1950) ("The fact that petitioner decided not to accept the benefits of this offer is of no consequence. The principle of constructive receipt is designed to prevent the exclusion from taxable income of items the actual receipt of which, at the taxpayer's option, can be deferred or postponed indefinitely."). *See also*, *Mertens* 10:1 ("The theory of constructive receipt is properly applicable to situations involving a question as to when income is received.").[4] Simply, constructive receipt for tax purposes does not transmute a claim into actual possession. It is, in fact, the possible disjunction between the two, such that a taxpayer is determined to be in constructive receipt of funds even if she is not in actual receipt, which encourages parties to adhere closely to I.R.S. trust rulings and

---

[4] Whittaker cites *Murphy v. United States*, 992 F.2d 929 (9th Cir. 1993), and *Hicks v. United States*, 314 F.2d 180 (4th Cir. 1963), in support of her argument. Neither citation is availing, as both hold, with the decisions the Court cites, that actual possession is not required for constructive receipt.

9

pronouncements. *See* Kathryn J. Kennedy, *A Primer on the Taxation of Executive Deferred Compensation Plans*, 35 J. Marshall L. Rev. 487, 491 (2002). Accordingly, whether or not the Debtors removed the "substantial limitations" to Whittaker's ability to receive funds from the Trust, such fact alone is insufficient to establish that the Trust Assets were distributed to Whittaker.

Though Whittaker devotes most of her briefs to the "constructive receipt" argument, the Court will also consider whether the Trust Assets were distributed in fact. The Putnam Email states, "[T]his is viewed simply as an account with Putnam. What this means is that the funds in the current account are available to you whenever you choose to take them. …In order to close out your account, and receive a check, we will need a letter of instruction from you." Arguably, this language may be read to suggest that the Trust Assets had been distributed, e.g. "[T]his is viewed simply as an account with Putnam," "In order to close out your account…." If the Trust Assets had been transferred out of the Trust to either a general Putnam account or an account specifically created for and belonging to Whittaker, then a distribution would necessarily have been made. This is a question of fact; whether the Trust Assets should have been distributed, or whether the Putnam email represented that the Trust Assets were distributed, are separate questions.

However, the factual record belies any suggestion that the Trust Assets were distributed in fact. Whittaker has not identified any documents recording such a transfer, even if only from one Putnam account to another. Similarly, Whittaker has not shown that the Trust was closed, nor that the Trust's records were altered to reflect a change in ownership. As Whittaker bears the burden of establishing that the Trust Assets were distributed in fact, the absence of such evidence is sufficient to resolve this issue. Moreover, Section 6.03 of the Deferred Compensation Plan

10

states, "All distributions of a Participant's Account shall be made in cash only." *Facts Stipulation*, Exhibit B at 7. Thus, it is not clear that the distribution would have been valid even if Putnam had moved the Trust Assets between accounts or designated Whittaker the owner, rather than beneficiary, of the Trust.

Accordingly, the Court concludes that the Trust Assets were not distributed in fact.

B. EQUITABLE ESTOPPEL

Whittaker also argues in the alternative that the Debtors should be equitably estopped from denying that Whittaker is the owner of the Trust Assets. Whittaker argues that, whether or not the Putnam Email distributed the Trust Assets in fact, it at a minimum represented that the Trust Assets had been distributed. Whittaker contends that she reasonably relied on such representations, to her detriment, and concludes that the Debtors should not now be allowed to enjoy the benefits of that misrepresentation by denying her ownership of the Trust Assets.

"Equitable estoppel is proper where the enforcement of rights of one party would create injustice to the other party who has justifiably relied on the words or conduct of the party against whom estoppel is sought." *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 462 F.3d 87, 94 n.3 (2d Cir. 2006). "Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe the other party will rely upon it; 2) and the other party reasonably relies upon it 3) to her detriment. *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2001).

As an initial matter, the Court notes that Whittaker's equitable estoppel argument, like her acceleration of payment argument, is founded on an erroneous application of the "constructive receipt" doctrine. Whittaker identifies the following statements as misrepresentations: "[The Trust] is viewed as simply an account with Putnam. What this means

11

is that the funds in the current account are available to you whenever you choose to take them." *Whittaker's Pre-Hearing Memorandum*, at 17. However, Whittaker mistakenly argues that these statements may only be true if she owned the Trust Assets. Whittaker again misapprehends the import and effect of the "constructive receipt" doctrine, arguing, "If these clear and unambiguous statements are true… Whittaker was vested with ownership of the assets when the Plan restrictions were removed and her account became a regular Putnam account." *Id.* As previously discussed, the elimination of the "substantial limitations" on Whittaker's authority to withdraw the Trust Assets would not, standing alone, vest Whittaker with ownership of the Trust Assets. In the same fashion, the representation that the "substantial limitations" were removed may not, by itself, estop the Debtors from denying that Whittaker is the owner of the Trust Assets.

Whittaker's estoppel argument suffers generally from this error, as Whittaker fails to otherwise demonstrate the falsity of the statements in the Putnam Email she identifies as misrepresentations. Specifically, Whitaker continues, "If, [on the other hand] as the Debtors now contend, Whittaker actually needed MCI's further permission to withdraw the funds and to physically remove them into another account to have them treated as 'simply an account with Putnam,' then the [Putnam Email] was a definite misrepresentation of fact." *Whittaker's Pre-Hearing Memorandum*, at 17-18. However, though it should be obvious, the Putnam Email was only a definite misrepresentation of fact in the context of Whittaker's claim if the Putnam Email stated or represented that the Trust Assets had been distributed or Whittaker had otherwise gained ownership of the Trust Assets. As Whittaker mistakenly believes merely establishing that the Putnam Email represented that the substantial limitations to withdrawal had been eliminated

12

demonstrates that ownership of the Trust Assets was transferred, she fails to otherwise identify how the Putnam Email *directly* represented that she owned the Trust Assets.

Moreover, even if the Court were to assume that the Putnam Email represented that Whittaker owned the Trust Assets – as the Court concluded that the Putnam Email did not distribute the Trust Assets itself, at best the Putnam Email could be read as representing that the Trust Assets had been distributed – the Court would conclude, first, that Whittaker has not established that she relied on the Putnam Email, and second, that even if Whittaker did so rely, that reliance was not reasonable. Whittaker testified that she believed that the Putnam Email represented that "the plan was over, the funds were mine, and I could take them out as planned." *Transcript of Hearing on June 20, 2006* ("*Transcript*"), at 18. She further testified that she did not withdraw the Trust Assets from her account in reliance on that representation: "Q: Why didn't you send [a letter requesting withdrawal of the Trust Assets]? A: Well, because, as I said, I now have this account and we were separate. …and I could take the money at any time." *Id.* at 19.

The Court first notes that Whittaker's statements now – that she believed that she owned the Trust Assets, and by extension, relied on the Putnam Email in support of that belief – are not supported by Whittaker's actions at the time. Whittaker has not identified any affirmative action she took in reliance upon the Putnam Email. In contrast, Whittaker's failure to withdraw the Trust Assets may have equally followed from a belief that she did not own the Trust Assets as from a belief that she did own the Trust Assets. In addition, Whittaker failed to declare the Trust Assets as income on her federal income tax return for 2002. Though Whittaker has testified that she "honestly did not think of it," it seems implausible that Whittaker would have both believed she had received roughly $345,000 in income and failed to act in most logical fashion upon that

13

belief, namely, declaring that income on her tax return. The more plausible conclusion consistent with the facts is that Whittaker did not believe she owned the Trust Assets and therefore did not rely on the Putnam Email. Thus, the Court concludes that Whittaker's statements are insufficient alone to establish that she relied on the Putnam Email as a representation that she owned the Trust Assets.

Moreover, even if Whittaker did indeed rely on the Putnam Email, the Court concludes that Whittaker's purported reliance was unreasonable. Reliance is reasonable only if "the party claiming estoppel did not know nor should it have known that its adversary's conduct was misleading." *Becker v. I.R.S.* (*In re Becker*), 407 F.3d 89, 99 (2d Cir. 2005). In the context of this dispute, Whittaker must then show that she did not know and need not have known that the Putnam Email did not accurately describe her ownership interests in the Trust Assets.

It must be recognized, insofar as the reasonableness of Whittaker's reliance is concerned, that Whittaker was not simply a typical employee participating in a general employee savings or investment plan. Rather, Whittaker had been a member of the MCI Board of Directors, and more particularly, a member of the MCI Board of Directors' Compensation Committee. In addition, Whittaker is an experienced corporate attorney and served as general counsel for a large corporation. *See Transcript*, at 31. Whittaker was therefore aware, or should have been aware, that the issue of ownership was integral to the operation and status of the Deferred Compensation Plan, the Trust, and the Trust Assets. As previously discussed, the ability to defer income taxes on that income deferred under the Deferred Compensation Plan was dependent on MCI retaining ownership of the deferred income. As a result, Whittaker knew, or should have known, that the Putnam Email was misleading or, at a minimum, incomplete. This is particularly true in light of the fact that a formal plan and a formal trust existed here, each with concomitant

14

rules and regulations defining the parties' respective obligations, rights, and interests.  Such formal and well-defined relationships are not typically altered, and in fact ceased, without following formal procedures and offering formal notification.  As an experienced corporate attorney and former member of the Compensation Committee, Whittaker should have known that an ambiguous and ill-defined communication purporting to state that Whittaker was now the owner of the Trust Assets could not, standing alone, be relied upon as an accurate reflection of fact.

Moreover, reliance will not be deemed reasonable if the party claiming estoppel "had the means by which with reasonable diligence he could acquire the knowledge [of the truth] so that it would be negligence on his part to remain ignorant by not using those means." *Heckler v. Comm. Health Services of Crawford*, 467 U.S. 51, 59 n. 10 (1984).  Whittaker had ample means through which to determine the accuracy and consequences of the Putnam Email, not the least of which was simply asking for formal confirmation of the transfer from the Trust, the creation of an account in her name and under her ownership, or the closing of the Trust.  Her failure to do so is particularly negligent given the obvious ambiguity of the Putnam Email and the existence of formal instruments defining the parties' relationship.  Whittaker's purported reliance on the Putnam Email was therefore unreasonable, both in itself and because Whittaker could have easily confirmed the truth or falsity of the Putnam Email.

Finally, even assuming Whittaker's reliance was reasonable at the time of receipt of the Putnam Email, a number of subsequent events rendered such reliance unreasonable.  As previously discussed, Whittaker did not declare the Trust Assets as income and noted that she did not receive a 1099 or other statement of income regarding the Trust Assets.  Whatever else the absence of such communication reveals, it surely put Whittaker on notice that, whatever her

15

personal beliefs regarding the Trust Assets, those beliefs were not shared by Putnam and MCI. Similarly, as the Debtors note, Whittaker received at least one quarterly account statement from Putnam following receipt of the Putnam Email. *Facts Stipulation*, at 4. That statement included the following boilerplate language: "The funds in this account belong to your company. The value of the account measures the unsecured promise of your company to pay benefits under the company's non-qualified plan, but the existence of this account does not give you or your beneficiary any ownership rights to these or any other assets of the company." *Facts Stipulation*, Exhibit E, at 4.[5] Again, such language, even if boilerplate, put Whittaker on notice that the Trust Assets had not in fact been distributed and the she was not in fact owner of the Trust Assets, regardless of any representations that might have been made in the Putnam Email to the contrary. Whittaker testified that she did not read that language in the statement and that she did not wonder why the statement she received following the purported distribution of the Trust Assets was identical to those she received prior to such purported distribution. *Transcript*, at 23. However, Whittaker's failure to read the statement does not excuse her purported reliance on the Putnam Email. Rather, it again clearly demonstrates that Whittaker could have determined the truth of the matter through reasonable diligence and that her reliance was negligent, not reasonable.

Accordingly, the Court concludes that Whittaker is not entitled to equitable estoppel here.

C. RETIREMENT PLAN

Finally, Whittaker argues that the Deferred Compensation Plan is a "retiree benefits" within the meaning of section 1114(a) of the Code and therefore must be paid in a timely fashion and may not be modified pursuant to section 1114(e). This argument is wholly without merit.

---

[5] The exhibit is an exemplar, produced in the first quarter of 2005, and was not received by Whittaker. Nonetheless, the parties agreed that the exhibit is representative of the quarterly account statements Whittaker did receive. *Facts Stipulation*, at 4.

16

*See In re Farmland Industries, Inc.*, 294 B.R. 903, 919 (W.D.Mo. 2003) (concluding that deferred compensation plans are not retiree benefits within the meaning of section 1114(a)).

>Section 1114(a) defines "retiree benefits" as
>
>[P]ayments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and defendants, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

Whittaker argues that the Deferred Compensation Plan "could be used as a retirement vehicle" and that she "in fact used the [Deferred Compensation Plan] for purposes of her retirement, electing to receive her deferred compensation in ten annual installments beginning no later than [the year she turned sixty-five]." *Whittaker's Pre-Hearing Memorandum*, at 22. The flaw in this argument is obvious. Simply, Whittaker seeks to excise the specific definition of "retiree benefits" provided in the statute and redefine that term as analogous to "retirement vehicle" and incorporating any payments "for purposes of retirement." As the statute makes clear, however, the fact that the Deferred Compensation Plan may been used to provide the participant with post-retirement income does not, standing alone, render payments under the Deferred Compensation Plan "retiree benefits."

At best, Whittaker argues that payments under the Deferred Compensation Plan are "retiree benefits" because the Deferral Agreement provided for alternative payments schemes in the event of her death or disability. *See Facts Stipulation*, Exhibit A, at 4. Nonetheless, the Deferred Compensation Plan was not "for the purpose of providing… benefits in the event of sickness, accident, disability, or death…." The purpose of the Deferred Compensation Plan was to defer income, and the requisite income taxes, until some later date. That the timing and

17

method of payment of the deferred income may have been altered in the event of death or disability is merely incidental to that purpose.

Whittaker also suggests that "the Debtors have not set forth a business judgment for the rejection of [the] Deferral Agreement or any reasons that the rejection is in the best interests of the estates…." *Whittaker's Pre-Hearing Memorandum*, at 23. As the Debtors are not rejecting either the Deferral Agreement or the Deferred Compensation Plan, this argument is irrelevant.

Accordingly, the Court concludes that the Deferred Compensation Plan does not constitute "retiree benefits" within the meaning of section 1114(a).

## VI. CONCLUSION

In light of the foregoing, the Court concludes that the Claim is a general, unsecured claim and that the Objection should be granted. The Debtors are to settle an order consistent with this opinion.

Dated: New York, New York
March 27, 2007

**s/Arthur J. Gonzalez**
UNITED STATES BANKRUPTCY JUDGE