|  |  |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | FOR PUBLICATION |

In re                                :    Chapter 11

WORLDCOM, INC., et al.,              :    Case No. 02-13533 (AJG)

       Reorganized Debtors.          :    (Confirmed Case)

OPINION GRANTING REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM
NO. 38365 AND MOTION FOR A DETERMINATION OF REFUND RIGHTS PURSUANT
TO SECTION 505(a)(1) OF THE BANKRUPTCY CODE

A P P E A R A N C E S

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, NY 10153-0119

    Marcia L. Goldstein, Esq.
    Lori R. Fife, Esq.
    Alfredo R. Pérez, Esq.

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

    Danna Drori, Esq.
    Nicole Guerin, Esq.

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

I. INTRODUCTION

       Before the Court is Proof of Claim No. 38365 (the "IRS Claim"), filed by the Internal

Revenue Service ("IRS") on behalf of the United States of America, the Reorganized Debtors'

Objection to Proof of Claim No. 38365 (the "Objection"), and the Reorganized Debtors' Motion for a Determination of Refund Rights Pursuant to Section 505(a)(1) of the Bankruptcy Code (the "Refund Motion"). The parties' dispute concerns the Reorganized Debtors' liability for the telecommunications excise tax due pursuant to 26 U.S.C. §§ 4251 *et seq* (the "Telecommunications Excise Tax" or "Excise Tax") with respect to central office based remote access ("COBRA") services the Reorganized Debtors purchased. Having reviewed the parties' pleadings, and hearings having been held on this matter, the Court concludes that the Objection and the Motion should be granted.

II. JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a "core" proceeding pursuant to 28 U.S.C § 157(b)(2)(B). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408, 1409.

11 U.S.C. § 505 grants the Court jurisdiction to "determine the amount or legality of any tax, any fine or penalty related to a tax, or any addition to tax…." subject to two exceptions not applicable here. In addition, the Debtors previously filed claims for refund with the IRS in satisfaction of 26 U.S.C. § 7422(a) and Treas. Reg. § 301.6402-2(b)(1). Accordingly, the Court may properly adjudicate the IRS Claim and the Refund Motion.

III. BURDEN OF PROOF

Although claimants typically bear the burden of proof, and in the case of administrative claims, the burden of production as well, the IRS Claim represents a federal tax assessment. "In general a government tax assessment is entitled to a presumption of correction. A taxpayer who

2

wishes to challenge the validity of the assessment, moreover, bears the burden both of production and of persuasion." *US v. McCombs*, 30 F.3d 310, 318 (2d Cir. 1994) (citations omitted).  As the underlying substantive law determines the burden of proof vis-à-vis a proof of claim in bankruptcy proceedings, *Raleigh v. Illinois Dept. of Rev.*, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000), the Debtors accordingly bear the burden of proof regarding both the Objection and the Refund Motion.

III. FACTUAL BACKGROUND

WorldCom, Inc., and in particular, its subsidiaries UUNET Technologies, Inc. ("UUNET") and MCI WorldCom Network Services, Inc. ("MWNS") (collectively, the "Reorganized Debtors" or "Debtors"), constructed, maintained, and sold access to computer networks.  The Debtors' networks were in turn linked to other computer networks, collectively forming the global digital communications network generally described as the Internet.  The Debtors' networks were among the largest in the world.

The Debtors provided a range of network access services to a variety of customers.  In addition to providing network access directly to residential and business customers, the Debtors also operated as an "upstream" and "wholesale" Internet Service Provider ("ISP"), selling access and transit rights on their networks to independent ISPs, who in turn used those access and transit rights to provide network access to their own business and residential customers.[1]  The dispute here concerns services the Debtors purchased in connection with these latter businesses.

In order to access an ISP's network connections to the Internet, a customer is required to establish a connection between her computer and the ISP's servers located at the ISP's Point-of-

---

[1] "Upstream" ISPs generally operate large networks and provided network access to more local networks with fewer inter-network connections; generally, "upstream" refers to the transmission of information up a network hierarchy. "Wholesale" ISPs generally sell and provide network access to virtual ISPs who sell network access to end-users but do not themselves operate networks.

3

Presence ("POP") or hub. Prior to the widespread deployment of broadband Internet access services, such as Digital Subscriber Lines ("DSL") and cable television network connections, ISPs typically provided Internet access to their customers through the telephone system, more specifically known as the Public Switched Telephone Network ("PTSN"). The customer dialed a telephone number associated with the ISP's POP, thereby establishing a connection between the customer's computer and the ISP's server. As the local loop,[2] that portion of the PSTN linking the customer to the Local Exchange Carrier's ("LEC")[3] central offices ("CO"), was generally only capable of or used to carry analog signals, these "dial-up" Internet connections required modems on both sides of the connection that could translate digital signals – from the computers at either end of the connection – into analog signals for transmission across the PSTN and then translate the analog signals received into digital signals useable by the customer's computer or routed through the network by the ISP's servers.

These analog dial-up connections operate at much slower speeds than the high-speed digital connections between the dedicated servers that host much of the information Internet users wish to access. Accordingly, the upstream connection from the ISP's hub to the Internet is generally capable of greater speeds than the downstream connection over the local loop between the customer and the CO. Therefore, in order to maximize the efficiency and productivity of their communications networks, the Debtors wished to aggregate a number of dial-up connections into a high-speed data stream that could then be routed into the Debtors' networks.

---

[2] In nearly all instances, the local loop consists of twisted pair copper cables, which run from the CO to the customer's premises. Voice communication through these copper cables has historically been and continues to largely be analog communication, although much of interconnection between COs is now digital. Nonetheless, twisted pair copper cables are capable of digital communication and are now used to so communicate, such as with broadband DSL connections. Thus, while analog communication is often described in reference to communication over copper wires, whereas digital communication is often described in reference to optical communication over fiber optic lines, it is important to distinguish between the medium and the communication method.

[3] Local Exchange Carrier is the regulatory description for local telephone companies, such as Verizon and Qwest. Central offices are the physical locations at which LECs house the telephone exchange equipment which route calls through the PSTN.

4

In addition, further efficiencies and productivity gains can be realized relative to the location of this aggregation function. By aggregating the dial-up connections at the CO, rather than at the hub, the Debtors could reduce the number of ingress lines from the CO to the hub that the Debtors were required to purchase from the LEC, as well as reducing the costs associated with adding capacity and capabilities to the aggregation system. The Debtors generally referred to this CO-located system as Central Office Based Remote Access ("COBRA"). It is this system that is at issue here.

The COBRA system consists of three basic components. First, dial-up connections are routed from CO switches to the COBRA system through ingress Primary Rate Interface ("PRI") lines, each of which is capable of transmitting 23 separate dial-up connections. These PRI lines terminate in the Network Address Server ("NAS"), which in essence processes and aggregates the dial-up data streams transmitted through the PRI lines. The aggregated streams are then transmitted from the COBRA system to the Debtors' routers located at the Debtors' POP or hub through egress T1 lines. A complete and fully utilized COBRA system has 12 ingress lines and a minimum of 2 egress lines and is capable of receiving and processing 276 distinct dial-up modem connections simultaneously.

As the COBRA system was designed to be located in LECs' COs, the Debtors offered the COBRA system to LECs as an integrated package. The Debtors simultaneously sold complete COBRA systems and contracted to purchase COBRA service on a per port basis. The LECs were responsible for maintaining the physical hardware and switching equipment comprising the COBRA system, while the Debtors had full control over the software operating the COBRA system. The egress connection marked the demarcation point between the COBRA system and the Debtors' networks.

5

As the Debtors purchased COBRA services from the LECs, the LECs collected the Excise Tax on behalf of the IRS pursuant to section 4251. The Debtors have identified total payments in the amount of $38,297,513 for COBRA services purchased from July 1998 to December 2004.

IV. PROCEDURAL BACKGROUND

On July 21, 2002 (the "Petition Date"), and continuing thereafter, the Reorganized Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code" and "Code"). The Court approved the Reorganized Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Reorganization Plan") on October 31, 2003. The Reorganization Plan became effective April 20, 2004. The Reorganized Debtors, renamed MCI, Inc., subsequently merged with Verizon Communications, Inc., on January 6, 2006. Under the merger agreement, MCI, Inc., merged with and into Eli Acquisition LLC as a direct, wholly owned subsidiary of Verizon Communications, Inc. Eli Acquisition LLC, as the surviving entity, was immediately renamed MCI LLC. MCI LLC is now doing business as Verizon Business Global LLC.

On November 30, 2001, February 2, 2002, and January 31, 2005, the Debtors filed IRS Form 8849 Claims for Refund of Excise Taxes paid for COBRA service (collectively, the "Refund Claims"). The Refund Claims totaled $38,297,513. On July 2, 2004, the IRS filed the IRS Claim as an administrative expense claim in the amount of $16,276,440.81, amending Claim No. 37947, which was withdrawn. On August 5, 2004, the Debtors filed the Objection. On November 2, 2005, the IRS filed its Reply to the Objection and the supporting Declaration of Dr. Michael Hills (the "Hills Declaration"). On December 19, 2005, the Debtors filed their Response to the Reply. In addition, on January 31, 2006, the Debtors filed the Refund Motion,

6

asserting a right to repayment of any excise taxes paid in connection with the purchase of COBRA services.

On February 1, 2006, the Court held a hearing (the "February Hearing") on the IRS Claim and the Objection. At that hearing, the Court heard the expert testimony of the Debtors' witness, John Anderson, director of switch and IP planning for Verizon Business and previously for the Debtors. The Court also heard the expert testimony of the IRS's witness, Dr. Michael T. Hills, President of HTLT Technologies Ltd., a consulting company specializing in network design and optimization.

On March 27, 2006, both parties filed Proposed Findings of Fact and Conclusions of Law as to the IRS Claim and the Objection.

On April 11, 2006, the Court held a hearing (the "April Hearing") for additional arguments regarding the IRS Claim and the Objection.

On May 17, 2007, the Debtors filed a Motion for Leave to File Supplemental Authorities. An order was entered immediately prior to the entry of this opinion denying that motion as moot.

V. DISCUSSION

26 U.S.C. § 4251(a)(1) provides, "There is hereby imposed on amounts paid for communications services a tax equal to the applicable percentage of amounts so paid." "Communications services" are defined in subsection (b)(1) as "(A) local telephone service; (B) toll telephone service; and (C) teletypewriter service." "Local telephone service" is further defined at 26 U.S.C. § 4252(a):

> For the purposes of this subchapter, the term "local telephone service" means –
> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and
> (2) any facility or service provided in connection with a service described in paragraph (1).

7

Section 4252(a) also excludes "any service which is a 'toll telephone service' or a 'private communication service as defined in subsection (b) and (d)."

A. Statutory Interpretation

Accordingly, the statute sets forth three principal criteria for determining whether a service is subject to the Excise Tax. First, the purchaser must be provided with "access to a local telephone system." Second, the purchaser must also have "the privilege of telephonic communication." Third, that privilege must extend to "substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system."

Statutory construction requires the presumption that the "legislature says in a statute what it says there." *BedRoc Ltd., LLC v. US*, 541 U.S. 176, 183 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (citations omitted). The inquiry "begins with the statutory text, and ends there as well if the statutory text is unambiguous." *Id.* The words of the statute should be given their ordinary, plain meaning unless the those words are otherwise defined. *Id.* "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). The Court also notes that "[w]hen interpreting federal tax provisions as a matter of law or as a mixed question of law and fact, the statutory language should be given its natural and quotidian meaning and should not be extended by implication to reach other matters." *America Online, Inc. v. US*, 64 Fed.Cl. 571, 576 (2005) (citing *Gould v. Gould*, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211 (1917). Moreover, if the Court concludes "that there must be doubt as to taxability, then it should be resolved in favor of the taxpayer." *Trans-Lux Corp. v. US*, 696 F.2d 963, 968 (C.A. Fed. 1982) (citing *Western Electric Co. v. US*, 564 F.2d 53, 57 (Ct.Cl. 1977)).

8

The majority of the parties' arguments concern the second criteria, the "privilege of telephonic quality communication." The parties agree to certain basic facts, but dispute both the proper interpretation of the statutory language and the more detailed technical capabilities of the COBRA system. Significantly, both expert witnesses agreed that COBRA service utilizes a telephonic quality path. The IRS's arguments rest in large part on this fact, as the IRS argues that COBRA service is subject to the Excise Tax because it is dependent on the provision of a telephonic quality path and the transmission of telephonic quality communication. The Debtors, however, argue that telephonic quality communication should be distinguished from communication traveling over a telephonic quality path.[4] While the Debtors concede that COBRA service utilizes a telephonic quality path, they contend that COBRA service does not provide telephonic quality communication. More fundamentally, the parties disagree as to whether the features and characteristics of COBRA service should be analyzed in term of capabilities or actual use, and relatedly, how expansively the capabilities of COBRA service should be assessed.

In *Comdata Network, Inc. v. US*, 21 Cl.Ct. 128 (Cl.Ct. 1990), the taxpayer argued that it did not owe the Excise Tax on its purchase of toll telephone service that was configured to limit outgoing calls to specific locations. The *Comdata* court disagreed, noting that "the word 'privilege' connotes right…." *Id*. at 130. "Accordingly, the tax is applicable because the service provided plaintiff grants it the right to utilize the telephone lines to communicate with a substantial number of stations in a distant area. That the service may not, in fact, be so used by plaintiff is irrelevant to the existence of the privilege." *Id*. at 131. The Court agrees with this

---

[4] Both expert witnesses provided similar, reductive definitions of "telephonic quality communication" as the quality of communication necessary to and present in a voice telephone call. The statute does not provide a definition of this term. The parties' dispute concerns in part whether "telephonic quality communication" only requires the ability to transmit voice communication or whether some additional capability, such as the provision of a telephone interface, is required.

9

reasoning.  "Privilege" is clearly a more expansive concept than use.  Privilege allows a certain act or use without regard to what is done in fact.  Therefore, the Court must look to the capability of COBRA service, not its actual use.

However, the concept of privilege is limited to the capabilities of the service as purchased.  As the *Comdata* court further noted, there is a distinction between inherent limitations and voluntary limitations.  The taxpayer in *Comdata* voluntarily limited its use of the purchased service.  In contrast, the *Comdata* court distinguished a service to which the Excise Tax did not apply by recognizing that this latter system "was inherently incapable of being used more expansively." *Id*.  The *Comdata* court did not further explore the concept of inherent limitation, but inherent limitation should be understood in relation to the capability of the service *as purchased*.  The inherent limitations of a purchased service, that is, its capabilities, define the privileges granted.  If the purchased service is incapable of a certain use – so long as the taxpayer does not unilaterally determine that capability after purchase – it follows that the privilege to use the service in that fashion was not granted or purchased.

The parties have engaged in a detailed discussion regarding the capabilities of COBRA service vis-à-vis telephonic quality communication.  The expert testimony has established that COBRA service translates the audio representations of data into the TCP/IP Internet protocol and then aggregates that digital data into a high-speed data stream.  Beyond this the parties disagree about most facts and their relevance to the legal issues.  For example, the Debtors argue that this high-speed data stream cannot be utilized by telephone equipment such as a Private Branch Exchange ("PBX") to enable communication by telephone between the Debtors and a party connected to the local telephone system.  The IRS argues in response that a PBX can be plugged into and interface with the ingress PRI lines to provide a telephone connection.  Similarly, the

IRS argues that COBRA service can transmit VOIP communication, which is essentially voice communication in TCP/IP form rather than the typical time-division multiplexing (TDM) format used in the PSTN.  The Debtors dispute this contention.  The Debtors argue first that COBRA service is intended to and does receive dial-up modem communication that effectively travels at speeds much lower than that necessary to carry voice communication at a telephonic quality.  Mr. Anderson testified that whereas voice communication requires transmission at 64 kilobytes per second, the dial-up modems that use COBRA service have a maximum speed of 53 Kbps and in practice typically only carry data at only 33 or 24 Kbps, depending on whether the data is traveling to or from the end user (dial-up user).  Anderson further testified that voice communication traveling at those lower speeds would sound garbled and unintelligible to anyone receiving it.  The Debtors also argue that the modem cards in the COBRA system are incapable of supporting VOIP communication, and that they are contractually precluded from using COBRA service in that fashion.  These and other arguments the parties raise highlight the difficulty in applying statutes drafted in relation to existing technologies to new technologies.

However, the Court need not resolve these issues, as a sufficient basis in uncontested fact exists to resolve the Objection and the Refund Motion in favor of the Debtors.  The third statutory element discussed previously requires that the privilege of telephonic quality communication be "*with* substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system." (emphasis added).  As the court noted in *USA Choice Internet Service, Inc. v. US*, 73 Fed.Cl. 780, 792-795 (2006), this language should be contrasted with similar, but distinct language in section 4252(b)(2) defining "toll telephone service."  That subsection defines, in part, such service as "a service which entitles the subscriber, upon payment of a periodic charge … to the privilege of an unlimited number of

11

telephonic communications *to or from* all or a substantial portion of the persons having telephone or radio telephone stations…." (emphasis added).

This distinction, between the use of "with" in section 4252(a) and the use of "to or from" in section 4252(b)(2), suggests that the concept of privilege incorporates some element of directionality. Most obviously, "to or from" could signify that the relevant service need not include the privilege to both receive and originate telephonic quality communication, whereas the use of "with" would signify that both privileges are required. Alternatively, the distinction could be conceptualized in terms of one-way as opposed to two-way communication; a beeper service, for example, would provide only one-way communication whereas CB, or citizen's band, radio provides for two-way communication. However, the term "telephonic quality communication" incorporates the concept of two-way communication. Telephone service is distinguished from other communication methods in that it is two-way, or "full-duplex," communication; indeed, the parties' expert witnesses defined "telephonic quality communication" as two-way communication. Moreover, section 4252(b)(2) describes services such as toll-free calling, whereby the recipient of a call agrees to pay the charges for the initiator of the call. Such services provide two-way communication but may be configured to only provide either call reception or call origination. For example, the service at issue in *Comdata* provided the ability to originate calls charged at bulk rates and was distinguished from a complementary service that provided incoming toll-free calling at bulk rates. *Comdata*, 21 Cl.Ct. at 129-130. Accordingly, the Court concludes that section 4252(a) requires that the taxpayer have the privilege to both initiate and receive telephonic quality communication. *See also*, *XO Comm., Inc. v. U.S.*, 99 A.F.T.R.2d 2007-473 (finding the reasoning of the court in *USA Choice* "well-reasoned and persuasive").

12

It is uncontested that the PRI ingress lines that route the incoming dial-up connections to the COBRA system are configured as Direct-Inward-Dial (DID) lines. *See* Transcript, February Hearing, 89:17-90:19, 187:23-188:3. DID lines allow for call reception but do not allow for call origination. Accordingly, COBRA service does not provide the Debtors with "the privilege of telephonic quality communication *with* substantially all telephone or radio telephone stations constituting a part of such local telephone system…." (emphasis added).

The IRS contends that the barriers to call origination are self-imposed, reflecting the business choices of the contracting parties. The IRS further argues that these self-imposed limitations are not inherent limitations as described in *Comdata*, which the IRS suggests arise only in relation to technical limitations or barriers. This argument simply cannot be accepted. First, the Debtors purchased COBRA service as a complete package, which package only utilized DID lines. It is certainly possible that the Debtors could have requested and paid for call origination capability, but the fact remains that they did not. The IRS has not persuasively argued why the Debtors' liability should be accessed on the basis of what the LECs could have offered but did not, or what the Debtors could have purchased but did not. Moreover, the IRS's definition of technical capability is so expansive as to be almost limitless. The IRS argues that COBRA service can originate calls with the installation of new modem cards and the use of bi-directional PRI lines. This is certainly true, but the IRS has not argued why the Court may look to such possible changes but not look to changes that would allow, for example, access to a cellular telephone network. The Debtors could obtain such functionality by adding the necessary equipment. Neither call origination nor cellular network interconnection is necessary to the Debtors' use of COBRA service, but the IRS argues that the Court should ignore the first without

13

distinguishing the latter.[5] The Court thus reiterates its conclusion that the capability of COBRA service must be assessed as purchased, not in relation to possible configurations. Simply, the Debtors only have the privileges that they purchased.

The IRS further argues in the alternative that under section 4252(a)(2) COBRA service is a "facility or service provided in connection with a service described" in section 4252(a)(1). The IRS does not fully develop this argument by identifying the local telephone service COBRA service is provided in connection with, nor does the IRS detail how COBRA service is provided "in connection with" whatever local telephone service would be identified. Presumably, the IRS would argue that COBRA service is provided in connection with general local telephone service or the local telephone service purchased by dial-up users accessing the COBRA system, as COBRA service is dependent on access to the local telephone system in order to function. However, that COBRA service is dependent on access to the local telephone system is not a sufficient basis upon which to conclude that COBRA service is subject to the Excise Tax under section 4252(a)(2). Section 4252(a)(1) defines "local telephone service" in relation to three criteria, one of which is access to the local telephone system. If section 4252(a)(2) were to be interpreted to apply the Excise Tax to any service or facility that accessed the local telephone system, then the other two criteria specifically set forth in section 4252(a)(1) would be rendered superfluous. Moreover, the statute distinguishes between "local telephone service" and the "local telephone system", and section 4252(a)(2) refers to a "service" not a system. Similarly,

---

[5] The IRS analogizes to taxpayers who purchase local telephone service but only utilize that service for modem-to-modem communication. The IRS ruled in Rev. Rul. 79-245 that the purchase of local telephone service is subject to the Excise Tax even though the service is used exclusively for data communication. Thus, the IRS argues, the actual use of COBRA service, and by extension, its current configuration, is irrelevant. However, the key distinction the IRS ignores is that the use of local telephone service was at issue in Rev. Rul. 79-245, whereas here the question is whether COBRA service constitutes local telephone service. That is, the taxpayer in Rev. Rul. 79-245 purchased telephone service identical to that purchased by typical telephone users but sought to distinguish its service based upon the use to which the service was put. Here, by contrast, the question is whether COBRA service has features sufficiently analogous to typical telephone service and which satisfy the statutory criteria such that the Excise Tax should apply.

14

liability under section 4252(a)(2) cannot be defined in reference to access to local telephone service purchased by another taxpayer, as the local telephone system is the network of local telephone service provided to other taxpayers; this would simply tax access to the local telephone system by another name.[6]  Finally, deduction requires the conclusion that the taxpayer who is ascribed liability under section 4252(a)(2) must have purchased the "local telephone service" the "facility or service" is provided in connection with.  This is true even though, as the IRS argues, this condition precedent is not specifically stated in section 4252(a)(2).  Accordingly, the Court concludes that COBRA service is not a "facility or service provided in connection with a service described in" section 4252(a)(1).

B. Deference to Revenue Rulings

The IRS also argues that the Court's interpretation of section 4252(a) is contrary to the IRS's interpretation as expressed in relevant revenue rulings (the "Revenue Rulings").  In Rev. Rul. 75-102, the IRS considered telephone time and weather services purchased by organizations wishing to advertise their services that provide callers with the time and date as well as an advertising message.  The IRS ruled that these services constitute "local telephone service" within the meaning of section 4252(a).  Similarly, in Rev. Rul. 77-196, the IRS concluded that automatic call distributing systems, which are only capable of receiving incoming calls, are local telephone services.  Finally, in Rev. Rul. 89-84, the IRS concluded that a service permitting subscribers to call a telephone number and receive information such stock prices, news reports, and sports scores was a "local telephone service" and thus subject to the Excise Tax.  The IRS

---

[6] However, if the facility or service was directly connected to another taxpayer's local telephone service – that is, it was not connected through the local telephone system but through a private connection – and accessed the local telephone system though that other taxpayer's local telephone service, a different conclusion would likely be required.

15

argues that the Revenue Rulings are entitled to great deference by the Court and impel the conclusion that COBRA service is a "local telephone service" subject to the Excise Tax.

The level of deference due IRS revenue rulings is an unsettled issue of law. The Supreme Court has itself refrained from deciding the issue. *U.S. v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220, 149 L.Ed.2d 401, 121 S.Ct. 1433 (2001) ("We need not decide whether the Revenue Rulings themselves are entitled to deference."). The Second Circuit has previously held that "a Revenue Ruling is entitled to great deference. It is regarded as representing the official IRS position on application of tax law to specific facts, and is presumed to have the force of legal precedent unless unreasonable or inconsistent with provisions of the Internal Revenue Code." *Weisbart v. U.S. Dep't of Treasury*, 222 F.3d 93, 99 (2d Cir. 2000) (citations and internal quotation marks omitted). *See also Texasgulf, Inc. v. Comm'r*, 172 F.3d 209 (2d Cir. 1999); *Gillespie v. U.S.*, 23 F.3d 36 (2d Cir. 1994). This line of cases did not explicitly rely on *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), but the standard applied did resemble and approximate Chevron deference. However, after the Second Circuit last considered the issue in *Weisbart*, the Supreme Court signaled a significant change in its approach to administrative rulings, refusing in *US v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), to accord Chevron deference to a Customs Service tariff classification. The Court in *Mead* held that Chevron deference is appropriate only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority" through "notice-and-comment rulemaking, or by some other indication of Congressional intent." *Id.* at 226-27. *See also Christensen v. Harris County*, 529 U.S. 576, 146 L.Ed.2d 61, 120 S.Ct. 1655 (2000) (declining to apply Chevron deference to Department of Labor opinion letter). As

16

the Second Circuit has recognized, the Court's decision in *Mead* has raised doubts concerning the Circuit's practice of according great deference to revenue rulings. *See Reimels v. Comm'r*, 436 F.3d 344, 347 n.2 (2006). *See also Fortis, Inc. v. U.S.*, 420 F.Supp.2d 166, 178-79 (S.D.N.Y. 2004) ("There is some doubt as to whether revenue rulings are necessarily entitled to [great deference under *Weisbart*] after the Supreme Court's more recent decisions in *Christensen* and *Mead*.").

Indeed, almost all courts confronting the issue post-*Mead* have denied revenue rulings Chevron deference. *See generally* Ryan Morris, Comment, *Substantially Deferring to Revenue Rulings After Mead*, 2005 B.Y.U. L.Rev. 999 (2005). Instead, these courts have relied on the Court's holding in *Mead* that "*Chevron* did nothing to eliminate [the Court's prior holding in *Skidmore v. Swift & Co.*, 323 US 134, 89 L.Ed. 124, 65 S.Ct. 161 (1944)] that an agency's interpretation may merit some deference whatever its form, given the "specialized experience and broader investigations and information" available to the agency, [*Id.*] at 139, and given the value of uniformity in its administrative and judicial understandings of what a national law requires, *Id.* at 140." 533 U.S. at 234-35. *See Christensen*, 526 U.S. at 587 (under *Skidmore*, administrative rulings and interpretations "are entitled to respect … only to the extent that those interpretations have the power to persuade") (citing *Skidmore*, 323 U.S. at 140). *See also US Freightways Corp. v. Comm'r*, 270 F.3d 1137, 1141-42 (7th Cir. 2001) ("After *Mead*, we know that we give full deference under *Chevron* only to regulations that were promulgated with full notice-and-comment or comparable formalities. We also know that deference to agency positions is not an all-or-nothing proposition; more informal agency statements and positions receive a more flexible respect, in which factors like "the degree of the agency's care, its consistency, formality, and relative expertness, and … the persuasiveness of the agency's

17

position," are all relevant.) (citing *Mead*, 533 U.S. at 228). In particular, the Sixth, Eighth, Ninth, and D.C. Circuits have all declined to accord revenue rulings, either specifically or generally, Chevron deference and have instead applied only Skidmore deference. *See O'Shaughnessy v. Comm'r*, 332 F.3d 1125, 1130-31 (8th Cir. 2004) ("Accordingly, we conclude that the district court did not err in declining to treat revenue ruling 75-491 as controlling or persuasive authority."); *Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 (6th Cir. 2003) ("In light of the Supreme Court's decisions in *Christensen* and *Mead*, we conclude that Revenue Ruling 82-20 should not be accorded *Chevron* deference."); *Omohundro v. U.S.*, 300 F.3d 1065, 1067-68 (9th Cir. 2002) (concluding that, under *Mead*, revenue rulings generally are only entitled to Skidmore deference, but determining that specific revenue ruling at issue was entitled to deference); *Del Commer. Props. v. Comm'r*, 251 F.3d 210, 214 (D.C. Cir. 2001) (noting that revenue rulings are entitled to Skidmore deference and finding that the revenue rulings at issue were persuasive).

In light of the Supreme Court's holding in *Mead*, and the conclusions of the circuit courts that have considered the issue, the Court concludes that the Revenue Rulings are not entitled to Chevron deference. Accordingly, the Court will defer to those revenue rulings insofar as they are persuasive, "the thoroughness evident in [their] consideration, the validity of [their] reasoning, [their] consistency with earlier and later pronouncements, and all those facts which give [them] power to persuade." *Mead*, 533 U.S. at 228. The Court concludes that the Revenue Rulings are not persuasive and thus not entitled to deference.

The Court notes first that Rev. Rul. 75-102 is merely a conclusory recitation of the relevant tax code provisions. Rev. Rul. 75-102 simply states, "The time-of-day and weather forecast services furnished by the telephone company in the instant case provide access to a local

telephone system and the privilege of telephonic quality communication with all persons having telephones in the system." No analysis of these statutory criteria is provided. Similarly, Rev. Rul. 89-84 cites Rev. Rul. 75-102 and concludes, "The [taxpayer] in this case is no different from an advertiser or any other service provider that wishes to communicate a message or information using the local telephone system." Again, no analysis of the relevant statute is provided. Moreover, neither revenue ruling provides sufficient information to determine whether the purchased service provided both call origination and call reception capabilities even though only the call reception capability was utilized. As the Court previously discussed, actual use of the service is irrelevant if both call origination and call reception capabilities were purchased.

Rev. Rul. 77-196 does provide a fuller discussion of the IRS's interpretation of section 4252(a). Specifically, Rev. Rul. 77-196 states, "In defining taxable local telephone service, section 4252(a)(1) makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that receive and originate calls." However, the revenue ruling only cites to Rev. Rul. 75-102 in support of this proposition and thus only supports a conclusory statement by reference to another conclusory statement. Neither Rev. Rul. 75-102 nor Rev. Rul. 77-196 consider the import of the difference between the use of "with" in section 4252(a) and "to or from" in section 4252(b). Accordingly, the Court does not find that the Revenue Rulings are persuasive interpretations of the relevant statutory language and declines to defer to those interpretations.

19

VI. CONCLUSION

       In light of the foregoing, the Court concludes that the Objection and the Refund Motion should be granted. The Debtors are to settle an order consistent with this opinion.

Dated: New York, New York
       June 1, 2007

                                      **s/Arthur J. Gonzalez**
                                      UNITED STATES BANKRUPTCY JUDGE