**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Not For Publication

_____
                                                    :
In re                                               :          Chapter 11
                                                    :
                                                    :
WORLDCOM, INC., *et al.*,                           :
                                                    :          Case No. 02-13533 (AJG)
                                                    :          (Jointly Administered)
                                                    :
                          Reorganized Debtors.      :
_____:


**OPINION GRANTING REORGANIZED DEBTORS' MOTION FOR SUMMARY**
**JUDGMENT REGARDING CLAIM 11468 AND DENYING DREW'S**
**MOTION FOR SUMMARY JUDGMENT REGARDING CLAIM 11468**

**APPEARANCES**

STINSON MORRISON HECKER LLP
Attorneys for Reorganized Debtors
1299 Farnam Street, Suite 1501
Omaha, NE 68102

        Mark M. Iba, Esq.
        Michael J. Leahy, Esq.
        Blake Pryor, Esq.
                Of Counsel

LAW OFFICES OF JOHN E. WALL, JR.
Attorney for Mr. Richard H. Drew
5728 Prospect Avenue, Suite 2001
Dallas, TX 75206

        John E. Wall, Jr., Esq.
                Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

## I.    INTRODUCTION

Before the Court is WorldCom, Inc. and certain of its direct and indirect subsidiaries' (collectively, the "Debtors," "WorldCom" or "MCI") motion for summary judgment and their motion to deny class certification of proof of claim number 11468 (the "Claim"), asserting Mr. Richard Drew ("Drew") does not have an individual cause of action.  Also before the Court is Drew's motion for summary judgment and his motion for class certification of the Claim, on behalf of himself and the putative class, asserting Drew does have an individual cause of action due to MCI's fraudulent overcharges.  The issues before the Court are (1) whether a genuine issue of material fact exists regarding the Claim in dispute such that the Debtors' motion should not be granted, and that Drew's motion should be granted and, if so, (2) whether Drew may represent a nationwide class on behalf of himself and the putative class.

Upon consideration of the pleadings and arguments advanced by the parties, the Court finds that MCI charged Drew in accordance with MCI's Tariff F.C.C. No. 1 (the "Tariff") filed with the Federal Communications Commission (the "FCC") and that there is no amount due to Drew.  Therefore, the Court grants Debtors' motion for summary judgment as to Drew's claims for fraud and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") since no amount is due to Drew under the Tariff and, accordingly, the Court denies Drew's motion for summary judgment.  The issue of class certification is moot due to the Court's determination that no amount is due to Drew.

## II.    JURISDICTION

The Court has subject matter jurisdiction over this proceeding under sections 157 and 1334 of title 28 of the United States Code and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.).  This matter is a core proceeding under section 157 of title 28 of the United States Code.  Venue is proper before the Court under sections 1408 and 1409 under title 28 of the United States Code.

### III.    BACKGROUND

#### A.  Procedural History

Debtors provided a broad range of communications services in over 200 countries on six continents.  Through their core communications service business, which included voice, data, internet, and international services, the Debtors carried more data over their networks than any other telecommunications entity.  The Debtors were the second largest carrier of consumer and small business long distance telecommunications services in the United States and provided a wide range of retail and wholesale communications services.

On July 21, 2002 and November 8, 2002, the Debtors commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  By orders dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases were consolidated for procedural purposes only and were jointly administered.

On October 29, 2002, the Court entered an order establishing January 23, 2003 as the deadline for the filing of proofs of claim against the Debtors (the "Bar Date").  On October 31, 2003, the Court entered an order confirming the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan").  The Plan became effective on April

3

20, 2004 (the "Effective Date"). Upon the Effective Date, WorldCom changed its name to MCI, Inc. On January 6, 2006, Verizon Communications, Inc. and MCI, Inc. merged. Under the relevant agreement, MCI, Inc. merged with and into Eli Acquisition, LLC, as a direct, wholly owned subsidiary of Verizon Communications, Inc. Eli Acquisition, LLC, as the surviving entity, was immediately renamed MCI, LLC. MCI, LLC is now doing business as Verizon Business Global, LLC.

Drew was a residential long distance customer of MCI from January 1999 to July 1999 under the MCI One Advantage plan.[1] Accordingly, Drew received a billing invoice for MCI services he used during the months of January, February, March, April, May, June, and July of 1999. On Drew's billing invoice, there was a line-item charge labeled "Federal Universal Service Fee," which is a percentage of the customer's monthly total service usage charges. MCI imposed the FUSF on its customers to recoup its payment to the FCC to fund the FCC's Universal Service Fund ("USF").[2]

Below is a summary of the service usage charges Drew incurred and the FUSF MCI charged Drew for each month Drew maintained an account with MCI:

|  | Per Minute Charges | Plan Fees | NAF | Total Charges | Allowable FUSF | FUSF Charged |
|---|---|---|---|---|---|---|
| January 1999 | $02.85 | $0.32 | $1.07 | $04.24 | $0.25 | $0.25 |
| February 1999 | $27.35 | $4.95 | $1.07 | $33.37 | $2.00 | $2.00 |
| March 1999 | $34.60 | $4.95 | $1.07 | $40.62 | $2.44 | $2.44 |
| April 1999 | $15.60 | $4.95 | $1.07 | $21.62 | $1.30 | $1.30 |
| May 1999 | $35.55 | $4.95 | $1.07 | $41.57 | $2.49 | $2.49 |
| June 1999 | $32.15 | $4.95 | $1.07 | $38.17 | $2.29 | $2.29 |

---

[1] Drew states he was a residential long distance customer of MCI from November 1998 to June 1999. (Drew's Mot. Summ. J. 2.) However, the respective billing invoices apparently were issued from January 1999 through July 1999.

[2] The purpose of the USF is to improve telecommunications services to schools, libraries, rural health care providers, and low-income customers through financial subsidies. *See* 47 U.S.C. § 254 (2000); *see also Kline & Co. v. MCI Commc'ns Corp.*, 98 F. Supp. 2d 69, 70 (D. Mass. 2000). The Telecommunications Act of 1996 (the "TCA 1996") requires that every telecommunications carrier providing telecommunications service contributes to the "specific, predictable, and sufficient mechanisms" in order to "preserve and advance universal service." 47 U.S.C. § 254 (2000).

To clarify, the USF refers to MCI's contribution to the universal service fund and the FUSF refers to the manner in which MCI recouped its contributions to the universal service fund from its customers.

| | | | | | | |
|---|---|---|---|---|---|---|
| July 1999 | $00.00 | $0.66 | $0.00 | $00.66 | $0.05 | $0.05.[3] |

On May 11, 1999, prior to WorldCom filing for bankruptcy, Drew filed a class action complaint in Texas state court against MCI seeking relief under common law theories of fraud[4] and RICO for charging long distance customers a FUSF exceeding the FUSF set out in the Tariff.[5]   On June 15, 1999, MCI removed Drew's state court lawsuit to the Texas District Court.  On December 21, 1999, Drew filed his second amended original complaint against MCI WorldCom Management Co., Inc. and MCI Synergies Management Co., Inc. d/b/a MCI WorldCom (the "Second Amended Original Complaint").[6]

In the Second Amended Original Complaint, Drew, on behalf of himself and the putative class, alleged MCI committed fraud by charging customers a fee deceptively labeled "Federal Universal Service Fee."  Drew argues MCI intentionally misrepresented the overcharges, Drew and the putative class relied on the accuracy of MCI's billing statement and paid it, and MCI received fees in excess of what it was entitled.  Drew, on behalf of himself and the putative class, also alleged MCI violated RICO by using the United States Postal Service to mail monthly invoices overcharging its customers with the intent that customers will rely upon the bill and pay the bill every month.

On February 21, 2001, the Texas District Court issued an order granting MCI's motion to dismiss Drew's Second Amended Original Complaint without prejudice after concluding resolution of the Tariff issue is within the exclusive jurisdiction of the FCC.

---

[3] (Debtors' Br. Supp. Debtors' Mot. Summ. J. 4; *see also* Graves Aff. ¶ 5.)
[4] Drew states that a breach of contract claim is subsumed in the fraud claim.  (Summ. J. Hr'g, November 14, 2006.)
[5] The class was not certified in the U.S. District Court for the Northern District of Texas (the "Texas District Court") or the Texas state court from which it was removed.  *Drew v. MCI WorldCom Mgmt. Co., Inc.,* No. 3:99-CV-1355-D, 1999 U.S. Dist. LEXIS 18677, at *1, n.1 (N.D.Tex. 1999).
[6] In a memorandum opinion and order dated December 1, 1999, the Texas District Court directed Drew to amend his complaint to comply with Federal Rule of Civil Procedure 9(b).

(Drew's Mot. Withdraw Reference.)  Shortly thereafter, Drew filed a complaint with the

FCC.  On November 22, 2002, WorldCom wrote a letter to the FCC's informal

complaints team asserting Drew's complaint is "more appropriately addressed by the

Bankruptcy Court" and the "appropriate avenue for relief is for [Drew] to file a proof of

claim with the Bankruptcy Court."  (*Id.*)  Further, WorldCom declared the FCC "does not

entertain class action lawsuits."  (*Id.*)  To date, the FCC has not resolved the matter due to

the automatic stay invoked by the filing of WorldCom's bankruptcy petition and,

following the Effective Date, the injunction issued in accordance with the Plan.

On January 16, 2003, Drew filed the Claim, on behalf of himself and the putative

class, against WorldCom for its fraudulent billing practices, seeking "hundreds of

millions of dollars or more."[7]  On October 15, 2004, MCI filed its Seventy-Second

Omnibus Objection to Proofs of Claim (the "Objection"), which included an objection to

the Claim.  On November 17, 2004, Drew filed a response to the Objection.

On April 6, 2006, the Debtors filed the instant motion with supporting documents,

including an affidavit from Mr. Andrew M. Graves ("Graves").  On April 26, 2006, Drew

filed a motion to withdraw the reference asserting that resolution of his claims

necessitates consideration of the Federal False Claims Act and title 11 of the Bankruptcy

Code.  Drew argued the Claim is not a core proceeding because MCI defrauded its

subscribers by overcharging them, and if MCI did not use the revenue generated from the

FUSF charge to pay its USF contribution, then MCI defrauded the United States

government.  On April 27, 2006, Drew filed his response moving the Court to deny

Debtors' motion for summary judgment and Debtors' motion to deny class certification.

On May 2, 2006, the Court issued an order staying discovery pending resolution of the

---

[7] *See* the Claim.

instant motion.  On May 4, 2006, Debtors filed their reply.  On May 5, 2006, Drew filed

his supplemental response to conform his pleadings with Local Bankruptcy Rule 7056-1[8]

— the Debtors did not object.  On May 9, 2006, a hearing was held before the Court.

On July 24, 2006, the United States District Court for the Southern District of

New York (the "New York District Court") issued an order denying Drew's motion to

withdraw the reference.[9]

On October 13, 2006, Drew, on behalf of himself and the putative class, filed a

motion for summary judgment on the basis that Drew has an individual cause of action

against MCI because MCI overcharged its subscribers, and Drew also moved the Court to

grant class certification on the Claim.  On November 6, 2006, the Debtors filed their

response with supporting documents, including documents previously submitted to the

Court in support of the Debtors' motion for summary judgment, moving the Court to

deny Drew's motion for summary judgment and class certification.  On November 14,

2006, a hearing was held before the Court.

Below are the parties' contentions derived from the parties' Statement of Material

Facts, exhibits, and other supporting documents.

### B.  Parties' Contentions

#### i.  Debtors' Contentions

---

[8] Local Bankruptcy Rule 7056-1(c) states in part "[p]apers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party…."  Local Bankruptcy Rule 7056-1(e) states in part "each statement by the…opponent…, including each statement controverting any statement of material fact by…opponent, shall be followed by citation to evidence which would be admissible."  Local Bankruptcy Rule 7056.

[9] The New York District Court held that the motion was untimely and Drew failed to provide a "legitimate justification for the length of the delay" in filing the motion.  *Drew v. WorldCom, Inc.*, No. 06 Civ. 3407, 2006 U.S. Dist. LEXIS 52318, at *18-19 (S.D.N.Y. 2006).  Further, that court stated "the timing of Drew's motion to withdraw the reference gives rise to a strong inference that he is attempting to forum shop."  *Id.*  Drew asserts he sought to withdraw the reference in order to have a jury trial on the fraud issue to assess punitive damages.  Now, Drew contends the Court can easily and efficiently determine the issue because the Plan provides the relief.  (Drew's Mot. Summ. J. 10.)

With respect to the Claim, MCI argues Drew does not have an individual cause of action against it, and, thus, the Claim is not subject to allowance under section 502(b)(1) of the Bankruptcy Code.  MCI states that under the TCA 1996, which regulates interstate telecommunications carriers, the FCC is authorized to require telephone service carriers, like MCI, to contribute a percentage of their revenues to the USF.  (Debtors' Br. Supp. Debtors' Mot. Summ. J. 2-3); *see also* 47 U.S.C. § 254(d) (2000).[10]  Likewise, MCI asserts that the FCC authorizes carriers, like MCI, to charge a fee to end-users to recoup their payment to the USF.  (*Id*. at 7); *see also* 47 C.F.R. § 54.712(a) (2006).[11]  Accordingly, MCI charged customers like Drew the FUSF to recoup its USF contribution, which appeared as a line-item charge on the customer's billing invoice.  MCI declares the FUSF is listed in the Tariff.  (Summ. J. Hr'g, May 9, 2006.)

In his affidavit, dated April 4, 2006, Graves states he is the Director of Marketing Strategy and Policy for Verizon Business' Mass Markets Division.  Graves asserts he has first hand knowledge with how Mass Markets computes the FUSF, the Tariff, and that he personally reviewed Drew's billing invoices to ascertain whether the FUSF MCI charged Drew is appropriate under the Tariff.

Graves contends the FUSF that MCI charges its customers is based on its USF contribution, meaning the FUSF is based on the factors the FCC required MCI to use in computing its USF contribution, and that MCI used those same factors to define service

---

[10] The Telecommunications Act states in part "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and [to] advance universal service."

[11] Under the Federal Code, "Federal universal service contribution costs may be recovered through interstate telecommunications-related charges to end users.  If a contributor chooses to recover its federal universal service contribution costs through a line-item on a customer's bill, the amount of the federal universal service line-item charge may not exceed the interstate telecommunications portion of that customer's bill times the relevant contribution factor."  The contribution factor is also referred to as the estimation factor.

usage charges under the FUSF, which is set forth in the Tariff.  Specifically, Graves

asserts lines 311 and 414 of the Telecommunications Reporting Worksheet, FCC Form

499-A ("Form 499-A")[12] instructs long distance carriers, like MCI, to include the

following factors in computing their USF contribution (1) per minute charges for the

customer's interstate and international long distance telephone calls, (2) monthly plan fee

associated with the customer's account, and (3) the National Access Fee ("NAF"), a pass-

through charge authorized by the FCC to recoup Presubscribed Interexchange Carrier

Charge ("PICC") fees.[13]  (Debtors' Mot. Summ. J. Schedule I ¶ 9.)  Graves states these

three factors comprise MCI's service usage charges and Form 499-A, included in the

instant motion, governs the 1999 reporting year.

In addition, MCI asserts that under the Tariff, MCI was authorized to charge its

customers a FUSF equal to a percentage of the customer's monthly total service usage

charges — applicable to residential plans.  MCI argues the FCC authorized its criteria for

computing usage when it provided that same criteria to long distance carriers, like MCI,

to use in determining their USF contribution.  Under the Tariff, from November 2, 1998

to June 30, 1999, the FUSF was 6% of the customer's service usage charges and in July

1999, the FUSF was 7.2% of the customer's service usage charges.[14]  (Summ. J. Hr'g,

---

[12] (Debtors' Mot. Summ. J. Ex. A2.)  MCI contends the Tariff is the controlling document and Form 499-A
is provided to explain the factors used to compute the FUSF.  Further, telecommunications providers use
Form 499-A to compute their USF; it is not filled out by customers or on behalf of every customer.  MCI
further explains that Form 499-A shows that MCI's basis for computing its USF contribution included the
monthly recurring charges and the NAF.  Thus, MCI argues that since MCI's USF computation included the
monthly plan fee and the NAF, then it is likely that when MCI computes the FUSF, MCI will also
include the monthly plan fee and the NAF.  (Summ. J. Hr'g, November 14, 2006.)
[13] When Drew was a residential long distance customer of MCI, the NAF was a pass-through charge
authorized by the FCC.  (Graves Aff. ¶ 3.)
    PICC are per-line charges paid to access a local phone company's telephone network.  PICC is imposed
on long distance carriers for each customer subscribed to the carrier's long distance service.  (*Id.*)
[14] Tariff states, "For customer invoices dated November 2, 1998 and thereafter, a charge equal to 6 percent
of total MCI service usage charges will be applied to invoices of customers of…Metered Use Service
Option NN (homeMCI One)."  Tariff also states, "Beginning July 1, 1999, a charge equal to 7.2 percent of

May 9, 2006; *see also* Debtors' Br. Supp. Debtors' Mot. Summ. J. 10.)  The FUSF that

MCI charged Drew did not exceed the amount permitted under the Tariff in effect when

Drew was a customer of MCI.

   In the Debtors' response to Drew's motion for summary judgment, MCI further

explains its service usage charges definition and how MCI computed Drew's FUSF

charge.  MCI contends that the term "usage charges" means "all tariffed charges

appearing on a customer's invoice" and that the Tariff explicitly states MCI must apply

the FUSF to "total MCI service usage charges" and not just the per minute charges as

Drew argues.[15]  (Debtors' Resp. Drew's Mot. Summ. J. 2; Summ. J. Hr'g, November 14,

2006.)  MCI further contends that both the monthly plan fee and the NAF charges are

tariffed charges appearing on Drew's billing statements.[16]  (*Id*.)  In other words, the

monthly plan fee and the NAF are listed in the Tariff and since the term "usage charges"

is defined broadly to include "all tariffed charges appearing on a customer's invoice,"

---

total MCI service usage charges will be applied to invoices of customers of Metered Use Service Option
NN (homeMCI One)." (Debtors' Mot. Summ. J. Ex. A3.)

   Initially, Drew asserted MCI did not inform him that MCI characterizes his "One Advantage Plan" as
"Metered Use Service Option NN (homeMCI One)" under the Tariff. (Decl. Richard H. Drew ¶ 3.)
However, Drew no longer challenges the validity of the Tariff.

[15] The definition of "usage charges" is listed in the Tariff under the heading "General Description of
Customized Business Communications Service," the subheading "General Charges," the subheading
"Subscriber Charges." (Debtors' Resp. Drew's Mot. Summ. J. Ex. A3.) Drew disagrees with MCI's
definition of the term "usage charges" because MCI's definition is applicable "unless otherwise specified"
and Drew contends Footnote 1 in the Tariff  "otherwise specifie[s]" what encompasses usage charges.
(Summ. J. Hr'g, November 14, 2006.)

[16] The NAF is listed in the Tariff under the heading "General Description of Customized Business
Communications Service," the subheading "General Charges," the subheading "Subscriber Charges," the
subheading "National Access Fee (NAF)." The monthly fee is listed in the Tariff under "Metered Use
Service," the subheading "Option A," the subheading "Premier Calling Plans," the subheading "Basic
Calling Plan Options" (the "Basic Calling Plan"). (Debtors' Resp. Drew's Mot. Summ. J. Ex. A3.)

MCI argues it may assess the 6%[17] FUSF percentage listed in the Tariff on Drew's per minute charges, monthly plan fee, and NAF.[18]

Further, MCI argues Drew's claim that the FUSF exceeds the amount set forth in the Tariff is barred by the filed-tariff doctrine.[19] MCI asserts the filed-tariff doctrine, applicable to long distance carriers, bars any judicial proceeding requiring the Court to assess the legality of a carrier's tariff or to resolve a dispute regarding the meaning of a tariff. MCI contends that it may not vary from the Tariff and the Court may not award damages that would enforce a charge not contained in the Tariff. (Debtors' Resp. Drew's Mot. Summ. J. 9.) MCI also argues that since it charged Drew a FUSF consistent with the Tariff, the filed-tariff doctrine bars Drew's claim that MCI should have charged a FUSF in an amount less than what the Tariff authorized; essentially, Drew is asking for a discount that is not permitted under the Tariff. Thus, MCI argues Drew cannot prove his claim as a matter of law.

In addition, MCI argues Drew does not proffer any evidence supporting his contentions that MCI committed fraud by charging him a FUSF exceeding the amount permitted under the Tariff and that MCI made a material misrepresentation to him.[20] MCI declares Drew's billing invoices clearly indicate he was charged a "Federal Universal Service Fee" and as stated above, MCI argues the FUSF that MCI charged

---

[17] "Beginning July 1, 1999, a charge equal to 7.2 percent of total MCI service usage charges will be applied to invoices of customers of…Metered Use Service Option NN (homeMCI One)." (Debtors' Mot. Summ. J. Ex. A3.)

[18] Drew contends the monthly plan fee is just another charge MCI is obligated to list in the Tariff. (Summ. J. Hr'g, November 14, 2006.)

[19] This doctrine is also referred to as the "filed-rate" doctrine and such term will be used by the Court in its discussion and analysis herein.

[20] MCI contends the standard for proving a fraud claim is "(1) [the plaintiff must show] the defendant made a material false representation; (2) [the plaintiff must show] the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance." (Debtors' Br. Supp. Debtors' Mot. Summ. J. 5.)

Drew each month did not exceed the amount permitted under the Tariff. MCI maintains it did not make any fraudulent representations to Drew nor did it misrepresent the amount of FUSF it could charge Drew. MCI further argues that under the filed-tariff doctrine, Drew is "conclusively presumed" to know the terms of the Tariff and Drew cannot file a claim for misrepresentation on the basis that he should have been charged an amount other than the tariffed rate. (Debtors' Resp. Drew's Mot. Summ. J. 11.)

Furthermore, MCI argues Drew cannot prove reliance as a matter of law because in the Second Amended Original Complaint, Drew declares he "caught" the alleged misrepresentation and obtained a refund from MCI, which MCI characterizes as a customer concession. (Summ. J. Hr'g, November 14, 2006.) MCI also argues Drew does not proffer any evidence supporting his contention that MCI violated RICO.[21] MCI contends Drew fails to prove MCI was involved in "racketeering activity" and engaged in an "enterprise" to carry out its fraud. Thus, MCI contends that since it is undisputed that MCI charged Drew in accordance with the Tariff, the sole dispute centers on the proper interpretation of the Tariff, which can be determined as a matter of law. (Debtors' Resp. Drew's Mot. Summ. J. 9; Summ. J. Hr'g, November 14, 2006.)

With respect to class certification, MCI argues Drew does not have an individual claim because MCI did not engage in deceptive or fraudulent conduct and MCI charged Drew a FUSF consistent with the Tariff; therefore, Drew cannot represent the putative class. MCI asserts Drew has not filed a motion asking the Court to apply Federal Rule of

---

[21] MCI contends the standard for proving a RICO claim is "(1) that MCI, through the commission of two or more acts which constitute racketeering activity, directly or indirectly participated in an enterprise which affects interstate commerce; and (2) that Drew's business or property was injured as a result of the conduct described in (1)." (*Id.* at 6.)

MCI contends Drew voluntarily dismissed his RICO claim during the pendency of the matter in the Texas District Court. (Summ. J. Hr'g, May 9, 2006.)

Bankruptcy Procedure 7023 or to have his Claim certified as a class action proof of claim. (Debtors' Mot. Summ. J. Schedule I ¶ 45.)

MCI also argues even if Drew has a claim, the Court should deny class certification. MCI asserts Drew's putative class action lawsuit does not satisfy the requirements for a class action as set forth in the Federal Rule of Bankruptcy Procedure 7023.[22] First, Drew is not a member of the class he purports to represent since he is subject to unique claims and defenses and MCI did not overcharge him. MCI contends that since Drew "caught" the alleged misrepresentation, MCI did not deceive Drew nor did he rely on the alleged misrepresentation. Thus, MCI argues Drew's alleged experience is atypical of the putative class members' experience. (Debtors' Resp. Drew's Mot. Summ. J. 16.)

Second, MCI contends individual factual issues predominate over common issues of the putative class members. MCI declares that putative class members will have to demonstrate "(1) that they were charged [a] FUSF in excess of amounts authorized in MCI's Tariff; and (2) that MCI used deceptive or fraudulent representations upon which the individuals relied. Both of these requirements are dependent on particular facts unique to each individual." (Debtors' Br. Supp. Debtors' Mot. Summ. J. 10.) MCI further asserts that a requirement to apply diverse laws and burden of proof to individual claims of the class members defeats the predominate requirement of Federal Rule of Civil Procedure 23(b)(3). (*Id*. at 19.)

---

[22] Federal Rule of Bankruptcy Procedure 7023 states "[o]ne or more members of a class may sue or be sued as a representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class." Federal Rule of Bankruptcy Procedure 7023.

In order to certify the class, MCI contends the Court would have to conduct several mini-trials as to each person's membership in the putative class. Specifically, MCI declares the Court would have to determine whether each putative class member was overcharged, analyzing the tariff in effect at the time of the overcharge and the maximum amount of FUSF MCI may charge, and then compare the maximum amount of FUSF MCI may charge to the FUSF MCI actually charged to determine whether the FUSF MCI charged the customer exceeded the tariff in effect at the time — this does not include the issue of reliance and whether reliance is reasonable, which requires the Court "to evaluate the mental state of each claimant to determine whether there is evidence of reasonable reliance." (*Id.* at 13.) Further, Debtors argue the subjective nature of identifying the putative class would overburden the Court and, thus, outweigh any potential benefits of class certification.

Third, MCI argues the putative class is unascertainable due to Drew alleging fraud. MCI contends Federal Rule of Bankruptcy Procedure 7023 implies class identification must be ascertainable through objective criteria. Here, MCI contends in the Second Amended Original Complaint the putative class consists of customers who were charged a fee deceptively labeled "Federal Universal Service Fee." MCI asserts Drew now states that certain class members may have been overcharged different amounts or may not have paid all of the overcharges as billed. (Drew's Mot. Summ. J. 8.) Thus, MCI contends that a determination whether a putative class member refused to pay the overcharges because the putative class member "caught" the alleged misrepresentation requires an examination of every individual member's state of mind — a subjective evaluation. (Debtors' Resp. Drew's Mot. Summ. J. 18.) Therefore, MCI asserts the

putative class is "defined in terms of the subjective state of mind of its members and the highly subjective nature of the individual's reliance on MCI's allegedly false statements" and "[i]f membership is based on a subjective determination, the class cannot be considered identifiable." (Debtors' Br. Supp. Debtors' Mot. Summ. J. 11-12.)

In addition, MCI argues that Drew's newly proposed class, residential and business customers who were deceptively charged the FUSF, is limitless rather than limited to customers like him, customers with the MCI One Advantage plan or customers within the same locality. (Debtors' Resp. Drew's Mot. Summ. J. 17.) MCI declares that Drew does not proffer any evidence demonstrating that another member of the putative class was overcharged. (*Id.*)

Fourth, MCI argues class action is not the "superior vehicle" for resolving common law fraud claims because each putative class member must prove his or her own reliance — individuals may file a proof of claim without counsel.[23] Further, MCI asserts it designed its customer service programs, policies, and practices to assist customers on an individual basis.

Fifth, MCI argues Drew's claim for class certification is untimely. MCI contends Drew should have moved the Court under Federal Rule of Bankruptcy Procedure 9014 for application of Federal Rule of Bankruptcy Procedure 7023 after MCI filed its Objection to the Claim. MCI asserts it objected to Drew's Claim in October 2004 and Drew did not move the Court to apply Federal Rule of Bankruptcy Procedure 7023 until April 2006, eighteen months later. MCI states there is a Texas District Court local rule requiring Drew to apply for class certification within 90 days of filing the action ("90-day

---

[23] Drew declares a class action is the superior method for fairly and efficiently adjudicating the controversy. (Drew's Mot. Summ. J. 10.)

Rule"). (Summ. J. Hr'g, November 14, 2006.) MCI further asserts timeliness is essential

so that a late class certification does not "gum up the works" of administering the

bankruptcy estate and absent class members may receive prompt notice of their right to

opt out.[24]

     Sixth and last, MCI questions whether Federal Rule of Civil Procedure 23 applies

to bankruptcy proceedings and MCI contends that if bankruptcy is an available method

for resolving the dispute, it is superior to a class action. MCI asserts small claims make

poor class claims because they hold little prospect of compensation or deterrence and

warrant the Court to exercise its discretion under Federal Rules of Bankruptcy Procedure

9014 and 7023. MCI contends that small claims turn the class action into a "lawyer's

vehicle" because the lawyer may settle quickly in order to obtain fees rather than risk the

settlement fee in exchange for the prospect of a higher recovery. MCI also questions

whether Drew has a sufficient interest in the case to represent the class because Drew

wants to "parlay" his total damage claim of $1.93 into a multi-million dollar claim based

upon his speculation that millions of other customers were allegedly overcharged. Thus,

MCI asserts that certifying the class prolongs these meritless claims proceedings.

(Debtors' Resp. Drew's Mot. Summ. J. 20-21; Summ. J. Hr'g, November 14, 2006.)

     ii.  Drew's Contentions

     In response to the Debtors' motion for summary judgment, Drew argues MCI

thwarted discovery by objecting to Drew's interrogatories on the basis that the

interrogatories are "overly broad, unduly burdensome and not reasonably calculated to

---

[24] MCI notes that the Plan has been approved, claims have been paid, and MCI has since emerged and
merged with another entity. (Debtors' Resp. Drew's Mot. Summ. J. 13-14.)

lead to discoverable information."[25]  Drew contends the answers to the interrogatories would provide the necessary information for ascertaining the class.[26]

Moreover, Drew objects to the submission of Graves's affidavit.  Drew argues Graves does not explain his role during his tenure with MCI nor does he have personal knowledge of the relevant facts, or demonstrates any knowledge regarding how MCI computed the FUSF.  Drew contends Mr. Scott Sullivan, Mr. Bernard Ebbers, and Mr. Kerr are the appropriate persons to discuss Form 499-A and the formulas used to compute the FUSF.  Accordingly, Drew argues under Federal Rules of Evidence 401 and 602 Graves cannot testify because he does not have personal knowledge.

In addition, Drew argues Graves is not credible.  Drew contends if MCI charged exactly what was set forth in the Tariff, then providing an explanation of Form 499-A is futile since the Tariff is suppose to be "clear and unequivocal."  Drew argues the purpose of Form 499-A is not to compute the USF, but to report universal service, telecommunications relay service, number administration, etc.  Drew also contends the Tariff that Graves refers to is applicable to "Customized Business Communication Services," not residential customers like Drew and questions whether a Tariff exists applicable to him.  (Summ. J. Hr'g, May 9, 2006.)  Drew also asserts that MCI WorldCom Residential Service issued his billing statements, not MCI Telecommunications Corporation.

---

[25] In Drew's interrogatories, Drew asked MCI to identify all customers who received a bill with a FUSF line-item charge and their personal information, including name, address, and long distance plan rate. (Drew's Resp. Debtors' Mot. Summ. J. 1-2.)

[26] MCI argues Drew has not indicated "what additional discovery he would need to do or how additional discovery would rebut the arguments" proffered in the Debtors' motion for summary judgment.  (Summ. J. Hr'g, May 9, 2006.)

Further, prior to submission of Graves's affidavit, Drew argued that under the

Tariff, the FUSF is only 6% of a customer's per minute charges, not 6% of the per minute

charges, the NAF, and the monthly fee.[27]  Drew declares "…the [T]ariff clearly states

that the NAF and the charges 'will be calculated after the application of promotional or

other discounts and will not apply to tax, tax like and/or tax related surcharges as

described.'"  Drew contends the NAF is a "tax like charge."[28]  (Decl. Richard H. Drew ¶

4a; *see also* Summ. J. Hr'g, November 14, 2006.)  Drew further asserts that in his

January 1999 billing statement, MCI stated it will charge him 6% of his monthly

international and interstate calls in order to recoup its contribution to the USF; thus,

Graves is using Form 499-A to justify why the FUSF exceeds the amount set forth in the

Tariff.  Drew argues that MCI abandoned its argument that Form 499-A justifies the

manner in which MCI applies the FUSF because the Tariff has to be clear on its face and

that MCI now argues the term "usage charges" encompasses per minute charges, monthly

plan fee, and NAF.

In support of Drew's contention that Graves is not credible, Drew first contends

that Graves used lines 311[29] and 414,[30] rather than line 403[31] of Form 499-A to compute

---

[27] Drew cites Debtors' Mot. Summ. J. Ex. A3 at 71, n.1 which states, "The Federal Universal Service Fee will either be included as a component of individual call charges on a customer's invoice or it may be included as part of a separate line item on a customer's invoice" ("Footnote 1").  (Summ. J. Hr'g, May 9, 2006.)
   MCI declares Footnote 1 refers to how the FUSF is reflected on a customer's bill and further asserts in the Debtors' response to Drew's summary judgment motion that Footnote 1 does not discuss how the FUSF must be computed.
[28] MCI asserts the NAF was a pass-through charge authorized by the FCC to recoup PICC fees and the FCC instructed long distance carriers, like MCI, to include the NAF in computing their USF contribution. *See supra* note 13.
[29] The heading states, "Revenue From Service Provided for Resale by Other Contributors to Federal Universal Service Support Mechanisms[.]"  The subheading states, "Toll [S]ervice[.]"  The text states, "Ordinary Long Distance (MTS, customer toll free 800/888 service, associated monthly account maintenance, PICC pass-through, and switched services not reported above)[.]"  (Debtors' Mot. Summ. J. Ex. A2 at 65.)

the FUSF.  Drew argues line 311 only applies to "revenue from service provided for resale by other contributors to the Federal Universal Service Support Mechanism" and it does not include monthly account maintenance and PICC charges as Graves asserts.[32] (Drew's Resp. Debtors' Mot. Summ. J. ¶ 4n.)  Drew asserts he is not a reseller and line 414 does not apply to him because line 414 states "other switched services not reported above."  (*Id*. at ¶¶ 4n-p; *see also* Decl. Richard H. Drew ¶ 4b.)

Second, Drew contends line 414 does include "ordinary long distance," PICC charges, and "other switch services not reported above," but argues if MCI had a filed tariff, it would not complete line 414 because line 403 specifically addresses the USF, stating "surcharges or other amounts on bills identified as recovering state or federal universal service contributions."[33]  Third, Drew argues a separate line exists for monthly service and PICC charges — not line 414 as Graves indicates — and asserts that according to the FCC, the NAF and PICC are not the same.  (Summ. J. Hr'g, May 9, 2006.)  In sum, Drew argues the Tariff does not authorize MCI to charge 6% of the monthly plan fee or the NAF; therefore, MCI charged Drew and the putative class more than what the Tariff allowed.

Moreover, Drew asserts Form 499-A was not in effect when MCI computed its USF and charged Drew the FUSF; Form 499-A did not become effective until after Drew terminated his account with MCI.  Drew declares Form 499-A is applicable from January

---

[30] The heading states, "Revenue From All Other Sources[.]"  The subheading states, "Toll [S]ervice[.]"  The text states, "Ordinary Long Distance (MTS, customer toll free 800/888 service, associated monthly account maintenance, PICC pass-through, and switched services not reported above)[.]"  (*Id.* at 66.)
[31] The heading states, "Revenue From All Other Sources[.]"  The text states, "Surcharges or other amounts on bills identified as recovering State or Federal universal service contributions[.]"  (*Id.*)
[32] *See supra* note 29.
[33] *See supra* note 31; (*see also* Summ. J. Hr'g, May 9, 2006.)

2000 to December 2000 as opposed to January 1999 to December 1999 and, thus, MCI did not know the alleged formula at the time.

Following the receipt of Graves's affidavit, Drew reiterates that MCI improperly applied the FUSF percentage to the monthly plan fee and the NAF when computing the FUSF and further argues that MCI should have used the 4.59% estimation factor as the FUSF percentage — MCI used the 4.59% estimation factor to calculate its USF contribution — to compute the FUSF as opposed to 6%. (Drew's Supplemental Resp. Debtors' Mot. Summ. J. ¶¶5-30.)

In addition, Drew argues MCI should be estopped from employing the filed-tariff doctrine as a defense because MCI overcharged its customers. Drew contends the amount MCI charged him exceeds the amount set forth in the Tariff and if a customer failed to pay the prior month's balance in full, MCI assessed the FUSF on the unpaid balance on the following month's bill.

Furthermore, Drew asserts the FCC advised him the FUSF that MCI charged him exceeded the amount "provided by law." (Drew's Second Am. Original Compl. ¶ 10; *see also* Decl. Richard H. Drew ¶ 2.) Drew states when he notified MCI of the overcharges, MCI refunded the overcharge for one month and stated it would not refund any other overcharges without proof. Drew contends the refund implies MCI intended to defraud him and the putative class. Drew declares MCI overcharged him the following amounts:

| Month | Overcharged Amount |
| --- | --- |
| January 25, 1999 | $0.08 |
| February 25, 1999 | $0.36 |
| March 25, 1999 | $0.36 |
| April 25, 1999 | $0.36 |
| May 25, 1999 | $0.36 |
| June 25, 1999 | $0.36 |

      July 25, 1999      $0.05.[34]

Drew states MCI charged him a fee although he did not make any interstate or international calls in July 1999.  Drew contends MCI overcharged him $1.93 and it overcharged its 16 million customers $30,888,000 during those six months.  Drew declares the overcharging occurred from January 1999 to July 2002 and MCI defrauded the putative class of $92,640,000.  (Drew's Supplemental Resp. Debtors' Mot. Summ. J. ¶ 6.)

Therefore, Drew contends he has a valid claim against MCI based upon undisputed evidence demonstrating MCI fraudulently overcharged and misrepresented the FUSF to its subscribers.  Drew asserts he is not challenging the validity of the Tariff, but the application of the Tariff to his usage charges; Drew demands that MCI charge the amount set forth in the Tariff.  Further, Drew contends the filed-tariff doctrine precludes MCI from charging the FUSF percentage on the monthly plan fee and the NAF.  (Drew's Mot. Summ. J. 13-14.)

With respect to class certification, Drew argues the Court should certify the class based on the fraud on the market theory,[35] or, in the alternative, a claim should be brought asserting MCI violated the Federal False Claims Act because MCI sent billing invoices to 16 million subscribers with a FUSF line-item charge and the subscribers paid their invoices relying on MCI's fee assessment — MCI described its charges as a federal fee/tax.[36]  Drew contends the circumstances surrounding each putative class member's

---

[34] (Decl. Richard H. Drew ¶ 4a.)
[35] MCI argues Drew cannot utilized the "fraud on the market" theory because the theory has not been employed in consumer fraud cases like Drew's and Drew would still have to conduct individualized inquires into each putative class member's claim.  (Summ. J. Hr'g, May 9, 2006.)
[36] Drew contends if the Court concludes MCI defrauded the United States government or the USF, Drew is entitled to bring a *qui tam* action.

reliance on the fraudulent misrepresentations are the same: MCI billed each subscriber

between 1998 and the filing of the complaint and each subscriber that paid his or her bill

relied on it; therefore, the Court does not have to ascertain each individual's state of mind

regarding reliance as MCI recommends, and it is impracticable to join everyone in the

case.

Furthermore, Drew argues since MCI committed fraud, the commonality

determination is based on facts common to all class members.  Drew contends the

questions of law predominate over any question affecting only individual members.

(Drew's Mot. Summ. J. 8, 10.)  Drew also argues that his claims are typical of the claims

of the putative class and he is an appropriate representative because MCI charged Drew

and the putative class a FUSF exceeding the amount set forth in the Tariff — common

question of law and fact.[37]

In addition, Drew states it is difficult to ascertain the size of the putative class,

which he estimates is in the millions and the degree of MCI's fraud if the Court does not

force MCI to provide answers to Drew's interrogatories.  (*Id.* at 7.)  In his motion, Drew

argues that the putative class consists of both business and residential customers, any

---

MCI argues Drew cannot assert a *qui tam* claim at this stage.  MCI contends Drew has not alleged MCI violated the Federal False Claims Act in his pleadings nor has Drew requested permission from the Court to amend the Second Amended Original Complaint.  MCI also contends Drew does not have a basis for these allegations.  (Summ. J. Hr'g, May 9, 2006.)

Based on Drew's summary judgment motion, the Court finds that Drew abandoned in the instant matter any pursuit of his contention that MCI defrauded the United States government.  Further, even if Drew had not abandoned such contention here, the Court agrees with MCI that an assertion of a claim under the Federal False Claims Act is not properly before the Court.

[37] MCI argues that the failure of a putative class representative to move promptly for class certification strongly indicates that the representative will not fairly and adequately represent the interests of the class. (Debtors' Resp. Drew's Mot. Summ. J. 16.)  MCI contends there are three instances where Drew was untimely: Drew violated the 90-day Rule, Drew failed to move the Court promptly for class certification, and the New York District Court denied Drew's motion to withdraw the reference because it was untimely. (Summ. J. Hr'g, November 14, 2006.)

Drew contends that moving for class certification in the Texas District Court was futile due to the numerous 12(b) and 9(b) motions and noted other instances where he responded timely.  (*Id.*)

customer who was an Executent or Home One user that received a billing invoice labeled "Federal Universal Service Fee" from June 15, 1995, to the date the Debtors filed their bankruptcy petitions.  (Summ. J. Hr'g, November 14, 2006.)  Drew clarified this contention at the hearing by stating that the class consists of those individuals who were charged the $1.07 NAF charge, the $4.95 monthly plan fee, or any other monthly fee upon which the FUSF was assessed, and only those who paid their bill should be reimbursed.[38]  (*Id.*)

Furthermore, Drew argues his application for class certification is timely.  Drew contends under Federal Rule of Bankruptcy Procedure 9014, the first opportunity a claimant has to move the court for class certification under Federal Rule of Bankruptcy Procedure 7023 is when an objection is made to the proof of claim and prior to that objection, moving under Federal Rule of Bankruptcy Procedure 7023 is premature because there is no adversary proceeding or contested matter.  Drew also argues it is premature to move the Court for class certification prior to resolution of the Objection to the Claim.  In Drew's motion for summary judgment, Drew further asserts that the motion to certify the class is timely in accordance with the scheduling order agreed to by both parties and now properly moves the Court to certify the class under Federal Rules of Bankruptcy Procedure 7023(a), 7023(b)(1)(A),[39] and 7023(b)(3).

---

[38] Drew states that MCI can obtain the mailing address of the putative class by utilizing its subscriber database and the putative class will be notified through the mail.  Drew contends the amount in controversy is $277,401,600.  (Drew's Mot. Summ. J. 9-10.)

[39] Under Federal Rule of Bankruptcy Procedure 23(b)(1)(A), a class may be certified if the prerequisites are met and "if the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class."  Federal Rule of Bankruptcy Procedure 23(b)(1)(A).

Drew contends that adjudicating the claims separately creates a risk of inconsistent determinations and establishes "incompatible standards."  (Drew's Mot. Summ. J. 10.)  MCI argues Drew fails to demonstrate the existence of any risk of inconsistent or varying adjudications.  MCI states all the bankruptcy

## IV.    STANDARD OF REVIEW

### A.  Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to

bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure,

states that summary judgment should be granted if the record demonstrates that "there is

no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under

governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986).  A "genuine issue" exists where "the evidence is such that a

reasonable jury could return a verdict for the non-moving party."  *Id.*  "When the movant

demonstrates through competent evidence that no material facts are genuinely in dispute,

the non-movant must set forth specific facts showing that there is a genuine issue for

trial."  *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2nd Cir. 1990)

(internal quotation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The evidence must be "viewed in the light most

favorable to the party opposing the motion."  *Terminate Control Corp. v. Horowitz*, 28

F.3d 1335, 1352 (2nd Cir. 1994).  Furthermore, the Court must resolve all ambiguities and

draw all reasonable inferences from the underlying facts in favor of the non-moving

party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986).

---

proceedings were consolidated and all the pertinent facts and law are to be determined by the Court.
Therefore, a risk of inconsistent resolutions does not exist requiring MCI to fulfill mutually conflicting
obligations.  (Debtors' Resp. Drew's Mot. Summ. J. 19, n.13.)

## V.    DISCUSSION

In Drew's initial pleadings, Drew set forth two causes of action.  In the first cause of action, Drew argues MCI committed fraud by charging its customers a fee deceptively labeled "Federal Universal Service Fee."  Drew contends, under the Tariff, the FUSF is 6% of a customer's per minute charges, not 6% of the per minute charges, the NAF, and the monthly plan fee.  Drew argues MCI intentionally misrepresented the overcharges, Drew and the putative class relied on the accuracy of MCI's billing statement and paid it, and MCI recouped more than its USF contributions.  Further, in response to the Debtors' summary judgment motion, Drew contends that MCI used the incorrect estimation factor to compute the FUSF, the Tariff is only applicable to business customers, and the MCI One Advantage plan is not listed in the Tariff.  In the second cause of action, Drew argues MCI violated RICO by mailing monthly invoices overcharging its customers with the intent that those customers will rely upon the bill and pay the bill every month.

However, in Drew's motion for summary judgment, Drew states he is not challenging the validity of the Tariff, meaning Drew no longer argues that the Tariff is inapplicable to MCI One Advantage plan subscribers and that MCI should have used the 4.59% estimation factor as the FUSF percentage instead of 6%.  Drew limits his challenge to the application of the 6% FUSF percentage to the service usage charges on his billing statements.

MCI argues it did not make any fraudulent representations to Drew nor did it overcharge Drew or the putative class, and the FUSF, which is based upon its USF contribution, is listed in the Tariff.  MCI contends it characterized Drew's MCI One Advantage plan as the Basic Calling Plan and the MCI One Advantage plan is included in

25

"Metered Use Service Option NN (homeMCI One)" and both are listed in the Tariff,
thus, the Tariff is applicable to Drew.  MCI asserts that the Tariff explicitly states MCI
must apply the FUSF to "total MCI service usage charges" and the term "usage charges"
means "all tariffed charges appearing on a customer's invoice," not just the per minute
charges as Drew argues.  MCI further asserts that both the monthly plan fee and the NAF
are listed in the Tariff and since the term "usage charges" is defined broadly to include
"all tariffed charges appearing on a customer's invoice," MCI may assess the 6%[40] FUSF
percentage listed in the Tariff on Drew's per minute charges, monthly plan fee, and NAF.
MCI contends that any argument advanced by Drew modifying the rates set forth in the
Tariff is barred by the filed-rate doctrine.  In addition, MCI argues it did not engage in
"racketeering activity" or is an "enterprise."[41]

Although Drew no longer argues that MCI improperly computed the FUSF, had
Drew maintained his initial position, the filed-rate doctrine[42] would have precluded the
Court from adjudicating any challenge by Drew to the rates at issue.[43]  In addition, Drew
no longer argues that the Tariff is inapplicable to him as a MCI One Advantage plan

---

[40] *See supra* note 17.

[41] *See supra* note 21 and accompanying text.

[42] The filed-rate doctrine precludes a carrier from charging rates other than those set forth in its tariff and
subscribers are "conclusively presumed" to have notice of the terms and rates set forth in the filed tariff —
even if the subscriber is ignorant of the applicable rate — and may not file a lawsuit against the carrier
invalidating or modifying the terms of the filed tariff, even if the subscriber relied on a carrier's intentional
misrepresentation of the published rate.  *Fax Telecomms., Inc. v. AT&T*, 138 F.3d 479, 488-489 (2nd Cir.
1998); *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000); *see also AT&T Co. v. Cent. Office Tel.,
Inc.*, 524 U.S. 214, 221-224, 118 S.Ct. 1956, 62-64 (1998).  If this Court were to award Drew a retroactive
refund based on his contentions, the Court would be effectively engaging in the rate-making process —
which is within the exclusive role of the FCC — by setting and applying a rate in opposite of the rate
presumed reasonable in the Tariff by the FCC, which directly contradicts the underlying principles of the
filed-rate doctrine.  *Fax Telecomms., Inc.*, 138 F.3d at 489; *see also Kline & Co.*, 98 F. Supp. 2d at 71-72.

[43] Initially, Drew's contentions regarding Graves's assertions as to the FUSF computation raised
evidentiary issues; however, Drew no longer challenges the validity of the Tariff.  Further, the basis of the
Court's findings is independent of Graves's affidavit, therefore, Drew's contentions regarding Graves's
credibility is moot for purposes of the issues determined by the Court regarding the applicability of the
Tariff.

subscriber.  Therefore, the only remaining issue for determination before the Court is the application of the Tariff to Drew's service usage charges.

### A.  Contract Issue

The issues raised by Drew regarding the applicability of the Tariff to Drew's monthly service usage and the manner in which the Tariff is applied do not implicate the filed-rate doctrine and is within the Court's conventional competence, thus, Drew's contentions are properly before the Court for determination.

### 1.  Application of Tariff

Drew argues that MCI improperly applied the FUSF percentage to the monthly plan fee and the NAF because Footnote 1 explicitly states MCI may only apply the FUSF percentage to per minute charges.[44]  Drew does not dispute that "Metered Use Service," the per minute charges, is a tarifed charge.

In response, MCI argues Footnote 1 states MCI has the option of including the FUSF as a component of individual call charges or as part of a separate line-item.  MCI asserts it elected to include the FUSF as a line-item charge on a customer's billing invoice.  Further, MCI argues under the Tariff, it may assess the FUSF percentage of 6%[45] on "the total MCI service usage charges."  MCI states the term "usage charges" is defined broadly in the Tariff to include "all tariffed charges appearing on a customer's invoice."  MCI asserts that both the monthly plan fee and the NAF are listed in the Tariff; thus, both are tariffed charges.  MCI contends since the monthly plan fee and the NAF appear on Drew's billing statements, under the Tariff, it may assess the FUSF percentage on Drew's per minute charges, monthly plan fee, and NAF.

---

[44] *See supra* note 27 and accompanying text.
[45] *See supra* note 17.

In addition, MCI argues the filed-rate doctrine bars any judicial proceeding requiring the Court to assess the legality of a carrier's tariff or to resolve a dispute regarding the meaning of the Tariff.  However, as previously stated, the issues Drew now focuses on do not challenge the legality of the Tariff but the application of the Tariff. Drew's contention in this regard centers upon his view of the proper application of Footnote 1.  Drew argues the proper application of Footnote 1 requires MCI to apply the FUSF percentage only to per minute charges.

The Court disagrees with Drew's application of Footnote 1 to his billing statements.  Footnote 1 conveys the options set forth in the universal service order, a carrier may increase its rates or include a separate line-item charge on a customer's billing invoice to recoup its USF contributions and it *does not* mean that MCI may only include per minute charges in its computation of the FUSF as Drew contends.[46]  Thus, the Court finds that MCI properly elected its option, as per the universal service order, to include the FUSF as a separate line-item charge on Drew's billing invoice.

Further, the Court notes that the term "usage charges" is defined in the Tariff as "all tariffed charges appearing on a customer's invoice" and that definition should be used wherever the term "usage charges" appears in the "Subscriber Charges" section, C-1.061, of the Tariff.[47]  The term "usage charges" also appears in the FUSF's description, which is also listed under the "Subscriber Chargers" section at C-1.0612.[48]  Thus, the FUSF percentage is applicable to "all tariffed charges appearing on a customer's

---

[46] *In re Federal-State Joint Board on Universal Service, Access Charge Reform*, 20 FCC Rcd 13779, 81 (FCC 2005) ("Carriers are not required to recover their universal service costs from subscribers at all.  If they chose to do so, carriers may recover these costs through their standard service charges or through a separate line-item." (citing *In re Federal-State Joint Board on Universal Service*, *Report and Order and Second Further Notice of Proposed Rulemaking*, 17 FCC Rcd 24952, 74, 78-80 (FCC 2002))).
[47] *See supra* note 15.
[48] *See supra* note 14.

invoice." The term "tariffed charges" refers to all charges listed in the Tariff. The NAF is listed in the Tariff under the "Subscriber Charges" section at C-1.0611[49] and the monthly plan fee is listed in the Tariff under the "Metered Use Service" section at 3.025108.[50]

On Drew's billing statements, there are several tariffed charges, including the monthly plan fee, the NAF, and whatever metered use service Drew used during that respective month in addition to other charges. Thus, under the Tariff, MCI may assess the FUSF percentage on Drew's per minute charges, the monthly plan fee, and the NAF — to recoup its USF contribution. Therefore, based upon the Tariff, MCI properly applied the FUSF to Drew for every month Drew maintained his MCI One Advantage plan account with MCI and Drew is obligated to pay the FUSF charge to MCI as computed. Accordingly, MCI charged Drew in accordance with the Tariff and MCI did not overcharge Drew. Thus, Drew has no claim to any amount resulting from the application of the Tariff.

### B. Drew's Fraud and RICO Claims

The underlying premise of Drew's fraud and RICO claims is that MCI overcharged him and the putative class. As previously stated, MCI properly applied the Tariff to Drew and no overcharge resulted. Therefore, as a matter of law, Drew's fraud and RICO claims are meritless because the Court finds that MCI did not commit the underlying wrongful act — overcharging subscribers — upon which Drew's fraud and RICO claims are premised.

---

[49] *See supra* note 16.
[50] *See supra* note 16.

## VI.    CONCLUSION

The Court finds that MCI charged Drew in accordance with the Tariff, therefore, there is no amount due to Drew under the Tariff.  Thus, the Court concludes that no genuine issue of material fact exists and that MCI is entitled to summary judgment as a matter of law regarding Drew's fraud and RICO claims and, accordingly, Drew is not entitled to summary judgment as a matter of law.

In view of the foregoing, the Court grants MCI's summary judgment motion and denies Drew's summary judgment motion.  The issue of class certification is moot since Drew has not established an amount due to him.

MCI is to settle an order consistent with this opinion.


Dated:   New York, New York
            June 26 2007


                                    **s/Arthur J. Gonzalez**
                                    UNITED STATES BANKRUPTCY JUDGE