UNITED STATES BANKRUPTCY COURT   For Publication
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
               :
In re            :   Chapter 11
               :
WORLDCOM, INC., *et al.*,     :   Case No. 02-13533 (AJG)
               :
      Reorganized Debtors.  :   (Confirmed Case)
               :
-------------------------------------------------------------x

## OPINION DENYING MOTION FOR SUMMARY JUDGMENT
## AND GRANTING MOTION IN LIMINE

A P P E A R A N C E S

GREENBERG TRAURIG, LLP
Attorneys for Reorganized Debtors
One International Place
Boston, MA 02110

     Mark A. Berthiaume, Esq.
      Of Counsel

DECOF & DECOF, P.C.
Attorneys for A.P.G., Inc.
One Smith Hill
Providence, RI 02903

     Howard B. Klein, Esq.
      Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

The telecommunications company MCI WorldCom Network Services, Inc. ("MCI" or

the "Debtor"), seeks summary judgment with respect to A.P.G. Inc.'s ("APG") claim of unjust

enrichment arising from a contract APG had with Conserv Corporation ("Conserv"), an

independent distributor that purchased MCI prepaid telephone cards for re-sale.  MCI also seeks

to exclude the testimony of an expert proposed by APG in support of its theory of damages.

Based upon the pleadings filed and the arguments made at the hearing, the Court finds that none

of the additional evidence causes the Court to reach a different conclusion than the First Circuit's

ruling that "there is enough in the record to warrant a jury's determination on whether appellant

conferred a benefit that MCI ought to pay for."  *APG, Inc. v. MCI Telecomm. Corp., 436 F.3d*

*294, 306-07 (1st Cir. 2006).*  After the First Circuit rendered its decision, the parties undertook

additional discovery with regard to liability, expert disclosure and damages.  Despite further

development of the record, material issues of fact remain in dispute, namely, (1) whether APG

conferred a benefit for which MCI ought to pay, and, if so, (2) the value of any such benefit that

would be due APG.  A finder of fact could conclude from the evidence presented that MCI

realized a benefit from APG's actions which would be unjust for MCI to retain without

adequately compensating APG.  APG has failed to present qualified expert testimony as to the

value of any benefit it might have conferred.  The opinion testimony of Dr. Ernest T. Kendall,

Ph.D. ("Kendall"), is not sufficiently reliable or relevant to the inquiry before the Court and thus

the Motion in Limine to exclude his testimony is granted.  However, construing the evidence in

the light most favorable to APG, the Court finds that APG could establish the value of the

benefit it conferred upon MCI upon development of evidence in the record that MCI

compensated agents in circumstances similar to those here.  Therefore, summary judgment is not

appropriate.

## Jurisdiction

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334

and 157(b) of title 28 of the United States Code, under the July 10, 1984 "Standing Order of

Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern

District of New York (Ward, Acting C.J.) and under paragraph 32 of the Court's Order

Confirming Debtors' Modified Second Amended Joint Plan of Reorganization under chapter 11

of title 11 of the United States Code (Oct. 31, 2003).

## Facts

The facts of this case are set forth in detail in the December 1, 2000 Report and

Recommendation of Magistrate Judge Robert W. Lovegreen (R.I. 2000) (the "Magistrate's

Report") and in the First Circuit's decision *APG, Inc. v. MCI Telecomm. Corp., 436 F.3d 294 (1st*

*Cir. 2006)* ("*APG v. MCI*").

In brief, APG partnered with Conserv, a distributor of MCI prepaid telephone cards, in

order to jointly take advantage of a contact APG had within CVS Corp. ("CVS"), the national

drug store chain.

Pursuant to a distributorship agreement dated April 24, 1996 (the "Conserv/MCI

Agreement"), Conserv was obligated to buy prepaid telephone cards from MCI for 15 cents,

thereafter reduced to 14 cents, per unit of prepaid telephone time. *See Conserv/MCI Agreement at 5.1 and 5.2.*[1] Conserv and APG intended that Conserv would sell the MCI cards to CVS for 16 cents per unit and that Conserv and APG would roughly split the 2 cent profit. In furtherance of this venture, Conserv and APG entered into two agreements. The first agreement, dated January 16, 1997, was a Non-Circumvention/Non-Disclosure Sales Agreement (the "Non-Circ. Agreement") which provided that upon being given the name of CVS by APG as a potential customer, Conserv would not "circumvent, avoid, or bypass APG either directly or indirectly, to avoid payment of fees or commissions or other benefits to APG." *Non-Circ. Agreement at 1.*

The second agreement, a sub-distributorship agreement (the "Sub-Distr. Agreement"), dated May 16, 1997, provided that "[i]f CVS enters into an agreement with Conserv for the purchase of pre-paid calling . . . units, then Conserv agrees to pay [APG] $0.0047[2] for every unit of calling time purchased by a customer of CVS based upon a purchase price for such calling time of $.16 per unit. If the purchase price of such calling time increases or decreases, then Conserv and [APG] will share equally in these adjustments." *Sub-Distr. Agreement at 2.* The agreement also provided that "[i]n the event that the customer negotiates a lower purchase rate per unit . . . , as mutually agreed upon, Conserv and [APG] will share 50% equally regarding the

---

1 According to MCI, the Conserv/MCI Agreement was amended on May 13th and May 28th of 1997 to reduce Conserv's purchase price to 14 cents per unit. Although the Court does not have a copy of the amendments, APG understandably does not dispute the existence of the purported amendments and the Court will use the 14 cents per unit price.

2 This $0.0047 commission rate has been described as "roughly half a cent." *Kendall Dep. at 17.* It was expected that Conserv would receive $0.0100 commission rate and appropriately one-half of that amount would be APG's commission. Further, Conserv and APG agreed that any reduction or increase in Conserv's profit margin would be shared equally – effectively at the rate of .047%.

new margin less any incidental costs" and "[t]he parties further agree that in the event Conserv's

per unit purchase rate with MCI Corporation decreases, then both Conserv and [APG] will share

equally creating a greater margin for both parties."  *Sub-Distr. Agreement at 3-4.*

In September 1999, CVS entered into a contract directly with MCI for the sale of prepaid

telephone cards in CVS stores.  As a result, APG filed a complaint alleging five causes of action

against MCI (1) tortious interference with APG's contract with Conserv, (2) tortious interference

with APG's business relationship with CVS, (3) quasi contract/unjust enrichment, (4) breach of

the Non-Circ. Agreement, and (5) unlawful misappropriation of APG's potential customer, CVS.

The Magistrate granted summary judgment in favor of MCI with respect to all of APG's claims

other than breach of contract.  The Magistrate found, among other things, that MCI's conduct

constituted legitimate competitive behavior and that there was insufficient proof to establish that

CVS would have selected Conserv's proposal but for MCI's intervention.  In ruling against APG

on the unjust enrichment claim, the Magistrate reasoned that MCI had a long-standing business

relationship with CVS and that it was not inequitable for MCI to retain the benefit since CVS

awarded it to them "in the spirit of business competition with other vendors."  *Magistrate's

Report at 24.*  The District Court of Rhode Island (the "District Court") adopted the Magistrate's

Report granting judgment in favor of MCI on the tort claims and, after a trial, judgment as a

matter of law with respect to the contract claim.

APG appealed the District Court's ruling.  The appeal was stayed upon MCI's filing for

bankruptcy relief on July 21, 2002.  APG thereafter filed a proof of claim asserting damages in

the amount of $4,105,136.  MCI objected to APG's claim as part of its 72nd Omnibus Objection

to Litigation Claims.  On October 31, 2003, MCI confirmed a plan of reorganization.  Thereafter,

pursuant to an order dated August 30, 2005, the parties agreed to a lift of the stay for purposes of

prosecuting APG's appeal (the "Lift Stay Order").

       The First Circuit rendered a decision on February 8, 2006 affirming the District Court's

decision except with respect to the issue of unjust enrichment concluding that "the facts of

record, thus far, viewed in appellant's favor, leave open the possibility of liability on a theory of

unjust enrichment."  *APG v. MCI at 297.*  Among other things, the court found that APG may

have served as a catalyst for MCI's prepaid telephone card transaction with CVS.  The court

remanded for further proceedings on that issue.  The Lift Stay Order expressly provided that in

the event of a remand by the First Circuit, all issues related to APG's claim would be resolved by

the Court.

**Discussion**

       MCI filed the instant summary judgment motion as a result of deposition testimony that

allegedly proves the absence of a basis for an unjust enrichment claim.  The testimony is from

Helena Foulkes ("Foulkes") and Janice Jacobs ("Jacobs"), both of CVS.  According to MCI, the

testimony clarifies that Conserv would not have been selected as CVS's vendor for prepaid

telephone cards and that CVS would not have selected a vendor without first obtaining a

proposal from MCI and AT&T.  The Court does not find this testimony sufficient, however, to

conclude that there is not a genuine dispute as to whether APG conferred some benefit upon

6

MCI under the circumstances of this case.  As the First Circuit stated, "we think a jury could conclude that Conserv and APG invested the time and effort needed to sell CVS on the MCI program and that MCI then came along and collected the benefit without crediting Conserv and APG for their contribution."  *APG v. MCI at 306*

### *Unjust Enrichment and Summary Judgment*

A plaintiff alleging unjust enrichment must prove three elements: "(1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof." *Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997) (quoting Anthony Corrado, Inc. v. Menard & Co. Bldg. Contractors, 589 A.2d 1201, 1201-02 (R.I. 1991)).* "The essence of unjust enrichment is that one party received a benefit at the expense of another." *Wolf v. Nat'l Council of Young Israel, 694 N.Y.S. 2d 424, 425 (2d Dept. 1999).* A person may be unjustly enriched not only where he receives money or property, but also where he otherwise receives a benefit . . . [such as] where he is saved an expense. *Blue Cross of Cent. New York, Inc. v. Wheeler, 461 N.Y.S. 2d 624 (4 Dept. 1983).* The unjust enrichment inquiry focuses on the human setting involved and not merely on the transaction in isolation. *Mayer v. Bishop, 551 N.Y.S.2d 673, 675 (3d Dept. 1990).*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

7

genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* This may be accomplished by showing that the nonmoving party will be unable to "establish the existence of an element essential to [the nonmoving] party's case, and on which [the nonmoving] party will bear the burden of proof at trial." *Id. at 322.* Once the burden is met, it shifts to the nonmoving party to "designate specific facts showing that there is a genuine issue for trial." *Id. at 324.* There is a genuine issue if the combined body of evidence, viewed in the light most favorable to the nonmoving party, would allow a reasonable jury to find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id. at 251-52.*

The First Circuit found that the relevant question was whether "even if Conserv and APG never would have gotten the deal on their own, would MCI's inside sales staff also have been out of the picture but for the distributors' involvement." *APG v. MCI at 306.* On the facts before it, the First Circuit held, and the Court agrees even after review of the expanded record, that a reasonable jury could find that MCI received a benefit -- access to the CVS account -- of which it was aware and that was accepted in circumstances in which failure to pay would be inequitable. Testimony by Foulkes and Jacobs to the effect that Conserv played no role in stimulating CVS's interest in MCI and that CVS would not have made a decision without having

received a proposal from MCI and AT&T appears to be inconsistent with other parts of the record. For example, CVS allegedly told Conserv in April and in May 1997 that it was one of two or three companies being considered for the contract and that a decision was imminent. Isaacs shared this information internally with MCI. Moreover, CVS's bid evaluation documentation indicates that Conserv was under consideration at the time MCI's bid was accepted. Foulkes also testified she had no recollection of whether AT&T had ever been contacted about making a proposal or had made a bid. And Jacobs testified that she did not believe AT&T was ever under consideration. Consequently, the material issue of what role Conserv and APG played in the MCI-CVS transaction remains in dispute.

Whether MCI benefitted and whether it would be unjust for MCI to retain any such benefit without compensating APG is a triable issue of fact for which summary judgment is not appropriate. In determining whether any benefit was conferred, a fact finder must consider and weigh the credibility of the evidence and testimony concerning, among other things, the timing, content and effect of the Isaacs's email, the Richards's email and the phone calls between CVS and the parties. Further, a fact finder must consider and weigh the credibility of the evidence and testimony concerning MCI's compensation practices with agents in circumstances, if any, that are similar to those here. These disputed material facts going to whether a benefit was conferred and the value of any such benefit, continue to be ones where a reasonable trier of fact could find in favor of APG. Therefore, the motion for summary judgment is denied.

*Damages*

MCI argues that even if a benefit is found to have been conferred by APG, summary judgment is nonetheless warranted because no qualified expert testimony has been presented as to the amount of such benefit or the portion thereof that should be paid to APG.  MCI has filed the Motion in Limine to exclude the testimony of APG's expert.  As such, MCI argues that APG's unjust enrichment damage claim -- the amount of alleged benefit MCI received by taking advantage of the efforts of APG and Conserv without compensating them (being spared the expense of paying a finder's fee, for example) has not been established.

### 1.    *Expert Testimony*

APG initially proposed Kendall as an expert in 2001 for purposes of proving damages in connection with its breach of contract claim.  Kendall undertook a telephone survey primarily through one research assistant.[3]  As described in his affidavit (the "2001 Affidavit"), he "directed and reviewed additional background research into the prepaid telephone card industry . . . consist[ing] of interviewing executives in the . . . industry . . .  This type of research is of the kind professional economists reasonably and customarily rely upon in compiling data in particular industries, especially where that data is not available from any public compilation or other readily available data service."  *2001 Affidavit at 3.*  Kendall concluded that this "additional research confirms my opinion that a commission of $0.0047 per unit of prepaid calling time, as determined in an arms-length transaction between APG and Conserv, was a

---

3  Kendall was not sure to what extent his daughter, also a research assistant, may have contributed to the survey.  *Kendall Dep. at 37.*

typical and appropriate commission in 1997 for a subagent such as APG." *Id. at 5.* Based on

this rate, Kendall calculated that APG was owed $4.1 million in lost commissions. The District

Court disagreed and dismissed APG's breach of contract claim.

APG has again proposed Kendall as an expert, but, in this instance, to assist the Court in

determining the measure of unjust enrichment damages. APG has submitted, in addition to the

2001 Affidavit, a letter written by Kendall in 2006 (the "2006 Letter"). Kendall states, in the

2006 Letter, that the unjust enrichment damages in this case are "the amount that MCI received

that would have been paid in commissions to APG from the sale to CVS of prepaid calling cards

and associated units of prepaid calling time but for MCI's decision to sell directly to CVS."

*2006 Letter at 1.* Kendall performed two analyses of sales data it obtained from MCI in relation

to the CVS account. In both instances, Kendall applied the $0.0047 commission rate because he

determined it to be "typical and appropriate" pursuant to his telephone survey research and the

fact that it was negotiated by Conserv and APG in an arms-length transaction. In the first

analysis, Kendall applied the commission rate consistently to the sales data through the life of

the MCI-CVS relationship and calculated unjust enrichment damages to be $4,049,674. *2006*

*Letter at 5.* In the second analysis, Kendall applied a commission rate decreasing from $0.0047

based upon the percentage decrease in the actual sales price to CVS and calculated unjust

enrichment damages to be $2,321,293. This analysis reflected that MCI actually sold cards to

CVS at varying prices during their relationship and always for less than 16 cents per unit.

11

MCI seeks to exclude Kendall's testimony because (1) he is not qualified as an expert, (2) his survey results are inadmissible heresay, and (3) even if he were an expert, such survey data is not of a type reasonably relied upon by experts in forming opinions on the subject at hand.  APG responds that (1) Kendall is a qualified expert, (2) the $0.0047 commission rate is reliable because it was negotiated in the ordinary course of business, (3) MCI has offered no evidence to refute its reliability, (4) Kendall's research is of a type reasonably and customarily used by experts, and (5) even if there is some issue with respect to the foundation for the $0.0047 commission rate, APG should be permitted to conduct further discovery and MCI should be ordered to produce evidence as to its commission practices with other sales agents.  As set forth below, the Court finds that Kendall is not qualified as an expert in this case.  Even if he were so qualified, his methodology for evaluating the issue of unjust enrichment damages -- his telephone survey research and his reliance on the arms-length nature of the commission rate -- is flawed.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Thus, whether testimony is based upon "technical" or "other specialized knowledge," it is admissible if (1) the expert is qualified to testify competently regarding the

12

matters he intends to address, (2) his methodology is sufficiently reliable, and (3) the testimony

will assist the trier of fact by bringing the expert's knowledge to bear upon a fact in issue. *See*

*Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993)*.  The court's ultimate goal is

"to make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmicheal, 526 U.S. 137,

150 (1999).*  The court's gatekeeping function on expert evidence extends to economic analysis

and the economic expert's conclusions must be arrived at in a scientifically sound and

methodologically reliable fashion. *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum

Corp., 175 F.3d 18, 34 & n.12 (1st Cir.).*  Where the assumptions underlying an expert's opinions

are unsupported and speculative, the expert's testimony may properly be excluded. *Eastern Auto

Distribs., Inc. v. Peugeot Motors of America, Inc., 795 F.2d 329, 338 (4th Cir. 1986).*

As an initial matter, expert testimony concerning the practices and customs employed in

the prepaid telephone card industry would be helpful to the Court in evaluating the parties'

conduct in this case.  An expert is one who is possessed of requisite skill, training, education,

knowledge or experience from which it can be assumed that the information imparted or the

opinion rendered is reliable. *Matott v. Ward, 48 NY 2d 455, 459 (NY 1979).  See also Pridgen v.

Gibson, 194 N.C. 289 (1927)* (an expert is "one who has made the subject upon which he gives

his opinion a matter of particular study, practice or observation").  Kendall is not qualified to

opine as to the subject matter at hand.

The sole basis provided by Kendall to establish that he is an expert qualified to testify under Rule 702 is that he is an economist. APG asserts that Kendall's 30 years as an economist qualifies him to "undertake and direct research into margin rates in the industry;" that he conducted "extensive background research into the prepaid telephone card industry" and is "indisputably an expert in collecting, organizing, analyzing and presenting economic data." *See APG Obj. Mem. at 7*. The Court disagrees. Kendall's education as an economist and his work as a researcher and in litigation support have never given rise to an opportunity to study or know the telecommunications industry or the sales practices therein.[4] There is no nexus between his credentials and the subject matter of his testimony. *See Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990)* ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."). Furthermore, his allegedly "extensive background research" and expertise in "collecting, organizing and presenting economic data" failed in this case. His opinion that the $0.0047 commission rate negotiated between APG and Conserv is "typical and reasonable" arose solely from a telephone survey utterly lacking in reliability. Kendall had no opinion on the industry or on commission rates generally prior to his involvement in this case. While it may be true, as APG suggests, that any economist can provide expertise with respect to "a simple commission rate analysis," Rule 702 demands that one's expertise be based upon relevant skill, experience or training such that his or her opinion,

---

4 Kendall states that he "did some consulting for several towns who were looking for cable communications providers" but the Court does not consider this experience relevant here.

14

grounded in sound methodology and applied reliably to the facts of a case, can be helpful to the court. Kendall meets none of these mandates.

Even if Kendall could be considered an expert with respect to the instant dispute, his testimony is not "based upon sufficient facts or data" nor "the product of reliable principles and methods." Fed. R. Evid. 702. The quantum of facts or data relied upon by the expert must be sufficient to support the opinions expressed. *See In re Canvas Specialty, Inc., 261 B.R. 12, 20 (Bankr. C.D. Cal. 2001).* There are numerous examples pointing to the unreliability of the process by which Kendall reached his conclusions, all of which would lead to the exclusion of his testimony.

A telephone survey is one way in which relevant data can be obtained, organized and form the basis of an expert's opinion. In *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc., 559 F.Supp. 1189 (E.D.N.Y. 1983),* the court described indicia of a survey's trustworthiness -- (1) the universe was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or purpose for which the survey was conducted, (5) the data was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured." *Id. at 1205.* Kendall's survey fails most, if not all, of these indicia.

Kendall's survey was performed not by Kendall but by his research assistant -- a college graduate in his mid-20's with no relevant prior experience, training or education.  As to who determined the survey questions, Kendall stated in his deposition -- *"Well, in general, I did . . . and I outlined the general information that we wanted which was very simple."*  As to whether a written outline was prepared -- *"No, I'm sorry.  It was all informal."*  Instead, Kendall had a general discussion with the assistants who would conduct the survey -- *". . . I described to them the problem, which they were very familiar with, and told them what we wanted to obtain and that was affirmation that the existing APG contractual commission was a typical and reasonable one and that they should get that information from responsible sources within the prepaid card industry.  And I think that's the extent of what I asked them to do . . . They're both bright kids."*

Kendall was unaware as to how the universe of entities and individuals to be contacted was defined or compiled -- *"I don't know.  Obviously it's a relevant list of a sort, and I would expect that probably Brian Lohman gave them to us"* and *"I assume that the research assistants looked for agents in the industry as opposed to subagents, resellers or carriers."*  As to whether, in constructing the survey, he had in mind the representative sampling that would be necessary for it to be valid, Kendall stated -- *"No.  We're not trying to determine a statistically valid rate. We were simply trying to confirm a rate that we have as being typical.  And so if we can get confirmation from three or four people, two or three people who are in the industry and who are respected, to that effect that's all we need.  We are not doing a statistical survey here.  We do them in case you ever want one."*

16

One of the few contacts made by the assistant was with a Mr. Lohman at the International Prepaid Commissions Association.  Kendall did not know anything about Mr. Lohman or the organization -- *"I assume it's an industry association for people who are in the prepaid communications business."*  Mr. Lohman had no information about the industry or commissions but did suggest three entities the assistant could contact.  Kendall did not know these entities and did not know whether or not they were contacted.  As to familiarity with the nature of their business Kendall stated, *"No, I don't.  I'm curious, in fact."*

Whether any of the three parties contacted were agents, subagents, resellers or wholesalers, Kendall had to refer to the assistant's notes, had no independent knowledge and could only speculate as to what the parties were -- *"No, I don't, but it certainly looks as if they're an agent rather than a reseller"* and *"To the extent that it says that it's a provider of promotional prepaid phone cards, I would say that it's not an agent. Well it could be an agent. It could be either an agent or a subagent or a reseller."*  Not only were there no written questions or outline upon which the assistant could rely, there was no apparent format evident in the handwritten notes for recording or comparing the responses from the three phone conversations. The assistant's notes consist of words, phrases, numbers and symbols, which are indecipherable to the Court.  Kendall was not able to make the notes meaningful -- *". . . Aaron got information that indicates to me, and I'm reading from his notes, that they wholesale from AT&T and Sprint, and they wholesale to distributors.  In our case we might think of Conserv as a wholesaler who then sells to distributors like APG, but that wouldn't be appropriate either.  So, I'll take that*

*back. That it's typical to buy a card, a $10 card for $6.40, sell it for $6.80 and that they get 20* *cents to 60 cents profit per card, that's not per unit but that's per card for the different type of* *cards if they sell."* Asked whether Kendall knew what certain notations meant, specifically whether the "6%" referred to gross or net profits -- *"No, I don't. And, in fact, the next line says* *80% of the time. 30% -- I can't read the next word -- profits. So, I really can't* say." And whether Kendall knew what that meant -- *"No, except that Aaron certainly regarded this as a* *definite affirmation of the reasonableness of the $0.0047 commission that APG would have* *gotten from Conserv where Conserv was a direct distributor for MCI."* Finally, whether one of the parties contacted used subdistributors or subagents, Kendall stated *"[the company] definitely* *does use sales agents at various times. But I don't know. I couldn't name you one of their sales* *agents or tell you how long they've been in the business or whether or not they have two* *children"* and *"I can tell you that a typical commission that they would have paid to a subagent* *would be less that the commission that they earned on a minute of time. Their margin is* *typically 12 to 15%, and so they could indeed pay half of that to a subagent. Now, half B 10% of* *16 cents on a card would be 1.6 cents, and half of that would be .8 cents which is far more than* *the half a penny that APG was getting. So, I don't see anything at all unrealistic here. In fact, I* *think APG might have been kind of shortchanged a little bit."* In light of all of the foregoing, the Court finds Kendall's survey unreliable and, as such, irrelevant to the inquiry here -- understanding the practices and customs of the prepaid telephone card industry. The survey's methodology and execution were not in accordance with any accepted procedural standards and

18

the data that was gathered was not reported in any accurate or helpful way.  Given its many failures, the survey has no value in assisting the court in understanding the industry and calculating damages in this case.

Kendall opines that, regardless of the survey, the $0.0047 commission rate is inherently reliable because it was the result of an arms-length transaction between Conserv and APG.  That opinion, however, while possibly determinative to establish damages in an interference with contract claim, is not determinative here.  The First Circuit affirmed the District Court's dismissal of APG's interference with contract claim and, with respect to a possible unjust enrichment claim, suggested that an appropriate award "would not necessarily lead to payment of commissions throughout the life of the CVS contract, but could, for example, be equivalent to a 'finder's fee' reflecting equitable considerations."  The Court finds, therefore, that a relevant expert opinion would be that which illuminates the payment arrangements in the industry generally, including whether and in what circumstances finder's fees are paid.  The fact that Conserv and APG agreed to a $0.0047 commission rate in the event Conserv would buy cards from MCI for 14 cents per unit and sell them to CVS for 16 cents per unit does not assist the Court in establishing the reasonableness of the fee from an industry standard.  There is no evidence that such arrangements are common in the industry by similarly situated parties.  As a result, the Court finds no value in Kendall's opinion.[5]

---

5 The $0.0047 commission rate could be relevant to determine what portion of any finder's fee should be allocated between Conserv and APG but it is of no value in determining the industry standard for any such fee.

Finally, Kendall asserts that his telephone survey research "is of the kind that professional economists reasonably and customarily rely upon in compiling economic data in particular industries, especially where that data is not available from any public compilation or other readily available data service." *2001 Affidavit at 3.* In his deposition Kendall states that *"telephone surveys are typically used by economists. We can start off with -- who was the guy that did the public opinion surveys for Jimmy Carter when -- Jimmy Carville . . . James Carville is a classic example of someone who used telephone survey to effect the election of a president"* and further, that *"[t]he Bureau of Labor Statistics does this continuously. They will, in fact, hire companies like mine to conduct phone surveys just like this to collect this sort of data."* While economists certainly may undertake telephone surveys, to be trustworthy such surveys must be undertaken and executed in a competent and supported manner. As the proponent of Kendall's testimony, APG has failed to establish that it is based on sufficient facts or data, that he used reliable principles and methods or that he applied the principles and methods reliably in this case. As a result, Kendall's testimony is of no assistance to the Court, which is the ultimate purpose of Fed. R. Evid. 702. Therefore, the Motion in Limine should be granted.

### 2.    *Other Evidence*

Having found Kendall unqualified as an expert with respect to his opinion that unjust enrichment damages should be calculated using the $0.0047 commission rate and Kendall having failed to put forth any testimony concerning the First Circuit's suggestion as to a possible measure of damages based upon a finder's fee award, the Court will not have the benefit of

expert testimony to determine unjust enrichment damages should liability be established at trial.

Discovery is now closed.  MCI argues that the failure to produce competent expert testimony as

to damages precludes APG from proving unjust enrichment.  However, viewing the current

record in the light most favorable to APG, the Court finds that evidence of MCI's history of

paying commissions to agents could, if sufficiently similar circumstances are shown, allow a

reasonable fact finder to determine an award of damages based upon a theory of unjust

enrichment.

### Conclusion

For the foregoing reasons, MCI's Motion for Summary Judgment is denied because there

are remaining material issues of fact in dispute as to liability and damages.  The Motion in

Limine is granted because Kendall does not qualify as an expert.

MCI is to settle an order consistent with this opinion.

Dated: New York, New York
　　　July 5, 2007

　　　　　　　　　　　　　　　**s/Arthur J. Gonzalez**
　　　　　　　　　　　　　　　UNITED STATES BANKRUPTCY JUDGE