UNITED STATES BANKRUPTCY COURT                    For Publication
SOUTHERN DISTRICT OF NEW YORK
_____
                                             :
In re                                        :    Chapter 11
                                             :
WORLDCOM, INC., *et al.*,                    :    Case No. 02-13533 (AJG)
                                             :    (Confirmed Case)
                    Reorganized Debtors.     :    (Jointly Administered)
                                             :
                                             :
_____:


OPINION GRANTING IN PART, DENYING IN PART, CLAIMANTS' MOTION FOR
SUMMARY JUDGMENT; GRANTING IN PART, DENYING IN PART, DEBTOR'S
MOTIONS FOR SUMMARY JUDGMENT


A P P E A R A N C E S

WEIL, GOTSHAL & MANGES LLP
Counsel for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153

          Joseph Allerhand, Esq.
          Marcia L. Goldstein, Esq.
          Lori R. Fife, Esq.
          Alfredo R. Perez, Esq.
          Adam P. Strochack, Esq.
               Of Counsel


HULETT HARPER STEWART LLP
Attorneys for Abbott Claimants
550 West C Street, Suite 1600
San Diego, CA 92101

          Kirk B. Hulett, Esq.
          Jennifer A. Kagan, Esq.
          Randall R. Sjoblom, Esq.
               Of Counsel


LAW OFFICES OF ANDREW W. HUTTON
Attorneys for Abbott Claimants

550 West C Street, Suite 1600
San Diego, CA 92101

        Andrew W. Hutton, Esq.
          Of Counsel


LOWENSTEIN SANDLER PC
Attorneys for Abbott Claimants
65 Livingston Avenue
Roseland, NJ 07068

        Michael S. Etkin, Esq.
          Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

# I.  INTRODUCTION

On July 21, 2002, and continuing thereafter, WorldCom Inc. and certain of its

subsidiaries (hereinafter "WorldCom" or "Reorganized Debtor") filed for bankruptcy

under Chapter 11 of the Bankruptcy Code in the Southern District of New York.  Roger

B. Abbott ("Abbott") subsequently filed proof of claim number 17111 against WorldCom

for $222 million, based on allegations contained in a California state action.[1]  Other

parties, who were shareholders of WorldxChange (together with Abbott, the

"Claimants"), also filed proofs of claims against WorldCom based on the allegations in

the California state action.[2]  As summarized in a recent opinion from the Court,[3] the

allegations in the California state action concern a corporate transaction in which the

Claimants agreed to merge a company they owned, WorldxChange, with World Access,

---

[1]  *See* First Amended Complaint ("Amended Complaint") in Roger B. Abbott, et al., v. John D. Phillips, et al., No. 321708 (Cal. Super Ct. June 21, 2001), Ex. 24, to Declaration of Adam P. Strochak ("Strochak Decl.") dated June 22, 2007.

[2]  WorldxChange shareholders asserted proofs of claim numbered 22573, 22574, 17112, 24819, and 24817.

[3]  *See* Opinion Granting In Part, Denying In Part, Permission To Assert Counterclaims (No. 02-13533(AJG), Docket No. 19004, July 18, 2007)

Inc. ("WAXS"), a company partially owned by WorldCom.  The Claimants contend that they entered the stock-for-stock transaction in part because of an alleged misrepresentation that WorldCom was obligated each month to purchase $25 million in services from WAXS via a Carrier Services Agreement (the "CSA").

Present before the Court are motions for summary judgment from both sides.  The Claimants move for summary judgment with respect to their first cause of action for rescissory damages for violations of California Corporations Code section 25401, 25501, and 25504.  Defendant WorldCom partially moves for summary judgment on statute of limitations grounds and for a determination of the date of sale.  The specific issues the Court must decide are (1) did WorldCom make a misrepresentation that violated section 25401, (2) what was the date of sale of the stock-for-stock merger for purposes of calculating damages, (3) is the Claimants' claim barred by the applicable statute of limitations, (4) did the Claimants have knowledge of the facts they allege constitute fraud, which is an absolute defense to liability, (5) is WorldCom a "control person" of WAXS under California law, and (6) should the Court draw any adverse inference from certain non-parties' invocations of their Fifth Amendment rights not to testify.

## II. STATEMENT OF FACTS

WAXS was a public company incorporated under Delaware law.  (*See* Amended Complaint, ¶ 35; Debtor's Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment as to the Date of Sale on Fifth Omnibus Objection to Proofs of Claims Pursuant to Local Rule 7056-1(A) ("Debtor's SOF as to Date of Sale"), ¶ 1).  John D. Phillips ("Phillips") was, at relevant times, a director, Chairman, and Chief Executive Officer of WAXS.  (Amended Complaint, ¶ 13.)  WorldxChange

("WorldxChange") was a corporation organized under California law.  (Debtor's SOF as
to Date of Sale, ¶ 2.)  Roger B. Abbott founded WorldxChange and was its largest
shareholder.  (*Id.*)  Phillips has been a business colleague of Bernard Ebbers ("Ebbers")
since at least 1993, when WorldCom acquired a company Phillips founded, Advanced
Telecommunications Corp.  (Ex. 57 to Kirk B. Hulett's Declaration in Support of
Claimants' Motion for Summary Judgment on the First Cause of Action for State
Securities Law Violations ("Hulett Decl."))  Ebbers was the Chief Executive Officer of
WorldCom.  (*See* Amended Complaint, ¶ 20.)  W. Tod Chmar ("Chmar") was an
Executive Vice President of WAXS.  (*Id.*, ¶ 18.)  Scott Sullivan ("Sullivan") was Chief
Executive Office of WorldCom.  (*Id.*, ¶ 22.)

In 1996, Cherry Communications owed WorldCom hundreds of millions of
dollars for services WorldCom provided.  (Ex. 38 to Hulett Decl.)  In July 1997,
WorldCom and Cherry Communications entered into a settlement agreement under which
Cherry Communications executed promissory notes in WorldCom's favor and executed a
pledge and security agreement giving WorldCom control of a majority (51%) of Cherry
Communications' voting stock.  (*Id.*)  Phillips was appointed CEO of Cherry
Communications and entered into a prepackaged bankruptcy, filed in the United States
Bankruptcy Court for the Northern District of Illinois on October 24, 1997.[4]  (*Id.*)  As the
key component of Cherry Communications' reorganization plan, Cherry
Communications agreed to merge with WAXS.  (Exs. 2, 38 to Hulett Decl.)  As part of
this transaction, WorldCom agreed to extinguish the debt Cherry Communications owed
in exchange for stock in WAXS.  (Ex. 38 to Hulett Decl.)

---

[4]  During its bankruptcy Cherry Communications was renamed Resurgens Communications Group, but for
clarity's sake, this opinion will use the original name in referring to the entity.

On June 5, 1998, WorldCom and Cherry Communications entered into the CSA. (Ex. 8 to Declaration of Adam P. Strochak dated June 25, 2007 ("Strochak Decl.")) Under the CSA, WorldCom was obligated to purchase at least $300 million in annual services from WAXS, pre-payable at $25 million per month. (*See* Exs. 2, 13, 21, 38 to Hulett Decl.) The Bankruptcy Court approved the merger plan between Cherry Communications and WAXS in September 1998. (Exs. 2, 38 to Hulett Decl.) On December 14, 1998, the WAXS and Cherry Communications merger was finalized and WAXS succeeded to the rights and obligations of Cherry Communications under the CSA. (*See* Amended Compliant, ¶ 38.)

WAXS subsequently asserted in its public filings that WorldCom was obligated to purchase at least $25 million a month in services under the CSA, and that the CSA had a "rolling 12-month evergreen term," meaning it was only cancelable on a year's notice. (*See* Exs. 42, 46, 51, 52, and 106 to Hulett Decl.) The accounting firm of Ernst & Young referred to the CSA as a "take or pay" contract. (Ex. 5 to Hulett Decl.)

In April 1999, Abbott met with Phillips and Chmar and began negotiating a sale of WorldxChange to WAXS. (Ex. 110 to Hulett Decl.) At the time, WorldxChange owed millions of dollars to WorldCom. (*Id*.) The parties do not dispute that Phillips sent Abbott a copy of WAXS's CSA with WorldCom, which Abbott received on or around May 7, 1999. (*Id*.; *see also* Abbott Claimants' Statement of Disputed Material Facts In Response to Reorganized Debtor's Statement of Undisputed Material Facts In Support of Motion for Summary Judgment on Statute of Limitations Issue, ¶ 18.)

On February 11, 2000, WAXS and WorldxChange entered into an Agreement and Plan of Merger ("Merger Agreement"), pursuant to which each share of WorldxChange

stock would be converted to .6583 shares of WAXS stock at the occurrence of the merger's closing.  (*See* Agreement and Plan of Merger, § 1.7(c), Ex. 9 to Strochak Decl.) The Merger Agreement stated that it would become effective on the Closing Date (the "Effective Time") after the parties filed a Delaware Certificate of Merger and a California Agreement of Merger (the "Certificates") with the Delaware Secretary of State and with the California Secretary of State, respectively, or at such subsequent time that WorldxChange and WAXS agreed to and specified in the Certificates.  (*See* Merger Agreement, § 1.3.)  The Merger Agreement further stated that effects of the merger, such as the property rights of the parties becoming vested in the surviving corporation, would take place "[a]t or after the Effective Time."  (*Id.* at § 1.4.)

WAXS's stock closed at $22.88 on February 11, 2000.  WorldCom owned 10.65 percent of WAXS common stock in early 2000.  (Ex. 109 to Supp. Decl. of Adam Strochak dated July 19, 2007 ("Supp. Strochak Decl.") (1999 10-K.))

On May 24, 2000, WAXS filed a registration statement with the Securities and Exchange Commission ("SEC") in connection with the Merger Agreement.  (Ex. 63 to Strochak Decl.)  The SEC approved the registration statement on November 14, 2000. (Ex. 17 to Strochak Decl.)  The California Public Utilities Commission approved the WAXS – WorldxChange merger on October 19, 2000.  (Ex. 16 to Strochak Decl.)  A majority of WAXS's shareholders approved the merger on December 14, 2000.  (Ex. 44 to Strochak Decl.)  December 18, 2000 was the closing date of the merger.  (Ex. 67 at Strochak Decl.)  On that date, WAXS's stock closed at $2.72 per share.  (Ex. 7 to Strochak Decl.)

WorldCom did not purchase at least $25 million a month in services under the CSA. For example, revenue from WorldCom in 1999 was only $267 million and totaled only $53 million for the first quarter of 2000. (Ex 7 to Hulett Decl.) For the second quarter of 2000, the revenue was $63 million. (Ex. 10 to Hulett Decl.) This figure dropped to $29 million for the third quarter of 2000. (Ex. 10 to Hulett Decl.) WorldCom, for disputed reasons, made "true up" payments that for some months or quarters made up the difference between the obligated monthly amount of $25 million and an amount based on actual usage, but in some periods did not. For example, WorldCom made a "true up" payment of $17.5 million for the first quarter of 2000, and $20 million in the third quarter of 2000. The parties dispute how the amounts of the payments were calculated. The Claimants allege that the "true-ups" were used to increase revenues and designed to allow WAXS to meet Wall Street's earnings estimates. The Debtor claims that the "true-ups" were negotiated between WAXS and WorldCom in good faith based on the amount of traffic WorldCom forecasted sending to WAXS compared to the actual traffic.

Between the execution of the Merger Agreement in February 2000 and the merger's closing in December 2000, Abbott had some participation in the management of WAXS, such as the integration of the billing systems of WAXS and WorldxChange and participating in some of WAXS's board of directors meetings, although the scope and details of his participation are sharply disputed.

In April 2001, WAXS filed for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Northern District of Illinois and its shares were worthless. (Amended Complaint, ¶ 69.) On May 29, 2001, the Claimants filed their original

complaint against WorldCom in California Superior Court.  (Ex. 23 to Strochak Decl.)

On January 21, 2003, Abbott filed his proof of claim in this matter.  (Ex. 25 to Strochak

Decl.)

## III.  DISCUSSION

### A.  *STANDARDS FOR SUMMARY JUDGMENT*

Pursuant to Rule 56(c), incorporated by Bankruptcy Rule 7056(c), summary

judgment should be granted to the moving party if the Court determines that "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  A movant has the initial

burden of establishing the absence of any genuine issue of material fact.  *Id*. at 322-23.

Once the moving party has made an initial showing that there is no evidence to support

the nonmoving party's case, the party opposing the motion must come forward with

competent summary judgment evidence of the existence of a genuine issue of fact.  *See*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A

genuine issue of material fact exists where "there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 249 (1986).  In determining whether such an issue exists, "the court is

required to resolve all ambiguities and draw all permissible factual inferences in favor of

the party against whom summary judgment is sought."  *Stern v. Trustees of Columbia*

*Univ.*, 131 F.3d 305, 312 (2d Cir.1997).  "One of the principal purposes of the summary

judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."

*Celotex Corp.*, 477 U.S. at 323-24.

Rule 56(d) provides for partial summary judgment if not all the facts exist without material controversy. Rule 56(d) "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *In re Asia Global Crossing, Ltd.*, 332 B.R. 520, 530 (Bankr. S.D.N.Y. 2005) (quoting Fed. R. Civ. P. 56 advisory committee note). Rule 56(d) allows the court to decide significant questions and otherwise "focus the litigation on the true matters in controversy." *Id.* (quoting 11 James W. Moore, *Moore's Federal Practice* § 56.40[2], at 56-281 (3d ed. 2005)). "The usual summary judgment standard applies to Rule 56(d) determinations." *Id.*

B. **THE CLAIMANTS' MOTION FOR SUMMARY JUDGMENT AS TO SECTION 25401**

The Claimants move for summary judgment against WorldCom for violations of California's securities laws. The alleged misrepresentation concerns the CSA between WAXS and WorldCom which "obligated" WorldCom to purchase $25 million per month in services from WAXS and which required notification 12 months before canceling. The Claimants alleged they entered into the stock-for-stock merger with WAXS assuming that WAXS would have a full 12 months of monthly guaranteed revenue of $25 million per month. The CSA was, according to the Claimants, "central" to their decision to sell WorldxChange to WAXS. (Claimants' Memo. in Support of First Cause of Action, 16.) As Claimants state "[t]he fraud was not in WorldCom's capacity or desire to take up to $25 million per month. The fraud was in lying about having an obligation to

take at least $25 million a month.  The investing public and others were falsely told that the CSA obligated WorldCom to take $25 million a month . . . ."  (*Id.* at 12.)

Section 25401 of California's Securities Act, codified at California Corporations Code sections 25500 *et seq*., makes one liable for the making of a material misrepresentation or omission in connection with the purchase or sale of a security. Reliance is not required.  *See Bowden v. Robinson*, 136 Cal.Rptr. 871, 878 (Cal. Ct. App. 1977) (noting that in a claim brought under § 25401 "(1) proof of reliance is not required, (2) although the fact misrepresented must be 'material,' no proof of causation is required, and (3) plaintiff need not plead defendant's negligence").  The remedies include rescission or damages.  Claimants allege that WorldCom is liable as control person and is also liable as an aider and abettor.  (Claimants' Memo. in Support of First Cause of Action, 2-3.)[5]

The Debtor argues that no misrepresentation was made.[6]  The Court does not agree.  Although WorldCom states that there is no evidence that someone at WAXS or anyone else said that the CSA required WorldCom to pay a minimum of $25 million per month regardless of actual usage, WAXS's public documents clearly spell out that the $25 million monthly revenue was guaranteed as long the provided services were of acceptable quality.  That WAXS provided services of acceptable quality is not disputed.

The Debtor states that the Claimants have identified four actionable statements from WAXS's SEC filings that are substantially similar.  The Debtor argues that the

---

[5] The control person issue is discussed at section III.E. of this opinion.

[6] WorldCom does not actively dispute materiality.  Given that the public statements reveal that 53% of WAXS's revenues came from WorldCom's performance under the CSA, a misstatement about the actual nature of that revenue and WorldCom's obligation to provide twelve months of it is clearly material as a matter of law.  *See Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991) (information is material if it would have assumed "actual significance in the deliberations of the reasonable shareholder").

statements must be looked at not in isolation but within context of the accompanying

language that contains significant disclosures.  The Debtor argues that the various

disclosures in the CSA would warn any investor that the $25 million was not guaranteed.

     The relevant paragraph of the CSA, as repeated in public documents such as

WAXS's 1998 Form 10-K, its 1998 Form 10-K/A, and its 1999 Form 10-K, reads

> MCI WorldCom is obligated to purchase from us at least $25.0 million a
> month of such services, provided the services are of acceptable quality and
> the rates quoted are at least equal to the rates MCI WorldCom is obtaining
> from other third party providers.  The Agreement has a rolling 12-month
> evergreen term, subject to a one year prior notice of termination.  Our
> revenue attributable to the Service Agreement comprised approximately
> 53% if our total revenue for the year ended December 31, 1999.  There
> can be no assurance that MCI WorldCom will purchase future services
> under the Service Agreement.  Termination of the Service Agreement, or
> any reduction in services provided thereunder, could have a material
> adverse affect [sic] on our business, financial condition or results of
> operations.

*See* Exs. 16 (1998 Form 10-K), 42 (1998 Form 10-K/A), and 52 (1999 Form 10-K) to

Hulett Decl.

     WorldCom argues that the term "guarantee" is not used.  This is semantics.  The

phrase "obligated" is clearly equivalent to a "guarantee" that WAXS would receive $25

million a month in services.

     The Claimants have shown that despite the language of WorldCom being

"obligated" to purchase $25 per month in services from WAXS, there never was an

obligation on WorldCom's part to take $25 million in services or pay for a minimum

amount regardless of usage.  Victor Goetz, WAXS's Chief Financial Officer, testified

that WorldCom was "not required to place orders under the CSA," (Dep. of Victor E.

Goetz, Ex. to Hulett Decl., dated April 27, 2006 at 83:20 – 83:25), and that if

WorldCom's actual order differed from the CSA a "negotiation was undertaken."  (*Id*. at

84:3 – 84:13.)  Marc Palmese, the Debtor's 30(b)(6) designee, testified over counsel's objection that even if the price and quality were acceptable, WorldCom was not obligated to take $25 million in services from WorldCom under the CSA.  (*See* Dep. of Marc D. Palmese dated July 28, 2006 at 202:10 – 202:14, Ex. to Hulett Decl.)

Another main argument of the Debtor is that the CSA cautioned that there was no assurance WorldCom would purchase future services, and that a reduction in purchases could be detrimental to WAXS's finances.  On this point, the Court agrees with the Claimants that the cautionary language "[t]here can be no assurance that MCI WorldCom will purchase future services under the Service Agreement" clearly refers to the possibility that WorldCom might choose not to renew the rolling contract with WAXS after it expired in one year.  If there truly were no obligation ever on WorldCom's part to purchase $25 million per month in services, the 12-month evergreen term would be meaningless and contrary to the rest of the CSA.

For the above reasons, the Court finds as a matter of law that WAXS made a material misstatement and grants partial summary judgment to the Claimants.

## C.  *THE DEBTOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE DATE OF SALE*

The Claimants have alleged a violation by the Debtor of California Corporations Code section 25401.  Section 25501 of that code provides for damages for violations of section 25401.  Section 25501 states, in part,

> Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of

the untruth or omission. Upon rescission, a purchaser may recover the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security, upon tender of the security. . . Damages recoverable under this section by a purchaser shall be an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received on the security by the plaintiff.

The Debtor moves for partial summary judgment as the date of sale of the Claimants' acquisition of WAXS stock. Both parties agreed that a determination of the date of sale is appropriate for summary judgment.

1. The Debtor's Arguments as to the Date of Sale

In its original and reply moving papers, the Debtor makes two principal arguments for why the date of sale for purposes of the calculation of any damages should be considered to be December 18, 2000, when the merger was consummated, and not February 11, 2000, when the parties entered into the Merger Agreement. The distinction looms large. The stock price of WAXS fell from $22.88 on February 11, 2000, to $2.72 on December 18, 2000, as the entire telecommunications industry faced a steep decline in their collective share prices.

a. *The Debtor's "Price Paid" Argument*

First, the Debtor states that the plain language of section 25501 of the California Corporations Code, not to mention guidance from the federal securities laws and common sense, compels calculation of damages from the date of the closing. Under the statute, the Debtor argues, the Court should look to the "price at which the security was bought" as its starting point. Since the Merger Agreement did not fix the price but rather fixed the ratio at which the parties would exchange respective shares of WAXS and

13

WorldxChange *at closing*, the Debtor argues that a "price" could only be calculated at the time of closing.  In support, the Debtor's counsel, at oral argument, made the statement that in no case involving a stock-for-stock merger has a court looked to the price at the date of the agreement rather than the date of the stock exchange to determine a security's price for the purposes of a damages calculation.  (Hr'g Tr: 21:08 – 21:18; 98:16 – 98:24, Aug. 28, 2007.)

The Debtor also offers a common sense argument and an analysis of the Merger Agreement's structure as support.  As a matter of common sense, the Debtor essentially states that damages for an alleged security fraud cannot be apportioned as of a date "when no stock was exchanged and no price was set."  (Debtor's Reply Memorandum in Further Support of Reorganized Debtor's Motion for Partial Summary Judgment as to the Date of Sale ("Debtor's Reply Memo. as to Date of Sale"), 6).  Under the argument regarding the merger's structure, the Debtor points out that under the "fixed exchange ratio" agreed to by WAXS and WorldxChange for the merger, both parties agreed to a fixed exchange ratio, rather than a fixed price, for the stock-for-stock transaction.  Under a fixed exchange ratio, both parties are said to have assumed the risk that the value of the stock they are to receive may decline (or appreciate) between the agreement date and closing date in the event of an industry downturn – as opposed to a fixed price, which can expose the buyer to risk if its share price drops significantly.  *See, e.g.*, Theodore N. Mirvis, *Takeover Law And Practice 2006,* Practicing Law Institute, 1599 PLI/Corp 147, 273-277 (April 2007) (discussing features and different risks of fixed exchange ratio/floating price and fixed value/floating exchange ratio stock-for-stock transactions and observing that with a fixed exchange ratio both parties bear general market risk,

which is minimized when the parties are in the same industry).  The Debtor argues that,

had they wished, the Claimants could have negotiated for a set consideration value,[7] or a

"walkaway price" that would have allowed the Claimants to back out of the merger

should WAXS's stock price fall below a certain threshold.

### b.  The Debtor's "Irrevocable Commitment" Argument

The Debtor argues in the alternative[8] that under the "irrevocable commitment"

theory, the date of sale did not occur until December 2000, "when all of the conditions

for satisfying the merger agreement were satisfied and the merger closed."

(Memorandum of Law In Support of Reorganized Debtor's Motion for Partial Summary

Judgment as to the Date of Sale ("Debtor's Date of Sale Memo."), 1.)

The Debtor begins that line of its argument by noting that the California

Securities Act contains no definition of "bought" to clearly explain the language in

section 25501 that the starting point of a damages calculation should be "the price at

which a security was bought."  The Debtor, however, observes that the California act

defines "sale" at section  25017(a).  To determine when a "sale" occurs under the act, the

Debtor argues that California courts use the "irrevocable commitment" test, also used by

federal courts.

The Debtor argues that a long line of case law holds that the date of a securities

sale is when a plaintiff becomes "irrevocably committed" to a transaction.  The Debtor

cites, for example, *Pell v. Weinstein,* 759 F. Supp. 1107, 1113-14 (M.D. Pa. 1991), *aff'd,*

---

[7] The Debtor argues that the Claimants could have bargained for the right to receive, for example, $600
million worth of WAXS's stock on the date of closing.  Under that scenario, if WAXS's stock price
declined, the conversion ratio would then be adjusted accordingly at closing, with the Claimants receiving a
greater number of shares, to ensure that the Claimants did receive $600 million worth of WAXS's stock.

[8] The Debtor argues that its first argument should settle the date of sale issue.  *See* Debtor's Reply Memo.
as to Date of Sale, 9 ("Given the clear application of the relevant damages statute to the undisputed facts,
the Court need not conduct any further analysis.")

961 F.2d 1568 (3d Cir. 1992), *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891

(2d Cir. 1972), and *In re Alliance Pharmaceuticals. Corp. Securities Litigation*, 279 F.

Supp. 2d 171, 185 (S.D.N.Y. 2003).  These cases generally hold that the date of the

"sale" of securities occurs when the parties become obligated to perform.   For example,

according to *Radiation Dynamics*, "'commitment' is a simple and direct way of

designating the point at which, in the classical contractual sense, there was a meeting of

the minds of the parties; it marks the point at which the parties obligated themselves to

perform . . . even if the formal performance of their agreement is to be after a lapse of

time." *Radiation Dynamics*, 464 F.2d at 891.

When the "irrevocable commitment" theory is applied to mergers, the Debtor

further argues that the existence of conditions that must be satisfied before a merger

closes means that parties cannot be irrevocably committed to the sale until those

conditions are satisfied.  The Debtor enumerates several conditions that had to be

satisfied or waived before the merger could be consummated, such as – the merger

gaining shareholder approval from WorldxChange and WAXS shareholders; the merger

gaining the required regulatory approval; the expiration of period for dissenters' rights by

WAXS shareholders under California law; that the California Public Utilities

Commission did not approve the merger until October 19, 2000; that the SEC did not

approve the registration statement for the WAXS stock that was to be distributed to

WorldxChange shareholders until November 14, 2000; WAXS's largest shareholders did

not execute a written consent approving the merger until November 15, 2000; and that

WAXS's shareholders did not approve the merger until a shareholder meeting on

December 14, 2000.  The Debtor cites such cases as *SEC v. National Student Marketing*

*Corp.*, 457 F. Supp. 682 (D.D.C. 1978), and *Portnoy v. Revlon, Inc.*, 650 F.2d 895 (7th

Cir. 1981), to support its application of the "irrevocable commitment" theory to mergers.

    2.   The Claimants' Arguments as to the Date of Sale

    The Claimants argue that the date of sale for determining rescissory damages

should be February 11, 2000.  They argue that the measure of damages under section

25501 is "fixed by the definition of 'sale' under" section 25017(a), which states that a

"sale" "includes every contract of sale of, contract to sell, or disposition of, a security or

interest in a security for value . . . [and] any exchange of securities and any change in the

rights, preferences, privileges, or restrictions of or on outstanding securities."  Because

the statute defines a "sale" as a "contract of sale," the Claimants theorize that a "sale" "is

not limited to the date on which the securities changed hands."  (Abbott Claimants'

Opposition to Reorganized Debtor's Motion for Partial Summary Judgment as to the Date

of Sale ("Claimants' Opp. Memo. as to Date of Sale"), 8).

    The Claimants also assert that they should prevail under the aforementioned

"irrevocable commitment" theory, arguing that WAXS and WorldxChange committed

themselves and made their respective investment decisions on February 11, 2000.  Under

the "irrevocable commitment" theory, the Claimants argue that the date of sale is when

parties obligate themselves to perform, even if the formal performance – i.e., the

exchange of shares – is to occur later.

    As to the Debtor's argument that conditions to the merger make the relevant date

the merger's closing date, the Claimants argue that section 25017 contains no reference to

conditions necessary for a sale.  The Claimants also argue that the point of the definitive

agreement between the parties is the relevant date of sale and that modifications to the

agreement do not constitute a new and different sale, and, thus, a new and later date of the sale. At most, the Claimants argue, exactly when the parties were "committed" to the transaction is a question of fact, making the matter unfit for summary judgment.

At oral argument, after it became apparent that the Debtor was relying more heavily on its "price paid" argument, rather than the "irrevocable commitment" theory, the Claimants attempted to distinguish the nature of the relief sought, rescission, from an application of a damages calculation under section 25501. In essence, the Claimants argued that the Debtor's proposed damages calculation – starting from the price paid at the date of closing – could not be correct because it was not literally rescission.

3. <u>Damages Under the California Statute Impact the Date of Sale Finding</u>

Section 25501 was modeled after, and is similar to, Section 12(2) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77l(2).[9] *See Hudson v. Capital Mgmt. Int'l, Inc.*, No. C-81-1737MHP, 1984 WL 2129, *1 (N.D. Cal. Mar. 7, 1984) (stating "Sections 25401 and 25501 together are similar to § 12(2) of the Securities Act of 1933"); *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 307 (N.D Cal. 1978) (stating that §§ 25401, 25501, 25504 of the California Corporations Code were "specifically modeled after § 12(2)"). Thus, the court can look to authorities interpreting Section 12 for guidance. *See In re Granite Partners, L.P.*, 208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997); *see also People v. Simon*, 886 P.2d 1271, 1283 (Cal. 1995) (discussing "the rule that when a state statute is modeled on a federal statute the court should presume that the state legislature intended to adopt the construction employed by the federal courts"); *Moreland v. Dep't of*

---

[9] Section 12(2) provides that a defrauded plaintiff
      may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

*Corporations*, 239 Cal.Rptr. 558, 561 (Cal. Ct. App. 1987) ("[I]t is a basic premise of

statutory construction that when a state law is patterned after a federal law, the two are

construed together.  In these situations, the federal cases interpreting the federal law offer

persuasive rather than controlling authority in construing the state law.") (internal citation

omitted).

Under Section 12, the primary remedy is clearly rescission.  *See Randall v.*

*Loftsgaarden*, 478 U.S. 647, 653 (1986) (stating "§ 12(2) prescribes the remedy of

rescission except where the plaintiff no longer owns the security."); *see also Riley v.*

*Simmons*, 45 F.3d 764, 774 n.11 (3d Cir. 1995) ("Plaintiffs' remedy under section 12(2)

of the Securities Act is essentially a remedy of rescission.").  When the plaintiff no longer

owns or possesses the security, or when the stock has been disposed of in a merger, literal

rescission is obviously not possible.  *See Junker v. Crory*, 650 F.2d 1349, 1362 (5th Cir.

1981); *see also Sales Online Direct, Inc. v. Stengel*, No. Civ. A. WHN-00-1261, 2001

WL 282690, *3 (D. Md. Mar. 19, 2001) (finding that rescission was not a reasonable

remedy as "given the nature of the transactions and the changes in the condition of the

contributed assets since the merger was consummated, it would be difficult, if not

impossible to undo the transaction").

If rescission is not possible, however, it is well settled that a court should award

damages equal to rescission.  *See, e.g., Randall*, 478 U.S. at 655-56 (where the plaintiff

no longer owns the security to tender, "we may assume that a rescissory measure of

damages will be employed; the plaintiff is entitled to a return of the consideration paid,

reduced by the amount realized when he sold the security and by any 'income received'

on the security"); *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir. 1979) ("If

plaintiff owns the stock, he is entitled to rescission but not damages.  If plaintiff no longer

owns the stock, he is entitled to damages but not rescission.").  The case of *Junker v.*

*Crory* is also analogous.  There, the Fifth Circuit found in favor of the plaintiffs, suing

under Section 12, who had received securities in an acquiring corporation in exchange for

their securities in the acquired company.  *Junker,* 650 F.2d at 1362.  For the remedy

measure, the court reasoned that because "the corporation acquired by or merged into [the

acquiring company] is no longer in existence, a complete return to the status quo ante is

no longer possible.  Therefore, damages was the proper remedy under the Section 12(2)

claims . . . ."  *Id.*

That leaves the question of how should the Court measure rescissory damages in a

situation like the current one.  Assuming for present purposes only that the Claimants

prevail on their section 25401 claim, they would be entitled, under section 25501's

language and the interpretation of Section 12 by *Randall*, to a return of the consideration

paid ("A"), reduced by the amount realized when the Claimants sold the security ("B")

and by any income received on the security ("C"), or A – (B+C).[10]

A "return of the consideration paid" can only mean that the Court should look to

what consideration was actually paid.  As the Supreme Court stated in *Randall*, there is

"no indication that Congress intended the word 'consideration' in § 12(2) to mean

anything other than what the context would suggest – *the money or property given by the*

*investor in exchange for the security*."  *Randall,* 478 U.S. at 659-60 (emphasis added).

---

[10]  In the current situation, B and C are likely non-existent for most of the Claimants, s*ee* Abbott Claimants'
Memo. of Law In Support of Their Motion for Summary Judgment on the First Cause of Action for State
Securities Law Violations ("Claimants' Memo. in Support of First Cause of Action"), 25 (Claimants lost
100% of the value of the company); Hr'g Tr: 15:10 – 15:12, Aug. 28, 2007 (the Claimants' counsel stated
that the value of both securities is zero); *id.* at 16:17 (the lawsuit was filed when the WAXS stock was
worth zero), although some of the Claimants made some sales.  (Hr'g Tr: 16:10 – 16:12, Aug. 28, 2007).

The Court also cited a congressional report stating that under Section 12, the buyer can

"'sue for recovery of his purchase price, or for damages not exceeding such price.'"  *Id*.

at 656 (citing H.R.Rep. No. 85, 73d Cong., 1st Sess., 9 (1933)).  In this case, the

consideration, the shares given "in exchange for the security," was paid on the date of the

merger, when the shares were actually exchanged.

The following passage from *Junker* supports the finding that the date of sale for a

merger transaction in which shares are exchanged, based upon a ratio, should be the

actual date of the merger's closing

> The trial court's award of damages measures only the value of what Junker
> gave up in the merger without an offset for the value of the stock he
> received.  *In order to obtain a proper measurement of the loss suffered as
> a result of the merger, the value of the Road shares as of the date of that
> transaction must be deducted from the value of the Reco shares as of that
> same date*. . . .  Therefore, upon remand, the trial court must calculate the
> value of the Road shares as of the date of the merger and reduce the
> judgment by that amount.

*Junker,* 650 F.2d at 1362 (emphasis added).[11]

---

[11] The finding that the Claimants would be entitled to rescissory damages measured from the merger's
closing date should make clear that the measure of damages is not "out of pocket" damages.  The Debtor's
counsel alluded to "out of pocket" damages as the proper measure under Section 12 during oral arguments.
(*See* Hr'g Tr: 25:1 – 25:5; 34:21 – 34:23; 36:17 – 36:21, Aug. 28, 2007).  However, the term may have
been used in a colloquial sense rather than as a legal term of art.  The proper measure under Section 12, as
stated above in the discussion of *Randall*, is clearly rescissory damages.  *See also Mathews v. Kidder,
Peabody & Co.*, Inc., 260 F.3d 239, 249-50 (3d Cir. 2001) (discussing the difference between rescissory
damages under Section 12(2) and out-of-pocket damages in Section 10(b) cases); *McFarland v. Memorex
Corp.*, 493 F. Supp. 631, 653 (N.D. Cal. 1980) (stating remedy under Section 12 is rescission); *Mecca v.
Gibraltar Corp. of America*, 746 F. Supp. 338, 348 (S.D.N.Y. 1990) (finding that Section 12(2) limits a
plaintiff to rescissory damages unless he no longer owns the security and that "rescissory damages do not
include consequential damages, that is, out-of-pocket losses").  Under the out-of-pocket standard of
damages, a defrauded buyer is entitled to recover the difference between the price for a security and the
actual value of that security at the time of the purchase, plus interest on the difference.  *See, e.g., Hoxworth
v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 203 n.25 (3d Cir. 1990) (defining "out-of-pocket loss" as
the difference between the price the defrauded seller actually received for his stock and the price he would
have received for his stock absent the fraud).  In contrast, under the rescissory measure, a court does not
need to determine the "true value" of the stock absent the fraud.

In *Junker*, the only reference elsewhere in the opinion to the "date of that transaction" was to the merger's closing in October. The court did not look to or discuss the date when the parties agreed to merge.

Under rescission, returning the Claimants to the status quo before the December merger would result in granting them their WorldxChange stock back or, since the stock is now non-existent, the value of that stock on the merger date. The Claimants would also be entitled to interest and would also have to subtract any income, such as dividends, they received from holding the WAXS stock.

4. Inapplicability of the "Irrevocable Commitment" Theory

Although a discussion of the "irrevocable commitment" theory is not necessary in light of the Court's discussion above, the Court observes that the theory does not appear to be applicable to the current situation – fixing a date of sale for the purpose of a damages calculation. The Court found no case applying the theory for that purpose, and cases that do apply the theory to other situations do so for reasons that would make this Court hesitant to apply the theory here.

For example, the case of *SEC v. National Student Marketing Corp.*, 457 F. Supp. 682, 702-03 (D.D.C. 1978), concerned whether the alleged conduct was "in connection with the purchase or sale of a security" for section 10(b) and Rule 10b-5 purposes, promulgated under the Securities Exchange Act of 1934, and had nothing to do with damages. The court explained the commitment theory stems from the "seminal case" of *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976 (1969), where the Second Circuit held that "liability for insider trading violations of Rule 10b-5 attaches at the time the commitment to buy or sell is made and

not when the transaction is ultimately consummated." *Id.* (citing *Texas Gulf Sulphur*, 401 F.2d at 853 n.17). The *National Student* court explained

> The rationale for using the moment of commitment as the critical point in time derives from the underlying purpose of the antifraud provisions to protect the investment decision from inadequate disclosure and misrepresentations. Once the decision is made and the parties are irrevocably committed to the transaction, there is little justification for penalizing alleged omissions or misstatements which occur thereafter and which have no effect on the decision.

457 F. Supp. at 703.

The discussion of fixing the date of sale concerned whether, as a matter of sound policy, an alleged wrongdoer should be punished for a misstatement made *after* the buyer has already made the decision to purchase the security. Such an analysis offers little guidance to the distinct decision of when a security should be deemed to have been bought or sold through a merger for the purposes of calculating damages.

Two other cases, *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972), and *In re Portnoy v. Revlon, Inc.*, 650 F.2d 895 (7th Cir. 1981), are also distinguishable on similar grounds. The main reason behind the commitment theory in *Radiation Dynamics* was to determine when an alleged wrongdoer used material inside information. 464 F.2d at 891. *In re Portnoy* also concerned when a sale occurred for purposes of attaching liability, not for purposes of calculating damages. Significantly, that court noted it was construing the language of "sale" in a way "consistent with the remedial purpose § 16(b) [of the Securities Exchange Act of 1934] to curb or inhibit speculative abuses by insiders." *In re Portnoy,* 650 F.2d at 898.

A case involving a stock-for-stock merger relied on by the Claimants also offers little guidance. In *APA Excelsior III L.P. v. Premiere Tech., Inc.*, 476 F.3d 1261 (11th

Cir. 2007), the Eleventh Circuit dealt with the issue of whether "sophisticated investors

involved in an arms-length merger transaction [were] entitled to recover under Section 11

of the Securities Act of 1933 if they make a legally binding investment commitment

months before the issuance of a defective registration statement." *Id*. at 1263.  In its

discussion, the court observed that the "commitment theory in securities law appears to

have begun as a means of establish commencement of the statute of limitations claims for

Rule 10b-5 claims." *Id*. at 1267.  The court, after an explanation of why a presumption of

reliance under Section 11 should not apply to investment decisions made before a

defective registration statement is issued, held that the district court properly granted

summary judgment to the defendants, *id.* at 1272-77, saying that to hold otherwise

"would mean that an impossible fact will be presumed in Plaintiffs' favor." *Id.* at 1273.

The court stated that the plaintiffs could not have purchased the securities pursuant to the

registration statement, but added, in a footnote the Claimants cite, that "it is true that

Plaintiffs in one sense 'acquired' their stock only after consummation of the merger and

after the registration statement was filed.  Regardless of when they may have physically

acquired the stock, however, Plaintiffs made their investment decision, and were

committed thereto, months before that time." *Id.* at 1276 n.6.

The Claimants cannot rely on that case and passage for one primary reason.  That

case's discussion of the distinction between "acquiring" the stock and "making the

investment decision" related to whether a presumption of reliance under Section 11

should still be granted even if the decision to purchase the securities was made before the

alleged misrepresentation.  That presents a much different issue than whether, for

damages purposes, a court should look to a stock's price when a merger was agreed to and not to when the merger was effected.

For the above stated reasons, the Court finds the applicable date of sale for the purposes of calculating damages shall be December 18, 2000, the date of the merger's closing.  The rescissory measure of damages, rather than the "out-of-pocket" measure is the correct measure under section 25501.  Furthermore, the Court does not apply the "irrevocable commitment" theory to the issue of the date of sale.

## D.  *THE DEBTOR'S MOTION FOR SUMMARY JUDGMENT AS TO KNOWLEDGE*

The Debtor seeks summary judgment on two grounds, (i) the Claimants' claim under the California Securities Act is barred by the applicable statute of limitations pursuant to section 25506(a) of the California Corporations Code, and (ii) the Claimants had actual knowledge of the facts they allege constitute fraud which is a defense to liability as provided for under California law.  Regarding both of these issues, the Court finds that the Debtor falls short of the threshold to grant summary judgment.

### 1.  The Claimants' Fraud Allegations

The Claimants' allegations of fraud and misrepresentation can be summarized as an allegedly empty promise made by the Debtor to purchase at least $25 million in services per month from WAXS.  As stated more fully in the Claimants' opposition to the instant motion,

> The fraud was the lie of having an obligation to take at least $25 million a month.  The investing public and others were falsely told [through public disclosures] that the CSA obligated WorldCom to take $25 million a month in services and that this obligation led to high margins on WorldCom traffic.
> . . .

25

> In stark contrast to these public disclosures, WAXS
> Executives and WorldCom *now admit* that WorldCom was
> never under an obligation to purchase $25 million in
> services or to pay "true-up" amounts if it fell short of the
> $25 million obligation.  It is this contradiction and
> misrepresentation that forms the foundation of Claimants'
> case.

(Claimants' Opposition to Reorganized Debtor's Motion for Summary Judgment on

Statute of Limitations Issues ("Claimants' Opp. Memo. on SOL"), 9-11.)

Accordingly, the Court may grant the instant motion if the Debtor shows that

there exist undisputed material facts, of which the Claimants had inquiry notice and

actual knowledge, concerning the WAXS's misstatement that WorldCom was obligated

to purchase at least $25 million a month in services under the CSA.  In other words, the

Debtor must present the Court with undisputed material facts, of which the Claimants had

knowledge, that either lead or should have lead them to discover that WorldCom was in

fact never obligated to meet the $25 million per month usage target.

2. <u>The Debtor's Statement of Undisputed Material Facts</u>

The Debtor's statement of undisputed material facts lists fifty-six (56) allegedly

undisputed facts filed in support of its motion.  The most relevant facts alleged for the

purposes of demonstrating that the Claimants had both inquiry notice and actual

knowledge of the facts that form the basis of their fraud claim can be categorized as

follows, (a) public disclosures regarding revenues and profit margins under the CSA, (b)

Roger Abbott's participation in day-to-day management of WAXS between the date the

Merger Agreement was executed and the merger's closing date that allegedly perpetrated

the fraud, and (c) the Cipoletti Memo and conference call.

26

*a. Public Disclosures*

The Debtor argues that after the Merger Agreement was signed on February 11, 2000 and before the closing on December 18, 2000, WAXS made a series of detailed public disclosures regarding revenues and profit margins under the CSA. Some of these disclosures show revenues from WorldCom under $75 million per quarter despite the alleged $25 monthly minimum under the CSA. These quarterly disclosures also show increasing gross profit margins as WorldCom's usage and associated costs declined and the true-up charges increased. The Debtor also presented evidence of annual disclosures showing the same failure to meet $300 million per year in revenue. For instance, on March 30, 2000, WAXS filed its 10-K for 1999, reporting approximately $267 million of revenue under the CSA and related gross profit of $35 million. The Debtor presents other SEC filings pre-dating the December 18th closing that demonstrate WorldCom's failure to pay revenues that do not meet the amount allegedly anticipated by the Claimants.

*b. Roger Abbott's Participation in WAXS*

The Debtor claims that Abbott was already working for WAXS before the close of the merger and was privy to the key facts concerning the WorldCom relationship. For example, the Debtor alleges that in the early spring of 2000, Abbott had access to WAXS traffic statistics for March 2000 and learned that WorldCom was using less than $25 million per month in services and that WorldCom's usage was trending down. The Debtor also states that Abbott attended a meeting at WorldCom's Cary, North Carolina, office on April 6, 2000, at which representatives of the two companies discussed pricing, quality of service, and other issues that were affecting WorldCom's ability to utilize WAXS's services under the CSA. On April 22, 2000, Abbott wrote a "lengthy email" to

Chmar regarding the April 6th meeting, commenting on how WorldCom traffic under the
CSA was a low margin business.  Moreover, Abbott's summary of his own proposed
strategy for the WAXS-WorldCom relationship addressed financial issues such as the
low margin business of WorldCom's traffic, the technical problems affecting
WorldCom's utilization of WAXS services, the possibility of WorldCom providing
"other favors" that help WAXS financially in circumstances where there was a shortfall
on traffic commitments and WAXS's internal goal to use the WorldCom relationship to
foster its ability to meet its revenue projections.

The Debtor also presents a number of post-May 29, 2000 instances where Abbott
allegedly participated in WAXS's internal discussions regarding true-ups and revenue
projections.[12]  For example, on September 8, 2000, Abbott was allegedly copied on an
email thread between Walter Burmeister, president of WAXS, and Bryan Yokley,
WAXS's chief financial officer, discussing the impact of the true-ups and the fall-off in
WorldCom usage as the year progressed.  In early October, Abbott was said to have
analyzed WAXS's fourth quarter revenue projections and noted that they include $14
million in expected revenues from WorldCom.  This information allegedly corresponds
with financial information compiled by Abbott which he allegedly included in a
November 11, 2000 memorandum that discusses strategies that WAXS might try in order
to close the gap between its revenue projections and actual performance for the fourth
quarter, including getting a larger true-up from WorldCom.  The Debtor goes on to plead
other instances demonstrating Abbott's alleged knowledge of the true-up payments and
WorldCom's below-expectation usage level.

---

[12] These alleged facts are irrelevant to the statute of limitations issue and will only be considered under the
actual knowledge issue.

### c. The Cipoletti Memo and Conference Call

On May 24, 2000, Bryan Cipoletti, a member of the WAXS board of directors, the audit committee and the chief financial officer of The Armstrong Group (a significant shareholder in WAXS), wrote a detailed memorandum questioning the implications of the true-up payments from WorldCom for the company's gross profit margins (the "Cipoletti Memo").[13] (Memorandum of Law in Support of Reorganized Debtor's Motion for Summary Judgment as to Knowledge Issues ("Debtor's SJ Memo. as to Knowledge"), 11; Ex. 33 to Strochak Decl.) The Cipoletti Memo was addressed to Kirby Campbell, president of The Armstrong Group and also a member of the WAXS board. *Id.* On May 25, 2000, Phillips, the chairman of WAXS, convened a conference call (the "Conference Call") of the senior management team at WAXS to discuss the Cipoletti Memo with Campbell and Cipoletti; participants in the call included Phillips, Campbell, Cipoletti, Burmeister, and Abbott. Abbott recorded the conference call from his hotel room in Europe where he was traveling on business.

The discussion during the Conference Call addressed such issues as WorldCom's inability to meet the $25 million per month usage target, the effect of true-up payments in the calculation of WAXS's gross profit margin, and the true-ups for the second quarter of 2000 being even larger than the one in the first quarter of 2000. Near or around the end of the Conference Call, Abbott uttered the words "we've got to get Bryan to stop writing that stuff." *Id.* at 14.

---

[13] The Court disregards the Claimants' hearsay objections to the Cipoletti Memo and the Conference Call. The Debtor is introducing the evidence not to prove the truth of the statements asserted in the memorandum or the Conference Call but for fact that the statements, whether true or not, were made, *see, e.g., United States v. Cardascia*, 951 F.2d 474, 486-87 (2d Cir. 1991) (quoting Advisory Committee Note to Fed. R. Evid. 801(c) "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, [then] the statement is not hearsay."), and for the effects of the statements on the listeners or readers. *See, e.g., Tuccio v. Papstein*, --- F.Supp.2d ----, No. 3:05-CV-1407(RNC) 2007 WL 2827790, *1 (D. Conn. Sept. 29, 2007).

3. Statute of Limitations

Section 25506(a) of the California Corporations Code provides that an action

under the California securities laws must be brought before "the expiration of four years

after the act or transaction constituting the violation or *the expiration of one year after the*

*discovery by the plaintiff of the facts constituting the violation*, whichever shall first

expire." Cal. Corp. Code § 25506(a) (2007) (emphasis added). "[I]nquiry notice is

sufficient to trigger the running of the limitations period under section 25506." *Deveny v.*

*Entropoin, Inc.*, 139 Cal. App. 4th 408, 423 (Cal. Ct. App. 2006). Such notice arises in a

securities action "when circumstances suggest to an investor of ordinary intelligence the

possibility that he has been defrauded." *Id.* (citing *Dodds v. Cigna Sec., Inc.*, 12 F.3d

346, 350 (2d Cir. 1993)). Inquiry notice is often likened to "storm warnings" which are

found "whenever there are any financial, legal, or other data, such as public disclosures in

the media about the financial condition of the corporation that would tend to alert a

reasonable person to the likelihood of fraud." *Deveny*, 139 Cal. App. 4th at 428 (internal

quotations omitted). An investor need not have full knowledge of the alleged fraud in

order to be on inquiry notice; rather, the investor must have notice of facts sufficient to

create a "duty of inquiry when the circumstances suggest to an investor of ordinary

intelligence the probability that [he or] she has been defrauded." *Id.*; *see Berry v.*

*Valence Tech., Inc.*, 175 F.3d 699, 705 (9th Cir. 1999) ("While an investor need not have

full knowledge of fraud in order reasonably to be expected to investigate worrisome

allegations concerning his investments, he will not be presumed to have done so unless

the allegations are sufficient to 'excite inquiry' into the possibility of fraudulent

conduct."); *see, e.g.*, *Dodds*, 12 F.3d at 352 (2d Cir. 1993) (finding that an investor is not

required to have notice of the entire fraud to be on inquiry notice and that "the issue is not

whether appellant was given inadequate information about the advisability of investments

in multiple limited partnerships but whether she had constructive notice of facts sufficient

to create a duty to inquire further into that matter").  As emphasized by the Seventh

Circuit, the facts constituting inquiry notice "must be sufficiently probative of fraud –

sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or

substantiated – not only to incite the victim to investigate but also to enable him to tie up

any loose ends and complete the investigation in time to file a timely suit." *Fujisawa*

*Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997).

Once storm warnings have been established and it is clear that the investor had a

duty of inquiry, a court must then determine at what point the investor, in the exercise of

reasonable diligence, should have discovered the facts constituting the alleged fraud.  The

answer to this question determines when the statute of limitations began to run.  *See In re*

*Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1026 (S.D. Cal. 2005).  Accordingly,

knowledge is imputed in one of two ways,

> (i) if the investor makes no inquiry once the duty arises,
> knowledge will be imputed as of the date the duty arose;
> and
> . . .
> (ii) if some inquiry is made, . . . [the Court] will impute
> knowledge of what an investor in the exercise of reasonable
> diligence should have discovered concerning the fraud, and
> in such cases the limitations period begins to run from the
> date such inquiry should have revealed the fraud.

*Deveny*, 139 Cal. App. 4th at 428 (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d

161, 168 (2d Cir. 2005)).  "Thus, inquiry notice triggers an investor's duty to exercise

reasonable diligence and the one-year statute of limitations period begins to run once the

investor, in the exercise of reasonable diligence, should have discovered the facts

underlying the alleged fraud." *In re Immune Response*, 375 F. Supp. 2d at 1027 (internal

citations omitted).

California courts "generally view[] the question of when a reasonably diligent

investor should have discovered a claim as one appropriate for the factfinder to determine

after trial rather than one for a judge to decide as a matter of law on summary judgment."

*Deveny*, 139 Cal. App. 4th at 428 (citing *Luksch v. Latham*, 675 F. Supp. 1198, 1201

(N.D. Cal. 1987)); *cf. Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th

Cir. 1984) ("The question of what a reasonably prudent investor should have known is

particularly suited to a jury determination."). As such, a party seeking summary

judgment has a "difficult burden in showing there are no material issues of fact regarding

notice." *Davis v. Birr, Wilson & Co., Inc.*, 839 F.2d 1369, 1370 (9th Cir. 1988); *see Gray

v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996) ("Summary judgment is

appropriate only when uncontroverted evidence irrefutably demonstrates plaintiff

discovered or should have discovered the fraudulent conduct.") (internal quotations

omitted); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1309 -10 (9th Cir. 1982) ("Because our

precedent dictates that the question of notice of fraud is for the trier of fact, the party

seeking summary disposition has an extremely difficult burden to show that there exists

no issue of material fact regarding notice.").

Thus, the inquiry of the Court under this issue is two-fold, (a) whether the Debtor

met its initial burden of establishing the existence of storm warnings, and (b) if the

Debtor has met its initial burden, whether an investor exercising reasonable diligence

would have discovered the facts constituting WorldCom's alleged fraud before May 29,

2000.[14]  Based on the evidence before the Court, the Debtor has not met its initial burden

of presenting undisputed facts that establish storm warnings.  Given that the Debtor did

not meet its initial burden, the Court need not reach the second prong of this analysis.

The Debtor's alleged facts dealing with WorldCom's inability to meet the $25

million monthly usage target are indicative of a poor financial performance by

WorldCom in relation to the terms of the CSA.  Poor financial performances, however,

are not necessarily indicative of fraud.  *See Gray*, 82 F.3d at 881 ("[I]t is well settled that

poor financial performance, standing alone, does not necessarily suggest securities fraud

at the time of the sale, but could also be explained by poor management, general market

conditions, or other events unrelated to fraud, creating a jury question on inquiry

notice."); *cf. In re Exodus Comm'ns, Inc. Sec. Litig.*, No. C01-2661 MMC, 160, 163,

2005 WL 1869289, at *9 (N.D. Cal. Aug. 5, 2005) ("Poor financial results for one quarter

do not necessarily suggest that earlier statements were fraudulent . . . .").  Whether the

Claimants and Abbott were aware of WorldCom's failure to meet its alleged monthly

obligation to purchase $25 million worth of services from WAXS is not largely

significant for the purposes of inquiry notice here.  Rather, the Debtor needs to

demonstrate that the Claimants had inquiry notice of the *falsity of WorldCom's stated*

*obligation* to use $25 million worth of WAXS's services per month.  The facts presented

---

[14] The Claimants argue that the Court must first determine when the cause of action arose and go on to
purport that if the Court finds in favor of the Debtor's summary judgment motion regarding the "date of
sale" issue, then the statute of limitations issue becomes moot.  (*See* Claimants' Opp. Memo. on SOL, 4.)
This is because the Debtor advocates for a December 2000 date for the calculation of any damages, which
was only six months before the Claimants' complaint was filed.  The Court finds the Claimants' logic
erroneous.  The date for calculating damages is a completely separate inquiry from the date upon which
Claimants' cause of action for the violation of the California Securities Act accrued.  Even the Claimants
themselves acknowledge that the cause of action "arose in February 2000 when the contract of sale for the
purchase of securities was entered." (*Id.*, 5.)  Accordingly, the Court will assume that February 11, 2000 is
the correct date on which the claims accrued regardless of the Court's determination on the date of sale
issue.

to the Court fail to do this.  Thus, although the Debtor does not need to demonstrate that

the Claimants had "full knowledge" that WorldCom was allegedly not obligated to pay

$25 million per month, the facts presented here do not "excite inquiry" into the

possibility of fraudulent conduct in general and certainly do not raise inquiry notice of the

specific fraud alleged by the Claimants.

The Debtor also alleges that based on Abbott's participation in the Conference

Call, Abbott knew that "WorldCom was making true-up payments, that the true-ups were

likely to increase in the second quarter of 2000, that [WAXS's] reported revenue

included the true-ups, and that [WAXS's] reported profit margin would be much lower

without the true-ups."  (Debtor's SJ Memo. as to Knowledge, 26.)  Moreover, the Debtor

alleges that the Claimants had notice that the true-up payments helped WAXS meet its

projections even though WorldCom was not reaching the $25 million per month target.

The Debtor cites to the case *Kramas v. Security Gas & Oil Inc.* to support its

argument that all of these facts put Abbott on notice of the facts he claims were

concealed.  672 F.2d 766 (9th Cir. 1982).  In *Kramas*, the Ninth Circuit found that letters

written by the plaintiff as well as the plaintiff's deposition testimony and participation in

a meeting with the defendants demonstrated that the plaintiff knew or should have known

of the facts giving rise to his complaint prior to when the statute of limitations began to

run.  *See id.* at 770.  Particularly, the plaintiff in that case wrote letters that (a) questioned

whether defendants were "merely incompetent, or in fact crooked," (b) indicated a desire

to retain counsel "to determine whether a lawsuit should be brought," (c) stated that he

reported the defendants to the SEC and the state Commissioner of Corporations, and even

(d) informed investors that the defendants "'misappropriate(d)' funds, 'ripped off' the

investors and [were] engaged in 'robbery' in respect to partnership moneys." *Id.* at 771. Moreover, the meeting that the plaintiff had with the defendants and a fellow investor directly addressed "the possibility of criminal fraud on the part of [the defendants]." *Id.* Clearly, the Ninth Circuit was justified in finding these facts sufficient to establish the plaintiff's knowledge of the allegedly fraudulent conduct upon which he relied. Here, however, none of the facts rise to the level of notice found in *Kramas*. There were no outright discussions of fraud during the Conference Call, Abbott's emails and proposed strategies did not indicate any suspicion of fraud, and the true-up payments, according to the Claimants, were viewed by Abbott as expected payments under the evergreen clause of the CSA. The facts before the Court do not amount to storm warnings that would create a duty of inquiry. Indeed, none of the facts would "indisputably" lead investors of ordinary intelligence to believe that they have been defrauded.

Based on the findings above, the Court holds that none of the facts presented by the Debtor are sufficient to put the Claimants on inquiry notice of their alleged "no-obligation" fraud. Accordingly, the Debtor's motion for summary judgment on the statute of limitations ground is denied.[15]

### 4. Actual Knowledge

Section 25501 of the California Corporate Code provides in pertinent part that, "[a]ny person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, . . . *unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission*." Cal. Corp. Code § 25501 (emphasis added); *see Casella v. Webb*, 883 F.2d 805, 809 (9th Cir. 1989) ("[P]urchasers

---

[15] Given the outcome of this issue, the Court need not consider the Claimants' "equitable tolling" argument.

may recover [under section 12(2) of the Securities Act of 1933] unless they have actual

knowledge of the untruth or omission.").[16]

The Debtor, in essence, recycles the facts alleged in the statute of limitations issue

to support its actual knowledge defense.  Based on the findings above, these facts do not

even rise to the level of inquiry notice let alone "actual knowledge."  Moreover, the post-

May 29, 2000 facts alleged by the Debtor, *see supra* Part III.D.2.b, are similarly based on

poor financial performance and discussions of the true-up payments.  Thus, these facts

suffer the same fate as the pre-May 29, 2000 facts alleged in support of the statute of

limitations issue.  Thus, the Debtor fails to prove that the Claimants actually knew facts

concerning the untruth.

The Debtor also argues that the Claimants' allegation in paragraph 64 of their

amended complaint to the effect that the fraud was "brought fully to light" by the

Cipoletti Memo is a judicial admission by the Claimants that the matters discussed in the

memo (and therefore the Conference Call) disclosed the alleged fraud.  (Debtor's Reply

Memorandum in Support of Motion for Summary Judgment as to Knowledge Issues

("Debtor's Reply Memo. as to Knowledge"), 6-7.)  To determine whether a genuine issue

exists, the Court must evaluate all evidence, resolve all ambiguities and draw all

permissible inferences in the light most favorable to the Claimants. *See Stern v. Trs. of*

*Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) ("In assessing the record to determine

whether there is . . . [a genuine issue of material fact], the court is required to resolve all

ambiguities and draw all permissible factual inferences in favor of the party against

---

[16] As stated above, Section 25501 traces its ancestry back to Section 12(2) of the Securities Act of 1933; thus, decisions analyzing the federal statute provide persuasive authority and guidance for the Court. *See In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 306-08 (N.D. Cal. 1978) ("All that has been said . . . about § 12(2) applies with equal force to the pendent state claims since they are based on California statutes specifically modeled after § 12(2).").

whom summary judgment is sought.").  Accordingly, the fraud remains as the "no-obligation" interpretation argued by the Claimants in their later pleadings.  Moreover, based on the Court's own reading of the Cipoletti Memo, it does not appear to indicate fraud, but rather, as the Superior Court in the underlying action found, merely a commentary on the "evaluation of profit margins."  (*See* Claimants' Opp. Memo. on SOL, 21.)

Thus, the Court denies the Debtor's summary judgment motion on grounds of actual knowledge.

### E. *CONTROL PERSON LIABILITY*

1. <u>The Appropriate Legal Standard for Control Person Liability</u>

California Corporations Code section 25504 provides

> Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

The parties disagree as the applicable standard for control person liability.  The Debtor argues that section 25504 requires a showing of actual control, culpable participation, and knowledge of the fraud.  The Claimants argue that only the power to control is required, not actual control, that they are not required to show WorldCom's culpable participation in the fraud, and disputes that the Claimants have the burden of demonstrating WorldCom's knowledge – according to the Claimants once they have

established their *prima facie* case of control the burden shifts to WorldCom to show it lacked knowledge of the fraud.

No state court, including the California Supreme Court, has discussed control person liability under section 25504 at any length. Thus, this Court must attempt to determine how the Supreme Court of California would rule. *See Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 667 (D.R.I. 1998). Both parties have observed that two control person statutes of the federal securities laws, and the cases interpreting them, may provide guidance. Specifically, the Abbott Claimants contend that control person liability under section 25504 is modeled after Section 20(a) of the Exchange Act of 1934. Also, the Ninth Circuit has observed that California's "control person statute is substantially the same as" Section 15 of the Securities Act of 1933. *See Underhill v. Royal*, 769 F.2d 1426, 1433 (9th Cir. 1985), *rejected on other grounds, Reves v. Ernst & Young*, 494 U.S. 56, 64 (1990).

Both the Ninth Circuit and the Second Circuit, the Circuit in which the Court sits, have dealt with control person liability under the aforementioned statutes in multiple cases that do provide guidance, although there is very little consensus between the two circuits, or even within each circuit for that matter, on the precise standards. As stated by the Ninth Circuit in 1987, and seemingly as true today, "the concept of control, in the context of the securities law, is an elusive notion for which no clear-cut rule or standard can be devised." *Wool v. Tandem Computers*, 818 F.2d 1433, 1441-41 (9th Cir. 1987).[17]

---

[17] As indicated in *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1066 n.10 (9th Cir. 2000), *Wool v. Tandem Computers* was impliedly overruled in part on other grounds by *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990).

The Debtor argues that recent decisions by both the Second and Ninth Circuits

hold that control person liability under federal law requires a showing of actual control

*and* "culpable participation" in the alleged fraud.  Courts within the Ninth and Second

Circuits generally equate "culpable participation" with scienter.[18]  The Claimants argue

that the "culpable participation" requirement is no longer the law in the Ninth Circuit.

Both parties are correct to a degree.  Although federal courts in both the Ninth and

Second Circuits have stated that the "controlling person" analysis is generally the same

under Section 15 of 1933 Act and Section 20 of the Securities Exchange Act of 1934,[19]

distinctions exist in regard to "culpable participation."  For Section 20 claims in the Ninth

Circuit, culpable participation is clearly not required.  *See Howard v. Everex Systems,*

*Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *see also Paracor Finance, Inc. v. General*

*Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (for Section 20 claims, "the

plaintiff need not show the controlling person's scienter or that they 'culpably

participated' in the alleged wrongdoing").  For section 15 claims, however, some

California federal courts have held that culpable participation is required.  *See In re*

*Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1081 (N.D. Cal. 2003) ("The Section 15

defendant must have exerted actual control and have been a culpable participant in the

---

[18] *See Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996); *Mishkin v. Ageloff*, No. 97 Civ. 2690LAP, 1998 WL 651065, at *25 (S.D.N.Y. Sept. 23, 1998) (the culpable participation element of section 20(a) requires the pleading of  "particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud"); *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ.3111 RWS, 2005 WL 225288, at *11 n.4 (S.D.N.Y. Feb. 1, 2005) ("The culpable participation element is subject to the [Private Securities Litigation Reform Act's] heightened pleading requirements, and requires particularized allegations that defendants acted with scienter.").  *But see In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 395 (S.D.N.Y. 2003) ("[A]lthough the meaning of 'culpable participation' is unclear, there is strong reason to believe that it is not the same as scienter.").

[19] *See, e.g., In re Harmonic, Inc., Sec. Litig.*, No. C 00-287 PJH, 2006 WL 3591148, at *5 (N.D. Cal. Dec. 11, 2006) (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990)); *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391, 395 (S.D.N.Y. 2003) (stating "both provisions are generally interpreted the same way").

alleged Securities Act violations") (citing *Durham v. Kelly*, 810 F.2d 1500, 1503-04 (9th Cir. 1987)); *Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1134 (N.D. Cal. 2006) ("To state a claim for control person liability under § 15(a), a plaintiff must allege that the individual defendants had the power to control or influence the company, and that the individual defendants were culpable participants in the company's alleged illegal activity.") (citing *Durham*, 810 F.2d at 1503).

Conversely, in the Second Circuit, although a split exists, "culpable participation" is generally a requirement of Section 20 claims but not of Section 15 claims. *See In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 810(GEL), 2005 WL 1907005, at *11 (S.D.N.Y. Aug. 8, 2005) ("In order to state claims under Sections 20(a) and 15, it is noncontroversial that plaintiffs must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator. Section 20(a) contains the additional requirement that plaintiff allege culpable participation 'in some meaningful sense' by the controlling person in the fraud.") (internal citations omitted); *see also American High-Income Trust v. AlliedSignal*, 329 F. Supp. 2d 534, 549 n.10 (S.D.N.Y. 2004) ("Although some courts in this circuit have imposed a 'culpable participation' element, as in Section 20(a) claims, on Section 15 claims, this Court joins the 'apparent majority of judges in the Southern District that have determined that culpable participation is not an element of § 15.'") (internal citation omitted); *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391, 395 (S.D.N.Y. 2003) ("A split has emerged amongst the district courts in this circuit, however, as to whether Section 15 claims require that plaintiffs allege the additional element of 'culpable participation.'"). As summarized by one court

> The district courts in this circuit have analyzed sections 15 and 20(a)
> in three different ways:  (1) requiring two elements – an underlying
> violation by the controlled person and the presence of control – to
> establish a prima facie case; (2) requiring the addition of culpable
> conduct by the controlling person to establish a prima facie case; (3)
> requiring the first two elements to establish a prima facie case pursuant
> to section 15 and all three elements in order to establish a prima facie
> case pursuant to section 20(a).

*In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ 9475 SHS, 2002 WL 244597, at *5
(S.D.N.Y. Feb. 20, 2002).

The reasons why courts within the Second Circuit have required culpable

participation for Section 20 claims but not for Section 15 claims have been explained

thoroughly.  Because the underlying violation pursuant to section 15 is a violation of

Sections 11 and 12(a)(2) of the 1933 Act, which do not require scienter as a pleading

requirement,[20] district courts have held that only "two elements are required to establish a

*prima facie* case of control person liability pursuant to section 15:  (1) an underlying

primary violation of the securities laws by the controlled person; and (2) control over that

controlled person."  *In re Deutsche Telekom*, 2002 WL 244597, at *6.   For Section 20(a),

culpable participation must be pled to allege control person liability because of, in part,

the pleading requirements of the Private Securities Litigation Reform Act (the

"PSLRA").  *Id.*  "The PSLRA requires that when money damages are recoverable 'on

proof that the defendant acted with a particular state of mind, the complaint shall, with

respect to each act or omission alleged to violate this chapter, state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of

mind.'"  *Id.* (citing 15 U.S.C. § 78u-4(b)(2)).  Furthermore, courts have looked to a

discussion by the Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).

*See, e.g., In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 354 (S.D.N.Y. 2001).  In

---

[20]  *See, e.g., Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1134 (N.D. Cal. 2006).

41

*Hochfelder,* the Supreme Court held that scienter is a necessary pleading element of Section 10(b) actions. *Id.* The Court stated that "each of the provisions of the 1934 Act that expressly create civil liability, except those directed to specific classes of individuals . . . contains a state-of-mind condition requiring something more than negligence." *Hochfelder,* 425 U.S. at 210 n.28. The Supreme Court explicitly cited Section 20(a) as an example of these "state-of-mind" provisions. *Id.*

The preceding discussion shows that the Court does not have clear guidance on the standards for control person liability under section 25504. Even if there were clear guidance from either of the circuits under applicable federal law, it is not apparent that the California Supreme Court would adopt either a Section 15 or Section 20 approach, as section 25401 seems to encompass both Section 15 and Section 20 claims, because it applies to both misstatements in prospectuses and general securities fraud. Section 25401 states

> it is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

The Court does not believe that the California Supreme Court would require culpable participation for section 25501 because scienter is not required for the underlying violation of section 25401. Also, the PSLRA seemingly has no effect on the causes of action here that are based on California state statutes. Furthermore, the Second Circuit's "culpable participation" approach has been criticized by a lower court. In *In re Livent*, the court, while adhering to Second Circuit precedent, noted that requiring the plaintiff to plead culpability, while at the same time requiring the defendant to prove

good faith at trial, "engenders an awkward allocation of pleading and proof whereby both parties bear burdens on the same issue." *In re Livent*, 148 F. Supp. 2d at 354.

The Court believes that the Ninth Circuit's approach from *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000), and *Paracor Finance*, 96 F.3d at 1161, for Section 20 claims would be appropriate and one that the California Supreme Court would follow for section 25501. In *Howard*, the Ninth Circuit held that "[t]o prove control person liability, a plaintiff must prove (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator." *Howard*, 228 F.3d at 1065. Culpable participation is not required. After "the plaintiff establishes that a defendant is a controlling person, the defendant then bears the burden of proving he acted in good faith, good faith can be demonstrated if a defendant can show no scienter and an effective lack of participation." *In re Homestore Sec. Litig.*, 347 F. Supp. 2d 790 (C.D. Cal. 2004) (citing *Paracor Fin.*, 96 F.3d at 1161).

2. Allegations of Control

Only two facts are in dispute. The parties agree that the same individual, Lawrence Tucker, simultaneously served as a member on the board of directors for both WorldCom and WAXS. The second undisputed fact is that WorldCom owed a minority interest, approximately 12%, in WAXS. Either separately or taken together, they are insufficient to demonstrate control as a matter of law. That a person is an officer or director of a corporation does not create any presumption of control for purposes of establishing control person liability. *See Paracor Fin.*, 96 F.3d at 1163. Tucker, an employee of investment bank Brown Brothers Harriman, testified that he sat on WAXS's board because his bank was entitled to name a director via a fund they managed and not

at any request of WorldCom's.  (*See* Dep. of Lawrence C. Tucker dated May 23, 2006

("Tucker Dep.") at 10:14 – 11:7, Ex. 92 to Supp. Decl. of Adam Strochak dated July 19,

2007 ("Supp. Strochak Decl.").)  He further testified that he did not share information

between WorldCom and WAXS and did not involve himself in the operations of WAXS.

(*See* Tucker Dep. at 34:14 – 34:22.)  The Claimants vaguely state that Tucker's dual

directorship "provided an additional conduit of information" between WAXS and

WorldCom, (Reply Memo., 10.), although they do not allege that Tucker actually shared

any specific information.  As for the minority stock ownership, it is well settled such an

ownership interest does not establish control.  *See In re Flag Telecom Holdings, Ltd. Sec.

Litig.*, 308 F. Supp. 2d 249, 274 (S.D.N.Y. 2004); *In re Alstom SA*, 406 F. Supp. 2d 433,

489 (S.D.N.Y. 2005) (stating that "[m]inority stock ownership is not enough to establish

control person liability, since minority stock ownership does not give the owner the

power to direct the primary violator.").

The Debtor disputes the Claimants' other key allegations of control.  The

allegations along with the Debtor's opposition materials are outlined below.

    a. *Allegations that WorldCom Controlled WAXS's Day-to-Day
      Operations*

The Debtor disputes the Claimants' allegations that WorldCom routinely

exercised control over WAXS and that WAXS did WorldCom's bidding.  Phillips

testified that WorldCom did not participate in the preparation of WAXS's external

financial reports, SEC filings, and similar documents; participate in preparation of

WAXS's internal financial projections; influence WAXS's operational decisions;

participate in development of WAXS's strategic business plan; direct or influence

operational decisions that World Access made regarding its business; direct personnel

decisions at WAXS, aside from Phillips' service; influence or control WAXS's sales
efforts. (*See* Dep. of John D. Phillips dated August 17, 2006 ("Phillips 8/2006 Dep.") at
117:2 –119.3, Ex.88 to Supp. Strochak Decl.); *see also* Dep. of Walter J. Burmeister
dated September 29, 2004 ("Burmeister Dep.") at 308:11 – 309:2, Ex. 78 to Supp.
Strochak Decl.) (WAXS's president testified that Phillips and WAXS did not take
direction from WorldCom).

       b. *Allegations that WorldCom Set Up WAXS to Acquire Companies*

The Claimants allege "WorldCom set up WAXS to acquire [WorldCom's] target
companies." (Claimants' Memo. in Support of First Cause of Action, at 27.) In support,
the Claimants cite a declaration by Henry Luken from the California state case of *Abbott
v. Phillips*.[21] (Decl. of Henry Luken, Ex. 39 to Declaration of Hulett ("Hulett Decl.")
dated June 22, 2007.) Luken declared that at an April 1999 meeting with Phillips,
Abbott, and himself that Phillips stated that WorldCom had grown to the point where its
acquisitions faced "intense regulatory scrutiny" so its strategy was for WAXS to buy
smaller telecommunications companies, then WorldCom would buy WAXS. (*Id.*; *see
also* Decl. of Victor Goetz, Ex. 40 to Hulett Decl. (Goetz, a former officer of WAXS and
Cherry Communications, declared in the same California action that Phillips said that
having WAXS acquire smaller companies than being acquired by WorldCom was part of
WorldCom's "roll up" strategy).)

In opposition, the Debtor sets forth testimony from witnesses who deny that
WorldCom had a strategy or plan to use WAXS as a vehicle to acquire smaller
telecommunications companies, before acquiring WAXS itself. Phillips, recalling
numerous transactions by WAXS, testified that none were done at WorldCom's request.

---

[21] *See supra* note 1.

(*See* Phillips Dep. at 110:12-112:7.)  In addition, the Debtor offered testimony from

executives of WAXS and WorldCom who denied that WorldCom had a strategy to use

WAXS as a vehicle for transactions.  (*See* Dep. of Scott Sullivan dated Nov. 3, 2005

("Sullivan Dep.") at 77:16 – 77:19, Ex. 91 to Supp. Strochak Decl.; Burmeister Dep. at

308:16 – 308:19.)

### 3. *Allegations Regarding an Auditor's Opinion that WorldCom Controlled WAXS*

The Claimants initially alleged that WAXS's independent auditors stated that

WorldCom had "effective control" of WAXS.  (*See* Claimants' Memo. in Support of

First Cause of Action, 27.)   The Debtor challenges the admissibility of the email, and

points out that the quote comes from an email from an auditor at Arthur Anderson, who

was WorldCom's auditor.  The email states, in a discussion of WAXS's stock value, "We

concluded with [WorldCom] that WorldCom's ability to route significant traffic over to

Resurgens [renamed Cherry Communications] effectively allowed the Company the

ability to control the value of Resurgens."  (*See* email from Kenneth J. Avery dated Jan.

20, 1999, Ex. 27 to Hulett Decl.)  The Court notes that an "ability to control" is different

than the exercise of control.  Furthermore, in his deposition, the auditor who wrote that

email testified that it was not his analysis that "as of January 20, 1999, WorldCom had

control over [WAXS] under relevant accounting standards."  (*See* Dep. of Kenneth J.

Avery dated July 25, 2005 at 71:4 – 71:9, Ex. 77 to Supp. Strochak Decl.)

### 4. *The Relationship Between Phillips and WorldCom Executives*

The Claimants allege that Phillips personal relationship with Ebbers, Sullivan, and

WorldCom is evidence of WorldCom's control over WAXS.  The Claimants assert that

WorldCom "arranged for the appointment of Jack Phillips to run WAXS."  (*See*

Claimants' Memo. in Support of First Cause of Action, 27.).  The Debtor argues that this

shows that WorldCom and other creditors wanted an experienced telecommunications

executive to help turn around Cherry Communications, WAXS's predecessor.  (*See* Opp.

Memo., 5.)

> 5.  *Allegations that WorldCom Controlled WAXS through the "Sham" CSA*

The Claimants allege that WAXS's willingness to enter into the allegedly "sham"

CSA, which purportedly did not obligate WorldCom to make payments, is evidence of

WorldCom's control over WAXS.  The point is disputed by WorldCom and even the

Claimants implicitly acknowledge that the parties actually performed within the letter of

CSA during some months.  (*See* Claimants' Memo. in Support of First Cause of Action,

17-19) ("WorldCom was not required to send any additional money to WAXS in either

April or May 1999 since actual traffic exceeded $25 million in each of those months.")[22]

Further, multiple executives for WAXS and WorldCom testified that the agreement was

performed in good faith.  (*See* Dep. of Victor E. Goetz dated April 27, 2006 at 211:16 –

212:1, Ex. 82 to Supp. Strochak Decl.; Phillips Dep. at 108:5-108:9; Sullivan Dep. at

75:3-76:4; Burmeister Dep. at 65:10 – 66:10.)

C.  <u>Summary Judgment as to Control Person Liability is Denied</u>

The Court finds that the evidence does not, for summary judgment purposes,

establish the Debtor's liability as a control person under section 25505.  The issue of

control is a complex factual question that necessitates a close examination of the parties'

relationship.  *See, e.g., In re Diasonics Sec. Litig.*, 599 F. Supp. 447, 459-60 (N.D. Cal.

1984).  "Whether [the defendant] is a controlling person is an intensely factual question,

---

[22] Although WorldCom cites to the Expert Report of Lisa Snow (Ex. 114 to Supp. Strochak Decl.), that report is inadmissible hearsay.

involving scrutiny of the defendant's participation in the day-to-day affairs of the

corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49

F.3d 1363, 1382 (9th Cir. 1994) (internal quotation marks and citations omitted).  For

many of the allegations, the facts are disputed conflicting inferences can be drawn from

the information presented.  For example, although the CSA may not have obligated

WorldCom to make a minimum monthly payment to WAXS, it cannot be inferred at the

summary judgment stage that the CSA shows WorldCom's control over WAXS.  An

equally reasonable inference, suggested in fact by the Claimants, is that the wording of

the CSA's "obligated" language allowed the WAXS–Cherry Communications merger to

gain approval from Cherry Communications' creditors and the bankruptcy court and had

little to do WorldCom's "control" of WAXS for its own purposes. Also, although much

of the Claimants' case appears solid, one of the key allegations of control seems

particularly uninspiring to the Court.  The Claimants make much ado about the long-

standing "relationship" between Phillips and Ebbers but the allegations lack specific

details of control by WorldCom over WAXS via this relationship.  As stated in *In re

Homestore*, pre-existing personal or professional relationships are not as relevant to the

control person inquiry as the examination of the involvement of WorldCom or Ebbers in

the day-to-day affairs of WAXS.  *See In re Homestore*, 347 F. Supp. 2d at 810.

        In sum, taken as a whole, the Claimants have not established as a matter of law

that the "defendant exercised actual power or control over the primary violator."

*Howard*, 228 F.3d at 1065.  Furthermore, given the unsettled standard for liability under

section 25504, the Debtor should have the opportunity to develop its good faith defense

should the Claimants first establish that the Debtor is a control person under section

25504.

F. **ADVERSE INFERENCE**

The Claimants seek an adverse inference against WorldCom because several of its

former employees invoked their Fifth Amendment right against self-incrimination and

refused to testify or answer questions at their depositions.  The Claimants argue that

WorldCom's principals repeatedly invoked their Fifth Amendment rights in depositions

"on virtually every relevant question" and that Ebbers, David Myers, and Sullivan "did

not answer questions relevant to the allegation of WorldCom's liability to the Claimants."

(Claimants' Memo. in Support of First Cause of Action, 28.)  As examples, the Claimants

state that the witnesses invoked the Fifth Amendment in response to questions regarding

Ebber's knowledge of and relationship with Phillips, the relationship between WorldCom

and WAXS (the Claimants cite only a deposition of Myers for a refusal to answer), the

CSA, true-up payments, and WorldCom's SEC filings.

The Debtor claims the imposition of an adverse inference would be draconian.

The Debtor states that it did not provide counsel for either Ebbers or Myers, and the two

testified years after they left WorldCom's employment, and before they each were to be

sentenced or report to prison.  The Debtor also takes issue with the Claimants'

description of the circumstances under which the deponents claimed the Fifth

Amendment.  For example, the Debtor argues that Sullivan provided extensive deposition

testimony and only invoked the Fifth Amendment rights when he was asked about

circumstances relating to his role in WorldCom's accounting manipulations – "matters

having nothing to do with the Abbott Claims."  (Debtor's Memorandum of Law in

Opposition to Abbott Claimants' Motion for Summary Judgment on the First Cause of

Action for State Securities Law Violations, 37.)  The Debtor also disputes whether

Sullivan refused to answer any question on the CSA, claiming gamesmanship on the

Claimants' part.  The Debtor accuses the Claimants of asking Sullivan an irrelevant

question of how WorldCom accounted for line costs under carrier services agreements

with the expectation he would plead the Fifth Amendment.

The Debtor further argues that the invocation of Fifth Amendment standing alone

cannot support an adverse inference.  The Debtor claims that the Claimants arguments are

especially weak because "they do not identify a single fact which they seek the Court to

infer; they just want the Court to rule on liability in their favor."  (*Id.*, 38.)

The Second Circuit has held that a non-party witness's invocation of his right not

to testify can be admissible as an adverse inference of liability.  *Brink's v. City of New

York*, 717 F.2d 700, 710 (2d Cir. 1983).  That the witness is a former, and not current,

employee of the related party does not bar finding an adverse inference.  *See id.*  The

Court, if the evidence is admissible, must determine if the evidence has probative value.

*See id.; see also In re WorldCom Sec. Litig.*, No. 02 CIV 3288 DLC, 2005 WL375315, at

*5 (S.D.N.Y. Feb. 17, 2005) ("Even if the evidence is generally admissible, the court

must still determine whether it should be admitted under the standards described in

Federal Rule of Evidence 403.").[23]

There are no bright line rules governing the drawing of an adverse inference from

a non-party's invocation of the privilege against self-incrimination.  *See LiButti v. United*

---

[23]  Fed. R. Evid. 403 states
     Although relevant, evidence may be excluded if its probative value is substantially outweighed by
     the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations
     of undue delay, waste of time, or needless presentation of cumulative evidence.

*States*, 107 F.3d 110, 122 (2d Cir. 1997).  The Second Circuit has held that the

admissibility and "concomitant drawing of adverse inferences appropriately center on the

circumstances of the case."  *Id.*  "[T]he circumstances of a given case, rather than the

status of a particular non-party witness, is the admissibility determinant."  *Id.* at 121.  The

Second Circuit suggested a non-exhaustive list of factors to guide a court in making that

determination.  *Id.*  Those factors include "(1) the nature of the relationship between the

party and the non-party; (2) the degree to which the party controls the non-party; (3) the

compatibility of interests of the party and non-party in the outcome of the litigation; and

(4) the role of the non-party witness in the litigation."  *Banks v. Yokemick*, 144 F. Supp.

2d 272, 289 (S.D.N.Y. 2001) (citing *LiButti*, 107 F.3d at 123-24).

The first factor has been called the most significant, and it should be examined

from the perspective of a non-party witness's loyalty to the Debtor.  *In re Handy &*

*Harman Refining Group*, 206 B.R. 32, 35 (Bankr. D. Conn. 2001).  The guiding principle

"is whether the adverse inference is trustworthy under all of the circumstances and will

advance the search for truth."  *Id.* (citing *LiButti*, 107 F.3d at 124).  In that search for

truth, courts have found that broad-based questioning and "sweeping invocation of Fifth

Amendment rights" do not provide guidance as to the potential relevancy of the

testimony.  *See Wechsler v. Hunt Health Sys., Ltd.*, No. 94 Civ. 8294(PKL), 2003 WL

21998980, at *3 (S.D.N.Y. Aug. 22, 2003) (finding that decision of whether negative

inference could be drawn against corporation could not be made until trial).  Courts have

discretion not to admit evidence of the invocation because of the potential for "lawyer

abuse" – where an examining attorney, once determining that the privilege will be

invoked, poses damaging questions, safe from contradiction by the witness.  *See In re*

*WorldCom Sec. Litig.*, 2005 WL375315 at *5) (citing *Brink's*, 717 F.2d at 716 (Winter, J. dissenting)).

After considering the *LiButti* elements, the Court will not draw any adverse inference at the current stage of the litigation.  First, it must be remembered that at summary judgment, the Court is required to draw all reasonable inferences in favor of the non-moving party, despite potential for the ultimate trier of fact to draw an adverse inference from the assertion of Fifth Amendment privileges.  *See Stichting Ter Behartiging v. Philippe S.E. Schreiber et al.*, 407 F.3d 34, 55 (2d Cir. 2005).  Further, the Claimants have not sufficiently demonstrated the compatibility of WorldCom's interests to the interests of Ebbers, Sullivan, and Myers at the time of their invocation of the Fifth Amendment.  Before ruling that a negative inference is warranted, courts have determined there must be sufficient information regarding the "compatibility of the parties' interests" and the degree of control the party retained over the Fifth Amendment-invoking non-party.  *See Wechsler*, 2003 WL 21998980 at *3.  Without further evidence of the ties among the non-parties, it can just as easily be inferred that the witnesses' refusal to answer questions was consistent with their desire to protect only their own interests, without regard to WorldCom's.  *See, e.g., Banks v. Yokemick*, 144 F. Supp. 2d 272, 290 (S.D.N.Y. 2001).

Even had they sufficiently demonstrated compatibility and the degree of control, the Claimants' arguments suffer from a lack of demonstration regarding the relevance of the requested inference.  The Court, having determined that a material misstatement by WAXS has occurred for purposes of section 25401, is inquiring into whether WorldCom is a control person of WAXS under California law.  The Claimants' pleadings

52

inadequately detail how the Fifth Amendment invocations of Ebbers, Sullivan, and Myers pertain to control person liability. *See Wechsler*, 2003 WL 21998980 at *3 (the movant must detail the "substance and application of the requested inference"). Myers, a former senior vice president of WorldCom, indicated that on advice of counsel he intended to plead the Fifth Amendment with respect to all relations that he had while at WorldCom. (See Dep. of David Myers dated October 5, 2005 at 7:18 – 7:23.) The closest may be Sullivan. He, however, refused to answer any accounting questions, including ones that related to the CSA, so it cannot easily be inferred that WorldCom controlled WAXS through the accounting treatment of the CSA.

For the reasons stated above, the Court refuses at present to draw any adverse inference against the Debtor.

## IV.  CONCLUSION

The Court grants in part and denies in part the Claimants' motion for summary judgment on the first cause of action, finding that WAXS made a material misstatement under section 25401 as a matter of law but denying that the Claimants have established control person liability as a matter of law as to WorldCom. The Court denies WorldCom's motion for summary judgment as to knowledge. The Court grants WorldCom's motion as to the date of sale of the merger. The Claimants' request for the drawing of an adverse inference is denied.

The Debtor should submit an order consistent with this opinion.


Dated: New York, New York
       October 15, 2007


                              **s/Arthur J. Gonzalez**
                              UNITED STATES BANKRUPTCY JUDGE