**UNITED STATES BANKRUPTCY COURT**　　　　For Publication
**SOUTHERN DISTRICT OF NEW YORK**
_____
　　　　　　　　　　　　　　　　　　　:
In re　　　　　　　　　　　　　　　:　　Chapter 11
　　　　　　　　　　　　　　　　　　　:
WORLDCOM, INC., *et al.*,　　　　　　:　　Case No. 02-13533 (AJG)
　　　　　　　　　　　　　　　　　　　:
　　　　　　　Reorganized Debtors.　　:　　(Confirmed)
_____:


**OPINION REGARDING CLAIM NUMBER 3059**
**INCLUDING WALDINGER CORP.'S MOTION FOR RECONSIDERATION**

**APPEARANCES**

STINSON MORRISON HECKER LLP
Special Counsel to the Reorganized Debtors
1201 Walnut Street
Kansas City, MO 64106

　　　Mark. S. Carder, Esq.
　　　Mark A. Shaiken, Esq.
　　　　　Of Counsel

LIEBEN, WHITTED, HOUGHTON, SLOWIACZEK & CAVANAGH, PC, LLO
Attorneys for the Waldinger Corporation
100 Scoular Building
2027 Dodge Street
Omaha, NE  68102

　　　James B. Cavanagh, Esq.
　　　　　Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

# I.  INTRODUCTION

　　Waldinger Corporation ("Waldinger") asserts a secured claim against WorldCom,

Inc. (the "Debtors" or "WorldCom") for $371,362 plus interest and attorneys' fees,

secured by a construction lien under Nebraska law.  The Debtors dispute that the claim is secured and additionally dispute the basis of the claim.

After considering multiple hearings and pleadings, the Court issued an opinion on February 23, 2007 (the "February Opinion") granting the Debtors' motion for partial summary judgment to classify Waldinger's claim as unsecured because of the finding that the Lien lapsed as matter of law on May 20, 2004.  Waldinger requests the Court to reconsider that partial summary judgment and to allow its claim as secured.

Waldinger asserts it is further entitled to the Nebraska statutory interest rate for a mechanic's lien of 12% per annum pursuant to Nebraska statutes §§ 45-103.02(2) and 45-104, and the recovery of all fees and expenses, including attorney's fees (collectively, "Attorney's Fees") pursuant to section 506 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors argue that Waldinger is not entitled to interest or Attorney's Fees for various reasons.

The Court held a trial on this matter on December 13, 2007.  For the reasons that follow, the Court has reconsidered its earlier judgment in the February Opinion that Waldinger's lien lapsed as matter of law but concludes that Waldinger is not entitled to a secured claim for other reasons.  The Court finds that Waldinger is entitled to recovery under *quantum meruit*, but the Court must hold a further hearing to determine the reasonable value of the services Waldinger provided to the Debtors.

## II.  JURISDICTION

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334 and 157(b) of title 28 of the United States Code, the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the

Southern District of New York (Ward, Acting C.J.), and paragraph 32 of the Court's

Order Confirming Debtors' Modified Second Amended Joint Plan of Reorganization

under chapter 11 of title 11 of the United States Code.  This matter is a core proceeding

pursuant to section 157(b)(2)(B) of title 28 of the United States Code.  Venue is proper

before the Court pursuant to sections 1408 and 1409 of title 28 of the United States Code.

## III.  BACKGROUND

A. *Factual and Procedural Background*[1]

Waldinger is engaged in the construction business in Omaha, Nebraska and the

surrounding region.  WorldCom owns a building in Omaha named the Mid-Continent

Data Center at 7400 World Communications Drive, Omaha, Nebraska (the "Data

Center").  Sometime in 2000, WorldCom executives informed the Data Center's building

manager, Raymond Brock ("Brock"), that they wanted to have additional air handling

units installed to meet their forecasted additional need.  (Trial Ex. 37, Brock Depo. 21:11-

21:20.)  Air handing units are large machines essential to cool and ventilate the rooms in

which multiple computer systems and data storage hardware are located.  Brock stated

that a colleague at WorldCom told him that Waldinger had done "some" to "all" of the

mechanical work at the Data Center and thus should be contacted to install the air

handing units.  (*Id.* at 21:21-22:22.)   Brock testified that he subsequently had contact

with Michael Smearman ("Smearman"), a manager for Waldinger, regarding the Debtors'

need for additional air handling units.  (*Id.* at 23:3-23:6.)  In mid to late-2000, WorldCom

requested a proposal and quote from Waldinger regarding air handling units for the Data

Center.  On September 15, 2000, Waldinger submitted a proposal to the Data Center

(Trial Ex. 1.)  The proposal provided a quote of $1,098,000 in labor and materials for the

---

[1]  Unless noted otherwise, the facts in Section III are undisputed.

purchase *and* installation of three new air handling units numbers 6, 7, and 43 (the

"AHU's"), at the Data Center, and contained proposed work for existing air handling unit

number 5.  The proposal by Waldinger included $576,332 for the cost of the three

AHU's.  (Trial Ex. 4.)  On November 14, 2000, WorldCom Purchasing, LLC issued a

written purchase order to Waldinger for the purchase of the three AHU's referenced in

the proposal at the price of $576,000.  (Trial Ex. 2.)   Installation was not referenced in

that purchase order.

Waldinger's employees were at the Data Center performing work on other air

handing units, numbers 5 and 24, in the fall and winter of 2000.  The Data Center is a

secure facility and Waldinger's employees needed authorization to access the facility.

Waldinger testified that from March through July 2001, Waldinger's employees

performed work to prepare the Data Center for the delivery and installation of the

AHU's, for example, building raised concrete "housekeeping pads" where the AHU's

were to be placed, and installing ductwork, piping, and sheet metal.  WorldCom's

building manager at the Data Center, Brock, stated in a deposition that there was some

"prep work" that needed to be done for the three AHU's to be put in place, including

putting up some ductwork and installing the housekeeping pads.  (Trial Ex 37, 47:19-

47:48.)  A Waldinger job foreman, George Russell ("Russell"), testified that he observed

Waldinger employees working to prepare the sheet metal ducts at the Data Center prior to

the installation and delivery of the three AHU's.  (Russell Depo., Trial Ex. 34, 43:8-44:7,

49:6-49:11).  Brock affirmed that Waldinger moved lights to make ductwork fit.  (Trial

Ex. 37, 52:21-52:23.)  Brock acknowledges that Waldinger did some sheet metal work,

but disputes whether they were directed to do so.  (Trial Ex. 37, 49:9-4918.)  Brock stated

that he did not tell any employee of Waldinger that they were authorized to install the AHU's.  (Trial Ex. 37, 49:9-49:18; 64:5-64:9.)

Russell testified that Brock authorized work on another air handling unit, number 5  (Trial Ex. 34, 8:14-8:23, 10:12-10:20.)  Brock admits that he instructed Russell or Smearman to get the work done on number five, as instructed by the Debtors' governance people.  (Trial Ex. 37, 47:19-48:4.)

The three AHU's were delivered to the Data Center in July 2001.  Waldinger contends that it rented a crane and forklifts to offload and move the AHU's to the concrete pads and that its employees performed that work.  At trial, Waldinger showed that it paid a sub-contractor in full for cost of the AHU's.  (Trial Ex. 21.)  Some time after the AHU's were in place on the concrete pads, Brock instructed Waldinger to stop all further work.   Brock testified that it was after the AHU's had been delivered and placed on the concrete pads, that a more senior WorldCom employee, Arnold Espinosa ("Espinosa"), [2] told him to instruct Waldinger to stop work.  (Trial Ex. 37, 58:2-58:10.)  Brock testified that Espinosa told him that Waldinger only had purchase orders to purchase the AHU's, and not to install them.  (Trial Ex. 37, 58:6-58:11).  The date of the instructions to Waldinger has not been precisely pinned down.  John Wilhelmi ("Wilhelmi"), Waldinger's Division President, testified that Smearman told him to stop work in July 2001 via WorldCom's instruction.  (Trial Tr. 78:11-78:20.)  At his deposition, Wilhelmi stated that Waldinger was told to stop work in approximately September 2001.  (Trial Ex. 36, Wilhelmi Dep., 65:9-65:11.)

---

[2] Brock's testimony leads to the conclusion that Espinosa is one of the Debtors' "Governance People" located in Colorado.  Explaining the role of the Debtors' governance people in Colorado, Brock testified that they monitored the cooling and power usage of the Data Center, through monthly reports they received, and also took on a planning role for the Data Center.  (Trial Ex. 37, 27:1-27:9.)

Waldinger submitted three Applications for Payment to WorldCom, addressed to the "Mid Continent Data Center, 7400 World Communications Drive, Omaha, NE 68122" to the attention of Ray Brock.  Application No. 1 was issued on June 5, 2001, requesting payment in the total amount of $483,500, and included a line item for the $223,053 related to the purchase of the three AHU's.  (Trial Ex. 7.)  WorldCom paid application No. 1 in full on or about July 27, 2001.  (Trial Ex. 8.)  Waldinger issued Application No. 2 on July 6, 2001, requesting payment in the amount of $51,879.  The majority of that application, $31,693, was requested for sheet metal work, and $12,450 was requested for concrete work.  (Trial Ex. 9.)  WorldCom paid the full amount of $51,879 on or about October 30, 2001.  Waldinger issued Application No. 3 on August 2, 2001, requesting payment in the total amount of $411,983.  That application included a line item for $353,279 related to the purchase of the three AHU's.  The balance of Application No. 3 related to other work and materials Waldinger claims to have performed at the Data Center.  WorldCom paid only $40,621 of the balance due Application No. 3 on October 15, 2001.   Thus, the total paid by WorldCom equaled $576,000 – a sum that matches the November 14, 2000 purchase order issued by WorldCom to Waldinger for the purchase of the three AHU's.

Thereafter, Waldinger requested payment from WorldCom, which it did not receive.  Paul Morrison, a controller for Waldinger in late 2001 to early 2002, testified that he spoke to Espinosa on September 24, 2001, about getting paid for the installation, Morrison does not recall whether he came to a resolution with Espinosa and stated that Espinosa neither confirmed nor denied that WorldCom owed Waldinger money.  (Trial Ex. 35, 24:8-24-13.)  On October 25, 2001, Morrison and Smearman held a conference

call with three managers from WorldCom to ask about payment. No resolution occurred. (Trial Ex. 16, October 25, 2001 e-mail from Morrison to Wilhelmi.)

Waldinger filed a lien (the "Lien") on the Omaha property with the Register of Deeds in Nebraska on or about October 29, 2001 pursuant to the Nebraska Construction Lien Act, Neb. Rev. Stat § 52-125, *et seq*. The Lien was in the amount of $463,862 for the cost of the installation, which included $371,362 for the Construction Services already performed. On or about January 29, 2002, Waldinger filed a petition against WorldCom in a Nebraska state court, alleging claims of breach of contract and *quantum meruit*. After WorldCom successfully moved that action to federal court, Waldinger withdrew that action and the parties reached a settlement agreement (the "Settlement Agreement"). The Settlement Agreement was executed between Waldinger and WorldCom Purchasing, LLC between June 26, 2002 and July 1, 2002. Along with the Settlement Agreement, Waldinger and WorldCom Purchasing, LLC also executed an Installation Services Agreement, attached to the Settlement Agreement as Exhibit A. Although relevant portions of the Settlement Agreement are discussed more fully below, some provisions will be noted here. In the Settlement Agreement, WorldCom Purchasing agreed to issue a purchase order to Waldinger to authorize the installation of the AHU's, and to pay Waldinger a total of $499,718 for the completion of installation of the AHU's. The Settlement Agreement referred to the payment, in two installations, as the "Settlement Funds."

Approximately three weeks after the Settlement Agreement was reached, the Debtors filed for bankruptcy protection. On July 21, 2002, and thereafter on November 9, 2004, the Debtors filed petitions under chapter 11 of the Bankruptcy Code.

Waldinger filed proof of claim 3059 (the "Claim") as a secured creditor in the amount of $371,362 "plus additional charges per attached" on or about December 3, 2002. The Claim listed MCI WorldCom Network Services, Inc. as Debtor. Attached to the Claim were copies of the Lien and the Settlement Agreement.

On May 17, 2003, MCI sent a letter to Waldinger formally terminating the Installation Services Agreement. (Trial Ex. 30.)

On October 31, 2003, the Court confirmed the Debtors' Plan of Reorganization (the "Plan"). The Plan became effective on April 20, 2004 (the "Effective Date"). May 20, 2004 was thirty days after the Effective Date. The Plan, in Article 7.01, entitled the Debtors to object to claims until 180 days after the Effective Date. On October 15, 2004, the Debtors timely filed an objection to the Claim as part of its Seventy-Second Omnibus Objection (the "Objection"), seeking to expunge and disallow the Claim, asserting that the Claim is disputed and unsecured. On November 16, 2004, Waldinger filed its response to the Debtors' Seventy-Second Omnibus Objection to Proofs of Claim. In that objection, Waldinger did not complain that it was not paid for the work it had done to finish air handling unit number five. Instead, Waldinger's grievance for lack of payment concerned just the three AHU's. (Response of the Waldinger Corporation to the Debtors' Seventy-Second Omnibus Objection to Proofs of Claim, ¶3.)

The Debtors subsequently filed for partial summary judgment in July 2005. Waldinger filed an opposition to that motion and a cross-motion for partial summary judgment. The Court held a hearing on January 31, 2006. After that hearing, the Debtors and Waldinger submitted supplemental memoranda of law addressing certain issues that were raised at the hearing. The Court then directed the Debtors and Waldinger to more

fully address certain issues which were implicated by Waldinger's and the Debtors'

arguments (the "Second Supplemental Briefing").  In response, the Debtors and

Waldinger submitted briefs primarily focusing on whether sections 362(b)(3) and

546(b)(2) or section 108(c) of the Bankruptcy Code were applicable to the Claim

throughout the duration of the automatic stay of section 362.

As of December 2007, Brock stated that air handling unit number 5 was never

completed to operational status and that various construction firms, including Waldinger,

were in the process of completing work on the three AHU's to get them into service.

(Trial Ex. 37, 41:9-42:9.)

B. *The February 23, 2007 Opinion*

After considering multiple hearings and pleadings, the Court issued the February

Opinion.  The February Opinion made several findings.  Among them, that (i) section

108 delayed the need for Waldinger to take action to foreclose on the Lien until May 20,

2004, thirty days after expiration of the section 362 automatic stay, (ii) on May 20, 2004,

the Lien lapsed and the Omaha property no longer secured the Claim, and (iii) the Claim

is unsecured because the Lien lapsed as matter of law on May 20, 2004.

The Court also considered the effect of the Plan's injunction, Article 10.04, in

describing a course of action Waldinger could have taken –

> On the Effective Date, the automatic stay of section 362 was lifted and, as such, section 108(c) tolled the need to commence a Foreclosure Action for 30 days after the Effective Date.  Waldinger was required to institute the Foreclosure Action within 30 days.  However, Waldinger was restricted by the Plan's injunction from commencing the Foreclosure Action.  Waldinger was required to seek the Court's permission to institute the Foreclosure Action or for the Court to provide other relief.  However, Waldinger failed to request any relief.

February Opinion, 21.

9

Waldinger moved the Court to reconsider, alter, and amend the February

Opinion, and the order signed on May 10, 2007 granting the motion of the Debtors

for partial summary judgment to reclassify proof of claim number 3059 of Waldinger

(the "Motion to Reconsider").

In the Motion to Reconsider, Waldinger argued that the February Opinion

includes an implied assumption that the Lien was in place on May 20, 2004, such that

Waldinger could have requested the Court to either lift the automatic stay or grant

Waldinger relief from the Plan's injunction to allow it to pursue action to foreclose on the

Lien.  However, Waldinger pointed out that the Lien, as well as all other liens, lapsed on

the Effective Date according to express provisions in the Plan and the Debtors'

Disclosure Statement.  Waldinger, in effect, argued that the proposed course of action the

Court described above would be an impossibility due to the Lien's termination under the

Plan on the Effective Date.  Waldinger further argued that it was an error for the Court to

determine the secured status of the Claim at a date past the Effective Date.

In its Motion to Reconsider, Waldinger requested that the hearing of the motion

be deferred and considered at the trial as to validity and amount of the Claim.

C.  *The Parties' Main Contentions at Trial*

The thrust of Waldinger's argument is that the Court's prior finding in the

February Opinion is wrong.  Waldinger then seeks to establish that prior to the

extinguishments of liens under the Plan, it held a valid lien.  Waldinger contends that the

Claim is secured as an involuntary statutory mechanics' lien claim pursuant to the

Nebraska Construction Lien Act ("the Lien Act"), Neb. Rev. Stat. §§ 59-126, *et seq*.  The

Lien Act requires the existences of a "real estate improvement contract" to qualify for a

construction lien.  The parties agree that a written contract was not made but dispute

whether the parties entered into an oral contract.

The Debtors argue that the Claim is unsecured because there was no contract for

the installation of the AHU's.  They further contend that Waldinger is not entitled to

allowance of the unsecured claim in the amount unilaterally billed but, rather, the Claim

should be allowed if at all in *quantum meruit* in the amount of the reasonable value

conferred by the installation.  The Debtors, citing Federal Rule of Evidence 702, argue

that expert testimony is required to prove the reasonable value of the installation and

point out that Waldinger proffered no expert testimony.  Thus, the Debtors state that

although *quantum meruit* recovery is hypothetically possible if established, it should not

be allowed on evidentiary grounds.

The Debtors argue that under Nebraska law pre-judgment interest is not

recoverable and that attorney's fees are not recoverable under 11 U.S.C. § 506(b),

because the Claim is not fully secured.  The Debtors argue that even the Claim were

secured, interest and fees are not recoverable because section 506(b) requires that the

provision for attorney's fees has to be provided for "under the agreement under which the

claim arose."  The Debtors argue that no agreement provided for such fees.

D. *The Motion to Modify the Pre-Trial Order*

The Debtors, after agreeing to a Joint Pre-Trial Order that contained a list of

undisputed facts, filed a motion on December 11, 2007 to modify that pre-trial order (the

"Motion to Modify the Pre-Trial Order").  The Debtors contend that one of the facts

agreed to as undisputed in the pre-trial order was erroneously included.  Part of item N

under Undisputed Facts stated that "[a]ny construction lien held by Waldinger was not

released prior to the filing of the bankruptcy." In the Motion to Modify the Pre-Trial

Order, the Debtors contend that statement is erroneous because the Settlement Agreement

released the Debtor from any lien or claim relating to the dispute over the installation of

the AHU's. The Debtors point to Paragraph 3.1 of the Settlement Agreement which

states in part

> Waldinger and its related persons . . . hereby release and forever discharge
> WorldCom and all other related persons, affiliates . . . , from and against
> all actions, causes of action, claims, suits, debts, liens, . . . that they now
> have or may have had, or hereafter claim to have . . . arising out of or
> relating to this Dispute.

The Debtors contend that the Settlement Agreement indicates that Waldinger

released the Debtors, including their affiliates, from liability for the claim and any lien

prior to the Debtors' bankruptcy filing. Likely because of the late nature of the Motion

to Modify the Pre-Trial Order, filed just two days before trial, Waldinger did not file a

written response or respond in depth at trial.[3] The Debtors' development of their

arguments was also lagging. The Debtors stated at trial that the Settlement Agreement

represented something akin to a novation, as found in the Court's decision in *Beepwear*

*Paging Products, LLC v. SkyTel Corp. (In re WorldCom, Inc.)*, No. 02-13533, 2006 WL

2400326 (Bankr. S.D.N.Y. May 30, 2006), *aff'd*, No. 06 Civ. 5245(KMW), 2007 WL

2049723 (S.D.N.Y. July 13, 2007) (finding that novation occurred, extinguishing

liability for original agreement).

Section 1.9 of the Settlement Agreement states that "[p]ayment of the Settlement

Funds by WorldCom shall finally settle and resolve all claims asserted or which could

---

[3]  At trial, Waldinger raised an allegation that the Debtors procured the Settlement Agreement through
fraud, knowing that they would soon file for bankruptcy protection, and that the Court should thereby find
that Waldinger was not bound the agreement. The Court disregards that entirely conclusory allegation of
fraud.

have been asserted against WorldCom, or any of its parents, subsidiaries, affiliates or
predecessors, arising out of, or in any relating to, the Dispute, the State Court Action or
the Federal Court Action.  Fulfillment of the obligations under this Agreement and the
Contract shall finally settle and resolve all claims asserted or which could have been
asserted against Waldinger, or any of its subsidiaries, affiliates or predecessors . . . .”

Section 5.2 states that the “Agreement is binding on the Parties, their heirs,
predecessors, successors, parents, subsidiaries, affiliates . . . .”

## IV.  <u>DISCUSSION</u>

*A.  Allowance of Claims*

The allowance of claims is governed by Bankruptcy Code section 502.  *See, e.g.,
In re Asia Global Crossing, Ltd.*, 344 B.R. 247, 250 (Bankr. S.D.N.Y. 2006).  Section
502(a) and Bankruptcy Rule 3001(f) state that a claim which is filed is deemed allowed
unless a party in interest objects.  Once an objection to a claim is made, the court is to
determine the amount of the claim after notice and a hearing.  *See, e.g., In re Adelphia
Commc’ns Corp.*, No. 02-41729(REG), 2007 WL 601452, at *4 (Bankr. S.D.N.Y. Feb.
20, 2007) (citing § 502(b)).  Once an objectant offers sufficient evidence to overcome the
*prima facie* validity of the claim, the claimant must meet the usual burden of proof to
establish the claim’s validity.  *See id.* at *5 (citing *In re Rockefeller Ctr. Props.*, 272 B.R.
524, 539 (Bankr. S.D.N.Y. 2000)).  The validity and legality of claims generally is
determined by applicable nonbankruptcy law.  *See Travelers Cas. & Sur. Co. of America
v. Pacific Gas & Elec. Co.*, 127 S.Ct. 1199, 1204-05 (2007); *see also* 4 *Collier on
Bankruptcy*, ¶ 502.03(1)(a) (15th Ed. 2007) (“In determining the amount, the court is

guided by otherwise applicable state or federal law, whether the claim is liquidated or contingent or if any other issues exist which bear upon the amount of the claim.").

B. *Waldinger's Motion to Reconsider, Alter, and Amend the February Opinion*

The granting of a motion to alter or amend an order under Bankruptcy Rule 9023, which incorporates Rule 59(e) of the Federal Rules of Civil Procedure, "is merited when there has been a clear error or manifest injustice in an order of the court or if newly discovered evidence is unearthed." *In re Enron Corp. v. J.P. Morgan Sec. Inc., et al. (In re Enron Corp.)*, 356 B.R. 343, 350 (Bankr. S.D.N.Y. 2006) (quoting *In re Bird*, 222 B.R. 229, 235 (Bankr. S.D.N.Y. 1998)); s*ee also In re Interbank Funding Corp.*, No. 02-41590(BRL), 2007 WL 2080512, at *2 (Bankr. S.D.N.Y. July 19, 2007) (To obtain relief under Bankruptcy Rule 9023, a party must present "manifest errors of law or fact" or "newly-discovered evidence.") (citing Rule 59(e)'s standards from *Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999)); *In re Best Payphones, Inc.*, No. 01-15472 (SMB), 2007 WL 203980, at *5 (Bankr. S.D.N.Y. Jan. 24, 2007) (stating that an amended judgment is also allowed when it is necessary to prevent manifest injustice.). The burden is on the movant to show that factual matters were overlooked that could have materially influenced the prior decision. *See In re Enron Corp.*, 356 B.R. at 350-51.

In the Motion to Reconsider and at trial, Waldinger argued that the February Opinion includes an implied assumption that the Lien was in place on May 20, 2004, such that Waldinger could have requested the Court to either lift the automatic stay or grant Waldinger relief from the Plan's injunction to allow it to pursue action to foreclose on the Lien. However, Waldinger pointed out, the Lien, as well as all other liens, lapsed on the Effective Date according to express

14

provisions in the Plan and the Debtors' Disclosure Statement.  Waldinger, in effect, argued that

the course of action the Court described above on page nine would be an impossibility due to the

Lien's termination under the Plan on the Effective Date.  Waldinger further argued that it was an

error for the Court to determine the secured status of the Claim as of a date past the petition date.

The Debtors countered that the Plan did not render enforcement of the Claim an

impossibility.  Regarding the Lien, the Debtors argued that the Lien remained in effect after the

Plan's Effective Date.  According to the Debtors, the Plan did not block Waldinger's route to

obtain allowance of the Claim, and thus the foreclosure of the Lien was still possible.  The

Debtors explained that article 403(b) of the Plan determines what would happen to the Claim if

"allowed" under article 1.10 of the Plan, such as by the allowance of a disputed claim after the

Court's final order.[4]  Further, the Debtors repeated their arguments from the briefings leading to

the February Opinion that Waldinger could have moved for relief from the automatic stay prior

to the Effective Date for the purpose of filing an action to foreclose on the Lien.  The Debtors

also asserted that after the Effective Date, Waldinger could have sought relief from the Plan's

injunction to achieve the same purpose.

Section 1141(c) of the Bankruptcy Code provides, with exceptions that are not relevant,

that "except as otherwise provided in the plan or in the order confirming the plan, after

confirmation of a plan, the property dealt with by the plan is free and clear of all claims and

interests of creditors, equity security holders, and of general partners in the debtor."  The "default

rule" is that section 1141(c) extinguishes liens, since they are "interests," unless the bankruptcy

---

[4]  As stated in the February Opinion at 24 -
> Under the Plan [¶ 1.10] there are five situations in which a claim is "Allowed" - (i) any
> Claim that has been listed by the Debtors in their Schedules, [...] as liquidated in amount
> and not disputed or contingent and for which no contrary proof of claim has been filed,
> (ii) any Claim allowed hereunder, (iii) any Claim that is not Disputed, (iv) any Claim that
> is compromised, settled, or otherwise resolved [...], or (v) any Claim that, if Disputed,
> has been Allowed by Final Order.

plan otherwise preserves them. *See Elixir Indus. v. City Bank & Trust Co. (In re Ahern Enter.)*,

507 F.3d 817, 820-21 (5th Cir. 2007*).* The Plan invokes section 1141(c).

Article 10.03 of the Plan states

> Discharge of Debtors. Upon the Effective Date and in consideration of
> the distributions to be made hereunder, except as otherwise expressly
> provided herein, each holder (as well as any trustees and agents on
> behalf of each holder) of a Claim or Equity Interest and any affiliate of
> such holder shall be deemed to have forever waived, released, and
> discharged the Debtors, to the fullest extent permitted by section 1141
> of the Bankruptcy Code, of and from any and all Claims, Equity
> Interests, rights, and liabilities that arose prior to the Effective Date.

Article 10.01 of the Plan states in part

> Vesting of Assets. Upon the Effective Date, pursuant to sections
> 1141(b) and (c) of the Bankruptcy Code, all property of the estates of
> the Debtors shall vest in the Reorganized Debtors free and clear of all
> Claims, Liens, encumbrances, charges, and other interests, except as
> provided herein.

The Court finds that Waldinger's premise is correct –the February Opinion incorrectly

assumed that the Lien was still in effect on the Plan's Effective Date and during the subsequent

thirty-day period.[5] The Court does not accept the Debtors' argument that the Plan did not

extinguish the Lien upon the Effective Date. As a general matter, a reorganization plan's

provision that vests the property of the estates in the debtors "free and clear" of all liens will void

all liens unless the lien was expressly preserved in the plan. *See, e.g., In re Ahern Enter.*, 507

F.3d at 820-21*; FDIC v. Union Entities (In re Be-Mac Transport Co., Inc.)*, 83 F.3d 1020, 1035

(8th Cir. 1996) (noting the rule that "a secured creditor who participates in the reorganization

may also lose its lien by confirmation of a reorganization plan which does not expressly preserve

the lien."); *In re Penrod*, 50 F.3d 459, 463 (7th Cir. 1995) (holding that section 1141(c) covers

---

[5] The application of the Plan to the Lien and all liens *vis a vis* section 1141(c) of the Bankruptcy Code was
overlooked by the Court and was not discussed by the parties prior to the February Opinion.

liens and "that unless the plan of reorganization, or the order confirming the plan, says that a lien is preserved, it is extinguished by the confirmation").

The recent Fifth Circuit decision of in *In re Ahern Enterprises* comprehensively discussed how, pursuant to section 1141(c), the confirmation of a Chapter 11 plan voids liens on property dealt with by the plan unless the liens are specifically preserved, provided that the lien holder participated in the reorganization. That court, after discussing the reasoning and results of the leading cases, stated that four conditions must be met for a lien to be avoided under section 1141(c). 507 F.3d at 822. First, "the plan must be confirmed; (2) the property that is subject to the lien must be dealt with by the plan; (3) the lien holder must participate in the reorganization; and (4) the plan must not preserve the lien." *Id.*

Applying those criteria to Waldinger's Lien shows that the Plan voided the Lien.

First, it is undisputed that the Debtors' Plan has been confirmed. As stated above in the "Background" section, the Court confirmed the Debtor's Plan on October 31, 2003 and it became effective on April 20, 2004.

Second, the property subject to the Lien was dealt with by the Plan. Article 10.01 of the Plan stated that "all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens . . . ." That section encompasses the Data Center, the property subject to the Lien. The Court notes that the second criterion of "the property that is subject to the lien must be dealt with by the plan" does not require the lien itself to be dealt with by the Plan. *See In re Ahern Enter.*, 507 F.3d at 823.

Third, Waldinger participated in the reorganization proceeding by filing a proof of claim. *See id.* ("it is a sufficient level of participated that Elixir filed a proof of claim as an unsecured priority creditor").

17

Considering the last criterion for the Plan to void the Lien, that "the plan must not preserve the lien," the Court finds that the Plan did not preserve the Lien.  Article 10.01 of the Plan stated that "all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, *except as provided herein*."  (Emphasis added.)   Courts have generally held that a phrase such as "except as provided herein" means that for a lien to survive it must be expressly preserved.  In *In re Ahern Enterprises*, the court stated that whether a plan of reorganization "provides otherwise" that property dealt with by the plan reverted to the debtors free and clear of liens means that the plan must *expressly* state that the lien remains on the property to which it is attached.  *Id*. at 824; *see also In re Be-Mac Transport*, 83 F.3d at 1027 ("Where a plan does not expressly preserve a lien, a lienholder may lose it after confirmation of the plan, *provided that* the lienholder participated in the reorganization and its property was dealt with by the plan.") (italics in original); *In re Regional Building Sys., Inc.*, 251 B.R. 274, 279 (Bankr. D. Md. 2000) ("when a property is dealt with by a plan, the effect of § 1141(c) is plain:  after confirmation of the plan, the creditor's liens on that property are extinguished if not expressly preserved").  The Debtors argument is that the Plan implicitly, not expressly, preserved the Lien because the parties still had to reach finality on the Debtors' objection to the Claim before the Claim reached article 403(b) of the Plan, which would determine the status of an "Allowed" Claim.  At trial, the Debtors counsel stated "the critical part is they [Waldinger] never got to Allowed Secured Claims, so. . . the lien remains in effect" and that "nothing happened on the filing of the Plan, or the confirmation of the Plan or the Effective Date of the Plan that terminated their Lien."  (Trial Tr., 174.)  Given the weight of the authority discussed above, the Plan voided the Lien because it did not expressly preserve it.

18

The Court thus has reconsidered the February Opinion that Claim filed by

Waldinger's Claim is unsecured because as a matter of law the Lien lapsed on May 20,

2004.  That finding will be disregarded by the Court in its consideration of the secured

status of the Claim.  As a result, Waldinger's failure to take action to foreclose upon the

Lien after the expiration of the section 108 period is not a basis for the Debtors to object

to the secured status of Waldinger's claim.  Since the Plan extinguished the Lien,

Waldinger could not take steps to foreclose upon the Lien.  The Debtors' objections to

the allowability of the claim or the status of the Lien will be limited to what objections

could be raised on the Effective Date.

C.  *Discussion of Dispositive Effect of the Settlement Agreement*

If the Debtors are correct that Waldinger released its Lien in the Settlement

Agreement, Waldinger's Claim would seem limited to unsecured status, with the possible

question remaining of whom it would be a claim against – the Settlement Agreement was

with WorldCom Purchasing, LLC while the Claim listed MCI WorldCom Network

Services, Inc.

For multiple reasons, the Court finds that the Settlement Agreement did not

operate as an accord or satisfaction, novation, or substitute agreement to extinguish

Waldinger's ability to pursue liability under any original agreement.  Although the

Settlement Agreement states that it "supersedes any and all prior agreements" (¶ 5.1), the

Settlement Agreement contemplated stipulated performance by both WorldCom and

Waldinger to satisfy or discharge the then-current claim of Waldinger.  For example,

paragraph 1.9 states that "[p]ayment of the Settlement Funds by WorldCom shall finally

settle and resolve all claims asserted or which could have been asserted against

WorldCom, or any of its parents, subsidiaries, affiliates or predecessors, arising out of, or in any relating to, the Dispute . . . " and that "[f]ulfillment of the obligations under this Agreement and the Contract <u>shall</u> finally settle and resolve all claims . . . ." (Settlement Agreement, ¶ 1.9) (emphasis added). It is not disputed that Waldinger submitted an invoice to the Debtors pursuant to paragraph 1.3 of the Settlement Agreement. Further, it is not disputed that the Debtors failed to pay Waldinger after receiving that invoice, as they were obligated under paragraph 1.4 of that same agreement.

An accord and satisfaction has been defined under Nebraska law as "a discharge of an existing indebtedness by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant in full satisfaction of the claim." *See Lone Cedar Ranches, Inc. v. Jandebeur*, 523 N.W.2d 364, 369 (Neb. 1994). To constitute an accord and satisfaction under Nebraska law, there must be (1) a bona fide dispute between the parties, (2) substitute performance tendered in full satisfaction of the claim, and (3) acceptance of the tendered performance. *See Mischke v. Mischke*, 571 N.W.2d 248, 256 (Neb. 1997). "The burden of proof to maintain an alleged accord and satisfaction is on the party seeking to enforce it." *Lone Cedar Ranches*, 523 N.W.2d at 369. The Debtors have not established the latter two requisite elements. The Debtors did not undertake the stipulated performance pursuant to the Settlement Agreement.

For similar reasons, that the Settlement Agreement contemplates future performance and thus did not completely extinguish the Debtors' existing liability, the Settlement Agreement did not constitute a novation. *See Chadron Energy Corp. v. First Nat'l Bank of Omaha*, 379 N.W.2d 742, 749 (Neb. 1986) ("In order for a novation to

occur, the existing liability must be completely extinguished and a new one substituted in its place.")

Along the same lines, the Settlement Agreement did not operate as a substituted agreement that would have immediately discharged Waldinger's prior claims.  See the discussion in Joseph M. Perillo, *Calamari & Perillo on Contracts*, §§ 21.4-21.5. (5th Ed. 2003).  An example of a bilateral executory accord is given that "C (creditor) writes D (debtor), 'I promise to discharge the debt you owe me upon delivery of your black Mercedes if you promise to deliver the Mercedes within a reasonable time.'" *Id.* at § 21.4.  If D delivers the car and C accepts it, there is an accord and satisfaction.  *Id.*  In the event the debtor materially breaches the executory accord, the creditor has the option of enforcing the original claim or the executory accord.  *Id.* at § 21.5.  The bilateral executory accord is distinguished from a substituted agreement.  As an example of the latter, C says to D, "'If you will promise to deliver your black Mercedes within 30 days I will immediately treat the debt you owe me as satisfied and discharged.'" *Id.*  That is a substituted agreement and operates immediately to discharge C's claim.  *Id.*  In the event of a breach of a substituted agreement, any action would have to be brought on the substituted agreement.  *Id.*  The Settlement Agreement, in contemplating future performance to resolve the claims, does not resemble the example of the substituted agreement.  Rather, it is closer to the example of the bilateral executory accord, the failure of which entails the creditor to sue under the original claim or the executory accord.

The case the Debtors cited at trial, *Beepwear Paging Products, LLC v. SkyTel Corp. (In re WorldCom, Inc.)*, No. 02-13533, 2006 WL 2400326 (Bankr. S.D.N.Y. May

30, 2006), *aff'd*, No. 06 Civ. 5245(KMW), 2007 WL 2049723 (S.D.N.Y. July 13, 2007),

where the Court and the affirming district court found that a substitute agreement or

novation occurred which extinguished liability for the original agreement, is

distinguishable.  In that case, decided under Delaware law, the district court found that a

settlement agreement was a novation, and not an accord and satisfaction, because the

parties in their settlement agreement intended to completely extinguish the original

agreement.   2007 WL 2049723, at *2.  That court also stated that an accord under

Delaware law occurs when a party to an existing contract "'may agree with the other

party to accept from him in the future a stated performance in satisfaction of the

subsisting contractual duty."  *Id.* (citation omitted).  As stated above, the Settlement

Agreement, in contemplating that Waldinger would accept future performance in

satisfaction of the subsisting duty, shows that the agreement did not operate as a

novation.

        Even had the Debtors established that the Settlement Agreement operated as an

accord and satisfaction, novation, or substituted agreement, the Court would have found

the Settlement Agreement subject to rescission from the total and complete failure of the

Debtors' performance.  *See Gallner v. Sweep Left, Inc.*, 277 N.W.2d 689, 690 (Neb.

1979) ("The failure to perform a promise, the performance of which is a condition,

entitles the other party to the contract to a rescission thereof."); *see also Eliker v. Chief

Indus., Inc.*, 498 N.W.2d 564, 566-67 (Neb. 1993) ("a ground for equitable cancellation

may arise from a breach of contract which is so substantial and fundamental as to defeat

the object of the parties in entering into the contract").  The Debtors' failure to pay

Waldinger pursuant to the Settlement Agreement was a breach of a mutual promise and a

failure of a condition precedent to Waldinger's performance of completing the installation work. *See Gallner*, 277 N.W.2d at 690 ("Where contractual promises are mutual and dependent, the failure of one party to perform authorizes the other to rescind the contract. The failure to perform a promise, the performance of which is a condition, entitles the other party to the contract to a rescission thereof.") Such a rescission would render the Settlement Agreement of no consequence. The purpose of rescission is to place the parties in a *status quo*, that is, return the parties to their position that existed before the rescinded contract. *See Johnson Lakes Dev., Inc. v. Central Nebraska Public Power & Irrigation Dist.*, 568 N.W.2d 573, 582 (Neb. App. 1997) (the "remedy of rescission involves more than cancellation of a contract and includes judicial effort to place contractual parties in, as nearly as possible, substantially the same condition which existed when the contract was entered into").

D. *The Existence of a Contract*

In order to a establish that it holds a valid lien under the Lien Act, Waldinger must show that the parties entered into a "real estate improvement contract." *See Tilt-Up Concrete, Inc. v. Star City/Federal, Inc.*, 582 N.W.2d 604, 610 (Neb. 1998) ("*Tilt-Up I*"); *see also Mid-America Maintenance, Inc. v. Bill Morris Ford, Inc.*, 442 N.W.2d 869, 871 (Neb. 1989) ("a construction lien is not valid absent a contract between the parties"). The Nebraska legislature has defined a "real estate improvement contract" as "'an agreement to perform services, including labor, or to furnish materials for the purpose of producing a change in the physical condition of land or in a structure . . . .'" *Tilt-Up I*, 582 N.W.2d at 610 (citing Neb. Rev. Stat. § 52-130). Since a mechanic's lien serves to secure the claims of those who have contributed to the construction of a building, "it

should receive the most liberal construction to give full effect to its provisions." *Vince Kess, Inc. v. Krueger Constr. Co.*, 276 N.W.2d 669, 676 (Neb. 1979).

Under Nebraska law, a "contract may be written or oral and can be shown by circumstantial evidence." *Tilt-Up I*, 582 N.W.2d at 610. "There must be both an offer and acceptance." *Id.* "Mutual assent to a contract is determined by the objective manifestations of intent by the parties, not by their subjective statements of intent." *Id.* "Acceptance of an offer may be illustrated by words, conduct, acquiescence indicating agreement and may be indicated by the silence and inaction of an offeree." *Id.*

At trial, Waldinger presented its evidence as to the existence of an agreement between Waldinger and the Debtors to install the three AHU's.

Waldinger did not present evidence of oral statements by any representative of the Debtors that shows their assent to paying more than $500,000 for the installation of the three AHU's. Waldinger's main contention is that the "silence and acquiescence of WorldCom as to the work performed by Waldinger after submission of the requested proposal is a clear manifestation of the existence of a real estate improvement contract." (Waldinger's Trial Brief, 20). Waldinger argues that Debtors' governance people in Colorado "obviously approved" of Waldinger's proposal to install three AHU's. (Trial Tr.,166.)

Russell, job foreman at the time for Waldinger, testified that Waldinger did work preparing for the installation of the three AHU's in the spring of 2001. (Trial Ex. 34, Russell Dep., 5:8). Russell testified that Brock authorized him to move and reconnect a waterline and to move a "control airline" to allow a hole to be opened in a concrete block wall so that sheet metal ductwork could be installed. *Id.*

24

Waldinger argues that trial exhibit thirty-nine shows that "there were five or six guys that are working there on a weekly basis for three or four months." (Trial Tr., 170). Exhibit thirty-nine is a spreadsheet prepared by Wilhemi, Waldinger's Division President, from Waldinger's accounting records that shows the hours worked by Waldinger employees for sheet metal shop, sheet metal field, and steamfitter. It is not clear whether the work referenced in the spreadsheet pertains to work for existing unit number five or the three AHU's.

The Debtors argue that there never was any agreement for Waldinger to install the three AHU's. The Debtors dispute that any WorldCom employee told Waldinger that they should or were authorized to install the AHU's. The Debtors also argue that no Waldinger representative testified that he believed that Brock, the manager of the Data Center, had the authority to bind WorldCom to a contract, or even had a conversation with Brock about entering into an installation contract. (*See* Trial Ex. 38, Morrison Depo., 34:8-34:11; Trial Ex. 34, Russell Depo. 18:19-18:22; Trial Ex. 36, Wilhelmi Depo., 22:12-22:17, 23:15-23:18.)

At trial, Debtor pointed out that nothing in the purchase order issued from WorldCom to Waldinger on November 14, 2000 (Trial Ex. 2), for the three AHU's concerned installation. (Trial Tr., 29). Brock also testified that after he submitted the September 15, 2000 proposal from Waldinger to the Governance People, they did not authorize him to undertake any action with respect to the proposal. (Trial Ex. 37, 30:10.)

Besides disputing that Brock gave Waldinger authority to install the AHU's, the Debtors pointed out that the one written agreement – the November 14, 2000 purchase order – for $576,000 for the purchase of the three AHU's is not from Brock; it is from

individual named Jason Stablier.  Brock testified that he had no involvement with the issuance of purchase orders.

The Debtors argue that Waldinger, in sum, relies on air and water line movement that Russell did on Brock's instruction months before the three AHU's arrived for the inference that Waldinger was authorized and there was a contract to install the AHU's.

For legal support, Waldinger relies on two Nebraska cases involving oral construction contracts and liens, *Tilt-up I* and *Sorenson v. Dager*, 601 N.W.2d 564 (Neb. App. 1999).

In both cases, a Nebraska court found that the circumstantial evidence showed that the parties had entered into an oral real estate improvement contract.  In *Sorenson*, the owner of real property, who was building a house, asked his general contractor, Michael Niemeyer ("Niemeyer"), to solicit bids for the construction.  *Id.* at 567. Niemeyer contacted the plaintiff, Lon Sorenson, to do the framing work.  Sorenson orally provided a figure of $72,840 to Niemeyer, a figure which Niemeyer used in his contract with the property owner.  The case is of little application to the present matter because the issue of whether there was a contract between Niemeyer and Sorenson did not appear to be critical or even disputed.  The appellate court noted that the trial court found that both Niemeyer and Sorenson *agreed* that they had a contract for Sorenson to do the house's framing.  *Id.* at 570.  The pressing issues on appeal were whether Sorenson had substantially performed under that agreement before walking off the job and whether Sorenson was entitled to a lien for the reasonable value of his services – under the theory of *quantum meruit* – in the absence of substantial performance.

26

*Tilt Up I* contains more relevant facts.  There, Tilt-Up Concrete, Inc. ("Tilt-Up") was a contractor specializing in the construction of buildings using concrete walls and had previously done numerous projects for the defendant Star City/Federal, Inc. ("Star City").  The defendant asked Tilt-Up to provide numerous bids for the construction of a building to be leased to the Lincoln, Nebraska office of Immigration and Naturalization Services ("INS").  Within days of being formally awarded the INS project, the defendant advised Tilt-Up that it should plan on working on the project through the winter.  A representative of the defendant and of Tilt-Up also discussed more changes and agreed to the scope of extra work.  Tilt-Up then sent a letter to the defendant delineating the scope of the extra work and the proposed costs (the "December Letter").

In responding to the December Letter, the defendant did not inform Tilt-Up that there was no agreement or ask Tilt-Up to stop working.  Rather, the defendant's response outlined the defendant's understanding of the scope of the work, its agreement with the pricing of certain work, and its disagreement with some of the pricing.  *Id.* at 608.  After further disputes over payment and the scope of their agreements, Tilt-Up filed a construction lien and sought to foreclose on it.  After the district court found that Tilt-Up had a valid construction lien, the defendant appealed the finding that the parties had entered into a lump-sum contract.  *Id.* at 610.  The state Supreme Court found that the evidence showed both an offer by Tilt-Up to perform work and that the defendant "by virtue of its words and actions or inactions did manifest assent to Tilt-Up's bid price and the extra and changed work."  *Id.* at 611.  Specifically the court found that after receiving the December Letter, the defendant's president, H. Lee Gendler, did not tell Tilt-Up they had no deal but, rather, authorized and directed Tilt-Up to perform concrete footing work.

Furthermore, the evidence showed that Gendler "was on site and personally observed the progress being made without voicing any objections and that Gendler subsequently made . . . partial payment to Tilt-Up." *Id.* at 611. What is more, Gendler made a public statement at the building's groundbreaking ceremony that "Tilt-Up was the building-shell contractor for the INS project." *Id.* The court summarized that "[c]learly, Gendler's and Hyman's directions to Tilt-Up after receipt of Tilt-Up's December 15 letter, as well as Gendler's acceptance of Tilt-Up's performance and Gendler's partial payment to Tilt-Up, evidences that Star City did accept Tilt-Up's June 29 lump-sum bid price for its normal scope of work and the extra or changed work, all as set forth in Tilt-Up's December 15 letter." *Id.*

In contrast to that case, the evidence presented by Waldinger does not show the Debtor and Waldinger reached an agreement for Waldinger to install the AHU's. There is no evidence that Brock or anyone from the Debtors gave anyone from Waldinger the Debtors' assent to install the AHU's. Brock stated that after he sent Waldinger's Full Proposal to the Debtors' governance people that they did not authorize him to take any action with respect to the proposal. (Trial Ex. 37, 30:6-30:13.) Brock's testimony does not indicate that the governance people acquiesced to an agreement for installation. For example, Brock stated that he talked to them "on occasion" (*Id.* at 61:10-61:14) and that when he told Espinosa that Waldinger was going finish the installation of the air handling units, Espinosa asked what Brock meant. (*Id.* at 58:23-59:7.) Unlike in *Tilt-Up I*, there is no evidence that a party who could bind the Debtors to a contract "observed progress being made without voicing objections." The evidence shows that Waldinger employees were at the Data Center but they were there on other projects beyond the three AHU's,

such as working on air handling unit number five.  Wilhemi himself could not even be

sure if Waldinger's employees were working at the Data Center when Waldinger

submitted the proposal to WorldCom because "we did work almost continuously for

them."  (Trial Tr., 60:7-60:10).

The best Waldinger can show is that Brock did ask about moving a water line

well in advance of the arrival of the three AHU's and that Brock did ask Waldinger to do

work on existing air handling unit number five.  That is not enough to show assent to an

installation agreement for the AHU's.

Critically, there was no assent, implicit or express, to Waldinger's proposed price

or scope of the work.  This marks a crucial distinction from *Tilt-Up I*, where Tilt-Up sent

a letter to the defendant that outlined the scope and cost of the proposed work and the

defendant did not express disagreement with the contents of that letter.  In the present

matter, the November 14, 2000 purchase order sent by the Debtors indicated it was only

for the purchase of the three AHU's and was only in the amount of $576,000.  (Trial Ex.

2.)  That purchase order, coming two months after Waldinger's proposal in the amount of

more than a million dollars for purchase and installation does not equate to silence or

acquiescence indicating the Debtors' acceptance of the offer.  On the contrary, the

purchase order indicates an incongruous response to the offer.

The Applications for Payment are inconclusive.  Although the Applications for

Payment that Waldinger sent to Brock beginning in June 2001 state the "Original

Contract Sum" was $1,098,000, that application states that the contract date was

November 14, 2000.  (Trial Ex. 7.)  November 14, 2000 was when the Debtors sent the

purchase order for $576,000 for the purchase of the three AHU's to Waldinger.  (Trial

Ex. 2.)  Further, the payments made by the Debtors precisely match the amount they agreed to pay for just the purchase of the AHU's in their purchase order of November 2000.  (Trial Ex. 2.)  That further undermines the existence of an agreement to the original September 2000 proposal.

Based on the foregoing, the Court concludes that no real estate improvement contract was entered into between Waldinger and WorldCom.  As a result of that conclusion, the Lien was not valid, and cannot support the allowance of a Secured Claim.

E.  *Attorney's Fees & Prejudgment Interest*

Because the Court finds that Waldinger is not entitled to a secured claim, it denies Waldinger's request for attorney's fees under section 506 of the Bankruptcy Code.  *See Enterprise Products Operating, L.P. v. Enron Gas Liquids Inc. (In re Enron)*, 306 B.R. 33, 43 (S.D.N.Y. 2004) *aff'd*, 119 Fed. Appx. 344 (2d Cir. 2005) ("To recover attorneys' fees under section 506(b), a creditor must establish: (1) that its claim is over-secured in excess of the fees requested; (2) that the fees are reasonable; and (3) that the agreement giving rise to the claim provides for attorneys' fees.  A party failing to meet any of these requirements is not entitled to recovery.").  Even if the Court determined the Claim to be secured, the Court would have denied attorney's fees because section 506 of the Bankruptcy Code requires that the attorney's fees claim arise from a provision under which the claim arises.  Even assuming there was a verbal agreement for Waldinger to perform the installation of the AHU's, there is no evidence of a provision in such a verbal agreement regarding attorney's fees.

Waldinger is also not entitled to prejudgment interest.  Because a reasonable controversy existed as to Waldinger's right to recover and as to the amount of the

recovery, "the claim is generally considered to be unliquidated and prejudgment interest is not allowed" under Nebraska statute section 45-104. *Graff v. Burnett*, 226 Neb. 710, 414 N.W.2d 271 (Neb. 1987); *see also Daubman v. CBS Real Estate Co.*, 254 Neb. 904, 580 N.W.2d 552 (Neb. 1998) ("prejudgment interest is available only when the claim is liquidated, that is, when there is no reasonable controversy either as to the plaintiff's right to recover or as to the amount of such recovery").

F.  *Recovery under Quantum Meruit*

As stated above, Waldinger filed suit in January 2002 against WorldCom in a Nebraska state court, alleging claims of breach of contract and *quantum meruit*, claims that were withdrawn when the parties entered into the Settlement Agreement.  The Debtors concede that Waldinger's Claim should be allowed at all in *quantum meruit* in the amount of the reasonable value conferred by the installation.

*Quantum meruit* is a theory of recovery "based on the equitable doctrine that one will not be allowed to profit or enrich oneself unjustly" at another's expense.  *Sorenson v. Dager*, 601 N.W.2d 564, 572 (Neb. App. 1999); *see also Tracy v. Tracy*, 581 N.W.2d 96, 101 (Neb. App. 1998) ("the principle of *quantum meruit* is a contract implied in law theory of recovery based on the equitable doctrine that one will not be allowed to profit or enrich oneself unjustly at the expense of another").  Under the theory, "[w]here benefits have been received and retained under circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the recipient to pay the reasonable value of the services."  *Sorenson*, 601 N.W.2d at 572.  To give rise to an implied contract to pay, the party providing services must have done so expecting the other to pay, and the party receiving the services must have

accepted them with the knowledge of that expectation of payment.  *Tracy*, 581 N.W.2d at

101 (citing 66 Am.Jur.2d Restitution and Implied Contracts § 20 (1973)).

The evidence supports recovery for Waldinger under *quantum meruit*, however, a

further hearing is required to determine the reasonable value of the services Waldinger

provided to the Debtors.

The evidence shows that Waldinger provided certain installation services for the

three AHU's, including building the concrete pads for the AHU's, performing certain

sheet metal and conduit work, as well as performing installation work on existing AHU

number five.  The Debtors, even if they did not agree to a contract with Waldinger for it

to perform installation work on the three AHU's, acknowledge accepting and retaining

these services.  As shown by Morrison's testimony, the Debtors, at some point, became

aware that Waldinger expected to be paid for these services.  Brock agreed that he told

the Debtor's governance people in Colorado that "a considerable amount of installation

had been performed" by Waldinger when Espinoza instructed Brock to tell Waldinger to

stop work on the AHU's.  (Tr. Ex. 37, 58:11-58:19.)  The Debtors would be unjustly

enriched if they were allowed to retain the provided benefits at Waldinger's expense.

Regarding the reasonable value of the services provided by Waldinger, the Court

rejects the Debtors' argument that expert testimony is required by Federal Rule of

Evidence 702 to determine that value.  Rule 702 states that "if scientific, technical, or

other specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue, a witness qualified as an expert . . . may testify thereto . . ."

Expert testimony is not "admissible when it addresses 'lay matters which a jury is

capable of understanding and deciding without the expert's help.'"  *Grdinich v. Bradlees*,

32

187 F.R.D. 77, 82 (S.D.N.Y. 1999) (quoting *Andrews v. Metro North Commuter R. Co.,*

882 F.2d 705, 708 (2d Cir. 1989)).  The Debtors did not provide, and the Court did not

locate, any case supporting the proposition that expert testimony is required to support a

*quantum meruit* claim.  On the contrary, the Court's own research indicates such

testimony is not required.  The Nebraska Supreme Court in *A. Sorensen Const. Co. v.

Broyhill*, 85 N.W.2d 898 (Neb. 1957), stated that there is "no specific standard" by which

a court should measure the reasonable value of goods and services provided regarding a

*quantum meruit* claim.  Other cases confirm that the fact finder can competently consider

evidence like business records, without the assistance of expert testimony.  *See Umberger

v. Sankey*, 50 N.W.2d 346, 349 (Neb. 1951) ("There is no specific standard by which

such reasonable value is to be determined (in *quantum meruit* claim).").

In *Sorenson v. Dager*, 8 Neb. App. 729, 601 N.W.2d 564 (Neb. App. 1999), the

appellate court found that the plaintiff has proven the "reasonable value of the services

Sorenson performed and materials he furnished on the Dagers' house for which Sorenson

was not paid," *id.* at 572, through evidence presented to the district court consisting of the

parties' testimony and their payment records.  In other words, no expert testimony was

needed.

Waldinger, however, has only set forth a few pieces of evidence from which the

Court could determine the amount of the reasonable value of services provided.

Wilhelmi testified that Waldinger spent from $10,000 to $15,500 to rent a crane and

forklifts to unload the three AHU's after they had been shipped to the Data Center.  (Tr.

Trans. 72:22-73:2.)  That testimony was not challenged.  Further, Waldinger sent Brock a

breakdown for the AHU project on September 25, 2000 that listed the expense of the

crane as $13,322.  (Tr. Ex. 4.)  The evidence also shows that Waldinger paid

subcontractor D.R. Anderson $14,900 to build concrete pads for the three AHU's.  (Tr.

Ex. 24.)  There was testimony given that from March through July 2001, Waldinger

employees worked hundreds of hours to prepare sheet metal for the ductwork that would

be needed for the three AHU's, and air handler unit number 5. (Tr. Ex. 39.)  That

evidence of hours worked, perhaps introduced to support the existence of an agreement,

does not offer much guidance for the determination of the value of the services because

no testimony was given as to the hourly rate of the workers.  Also, as stated above, it is

not clear whether the work referenced in the spreadsheet pertains to work for existing unit

number five or the three AHU's.

Brock testified that Waldinger did not do all sheet metal duct work for the AHU's

but that "some" duct work was done.  (*Id.* at 42:16-42:21, 47:23.)  Brock admits that

"there was some preparation work done" for the three AHU's.  (*Id.* at 47.)  But without

evidence to quantify how the sheet metal work provided a reasonable value to the

Debtors, the Court cannot guess and should not attempt to determine it without additional

evidence being submitted.

The Settlement Agreement does not provide the basis for recovery under *quantum*

*meruit.*  Although Waldinger contends that the Settlement Agreement is conclusive as to

the amount of the Claim, Waldinger does not contend that the Settlement Agreement

provides a measure of the "reasonable value of the services" provided under *quantum*

*meruit*.  Furthermore, the Settlement Agreement could not provide a basis for the

reasonable value of services provided.  That agreement contemplated that Waldinger

would provide further installation services but such services were ultimately not

34

provided.  Under the Settlement Agreement's paragraph 1.5, Waldinger was to "begin

completion of the installation of the AHU's . . . .",  however, the Debtors' bankruptcy

intervened and it is undisputed that Waldinger did no further work at the Data Center

under the Settlement Agreement.

For the reasons stated above, Waldinger will be entitled to recover $14,900 for the

concrete pad installation, $15,500 for the cost of the crane rental, and an additional

amount to be determined after a further hearing for the reasonable value of the

installation services under the theory of *quantum meruit*.

## IV.  CONCLUSION

For the reasons stated above,

1.  Waldinger's motion for reconsideration is granted.

2.  Waldinger is not entitled to a secured claim.

3.  Waldinger is entitled to an unsecured claim under *quantum meruit* in an

amount to be determined after a further hearing.

The Debtors shall submit an order consistent with this opinion.


Dated: New York, New York
       February 21, 2008


                              **s/Arthur J. Gonzalez**
                              **UNITED STATES BANKRUPTCY JUDGE**