| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | NOT FOR PUBLICATION |

| | |
|---|---|
| In re<br><br>      WORLDCOM, INC., *et al.*,<br><br>                       Reorganized Debtors. | Chapter 11<br><br>Case No. 02-13533 (AJG) |

**OPINION REGARDING QUANTUM MERUIT CLAIM OF
WALDINGER CORPORATION**

**APPEARANCES**

STINSON MORRISON HECKER LLP
Special Counsel to the Reorganized Debtors
1201 Walnut Street
Kansas City, MO 64106

    Mark S. Carder, Esq.

LIEBEN, WHITTED, HOUGHTON, SLOWIACZEK & CAVANAUGH, P.C., L.L.O.
Attorneys for Waldinger Corporation
100 Scoular Buidling
2027 Dodge Street
Omaha, NE 68102

    James B. Cavanaugh, Esq.

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

       On February 21, 2008, the Court issued an "Opinion Regarding Claim Number 3059 Including Waldinger's Corp.'s Motion for Reconsideration" (the "February 2008 Opinion"), with which the Court presumes familiarity. *See In re WorldCom, Inc.*, 382 B.R. 610 (Bankr. S.D.N.Y. 2008). In that opinion, the Court held that no real estate improvement contract was entered into between Waldinger Corp. ("Waldinger") and WorldCom, Inc. ("WorldCom" or "Reorganized Debtors"), therefore Waldinger did not have a secured claim. However, a further

hearing was required under the theory of *quantum meruit* to determine the reasonable value of the services Waldinger provided to WorldCom. A hearing on that matter was held on June 17, 2009 (the "Hearing").

### I. *Quantum Meruit*

In January 2002, Waldinger had filed suit against WorldCom in Nebraska state court on breach of contract and *quantum meruit* grounds under state law. Those claims were withdrawn as part of a settlement agreement entered into between the parties on June 26, 2002 (the "Settlement Agreement"). The Settlement Agreement purported to resolve the dispute between the parties over the installation of air handling units 6, 7 and 43 (the "AHU's") at the Mid-Continent Data Center (the "Data Center"), which was the basis of the state law *quantum meruit* claim. However, three weeks after the Settlement Agreement was reached, WorldCom filed for bankruptcy protection. Waldinger subsequently filed a proof of claim as a secured creditor in the amount of $371,362.00.

In the February 2008 Opinion, the Court stated a further hearing was required because the Court found there was no real estate improvement contract between Waldinger and WorldCom to install the AHU's, thus no lien under Nebraska law. However, the evidence supported recovery under *quantum meruit* for the installation services provided by Waldinger. *See WorldCom*, 382 B.R. at 629 ("[T]he Court concludes that no real estate improvement contract was entered into between Waldinger and WorldCom. As a result of that conclusion, the Lien was not valid, and cannot support the allowance of a [s]ecured [c]laim."); *see also Tracy v. Tracy*, 7 Neb. App. 143, 148 (Neb. Ct. App. 1998) ("[A]n express contract . . . preclude[s] recovery based on a *quantum meruit* theory of recovery.") (citing *Associated Wrecking v.*

2

*Wiekhorst Bros.*, 228 Neb. 764, 424 N.W.2d 343 (1988)); *Kisicki v. Mid-America Fin. Inv. Corp.*, No. A- 01-708, 2002 Neb. App. LEXIS 297, at *18 (Neb. Ct. App. Nov. 26, 2002) ("[T]he doctrine of unjust enrichment is recognized only in the absence of an agreement between the parties."). The hearing was scheduled to permit the parties to present evidence as to the reasonable value of the installation services rendered in connection with the purchase of the AHU's.

*Quantum meruit* is a "theory of recovery based on the equitable doctrine that one will not be allowed to profit or enrich oneself unjustly at the expense of another." *Id.* "Where benefits have been received and retained under circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the recipient to pay the reasonable value of the services." *Carlson v. Gray*, No. A-98-1384, 2000 Neb. App. LEXIS 141, at *12 (Neb. Ct. App. May 16, 2000). To give rise to an implied contract to pay, the services must have been rendered in expectation that the other party would pay. In turn, the other party must have accepted the services with knowledge of that expectation. *See Tracy*, 7 Neb. App. at 149. Here, the Court previously found that WorldCom Purchasing LLC issued a written purchase order to Waldinger for the three AHU's in the amount of $576,000.00 but the order made no reference to installation. The scope of the discussion will be limited to determining the reasonable value of the services provided by Waldinger.

    a.  <u>Reorganized Debtors' Objection to Testimony</u>

        i.  *Federal Rule of Evidence 602*

WorldCom raised an objection to the testimony of John Wilhelmi ("Wilhelmi"), the former Division President for the Omaha division of Waldinger, who testified from business

records as to the costs incurred by Waldinger in connection with the installation of the AHU's. The Reorganized Debtors contend under FED. R. EVID. 602 that Wilhelmi could testify as to what the business records indicate Waldinger charged for the installation but he lacked personal knowledge that any of the work was actually done. In the February 2008 Opinion, the Court stated, after an examination of Nebraska case law, "there is no 'specific standard' by which a court should measure the reasonable value of goods and services provided regarding a *quantum meruit* claim. Other cases confirm that the fact finder can competently consider evidence like business records, without the assistance of expert testimony." *WorldCom*, 382 B.R. at 630 (citing *S. A. Sorenson Constr. Co. v. Broyhill,* 85 N.W.2d 898 (Neb. 1957); *Umberger v. Sankey,* 50 N.W.2d 346, 349 (Neb. 1951)).

Wilhelmi's testimony was not offered to establish that work was actually performed in connection with the installation of the AHU's. Such testimony establishing the performance of installation services was previously offered in conjunction with the February 2008 Opinion.

> The evidence shows that Waldinger provided certain installation services for the three AHU's, including building the concrete pads for the AHU's, performing certain sheet metal and conduit work, as well as performing installation work on existing AHU number five. The Debtors, even if they did not agree to a contract with Waldinger for it to perform installation work on the three AHU's, acknowledge accepting and retaining these services. As shown by [Waldinger's controller's] testimony, the Debtors, at some point, became aware that Waldinger expected to be paid for these services. [The Data Center's building manager] agreed that he told the Debtor's governance people in Colorado that "a considerable amount of installation had been performed" by Waldinger when [a WorldCom Employee] instructed [the Data Center's building manager] to tell Waldinger to stop work on the AHU's. (Tr. Ex. 37, 58:11-58:19.) The Debtors would be unjustly enriched if they were allowed to retain the provided benefits at Waldinger's expense.

*WorldCom*, 382 B.R. at 630. Rather, the purpose of Wilhelmi's testimony was to establish the costs incurred by Waldinger in connection with the installation of the AHU's through an

4

assessment of Waldinger's business records.

Wilhelmi testified as to the computerized cost-accounting system that Waldinger maintains to ensure that materials, labor and equipment are accurately charged to the correct job. Waldinger maintains an individual accounts payable file for every project. In that file are purchase orders, invoices and packing slips for material and equipment that have been used on a particular project. The project manager receives all purchases orders, invoices and packing slips and ensures that the correct material is charged at the correct price and assigned to the right site. The project manager is directly responsible for the profit at a managed site and therefore has an incentive to ensure the correct charges are incurred for work performed. After the project manager signs all the documents, they are sent to Waldinger's accounts payable department for processing.

As for labor costs, Wilhelmi stated there were two methods under which workers tracked their time. Sheet metal workers complete time cards everyday indicating the number of hours worked on a particular job. The shop superintendent reviews all the time cards and looks for any errors or discrepancies. After review, the time cards are then sent over to Waldinger's payroll department and the information is entered into Waldinger's payroll system. For workers actually at a job site, the foreman usually fills out the time cards for his crew indicating the number of hours worked on a particular job. The time cards are then sent to the payroll department to be input into the system.

Wilhelmi's testimony revealed that material, equipment and labor charges are subject to the review of project managers, superintendents and foremans for accuracy. WorldCom claims Wilhelmi had no personal knowledge that work listed in the invoices was actually performed and

5

therefore he was not competent to testify as to the reasonable value of any work performed by Waldinger at the Data Center.  But it is undisputed that Waldinger did substantial work at the Data Center that required certain amounts of material, equipment and labor.  Further, Wilhelmi testified that the procedures established by Waldinger were followed at the Data Center project to ensure that WorldCom was only charged for material, equipment and labor actually furnished.  The Reorganized Debtors do not attack the veracity of any of the time cards, invoices, packing slips or purchase orders.  Nor do they allege any deviation from the operating procedures established by Waldinger.  Therefore, in light of the testimony establishing that Waldinger performed work at the Data Center, Wilhelmi's testimony is admissible for the purpose of determining the reasonable value of the installation services performed at the Data Center.

Further, the Reorganized Debtors did not object to the introduction into evidence of the business records about which Wilhelmi testified.[1]  Trial exhibits 44 and 45 are spreadsheets listing the actual costs incurred by Waldinger in connection with the installation of the AHU's.  Wilhelmi testified that the business practice of Waldinger was to have accounting clerks verify that costs listed are actually incurred for the correct job.  Wilhelmi also explained the regular business practice of Waldinger was to make these spreadsheets and that such spreadsheets were kept in the regular course of Waldinger's business.  Also, Wilhelmi testified that the

---

[1] FED. R. EVID. 803(6) provides that records of regular conducted activity are admissible as evidence and not excluded by the hearsay rule.
> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

6

spreadsheets were made by a person with knowledge of costs incurred in connection with the installation of the AHU's and that the spreadsheets were made near the time of the installation. WorldCom has not produced any evidence showing that the amounts detailed in the business records were not incurred as part of the AHU installation. Consequently, WorldCom has not overcome the "element of unusual reliability of business records . . . supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation." *See* FED. R. EVID. 803 advisory committee's notes.

        ii.  *Air Handling Unit 5*

The next objection WorldCom asserted is that the business records cannot be used to determine the reasonable value of the installation services because they do not differentiate between the costs incurred as part of installing the AHU's and the costs incurred in connection with work on an existing air handling unit called unit 5 ("Unit 5"). The basis for WorldCom's objection is that Waldinger's proof of claim, to which a Claim of Lien was attached, asserted a secured claim in the amount of $371,362.00, as determined by the amount outstanding under the Settlement Agreement.[2] Further, Waldinger's response to WorldCom's Seventy-Second Omnibus Objection to Proofs of Claims made no mention of nonpayment for work done on Unit 5. *WorldCom*, 382 B.R. at 617.

As a preliminary matter, WorldCom erroneously relies on the Settlement Agreement to establish the scope of work for which Waldinger may recover on its claim. In the February 2008

---

[2] The Claim of Lien filed by Waldinger only mentions the labor, services and materials provided by Waldinger to replace the three AHU's. (Tr. Ex. 31). The Settlement Agreement between the parties similarly makes no mention of any work on existing Unit 5 - the preamble to the Settlement Agreement only mentions Waldinger's

7

Opinion, the Court expressly stated "the Settlement Agreement did not operate as an accord [and] satisfaction, novation, or substitute agreement to extinguish Waldinger's ability to pursue liability under any original agreement." *WorldCom*, 382 B.R. at 623. In addition,

> Even had the Debtors established that the Settlement Agreement operated as an accord and satisfaction, novation, or substituted agreement, the Court would have found the Settlement Agreement subject to rescission from the total and complete failure of the Debtors' performance . . . . The Debtors' failure to pay Waldinger pursuant to the Settlement Agreement was a breach of a mutual promise and a failure of a condition precedent to Waldinger's performance of completing the installation work . . . . Such a rescission would render the Settlement Agreement of no consequence . . . .

*WorldCom*, 382 B.R. at 625 (internal citations omitted). More pertinent is that the Court explicitly pointed out that "the Settlement Agreement could not provide a basis for the reasonable value of services provided." *Id.* at 631. There is no reason to now look to the Settlement Agreement as a guide for *quantum meruit* recovery. As stated in the Court's prior decision, the Settlement Agreement cannot be looked to as a basis to determine the reasonable value of the services provided by Waldinger.

The Reorganized Debtors also claim Unit 5 should not be considered in the *quantum meruit* analysis because the Court made a statement in the February 2008 Opinion separating Unit 5 from the other three AHU's. The Court stated, in connection to the reasonable value of the services provided, that the accounting records kept by Waldinger did not differentiate between work done of Unit 5 and work done on the three AHU's. *Id.* ("[I]t is not clear whether the work referenced in the spreadsheet pertains to work for existing unit number five or the three AHU's.").

The Reorganized Debtors overlook the Court's explicit statement that Waldinger's work

---

work on the three AHU's.

8

on Unit 5 should be considered in its *quantum meruit* analysis. *See WorldCom*, 382 B.R. at 630 ("The evidence shows that Waldinger provided certain installation services for the three AHU's, including building the concrete pads for the AHU's, performing certain sheet metal and conduit work, *as well as performing installation work on existing AHU number five*. The Debtors, even if they did not agree to a contract with Waldinger for it to perform installation work on the three AHU's, acknowledge accepting and retaining these services . . . . The Debtors would be unjustly enriched if they were allowed to retain the provided benefits at Waldinger's expense.") (emphasis added).

The Court's statement concerning the accounting records was made in reference to the differences between Unit 5 and the three AHU's. For example, in contrast to the dispute over whether Waldinger was authorized to install the AHU's, a Waldinger foreman testified that the Data Center's building manager authorized work on Unit 5. *Id*. at 615. The building manager also stated that WorldCom's governance people instructed him to complete the work on Unit 5. *Id.* Further, "evidence shows that Waldinger employees were at the Data Center but they were there on other projects beyond the three AHU's, such as working on air handling unit number five." *Id.* at 610. These differences were discussed in the context that even though Waldinger was asked by the Data Center building manager "to do work on existing air handling unit number five[,] [t]hat is not enough to show assent to an installation agreement for the AHU's." *Id*. at 628.

Since there was no contract for any of the work, either on Unit 5 or the three AHU's, the Court required the Hearing to address the issue of *quantum meruit* for all the installation services provided by Waldinger. The prior finding that Waldinger's claim is no longer secured is not a

9

reason to disregard the installation services provided by Waldinger on Unit 5. Rather, since Waldinger's claim is unsecured and subject to a *quantum meruit* analysis, the Court must determine the reasonable value of the services provided to WorldCom, including work done on Unit 5. *See Richardson v. Foxley Cattle Co.*, No. A-90-754, 1992 Neb. App. LEXIS 243, at *6 (Neb. Ct. App. Oct. 20, 1992) ("The theory of quantum meruit arises when there is additional work performed under no express or implied agreement.").

Further, Waldinger always contended that the work done on Unit 5 was a portion of its claim.[3] Waldinger asserts that the reason the Settlement Agreement and its response to WorldCom's Seventy-Second Omnibus Objection to Proofs of Claims contains no mention of the work on Unit 5 is because the total amount recoverable by Waldinger under the Settlement Agreement already included work done on Unit 5. At the Hearing, Wilhelmi testified that the amount claimed in the construction lien filed by Waldinger included the labor and materials related to the work it performed on Unit 5. Since the lien formed the basis of Waldinger's proof of claim, the work done on Unit 5 was already factored into the $371,362.00 that Waldinger asserted as a secured debt. In addition, even though the Settlement Agreement only mentions the three AHU's, the amount demanded by Waldinger - $371,362.00 - already took into consideration Waldinger's work on Unit 5.

  b. Reasonable Value of Services

As stated above, under Nebraska law there is "no specific standard by which reasonable value is to be determined." *Sorenson*, 85 N.W.2d at 903. WorldCom claims that since they

---

[3] Waldinger always viewed the work done on Unit 5 and the three AHU's as part of the same project. Trial exhibit 1 is a copy of the September 15, 2000 proposal that Waldinger sent to WorldCom providing "a quote of $1,098,000 in labor and materials for the purchase and installation of three new air handling units numbers 6, 7, and 43, at the Data Center, and contained proposed work for existing air handling unit number 5." *WorldCom*, 382 B.R.

10

never actually needed to use the air handlers, the Court should determine reasonable value by looking to the value the installation of the AHU's conferred upon WorldCom. No evidence was elicited to support that statement. Further, whether WorldCom actually needed to use the air handlers is not relevant to the *quantum meruit* analysis. The Court has already stated that the Reorganized Debtors would be "unjustly enriched if they were allowed to retain the provided benefits at Waldinger's expense." *WorldCom, Inc.*, 382 B.R. at 630. Once WorldCom received and retained Waldinger's services, and accepted those services knowing Waldinger expected payment, *quantum meruit* requires WorldCom to pay the reasonable value of those services. *See Carlson*, 2000 Neb. App. LEXIS 141, at *12; *Tracy*, 7 Neb. App. at 149. The focus is not on whether WorldCom was ultimately able to enjoy the benefits of the services, but rather whether Waldinger's services produced a benefit to WorldCom at the time such services were rendered and accepted. To that end the Court can look to "all reasonable inferences of value that flow from the evidence adduced." *Tracy*, 7 Neb. App. at 150.

At the Hearing, Wilhelmi presented several figures to the Court to determine the reasonable value of the installation services.[4] First, exhibit 44 lists the total costs incurred by Waldinger that relate to "mechanical costs," in the amount of $627,288.37. Included in this figure is the $576,000.00 charge for the three AHU's, for which WorldCom already paid. Second, exhibit 45 lists the amounts incurred by Waldinger that relate to "sheet metal costs," in the amount of $128,259.90. Both the mechanical and sheet metal costs include work that

---

at 615.

[4] As stated in the February 2008 Opinion, the "installation services for the three AHU's, include[d] building the concrete pads for the AHU's, performing certain sheet metal and conduit work, *as well as performing installation work on existing AHU number five*. The Debtors, even if they did not agree to a contract with Waldinger for it to perform installation work on the three AHU's, acknowledge accepting and retaining these services . . . The Debtors would be unjustly enriched if they were allowed to retain the provided benefits at Waldinger's expense." *See*

11

Waldinger did regarding the three AHU's and Unit 5. The costs for labor and materials totaled $755,548.27.

Wilhelmi proposed two methods to determine the reasonable value of labor and materials used during the installation process. Under the first method, Wilhelmi took the actual mechanical and sheet metal costs and included the cost of a project manager and then added a markup for overhead and profit. Wilhelmi calculated the reasonable value for a project manager at $22,208.33, which was 25% of the project manager's salary. To calculate the amounts for profit and overhead, Wilhelmi looked at data contained in the RSMeans "Mechanical Cost Data" manual, 25th edition ("RSMeans Manual"). The RSMeans Manual is published by the R.S. Means Company and provides cost information used by the construction industry for estimating construction costs.[5] *See e.g.*, *Trs. of the Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Darwan*, No. 01 C 2458, 2004 U.S. Dist. LEXIS 11967, at *40 (N.D. Ill. June 29, 2004) (discussing other RSMeans publications used for construction estimation). Following the formulas set forth in the RSMeans Manual, Wilhelmi added $124,441.06 in overhead and $90,219.77 in profit.[6] Under this method, Wilhelmi took the actual cost of the project ($755,548.27) and added the reasonable value of a project manager ($22,208.33), plus profit ($90,219.77), plus overhead ($124,441.06) to come to a total of $992,417.43 as the reasonable value of the services provided by Waldinger.

Under the second method to determine reasonable value, Wilhelmi used the prices listed

---

*WorldCom*, 382 B.R. at 630 (emphasis added).

[5] RSMeans "researches, analyzes and reports on construction costs for all industry sectors." Tr. Ex. 51. The various RSMeans publications "provide relevant cost information for the entire life cycle of a project – from early planning to design, construction and facility maintenance." *Id.*

[6] The RSMeans Manual provides the calculations for determining overhead and profit. Overhead is set at 16.5% of a contractor's costs. Similarly, profit is determined as 10% of a contractor's costs. *See* Tr. Ex. 47.

in the RSMeans Manual and applied those to the materials, labor and equipment used by Waldinger during the installation services. Pursuant to this method, Wilhelmi calculated the reasonable value of Waldinger's services at $992,958.75. (Tr. Ex. 43.) To this figure, Wilhelmi added a credit of $15,200.00 for piping and sheet metal work that Waldinger had not completed on the Data Center project. Therefore, in trial exhibit 43, the total value of the work under the RSMeans Manual totaled $977,758.75. That figure did not include the reasonable value of a project manager. At the Hearing, Wilhelmi testified that the $22,208.33 prorated estimated cost of the project manager would be billed out at $28,000.00 under the RSMeans Manual formulas. In total, Wilhelmi calculated that under the RSMeans Manual, Waldinger would be entitled to the reasonable value of the work ($977,758.75), plus the RSMeans Manual value of the project manager ($28,000.00), for a total recovery of $1,005,758.75.

Since there is "no specific standard" by which the Court must determine reasonable value, the Court can consider all reasonable inferences of value adduced from the evidence presented at the Hearing. *See Tracy*, 7 Neb. App. at 150. The Nebraska Supreme Court has stated that "evidence as to cost and a lack of any effort on the part of the defendants to show that this was not the reasonable value [is] sufficient as prima facie evidence of reasonable value." *Sorenson*, 85 N.W.2d at 903.

As to the second method proposed by Wilhelmi, the Reorganized Debtors argue that the RSMeans Manual prices presented at the Hearing do not represent reasonable value because the RSMeans Manual was not used by Waldinger. Indeed, Wilhelmi testified that Waldinger did not use RSMeans Manual pricing on the Data Center project. Conversely, the Reorganized Debtors did not raise issue with the actual costs incurred by Waldinger, except to the extent that the costs

listed actually were performed and any costs were attributable to Unit 5.[7] Since the RSMeans Manual prices were not used by Waldinger, the Court declines to apply those figures and finds that the actual costs of Waldinger in the amount of $755,548.27 is a reasonable value for the installation services provided. *See id; cf. Gee v. Sutton*, 149 Neb. 603, 609 (Neb. 1948) ("The principle applied is that of reimbursement; and the plaintiff can only recover the actual cost of the services rendered and material furnished without the allowance of profits, and not exceeding the legal rate of interest."). Further, Waldinger does not use the RSMeans Manual prices on their projects and did not use them for the installation of the AHU's or the work on Unit 5. Thus, the spreadsheets listing the actual costs incurred are a more accurate representation of the cost of the project to Waldinger.

Also, with respect to the cost of a project manager, there was no evidence put forth establishing the amount of time the project manager spent on the job or any evidence demonstrating the actual cost of the project manager. Nor was there any effort made to explain why the project manager himself did not provide testimony to support Waldinger's position. Wilhelmi, whose office was adjacent to the project manager's office, observed the project manager on site but no time cards were filled out. Wilhelmi derived the $22,208.33 amount from estimating that the project manager, whose salary was $82,000.00 for 13 months, spent 25% of his time on the installation of the AHU's. However, this figure is simply an estimate by Wilhelmi. No evidence was submitted to support the assertion of the amount of time the project manager spent on the Data Center Project. In *Sorenson*, the court denied recovery in *quantum meruit* for the services provided by a supervisor because there was no evidence presented as to

---

[7] The issues of (1) performance of listed costs and (2) costs attributable to Unit 5 have been addressed above.

the amount of supervision required or the reasonable value of the supervision provided. 85 N.W.2d at 904. Therefore, under *Sorenson*, the Court denies any recovery for services provided by the project manager.

Even if Waldinger adequately established the reasonable value of the project manager's services, the issue as to whether that amount would constitute a cost recoverable by Waldinger under *quantum meruit* is not clear. Under the theory that *quantum meruit* provides recovery of a party's costs, Waldinger arguably should not recover anything unless they can demonstrate that the project manager's work on the Data Center project resulted in some cost to Waldinger that otherwise would not have been incurred.[8]

Lastly, with respect to the amounts presented for profit and overhead, Nebraska courts generally do not allow profits in *quantum meruit* cases. *Sorenson*, 85 N.W.2d at 904 (stating in dicta that profits may be an element of recovery in a "cost-plus" agreement); *see also Lanphier v. Omaha Public Power Dist.*, 417 N.W.2d 17, 23 (Neb. 1987). Consequently, Waldinger is not entitled to any profit. Similarly, Waldinger is not entitled to overhead because those costs were not shown to be actual costs associated with the installation of the AHU's or work on Unit 5. Rather, overhead and profit were derived from formulas set forth in the RSMeans Manual and thus are not recoverable.

Waldinger is entitled to recover the actual costs of the services rendered and materials furnished in the amount of $755,548.27. The parties agree that WorldCom has already paid $576,000.00 to Waldinger for equipment consisting of the three AHU's. Therefore, Waldinger

---

[8] Since the project manager received an annual salary, he would be paid his salary regardless of the number of projects he was working. There is no evidence presented that the cost of the project manager was in anyway impacted by his assignment to the Data Center project. Therefore, the cost of project manager is arguably not a reimbursement expense attributable to Waldinger's work on the Data Center, but simply non-reimbursable overhead.

15

has an unsecured *quantum meruit* claim in the amount of $179,548.27.

II. Amendment to Waldinger's Proof of Claim

At the Hearing, Waldinger made a motion to amend its proof of claim to increase its claim in the situation where its unsecured claim exceeded the amount listed in its original proof of claim. The Court denies the motion since Waldinger's original proof of claim was in the amount of $371,362.00 and the Court has determined that its claim is now an unsecured claim in the amount of $179,548.27.

## CONCLUSION

In light of the testimony and other evidence produced at the Hearing, the Court finds that the reasonable value of the services provided by Waldinger is $179,548.27. As such, Waldinger's motion to amend its proof of claim to increase its claim is denied.

The parties are directed to submit an order consistent with this opinion and the February 2008 Opinion.

Dated: New York, New York
       August 18, 2009

                                        s/Arthur J. Gonzalez
                                        UNITED STATES BANKRUPTCY JUDGE