UNITED STATES BANKRUPTCY COURT         For Publication
SOUTHERN DISTRICT OF NEW YORK

_____
:
In re                                                   :         Chapter 11
:
WORLDCOM, INC., *et al*.                 :         Case No. 02-13533 (AJG)
:
        Reorganized Debtors.          :         Confirmed Case
_____:

OPINION, FOLLOWING REMAND FROM THE DISTRICT COURT, REGARDING
ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO
THE REORGANIZED DEBTORS' (I) OBJECTION TO PROOF OF CLAIM NO. 38365, AND
(II) MOTION FOR A DETERMINATION OF REFUND RIGHTS PURSUANT TO SECTION
505(a)(1) OF THE BANKRUPTCY CODE

APPEARANCES:

WEIL GOTSHAL & MANGES LLP
Counsel for the Reorganized Debtors
Houston, Texas

       By:    Alfredo R. Perez, Esq.


UNITED STATES DEPARTMENT OF JUSTICE
United States Attorney's Office for the
Southern District of New York
Counsel for the Internal Revenue Service
New York, New York

       By:    Benjamin H. Torrance, Esq.


ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE

      This matter is before the Court on remand from the District Court for certain additional

determinations and findings of fact concerning a dispute between, on one side, Verizon Business

Global LLC, successor in interest to MCI, Inc., together with certain of its affiliates as

reorganized debtors in the above captioned bankruptcy case (collectively, the "Debtors"), and, on the other side, the Internal Revenue Service (the "IRS"). In that regard, the parties currently have motions before the Court seeking entry of their respective proposed findings of fact and conclusions of law. The parties' underlying dispute concerns the Debtors' liability for the telecommunications excise tax under 26 U.S.C. §§ 4251 *et seq.* (the "Excise Tax") with respect to central office based remote access (''COBRA'') services that the Debtors purchased from various Local Exchange Carriers (the "LECs").[1]

Prior to issuing *WorldCom I*, the Court had before it (i) a proof of claim filed by the IRS for certain amounts it alleged were due as Excise Tax; (ii) the Reorganized Debtors' objection (the "Claim Objection") to that proof of claim; and (iii) the Reorganized Debtors' motion (the "Refund Motion") seeking a refund of amounts that had already been paid to the IRS representing Excise Tax. On June 1, 2007, this Court issued its opinion granting both the Claim Objection and the Refund Motion, *WorldCom I,* 371 B.R. 19, and orders (the "Orders") to that effect were subsequently entered. The Orders were appealed to the District Court of the Southern District of New York, which issued its opinion reversing this Court's Orders and remanding the case for further consideration. *See WorldCom II,* Slip Op., 2009 WL 2432370.

In its opinion, the District Court noted that this Court had relied primarily upon a Court of Federal Claims opinion in *USA Choice Internet Service, Inc. v. U.S.,* 73 Fed.Cl. 780 (2006), when this Court reasoned that "section 4252(a) requires that the taxpayer have the privilege to

---

[1]The detailed factual allegations relevant to this matter are set forth in the opinions issued by both this Court, *In re WorldCom, Inc. ("WorldCom I"),* 371 B.R. 19 (Bkrtcy.S.D.N.Y.2007), and the District Court on appeal, *In re WorldCom, Inc. ("WorldCom II"),* No. 07-7414, 08-3070, 2009 WL 2432370 (S.D.N.Y. 2009), and familiarity with those facts is presumed.

both initiate and receive telephonic quality communication. *WorldCom I,* 371 B .R. at 28."[2] *WorldCom II*, 2009 WL 2432370 at *2. Prior to the District Court issuing its ruling, however, the decision of the Federal Court of Claims on that point had been reversed by the Federal Circuit Court in *USA Choice Internet Services, Inc. v. U.S.,* 522 F.3d 1332 (Fed. Cir. 2008). The District Court issued a ruling agreeing with the Federal Circuit Court's interpretation of section 4252(a), and for that reason reversed this Court's orders and remanded the case for further consideration.

Specifically, the District Court requested that this Court "determine whether the COBRA service purchased by Debtors afforded 'access' to a 'local telephone system' as well as 'two-way' or 'full duplex' 'telephonic quality communication.' The District Court further referenced "at least two principal factual issues that must be resolved" to make such determination. The first factual issue referenced was that

> the parties dispute the nature and function of Primary Rate Interface ("PRI") circuits and services in relation to the COBRA service. (More specifically, the parties dispute in the first place whether PRI lines are included in the COBRA service purchased by Debtors. They also dispute whether the data stream produced through the COBRA service could be utilized by telephone equipment such as a Private Branch Exchange ("PBX") to enable communication by telephone between the Debtors and a party connected to the local telephone system. They also dispute whether, even if the data stream may be so utilized, it is within the power of the Debtors to plug in such a PBX.)

*WorldCom II,* Slip Op., 2009 WL 2432370 at *4. Citing this Court's decision, the District Court indicated that a second factual issue requiring resolution was the parties dispute whether the COBRA service can transmit VoIP communication. *WorldCom II,* Slip Op., 2009 WL 2432370

---

[2] As a result of this Court's determination, the resolution of certain factual disputes between the parties was not required for the disposition of the case.

3

at *4 (citing *WorldCom I,* 371 B.R. at 28.). The District Court further noted that 'these issues go to both prongs of section 4252(a) and require factual findings from the Bankruptcy Court." *Id.*[3]

In remanding for these limited factual findings, the District Court also noted that it agreed with certain determinations reached by this Court. Specifically, the District Court noted that it agreed with this Court's reasoning that

> the capability of COBRA service must be assessed as purchased, not in relation to possible configurations . . . the Debtors only have the privileges that they purchased. *WorldCom*, 371 B.R. at 29. Neither self-imposed limitations nor unpurchased hypothetical configurations need be considered in determining whether the COBRA system purchased by Debtors afforded connectivity to a "local telephone system" and "two-way" "telephonic quality communication." The Court need only determine what was purchased and what uses of those purchases the Debtors may make of their own volition and without having to seek permission or additional purchases of the LECs or any other party.

*WorldCom II,* Slip Op., 2009 WL 2432370 at *4.

In light of the District Court's ruling, thereafter, the Debtors filed a motion seeking additional findings of fact and conclusions of law, accompanying the motion with proposed findings and conclusions. The IRS responded by filing a motion seeking entry of its own proposed findings of fact and conclusions of law, and opposing entry of the Debtors proposal. The parties contend that the factual record that was developed before this Court at the evidentiary hearing conducted prior to the issuance of *WorldCom I* has sufficient elements to make any additional findings and conclusions required by the District Court. A hearing on these motions was heard on March 30, 2011.

---

[3]The District Court also referenced certain factual findings that would be required to decide a separate dispute between the parties "concerning COBRA's potential qualification as a 'private communication service' and concomitant exclusion from taxation under section 4252(a)." *WorldCom.,* 2009 WL 2432370 at *5. However, the way in which this matter had been resolved does not require a determination of the "private communication service" issue and, therefore, obviates the need to determine those additional factual issues.

## ADDITIONAL FINDINGS OF FACT[4]

COBRA is a service technology that allows persons using dial-up modems (the "Dial-Up Users") to access the Internet. LECs sold COBRA service, whereby the LECs would aggregate Dial-Up Users' data into transmission control protocol/Internet protocol ("TCP/IP") packets, which are suitable for transmission over the Internet. With COBRA service, the Debtors plugged the output TCP/IP high speed data stream into their network, and sold access to the stream to ISPs, who in turn sold access to Dial-Up Users.

A Dial-Up User would make a telephone call using a modem (through a separately purchased local telephone service) to a telephone number associated with COBRA. The modem data traveled through the public switched telephone network (the "PSTN"), the same network on which traditional telephone calls travel. After traveling from the Dial-Up User using the PSTN, the data passed through a switch at the LECs' central office (the "LEC Switch").

After passing through the LEC Switch, the data traveled along a PRI to the LECs Network Access Server (the "NAS"). The NAS contained several digital signal process ""DSP" cards that aggregated and converted the data from the Dial-Up User's modem into TCP/IP packets. The NAS then transmitted the TCP/IP packets to a high speed router or a frame relay line card via a PRI, both located within the NAS. The TCP/IP packets then traveled on a high speed data line through the egress port of the NAS.

The PRI lines, the DSP cards, and all aspects of the NAS up until the Debtors plugged into the egress port, were COBRA equipment, and thus used by the LECs as part of their provision of COBRA service.

---

[4]These findings of fact are derived from the parties' submissions.

5

The parties agree that there was a path for telephonic quality communications all the way from the Dial-Up Users modem to the DSP card[5] contained in the NAS. The parties further agree that A PRI can plug into a PBX, which is a switch permitting traditional telephone voice communication. The service purchased by the Debtors did not include a PBX connection to the PRI lines. Further, the Debtors contracts did not permit them to access the PRI line to reconfigure it in any way.

The Debtors did not own any of the COBRA equipment. The equipment, including the NAS, all DSP cards, and all PRI lines remained with the LECs at their central offices. The demarcation point between the LECs' equipment and the Debtors' network lay at the egress point of the back of the NAS. The COBRA equipment was behind the LECs locked doors so that the Debtors could not physically access it. The Debtors only had electronic remote access to the COBRA service components. This electronic remote access allowed the Debtors to disable a modem if it was malfunctioning or make limited software changes.

The high speed data stream that resulted from COBRA service was not capable of providing the Debtors with telephonic quality communication. The Debtors could not have obtained a dial tone by plugging a telephone and a telephone jack into the stream. The Debtors were unable to plug in any equipment into the data stream that would have allowed them to have telephonic quality communications.

The PRI lines were capable of transmitting a telephonic quality communication. The capability of a telephonic quality communication existed from the Dial-Up User's modem, through the LEC Switch, to the PRI, but once the path reached the DSPs within the NAS, the

---

[5]The parties interchangeably refer to the DSP card as the modem for the NAS.

6

DSPs converted the data into TCP/IP packets and, from that point on, COBRA service was not capable of transmitting a telephonic quality communication. Because the Debtors did not purchase access to the COBRA equipment or to the LECs' central offices, the Debtors could not access the COBRA service at any point where it was capable of transmitting telephonic quality communications.

The Debtors did not purchase the ability to alter COBRA service. The Debtors did not purchase the ability to plug in a PBX, which is a switch that would permit telephone voice communication. Therefore, the Debtors could not have used a PBX or similar telephone equipment to enable telephonic quality communications within the COBRA service. The Debtors did not have access to any COBRA equipment that would have enabled telephonic quality communication if altered.

Voice over Internet Protocol ("VoIP") is a technology that allows regular voice signals to be converted to packets that are designed to travel on the TCP/IP network. There are two ways to enable VoIp communication: (i) a VoIP gateway, whereby voice TCP/IP packets travel to an LECs' central office, and are converted by the LECs' modems into voice data that can travel on the PSTN to any local telephone number; and (ii) computer to computer VoIP, whereby users convert their voice data into TCP/IP packets on their computer using a VoIP service such as Skype before it is sent over the Internet like any other TCP/IP packet.[6] These two types of VoIP require different equipment.

The COBRA services cannot distinguish between a computer-to-computer VoIP packet

---

[6]Thus, in VoIP gateway, a user send a traditional voice call into the gateway, which converts it to VoIP Internet packets. Whereas, in computer-to-computer VoIP, the conversion from voice to IP packets takes place on the Dial-Up User's own computer, and these packets generated by the computer are similar to any other voice or non-voice packets that travel over the Internet.

7

carrying a packetized voice transmission and any other non-voice packet coming out of a dial-up user's computer.

The relevant contracts between the Debtors and various LECs (the "COBRA Contracts") prohibited the Debtors from adding any VoIP capability without renegotiating with the LECs. One such agreement read:

> Should [the Debtors] wish to directly use the COBRA Services to directly provide any one-way or two-way voice telephony communications, whether local or long distance ("VoIP"), [the Debtors] and Vendor shall negotiate terms, conditions, and rate structures that are applicable to VoIP prior to [the Debtors] utilizing the COBRA Services to directly provide VoIP.

The parties agree that the Debtors could not have used gateway VoIP with COBRA service. A VoIP gateway requires that an LEC utilize certain DSP cards in the NAS that are capable of converting incoming VoIP packets into voice data that can travel over telephone lines. COBRA service, as configured pursuant to the COBRA Contracts, did not use any DSP cards that were capable of serving as a VoIP gateway.

The parties agree that the Debtors did not have any access to the DSP cards, which were inside the NAS, in the LECs' central offices. The parties further agree that the Debtors did not have the contractual right to enable a VoIP gateway.

Prior to the Debtors commencing to decommission the COBRA service, computer to computer VoIP was not possible with COBRA service because the technology then available with the COBRA service was too slow to enable it. Based upon the testimony, the speed of service that COBRA could maintain would result in the communication being garbled and unintelligible when converted from data to voice. Therefore, the COBRA service could not

8

provide telephonic quality communication for computer to computer VoIP.[7]

The Debtors paid for COBRA on a bundled, monthly per port basis. The price of the port includes all access to the PSTN. The monthly charge that the Debtors paid for COBRA services (i) excluded the egress circuits that connected COBRA to the Debtors' network; (ii) did not vary with the volume carried by each port; (iii) did not vary with the content of the packet - - whether representations of voice or data – sent over COBRA; and (iv) would not have varied if VoIP packets were sent over COBRA.

However, as previously noted, under the COBRA Contracts, the Debtors did not have the right to utilize the COBRA services to directly provide VoIP service or request that the provider reconfigure the system to allow for such service unless the terms, conditions, and rate structures applicable to VoIP service were first renegotiated.

Conclusions of Law

Pursuant to the Internal Revenue Code (the "IRC"), a three percent excise tax is imposed on "communications services," including "local telephone service." *USA Choice*, 522 F.3d at 1335 (citing 26 U.S.C. § 4251(a)(1) & (b)(1)(A)).[8] Section 4252(a) of the IRC defines "local telephone service" is defined as

---

[7] Telephonic quality requires "a communication channel over which it [i]s possible to have a two-way conversation with the use of telephones." *USA Choice Internet Services, LLC v. United States*, 522 F.2d 1332, 1341 n.2 (Fed. Cir. 2008) (*quoting*, *USA Choice Internet Serv., LLC v. United States*, 73 Fed. Cl. 780, 783 & n.7 (2006)).

[8] In relevant part, 26 U.S.C. § 4251 provides
(a) Tax imposed.--
(1) In general.--There is hereby imposed on amounts paid for communications services a tax equal to the applicable percentage of amounts so paid.
(2) Payment of tax.--The tax imposed by this section shall be paid by the person paying for such services.
(b) Definitions.--For purposes of subsection (a)--
(1) Communications services.--The term "communications services" means--
(A) local telephone service;
(B) toll telephone service; and
(C) teletypewriter exchange service.

9

> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and
> (2) any facility or service provided in connection with a service described in paragraph (1).

26 U.S.C. §4252(a). Section 4252 further provides that "local telephone service" does not include "toll telephone service"' or a "private communication service" as defined in the subsections (b) and (d) of section 4252.

The expert witnesses in this case defined telephonic quality communication as the quality of communication necessary to and present in a voice telephone call. It appears that "'telephonic quality' requires a communication channel over which it is possible to have a two-way conversation with the use of telephones." *USA Choice*, 522 F.3d at 1341 n.2 (citing *USA Choice*, 73 Fed. Cl. at 794 & n. 24); *see also* IRS Rev. Rul. 79-245, 1979-2 C.B. 380 (1979) (equating telephonic quality communication with *voice* communication).[9]

In this case, the Debtors only purchased access to a high speed data stream that resulted

---

[9] In its 2007 decision, the *Comcation* court made the observation that "any distinction between voice and data communications has long become outdated in the face of [VoIP] technology, which allows the routing of realtime, two-way voice communications over the Internet or any other packetized communications network", *Comcation*, 78 Fed. Cl. at 72 n.18 (citing. *See Vonage Holdings Corp. v. FCC,* 489 F.3d 1232, 2007 WL 1574611 (D.C.Cir. Jun.1, 2007). The *Comcation* court's observation that the absence of voice communication was irrelevant was premised upon availability of technological advances by that time that were capable of voice communication. However, as evident from the expert testimony adduced at trial in the instant matter, during the period in which the COBRA services were provided here, there was a clear dispute as to whether that service had the capability to transmit a viable VoIP communication. Therefore, preserving the previously applied requirement for "voice" communication to the instant matter is appropriate. Nor does the fact that the statute does not use the term "voice" dictate otherwise. The statute requires the privilege of "telephonic quality" communication. The reference to "telephonic quality" was added in 1965 and, as often noted, that term was not defined. The lack of a definition was likely the consequence of the common perception, at that time, that telephone quality had to be capable of comprehendible voice communication.

To be clear, the Court is not relying on the fact that ISPs could not have been contemplated when the statute was enacted to preclude its application to this more recent technology. Rather, the Court is analyzing the language used in the statute, in the context of the common understanding of the terms employed at the time of its enactment, to conclude that the tax was meant to be imposed on services that were capable of voice quality communication. Inasmuch as the Court finds that the configuration of the COBRA services purchased here was not capable of any viable voice quality communication, the tax does not apply.

from the COBRA service the LECs provided. As configured, the Debtors were able to access only the high speed data stream. That data stream was incapable of providing the Debtors with telephonic quality communication. The limitations on the configuration was inherent to the right purchased, not self-imposed by the Debtors in how they directed the counter-party to configure the access. Thus, the configuration was dictated by the rights the Debtors purchased. Therefore, the Debtors did not purchase access to a local telephone system or the privilege of telephonic quality communications with persons constituting a local telephone system.

The Debtors may only be taxed on services actually purchased, not hypothetical configurations that they could have purchased from the LECs. The COBRA service as purchased by the Debtors was not a local telephone service. The Debtors may not be taxed for services if they would be required to negotiate new terms, conditions and rate structures from the LECs in order to access those services. Although certain telephonic quality services may have been technologically possible if a different configuration had been purchased, the Debtors contractual arrangement did not permit for such configuration. Any such configuration would have required additional negotiation concerning the terms, conditions and rate structures contained in the COBRA Contracts.

Thus, although it might have been possible to enable voice communications by plugging telephone equipment such as a PBX into the PRI circuit, the Debtors did not purchase the ability to do so, and could not do so because they lacked physical access to the PRI lines. Therefore, the Debtors did not purchase the privilege of telephonic quality communications by virtue of the PRI being part of the COBRA service.

The Debtors did not purchase gateway VoIP communication capability for COBRA

11

service.  Under the COBRA Contracts, the Debtors would have had to renegotiate the terms, conditions, and rate structure, if they wished to add gateway VoIP capability.  Thus, the Debtors did not purchase the privilege of telephonic quality communication by way of a VoIP gateway communication.

The Debtors purchased COBRA service, including the DSP cards, as configured within the NAS.  The DSP cards used did not have the capacity to be used as a VoIP gateway, meaning the service the Debtors purchased did not have the ability to be used as a VoIP gateway.  Therefore, the Debtors did not have access to a local telephone system or the privilege of telephonic quality communications with substantially all persons constituting that local telephone system by way of a VoIP gateway.

The Debtors would have needed permission and access to the LECs' central offices if they wished to enable a VoIP gateway because they would have needed to change the DSP cards.  The Debtors did not purchase the ability to make any such alterations.  Further, without renegotiating the terms and rates of the COBRA Contracts, the Debtors could not direct the LECs to reconfigure the COBRA system to allow for VoIP gateway.  Therefore, the Debtors did not have access to a local telephone system or the  privilege of telephonic quality communication with substantially all persons constituting that local telephone system through use of a VoIP gateway.

Further, computer-to-computer VoIP over the COBRA services purchased would have been too garbled and unintelligible for telephonic quality communication.  Based upon the testimony of the expert witnesses, the configuration of the COBRA system could not have supported the speeds necessary to allow for computer to computer VoIP communication with the

technology available during the period prior to the Debtors commencing to decommission the services. At a minimum, even if such technology were available at that time, there is no indication that the COBRA system services purchased by the Debtor were configured with the necessary technology to allow for such computer-to-computer VoIP communication. Thus, VoIP service was not technologically feasible. Therefore, the putative VoIP capability does not provide a separate basis for applying the excise tax to the COBRA services purchased by the Debtors.

The COBRA services purchased by the Debtors is legally distinguishable from the services described in *Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128 (1990), *USA Choice Internet Services, LLC v. United States*, 522 F.3d 1332 (Fed. Cir. 2008 (2008), and Revenue Ruling 79-245, 1979-2 C.B. 380, wherein taxpayers received data streams or services that, when they reached the taxpayers, were capable of telephonic quality communication. By contract, COBRA service was not capable of telephonic quality communication at its egress point. COBRA service's limitations are inherent as purchased by the Debtors, whereas the limitations in the cited cases were self-imposed by the taxpayers.[10]

The COBRA system configuration did not result from the Debtors' self-imposed limitations. Instead, the configuration was a function of the services actually purchased, which services were inherently incapable of being used more expansively. *See Comcation*, 78 Fed. Cl. at 65 (noting that "section 4252(a) distinguishes between, on the one hand, inherent limitations

---

[10]In the cited cases, the limitation in the service was a "product of how plaintiff itself decided to configure those lines." *See* Comcation, 78 Fed. Cl. at 65. In our case, it was not the Debtors decision to configure the system that way. Rather, it was a limitation imposed by the contractual agreement, *i.e.*, it was dictated by the rights purchased. The Debtors could neither alter the configuration nor direct the provider to reconfigure the system without renegotiating the terms, conditions and rate structure.

associated either with the capacity of equipment or the contractual right to use it, and, on the other, those voluntarily associated with the way a given taxpayer chooses to use a particular service"). If the Debtors desired a configuration that would provide them with the privilege of telephonic quality communication, they were required to renegotiate the terms and rates of their agreements for such capability with the COBRA service. The inherent limitations of the configuration of the system were associated with the Debtors' contractual rights to use the system. It was an inherent limitation of the services purchased. Thus, the Debtors carried their burden to show that the system was not appropriately configured to provide them with the privilege of telephonic quality communication.

The Debtors were physically, contractually, and technologically incapable of altering COBRA service to obtain access to telephonic quality communication. Several alterations to the LECs' equipment - alterations which the Debtors' contracts, as negotiated, did not permit - would have been required to allow for voice quality communication. Moreover, the Debtors did not have access to the LECs COBRA equipment to unilaterally reconfigure such equipment to enable voice communication with the local telephone system.

Therefore, the COBRA services purchased by the Debtors are not subject to the § 4251 excise tax because they did not provide the Debtors with access to the local telephone system and the privilege of telephonic quality communication.

Because the Debtors met their burden of production and persuasion in challenging the validity of the federal excise tax, as applied to COBRA service, the Objection is granted, and the Court grants the relief requested in the Refund Motion as set forth in the Stipulation and Order.

An order consistent with these findings of fact and conclusions of law will be entered contemporaneously herewith.

Dated: New York, New York
June 15, 2011

s/Arthur J. Gonzalez
CHIEF UNITED STATES BANKRUPTCY JUDGE